## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CYNTHIA WARMBIER, individually and as personal representative of the Estate of Otto Warmbier**, | ) ) ) ) |
| **FREDERICK WARMBIER, individually and as personal representative of the Estate of Otto Warmbier**, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) )     Civil Case No. 1:18-cv-00977 |
| **DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA**, c/o Foreign Minister Ri Yong Ho Ministry of Foreign Affairs Jungsong-Dong, Central District Pyongyang, DPRK | ) ) ) ) ) ) ) ) |
| Defendant. | ) ) ) |

## COMPLAINT

Plaintiffs, the surviving parents of Otto Warmbier, allege as follows:

## INTRODUCTION

1.      This action is brought against the Democratic People's Republic of Korea ("North Korea") pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*.  It arises from North Korea's hostage taking, illegal detention, torture and killing of a young American tourist, Otto Warmbier ("Otto").  In an attempt to extract various concessions from the United States government, North Korea detained Otto, forced him to falsely "confess" to an act of subversion on behalf of the United States government, tortured him, kept him in detention for a year and a half without allowing him to communicate with his family, and returned him to them

in a non-responsive state and brain dead.  As a direct and proximate result of North Korea's actions, Otto died at 22, mere days after his release.  North Korea has repeatedly lied about the causes of Otto's condition and refuses to acknowledge its abhorrent actions.  In fact, North Korea, which is a rogue regime, took Otto hostage for its own wrongful ends and brutally tortured and murdered him.  Plaintiffs are Otto's parents, who bring this lawsuit on their own behalf and on behalf of Otto to obtain justice for the severe injuries North Korea has caused them to endure.

## **THE PARTIES**

2.      Otto died at age 22 on June 19, 2017 in Cincinnati, Ohio after enduring torture, extreme emotional distress and mental anguish, and other mistreatment at the hands of North Korea.  Upon his death and for the entire period of time underlying this lawsuit, Otto was a national of the United States and a domiciliary of Ohio.

3.      Plaintiffs Cynthia Warmbier ("Cindy") and Frederick Warmbier ("Fred") are the mother and father of Otto.  They are now, and have been for the entire period of time underlying this lawsuit, nationals of the United States and domiciliaries of Ohio.  As a result of their son's torture and death, Cindy and Fred have each experienced the loss of their son's society, companionship, comfort, advice and counsel and have suffered severe mental anguish, extreme emotional distress and solatium damages.

4.      Cindy and Fred were appointed the co-administrators of the estate of Otto Warmbier on September 14, 2017.  In addition to acting on their own behalf, they bring this action as the personal representatives for the exclusive benefit of the heirs of Otto.

5.      Defendant North Korea is a foreign state within the meaning of 28 U.S.C. § 1603, and includes its officials, employees, agents, and other instrumentalities.

6.      Defendant North Korea was designated as a state sponsor of terrorism pursuant to section 6(j)(i) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), and as continued in effect by Executive Order 13222 of August 17, 2001, section 620A(a) of the Foreign Assistance Act of 1961, Public Law 87-195, as amended (22 U.S.C. 2371(c)), and section 40(f) of the Arms Export Control Act, Public Law 90-629, as amended (22 U.S.C. 2780(f)), on or about November 17, 2017.  82 Fed. Reg. 56100 (Nov. 27, 2017).  It was so designated as a result of the acts herein described.  28 U.S.C. § 1605A(a)(2)(A)(i)(I).

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1330(a), 1367, and 1605A because North Korea committed acts of torture, hostage taking, and extrajudicial killing.

8.      This Court has personal jurisdiction pursuant to 28 U.S.C. § 1330(b) because it has subject matter jurisdiction pursuant to 28 U.S.C. § 1330(a) and because service of this Complaint is being made pursuant to 28 U.S.C. § 1608.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4).

## FACTUAL ALLEGATIONS

### North Korea's Detention, Hostage Taking, Torture, and Killing of Otto

10.      North Korea, through its officials, employees, agents, and other instrumentalities, intentionally ordered, directed and caused the torture, hostage taking, and extrajudicial killing of Otto and the resulting harm to Plaintiffs.

11.      Otto was born on December 12, 1994 in Cincinnati, Ohio.  He was Fred and Cindy's first child, and the older brother to Fred and Cindy's other two children, Austin and G.W.

12.     Otto graduated as the salutatorian of Wyoming High School in 2013 and was a National Merit scholar and homecoming king.  He enrolled in the University of Virginia ("UVA") later that same year.  At UVA, Otto pursued a major in economics and had earned enough credits to graduate as a sophomore.  Otto also spent one summer studying at the London School of Economics.  Otto loved working with numbers and learning about the management of companies, working for a time at an investment bank on Wall Street. He planned to pursue further education in the fields of business and finance.

13.     Otto was an athletic young man and was the captain of the soccer team in high school.  Prior to his hostage taking and torture in North Korea, he never had any significant health issues, had no scarring or wounds on his feet and had straight, well-aligned teeth.

14.     In the spring semester of Otto's junior year at UVA, Otto was scheduled to participate in a study abroad program in Hong Kong.  Prior to the scheduled beginning of that program, Otto traveled in Asia in December 2015.  Otto had turned 21 years old earlier that month.

15.     During that trip, Otto took a tour to North Korea through Young Pioneer Tours, a China-based tour operator that catered to Westerners.  Otto believed this was an opportunity to understand how people lived in one of the only closed societies in the world.  Although the State Department later banned Americans from traveling to North Korea less than a month after Otto's death, citing "mounting concerns over the serious risk of arrest and long-term detention under North Korea's system of law enforcement," at the time of Otto's trip hundreds of Americans visited North Korea each year.

16.     North Korea is a single-party, totalitarian state.  Kim Jong Un is the country's marshal and the supreme commander of the Korean People's Army.  As reported in the State

Department's 2016 Human Rights Report for the country, citizens do not have the ability to choose their own government and "[t]he judiciary was not independent and did not provide fair trials."

17.     Earlier in December 2015, the same month Otto arrived in North Korea, the United States had announced new sanctions on North Korea over its weapons proliferation activities.

18.     Otto's tour in North Korea lasted five days.  When his tour group was at the Pyongyang Sunan International Airport on their scheduled departure date of January 2, 2016, Otto was suddenly and without explanation detained while going through security by North Korean officials, and was prevented from leaving the country with the rest of the group.

19.     Just four days later, North Korea claimed that it had conducted a successful test of a nuclear hydrogen bomb.  It stated that the test was conducted to enhance its self-defense capabilities against the United States.  This was the first time in three years that it had reported detonating a nuclear weapon.

20.     Nearly three weeks after Otto's initial detention, on January 22, 2016, North Korea's state media outlet, the Korean Central News Agency ("KCNA") – a *de facto* mouthpiece for the regime – reported that Otto had been arrested for perpetrating a hostile act against North Korea.  The report stated that he entered the country under the guise of being a tourist and plotted against North Korea under the manipulation of the U.S. government.

21.     Just over two weeks after that announcement, on February 7, 2016, North Korea fired a long range rocket.  The launch was subsequently condemned by the United Nations as using ballistic missile technology, and the U.S. House of Representatives condemned it in a resolution later that month.  H. Con. Res. 116.

22.     On February 18, 2016, the United States imposed expanded sanctions on North Korea.  North Korea Sanctions and Policy Enhancement Act of 2016 (H.R. 757, Pub. L. 114–122).

Versions of this legislation had been pending in the House and Senate since February (House) and July (Senate) 2015.

23.     Later that month, on February 29, 2016, North Korea forced Otto to make a false "confession" during a televised "press conference" that was actually the words of the North Korean regime forced through Otto's mouth.  The statement was televised and released by North Korea to provide a façade of legitimacy to their lawless hostage taking of Otto, and to connect his continued detention to U.S. government policy towards North Korea.  After being escorted in by uniformed guards, Otto read the prepared statement.  The statement and his answers to the planned questions that followed were claiming facts that were untrue, scripted and coerced, using extremely unnatural language consistent with the language typically employed by the North Korean regime and not that of a 21-year old American college student.  Otto was distraught during the conference, pleading for help to save his life several times and begging for forgiveness and to be returned home to his family.

24.     Otto began by "beg[ging] for any assistance to save my life."  He "confessed" to the crime of taking down a political slogan in the staff-only area of the hotel where his tour group was staying.  He stated that this "task was given by the Friendship United Methodist Church," a church in Cincinnati, in exchange for the promise of a used car, so that the poster could be hung in the church "as a trophy."   Otto explained that "[t]he United States administration and the politicians use the Friendship United Methodist Church to harm the DPR Korea by all dirty ways and means."  In fact, Otto had no contact with the Friendship United Methodist Church and it is not used by the U.S. government in the manner falsely alleged.  Otto also stated that he prepared extensively for this crime before departing the United States, including that he "intentionally packed my quietest boots, the best for sneaking."

25.     Otto further stated that his "crime" was conducted "[a]t the encouragement of the Z Society," a secret society at UVA that Otto stated was "closely linked" to the CIA, and at "the connivance of the United States administration."  In fact, Otto had no contact with the Z Society, and it is not linked to the CIA. He referenced actions of the U.S. government throughout his statement, including claiming to be "a victim of the United States administration's consistent, hostile policies against the DPR Korea."  The press conference ended with Otto providing obviously prepared answers he was forced to provide in response to scripted questions from the audience.

26.     Several days after Otto's statement, on March 2, 2016, the United Nations Security Council voted unanimously to impose additional penalties against North Korea in response to its nuclear test in January.  Res. 2270 (March 2, 2016).

27.     The following day, on March 3, 2016, Kim Jong Un threatened preemptive nuclear strikes and ordered his country's nuclear weapons to be ready for use at a moment's notice.  On March 10, 2016, North Korea fired two Scud missiles.

28.     Just over two weeks after Otto's false "confession" at the press conference, on March 16, 2016, KCNA reported that an hour-long "trial" was held where Otto was convicted by the non-independent judiciary of North Korea of a charge of state subversion and sentenced to fifteen years of hard labor.  KCNA stated that Otto committed the act "pursuant to the U.S. government's hostile policy" towards North Korea.  Only short excerpts of the "trial" were released, and no public court records are available.  In the video clips that were released, Otto's hands appeared turned inward in an unnatural position.  The event was called a "kangaroo court" by Human Rights Watch.  U.S. State Department spokesman Mark Toner commented that it was

"clear" that DPRK was using Otto "for political purposes."  Chicago Tribune, *North Korea sentences Virginia student to 15 years hard labor* (Mar. 16, 2016).

29.     The day before Otto's "trial," President Obama had signed an Executive Order imposing a variety of sanctions on North Korea, citing its "continuing pursuit of nuclear and missile programs."  Executive Order 13722 of March 15, 2016, 81 Fed. Reg. 14943.  North Korea held Otto's "trial" on the day this Executive Order was to become effective.  *Id.* at 14946 (effective date of March 16, 2016).

30.     Two days after Otto's "trial" and sentencing, North Korea launched two mid-range ballistic missiles.

31.     Otto languished in North Korean detention for an additional fifteen months after his "trial," for a total of seventeen and a half months.  During this time Otto was never allowed to communicate with family by any means.  North Korea did not allow information about Otto to be released for well over a year, leaving his family in agony wondering whether he was healthy and safe.

32.     During this time, North Korea repeatedly demanded to U.S. government officials that the United States take various actions, such as removing sanctions, as a condition of Otto's release.   As these demands were unsuccessful, North Korea escalated its rhetoric, calling Otto a prisoner of war and a war criminal.

33.     On July 6, 2016, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") imposed additional sanctions, designating top officials of the North Korean regime, including Kim Jong Un, "for having engaged in, facilitated, or been responsible for an abuse or violation of human rights."   A top official stated that the sanctions "highlight the U.S. Government's condemnation of this regime's abuses and our determination to see them stopped."

U.S. Department of the Treasury, *Treasury Sanctions North Korean Senior Officials and Entities Associated with Human Rights Abuses* (July 6, 2016), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0506.aspx.

34.     Several bills that would impose increased sanctions on North Korea were also pending in the House of Representatives during this time.   *See* H.R. 5208 (North Korea State Sponsor of Terrorism Designation Act of 2016); H.R. 6281 (Block Access to North Korea Act of 2016).

35.     Throughout the period of Otto's detention, North Korea continued to escalate its program of almost monthly rocket and missile launches.  It also continued its nuclear efforts, announcing on September 9, 2016, that it had conducted a "higher level" nuclear warhead test.

36.     Over a year after Otto's "trial," in early June 2017 the Warmbiers were notified by a State Department official that Otto was in a coma and had been in that condition for a year.  After further meetings between government representatives, North Korea released Otto from its custody, and he was medically evacuated to Cincinnati, Ohio, arriving on June 13, 2017.

37.     The physician on the flight that evacuated Otto from North Korea has stated that the hospital in Pyonyang from which Otto was retrieved had poor sanitary conditions, antiquated equipment and personnel shortages, and that he believed that North Korea might not release Otto unless he wrote a falsely positive evaluation of Otto's medical condition.  Neil McGahee, *Bringing Otto Home*, The Daily Tribune News (Feb. 24, 2018).

**Otto's Return to the United States and Untimely Death**

38.     Otto's parents were at the airport in Cincinnati when the plane carrying Otto landed. When they arrived on the plane, they were stunned to see his condition.  Otto was blind and deaf. He had a shaved head, a feeding tube coming out of his nose, was jerking violently and howling,

and was completely unresponsive to any of their efforts to comfort him.  They also noticed that his once straight teeth were now misaligned and had been forced into abnormal positions, particularly in the front of his mouth.

39.     Otto was transported to the medical center at UC Health where physicians conducted a number of tests.  Based on those tests and their observations, they concluded that he was severely brain damaged and that his condition was unrecoverable.  They also concluded that his extensive loss of brain tissue was caused by an earlier hypoxic-ischemic brain injury caused by the cessation or severe reduction of blood flow to the brain.  When Otto originally traveled to North Korea, he was a healthy and physically active young man and had no physical condition that would cause the cessation or severe reduction of blood flow to the brain that occurred while he was in North Korean custody.

40.     A highly incomplete set of medical records that arrived from North Korea with Otto showed that brain damage existed on a scan dated April 2016, a month after his trial.

41.     Otto's family and physicians also observed a scarred wound on Otto's left foot, not present prior to his departure for Asia in December 2015.  North Korea has offered no explanation for this wound.

42.     Otto's physicians concluded that his condition would never improve.  Thus, Fred and Cindy instructed physicians to provide palliative care measures and cease feeding and breathing assistance.  Otto died on June 19, 2017, at the age of 22, of the injuries inflicted by North Korea.  North Korea caused Otto's severe and unrecoverable brain damage, and placed Otto in a condition where he could not survive on his own.  Otto's tragic death was directly and proximately caused by and was a direct and foreseeable result of the torture and mistreatment that North Korea and its agents inflicted upon Otto.

43.     Cognizant of its illegal actions and in an effort to explain how a formerly healthy 21-year-old man could end up in such a condition, North Korea has falsely claimed that Otto contracted botulism and was then given a sleeping pill.   Otto's physicians conducted an electromyography test and found no evidence of botulism or the lasting nerve damage that would be expected had Otto contracted botulism in the past.   Botulism also would not typically cause the cessation of blood flow to the brain that was the cause of Otto's injury.   Nor would a sleeping pill be a treatment for botulism.   North Korea's false explanations for Otto's condition demonstrate that is it covering up its torture and mistreatment of Otto while he was in North Korean custody.

44.     After Otto's death, North Korea released a lengthy statement on June 23, 2017 including the following.   These statements confirm that North Korea detained and continued to detain Otto in connection with its policy disputes with the United States:

- Otto had acted "on an assignment from an anti-DPRK plot-breeding organization of the U.S." and the CIA.

- "Although we had no reason at all to show mercy to such a criminal of the enemy state, we provided him with medical treatments and care with all sincerity on humanitarian basis until his return to the U.S., considering that his health got worse."

- "Warmbier is a victim of policy of 'strategic patience' of Obama who was engrossed in utmost hostility and negation against the DPRK and refused to have dialogue with the DPRK."

45.     As recently as the fall of 2017, North Korea has continued to evade and lie about the cause of Otto's death, calling it a "mystery" and blaming it on the United States' government. The New York Times, *In North Korea, Confronting Them on the Death of Otto Warmbier* (October 5, 2017).

46.     United States officials have publicly confirmed that North Korea tortured and killed Otto.   For example:

- The *New York Times* reported on June 14, 2017 that "[a] senior American official has said the United States obtained intelligence reports that [Otto] had been repeatedly beaten." Choe Sang-Hun, Austin Ramzy, & Motoko Rich, Otto Warmbier Got an Extra Dose of Brutality from North Korea. The Mystery is Why, N.Y. Times, June 14, 2017, https://www.nytimes.com/2017/06/14/world/asia/north-korea-otto-warmbier-.html.

- President Trump stated on September 26, 2017 that "Otto was tortured beyond belief by North Korea." Donald J. Trump (@realDonaldTrump), Twitter (Sept. 26, 2017, 4:14 AM), https://twitter.com/realdonaldtrump/status/912636538156146688?lang=en.

- Senator John McCain, the chairman of the Senate Armed Services Committee, stated on June 19, 2017 that Otto was "tortured and murdered by [North Korea]." John McCain (@SenJohnMcCain), Twitter (June 19, 2017, 3:42 PM) https://twitter.com/senjohnmccain/status/876933249007747072?lang=en

- U.N. Ambassador Nikki Haley stated on July 5, 2017 that "Otto Warmbier is but one person out of millions who have been killed, tortured, or deprived of their human rights by the North Korean regime." Nikki Haley, U.S. Permanent Representative to the U.N., Remarks at an Emergency UN Security Council Meeting on Nonproliferation in the DPRK (July 5, 2017), https://usun.state.gov/remarks/7890.

**Relevant Background on North Korea**

47.     Otto Warmbier is not the first innocent American to be taken hostage, tortured, and killed by North Korea. In fact, North Korea's history and practice teaches that it regularly seizes and detains innocent Americans to support the regime's agenda. As Human Rights Watch reported in the wake of Otto's death, North Korea has a "practice of seizing foreign nationals for political purposes." Phil Robertson, *Death of Otto Warmbier Highlights North Korea Rights Abuses*, Human Rights Watch (June 20, 2017), *available at* https://www.hrw.org/news/2017/06/20/death-otto-warmbier-highlights-north-korea-rights-abuses.

48.     Indeed, courts in this Circuit have previously held that North Korea has committed torture, extrajudicial killing, and/or hostage taking in at least two previous cases. In *Massie v. The Government of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57 (D.D.C. 2008),

the court held that several members of the crew of the naval vessel USS Pueblo were victims of torture and hostage taking by North Korea during a year of detention in 1968. One "common and extremely painful torture was to force a captive to hold a chair above his head while kneeling or squatting with a board or stick behind his knees." *Id.* at 64. Physical beatings "were accompanied by intimidation and threats that the crew members would be shot as spies if they did not confess." *Id.* The goal of this treatment was "to extract confessions from them that they were spying on North Korea in North Korean waters," so that the United States would apologize for that incursion. *Id.* at 65, 67.

49. In *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014), the court held that North Korea was responsible for the kidnapping, torture and extrajudicial killing of an American reverend providing humanitarian services to North Korean refugees and defectors. The court pointed to expert testimony that "a foreigner abducted by the DPRK for political purposes . . . would have been singled out for exceptionally painful, brutal, and outrageous treatment" and that the victim in that case likely died "as a result of his torture and malnutrition." *Id.* at 1050.

50. Other recent U.S. prisoners in North Korea who were eventually returned home have described the physical and mental abuse they experienced. For example, Laura Ling, a journalist, was kicked in the face and shoulder and struck with a rifle butt in the head. Laura Ling & Lisa Ling, *Somewhere Inside* 17-18 (2011). She was also threatened with death if she did not falsely confess to an offense she did not commit. *Id.* at 38. Similarly, Kenneth Bae, an evangelical Christian missionary, was interrogated for up to fifteen hours a day for a month and threatened with death numerous times. Kenneth Bae with Mark Tabb, *Not Forgotten* 55, 58 (2016); Rick Gladstone, *Kenneth Bae, Longest-Held U.S. Prisoner of North Korea, Reveals Details of Ordeal*,

N.Y.      Times      (May      2,      2016),      *available*      *at*
https://www.nytimes.com/2016/05/03/world/asia/kenneth-bae-longest-held-us-prisoner-of-north-korea-reveals-details-of-ordeal.html.

51.      A 2016 State Department report noted that defectors from North Korea "continued to report extrajudicial killings, disappearances, arbitrary detention, arrests of political prisoners, and torture.  The judiciary was not independent and did not provide fair trials."  U.S. State Department, *Democratic People's Republic of Korea 2016 Human Rights Report* at 1.  "Numerous defector accounts and NGO reports described the use of torture by authorities in several detention facilities:"

> Methods of torture and other abuse reportedly included severe beatings; electric shock; prolonged periods of exposure to the elements; humiliations such as public nakedness; confinement for up to several weeks in small 'punishment cells' in which prisoners were unable to stand upright or lie down; being forced to kneel or sit immobilized for long periods; and being hung by the wrists or forced to stand up and sit down to the point of collapse.  Mothers were in some cases reportedly forced to watch the infanticide of their newborn infants.

*Id.* at 3.  Many prisoners die from the torture they suffer.  *Id.*   Moreover, "political prisoners were subject to harsher punishments and fewer protections than other prisoners and detainees."  *Id.* at 9.

52.      While only North Korea knows precisely what torture and mistreatment it inflicted on Otto—and so far it has chosen to release only patent falsehoods regarding its actions—the backdrop of North Korea's longstanding and consistent abuse and mistreatment of American detainees and other political prisoners, combined with his conditions and injuries upon release, demonstrate that North Korea tortured Otto and deliberately caused his death.

**U.S. Re-listing of North Korea as a State Sponsor of Terrorism**

53.     North Korea was designated by the State Department as a State Sponsor of Terrorism from 1988 to 2008.

54.     On October 20, 2017, sixteen Congressmen sent a letter to the Secretary of State Rex Tillerson urging him to list North Korea as a state sponsor of terrorism, noting that since it "was removed from the State Sponsors of Terrorism list in 2008, the Kim regime has repeatedly perpetrated or supported heinous acts, the most recent example of which was the illegitimate detention, murderous mistreatment, and tragic death of Otto Warmbier."

55.     On October 24, 2017, the House passed the "Otto Warmbier North Korea Nuclear Sanctions Act," H.R. 3898, which House Majority Leader Kevin McCarthy described as "the most far-reaching sanctions Congress will ever have imposed on North Korea. . . .  Those who do business with North Korea support a brutal dictatorship that tortured and murdered Otto Warmbier—not because he committed a crime or threatened the North Korean government in any way, but because he was an American."  On November 7, 2017, the U.S. Senate Committee on Banking, Housing and Urban Affairs passed the "Otto Warmbier Banking Restrictions Involving North Korea Act of 2017."

56.     On November 20, 2017, President Trump announced that he was re-designating North Korea as a state sponsor of terrorism.  He stated that "[a]s we take this action today our thoughts turn to Otto Warmbier, a wonderful young man, and the countless others so brutally affected by the North Korean oppression."   The official listing by the U.S. Department of State was published a week later.  82 Fed. Reg. 56100 (Nov. 27, 2017).  This relisting of North Korea was a result of its torture, hostage taking and extrajudicial killing of Otto and the related circumstances giving rise to this complaint.

**FIRST CLAIM FOR RELIEF**
**ACTION FOR DAMAGES UNDER 28 U.S.C. § 1605A(c)**

57.     The preceding allegations are incorporated and re-alleged as if fully set forth herein.

58.     Anti-terrorism provisions codified at 28 U.S.C. § 1605A establish a federal cause of action against North Korea for the personal injury and death it caused by committing the hostage taking, torture and extrajudicial killing of Otto.  Section 1605A(c) provides that a private right of action for personal injury or death lies where:

> a) The defendant is a foreign state was designated as a state sponsor of terrorism at the time the relevant acts occurred or was so designated as a result of such acts, and remains so designated when the claim is filed;

> b) The plaintiff is a national of the United States or a legal representative of a national of the United States;

> c) The defendant committed, among other things, hostage taking, torture, and/or extrajudicial killing that caused plaintiff's personal injury or death; and

> d) The court has jurisdiction, which, in addition to the elements just described, requires that where the relevant acts occurred in the foreign state against which the claim has been brought, the plaintiff "has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration."

59.     All necessary elements of Section 1605A(c) are satisfied here.  North Korea was designated as a state sponsor of terror as a result of its treatment of Otto and remains so designated at the time this action is filed.  *Supra* ¶¶ 6, 56.  All Plaintiffs are and were U.S. nationals.  *Supra* ¶ 3.  North Korea's treatment of Otto constituted hostage taking, torture, and extrajudicial killing, as described below.  This Complaint will be served on North Korea along with an offer to arbitrate.  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003).

60.     "Hostage taking" is defined under Section 1605A(h) as having the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages, which in turn provides:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridicial person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

United Nations, *International Convention against the taking of hostages*, No. 21931, Article I (Dec. 17, 1979). Here, North Korea detained and continued to detain Otto in an effort to extract concessions from the United States to cease sanctions and allow its continued weapons proliferation, and expressly demanded such concessions from U.S. government officials as a condition of Otto's release. North Korea timed key public events in Otto's detention in conjunction with sanctions, nuclear testing, and missile launching, intentionally linking Otto's detention to its strategic objectives. Further, North Korea stated after Otto's death that Otto was a victim of the United States' refusal to negotiate with North Korea.

61. Section 1605A(h) defines "torture" by reference to Section 3 of the Torture Victim Protection Act ("TVPA") of 1991, 28 U.S.C. § 1350 note, which states:

> (1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual . . . information or a confession, punishing that individual for an act that individual . . . has committed or is suspect of having committed, intimidating or coercing that individual . . . or for any reason based on discrimination of any kind . . . .

> (2) mental pain or suffering includes prolonged mental harm caused by or resulting from—
> > (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> >
> > (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; [or]
> >
> > (C) the threat of imminent death . . . .

North Korea knows what it did to a healthy young man in its custody that resulted in his completely non-responsive state and ultimate death.  Its meager proffered explanations, put forth only long after Otto supposedly was put into his permanently brain-damaged state, are patently false and an obvious cover up.  North Korea tortured Otto, as reflected in Otto's coerced public statement, in his condition upon return to the United States, North Korea's demonstrably false claim of botulism, the statements of the President and other senior U.S. officials, and North Korea's documented treatment of many other American and other detainees.

62.     Otto was subjected to both physical and mental torture.  Physically, he returned destroyed in a state of unresponsive wakefulness with a devastating brain injury; he also had a large scar on his left foot and traumatic dental injuries all of which resulted from North Korea's torture.  Mentally, Otto's "confession" was self-evidently coerced; in his televised "confession" and televised excerpts of his "trial," he appeared distressed and begged for his life several times. Further, North Korea's physical and mental torture of prisoners, particularly those detained for political reasons, is well-documented.  The torture it inflicts includes many methods that do not leave any visible signs, especially when, as here, North Korea continues to unlawfully detain the individual for months before returning him to the United States, allowing any visible signs to dissipate.  And, of course, by putting Otto in a state of unresponsive wakefulness, North Korea left Otto unable to report the torture he endured.

63.     Section 1605A(h) also defines "extrajudicial killing" by reference to the TVPA, which defines it as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  Otto was sentenced to 15 years hard labor by North Korea; he was not sentenced to death.  The actions North Korea took to cause Otto's condition when he

18

arrived home were the cause of his death.  The only explanation North Korea has offered for his death--botulism and a sleeping pill--were not consistent with what Otto's UC Health physicians observed.  Thus, based on North Korea's concealment and known treatment of other prisoners, it is evident that it took deliberate actions that caused Otto's death.

64.     The hostage taking, torture, and extrajudicial killing of Otto caused him, his estate, and Cindy and Fred to suffer severe injury, including conscious pain and suffering, pecuniary loss and loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium.

65.     As a direct and proximate result of North Korea's conduct, Plaintiffs suffered the injuries and harm described herein, and North Korea is liable for the full amount of their damages.

66.     The conduct of North Korea was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF
## <u>WRONGFUL DEATH & SURVIVAL</u>

67.     The preceding allegations are incorporated and re-alleged as if fully set forth herein.

68.     North Korea is liable for wrongful death because it caused Otto's death by wrongful act, neglect, or default that would have entitled Otto to recover damages if he had not died; thus, Otto's personal representatives may recover damages from North Korea.

69.     North Korea is also liable in a survival action for the pain and suffering Otto experienced at the hands of North Korea as well as his future earnings had his life not been cut short by North Korea.  Otto suffered great physical and mental anguish before his death as a result of North Korea's torture and other abuse.

70.     Because it wrongfully caused Otto's death and great pain and physical and mental anguish, North Korea is liable for compensatory damages including those resulting from the loss of support from the reasonably expected earning capacity of Otto, funeral costs, loss of services and society of Otto, and mental anguish incurred by Fred and Cindy.  Further, North Korea's conduct was criminal, outrageous, extreme, wanton, willful, malicious and constitutes a threat to the public warranting an award of punitive damages.

### THIRD CLAIM FOR RELIEF
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

71.     The preceding allegations are incorporated and re-alleged as if fully set forth herein.

72.     North Korea's conduct was willful, outrageous, extreme and dangerous to human life, and violates applicable criminal law and all international standards of civilized human conduct and common decency.

73.     North Korea intended to, and did, or at least acted with the reckless disregard of the probability that it would, actually and proximately cause Plaintiffs' psychological injury, including egregious emotional distress, terror, severe mental anguish, and bereavement and grief.  Plaintiffs, including Otto, suffered serious mental anguish of a nature no reasonable person could be expected to endure.

74.     North Korea is therefore liable for the full amount of Plaintiffs' damages.  Further, its conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

### FOURTH CLAIM FOR RELIEF
### ASSAULT AND BATTERY

75.     The preceding allegations are incorporated and re-alleged as if fully set forth herein.

76.     North Korea intended harmful or offensive contact with Otto without his consent and intentionally took actions reasonably tending to create the apprehension of Otto that it was about to apply such force to him, and did in fact cause such apprehension.  It also willfully and unlawfully applied force to the person of Otto.

77.     North Korea is therefore liable for the full amount of Plaintiffs' damages.  Further, its conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

(a)     Enter judgment against Defendant in favor of each Plaintiff, in an amount to be determined by the Court, for both economic and non-economic compensatory damages as a result of the personal injuries Plaintiffs have suffered due to Defendant's tortious acts, including but not limited to pain and suffering, loss of solatium, medical expenses, and loss of earnings, in an amount to be determined;

(b)     Enter judgment against Defendant in favor of each Plaintiff for punitive damages because Defendant's acts were intentional, malicious, and performed deliberately to injure, damage, and harm each Plaintiff, in an amount to be determined;

(c)     Enter judgment against Defendant for Plaintiffs' costs, expenses, attorney's fees, and such other relief as this Court finds just and equitable; and

(d)     Award all such other relief the Court deems just and proper.


Dated: April 26, 2018                          Respectfully submitted,


                                               McGuireWoods LLP

21

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch (D.C. Bar # 1044804)
E. Rebecca Gantt (D.C. Bar # 988752)
McGUIREWOODS LLP
World Trade Center
101 W. Main St.
Suite 9000
Norfolk, VA 23510
Tel: 757 640 3727
Fax: 757 640 3947
bhatch@mcguirewoods.com

Richard Cullen (*pro hac vice* pending)
McGUIREWOODS LLP
Gateway Plaza
800 East Canal St.
Richmond, VA 23219
Tel: 804 775 1009
Fax: 804 698 2035
rcullen@mcguirewoods.com

*Counsel for Plaintiffs*