**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CYNTHIA WARMBIER, individually and as personal representative of the Estate of Otto Warmbier**, | ) ) ) ) | |
| **FREDERICK WARMBIER, individually and as personal representative of the Estate of Otto Warmbier**, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Case No. 1:18-cv-00977 (BAH) |
| **DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA**, | ) ) ) ) | |
| Defendant. | ) ) | |

<u>**EXPERT DECLARATION OF DAVID HAWK**</u>

I, David Hawk, of Sarasota, Florida, declare pursuant to 28 U.S.C. § 1746 under penalty of perjury as follows:

<u>**Professional and Educational Background**</u>

1. I am the former Executive Director the United States section of Amnesty International, and a former Officer-in-Charge of the Cambodia Office of the United Nations High Commissioner for Human Rights. I was previously a visiting scholar at the Columbia University Institute for the Study of Human Rights, and a lecturer in international human rights at Hunter College City University in New York City. Currently I teach human rights courses at the University of South Florida (Tampa).

2. My current activities focus on researching and documenting ongoing human rights violations of the North Korean regime, including advocacy work at the United Nations. I am a

1

Member of The National Committee on North Korea ("NCNK"), a non-governmental organization of persons with significant expertise related to North Korea that supports principled engagement with North Korea as a means to promote peace and security on the Korean Peninsula and to improve the lives of the people of North Korea.  I am also a consultant to the U.S. Committee for Human Rights in North Korea ("HRNK"), a non-partisan human rights organization whose principal objective is to raise international awareness of North Korea's human rights situation through the publication of researched reports and by undertaking outreach activities in support of the findings of those reports.

3.      Previously, I was a Reagan-Fascell Fellow at the International Forum for Democratic Studies at the National Endowment for Democracy in Washington, D.C., where I worked on issues pertaining to North Korea's nuclear weapons program.  Prior to that, I was a consultant to Freedom House, an independent watchdog organization dedicated to the expansion of freedom and democracy worldwide, where I investigated human rights abuses of the North Korean regime and analyzed its gulag system of work camps for political prisoners.

4.      I have researched and published extensively on prisoner and detainee human rights violations in North Korea.  Most relevant to this report include the following:

- I researched and authored a landmark report published in 2003 entitled *The Hidden Gulag: Exposing North Korea's Prison Camps – Prisoner's Testimonies and Satellite Photographs*, *available at* https://www.hrnk.org/uploads/pdfs/The_Hidden_Gulag.pdf, which documented the human rights abuses of prisoners in North Korean detention and was based on extensive in-depth interviews with North Korean refugees who had recently obtained asylum in South Korea.  In 2012, I published a 175-page updated second edition of that report,

entitled *The Hidden Gulag: The Lives and Voices of "Those Who are Sent to the Mountains" – Exposing North Korea's Vast System of Lawless Imprisonment*, attached hereto as Exhibit A and available at https://www.hrnk.org/uploads/pdfs/HRNK_HiddenGulag2_Web_5-18.pdf. These reports were translated into Korean and Japanese and published in Seoul and Tokyo.

- I then authored two subsequent reports to *The Hidden Gulag*. *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps* was published in 2013, *available at* https://www.hrnk.org/uploads/pdfs/NKHiddenGulag_DavidHawk.pdf, and *The Hidden Gulag IV: Gender Repression and Prisoner Disappearances* was published in 2015, attached hereto as Exhibit B and *available at* https://www.hrnk.org/uploads/pdfs/Hawk_HiddenGulag4_FINAL.pdf.

- In November 2017, I authored a 55-page report called *The Parallel Gulag: North Korea's "An-Jeon-Bu" Prison Camps*, documenting the arbitrary detention in prison camps and penitentiaries by the regular police of North Korea. A copy of this report is attached hereto as Exhibit C and available at https://www.hrnk.org/uploads/pdfs/Hawk_The_Parallel_Gulag_Web.pdf.

5.    In addition to the publications discussed in the preceding paragraph, my published works in this area include: (i) "North Korea's Response to the UN Commission of Inquiry Report on the Situation of Human Rights in the D.P.R.K." in *Law and Policy on Korean Unification: Analysis and Implications*, eds. Jong-chul Park and Jeong-ho Roh, KINU and the Korean Legal Studies Department of the Columbia University Law School, 2014; (ii) "International Human Rights Law; and the D.P.R.K." in *China's Internal and External Relations and Lessons for Korea and Asia*, eds. Jung-ho Bae and Jae Ku, Korea Institute for National Unification (KINU), 2013;

(iii) *Pursuing Peace While Advancing Rights: The Untried Approach to North Korea*, U.S.-Korea Institute, Johns Hopkins School of Advanced International Studies (SAIS), May 2010; (iv) "Appendix: Human Rights Issues During Phase Three of the Six Party Talks on the Denuclearization of the Korean Peninsula" in *Failure To Protect: the Ongoing Challenge of North Korea*, Havel, Bondevik and Wiesel, DLA Piper, the Committee for Human Rights in North Korea, and The Oslo Center for Peace and Human Rights, September 2008, (v) "Introduction" in *A Prison Without Bars: Refugee and Defector Testimony of Severe Violations of Freedom of Religion or Belief in North Korea*, U.S. Commission on International Religious Freedom, Washington DC, March 2008, (vi) "The Realities and Policies of Third-World Nations Regarding North Korean Defectors, with an Emphasis on Mongolia and Thailand" in *International Trends Concerning Human Rights for North Korean Defectors*, National Human Rights Commission of Korea, Seoul, November 2007, (vii) *Concentrations of Inhumanity: An Analysis of the Phenomena of Repression Associated with North Korea's Kwan-li-so Political Penal Labor Camps According to the Terms and Provisions of Article 7 of the Rome Statute of the International Criminal Court and the Parallel Provisions of Customary International Law on Crimes Against Humanity*, Freedom House, Washington, May 2007 (viii) "Factoring Human Rights Into the Dismantlement of Cold War Conflict on the Korean Peninsula" in *Human Rights in North Korea*, Eds. Kie-Duck Park and Sang-Jin Han, The Sejong Institute, Seoul, 2007; and (ix) "Human Rights and the Crisis in North Korea" in *North Korea: 2005 and Beyond*, Eds. Philip Yun and Gi-Wook Shin, Asia-Pacific Research Center (APARC), Stanford University/Brookings Press, March 2006, (vii) *Thank You Father Kim Il Sung: Eyewitness Accounts of Severe Violations of Freedom of Thought, Conscience and Religion in North Korea*, U.S. Commission on International Religious Freedom, Washington DC, November 2005.

6.      I obtained by Bachelor of Science degree from Cornell University in 1965 and a Master of Divinity degree from Union Theological Seminary in 1982.  I also studied for two years as an International Fellow at Columbia University and completed two years of graduate study in International Relations at Oxford University from 1972 to 1974.

7.      A copy of my curriculum vitae is attached hereto as Exhibit D.

### Nature of this Expert Witness Report

8.      I have been asked by counsel for plaintiffs in this matter, *Warmbier v. Democratic People's Republic of Korea* (D.D.C. No. 1:18cv977), to submit this report and provide my expert opinion on North Korea's treatment of Otto Warmbier during his detainment in North Korea from 2016 to 2017.

9.      I am not receiving compensation for my services in this matter.  I have previously served as an expert in *Kim v. Democratic People's Republic of Korea*, No. 1:09-cv-648-RWR (DDC).

10.      My opinion set forth below is based upon my academic studies, research, teaching positions and publishing for the course of many years as an expert on Korean affairs.  I have obtained information from interviews with political leaders and refuges, reviews of documents, periodicals, credible news reports, discussions with reliable journalists, government publications, and scholarly works, as well as from my own experience working, living and traveling in the Far East, particularly in South Korea.

11.      For purposes of providing this expert testimony, I have reviewed the legal complaint filed by Otto's parents, Cynthia and Frederick Warmbier, in this Court.  I have also reviewed the following videos: the press conference held on February 26, 2016 in North Korea where Otto "confessed" to his alleged crimes; excerpts from Otto's trial and sentencing on March

17, 2016; the press conference regarding Otto's condition held at UC Health on June 15, 2017; the Warmbiers' interview on Fox and Friends on September 26, 2017; and an interview of a North Korean Official by the New York Times on October 5, 2017.  I have also reviewed statements published on KCNA, North Korea's state media outlet that is directly controlled by the North Korean regime, with respect to Otto Warmbier, dated January 22, 2016, February 29, 2016, March 16, 2016, and June 23, 2017.  I have also reviewed the affidavits submitted in this case by Dr. Daniel Kanter, Dr. Murray Dock, Dr. Todd Williams, and Cynthia and Frederick Warmbier.

**Report**

Overview of North Korean Detention Facilities

12.     The following information is true presently and historically at all times relevant to Otto's seizure and holding.

13.     My research and work with respect to North Korea has included all of the various categories of government-run detention facilities in the country.  While there are some differences in the length of detention at the facilities and the reasons for which individuals are sent there, prisoners in all facilities are uniformly treated with brutality and disregard for human rights.

14.     The largest detention system in North Korea is the *kwan-li-so* political prison and prison camp system run by the *Bo-wi-bu* police, also known as MSS or the secret police, targets political conduct and is extra-judicial, extra-legal, secret, and *incommunicado*, meaning that prisoners are denied communication with anyone outside the *kwan-li-so*.  It is used to preemptively purge, punish, and remove from North Korean society political elements or factions from the Korean Workers' Party (KWP), the army, and the state administrative structures that the Kim regime leadership surmises or suspects might challenge their dictatorial rule, their monolithic ideology, or their revolutionary and extreme policies and practices.  Examples of accused conduct

that would lead to deportation to the *kwan-li-so* include expressing criticism of regime policies, leaving the country without permission, skipping compulsory ideological education classes, or defacing or failing to take adequate care of photographic images of Kim Il-sung.  The prison camps have been in operation for over 50 years and throughout most of their history have implemented a penal philosophy of "collective responsibility" or "guilt by association" whereby the siblings, spouse, children and sometimes grandchildren of the offending political prisoner may be imprisoned in a "three generations" practice.

15.     The population of the *kwan-li-so* system in North Korea is estimated as approximately 80,000 to 120,000, housed in a series of encampments primarily located in the mountains and valleys of northern North Korea.  Prisoners there are not arrested, charged, or tried in any sort of judicial procedure, but rather are seized, taken to an interrogation facility, and frequently tortured until they "confess" before being deported to the *kwan-li-so* along with their family members.  Prisoners receive below-subsistence food rations, such that all are in a state of semi-starvation and attempt to survive on plants, grass, bark, and small animals they are able to find.  Prisoners are also subject to extreme hard labor, working in logging, mining, or agriculture over twelve hours a day, seven days a week.  This combination of forced labor in inhumane conditions and below-subsistence food rations lead to very high mortality rates.  Prisoners accused of violation of camp regulations, such as stealing food for livestock, failure to meet production quotas, or losing tools, are severely beaten and subjected to systematic torture and drastically reduced food rations, and frequently die shortly after being punished.  Refugee accounts indicate attempted escapes were punished by public executions that all prisoners are required to witness.

16.     A second detention system in North Korea is the *kyo-hwa-so* long term penitentiary facilities, administered by the *An-jeon-bu*, or MPS regular police force for persons accused and

convicted of violations of the North Korean Criminal Code, and holding an estimated population of 70,000 or more.  The *kwan-li-so* prison camp system administered by the MSS is extra-judicial and extra-legal, while the prison system administered by the MPS is not, although its legal and judicial underpinnings fall far short of international standards.   Persons arrested by the MPS are charged with violations of the North Korean Criminal Code, but that code, in addition to more traditional offenses such as murder, assault, and theft, contain a large number of what effectively are political offenses, such as unauthorized gatherings, violations of the order of socialist collective act, and demonstrating an anti-state purpose.  Persons arrested by the MPS are also supposed to have access to legal counsel during or at their trial. However, in actual practice, this is questionable. Some former prisoners report that they did not have a lawyer at all. Other former prisoners were not sure.  One former prisoner stated that she thought her lawyer was the person who asked her if she had committed the offense she was charged with. Another former prisoner related that she thought she had a lawyer, but she could not tell which of the men sitting at the table with her was her lawyer. This is far removed from the "fair trial" or "due process" standards enumerated in the International Covenant on Civil and Political Rights that North Korea has acceded to.

17.     Conditions in the *kyo-hwa-so* are similarly brutal as those in the *kwan-li-so*. Prisoners are given grossly inadequate food rations and kept in a persistent state of hunger and malnutrition.  They are forced to engage in arduous and frequently dangerous labor, such as mining done with picks and shovels and logging done by axes and handsaws, where a failure to meet quotas can result in beatings.  There is an absence of medicine and medical facilities.  Prisoners die at high rates, and when they do they are dumped in unmarked graves without traditional Korean funeral rights.

18.     Third, the *kyo-hwa-so* and related forced labor prison facilities have an elaborate and brutal feeder system of temporary holding and interrogation facilities.  A person is arrested by the MPS police or, in some cases, handed over to the MPS police by the MSS secret police. Once in police custody, the arrested person is held in a local detention facility known as a *ka-mok*, which is usually in the same building as the interrogation rooms known as *ku-ryu-jang*.  The detention facilities are sometimes overcrowded.  The ensuing detention and interrogation can last for a few days or for months on end. Many former prisoners report having to kneel motionless in their detention cells for hours on end. Many report being beaten or subjected to systematic torture during detention and interrogation if their jailers are not satisfied with their confession, which may have to be written over and over again until their interrogators are satisfied.  Former prisoners also frequently complain about extreme confinement and grossly inadequate food provisions, and those detained a long time frequently report horrific weight loss, such that many expressed relief at the prospect of being sent to a *kyo-hwa-so* prison, where they can at least walk around and forage for grass, insects, or rodents to eat. It is not until later in the process that local police may notify their families of their detention.

19.     The trial and long-term imprisonment are supposed to take place, and usually do take place, in or very near the detainee's hometown or place of legal residence. If the detainee is arrested and held in some other location, once the interrogators have sufficient records, the detainees are sent to a holding facility known as a *jip-kyul-so* or misdemeanor level prisons to wait for police to come and transport them back to their town of residence for trial. This process can take weeks. Former prisoners again report continued grossly inadequate food provisions and continued loss of body weight.  It is in the *ka-mok* and *jip-kyul-so* where some of the most egregious human rights violations take place. While there are beatings and systematic torture

reported in the prisons and prison camps, often for failure to meet production quotas or for violations of prison regulations, former prisoners report routine beating and systematic torture following and during their initial arrest and interrogation. It is in the *ka-mok* and *jip-kyul-so* where forcibly repatriated women who are found or discovered to be pregnant—it is presumed by Chinese husbands—are subjected to forced abortion or infanticide if the pregnancy is too far advanced for an abortion.

The Torture and Extrajudicial Killing of Detainees and Prisoners is a Consistent Practice Throughout North Korea's Facilities

20.     According to almost all of the former prisoner testimony I gathered in order to prepare the reports detailed in paragraph 4 above, the practice of torture permeates the North Korean prison and detention system.  Because it is so widespread and systematic, it clearly is not the work alone of sadistic elements, but reflects state policy of a de facto totalitarian government that is intended to punish, degrade, intimidate and humiliate the prisoners in an effort to root out political disloyalty, connections to South Korea or belief in banned religions. At the same time, the practice of torture is intended to help amass widespread confessions that demonstrate threats to state security, thereby rationalizing or making essential constant vigilance, police presence and the use of torture. Notwithstanding, awareness that torture involves serious human rights transgressions has also led to the practice of requiring prisoners to discipline and beat other prisoners.

21.     Other entities have also concluded that the practice of torture in North Korea is deliberately executed pursuant to and in furtherance of state policy, and that the practice is systematic and widespread.  For instance, the United Nations Human Rights Council's Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea conducted an investigation of human rights practices in North Korea, releasing a report of its findings in

February 2014.  *See* United Nations Human Rights Council, *Report of the detailed findings of the commission of inquiry on human rights in the Democratic People's Republic of Korea* (Feb. 7, 2014), *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/G14/108/71/PDF/G1410871.pdf?OpenElement.   It likewise concluded that "[v]ery similar types of punishment practices and torture facilities (*e.g.*, tiny solitary confinement cells) are used across different detention installations." *Id.* at 333.  The guards who perpetrate these gross human rights abuses are not subject to punishment, and such "[p]atterns of impunity also indicate that inhumane acts committed against prisoners represent official policy." *Id.*  Similarly, "[d]eliberate starvation and forced labour follow the same patterns in different prisons across the country, making it likely that acts are based on orders originating at the central level." *Id.*  "Policies emanating from the central government to manage ordinary prisons, . . . including the deliberate denial of adequate food and medical care, are being pursued despite awareness that they will cause the death of a large portion of the prison population in the ordinary course of events. This level of criminal intent is sufficient, in the view of the Commission, to establish that crimes against humanity of extermination and murder have been committed." *Id.* at 331.

22.     The United Nations inquiry also described some forms of torture that are commonly inflicted on North Korean prisoners.  "Torture, as defined in international criminal law, is an established feature of the ordinary prisons in the DPRK. Torture manifests itself in the form of solitary confinement in tiny cells, the deliberate imposition of extreme levels of starvation as a disciplinary measure, and the infliction of severe beatings and other atrocities to punish inmates. The suffering resulting from the prolonged starvation, coupled with other inhumane conditions of detention, imposed on inmates to aggravate their punishment generally often also meets the

threshold of torture." *Id.* at 331.  "The forced abortions to which pregnant inmates have been subjected constitutes a form of sexual violence of a gravity that meets the threshold required for crimes against humanity." *Id.*

23.     My research and studies similarly found that North Korea is capable of an enormous amount of brutality and torture, and that there are consistent patterns to its phenomena of treatment applied to prisoners across the country.  Systematic torture was witnessed by virtually all former prisoners that I interviewed, and torture is particularly common in two instances: during interrogations and for infractions of prison regulations.   For instance, prior to entry into the *kyo-hwa-so* prisons, my interviews revealed that prisoners are subject to months and months of pre-trial, pre-sentence brutality at local police detention facilities.

24.     Based on my extensive interviews with the victims of such torture, the torture inflicted by North Korea causes extreme pain and suffering, both mentally and physically.  Such mental agony is caused by direct threats of execution or further torture, or results from the prolonged application of physical torture to the individual.  Just a few illustrative examples of torture that prisoners described to me included:

- "Sitting-still-for-hours"  or  "kneeling-motionless-for-hours,"  sometimes  with  a circulation-cutting bar between the legs, which former prisoners and detainees described as much more painful than the beatings they also regularly endured.

- One prisoner was beaten, subjected to water torture, and hung by his wrists in a police jail.

- One prisoner was subjected to sleep deprivation and "sitting motionless" torture for days at a time over a year-and-a-half period.

- One prisoner was held for six months in Pyongyang by the MSS and subjected to kneeling torture (made to kneel motionless, not even turning his head, for hours at a time) and waterboarding torture (held down by five or six agents who poured water into his mouth and nose until he gagged and nearly suffocated), and was severely beaten on the shins, eyes, ears, head, and mouth leading to the breaking of six of his teeth.

- Another prisoner witnessed the use of undersized punishment cells where detainees could not stand up or lie down.  She was forced to kneel motionless and also to do stand-up/sit-down positions to the point of collapse.

- Numerous detainees witness the forced abortions by brutal methods, and killing or burying alive of babies born in detention facilities.

25.     Extrajudicial killing is also common in North Korean detention facilities.  One form is an execution in response to infractions of prison regulations, including escape attempts, which other prisoners are forced to watch and also often forced to defile the corpse of the executed prisoner.  Another form of extrajudicial killing is the intentional withholding of medical care, denial of adequate food rations, and/or imposition of hard labor that leads to frequent deaths.  For instance, one former prisoner told me that out of 230 prisoners in his residence unit, there were at least 26 known deaths over a three year period (23 from malnutrition, 2 from public execution, and 1 from torture), not including an additional 6 persons who were removed for likely execution elsewhere.  The number of prisoners in the *kwan-li-so* decreased from an estimated 150,000 to 200,000 fifteen or twenty years ago to 80,000 to 130,000 in 2010, likely as a result of the extraordinarily high death rate.

<u>North Korea and the Outside World</u>

26.     Despite the statements of hundreds of individuals who have left North Korea as well as satellite images showing the *kwan-li-so*, North Korea routinely misrepresents the conditions and even existence of its massive detention and prison facilities.  As to the *kwan-li so*, North Korea simply denies their existence.  Government agents have long, formally and officially, denied that these political prison camps even exist, most recently in a 2015 letter from the DPRK Permanent Representative to the UN to the Geneva-based UN Human Rights Council.  North Korea has never provided an explanation for any of the well-documented detention facilities easily recognizable on Google Earth and other satellite imagery.  Based on ample and credible testimony from former prisoners, prison camp guards, and former North Korean police officials who defected to South Korea, there have been between four and twelve *kwan-li-so* prison camps in the midst of North Korea's unequivocal denial of their existence.

27.     While North Korea does not deny the existence of its *kyo-hwa-so* prison system, as the existence of these correctional labor facilities are specified in Article 30 of the Criminal Law of the Democratic People's Republic of Korea, it misrepresents the conditions in that system with extraordinary claims that contradict the statements of countless former prisoners.  High-ranking officials in the Ministry of Public Safety have as recently as 2015 denied the rampant human rights violations known to exist there.  For instance, Colonel General (three-star general) Hung Young-kwon stated that "[a]lthough the country is in a poor economic conditions, Marshall Kim Johng-un, with warm love and consideration of the people, takes extra care to feed the *kyo-hwa*-persons and provide summer and winter clothes, necessities of life, medicines, and other supplies to them. . . .  We conduct monthly health checkups to find any disease and provide the right treatment at the right time.  We also distribute workload according to the checkups."  Lieutenant General (two-star general) Kim Sung-il stated, "When they have dinner we let them study and watch TV.  About

twice a week we also show them interesting TV soap operas or films."  Colonel General Kim Kyul added, "Now there is a TV in every room. We also provide newspapers [and] magazines."  Ex. B (*The Hidden Gulag IV*) at 13-14.  However, there are literally hundreds of former *kyo-hwa-so* prisoners who defected to South Korea following their release, and the statements by North Korean officials starkly contradict the testimony of countless former prisoners.

28.     North Korea is known to intimidate potential witnesses to its human rights abuses to prevent information about such abuses from reaching the outside world.  This includes threats against or the punishment of the remaining family members of defectors who have left North Korea, which punishment is especially severe if those defectors are to make public statements critical of North Korea."

29.     Tellingly, North Korea does not allow the International Committee of the Red Cross (ICRC), non-governmental organizations (NGOs) such as Amnesty International or Human Rights Watch, United Nations human rights experts, or any foreign diplomats or journalists to have access to its places of detention, even those places of detention that are posited in the North Korean criminal and criminal procedure codes.  Nor does North Korea allow the overwhelming majority of its citizens to have telephone or Internet contact with the outside world.

30.     My findings accord with that of the United Nations Inquiry, which found that North Korea "has taken concerted steps to conceal violations in the prison system from its population and the international community.  Furnaces and mass graves have been set up in or close to prison facilities to dispose of the bodies of those who die in prison to prevent family members from discovering the fate of their incarcerated relative.  Where they have cooperated with United Nations human rights mechanisms, DPRK delegations have provided grossly inaccurate information about the size of the prison system and the conditions of treatment, in response to

specific questions. The DPRK has also consistently denied access to prisons (except for occasional visits to certain model prisons). The repeated requests by this Commission to have access to the DPRK, including to its prison facilities, have all been ignored or rejected." *Id.* at 333.

31.     North Korea's routine concealment of the egregious conditions and rampant human rights violations in its facilities demonstrates both that it is aware that the rest of the world views these conditions as problematic, and also that it cares about and attempts to influence its international reputation.

32.     The United States and North Korea have no direct diplomatic arrangements.  There is no United States Embassy in North Korea.  Rather, the Swedish Embassy in North Korea is the U.S. protecting power and provides limited consular services to U.S. citizens.

North Korea Views and Treats American Prisoners as Hostages

33.     In addition to following the public reports of Otto Warmbier's seizure and imprisonment in North Korea, I have also followed the public reports of other Americans previously held by North Korea.  All American prisoners are intended by North Korea as hostages. Specifically, North Korea seeks to use them as a means of getting high level U.S. personnel to come to North Korea to negotiate their release.  When successful in achieving this goal, North Korea treats these visits as a domestic propaganda victory among its citizens, using it to enhance North Korea's political standing and treat it as a powerful player in global affairs.  North Korea also seeks to induce the involvement of high-level American officials to enable them to have discussions with those officials about improving United States/North Korean relations.

34.     For example, after detaining American journalists Laura Ling and Euna Lee, a 2009 memo from Kim Jong Il recently released by WikiLeaks revealed that Kim specifically requested that former President Bill Clinton travel to North Korea.  When he did, the journalists were

released.  As another example, North Korea released Americans Kenneth Bae and Matthew Miller only after the visit by a U.S. cabinet-level official, then-Director of National Intelligence James Clapper, who traveled to Pyongyang in order to secure their release.  He reported that North Korean officials expressed that they expected a diplomatic breakthrough in relations as a result of them releasing Bae and Miller.

Otto's Detention and Treatment

35.     I followed the public reports of Otto's detention closely and am very familiar with his case.

36.     Like political prisoners in *kwan-li-so*, Otto was at all points of his detention kept almost entirely incommunicado, unlike recent previous American prisoners such as Laura Ling and Kenneth Bae who reported being allowed to communicate with family members in the United States.

37.     It is my opinion that Otto was almost certainly subject to harsh interrogation methods, including torture and/or other cruel, inhuman or degrading treatment or punishment as prohibited by the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and as prohibited by the Torture Victim Protection Act, 28 U.S.C. § 1350 note, in order to obtain his televised "confession," for several reasons.  First, the initial or pretrial interrogation stage, when interrogators are attempting to extract a confession, is when torture most commonly occurs in North Korea; indeed, it would be unusual if torture did not occur in this phase. This conclusion is supported by the fact that North Korea evidently did obtain a confession that it most likely dictated to Otto after rendering him psychologically broken.  The confession contains gibberish that is typical of North Korean posturing and language with which I am familiar, such as stating that the political slogan "inspires the people's love for their system.  This task was given

by the Friendship Methodist Church . . . and the connivance of the United States administration."
In the video of his confession, I also observed that Otto also cried and pleaded for his life, which
either 1) were unscripted and thus a sign of obvious distress and fear for life and liberty that was a
product of torture, or 2) were scripted and thus a strong indication of North Korea's attempt to use
Otto as a pawn to obtain engagement with the United States government, as discussed further
below.

38.    The second reason why I conclude that North Korea almost certainly tortured Otto
with the meaning of the laws referenced above is because of the nature of the offense of which he
was accused.   Public reports indicate he was charged with a violation of Article 60 of North
Korea's criminal code, for committing a "conspiracy to subvert the state," which is a capital
offense.   This charge punishes "[a] person who, with anti-state purposes, participates in a coup
d'état, riot, demonstration or assault, or takes part in a conspiracy."   "In cases where the person
commits a grave offense," they are subject to life imprisonment or the death penalty."   Ex. C
(*Parallel Gulag*) at 84.   This is a crime of a political nature, making it particularly egregious and
meriting harsh treatment.   The poster Otto was accused of removing reportedly contained a
political slogan that mentions the former Supreme Leader, stating "Let's Arm Ourselves Strongly
with Kim Jong-il Patriotism!"   In North Korea, showing disrespect to a Supreme Leader is
particularly abhorrent.   I am aware of credible reports where citizens were imprisoned for
unwittingly sitting on a newspaper containing an image of the Supreme Leader.   An act viewed as
showing intentional disrespect would, in North Korea, carry particularly brutal treatment.

39.    It is also my opinion that North Korea imprisoned and continued to imprison Otto
in order to use his fifteen-year sentence of imprisonment to compel the United States to send a
high level official to North Korea to increase its stature and to open a dialogue with North Korea

during a time when the two countries were not communicating with them.  Given the grievous nature of the offense of which Otto was accused, they would have expected the involvement of a particularly high level official.

40.     It is also my opinion that North Korean authorities likely deliberately caused the condition in which Otto arrived to the United States.  There are two examples of ways in which they may have done so.  First, many of the methods of torture in which they engage pose a substantial danger to human life, as evidenced by the statements of prisoners who were aware of other prisoners dying from North Korean torture.  Second, as discussed above, North Korea routinely withholds medical care from those in its custody, with such frequency that it amounts to an intentional act.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_October 8_, 2018 in _Sorasota, FL_.

Signed: _David Hawk_
             David Hawk

19

# Exhibit A

# The Hidden Gulag

## Second Edition

## The Lives and Voices of
## "Those Who are Sent to the Mountains"

*Exposing North Korea's Vast System of Lawless Imprisonment*

# David Hawk



A Report by the Committee for Human Rights in North Korea

Copyright © 2012 by the Committee for Human Rights in North Korea

All rights reserved
Printed in the United States of America

ISBN: 0615623670

Library of Congress Control Number: 2012939299

# The Hidden Gulag
### *Second Edition*
### The Lives and Voices of
### "Those Who are Sent to the Mountains"

Committee for Human Rights in North Korea
1001 Connecticut Avenue, NW
Suite 435
Washington, DC 20036

## ABOUT THE COMMITTEE FOR HUMAN RIGHTS IN NORTH KOREA

In October of 2001, a distinguished group of foreign policy and human rights specialists launched the Committee for Human Rights in North Korea (HRNK) to promote human rights in that country. HRNK seeks to raise awareness and to publish well-documented research that focuses international attention on North Korean human rights conditions, which have been so closed off from the rest of the world.

The Committee's studies have established its reputation and leading role in the growing international network of organizations committed to opening up and promoting reform and transition in North Korea. The Committee's reports have addressed many of the fundamental human rights issues in North Korea. Its 2003 report, "The Hidden Gulag: Exposing North Korea's Prison Camps" (by David Hawk), was the first comprehensive study of the camps. Other reports published by the Committee have included:

• "Hunger and Human Rights: The Politics of Famine in North Korea" (by Stephan Haggard and Marcus Noland, 2005)
• "The North Korean Refugee Crisis: Human Rights and International Response" (by Stephan Haggard and Marcus Noland, 2006)
• "Failure to Protect: A Call for the UN Security Council to Act in North Korea" (published with DLA Piper LLP, 2006)
• "Legal Strategies for Protecting Human Rights in North Korea" (published with Skadden, Arps, Slate, Meagher & Florn LLP, 2007)
• "Failure to Protect: The Ongoing Challenge of North Korea (published with DLA Piper LLP, 2008)
• "Lives for Sale: Personal Accounts of Women Fleeing North Korea to China" (by Lee Hae-young, 2009)
• "After Kim Jong-il: Can We Hope for Better Human Rights Protection?" (by Kim Kwang-jin, 2009)
• "Taken! North Korea's Criminal Abduction of Citizens of Other Countries" (by Yoshi Yamamoto, 2011)
• "North Korea after Kim Jong-il: Can We Hope for Better Human Rights Protection?" (by Kim Kwang-jin, 2011)

The Committee is currently finalizing reports on: "Songbun," North Korea's social classification system, which is at the root of human rights violations in North Korea; the structure and operation of North Korea's public security agencies, which shows the system of political repression employed by North Korea; and the restrictions on information circulation inside North Korea.

I

# BOARD OF DIRECTORS
## (affiliations provided solely for identification)

**Roberta Cohen** *Co-Chair*
Non-Resident Senior Fellow, *Brookings Institution,* specializing in humanitarian and human rights issues

**Andrew Natsios** *Co-Chair*
Former Administrator, *USAID*
Professor, *Georgetown University*

**Suzanne Scholte** *Vice-Co-Chair*
President, *Defense Forum Foundation*
Seoul Peace Prize Laureate

**Gordon Flake** *Vice-Co-Chair*
Executive Director, *Mike and Maureen Mansfield Foundation*

**Helen-Louise Hunter** *Secretary*
Attorney

**John Despres** *Treasurer*
Consultant on International Financial & Strategic Affairs

**Greg Scarlatoiu**
Executive Director, *HRNK*

**Morton Abramowitz**
Senior Fellow, *The Century Foundation*

**Jerome Cohen**
Of Counsel (Retired Partner), *Paul, Weiss, Rifkind, Wharton & Garrison LLP*

**Lisa Colacurcio**
Advisor, *Impact Investments*

**Rabbi Abraham Cooper**
Associate Dean, *Simon Wiesenthal Center, LA*

**Jack David**
Senior Fellow, *Hudson Institute*

**Paula Dobriansky**
Senior Fellow, Belfer Center, John F. Kennedy School of Government, *Harvard University*

**Nicholas Eberstadt**
Henry Wendt Chair in Political Economy, *American Enterprise Institute*

**Carl Gershman**
President, *National Endowment for Democracy*

**Steven Kahng**
General Partner, *4C Ventures, Inc.*

**David Kim**
Coordinator, *The Asia Foundation*

**Thai Lee**
President, *SHI International Inc.*

**Debra Liang-Fenton**
U.S. Institute of Peace
Former Executive Director, *HRNK*

**Winston Lord**
Former Assistant Secretary for East Asia, *Department of State*

**Marcus Noland**
Deputy Director and Senior Fellow, *Peterson Institute for International Economics*

**Jacqueline Pak**
Fellow, East Asia Program, *Cornell University*

**Katrina Lantos Swett**
President and CEO, *Lantos Foundation for Human Rights and Justice*

**Richard Williamson**
Principal, *Salisbury Strategies*

# TABLE OF CONTENTS

Executive Summary ...................................................................................VII-XII
About the Author ................................................................................................1
Acknowledgements ...........................................................................................2
Preface ................................................................................................................4
Map .....................................................................................................................6

**Part One: Introduction** ...................................................................................7
   Not in a Vacuum ............................................................................................10
   The Second Edition of Hidden Gulag ..........................................................11
   Notes on Research, Limits of Information, Sources, Translations, and
   Transliterations ..............................................................................................13
   Organization of the Report ...........................................................................18
   Scope of Information: Documenting the Hidden Gulag ............................18
   Glossary of Repression .................................................................................22

**Part Two: The *Kwan-li-so* Political Penal Labor Colonies** ...................25
   The Prisoners: Who They Are .......................................................................25
   Overview of the Prison Labor Camp System ..............................................27
      Guilt by Association ..................................................................................29
      Forced Disappearances and *Incommunicado* Detention without Trial ...29
      Systemic and Severe Mistreatment .........................................................30
      Induced Malnutrition, Slave Labor and High Rates of Deaths in Detention ...31
      Prisoner Informants and Intra-Prisoner Surveillance and Hostility .....33
      Execution and Extreme Punishments .....................................................33
      Sexual Relations, "Marriage," and Prison Camp Schools ....................34
      The Sexual Exploitation of Women .........................................................34
      Prisoner Releases ......................................................................................34
      The Economic Role of the Forced Labor Camps ...................................35
      The Absence of Due Process: Arbitrary and Extra-Judicial Detention...36

   Successive Waves of Political Imprisonment: A Historical Overview........37
   How Do We Know: A Brief Historical Recounting ....................................41
      Scholary Insights......................................................................................42
      Early Non-Governmental Organization Documentation ......................42
      Prisoners' Memoirs and Testimonies......................................................44
      The First Satellite Photographs of the Prison Camps ...........................44
      Hidden Gulag (first edition)....................................................................48
   Google Earth: Mapping the Fences..............................................................48
   Contemporary Witnesses and Testimony ...................................................48
      *Kwan-li-so* No. 14 .....................................................................................48

Mr. Shin Dong-hyuk ..................................................................49
Mr. Kim Yong .........................................................................51
*Kwan-li-so* No.15 ....................................................................53
Mrs. Kim Young-sun ..............................................................56
Mr. Kang Chol-hwan ..............................................................59
Mr. An Hyuk ...........................................................................60
Mr. Kim Tae-jin ......................................................................60
Mr. Lee Young-kuk .................................................................61
Former Prisoner # 27 ...............................................................62
Mr. Kim Eun-chol ...................................................................64
Mr. Jung Gwang-il ..................................................................65
Former Prisoner # 28 ...............................................................67
*Kwan-li-so* No. 18 ...................................................................70
Mrs. Kim Hye-sook .................................................................71
Mr. Lim Jung-soo ....................................................................73
Former Prisoner # 29 ...............................................................75
Mr. Kim Yong (continued) .......................................................76
*Kwan-li-so* No. 22 ...................................................................77
Mr. Ahn Myong-chol ...............................................................77
Other *Kwan-li-so* ....................................................................79
Closed *Kwan-li-so* ...................................................................80
Mr. Yoshio Kinoshita ..............................................................80
Mr. Choi Dong-chul ................................................................81

**Part Three: The *Kyo-hwa-so*: Long-Term Prison-Labor Facilities** .......83
Introduction .............................................................................83
*Kyo-hwa-so* Witnesses and Testimony.....................................85

Former Prisoner # 37, *Kyo-hwa-so* No. 12 ...............................85
Former Prisoners # 28, *Kyo-hwa-so* No. 12 ..............................88
Ms. Seo Jin, *Kyo-yang-so* No. 55 .............................................90
Former Prisoner # 31, Chung-san *Kyo-hwa-so* ..........................92
Mrs. Bang Mi-sun, *Kyo-hwa-so* No. 15 ....................................93
Mr. Yoo Chun-sik, *Kyo-hwa-so* No. 22 ....................................98
Ms. Ji Hae-nam, *Kyo-hwa-so* No. 1 ........................................100
Mrs. Lee Soon-ok, *Kyo-hwa-so* No. 1 ......................................103
Former Prisoner # 6, *Kyo-hwa-so* No. 77 ................................105
Former Prisoner # 3, *Kyo-hwa-so* No. 3 ..................................106
Former Prisoner # 12, Hoeryong *Kyo-hwa-so* ..........................107
Former Prisoner # 19, *Kyo-hwa-so* No. 4 ................................109

## Part Four:  Detention Facilities and Punishments for North Koreans Forcibly Repatriated from China: Violence Against Women ...........................................................................111

Why They Go: The Flow of North Koreans to China ..........................111

The Situation of North Koreans in China ..........................................113

Encountering South Koreans or South Korean Culture ....................114
Trafficking of North Korean Women ...............................................114
Protection Denied ............................................................................115

Corridors of Forced Repatriation: Pathways to Pain, Suffering and Violence Against Women ...........................................................................118

Map of Repatriation Corridors ........................................................120

*Jip-kyul-so* short-term (misdemeanor-level) detention facilities ......121
*Ro-dong-dan-ryeon-dae* labor training center/mobile labor brigades ..............121

Racially Motivated Forced Abortion and Infanticide ......................122

Forced Repatriation: Sinuiju Corridor ..............................................123

Ms. Choi Yong-hwa ........................................................................123
Former Detainee # 24 .....................................................................125
Mr. Yoo Chun-sik ...........................................................................126
Mrs. Koh Jyon-mi (Yomida Chiba) ................................................127
Mr. Lee Yoo-keum ..........................................................................128
Mr. Kim Myong-ho .........................................................................129

Forced Repatriation: Hyesan Corridor ..............................................130

Mrs. Lee Chun-shim ........................................................................130

Forced Repatriation: Musan Corridor ................................................130

Mr. Kim Tae-jin ..............................................................................131
Former Detainee # 1 .......................................................................131
Mrs. Bang Mi-sun ...........................................................................133
Former Detainee # 26 .....................................................................133

Forced Repatriation: Hoeryong Corridor ..........................................135

Former Detainee # 34 .....................................................................135

Forced Repatriation: Onsong Corridor ..............................................136

Former Detainee # 27 .....................................................................137
Former Detainee # 25 .....................................................................137
Former Detainee # 21 .....................................................................139
Former Detainee # 8 .......................................................................140
Former Detainee # 9.........................................................................141

Former Prisoner # 31 ........................................................................141

Ms. Seo Jin .....................................................................................142

Former Detainee # 32 .....................................................................142

Mrs. Lee Young-suk ........................................................................143

Former Detainee # 33 .....................................................................145

Former Detainee # 35 .....................................................................146

**Part Five: Summary of Torture and Racially Motivated Forced
Abortion/Infanticide Information** ...............................................148

Torture ...........................................................................................148

Racially Motivated Forced Abortion/Infanticide ..............................152

**Part Six: Conclusion: The Normative and Legal Framework
for Analyzing Human Rights Violations in North Korea** ...............156

Clear and Massive Crimes Against Humanity: The *Kwan-li-so* Political Penal

Labor Colonies ...............................................................................158

Serial Atrocities Inflicted On Forcibly Repatriated Koreans ..............164

**Part Seven: Recommendations** ...................................................168

I . To the Democratic People's Republic of Korea ............................168

• Regarding the *Kwan-li-so* Political Penal Labor Colonies ............168

• Regarding the *Kyo-hwa-so*, *Jip-kyul-so* and *Ro-dong-dan-ryeon-dae* Peniten-

tiaries, Prisons and "Labor Training" Facilities ..............................171

• Regarding the Treatment of Persons Repatriated from China .........171

• Regarding International Standards and Procedures ........................172

II. To the People's Republic of China ..............................................172

III. To UN Member States ..............................................................173

IV. To UN Member States Enjoying Diplomatic Relations with the

DPRK .............................................................................................175

V . To the United States, the Republic of Korea, and Japan ..............175

**Appendix** ...................................................................................176

UN Standard Minimum Rules for the Treatment of Prisoners ............176

UN Body of Principles for the Protection of All Persons Under Any Form of

Detention or Imprisonment ..............................................................189

Satellite Photographs ......................................................................197

# EXECUTIVE SUMMARY

The second edition of *Hidden Gulag* utilizes the testimony of sixty former North Koreans who were severely and arbitrarily deprived of their liberty in a vast network of penal and forced labor institutions in the Democratic People's Republic of Korea (DPRK or North Korea) for reasons not permitted by international law. This contradicts the formal December 2009 proclamation by North Korea to the United Nations Human Rights Council that the term 'political prisoners' is not in the DPRK's vocabulary, and that the so-called political prisoner camps do not exist.

At the time of the research for the first edition of *Hidden Gulag* in 2003, there were some 3,000 former North Koreans who recently had found asylum in the Republic of Korea (ROK or South Korea) among whom were several scores of former political prisoners in the DPRK. By the time of the research for the second edition in 2010 and 2011, there were some 23,000 former North Koreans who recently arrived in South Korea. Included in this number are hundreds of persons formerly detained in the variety of North Korea's slave labor camps, penitentiaries, and detention facilities. Included in this number are several former prisoners who were arbitrarily imprisoned for twenty to thirty years before their escape or release from the labor camps, and their subsequent flight through China to South Korea. This newly available testimony dramatically increases our knowledge of the operation of North Korea's political prison and labor camp system.

This second edition of *Hidden Gulag* also utilizes a recent international legal framework for the analysis of North Korea's human rights violations: the norms and standards established in the Rome Statute of the International Criminal Court for defining and determining crimes against humanity, which became operative in July 2002. This international legal framework enables a much more accurate and penetrating analysis of the various phenomena of repression associated with North Korea's system of arbitrary detention, political imprisonment, and forced labor. This more recent framework for analysis facilitates a series of detailed recommendations that would, if implemented, effectively disable and dismantle the prison labor camp system. This legal framework also facilitates a series of recommendations to other member states within the international community on how to better respond and take action against the massive and severe human rights violations in North Korea.

In addition to the testimony and accounts from the former political prisoners in this report, this second edition of *Hidden Gulag* also includes satellite photographs of the prison camps. The dramatically improved, higher resolution satellite imagery now available through Google Earth allows the former prisoners to identify their former barracks and houses, their former work sites,

execution grounds, and other landmarks in the camps.  The report provides the precise locations—exact degrees of latitude and longitude—of the political prison camps that North Korea proclaims do not exist.

**Part One** introduces the research methodology, sources, and information base used in the report and contains a glossary of terms associated with repression in North Korea.

**Part Two** describes the phenomena of repression associated with the North Korean *kwan-li-so* political penal labor colonies where scores of thousands of political prisoners—along with up to three generations of members of their families—are banished, deported, imprisoned without any judicial process, and subjected to slave labor for mostly lifetime sentences in mining, logging or various agricultural enterprises operating within a half-dozen sprawling encampments, enclosed in barbed wires and electrified fences, mostly in the north and north central mountains of North Korea.  The report describes who the political prisoners are: real, suspected or imagined wrong-doers and wrong-thinkers, or persons with wrong-knowledge and/or wrong-associations who have been deemed to be irremediably counter-revolutionary and pre-emptively purged from North Korean society.

This part also provides an overview of the prison-labor camp system: the guilt-by-association collective punishment, forced disappearances and incommunicado detention without trial, systemic and severe mistreatment, induced malnutrition, slave labor and exorbitant rates of deaths in detention, informants and intra-prisoner hostilities, executions and other extreme punishments, sexual relations, "marriage" and prison camp "schools," the sexual exploitation of women prisoners, prisoner releases, the economic role of the forced labor camps, and the complete removal from any protection of law, along with the arbitrary and extra-judicial nature of the system.

It outlines the successive waves of political imprisonment over the fifty-odd years the prison camps have been in operation, and provides a brief recounting of how, over several decades, information about the secret and officially denied prison camps has become knowable and known to the world outside North Korea.

Part Two then presents the heart-rending stories and testimonies of fifteen former *kwan-li-so* prisoners—the lives and voices of "those who are sent to the mountains"—and several former guards at a half-dozen prison-labor camps who were interviewed for this report.

The total number of those currently incarcerated in prison labor camps is estimated between 150,000 and 200,000, as reported by North Korean state security agency officials who defected to South

Korea. From virtually all former prisoners' testimonies, it is evident that there has been an extraordinarily high rate of deaths in detention (measured by the deaths of family members or those in work or residence units). Whether the rate of new imprisonment is as high as the rate of deaths in detention is not known. The International Committee of the Red Cross would have to gain entry to the camps in order for a precise number of prisoners to be established.

*Part Three* describes North Korea's *kyo-hwa-so* long-term, felony level penitentiaries and prison camps.  These facilities hold persons convicted of criminal acts, as defined in the DPRK criminal codes, as well as large numbers of persons suspected of political malfeasance—actions which would not, by international norms and standards, be regarded as criminal offenses.  Some of the *kyo-hwa-so* resemble the sprawling *kwan-li-so* encampments and prisoners also engage in mining, lumber cutting and agricultural labor.  Other *kyo-hwa-so* resemble penitentiaries: a small campus of several buildings surrounded by high turreted walls, where prisoners labor in terrible conditions in industrial factories or agricultural plots within the prison.

Some of these prisoners were tried in North Korean courts, but many were not.  Some of the women's prisons have very large numbers of women who were forcibly repatriated from China. The brutal conditions of imprisonment are a far cry from international standards, which are for ease of comparison appended to the present report.  The *kyo-hwa-so* prisons and penitentiaries are also characterized by very high rates of deaths in detention.  *Kyo-hwa-so* prisoners are released back into society upon completion of their sentences.  In fact, many prisoners are given sickness-related early releases to lower the number of deaths in detention and spare the prison officials from the need to return the bodies to their families.

Part Three presents the stories and testimonies of twelve former *kyo-hwa-so* prisoners from ten different prisons.

*Part Four* focuses on three additional North Korean institutions of arbitrary detention, brutal interrogation, severe punishment and forced labor that are primarily directed at North Korean citizens who have been *refouled*—forcibly repatriated—from China: *ku-ryu-jang* police interrogation and detention facilities; *jip-kyul-so* misdemeanor level prisons; and mobile labor brigades termed *ro-dong-dan-ryeon-dae* "labor training centers."  These facilities are characterized by shorter periods of detention. But they are no less brutal than the longer term *kwan-li-so* and *kyo-hwa-so* prisons and camps detailed in Parts Two and Three.  Beatings and more systematic torture are commonplace, if not routine, in the initial *ku-ryu-jang* police detention-interrogation facilities located along the China-North Korea border.And it is at these detention-interrogation facilities, or the "collection places" known as *jip-*

*kyul-so*, where the horrific practices of racially-motivated forced abortions, infanticides and other forms of humiliation and violence against women take place.

Part Four begins with an examination of the conditions that lead to the flow of North Koreans into China, the situation of North Koreans in China, including the unavoidable contact with South Koreans and South Korean culture, contact with Korean-Chinese Christian churches, and the situation that leads to the trafficking of North Korean women inside China.

It then examines four of the main forced repatriation corridors through which North Koreans are *refouled* by Chinese police to the awaiting North Korean police agencies.  Testimony is presented from six North Koreans forcibly repatriated at Sinuiju, one person repatriated at Hyesan, five persons forcibly repatriated at Musan, one person forcibly repatriated at Hoeryong, and eleven persons repatriated at Onsong.  Their stories trace the former prisoners' punishing travails through one, and often more than one, police interrogation facilities before being dispatched, often without any judicial processes to one of the prison labor camps or penitentiaries described in Parts Two and Three or to one or more of the misdemeanor level prisons or mobile work brigades described in Part Four.

**Part Five** summarizes the torture and racially-motivated-infanticide and forced abortion experienced or directly witnessed by former North Korean prisoners and detainees interviewed for this report.

**Part Six** concludes that the prison labor camp system as it has operated in the DPRK for some fifty years, and continues to so operate today, constitutes a clear and massive crime against humanity. This section utilizes the best available contemporary norms of international human rights law and international criminal law—the International Covenant on Civil and Political Rights, and Article 7 of the Rome Statute of the International Criminal Court—to analyze the human rights violations detailed in Parts Two, Three, Four and Five.  This analysis concludes that 10 of the 11 actions proscribed in Article 7 of the Rome Statute as crimes against humanity are being committed in North Korea against civilian populations imprisoned in the *kwan-li-so* political labor camps: enforced disappearance, deportation, massive and prolonged extra-judicial and incommunicado imprisonment in violation of the fundamental rules of international law, enslavement, torture, murder, extermination, rape, persecution against identifiable groups on political grounds, and other inhumane acts committed knowingly in a systematic and widespread manner by state police agents operating on behalf of the state authority.

In addition, Part Six finds the serial atrocities committed by DPRK police agents against North Korean citizens forcibly repatriated from China, as detailed in Parts Four and Five (held in the *kyo-hwa-so*, *ku-ryu-jang*, *jip-kyul-so*, and *ro-dong-dan-ryeon-dae* prisons and other facilities), to constitute crimes against humanity. Such crimes include imprisonment in violation of the fundamental rules of international law, enslavement, torture, sexual violence of comparable gravity to rape, murder, persecution on political grounds, and other inhumane acts of similar character causing great suffering and serious injury to mental and physical health.

The report posits that international recognition that the consistent pattern of gross violations of human rights, documented in this report, constitutes crimes against humanity, would, in the long run, be conducive to halting such violations. Such recognition could encourage the North Korean authorities, who presently deny that the camps even exist, and who presently refuse to cooperate with key United Nations human rights procedures, to admit that the political prison forced labor camp system is a matter that they cannot fail to address and resolve.

***Part Seven***.  Based on the facts of the operation of the North Korean gulag system, as detailed in the report, and utilizing the international legal framework for analysis outlined in Part Six, this section makes a series of detailed recommendations to the DPRK, to the People's Republic of China, and to other member states of the international community.  Recommendation highlights include:

To the DPRK: With respect to the *kwan-li-so* prison labor camp system, the report recommends a schedule for prisoner releases and sets forth the measures that would fully restore to those detained the liberties of which they have been so severely deprived. In effect, it provides a blueprint for disabling and dismantling the prison labor camp system.

With respect to the other prison and forced labor facilities described, the report recommends the release of all persons who have not been charged, tried and convicted of violations of the DPRK Criminal Code in a DPRK court of law operating under international standards for due process and fair trial. It also recommends that all detention and re-education through labor facilities be brought into line with international standards.

Further, it is recommended that all persecutions and prosecutions cease against North Koreans who have exercised their right to leave their country of origin; and that the practices of torture, forced abortions and infanticide be halted immediately and absolutely.  More generally, it is recommended that the DPRK allow the International Committee of the Red Cross to have access to detention facilities, and cooperate with United Nations human rights personnel and programs.

XI

<u>To China</u>: The report recommends that the office of the UN High Commissioner for Refugees be granted immediate access to North Koreans seeking protection and first asylum in China, and that all forced repatriation of pregnant Korean women be halted immediately and unconditionally.

<u>To UN Member States</u>:  As a step toward international recognition that the human rights violations detailed in this report constitute crimes against humanity, it is recommended that a commission of inquiry or group of experts be created to examine DPRK breaches of international human rights law and international criminal law.

<u>To the United States, South Korea and Japan</u>: It is recommended that the human rights concerns raised in this report be factored into any future normalization of political and economic relations with the DPRK.

An ***Appendix*** provides the texts of the UN Standard Minimum Rules for the Treatment of Prisoners, and the UN Body of Principles for the Protection of All Persons Under any Form of Detention or Imprisonment.

***Satellite Photographs***.  The report contains 41 satellite photographs of numerous North Korean prison labor camps and penitentiaries holding North Koreans for essentially political offenses. The locations have been confirmed by former prisoners in these facilities.

## ABOUT THE AUTHOR:
## DAVID HAWK



A prominent human rights researcher and advocate, David Hawk is a former Executive Director of Amnesty International USA, and a former United Nations human rights official.  His career began with involvement in voter registration and desegregation campaigns in Mississippi and Georgia in the early-and-mid-1960s. After post-graduate studies, Hawk began directing AIUSA in 1974, overseeing a rapid expansion and extension of influence at a time of surging international interest in human rights. Hawk later served on the Board of Directors of AIUSA and became a founding member of the Board of Directors of Human Rights Watch/Asia.

In 1981, while based in Thailand to monitor the situation of Cambodian refugees and famine relief, Hawk kicked-off groundbreaking investigation, documentation and analysis of the Khmer Rouge genocide—a project that he would continue through the decade—traveling regularly to Cambodia and obtaining and publishing original Khmer Rouge prison documents, prisoner/execution and mass grave photographs, and supplying first-person eye-witness testimony from Cambodians inside the country and in refugee camps, along with a framework to understand the system of repression within the terms of international human rights law.

In August 1995 Hawk traveled to Rwanda to document genocidal massacres for the US Committee for Refugees, and in 1996 he returned to Kigali on mission for Amnesty International.  In the mid-to-late 1990s, he directed the Cambodia Office of the UN High Commissioner for Human Rights, helping to train and sustain fledgling Cambodian human rights civil society organizations, monitor current violations, and stand up for accountability. Returning to the USA in 1999, Hawk consulted for the Washington DC-based Landmine Survivors Network, advocating the landmine ban and disability rights conventions, and assisting in humanitarian aid for landmine victims in Cambodia and Vietnam.

Since 2002, Hawk has focused on the grievous situation of human rights in North Korea. His publications on the DPRK include: *Hidden Gulag: Exposing North Korea's Prison Camps—Prisoner Testimonies and Satellite Photographs*, The Committee for Human Rights in North Korea, 2003; *Thank You Father Kim Il Sung: Eyewitness Accounts of Violations of Freedom of Thought Conscience and Belief in North Korea*, U.S. Commission on International Religious Freedom, 2005; "Human Rights and the Crisis in

1

North Korea," North Korea: 2005 and Beyond, APARC/Stanford University, Brookings Institution Press, 2006; *Concentrations of Inhumanity: An Analysis of the Phenomena of Repression Associated with North Korea's Kwan-li-so Political Penal Labor Camps*, Freedom House, 2007; "Factoring Human Rights into the Resolution of Cold War Conflict on the Korean Peninsula" in *Human Rights in North Korea: Toward a Comprehensive Understanding*, eds. Park and Han, The Sejong Institute, Seoul, 2007; and *Pursuing Peace While Advancing Rights: The Untried Approach to North Korea*, The U.S.-Korea Institute at the John's Hopkins School of Advanced International Studies, 2010.

Currently he is a Visiting Scholar at the Columbia University Institute for the Study of Human Rights, and teaches at Hunter College, City University of New York.

# ACKNOWLEDGEMENTS

This report benefited from the help of many people in the United States, South Korea and elsewhere—the author is extremely grateful to each and everyone.

But some assisted in ways that can only be described as over and above the call of duty. Ms. Sarah Kim, my research assistant is at the top of that category. A graduate student in international affairs at George Washington University, Sarah assisted in translating, conducting and transcribing interviews, organizing files, assisted in Korean and Japanese word usage, and copy-editing. She made the computerized illustrations from the former prisoners' hand-drawn sketches of detention facilities, and her enthusiasm for the project—regardless of the assignment—never flagged.

Special thanks also to Committee Chair, Roberta Cohen, for taking so much care and time for substantive comments and detailed copy-editing of successive draft manuscripts, which imparted more clarity and a smoother read. Thanks also to former HRNK Executive Director, Chuck Downs, for his patience and guidance during the research and writing of this report, and for obtaining the important testimony of Mrs. Kim Hye-sook. And to current HRNK director Greg Scarlatoiu, for his work to complete the publication.

Locating former North Korean prisoners and detainees to participate in my interviews was helped so much by "Free the North Korean Gulag" (NKGULAG), a Seoul-based NGO of former North Korean political prisoners, and by Mr. Chung Tae-ung, who previously assisted the Stephen Haggard and Marcus Noland refugee survey, *Witness to Transformation: Refugee Insights into North Korea*. Thanks to Ms. Lee Hae-young for assistance in translating during interviews with former prisoners and for briefing me on Korean language memoirs by former prisoners. Lee Hae-young also reviewed the sections of the text on North Koreans in China and their repatriation to the DPRK.

2

Thanks to Prof. Haruhisa Ogawa and his colleagues at the Japanese NGO, NO FENCE, for arranging my interviews with former North Koreans in Tokyo and Osaka.

There are others who gave their time and expertise.  Among these are Mr. Joshua Stanton, a Washington attorney and blog manager (OneFreeKorea); Mr. Curtis Melvin, Editor of North Korea Economy Watch (NKEconWatch); HRNK interns, Jason Keller, Chung Hae-gun, James Do, and Lee Hyung-chang, who helped with Google Earth satellite photo images; Mintaro Oba for help with copy editing; Geena An, Suzanne Lee Riopel and Grace Oh for help with translating background documents; and Rosa Park for graphic design, and help with copy editing and text arrangement. Thanks also to Mr. Kim Sang-hun, Chairman of the Board of Directors of NK Data Base (NKDB) for finding the former residents of Chongjin who confirmed the location of Prison Camp No. 25.

Thanks to those who generously reviewed the report's legal analysis and recommendations, who include Jared Genser, an international human-rights lawyer and Managing Director of Perseus Strategies; Sir Nigel Rodley, Professor of Law and Chair of the Human Rights Centre at Essex University; and Prof. George Andreopoulos, Director of the Center for International Human Rights at the John Jay College of Criminal Justice, City University of New York.  Needless to say, remaining errors of fact or interpretation are the responsibility of the author.

Special thanks to Joan Libby Hawk, for her unflagging patience, valued advice and editing assistance during the research and writing of this report.

**David Hawk**

3

# PREFACE

Upon receipt of the Nobel Prize for Literature in 1980, Czeslaw Milosz, a defector from communist Poland and author of *The Captive Mind,* observed that "those who are alive receive a mandate from those who are silent forever." In publishing the first and second editions of *Hidden Gulag*, the Committee for Human Rights in North Korea has assumed that mandate. By means of these reports, it gives voice to those silenced in the remote labor camps and prisons of North Korea.

There may be as many as 200,000 North Koreans locked away on political grounds behind barbed wire and subject to extreme cruelty and brutality. Many are "not expected to survive," according to the State Department's 2010 human rights report, in particular those incarcerated in the *kwan-li-so* (political penal labor colonies). Others are held in long-term prison-labor penitentiaries or camps, shorter-term detention facilities, mobile labor brigades and interrogation detention facilities. The vast majority are arbitrarily arrested with no reference to any judicial procedure and for "offenses" that are not punishable in most countries, namely listening to a foreign radio broadcast, holding a Protestant religious service, watching a South Korean DVD, leaving dust on Kim Il-sung's picture, exiting the country without permission, expressing critical remarks about government policies, or having a father or grandfather who was a landowner or defected to South Korea or worked for the Japanese, thereby placing the family in a "hostile" category under North Korea's social classification or *songbun* system.

Starvation food rations, forced labor, routine beatings, systematic torture and executions put the North Korean camps in the ranks of history's worst prisons for political offenders. Originally modeled on the Soviet gulag, the North Korean camps have developed distinctive features of their own for which no terminology has yet been devised. Particularly horrifying is the incarceration of entire families, including children and grandparents, in order to isolate them from society and punish them because of their relationship to family members accused of political crimes. Rooting out "class enemies for three generations" was specifically ordered by Kim Il-sung, which at times has led to comparisons with Nazi death camps. An equally horrifying practice distinctive to North Korea is forced abortion regularly carried out and in the most brutal manner on women prisoners who illegally crossed the border into China, became pregnant by Chinese men and were forcibly repatriated to North Korea. In cases where the pregnancy is too advanced, guards beat the infants to death or bury them alive after they are born. Still another point of departure in North Korea is that all the residents of the *kwan-li-so* are denied any correspondence, visits or life saving parcels from family and friends. They are totally *incommunicado*.

Estimates of the numbers who have died in the camps over the past 40 years have run well over one hundred thousand. The existence of the political prison camps, however, is soundly denied by North Korean officials. "We must envelop our environment in a dense fog to prevent our enemies from learning anything about us," Kim Jong-il reportedly said. Human rights specialist David Hawk in his

4

first edition of *Hidden Gulag* (2003) and now in its second edition (2012) challenges North Korea's deliberate effort to hide the truth. With painstaking care he has unearthed and compiled evidence from the period 1970 to 2008 to demonstrate an extensive prison camp system hidden away in North Korea's isolated mountains. Amassing satellite photographs and hand drawings of the different camps, testimonies from former prisoners and interviews with former guards, he has documented beyond a doubt the existence of penal labor camps and other political prisons. He has met with almost all of the former *kwan-li-so* prisoners who were either released or escaped to South Korea. Of the more than 23,000 defectors who have made the treacherous journey to the South over the past decade, hundreds are former prisoners. In telling their stories, they are making the world aware of the crimes and atrocities upon which Kim family rule has long been based.

It is worth recalling that some forty-five years ago, political prisoners in China were an undifferentiated mass of people unknown to the rest of the world. In fact Andrei Sakharov, the renowned Soviet scientist and dissident, together with other Soviet dissidents in the 1970s publicly called on their Chinese counterparts to establish lines of communication with the outside world in order to prevent the authorities "from crushing them without a trace in the remote labor camps and prisons." They pointed out that international exposure of human rights violations was an important way to deter governments and bring about change. Today, North Korean prisoners are the ones coming to the fore. Their country, now led by Kim Jong-un, continues to be closed to the world, but the conspiracy of silence surrounding the camps is nonetheless being breached.

More than 120 states at the UN General Assembly in 2011 expressed "serious concern" about the "the existence of a large number of prison camps and the extensive use of forced labour" in North Korea. This must be followed by bilateral and multilateral efforts to gain access to the camps so that international organizations can bring in food and medicines, help reduce the high death rates and end the horrifying isolation of these prisoners. For too long, it has been considered too difficult, too controversial, and too confrontational to point to the camps in discussions with North Korean officials. That is precisely why the report's recommendations are so important in calling for access to the starving, abused and broken men, women and children held captive. It is not just nuclear weapons that have to be dismantled in North Korea but an entire system of political repression.

**Roberta Cohen**

Co-Chair

Committee for Human Rights in North Korea

The Hidden Gulag Second Edition

# MAP OF NORTH KOREA



# PART ONE

# INTRODUCTION

*"The term 'political prisoner' does not exist in the DPRK's vocabulary … the so-called political prisoner's camps do not exist."*

Or so asserted the representative of the Democratic People's Republic of Korea (DPRK or North Korea) to the United Nations Human Rights Council on December 7, 2009.[1]

The second edition of Hidden Gulag is based on information provided by former North Koreans who were incarcerated in the DPRK prisons and prison-labor camps. It challenges the denial of political prisoner camps and outlines the operations of a large scale and far reaching system of arbitrary and extra-judicial detention coupled with a regime of forced labor that abuses scores of thousands of North Koreans at any one time, and brutalized hundreds of thousands of North Koreans from the period 1970 to 2008.

The first-person testimony on which this report is based, along with brief biographies of the former prisoners interviewed, is now available to the international public because these individuals took long and dangerous journeys outside the DPRK and agreed to give accounts of what happened to them. After their release, or, in a very few cases, escape from imprisonment, they fled to the area of Northeast China, formerly known as Manchuria. From Northeast China, a few crossed the Gobi desert to Mongolia and travelled from Mongolia to South Korea. Many more undertook an arduous "underground railroad," a 4,000 to 5,000 mile trek of several months duration (without travel documents and permits) from Northeast China down through Beijing, Shanghai, Guangzhou, Kunming, and further down into Southeast Asia through Vietnam, Laos, Cambodia or Thailand. This was before reaching Bangkok, where they found asylum and protection via the South Korean consulate, which transported them to Seoul. In the last decade, some 23,000 former North Koreans have found refuge and citizenship in the Republic of Korea.[2]

Included among them are hundreds of North Koreans previously detained in the network of prison camps, penitentiaries, police detention facilities and mobile forced labor brigades described in this report. This network of arbitary, often extra-judicial, detention and forced labor facilities constitutes the North Korean "gulag," appropriating the common name for the Stalinist prison-labor camps of the former Soviet Union.[3] Some 60 former North Koreans, previously detained in these facilities, were interviewed for this report. Their testimony and personal stories detail egregious suffering.

---

[1] "Report of the Working Group on the Universal Periodic Review: DPRK," UN Doc. A/HRC/13/13, 4 January 2010, para. 45.

[2] There are also several hundred former North Koreans who have found asylum in Europe or North America.

[3] Literally, *gulag* is the Russian language acronym for "Chief Administration of Corrective Labor Camps." The term has come to signify not only the labor camps established by Stalin after 1929, but the whole system of slave labor, and the repressive system itself: the arrests, interrogations, transport, destruction of families, the years in exile, and the early and unnecessary deaths. Michael Scammell, "Circles of Hell" *New York Review of Books*, April 28, 2011 citing Anne Applebaum, *Gulag, A History*, Random House, 2003.

The Hidden Gulag Second Edition

The official denial cited above is, in part, semantic legerdemain.[4] It is also a corollary of the stock, Orwellian assertion used by North Korean representatives and diplomats from the late Kim Jong-il on down, "There can be no human rights problem in our people-centered socialism.[5]

In actuality, the only real way for North Korea to refute, contradict or invalidate the claims and testimonies of the North Korean refugees interviewed in South Korea for this report would be to permit officials of the United Nations, the International Committee of the Red Cross (ICRC), the International Labour Organization (ILO), or experienced international human rights organizations such as Amnesty International or Human Rights Watch, or a delegation of Pyongyang-based Ambassadors to verify or invalidate on-site the allegations of the former prisoners.[6] In the absence of reliable on-site refutation, the refugee testimonies stand.

This report also provides extensive testimony about the severely inhumane punishments meted out to North Koreans who are *refouled*, that is forcibly repatriated, from China for having exercised their internationally recognized "right to leave their country of origin" in search of food, employment, or refuge and asylum. At the December 7, 2009 session of the UN Human Rights Council cited above, DPRK representatives made the astonishing admission:

*"Border crossers linked to outside forces who perpetrate anti-state acts will be strongly guarded against and punished."*[7]

Testimony from scores of "border crossers"—North Koreans forcibly repatriated from China and severely punished upon return to the DPRK—who eventually fled again to China and made their way to South Korea amply demonstrates that virtually any encounter with South Koreans or South Korean culture (which in the ethnic-Korean region in Northeast China is virtually impossible to avoid) is regarded as "an anti-state act." There is, however, no basis in contemporary international norms and standards for imprisonment on the grounds of meeting foreign nationals or listening to foreign TV programs, videos or music, or attending church in a third country.

The testimony reveals that forced repatriation from China is a pathway to pain, suffering, and violence. Arbitrary detention, torture and forced labor are inflicted upon many repatriated North Koreans, and sexual humiliations, forced abor-

---

4  The term used by DPRK officials and guards for those confined in the labor camps is "migrant" (*e-ju-min*). And, it is possible to define "prisoner" (as opposed to a "detainee") as someone convicted in a court for violating what is defined in law as a crime, whereas, the North Korean political penal labor camp system, as described in this report, is virtually extra-judicial – outside the DPRK court and legal system. Thus, the inmates in the North Korean gulag, with a few exceptions noted below, have not been tried or convicted. However, contrary to North Korean semantics, the standard international legal definition is "imprisonment or other severe deprivation of physical liberty in violation of the fundamental rules of international law." As can be seen in the testimonies in this report the deprivation of physical liberty in the prison camps, penitentiaries, detention-interrogation facilities and mobile forced labor brigades is severe in the extreme. And severely contrary to the norms and standards of modern international human rights and criminal law.

5  Recently reiterated in the offical Korea Central News Agency (KCNA) Bulletin, 26 October 2011: "There are no 'human rights issues' for us. There can be no such things in the light of the intrinsic nature of the socialist system which serves the people, placing them in the center of everything."

6  This report provides the precise locations (degrees, minutes and seconds of latitude and longitude) of the prison camps.

7  Author's notes from the UN-provided oral translation at the Human Rights Council meeting, Geneva, 7 December 2009.

tions and infanticides are inflicted upon repatri-ated North Korean women, many of whom are pregnant after having been trafficked and tricked or coerced and sold into "marriage" to men in China. The testimonies from former women prisoners and detainees also reveal the racial prejudices that North Korean prison officials and guards hold toward half-Chinese fetuses and newborn babies, which are aborted or killed immediately upon birth, a practice documented at multiple detention facilities along the North Korea-China border.

In recounting the stories of victims and survivors, *Hidden Gulag* provides testimony and analysis of arbitrary and largely extra-judicial detention in a variety of penal and forced labor facilities:

> *Kwan-li-so* political penal labor colonies, where North Koreans suspected of wrong-doing and wrong-thinking, along with up to three generations of family members are summarily deported without trial to disappear into fenced-in and heavily guarded mountainous areas where they are subjected to forced labor in mines, logging, state farming and factory work, for mostly life–time duration.

> *Kyo-hwa-so* penitentiaries or camps, where persons deemed to have committed felony level criminal and political offenses are sent for fixed-term forced labor often under very strict regime and brutal conditions.

> *Jip-kyul-so* shorter-term detention facilities for misdemeanor-level offenses, both criminal and political.

> *Ro-dong-dan-ryon-dae* mobile labor brigades,

localized "labor training" facilities largely for repatriated North Koreans, set up originally because the numbers of repatriated Koreans overwhelmed the *jip-kyul-so* detention facilities.

> *Ku-ryu-jang* interrogation-detention facilities run by either the *Bo-wi-bu* political police or the *An-jeon-bu* criminal police agencies.

The above facilities are listed in the descending order of length of detention. But the length of detention should not be equated with the harshness or brutality of mistreatment. Brutality and abuse reign, regardless of the length of detention. While the phenomena of repression varies according to the type of detention facility, the stories and testimonies of the victims and survivors of these facilities contained in this report show extreme brutality—across the board—characterizing the arbitrary detention to which hundreds of thousands of North Koreans are subjected. Deliberately below-subsistence level food rations, coupled with routine beatings and systematic torture, and onerous forced labor lead to very high rates of deaths in detention. The entire system, with all of its components, is rife with human rights violations so brutal and severe as to shock the conscience of mankind. In the words of one scholar, the term "gulag" has "come to stand with the word 'Holocaust' as the name of one of the two great aberrations of twentieth century civilization."[8]   The gulags of Kim Il-sung, Kim Jong-il, and Kim Jong-un continue into the twenty-first century with, at present, no end in sight.

---

8  Scammell, *op cit*., p.46.

## Not in a Vacuum

The prison and labor camp atrocities detailed in this report do not take place in a socio-political vacuum. To the contrary, these severe human rights violations occur in an environment of large-scale denial of human rights and fundamental freedoms. The systematic and widespread human rights violations in North Korea are comprehensively surveyed in the annual White Paper on Human Rights in North Korea published by the Seoul-based Korea Institute for National Unification (KINU).[9]  The White Paper follows the categories and provisions of the International Covenants on Human Rights, and references or incorporates up-to-date information and accounts from international and national human rights NGOs, and the findings in the US Department of State's annual "country reports."[10]

In the words of noted Korea specialists:

> "The DPRK is the single most controlling state in history, bar none… [the Chosun

dynasty feudal] system, already transformed by decades of guerilla war against Japanese colonialism and occupation, was supplemented after 1948 by the political-surveillance techniques grafted onto the traditional control system by Soviet and Chinese 'best practice,' thereby achieving a truly totalitarian level of individual monitoring, reporting, and control without precedence in human history. This control system is designed to sustain a social system that is based on political loyalty…"[11]

The broad array of human rights violations involved with the population "control system" in North Korea has been set forth in a series of reports by the UN Special Rapporteur on the situation of human rights in the DPRK.[12]  In his 2010 report to the UN Human Rights Council, the Special Rapporteur characterized the human rights violations in North Korea as "harrowing," "horrific" and "sui-generis," putting North Korea "in its own category."[13]  Based largely on these reports, the United Nations Human Rights Council and General Assembly have passed a series of resolutions recognizing and condemning the "systematic, widespread, and grave violations of civil, political, economic, social and cultural rights in the D.P.R.K."[14]

---

9  Korea Institute for National Unification, Insu-dong, Gangbuk-gu, Seoul, Korea, pp.142-728, http://www.kinu.or.kr.

10  See also the reports and web sites of Amnesty International and Human Rights Watch, the Committee for Human Rights in North Korea (hrnk.org) and the Seoul-based Citizen's Alliance for North Korean Human Rights (nkhumanrights.or.kr), the Network for North Korean Democracy and Human Rights (nknet.org), and Database Center for North Korean Human Rights (NKDB.org). In 2008 the (South) Korean Bar Association also published a 700 page *White Paper on Human Rights in North Korea* in both Korean and English containing chapters on important aspects of the human rights situation (koreanbar.or.kr). For readers interested in general accounts of life in North Korea which reference the overall human rights situation, see Barbara Demick, *Nothing to Envy: Ordinary Lives in North Korea*, Spiegel and Grau, New York, 2009; Ralph Hassig and Kongdan Oh, *The Hidden People of North Korea: Everyday Life in the Hermit Kingdom*, Rowman and Littlefield, Lanham, Maryland, 2009; and Stephan Haggard and Marcus Noland, *Witness to Transformation: Refugee Insights into North Korea*, Peterson Institute for International Economics, Washington DC, 2011.

11  Peter Hayes, Scott Bruce and Dyana Mardon, "North Korea's Digital Transformation: Implications for North Korea Policy," Nautilus Institute, November 8, 2011, p. 2.

12  The first Special Rapporteur was Vitit Muntarbhorn, a professor of international and constitutional law at Chulalongkorn University, Bangkok Thailand. The second, and current, Special Rapporteur is Marzuki Darusman, the former Attorney General of Indonesia.

13  UN Doc. A/HRC/13/47, 17 February 2010.

14  In 2011, the UN General Assembly resolution condemning the human rights violations in the DPRK passed by a vote of 123 in favor and only 16 against (with 51 abstentions and three absences). For the text of this resolution see UN Doc. A/C.3/66/L.54, 28

But, just as they deny the existence of the political prison forced labor camps, the North Korean authorities have long denied that there are any human rights problems or issues in the DPRK. In 1988, the North Korean Ambassador to the United Nations wrote to the Minnesota Lawyers International Human Rights Committee that violations of human rights do not take place and are "unthinkable" in North Korea.[15]  In 1994, an official publication, *The People's Korea* proclaimed, "... there is no 'human rights problem' in our Republic either from the institutional or from the legal point of view."[16]  North Korean diplomats at the United Nations in Geneva routinely deny that there are any violations of human rights. The General Assembly resolutions are regularly and officially denounced by the Korean Central News Agency (KCNA) as a smear campaign by the United States and its "sycophants."

## The Second Edition of Hidden Gulag

There are three major differences between the 2003 first edition of *Hidden Gulag* [17]  and the present, second edition: first, a substantial increase in the amount of available testimony from former prisoners; second, many more and clearer resolution satellite photographs; and third, the availability of an important new international legal framework for the evaluation of severe human rights violations. This new legal framework for analyzing the North Korean violations enables a fresh and more penetrating series of recommendations to the DPRK on how to dismantle the camp system, and a more focused set of recommendations to the international community on appropriate and efficacious responses to the DPRK violations.

## More Sources, New Dimensions

In 2002 and 2003, during the research for the first edition of *Hidden Gulag*, there were roughly 3,000 former North Koreans who had re-settled in South Korea. In-depth interviews were conducted with thirty former prisoners. By 2009 and 2010, during the research for the second edition, the number of recently arrived

---

October 2011.

15  *Human Rights in the Democratic People's Republic of Korea* (North Korea), Minnesota Lawyers International Human Rights Committee and Human Rights Watch/Asia, December 1988.

16  The People's Korea, No. 1661 (August 13, 1994), p. 8, as cited in *North Korea Through the Looking Glass*, Kongdan Oh and Ralph C. Hassig, The Brookings Institution Press, Washington DC, 2000, p. 134. (What are described herein and elsewhere as political prisoner camps are proclaimed by The People's Korea to be instead "... industrial establishments and cooperative farms animated with creative labor and rows of modern apartment houses and rural houses overflowing with the happiness of the people.")

17  The first edition, entitled *Hidden Gulag: Exposing North Korea's Prison Camps*, published in 2003, was the first systematic and comprehensive account of political prisons, prison camps, and the subsidiary sub-systems of of arbitrary detention in the DPRK.

Prior to the report's publication, the different types of DPRK detention facilities had been translated from Korean to English as "political prisons" and those detained therein as "political prisoners." This was accurate, but not descriptive of the considerable variations in the systems of arbitrary detention in North Korea. Some prisoners had judicial proceedings. Many others did not. Some were imprisoned for life, others for a few months. North Koreans use different names for the different kinds of detention facilities, and these differences are similarly understood by South Koreans. The report therefore sorted testimonies according to their Korean language designations, providing more descriptive translations in English, and then detailed the various phenomena of repression associated with the varieties of political imprisonment. Further, Hidden Gulag was the first time that satellite photographs were used by an NGO report to document the sites of human rights violations. The satellite images allowed former prisoners to locate and identify their former houses, barracks, worksites, execution grounds, and other facilities within the camps, thereby enabling them to confirm the precise location of the camps.

North Koreans residing in South Korea had grown to over 20,000. Included in this number are hundreds of former North Koreans who were subjected to arbitrary detention and other mistreatments documented in this report. For the present edition, an additional thirty in-depth interviews were conducted in 2009 and 2010.

These additional interviews corroborate and re-confirm the testimonies, findings and analysis of the first edition. They also extend, by nearly two decades, the time frame of political imprisonment testimony. The first edition covered political imprisonment between the years 1977 to 1999. The testimony available for the second edition covers 1970 to 2008. Two of the newly interviewed former political prisoners were held in the prison camps for two-and-a-half and nearly three-decades, respectively. Their decades-long incarceration provides significant new details and perspectives on how the prison labor camp system works, and how it can be ended.

### Higher Resolution Satellite Photographs

The satellite photography of the camps used in the first edition was provided by two private companies that specialize in commercial satellite photos, Digital Globe and the Space Imaging Corporation. Obtaining the photographs and inputting the citations and designations by the former prisoners into the satellite photographs was a laborious and time consuming process. The Committee for Human Rights in North Korea (HRNK) obtained very detailed maps of North Korea that included degrees of latitude and longitude. The maps were airmailed to our local NGO partners in Seoul, who called the

former prisoners into their offices and showed them the maps. If and when the former prisoners could locate the camps at which they were held, the degrees of latitude and longitude were plotted. We then contacted the two satellite photo firms to see if they had any imagery for those coordinates in their database. If so, we would order detailed satellite images for those coordinates. Those photographs would then be airmailed to our NGO colleagues in Seoul who would again call the former prisoners to return to their offices and identify any recognized landmarks in the photographic images. The translated identifications were then entered by computer onto the photographic images published in the first edition. This process required several months of consultation and analysis.

By the time of the research for the second edition, Google Earth made satellite images, often of much higher resolution, of the entire Korean peninsula available to anyone with a computer and Internet connection. Using the coordinates from the first edition of *Hidden Gulag*, Korea specialists pored over the higher resolution images of the camps, identifying the fences and guard towers that demarcate the prison camp boundaries. Google Earth enables pinpointing landmarks with efficiency.

During interviews with former North Koreans for the second edition, the author and a Korean translator would sit with former prisoners using the Korean language version of Google Earth, which is better apt at finding North Korean locations, including *ri* and *kun* designations for counties and townships, entered into "search boxes" in Hangul. We would pinpoint landmarks that the former prisoners could identify with confidence.

## Additional Normative and Legal Framework for Analyzing Human Rights Violations

The first edition used, as its framework for analysis, the standard, internationally accepted terminology of a "consistent pattern of gross violations of internationally recognized human rights," based on violation of the human rights norms contained in the International Covenants on Civil and Political and Economic, Social and Cultural Rights, and the UN Standard Minimum Rules for the Treatment of Prisoners. Just as the research for *Hidden Gulag* was underway, an important new framework for analyzing and evaluating severe violations of human rights became available when the Rome Statute of the International Criminal Court (ICC) entered into force in mid-2002. The Rome Statute contains an updated and refined definition of crimes against humanity. The second edition of *Hidden Gulag* utilizes this important additional normative framework for analyzing severe human rights violations in the DPRK.

Breaking down the phenomena of repression in North Korea into the separate criminal acts defined in the Rome Statute reveals a detailed guide to dismantling the prison camp system. Article 7 of the Rome Statute enumerates twelve discrete actions, which, under the requisite circumstances, constitute crimes against humanity. Eleven of those acts, clearly and massively carried out under the requisite circumstances, are detailed in this report. Ending the violations of international human rights and criminal law would effectively dismantle the prison camps.

## Notes On Research, Limits of Information, Sources, Translations, and Transliterations

### Research

This report is based on more than sixty in-depth personal interviews with former prisoners in North Korea's detention facilities who subsequently escaped to South Korea. This is in addition to interviews with several former guards at the camps who later defected to South Korea.[18]

There is a noteworthy difference between the interview data obtained from the former prisoners in the *kwan-li-so* prison-labor camps and the interview data obtained from former prisoners and detainees in the other North Korean detention facilities described and analyzed in this report. I have interviewed almost all of the former *kwan-li-so* prisoners who were released or escaped from detention, fled North Korea, and made their way to South Korea. While each of their accounts—and many interviewees for this report have extraordinary personal histories—could be amplified in much greater detail, as could their descriptions of the section of the sprawling labor camps where they were held (for periods varying from three to thirty years), this report outlines in summary what is known and presently knowable about the DPRK's *kwan-li-so* political-penal labor camp system.

---

18   As is described in this report, most of the prisoners have been deported to the camps for hard labor for the rest of their lives without the possibility of release or parole. Only a small number of prisoners in the labor camps are even eligible for release. While there are a fair number of escape attempts—every former *kwan-li-so* prisoner interviewed for this report witnessed multiple public executions of persons caught trying to escape—there are only two known successful escape attempts. Their stories are recounted herein.

The Hidden Gulag Second Edition

In contradiction to the first person eye-witness interview base for the former prisoners from the *kwan-li-so* camps, there are among the 23,000 former North Koreans who have fled to South Korea in the last decade, hundreds more former North Koreans who were detained in the *kyo-hwa-so*, *jip-kyul-so*, *ro-dong-dan-ryeon-dae* and *ku-ryu-jang* detention facilities. This is in addition to the score of former prisoners and detainees at these facilities interviewed for the present report. In this situation, I sought out enough interviews to ascertain what in human rights terminology is called a "consistent pattern of gross violations of internationally recognized human rights." Thus, it should be noted at the outset that there are, literally, scores of additional witnesses to the phenomena of repression detailed in Parts Three, Four and Five of this report who could, potentially, be sought out and interviewed.

Most of the interviews were conducted in English in downtown or suburban Seoul using South Korean or Korean-American translators of the highest expertise, virtually all of whom had prior experience speaking with North Koreans. A few interviews were conducted in Tokyo and Osaka with former Korean-Japanese who had previously migrated from Japan to North Korea before escaping to China and returning to Japan.

More and more recent information can be obtained from North Koreans currently hiding without entrance visas or legal papers in China. However, upon the recommendations of South Korean colleagues, such interviews are best left to non-Western investigators.[19]

There is, thus, an unavoidable delay between the time the former prisoner is released or escapes from detention, and the time the former prisoner becomes accessible to researchers in South Korea. The former prisoner may spend several months or years before deciding to leave the land of his or her birth, and making the necessary connections to flee to China. The former prisoner may spend several months or years in China to make preparations and connections for the onward journey to South Korea, usually via Southeast Asia or Mongolia. Upon arrival in South Korea, asylum seekers undergo several months of debriefing by South Korean intelligence officials, who try to ferret out North Korean spies or operatives who may have been put into the North Korean refugee flow to South Korea. Then, the new arrivals, now in effective receipt of South Korean citizenship, are provided with several weeks or months of orientation sessions by the South Korean Ministry of Unification. Only after these arrangements are the former prisoners and detainees accessible to journalists, scholars or human rights investigators.

### Limits of Information

While there is easily more than enough data to outline and detail with confidence "consistent patterns" of gross human rights violations, the unavoidable delay described above means that

---

19  There are large numbers of South Korean tourists, students and business people in the areas along the China-North Korea border

where the undocumented North Koreans are working or seeking asylum. There are also Japanese business people as well. There are very few Western tourists or business people in the areas of Northeast China along the DPRK border. Thus, it is feared that a Western researcher conducting multiple in-depth interviews with North Koreans hiding in China, might bring unwanted and dangerous police attention to the undocumented North Koreans who risk forced repatriation and severe punishment if sent back to the DPRK.

14

gaps remain, only some of which can be bridged by additional research interviews. For example, much of the recent information about one of the most well known *kwan-li-so* labor camps comes from relatively short-term prisoners from a recently constructed section for single men and single women in the "revolutionizing process zone" at Camp 15 (Yodok) for prisoners who are eligible for release. Even though the former North Korean prisoners now residing in South Korea try to track information very closely through their extensive information networks back in North Korea, there have been no known releases from Yodok since 2009. Thus, as of the publication of this report in 2012, we do not know if releases from the "revolutionizing process zones" continue or if the policy and practice has changed.

Similarly, a number of prisoners in the *kwan-li-so* labor camps interviewed for this report were sent to the family sections of the camps under the "three generation collective guilt and responsibility system" for the real, perceived or imagined political stances, actions or associations of their parent or grandparent. Yet, as much as our recent information comes from former prisoners from "singles" sections of the camps, we cannot know with certainty the extent to which the familywide "guilt-by-association system" operates currently for new prisoners deported to the camps. All we can know with certainty is that there are persons remaining incarcerated who were imprisoned for the perceived political associations or perceived misdeeds of their parents or grandparents.

Lastly, new construction can be seen in more recent satellite photographs of the camps. But without first person or eye-witness testimony, we do not know if the new construction means the prisoner population is expanding or if the new construction is for the prison guards and officials, who are also housed within the sprawling encampments.

### Sources

Many of the former North Koreans interviewed for this report, believing their relatives to be either dead or now living in South Korea, agreed to have their names and, in some cases, their photographs published. Many others, fearing that the North Korean government practices collective punishment, would agree to be interviewed and provide testimony only under condition of anonymity, lest relatives remaining in North Korea be punished for the interviewees' crime of escaping to the Republic of Korea. Such individuals are identified in this report with a number rather than a pseudonym.

For some prison camps and detention facilities described in this report, more than one source of information was available, allowing a comparison of accounts. In other cases, the description of a particular camp or facility rested on the testimony of a single former prisoner. In those instances, the coherence and internal consistency of the testimony and my professional experience[20] had to be relied upon. In more than sixty interviews, only three struck me as too inconsistent to be reliable—one, from a very recent arrival

---

20  In the course of several decades of human rights work, I have interviewed large numbers of victims of repression from a variety of political systems and country situations: perhaps, most notably, hundreds of survivors of the Khmer Rouge genocide in Cambodia between 1975 and 1979 and scores of survivors of the genocide in Rwanda in 1994.

who wanted to make a declaration against Kim Jong-il but whose story and assertions dissolved under close questioning, and two interviewees who may have suffered greatly, but whose testimonies were too confused to be usable.

Because violations of human rights happen to individual human beings, the personal stories of the prisoners are as important to our understanding of repression in North Korea as the first-hand eyewitness information they provide. Most former North Korean prisoners, like the Cambodian and Rwandan survivors I interviewed in the 1980s and 1990s, have extraordinary stories of suffering and survival. Thus, brief sketches of their personal histories are provided along with their descriptions of the prison camps they survived. To a large extent, this report uses the practice of briefly profiling a witness (under the heading "Witness") before providing his or her testimony about the particular camp or facility in which he or she was incarcerated and the phenomena of repression endured and observed there (under the heading "Testimony").

This is not to say that the interviewees' memories are always entirely accurate or that some details have not been lost in translation. Nonetheless, I am convinced that the overwhelming bulk of testimony is reliable. The stories in this report create a fuller picture of the phenomena of repression in North Korea than what has previously existed in English-language sources.

## Translation and Transliteration

In reviewing the North Korea prison literature available in English and after initially conduct-

ing interviews through multiple translators, it became apparent that there is no standard or consistent translation of Korean prison or police terminology into English. Further, North Koreans sometimes use the same word inconsistently. For example, the term *ku-ryu-jang* is used generically by some to mean "detention facility" and more narrowly by others to mean "interrogation facility." In most cases, the usage employed by the interviewee was retained for this report. The term for "jail" (*ka-mok*) is sometimes used interchangeably with *ku-ryu-jang*.

There are also different ways that Korean terms are romanized or transliterated into alphabetically rendered versions of the Korean *Hangul* characters. Recently, the South Korean government formally introduced a newer transliteration system. But many older books or articles use the earlier version, which is the same transliteration system used in North Korea. For example, the new official South Korean transliteration for the prison camps is *gwalliso* whereas the former transliteration, and the one still used by North Koreans is *kwan-li-so*. Generally, this report uses the older transliteration system, as this transliteration reads more like the way the words sound phonetically when used by former North Koreans.

More problematically, some Korean prison terms are frequently translated in ways that are literally accurate but are either meaningless or misleading in what the words convey in English. For example, the term *kwan-li-so* is sometimes literally translated as "management center," which sounds rather like a business-consulting firm, and is a meaningless translation for a political prison and slave-labor camp. The term *kwan-li-so* is also variously translated as "political-detention camp," "prison camp," or "concen-

tration camp," which are better translations. In this report, the term *kwan-li-so* is translated as "political penal-labor colony," a more descriptive English rendering.

If the term *kwan-li-so* has been meaninglessly translated as "management center," even more misleading is translating the term *kyo-hwa-so* (alternatively transliterated as *gyohwaso*) as "re-education center," or even as "enlighten-ment center," or "edification center." Judged by the testimonies of the former prisoners, there is nothing remotely educational, enlightening, edifying or rehabilitative about these penitentia-ries and long-term prison-labor facilities, as they are more accurately called in this report. Many are characterized by staggeringly high rates of deaths in detention resulting from forced labor under brutal conditions combined with starva-tion-level food rations.

For ease of reference, this report includes a "Glossary of North Korean Repression"—a chart of common North Korean prison and police terms, which lists the Hangul charac-ters, the Chinese characters from which the Korean language expression is based, the formal and common Romanized renderings of the Korean characters, and a literal and a descrip-tive translation into English. For clarity, so that Korean readers will know precisely what is being described, the running text of this report includes the Korean terms used by the inter-viewees as adjectives in front of the descriptive English translation.

To improve accuracy of usage, the second edition of Hidden Gulag introduces changes in the translations of North Korean detention facilities into English. In the first edition, the term "camps" was used for three different kinds of detention facilities: the *kwan-li-so* political labor colonies, the *kyo-hwa-so* long-term, felony-level prison labor facilities, and the *ro-dong-dan-ryeon-dae* mobile labor brigades. In the present, second edition, the term "camp" is used only for the sprawling *kwan-li-so* encampments. The *kyo-hwa-so*, and the related *kyo-yang-so*, which in satellite photographs look like penitentiaries—a small cluster of multiple buildings surrounded by clearly visible high walls with gates and often identifiable guard towers—are termed "felony-level detention or prison-labor facilities." And the *ro-dong-dan-ryeon-dae* are referred to as "labor training centers" or more descriptively, "mobile labor brigades."

Korean names usually appear with the family name followed by the given name, except for a few individuals who have, for English usage, adopted the Anglicized form of their given names and followed these with their family names. In this report, Korean family names appear first followed by the given name, which is often indicated with a hyphen between two syllables of the given name.

## Organization of the Report

*Part One*, following this introduction, contains a chart detailing the "Scope of Information," which lists the times and places of detention experienced by the former North Koreans interviewed for this report and a "Glossary of Repression" which provides literal and explana-tory translations of the terminology associated with North Korea's policy and practice of arbi-trary and extra-judicial imprisonment.

*Part Two* describes the general characteristics of the *kwan-li-so* political penal labor colonies, and provides the testimony of 14 former inmates detained therein, along with the observations of three former prison guards, and workers at the camps.

*Part Three* describes the characteristics and provides testimony from 12 former prisoners in the *kyo-hwa-so* long-term penitentiaries that utilize forced labor with both criminal and political prisoners.

*Part Four* describes the brutal punishments and mistreatments meted out to North Koreans forcibly repatriated from China, all of whom were detained and interrogated in police *kyu-ru-jang* detention-interrogation facilities before being sent to *jip-kyul-so* short-term detention facilities or *ro-dong-dan-ryeon-dae* "labor training centers" which are, in effect, mobile labor brigades, or else the previously described *kwan-li-so* forced labor camps or *kyo-hwa-so* penitentiaries.

*Part Five* summarizes two particularly abhorrent atrocities—torture and racially motivated infanticide/forced abortion—that occur in the various detention facilities described in this report.

*Part Six* analyzes the phenomena of repression according to the terms and provisions of contemporary international human rights law and international criminal law.

*Part Seven* provides a series of recommendations to the DPRK and to other UN Member States of the international community.

# Scope of Information: Documenting the Hidden Gulag

Former North Korean prison detainees and prison guards interviewed for this report were detained, imprisoned or employed at the following places and times[21]:

### *Kwan-li-so* Political Penal-Labor Colonies

*Kwan-li-so* No.14
Kaechon, S. Pyongan Province
- August 1993 – Oct.1995
- 1982–2005

*Kwan-li-so* No. 15
Yodok, S. Hamgyong Province
- 1970–1978
- 1977–1987
- Nov. 1987–Feb. 1989
- March 1988–1992
- April 1995–Jan.1999
- 1999–2000
- March 2000–April 2003
- 2003–2006
- 1999–2006

*Kwan-li-so* No. 18
Bukchang, S. Pyongan Province
- 1977–1983
- 1967–1987
- Oct. 1995–Sept.1998

*Kwan-li-so* No. 22
Hoeryong, N. Hamgyong Province
- 1990–1994
<Closed *Kwan-li-so*>
*Kwan-li-so* No. 105 (closed) Danchun, S.

---

21   Some of the interviewees who requested anonymity also asked that the precise dates of their imprisonment be withheld from publication.

Hamgyong Province
        mid-1980s

*Kwan-li-so* No. 11 (closed in 1989) Kyongsong, N.
Hamgyong Province
        Feb 1985–June 1986
        May–August 1987

*Kwan-li-so* No. 13 (closed in 1990) Jongsong, N.
Hamgyong Province
        1987–1989

*Kwan-li-so* No. 26
Sungho-ri (closed in 1991) Pyongyang
(1964–1984)
1986–1989

### *Kyo-hwa-so* Long-Term (Felony level) Prison-Labor Facilities

*Kyo-hwa-so* No.1
Kaechon, S. Pyongan Province
- Nov. 1987–Dec.1992
- Early 1993–late 1995

*Kyo-hwa-so* No.3
Sinuiju, N. Pyongan Province
- Late 1980s–early 1990s

*Kyo-hwa-so* No. 4
Samdung-ri, Kangdong, S. Pyongan Province
- April–Nov. 1997

*Kyo-hwa-so* No. 8 "Yongdam"
Wonsan, Kangwon Province
- Early to mid–1980s

*Kyo-hwa-so* No. 12
Chongo-ri, N. Hamgyong Province
- Dec. 1998–July 1999

- April 2003–March 2006

*Kyo-hwa-so* No. 22 "Two-Two"
Oro, S. Hamgyong Province
- Sept. 1996–Sept. 1997

*Kyo-hwa-so* No. 77
Danchun, S. Hamgyong Province
- Sept. 1985–July 1987

*Kyo-hwa-so*
Hamhung, S. Hamgyong Provice
- 1.5 year, June 2000–Dec. 2001

*Kyo-hwa-so*
Hoeryong, N. Hamgyong Province
- 1991–1995

Oro *Kyo-yang-so*,
Hamhung, S.Hamgyong Province
-June 2004–July 2005

### *Jip-kyul-so* Provincial (Misdemeanor level) Detention Centers

Chongjin City, N. Hamgyoung Province
- March 2004
- 4 days, mid–2006
- Late March 2007
Nongpo, Chongjin City
N. Hamgyong Province
- Oct. 1986–May 1987
- December 1997
- December 1999
- May 2000
- Mid 2000
- July – Sept. 2000

Onsong, N. Hamgyong Provincce
- Sept. 2000

*Ro-dong-dan-ryon-dae*
**Labor Training Centers/
Mobile Labor Brigades**

Onsong, N. Hamgyong Province
- Jan.–Sept.1996
- June 2000
- 2 months, 2002
- 1 month, Nov. 2003
- 1 year, 2005
- 17 days, mid 2006
- Mid–late March 2007

Musan, N. Hamgyong Province
- October 1998
- Nov.–Dec. 1999
- 20 days, April 30th 2007

Sinuiju, N. Pyoung-an Province
- 3 months, 2002
- 3 months, end of 2003

Youngkwang district, S. Hamgyong Province
- Oct. 2000

*Ka-mok* and *Ku-ryu-jang*
**Police Detention/Interrogation Facilities**[22]

Chung-san, S. Pyongan Province
-2004–2005

Chongjin *An-jeon-bu*, N. Hamgyong Province
- May–Nov. 1987
- Dec. 2001–Feb. 2002

Chongjin *Bo-wi-bu*, N. Hamgyong Province
- Dec. 1987–March 1988
- 8 months, 1998
- 3 months, 2000

Hamju district *An-jeon-bu*, S. Hamgyong Province
- Jan. 1993

Hoeryong *An-jeon-bu*, N. Hamgyong Province
- Couple of days, 2004
- 40 days, July 2008

Hoeryong *Bo-wi-bu*, N. Hamgyong Province
- July 2001
- 2.5 months, late 2004
- June 2008

Hyesan *An-jeon-bu*, Yang-gang Province
- Early 1991

---

22 Identified by the shorthand colloquial names used by former detainees for the two distinct and separate police forces that operate the detention-interrogation facilities.

The Hidden Gulag Second Edition

Kyongsong *An-jeon-bu*
3 months, early 2004

Kyongsong *Bo-wi-bu*
- 2 months, early 2004

Maram *Bo-wi-bu*, Pyongyang
- Early–mid 1993
- Nov. 1994–April 1995
- March–Sept. 1997
- Jan. 1996–Nov. 1997

Moonsu *Bo-wi-bu*, Pyongyang
- Early–mid 2003

Musan *An-jeon-bu*, N. Hamgyong Province
- Jan.–June 2000
- 50 days, early 2004
- April 7th, 2007
Musan, *Bo-wi-bu*, N. Hamgyong Province
- 3 days, Oct. 1999
- 6 months, 2000
- 40 days, Jan. 2004

Myungchun district *An-jeon-bu*, N. Hamgyong Province
- Jan.–July 1993

Namindang *Bo-wi-bu*, Sinuiju, N. Pyongan Province
 - Dec. 1999

Onsong *An-jeon-bu*, N. Hamgyong Province
- 5 months, Oct. 2002–March 2003
- 1 day, mid March 2007

Onsong *Bo-wi-bu*, N. Hamgyong Province
- 15 days, 2001
- September 2002
- 5 months, around December 2002
- 6 months, early 2003
- 3 months, 2003
- 15 days, Dec. 2003
- 25 days, 2004
- 15 days, early/mid 2006
- 21 days, late February 2007

Sambong, Musan, *Bo-wi-bu*, N. Hamgyong Province
- July 2001

Sinuiju *An-jeon-bu*, N. Pyongan Province
- 3 months, late 2002

Sinuiju *Bo-wi-bu*, N. Pyongan Province
- Nov.–Dec. 1999
- 3 months, mid 2002
- 5 months, Jan. 2003
- 25 days, March 2003

21

The Hidden Gulag Second Edition

## Glossary of Repression

| Korean | 관리소 | 교화소 | 집결소 | 노동단련대 | 감옥 | 구류장 |
|---|---|---|---|---|---|---|
| Chinese | 管理所 | 敎化所 | 集結所 | 勞動鍛鍊隊 | 監獄 | 句留場 |
| Colloquial Korean Phonetic Romanization | kwan-li-so | kyo-hwa-so | jip-kyul-so | ro-dong-dan-ryeon-dae | ka-mok | ku-ryu-jang |
| Formal Korean Romanization | gwal-liso | gyohwaso | jipkyulso | nodong-danryeon-dae | gamok | guryujang |
| Literal English | control and managing place | a place to make a good person through reeduca-tion | gathering place | labor-training corps | jail | detention facility |
| Descriptive English | political penal-labor colony | long-term prison labor facil-ity | shorter-term labor/detention facility | mobile labor brigades | jail (often pre-sentence deten-tion) | interroga-tion and detention facility |

22

The Hidden Gulag Second Edition

| Korean | 교양소 | 수용소 | 완전통제구역 | 혁명화구역 |
|---|---|---|---|---|
| Chinese | 敎養所 | 收容所 | 完全統制區域 | 革命化區域 |
| Colloquial Korean Phonetic Romanization | kyo-yang-so | soo-yong-so | wan-jeon-tong-je-koo-yeok | hyeok-myong-hwa-koo-yeok |
| Formal Korean Romanization | gyoyangso | sooyongso | wanjeontongje-gooyeok | Hyeogmyongh-wagooyeok |
| Literal English | a place to make a refined person through teaching and nurturing | a place where many people are put in together. | total control zone | revolutionizing zone |
| Descriptive English | labor detention facility, often for women border crossers | a generic South Korean term for a place of incarceration; occasionally used by North Korean defectors | isolated lifetime political labor colony | non-lifetime prisoner area of the camp |

| Korean | 국가보위부 | 사회안전부 | 인민보안성 |
|---|---|---|---|
| Chinese | 國家保衛部 | 社會安全部 | 人民保安省 |
| Colloquial Korean Phonetic Romanization | Kuk-ga-bo-wi-bu*  "Bo-wi-bu" | Sa-hoe-an-jeon-bu**  "An-jeon-bu" | In-min-bo-an-seong |
| Formal Korean Romanization | Gukgabowibu | Sahoeanjeonbu | Inminboanseong |
| Literal English | State Security Agency | Social Safety Agency (pre-1998) | People's Safety Agency  (post-1998) |
| Descriptive English | political police | regular police | regular police |

\* Former North Koreans interviewed for this report frequently used the shorthand *Bo-wi-bu*, meaning political police, rather than its full name (it is also sometimes translated into English as the National Security Agency or State Security Department).

\*\* Former North Koreans interviewed for this report continued to use the shorthand *An-jeon-bu* to refer to regular police rather than the newer formal name *In-min-bo-an-seong*.

23

The Hidden Gulag Second Edition

| Korean | 고문 | 공개형 | 영아살해 | 강제낙태 | 연좌제 |
|---|---|---|---|---|---|
| Chinese | 拷問 | 公開死刑 | 嬰兒殺害 | 强制落胎 | 緣坐制 |
| Colloquial Korean Phonetic Romanization | ko-mun | kong-gae-sa-hyeong | yeong-a-sal-hae | kang-je-nak-tae | yeon-jwa-je |
| Formal Korean Romanization | gomun | gonggae-sahyeong | yeongasal-hae | gangjaenak-tae | yeonjwaje |
| Literal English | torture | public execution | killing babies | forced abortion | association system |
| Descriptive English | torture | public execution | infanticide | involuntary abortion | guilt by association |

| Korean | 도강자 | 비법월경자 |
|---|---|---|
| Chinese | 渡江者 | 非法越境者 |
| Colloquial Korean Phonetic Romanization | to-kang-ja | pi-bup-wol-kyoung-ja |
| Formal Korean Romanization | dogangja | bibupwolgyoungja |
| Literal English | river crosser | illegal border crosser |
| Descriptive English | person who left the country through crossing a river at the border | person who left the country by border crossing |

24

# PART TWO

# THE *KWAN-LI-SO* POLITICAL PENAL-LABOR COLONIES

### Arbitrary Detention and Forced Labor: Generations Imprisoned Without Trial and Enslaved

## The Prisoners: Who They Are

The *kwan-li-so* labor camps are the incommunicado repositories for those North Korean citizens who have been cleansed or purged and deported to areas of North Korea "outside the protection of the law" because of their perceived counter-revolutionary attitudes or associations. They are deemed to be social, political, economic or ideological deviants who do not fit into or who pose a risk to what the North Koreans themselves term the "Kim Il-sung nation."

The presumed political, ideological, and sociological deviants deported to and imprisoned in the labor camps include persons suspected of *wrong-doing*, *wrong-thinking*, *wrong-knowledge*, *wrong-association*, or *wrong-class-background*. This report provides the stories and testimonies of real persons subjected to severe punishment for this catalogue of perceived wrongs—"crimes that are not really crimes" in the words of one former prisoner.

• Imagined or perceived ***wrong-doing*** can include being on the "wrong" or losing side of a bureaucratic, factional, or political dispute within the Korean Workers' Party, skipping too many of the compulsory ideological education classes all North Koreans are required to attend, defacing or failing to take adequate care of photographic images of Kim Il-sung, complaining about conditions, expressing criticism of regime policies, or leaving the country without permission, and in particular, meeting South Koreans while outside North Korea.

• Imagined or perceived ***wrong-thinking*** includes expressing or supporting ideas at variance with the official ideology. At times this could have been belief or evidence of belief in Protestant Christianity. At other times wrong-thinkers were orthodox Marxists who thought that "juche ideology" or dynastic succession within Kim Il-sung's family was contrary to the spirit and tenets of Marxism-Leninism.

• An example of ***wrong-knowledge*** includes the situation of North Korean students or diplomats who had been studying or posted in Eastern Europe in the late 1980s during the collapse of socialism, and who were recalled to the DPRK only to be immediately dispatched to labor camps to prevent their knowledge of the collapse of state socialism in North Korea's allies from spreading to the North Korean population. An earlier example of wrong-knowledge was the exposure to and knowledge about capitalist prosperity, democracy and civil liberties in Japan by ethnic Koreans who "repatriated" to the DPRK in the 1960s to build socialism in the Korean fatherland, but found Kim Il-sung's version of totalitarian socialism not what they had imagined.[23]

• ***Wrong-association*** is being part of a family whose husband, father or grandfather had collaborated with the Japanese occupation of Korea, or who was a Presbyterian elder or deacon, or

---

23  Substantial numbers of the ethnic Koreans who emigrated to the DPRK from Japan ended up in their own sub-sections of the labor camps.

The Hidden Gulag Second Edition

part of a family whose patriarch was part of a purged faction of the Korean Workers' Party, or who was suspected of supporting South Korea during the Korean War or having subsequently defected to South Korea.[24]

• **Wrong-class** background includes those who had been aristocratic land-owners or otherwise privileged bourgeoisie during the Japanese colonial regime in Korea.

Thus, the purged elements of the population deported to the camps mirror North Korean society. There are "high level" individuals and families as well as members of the lowest socio-political orders in North Korea's rigidly hierarchical *songbun* social classification system.[25] Prisoners include Christian religious believers and orthodox Marxist-Leninist Workers' Party members, as well as large numbers of apolitical citizens who ran afoul of the many rules and regulations put in place to achieve and enforce the unity of heart and mind between the populace and the "Great Leader" Kim Il-sung, and his dynastic successors.

As noted, those deemed irremediably counter-revolutionary were, and are, deported to the camps designated exclusively as "zones under special dictatorship," or to the "total control zones" of mixed-zone camps. Those elements of the population deemed capable of rehabilitation were, and are, sent to the "re-revolutionizing areas" of the labor camps.[26]

Perhaps inevitably, a large ongoing, secretive, extra-judicial camp system such as has long existed in the DPRK becomes a convenient dumping-ground for other individuals or groups that do not fit in. Thus, it is thought that some of the South Korean POWs from the Korean War not repatriated to South Korea ended up in labor camps. Likewise, it is suspected that South Korean soldiers who fought for the Americans in Vietnam and were captured by the North Vietnamese and then turned over to North Korea also ended up in the North Korean labor camps.

Notwithstanding North Korean claims that there are no human rights violations in the DPRK, both Kim Il-Sung and Kim Jong-il have defended and justified the forced labor prison camp system. According to Kim Il-Sung, the imprisonments were:

> "… a legitimate measure to protect the country's democracy from its hostile and impure elements who have abused democratic order and attempted to destroy our socialist system…The type of democracy which can guarantee freedoms and rights to the People, including workers, peasants and the working intelligentsia, and which at the same time can punish a small number of class enemies, is the type of socialist democracy we have in our country."[27]

South Korean POWs since the Korean and Vietnam Wars," The Korean Journal of Defense Analysis, Vol. XIV, No.2, Fall 2002.

27  Kim Il-sung, "Let us strengthen the Peoples Regime," Works of Kim Il-Sung 32, January-December 1977, Korean Workers Party Press, Pyongyang, cited in Jiyong Song's *Human Rights Discourse in North Korea*, Routledge, London and New York, p. 104 . (N.B. In reality North Korea never guaranteed civil and political rights to its people, including its workers, peasants and intellectuals. It no longer guarantees economic freedoms such as freedom from hunger or the right to adequate health either. And the number of "punished enemies" is not small.)

24  Even decades after the Korean War, wives and children in North Korea whose father was believed to have aided or fled to the South, were being tracked down and sent to the camps.

25 See HRNK report, *Marked for Life: Songbun, North Korea's Social Classification System*, (forthcoming in the summer of 2012).

26  See Heo Man-ho, "North Korea's Continued Detention of

Kim Jong-il, in turn, entirely inverted human rights protection and human rights violations:

> "The fact that the People's regime uses dictatorship against the forces violating the interests of the People is indeed the protection of human rights, not the violation of human rights…The original meaning of People's Democratic Dictatorship is a powerful function of the People's regime in an aim to guarantee democratic rights and freedoms for the People as the master of state and society."[28]

Following a descriptive overview of the North Korean system to "punish" the "enemies" of the self-described "People's Democratic Dictatorship," there is a brief account tracing the pattern and evolution of the regime's perceptions of the "hostile and impure elements" that sent successive waves of persons deemed to be among the "forces violating the interests of the People" to the forced labor camps.

## Overview of the Prison Labor Camp System

The *kwan-li-so* political penal forced-labor facilities consist of a series of sprawling encampments measuring many miles long and many wide. They are located in the mountains and valleys, mostly, in the northern provinces of North Korea. There are between 5,000 and 50,000 prisoners per *kwan-li-so*, totaling some 150,000 to 200,000 prisoners throughout North Korea.[29] The perceived or suspected wrong-doers and wrong-thinkers and up to three generations of their extended families are apprehended by police authorities and forcibly deported to the *kwan-li-so*, without any judicial process or legal recourse whatsoever, usually for lifetime isolation and punishment comprised of hard labor in mining, timber-cutting, farming and related enterprises. The prisoners live under brutal and severe conditions in permanent situations of intentional, deliberate semi-starvation.

The *kwan-li-so* are usually surrounded at their outer perimeters by barbed-wire (often electrified) fences, punctuated with guard towers and patrolled by armed guards. The encampments include self-contained, closed compounds (sometimes called "villages") for single persons, usually the alleged wrong-doers, and other closed, fenced-in compounds for the wrong-doers' extended families. Two of the camps, 15 and 18, are divided into sections called *wan-jeon-tong-je-kyoo-yeok* (total-control zones) where the incarceration is for life; and sections called *hyuk-myung-hwa-koo-yeok* (best translated as "re-revolutionizing zones"), from which prisoners may be released.[30] North Koreans deemed by DPRK authorities to be implacably or irre-

---

28   Kim Jong-il, "For the promotion of the superiority of the People's regime" Selected Works of Kim Jong-il 13, February 1992-December 1994, Korean Workers Party Press, Pyongyang, cited in Siyoung Song, ibid, p.156.

29   The 200,000 figure comes from a former guard, Ahn Myong-chol, who previously worked at four different prison camps. Yoon Dae-il, a former official of the *Bo-wi-bu* State Security Agency, the police organization that administers the prison camps, says the 200,000 figure is "the minimum." It is obvious from the testimony of former prisoners that the rate of deaths in detention is very high. It is also clear from prisoner testimony that new prisoners continue to be sent to the camps.

30   Much of our information about the *kwan-li-so* camps comes from former prisoners released from the "re-revolutionizing zones" who subsequently fled to China and made their way to South Korea. Other information comes from the few prisoners who managed to escape prison camps Nos. 14 and 18, and from former guards at a number of the camps who also fled to China and made their way to South Korea.

mediably counter-revolutionary are deposited in the total control camps or zones. Those deemed capable of rehabilitation through intense labor and political indoctrination and "re-education" and hence eligible for eventual release back into North Korean society are placed in the "re-revolutionizing" zones.

Resident and family policy varies. There are sections and dormitories for single men and single women, sometimes in rather close proximity. There are other areas for families (without the primary wrongdoer who is often the family patriarch). Only a very few privileged or model young prisoners are allowed to conjugate and have children. Otherwise, sex between men and women prisoners is prohibited. Except for a number of persons at Camp 18, prisoners have no correspondence or contact with the world outside the political penal-labor colony. The *kwan-li-so* are also sometimes referred to as *teuk-byeol-dok-je-dae-sang-gu-yeok*, which translates as "zones under special dictatorship." The *kwan-li-so* political penal labor colonies are also variously translated into English as "control centers," "management centers," "concentration camps," or "political prison camps."

Over the past decades, there has been a gradual consolidation of the *kwan-li-so*, according to former guards and police officials. Originally there were a dozen, but several have been closed, for a variety of reasons. Camp 11, at Kyongsong, North Hamgyong province was closed to convert the location into a villa for Kim Il-sung at the foot of scenic Mount Gwanmo. Some closed camps were deemed too close to the Chinese border. In these cases, the prisoners were transferred to other camps. According to former police officials, there are now six *kwan-li-so* in operation. Four of these six prison camps, numbered by the North Koreans as 14, 15, 18 and 22 were confirmed by persons interviewed for this report. The location of a fifth camp, 25, has been confirmed by former North Koreans who resided near the prison camp and went to it for various reasons. Former prisoners from Camp 15 relate that there is at least one former prisoner from Camp No. 16, located at Hwasong, North Hamgyong province, who has fled North Korea and presently resides in South Korea, but who declines to be interviewed by journalists or researchers.[31]

Originally, the prison-labor camps were run by the *In-min-bo-an-seong* (People's Safety Agency), regular police forces that are part of the Ministry of Interior (before 1998 called the *Sa-hoe-an-jeon-bu*, meaning Social Safety Agency). Former North Koreans continue to use the older abbreviation, "*An-jeon-bu*," for North Korea's regular police force. Except for *Kwan-li-so* No. 18 in South Pyongan province where the *An-jeon-bu* police agency retains an administrative role, the administration of the *kwan-li-so* prison-labor camps was taken over by *Kuk-ga-bo-wi-bu* (commonly abbreviated as "*Bo-wi-bu*") police force. This is variously translated as the State Security Agency, National Security Agency, National Security Police, State Political Protection Agency, or State Safety and Protection Agency. Reportedly, this political security force was created in 1973 and reported not to the

---

31  The annual *White Paper on Human Rights in North Korea*, ROK Korea Institute for National Unification (KINU) also notes a camp No. 17 at Hoeryong in North Hamgyong Province. (The KINU *White Paper* does not identify Camp No. 18. at Bukchang, South Pyongan Province as a *kwan-li-so* camp because it is largely administered by the regular *An-jeon-bu* police force rather than the *Bo-wi-bu* political police authorities.)

The Hidden Gulag Second Edition

Ministry of Interior or Defense, but according to former *Bo-wi-bu* officials, directly to Kim Jong-il through Chang Song-taek, Kim Jong-il's brother-in-law.[32]  The outer perimeters of the *kwan-li-so* are patrolled by privileged members of North Korea's army.

## *"Great Leader" Kim Il-sung: "Factionalists or enemies of class, whoever they are, their seed must be eliminated through three generations."*

### Guilt by Association

A striking feature of the *kwan-li-so* system is the penal philosophy of "collective responsibility," or "guilt by association" (*yeon-jwa-je*) whereby the mother, children and sometimes grand-children of the offending political prisoner are imprisoned in a "three-generations" practice.[33] Former prisoners and guards align this practice with the 1972 statement by "Great Leader" Kim Il-sung: "Factionalists or enemies of class, whoever they are, their seed must be eliminated through three generations."According to the testimony of a former guard at *Kwan-li-so* No. 11 at Kyongsong, North Hamgyong province, this slogan was carved in wood above the prison guards' headquarters building.

The three-generation guilt-by-association is a revival of feudal penal practices associated with the five-hundred-year-old Chosun dynasty (1392–1897). The practice was discontinued in the early twentieth century following the collapse of the dynasty, but, as is described below, was revived by Kim Il-sung after the Korean War along with other feudal Korean practices such as dynastic succession and extreme ideological orthodoxy.  According to the testimony of a former police official, the number of family members abducted and sent to the lifetime labor camps depends on the severity of the presumed political offense.

### Forced Disappearances and *Incommunicado* Detention without Trial

Another striking characteristic of the *kwan-li-so* system is that those citizens who are to be deprived of their liberty are not arrested, charged (that is, informed of their offense of, or against, a particular criminal act delineated in the DPRK Criminal Code), or tried in any sort of judicial procedure. There is no chance to appear before a judge, confront their accusers, offer a defense or have benefit of legal counsel. The presumed offender is simply picked up, taken to an inter-rogation facility and frequently tortured to "confess" before being deported to the political penal-labor colony. The family members are also picked up and deported to the *kwan-li-so*. None of the interviewees reported having been told of the whereabouts or alleged misconduct of the presumed wrong-doing or wrong-thinking head of family.

---

32  Kim Jong-un succeeded Kim Jong-il in December 2011. Chang Song-taek has recently been promoted. The lines of authority and command for the State Security Agency during and following North Korea's leadership succession process is not known by the present author.

33 Sometimes, the wife of a purged high ranking official is allowed or required to divorce her deported husband rather than accompany him to the labor camps.

Friends, neighbors, co-workers, or more distant family members not sent to the camps are not given any information as to the whereabouts of those who have "disappeared" into the mountains. "Forced disappearance" leading to arbitrary detention or execution is a modern day phenomena of repression.[34] But nowhere else does it take place on the massive and prolonged scale—hundreds of thousands of persons over half a century—as is the case in North Korea.

## Systemic and Severe Mistreatment

United Nations Member States have developed a series of penal guidelines that "set out what is generally accepted as being good principle and practice in the treatment of prisoners and the management of institutions."[35] Among the most important of these guidelines are *The Standard Minimum Rules for the Treatment of Prisoners*, commonly called the "Standard Minimum Rules," adopted by the Economic and Social Council of the United Nations General Assembly,[36] and the *UN Standard Minimum Rules for the Administration of Juvenile Justice*, commonly

termed the "Beijing Rules" after the city where these standards were drafted.[37]

The prison camp system in North Korea described by the former prisoners interviewed for this report is at marked variance with these norms and standards. For example, Rule 13 of the Standard Minimum Rules says that adequate bathing and shower installations shall be provid-ed… as necessary for general hygiene. Rule 20 says that every prisoner shall be provided with food of nutritional value adequate for health and strength. Rule 31 says that corporal punishment and all cruel, inhumane or degrading punish-ments shall be completely prohibited as punish-ments for disciplinary offences. Rule 37 says that prisoners shall be allowed, under necessary supervision, to communicate with their family and reputable friends at regular intervals. Rule 75 (2) says that the hours fixed for prison labor shall leave one rest day per week. Rule 89 says that an untried prisoner shall be offered the opportunity to work, but shall not be required to work and if he chooses to work, he shall be paid for it.

Three former inmates interviewed for this report were imprisoned as youths, two were brought in with their mothers for political offenses commit-ted by their grandfathers, and one was born in the camps as a result of the assigned mating of two model prisoners.[38]  The former juvenile pris-oners report frequent beatings in their schools

---

34  For example, during the military dictatorships in Chile and Argentina during the "dirty wars" of the 1970s, although in these situations "disappearance" frequently resulted in execution not long-term detention without trial. "Enforced disappearance" is "the arrest, detention, abduction or any other form of depriva-tion of liberty by agents of the State…followed by a refusal to acknowledge the deprivation of liberty or by concealment of the fate or whereabouts of the disappeared person, which places such a person outside the protection of the law." (Article 2, International Convention for the Protection of all Persons from Enforced Disap-pearance.)

35  The Standard Minimum Rules for the Treatment of Prisoners, para. 1.

36  ECOSOC Res. 2076, 13 May 1977.

37  In May 1984. Submitted to General Assembly, 29 November 1985 Res. A/RES/40/33. Additional norms and standards for the penal practice and administration of justice were similarly discussed and defined at conferences in Japan and Venezuela and are known as "The Tokyo Rules" and "The Caracas Declaration Rules," adopted by the UN General Assembly in res. 45/110, 14 December 1990 and Res. 35/171, 15 December 1980 respectively

38  See p. 49, 59 and 71 below.

by the *Bo-wi-bu* guards assigned to be teachers. Apart from the question of why these children were incarcerated in a labor camp to begin with, Rule 17.3 of the Beijing Rules for the Administration of Juvenile Justice provides that juveniles should not be subject to corporal punishment.

As noted above,[39] DPRK officials deny that they have political prisoners and instead refer to the *kwan-li-so* inmates as "moved people" or "migrants" (*e-ju-min*).[40] However, international human rights norms, including the Standard Minimum Rules, explicitly refer to persons who have been deprived, or severely deprived, of their personal liberty. No matter what they are called, the residents in the political penal labor colonies are severely deprived of their liberty.

The Standard Minimum Rules "cover the general management of institutions, and [are] applicable to all categories of prisoners, criminal or civil, untried or convicted, including prisoners subject to 'security measures.'"[41] These rules, as can be seen in the examples above, offer minimal standards. Yet, in the stories and testimonies that follow in this report, these minimum standards are grossly ignored or abused.

### Induced Malnutrition, Slave Labor and High Rates of Deaths in Detention

The most salient feature of day-to-day prison labor camp life is the combination of below-subsistence food rations and extreme hard labor. In a system of intentional, administratively inflicted hunger, the regimen of chronic semi-starvation provides only enough food to be kept perpetually on the verge of starvation. Prisoners are driven by hunger to eat, if they can get it (and avoid being caught) anything remotely edible: plants, grass, bark, rats, snakes, the food-stuffs of the labor camp farm animals. According to the testimony of former prisoners, deliberate below-subsistence-level food rations in the camps preceded by decades the severe nationwide food shortages experienced by North Korea during the famine of the 1990s.

When entire families are deported to the camps, much of their household and personal belongings—clothing, blankets and bedding, pots, pans, cooking utensils, etc.—are trucked along with them. However, these material possessions are soon bartered away for food. The former prisoners interviewed for this report recall their shock upon initial arrival at the camps at the sight of the malnourished inmates: stick figures dressed in tattered, patched and threadbare clothing; and literally, rags. The prisoners are occasionally issued shoes, but not socks, so that rags are frequently wrapped around ankles for warmth. The prisoners are covered in dirt from the infrequency of bathing privileges, and marked by physical deformities: hunched backs, from years of bent-over agricultural work in the absense of sufficient protein and calcium in the diet; and missing toes and fingers, from frostbite; and missing hands, or arms or legs, from work accidents.

Many of the *kwan-li-so* labor camps feature multiple production areas. These include: mining coal, iron, gold, and other ores; logging on the mountainsides within the boundaries of

---

39 See p. 7-8.

40 Former prisoners, however, relate that prison officials and guards also address them as "traitors" or "animals without tails."

41 *The Standard Minimum Rules for the Treatment of Prisoners*, para. 4 (1).

the encampments, agricultural production in the valleys between the mountains; and artisan work such as furniture-making and woodworking from the logs felled by other prisoners; animal husbandry, chicken or rabbit-raising, or bee-keeping in the agricultural sections of the camps. Camp 14 includes a large textile factory.

Backbreaking agricultural, mining or manu-facturing labor is usually performed twelve or more hours per day, seven days per week, with only one day of rest per month and on the three national holidays such as New Year's Day, and Kim Il-sung's and Kim Jong-il's birthdays. Pris-oners receive small food rations, mostly corn-meal. No former prisoner interviewed for this report received payments in money or redeem-able or transferable coupons. The small amount of money provided to the prisoners was, in their words, cigarette money, about one pack a month. Most prisoners are assigned daily production quotas, accompanied by threats of reduced food rations, and/or beatings. Labor is performed in work groups; the whole group can be punished for failure to meet production quotas. These work units are required to participate in evening "mutual work criticism" sessions.

The combinations of forced labor in very inhu-mane conditions and below-subsistence-level food rations lead to very high rates of deaths in deten-tion. Clearly, North Korea does not publish statis-tics on the population levels of the prison camps that they deny exist. However, the former prison-ers interviewed for this report describe extraor-dinary death rates in their work groups and the sections of the camp in which they resided.

A comparison to the labor camps of the Soviet Union demonstrates the extreme inhumanity of the North Korean prison camp system. In the USSR, the gulag camps were divided into four "regimes" or regimens: ordinary, re-enforced, strict, and special. The "special regime" camps were essentially punishment facilities in which the pris-oners were confined to cells (rather than subjected to forced labor), and were not eligible for visits or parcels. The other "regimes" were denominated in terms of the amount of correspondence, brief or prolonged visits (measured by hours and/or days), and the number of food parcels the prison-ers could receive after completing a part of their sentence of hard labor. Prisoners in the "ordinary regime" labor camps could receive four brief and two prolonged visits and up to three parcels per year. Those in the "re-enforced regime" camps could receive three brief and two prolonged visits and two parcels per year, while prisoners in the "strict regime" camps got only one short, one prolonged visit and one parcel per year.[42]

In the North Korean prison labor camps, all the residents, while subjected to arduous forced labor, are entirely *incommunicado*, unable to have any correspondence, visits, and most impor-tantly, unable to receive life saving parcels of food, clothing, soap or medicines from family members, friends, neighbors or former colleagues outside the camps. According to the former pris-oners interviewed for this report, the prisoners who are sent to the equivalent of "special regime" detention facilities within the DPRK camps most usually die there or shortly after release to the general prison camp population.

---

42  Information on the Soviet camps is taken from Joshua Ruben-stein and Alexander Gribanov, *The KGB File of Andrei Sakharov*, Yale University Press, 2005; and *Prisoners of Conscience in the USSR: Their Treatment and Conditions*, Amnesty International, April 1980.

The Hidden Gulag Second Edition

## Prisoner Informants and Intra-Prisoner Surveillance and Hostility

Semi-starvation generates large numbers of informants among the prisoners, leading to a prison-camp culture of extreme distrust and hostility. Complaints from one prisoner to another about life in the prison camps are frequently reported to camp authorities. Conditions drive people to violence and aberrant behavior. Former prisoners report that inmates beat each other in retaliation for the non-achievement of production quotas for which the entire work unit will be punished. Prisoners fight each other over scraps of food, or over the clothing of deceased inmates.

## Execution and Extreme Punishments

The camps contain disciplinary punishment facilities for inmates who violate camp regulations. Former prisoners describe these facilities as tiny underground or partially underground cells in which prisoners cannot fully stand up or lie down. Punishment cell detention within the prison camps is reportedly accompanied by severe beatings or systematic torture and even more drastically reduced food rations. Former prisoners report that fellow inmates came back from the punishment cells "in very bad shape" and frequently die shortly thereafter.

Such punishments are meted out for various infractions of camp rules: unauthorized food gathering or eating, stealing the food provided for animals or live-stock, repeated failure to meet production quotas, losing or damaging tools or equipment, suspected sabotage of camp facilities, reported complaints about camp life, or unauthorized sexual conduct between prisoners.

Escape attempts are punished by public execution, sometimes by hanging but more often by firing squad. The prisoners are compelled to assemble and witness the executions at close range. Virtually all former prisoners interviewed for this report witnessed numerous executions. Sometimes the prisoners were compelled to file by the corpse and throw stones at or strike the corpse. Former prisoners relate that they hated this gratuitous indignity, and held in contempt those prisoners who stoned the executed corpse with obvious force.[43]  And former prison guards reported that they also hated the public executions because the prisoners wailed and cried out in distress. The guards recounted that they feared the distraught prisoners might revolt and thus attended the public executions in force and heavily armed.

Former prisoners also report that other prisoners were taken away, never to return, and are widely believed to have been executed in secret. Detentions in the labor camp punishment cells, disappearances, and public executions are all extra-judicial in nature. Neither the DPRK Criminal Code, Criminal Procedures Code nor court system, such as it is, has any reported reach, applicability, or presence inside the *kwan-li-so* encampments. The camps appear to be entirely outside North Korea's constitution, courts and laws.

---

43   Testimony on the compulsory defilement of the corpses of executed prisoners does not extend past 1985. It is possible that the use of this gratuitously dehumanizing practice has declined.

## Sexual Relations, "Marriage" and Prison Camp Schools

The practice of imprisoning the family members of suspected wrong-doers and wrong-thinkers brings numbers of young people into the camps. Sexual relations between young men and women camp residents are prohibited. Young women who become pregnant are severely punished: they are often taken away by the guards and not seen again. The former prisoners assume they have been executed.

A very small number of "model" young prisoners are rewarded by being allowed to "couple," often with a mate selected by prison authorities to reward "model" prisoners of the opposite sex. However, the mated couples do not thereafter live together. Rather, they remain in the sexually segregated housing facilities. The "married" couples are allowed to meet periodically, with the resulting children living with the mother up to age twelve or thirteen, and rarely seeing their fathers.[44]

For the young children brought into the camps with their parents or grandparents, and for the small number of children born to model prisoners, primary schools offering limited instruction in basic literacy and very basic math (addition and subtraction, but not even multiplication or division, according to the former prisoners) exist. Uniformed police officers serve as teachers. There are also so-called "middle schools". But the former prisoners describe these as, in reality, bases for young people's mobile labor brigades, the students having already learned in primary schools the basic reading, writing and math

necessary to perform prison camp labor. The children are indoctrinated to inform on other prisoners, even their parents.

## The Sexual Exploitation of Women

Grossly inadequate food rations and forced labor under harsh conditions inevitably lead to sexual exploitation of young women vulnerable to offers of additional food or less arduous work such as record keeping or cleaning guards' offices or quarters in exchange for sexual favors. Such practice is, reportedly, not in accordance with camp policy, but former prisoners relate that it was widespread, and understood by other prisoners as a necessity for survival. Contemporary international human rights law regards sex between prisoners and prison guards to be so inherently coercive as to constitute rape.

## Prisoner Releases

Reported releases from the labor camps that take place from the "re-revolutionizing" areas in Camps 15 and 18 took place on the birthdays of Kim Il-sung or Kim Jong-il. The prisoners from those areas are assembled, and speeches are made praising the hard work and rehabilitation of those soon to be released. They, in turn, are required to publically pledge their appreciation and loyalty to the regime. The prisoners are sworn to secrecy, promising not to disclose information about the camps to persons outside. On some occasions the prisoners are required to affix their fingerprints to their oaths of secrecy and silence. A return to the camps, or worse, would be the punishment for talking to North Koreans outside the camps about the camps.

---

44  See the story and testimony of Shin Dong-hyuk, who was born and raised in Camp No. 14. pages 48-51.

The Hidden Gulag Second Edition

The released prisoner is given a travel pass and a food rations coupon that identifies the released prisoner as a worker at specially designated Military Units that North Korean police will recognize as the political penal labor colonies.

Notwithstanding the regime's attempt to prevent information about political imprisonment from reaching the general population, recent surveys of larger numbers of former North Koreans now living in South Korea indicate that much of the population knows of the camp system,[45] even if it is safer within North Korea to use the euphemistic phrase "those who are sent to the mountains."

## The Economic Role of the Forced Labor Camps

The "gulag archipelago" in the former Soviet Union, with its combination of political and criminal prisoners, had a clear economic function: to open up the vast areas of Siberia for the exploitation of the mineral wealth beneath the frozen earth. The production of the forced labor camps contributed measurably to the Soviet economy. The DPRK does not publish national macro-economic statistics, let alone production figures for the prison labor camps they claim do not exist. Thus, the economic role of the political penal labor colonies cannot be quantified.

However, what we do know is that much of the coal mined in the prison camps goes directly to nearby power plants for the generation of electricity. Some of the lumber cut down from the mountainsides goes into factories to make furniture for government offices and schools. The fur of the rabbits raised by juvenile prisoners is used to line winter coats for army officers. Some of the textile factory output also reportedly goes into army uniforms. Prior to recent sanctions, rare mushrooms collected in the mountainsides were reportedly exported to Japan.[46]

The agricultural production by prisoners is used in part to feed the prison population, but was, at one point, also provided to the state-run Public Distribution System (PDS) for distribution to the general population. Probably, some of the food produced by the prisoners is sold by prison officials in the public markets that sprung up during and after the 1990 famine. Also, much of the honey produced by prison camp bee keeping or the whiskey and *soju* (a popular inexpensive Korean liquor) distilled in the prison camps most likely ends up in local markets. But whether profit from these sales finds its way into the pockets of the prison camp officials or goes to the national treasury is anybody's guess.

Nonetheless, what is clear from the testimonies of the former prisoners is that prison camp slave labor is notoriously inefficient. Sending malnourished men down into the earth to mine coal with picks and shovels, while malnourished women and children workers pick up the coal pieces and put them in carts and trolleys to pull and push to the surface, is very old-fashioned mining. Having malnourished loggers walk for an hour or two up into the mountains to cut down trees with saws and axes and then drag the

---

45  See Survey Report on Political Prisoners' Camps in North Korea, National Human Rights Commission of Korea, Seoul, 2009, p. 188. In a survey of over three hundred former North Koreans now residing in South Korea, one-third had experienced political imprisonment, another third knew about it, leaving only one third of the respondents unaware of political imprisonment.

---

46  Japanese imports from the DPRK have largely, if not entirely, stopped.

trimmed logs down the mountainside with ropes seems similarly inefficient compared to chain-saw logging practices in other developing countries. Even if the productivity of agricultural and industrial enterprises throughout North Korea is not high, productivity in the prison labor camps seems, likely, even lower, even if the prisoners are punished and beaten if they do not fulfill their production quotas.

In theory, slave or forced labor should be cheaper than work remunerated by wages or salaries. But almost all of the North Korean economy, prior to the economic breakdown of the 1990s, was substantially demonetized. Most work throughout North Korean society was rewarded by the provision of food and clothing, with the amount and quality of food and clothing linked to the person's employment and to the *songbun*, the social-political status of the male head of household. But when the PDS broke down in the 1990s, the rations provided to citizens across the board plummeted. Even before that, it seems difficult to calculate the economic significance of the marginal savings that accrued to the state from the lesser amounts of food provided to prison versus non-prison labor.

### The Absence of Due Process: Arbitrary and Extra-Judicial Detention

Virtually all of the prisoners in the *kwan-li-so* are victims of "arbitrary detention," as this phenomena of repression is called by international human rights bodies, such as the UN Working Group on Arbitrary Detention.[47] The severe

deprivations of physical liberty in North Korea's *kwan-li-so* political penal labor colonies are extra-judicial, that is, outside of, and without regard to, the provisions of the DPRK constitution, the DPRK Criminal Code and Criminal Procedures Code, and the North Korean court system, which, as noted above, has no existing jurisdiction or presence within the labor camps.

Former prisoners from the *kwan-li-so* camps now residing in South Korea and their South Korean translators sometimes apply legal and judicial language to imprisonment in the *kwan-li-so*. For example, the amount of "time served" in the prison camp is called a "sentence." More accurately, in legal usage of the English language, a "sentence" is the duration and/or place of punishment pronounced by a judge in a court of law following a legal process resulting in a conviction, which should not be conflated with the amount of "time served" in the prison camp.

Similarly, the former prisoners spend significant mental energy trying to figure out what it is they did wrong to bring such misery into their lives. And sometimes, it is quite possible to reconstruct from the endlessly repeated questions of the police interrogators, what it is that the regime was concerned about. Thus, some of the former prisoners refer to the presumed reasons for their imprisonment as "charges," a misleading appropriation of legal and court of law terminology.

---

47  The UN Working Group on Arbitrary Detention, which reports to the Geneva-based UN Human Rights Council and is supported by the Office of the High Commissioner for Human Rights, has defined three categories of arbitrary detention: (1) when there is no legal basis for the deprivation of liberty; (2) when a person is deprived of their liberty because they have exercised the rights and freedoms guaranteed in the Universal Declaration of Human Rights (UDHR) and the International Covenant on Civil and Political Rights (ICCPR); and (3) when a person is deprived of liberty after a trial which did not comply with the standards for fair trial set out in the UDHR and ICCPR and other relevant international instruments.

Further, some accounts mention that within the *Bo-wi-bu* political police force, there are "prosecutors" and that "sentences"—the decision to send someone or a whole family to the camps—are made by a "judge" deciding on behalf or in the the name of, and/or reporting to the North Korean Central Court. It is possible that one or more *Bo-wi-bu* police officials are termed "prosecutor" or that the person who makes the judgment to send a person or family to the camps is called a "judge." It is also possible that the DPRK court system is informed of the names of persons deported from society to life-long servitude in the labor camps.

However, fundamentally, the use of the language of law in such instances is misleading.  International conventions, which the DPRK has officially adhered to, particularly Article 14 of the International Covenant on Civil and Political Rights, spell out the minimum requirements for fair trial and due process of law. This sets the standards of a judicial process that enables a government to lawfully deprive a citizen of his or her liberty. Clearly, the practice of abducting and deporting North Koreans, not to mention foreign nationals, to the *kwan-li-so* labor camps violates international norms. With one or two exceptions discussed below, nothing in the testimony of the former prisoners about their interrogation or deportations indicates any reference by North Korean political police authorities to the DPRK Criminal Code, the Criminal Procedures Code, or the DPRK court system. The system of severe deprivation of physical liberty described below, to which hundreds of thousands of North Koreans have been, and continue to be, subjected is essentially, and certainly by international standards, extra-judicial.

Such a massive and enduring system of arbitrary and extra-judicial detention would likely itself be deemed a crime against humanity under contempory international human rights law.

## Successive Waves of Political Imprisonment: A Historical Overview

There is a sequence to political incarceration in North Korea—a dynamic that will be familiar to students of communist party rule: first, suppression of the opposition to the revolution; then, the elimination of enemies from within the revolution; and finally, the elimination of successive victims of, and scapegoats for, the failure of the revolution. The pattern of deporting purported opponents to the North Korean gulag follows Kim Il-sung's successful struggle to achieve power and gain complete control over the North Korean people, society, economy and state. More recent deportations include those who complained about or sought to escape from the economic, social and political failures of the regime.

After Japan's defeat in WWII and the end of Japanese colonial rule in Korea, Kim Il-sung, under Soviet tutelage, instituted what is usually termed a "national democratic revolution" in Korea north of the 38th parallel. This included genuinely popular reforms, such as the official establishment of an eight-hour workday, positing formal equality of the sexes and prohibiting prostitution, concubinage and female infanticide. It included a sweeping and popular land reform that expropriated the landholdings of absentee Japanese landlords and the native Korean land-owning aristocracy. It also included

a purge of Koreans in the colonial bureaucracy, who thought that Korea should follow the Japanese path to economic, social and political modernization, and Korean police officers who had collaborated with the harshly repressive Japanese rule in Korea. Many purged police officials and dispossessed Korean landlords fled to the south. Many of their family members who remained in the north ended up in labor camps.[48]

Kim Il-sung's drive for political power and his earliest plans for Korea were initially challenged by political parties affiliated with two popular religions in Korea: Protestant Christianity (*Kiddokyo*) and an indigenous syncretic faith known initially as "Eastern Learning" (*Tonghak*) and subsequently as the "Followers of the Heavenly Way" (*Chondokyo*).[49]   Protestant Christian and *Chondokyo* leaders had spearheaded the internal Korean opposition to the Japanese occupation, most famously the March 1919 "Korean Declaration of Independence" and subsequent mass demonstrations. After Japan's defeat, the Korean Christians and *Chondokyoists* established political parties and rejected the proposed Soviet-American plan for a five-to-ten-year Korean

trusteeship in favor of immediate independence with full Korean sovereignty.[50]  Kim suppressed these rival, non-communist, nationalist political parties through the arrests and executions of Protestant and *Chondokyo* leaders.[51]  Many of their followers fled to the south. Again, family members who remained in the north were under suspicion and many ended up in prison camps.

The Soviets had tasked Kim Il-sung, the former leader of a Manchuria-based band of partisan anti-Japanese guerrilla fighters, with forming the Korean Workers' Party out of various ethnic Korean members within the Chinese, Japanese or Russian communist parties. This was along with incorporating Korean leftists, many previously based in the southwest corner of Korea who fled north of the 38th parallel after 1945.

However, following the Korean War (1950–53), Kim instituted a series of intense purges within the communist Korean Workers' Party. First, he purged his leftist rivals who had fled north from the southern portion of Korea. He scapegoated them for their failure to launch a successful popular uprising to coincide with the military invasion from the North and thus liberate the South from American 'imperialist' occupation.

---

48  For a general description of this process see, Charles Armstrong, *The North Korean Revolution*, 1945-1950, Cornell University Press, 2002.

49  In the late 19th century, Pyongyang became the epicenter of Protestant Christianity in Asia. In other parts of Asia, Christianity was associated with European colonial powers. But Korea was colonized and occupied by Shintoist and Buddhist Japan. Protestant Christianity, introduced by medical and educational missionaries, was perceived as a modernizing and nationalist force, opposed to Japanese colonization. (Kim Il-sung's family members were Protestant Christians and his mother and her family were particularly devout). *Tonghak/Chondokyo* was a synthesis of neo-Confucianism, Buddhism, and Catholic Christianity distilled by a disaffected Confucian scholar earlier in the 19th century. A millenarian and eschatological belief system, it attracted large numbers of dispossessed peasants to fight for heaven on earth against corrupt feudal officials and then against Japanese encroachments on Korean sovereignty during the terminal decline of the five-hundred year old Chosun dynasty.

50   During the time of the trusteeship, the USA, the USSR and China would "prepare" Korea for full independence. It was thought at the time that the Americans and Russians could restrain the rival Korean nationalists they had installed in the south and the north, and thus prevent civil war. But the Americans and Russians failed to work out the terms of a trusteeship, leading to the proclamation of competing and implacably hostile regimes in the north and south of the peninsula, followed shortly by the Korean War.

51  While Kim Il-sung was suppressing Christian and Chondokyo religious leaders north of the 38th parallel, Syngman Rhee, the US-installed leader in the south, was repressing Korean leftists with even more violence. Many southern leftists fled north, while others fled to Japan. Many of the southern leftists who fled north were later purged and sent to the camps. Many of the southern leftists who fled to Japan later migrated to North Korea, where, again, many ended up in the camps.

Next, Kim purged rival Korean communist leaders who had been affiliated with the Chinese communist party and army.[52]  Subsequently, he purged the Koreans who had previously lived in and had been affiliated with the Soviet Union.[53]  According to Korea scholar Charles Armstrong, "By the 1960s, the former Manchurian partisans [the Kim Il-sung-led anti-Japanese resistance fighters] were at the apex of the power system in the DPRK, and those who had been aligned with the Southern Workers' Party, the Soviets, and the Chinese in Yan'an had almost all been purged, executed, exiled or otherwise eliminated from positions of power."[54]

These purges usually involved executing the leaders, initially after Stalinist-type show trials, and sending their networks of supporters in the party, the army and the bureaucracy to the camps. According to Hwang Jang-yop, the highest level North Korean official to defect to South Korea, the "total control zones" were established after 1956 for the "purged factionalists."[55]  Korea specialists have noted subsequent purges:

> "After Kim Il-Sung designated his son as his successor, the elder Kim purged military officers in 1976-77 who voice[d] displeasure with the move. Another purge of military officers occurred in 1987-88 … when the SSD [the *Bo-wi-bu* State Security Department, the police agency that runs the *kwan-li-so* political prison camps] exposed an alleged military coup attempt in 1992, six hundred officers were purged."[56]

Another development following the Korean War profoundly affected the nature of North Korean society, including the peopling and operation of the prison labor camps.  Following the death of Stalin in 1953, the Soviet Union and most of Eastern Europe curbed some of the worst excesses of Stalinism[57] seeking a measure of return to "socialist legality," and in anticipation of what became known as "revisionism," the possibility of "peaceful co-existence" between capitalism and socialism. Ruling communist parties in East Asia took a dramatically different course that has been described as "national Stalinism."  Most famously, in China, Mao Zedong set off on the radical and disastrous policies of the "Great Leap Forward" and "Cultural Revolution." Cambodia's Pol Pot set off on an even more disastrous "Super Great Leap Forward." In North Korea, in an attempt to Koreanize Stalin-

---

52  There have always been large populations of ethnic Koreans on the China side of the China-Korea border. Because of the Japanese occupation of Korea, many ethnic Koreans in China joined Mao's Red Army to fight the Japanese who were seizing larger and larger parts of China. Immediately after World War II, the ethnic Korean divisions of Mao's Red Army played a major role in China's civil war, defeating Chiang Kai-shek's US-backed Kuomintang army in Manchuria and handing northern China over to Mao. Mao returned the favor by handing over these battled-hardened ethnic Korean troops to Kim Il-sung for use in the 1950 invasion of South Korea. But following the Korean War, Kim Il-sung did not trust the loyalty of the "Yan'an faction" of the Korean Workers' Party (named after Mao's headquarters in China during WWII and the Chinese civil war) and had them purged, executed or imprisoned.

53  In the late 19th and early 20th centuries, thousands of ethnic Koreans from Korea or Manchuria moved into Siberia and the Russian Maritime Provinces. Many of these Korean residents in the USSR and their families returned to the north of the peninsula as administrators or members of the Communist Party of the USSR or simply as administrators and Russian-Korean translators.

54  Armstrong, *op cit*, p. 72-73. Quite a large number of the purges in the 1950s and 1960s are detailed in Robert Scalapino and Chong-Sik Lee's two volume *Communism in Korea*, University of California Press, Berkeley, 1972.

55  See *White Paper on Human Rights in North Korea*, KINU, Seoul, 2003, p. 177-180.

56  Patrick McEachern, *Inside the Red Box: North Korea's Post-Totalitarian Politics*, Columbia University Press, New York, p. 94.

57  For a discussion of the term and its unfolding in the DPRK, see Andrei Lankov, *Crisis in North Korea*, University of Hawaii Press, 2005.

ism, usually referred to as "socialism in our style" (*urisik sahoejuui*), Kim Il-sung turned to the only Korea he and his Manchurian partisans knew, or imagined—the Korea that had existed prior to the Japanese occupation where the feudalist Chosun dynasty had ruled for nearly five hundred years.

Chosun dynasty feudal practices were revived and incorporated into the Stalinist system bequeathed to North Korea by the Soviet Union including a return to "hermit kingdom" self-styled isolation, prohibiting travel abroad and rigorously excluding foreign influence in order to develop a distinctive and unique Korean political culture. With rare exceptions, North Koreans were, and still are, forbidden to leave North Korea. People who did were caught and sent to a variety of detention facilities including the prison camps. These numbers skyrocketed when tens of thousands of North Koreans fled to China during the famine of the 1990s.

The entire North Korean population was divided into three more-or-less hereditary classes (*songbun*): "loyal" or "core," "wavering," and "hostile" or "antagonistic." As characterized by Professor Armstrong:

> "Social stratification had been one of the most enduring characteristics of Korean society before the twentieth century…The hereditary three-tiered structure…that became explicit in North Korea from the 1960s onward was based on the actions of oneself or one's ancestors during the colonial period and the Korean War. Such stratification was made possible by the careful categorization of all North Korean citizens by social strata beginning in 1946

and resonated with the three-class structure of *yangban* [scholar/bureaucratic or land-owning aristocrat], commoner, and outcast/slave that dominated Choson society." [58]

The prisoners exiled to the political penal labor camps are the modern day "outcasts/slaves" of Kim Il-sung's re-feudalization of North Korean society.

An extreme version of collectivism was instituted as well. The North Korean Workers' Party determined residence, educational opportunities, occupations and work sites for the citizenry, largely based on calculations of loyalty toward the Kim regime. A Public Distribution System that dispensed food and clothing according to social class *songbun* ranking and occupation replaced salaries and wages. Agricultural production was collectivized. Private selling of goods and services was prohibited. The regime re-instituted the feudalistic *yeon-jwa-je* "guilt-by-association" three-generation collective punishment system for political opposition or deviance. This provided the rationale for populating the labor camps with the families of purged or offending deviants.

As in the Chosun dynasty, a rigid and extreme ideological orthodoxy was instituted. [59] Variously

---

58   Armstrong, *op. cit.*, p.72-73.

59   Prior to the Chosun dynasty (1392-1910) Buddhism, as the state religion, and Confucianism, as a theory of social and political relations, co-existed for a thousand years. Starting in the 15th century, for four hundred years, neo-Confucianist Chosun dynasty officials persecuted Buddhism almost to the point of extinction. When in the 18th century, Roman Catholic Christianity was introduced by Korean diplomats who had learned of it at the Emperor's court in Ming Dynasty Beijing, those bringing these new ideas about the "Lord of Heaven" back to Korea were executed, as were subsequent Korean and foreign Catholics in Korea for a hundred years. In the 19th century when itinerant scholars-visionaries constructed the syncretic Tonghak (Eastern learning) system of

termed "*ju-che* thought" or the "*ju-che* ideology" or simply "Kim Il-sungism," the regime vigorously promulgated *ju-che* as "the one-and-only ideology system" (*yuil sasang chegye*). North Koreans, and even foreign leftists working in the North Korean Foreign Ministry, who were overheard saying that "*ju-che* thought" was contrary to Marxism were sent to prison camps.[60]

An extreme cult of personality was organized around Kim Il-sung and his family, going back to his great grandfather, and extending to his son, Kim Jong-il, as dynastic succession was reintroduced. Kim Il-sung was venerated as the founder of a new dynasty, comparable to the founders of the previous Koryo and Chosun dynasties. Kim was even elevated to the status of a Korean messiah, destined to liberate the Korean people from the consecutive and seamless evils of Japanese colonialism and American imperialism. Portraits of the one or both Kims were required in every house. Everybody was required to affix a Kim button to his or her lapel. Hallowed, church-like "study halls for General Kim Il-sung revolutionary activity" (*Kim Il Sung Wonsu hyukmyeong hwaldong yeongusil*) were set up in every factory, farm, school and office. The entire population was required to attend weekly sessions to venerate Kim Il-sung and master his teachings. Failure to attend these classes or to show sufficient respect to the portraits of the "Great Leader" risked exile to the camps.

Further purges and arrests from within the Party, the army, and state bureaucracy coincided with the development of the "cult of personality" around Kim Il-sung and the feudal-dynastic succession of Kim Jong-il, the first son of Kim Il-sung's first wife.

The extreme ideological orthodoxy effectively criminalized the *wrong-thought* and some of the *wrong-doing* described previously. A heavy gloss of pseudo-religiosity[61] began to coat this extreme ultra-orthodoxy. As expressed by a former *kwan-li-so* prison guard interviewed for this report, North Korea is similar to a gigantic religious cult. Not thinking in accord with the thinking of the cult is simply not allowed. If noncompliance is suspected, it is punished severely.

## How Do We Know: A Brief Historical Recounting

In his 1997 history, *Korea's Place in the Sun*, Bruce Cumings predicted, "... if and when the [North Korean] regime falls, we will probably learn of larger numbers [of people held in prisons and reform-through-labor camps] and various unimaginable atrocities..."[62] Historians will continue to anxiously await the regime archives and police files. But, as reflected in Professor Cuming's prediction, for fifty years, information about North Korea's prison

---

ideas, they too were hunted down and executed. Today, DPRK police officials hunt down and vigorously prosecute North Koreans who convert to Protestant Christianity while in China or who attempt to bring Christian literature, primarily Bible verses, back with them to North Korea.

60  See p. 25 above.

61  Miracles in the skies and forests, signifying the joy of both heaven and nature, were attached to the birth of Kim Jong-il on Mount Paektu, long regarded as the sacred birthplace of the Korean people. (Historians of Korea outside of the DPRK commonly record that Kim Jong-il was born in the USSR at a Soviet army base.) The portraits of Kim Il-sung in the ubiquitous "study halls for General Kim Il-sung revolutionary activity" are arranged in a sacred-like, altar setting.

62  Bruce Cumings, *Korea's Place in the Sun*, Norton, NY, 1997, p. 398.

camp system was quite limited. It took until the present millennium when scores of former political prisoners escaped from North Korea that enough information became available to detail the camp system and how it works. Notwithstanding, the bits of information that did leak out of North Korea in the 1970s, '80s and '90s are worth noting as they demonstrate both the duration and evolution of the prison camp system the regime persists in denying.

### Scholarly Insights

Korea scholars have written about political imprisonment, often in conjunction with their study of the North Korean political leadership. They have documented waves of purges sweeping through the highest echelons of the government, the army, and the Korean Workers' Party. In their two-volume 1972 textbook, *Communism in Korea*, Professors Robert Scalapino and Chong-sik Lee noted that along with various prisons, two prison camps had been set up in the 1950s. They are named after the number of proclamations that brought them into existence: Camp 8 for perceived political wrong-doers and Camp 149 for both wrong-doers and their families.[63]

### Early Non-Governmental Organization Documentation

In 1974, the situation of the North Korean prison camps became known in select international human rights circles when Amnesty International (AI) campaigned for the release of Ali Lamada, a citizen of Venezuela, and Jacques

Sedillot, a citizen of France, both of whom had been recruited to work in North Korea by the DPRK Ministry of Foreign Affairs to translate the collected works of Kim Il-sung into Spanish and French, respectively. Following the release of Ali Lamada, Amnesty published in 1979 his account of his imprisonment—perhaps the first English-language North Korean political-prisoner account to introduce the North Korean prison-camp system to an international audience. Lamada's story of his imprisonment from 1967 to 1974, except for his nationality, is remarkably similar to the stories of recently escaped North Koreans. Their cases are summarized herein because they demonstrate the longstanding nature of the ongoing phenomena of repression documented in this report.

A decade later, the first full length international human rights NGO report on North Korea, Human Rights in the DPRK (North Korea), was published in December 1988 by the Minnesota Lawyers International Human Rights Committee and Human Rights Watch/Asia. Primarily a legal analysis of the DPRK Constitution and legal system, it noted the camps cited by Professors Scalapino and Lee.

In the early 1990s, researchers at Amnesty International investigated and publicized three different categories of persons imprisoned on political grounds in the DPRK: 1) ethnic Koreans from Japan who voluntarily migrated from Japan to North Korea in the early 1960s; 2) North Korean loggers in Russia who attempted to escape their labor crews and were caught by North Korean police operating within Russia; and 3) other North Koreans who were forcibly repatriated from Russia and/or China to the DPRK. AI's investigations focused on five cases: two Korean-Japanese who migrated to the DPRK only to disappear into, AI believed, the labor camps;

---

63  Scalapino and Lee, *Communism in Korea, op. cit.*, p. 830.

### The Cases of Ali Lamada and Jacques Sedillot, 1967 to 1974

Ali Lamada and Jacques Sedillot were recruited in 1967 by the DPRK Ministry of Foreign Affairs and placed in the Department of Publications to translate the writings of Kim Il-sung into Spanish and French respectively. Lamada was an active member of the Venezuelan Communist Party and his poetry and books were well known in the Spanish-speaking world. Both Lamada and Sedillot were arrested in September 1967. Sedillot was accused of being a French imperialist spy. No charges were initially brought against Lamada, who was simply arrested and coerced to confess to spying by means of solitary confinement in a 2 meter by 1-meter cell (7 feet by 3 feet by 10 feet) in the Ministry of Interior for a year on below-subsistence level food rations. During this time, he lost 22 kilograms (more than 50 pounds) and his body became covered with sores.

After a year, Lamada was returned to his residence in Pyongyang and placed under house arrest but was picked up two months later and sentenced to twenty years of forced labor for being a spy. He was driven some three hours from Pyongyang and thrown into a punishment cell in a prison camp, where, handcuffed for three weeks, he slept on the floor without a blanket or mattress in freezing temperatures. Transferred to the main prison-camp building, he was locked in unheated rooms and his feet suffered frostbite. His toenails dropped off, and his feet became covered with sores. From guards, he learned that the name of the prison camp was Sariwon, where some 6,000 to 8,000 prisoners worked twelve hours per day assembling jeep parts. A doctor told Lamada that there was a special section of the prison camp where 1,200 sick persons were held.

While imprisoned at Sariwon prison-labor camp, Lamada learned from guards and "orderlies," who were privileged prisoners, some of whom had been held previously in other prison-labor facilities, of approximately twenty other prison-labor camps holding, Lamada calculated, at that time roughly 150,000 prisoners altogether.

The government of Venezuela and the President of Romania intervened on behalf of Lamada, and both he and Sedillot were released in May 1974. Sedillot died in Pyongyang of prison-related illnesses before he could return to France. Lamada recuperated in Eastern Europe before returning to Venezuela, where he published his account of his experience in the North Korean prisons and the Sariwon prison-labor camp.  (See Ali Lamada, A Personal Account of the Experience of a Prisoner of Conscience in the DPRK, AI: ASA 24/02/79)

a North Korean, Mr. Kim Duk-hwan, who married a Russian woman while studying in Moscow, but who, upon return to North Korea, disappeared into detention; and two other North Koreans who were believed to have been forcibly repatriated from Russia to the DPRK. These cases are summarized herein, as they demonstrate the systemic and on-going continuity of the conditions about which we now have much more voluminous documentation.

### Prisoners' Memoirs and Testimony

Prisoner testimony, initially only in the Korean language, started to emerge publicly in the mid-1990s, after two former prisoners from the "re-revolutionizing zone" of *Kwan-li-so No. 15* (Yodok), Kang Chol-hwan and An Hyuk, escaped to South Korea via China in 1992 and published their prison memoirs in Seoul.[64] In 1994, a former prison guard, Ahn Myong-chol, who had worked at four different prison-labor camps, defected to South Korea and was able to provide a great deal of first-hand information. In 1996, the Seoul-based Korea Institute of National Unification (KINU) began publishing an annual *White Paper on Human Rights in North Korea*, which contains reporting that draws on the extensive interviews conducted by the South Korean government with all North Koreans provided with asylum by the Republic of Korea.

In the late 1990s, as the production and distribution system in North Korea broke down, greater numbers of Koreans fled to China, primarily in search of food. Some of these had been imprisoned in either the *kwan-li-so* or the *kyo-hwa-so*.

A number of those who fled to China, particularly after 2000, made their way to South Korea and published accounts or interviews in South Korean journals or magazines.

### The First Satellite Photographs of the Prison Camps

The first public satellite photographs of the prison camps appeared in December 2002 in the Far Eastern Economic Review, a now defunct but formerly influential weekly news magazine. It published satellite photographs of *Kwan-li-so No. 22* at Hoeryong, North Hamgyong province. John Larkin, a Seoul-based, Korean-speaking correspondent for the Far Eastern Economic Review, was able to obtain coordinates of latitude and longitude of *Kwan-li-so No. 22* from old Soviet-made maps of North Korea on which, in consultation with former guard Ahn Myong-chol, Larkin was able to precisely locate the sprawling encampment at Hoeryong. After Larkin obtained satellite photos from a commercial firm, Ahn was able to locate and identify buildings at the penal-labor colony where he had been a guard.[65]

---

64  In 2001, Kang Chol Hwan's memoirs, co-authored with Pierre Rigoulot, was published in English as *Aquariums of Pyongyang: Ten Years in the North Korean Gulag*, Basic Books, New York.

65  Apparently, both the United States and South Korean governments long had even better satellite photographs of the prison-labor camps. When Kang Chol-hwan first came to Seoul in 1992, he was shown satellite photos of the *Kwan-li-so* No. 15 "Yodok" and was able to pick out his former house in the images. But these intelligence agencies have never released their photographs to the press or public.

### Korean Migrations from South Korea to Japan to the DPRK

Some 600,000 ethnic Koreans, overwhelmingly from the southern parts of the Korean peninsula closely adjacent to the Japanese islands, migrated or were transported to Japan during the Japanese occupation of Korea (1910–1945). According to a prominent scholar, Professor Tessa Morris-Suzuki, Australian National University, the Koreans were designated as "foreigners" by the Japanese government, had no legal right to permanent residence, and faced considerable prejudice and discrimination. In the mid-to late-1950s, ethnic Koreans in Japan, with the support of the North Korean and Japanese governments, began agitating to migrate to North Korea. At the time, Syngman Rhee's impoverished and authoritarian regime in South Korea had no desire to repatriate these ethnic Koreans, many of whom were leftist-nationalists in their political orientation. North Korea, sensing a propaganda and hard currency opportunity, offered the Koreans in Japan employment opportunities, free education, housing and medical care, and the chance to build and live in "the socialist paradise." The Japanese government was not unhappy to reduce the number of resident ethnic Koreans, some of whom were involved in leftist politics, and others with criminal groups or semi-legal enterprises.

Following ethnic Korean "repatriation" demonstrations in front of the Japanese Red Cross Society, which were observed by a visiting delegate from the Geneva-based International Committee of the Red Cross (ICRC), the National Red Cross Committees of Japan and North Korea arranged what was called a "repatriation" program, even though most of the Koreans were from what was then South Korea. Starting in 1959, some 93,000 persons migrated to the DPRK, including roughly 6,000 Japanese who had married Korean spouses. A few of the Korean migrants to the DPRK did very well. One woman became Kim Jong-il's wife. Many others fared poorly.

The Koreans migrating from Japan were ranked number 32 in the 51-category hierarchy of social classes (*songbun*) that the DPRK developed in the 1960s. Some twenty to forty percent ended up in the labor camps. (The forty percent figure comes from one of the Korean-Japanese interviewed for this report based on a statement by DPRK officials. When celebrating the 20th anniversary of the "repatriation" program North Korean officials noted that "forty percent" of the migrants needed "revolutionizing," the name of the zone within the labor camps to which many "returnees" were sent.) Perhaps as many as 150 of the migrants subsequently fled from North Korea to China and have resettled in either Japan or South Korea, reportedly 100 in the Tokyo area and another thirty to fifty in the vicinity of Osaka. Several Korean-Japanese who recently fled from North Korea were interviewed for this report. Their testimony appears on p. 73, 79, 80, 126, and 127.

## Korean Laborers in Russia

According to AI, a 1967 agreement between Russian Prime Minister Leonid Brezhnev and Kim Il-sung set up North Korean work crews at logging sites in the Khabarovsk and Amur regions of the Russian Far East, and at construction sites in several Russian cities. Initially the North Korean labor crews in the USSR were thought to number around 20,000, but by the mid-1990s, the number was thought to have declined to somewhere between 2,500 and 6,000. These crews worked under the control of North Korean state enterprises and North Korean police. While it was recognized that these work crew jobs were highly sought after, AI was concerned about labor conditions, and about reports of political imprisonment within the labor sites for those who criticized the North Korean system or expressed a desire not to go back to the DPRK. But mostly, AI was concerned about the fate of North Korean laborers who escaped from the work sites, rather than returning to North Korea after their three-year contracts expired.

AI had received reports about North Korean police agents tracking down Koreans within Russia, and reports of Russian police turning over North Koreans for repatriation against their will to the DPRK. Following the collapse of the USSR, Russian journalists visited the lumber cutting sites and wrote a number of stories about the conditions of the North Korean labor crews. In 1993, a number of logging sites were visited by the Russian Parliamentary Human Rights Commission, headed by the noted former dissident, Sergei Kovalyov, who obtained copies of the cooperation protocols between the Russian and North Korean police agencies operating in Russia and declared the protocols to be illegal. These concerns and others, particularly the forced repatriation of North Koreans from Russia to the DPRK, are summarized in the AI report, "Pursuit, Intimidation, and Abuse of North Korean Refugees and Workers" (AI Doc # ASA/24/06/96). An appendix to this report contains the text of a 30 December 1994 appeal from North Korean refugees in Moscow seeking assistance and support from the UN, the ICRC, "the Church" and human rights organizations. See also AI, "Russian Federation/DPRK: Refoulment of Lee Yen Sen / Fear for Safety in the DPRK" (AI Doc # EUR 46/06/96, February 1996).

For the testimony of a North Korean refouled from Russia in 1999 and sent to *kwan-li-so* Camp No.15 (Yodok) who was interviewed for the present report, see Kim Eun-chol, page 63 below.

## AI's Investigation of Shibata Kozo and Cho Ho-yong

### Mr. Shibata Kozo (Korean alias, Kim Ho-Nam)

Born in Tokyo in 1930, Kozo, a Japanese citizen, married Shin Sung-suk, a Korean widow living in Southwest Japan in 1959. In late January 1960, Kozo, Shin and her two children from a previous marriage took the sixth boat transporting Koreans and their Japanese spouses to North Korea. Living in Pyongyang, Kozo worked on Korean-Japanese translations, and had a child with Shin. In 1964 Shin wrote Kozo's sister in Japan that he had been taken to a sanitarium. Knowing that some "returnees" had not fared well, Kozo's family doubted this, as he did not mention any health or medical problems in previous letters. In 1974 letters from Shin or their daughter stopped completely.

In 1992, a weekly news magazine, Bunshun, carried a story about a former North Korean, Huang Pyong-joo, who fled to China, and claimed he had shared a prison cell with Kozo at the Sungho-ri prison labor facility, which reportedly contained some 6,000 prisoners at that time. According to Huang, Kozo had been imprisoned as a spy from 1964 to 1984. The spying allegation was based on Kozo's admission that years before, while still in Japan, he had rented an apartment owned by a Japanese police official. Kozo had also supported the protests of several Japanese wives of "returned" Koreans, who were seeking the implementation of the previously promised guarantee that they could visit their families in Japan every three years. Additionally, according to Huang, a guard at Sunho-ri told him that Shin and the three children had been sent to the camps.

### Mr. Cho Ho-yong

Cho Ho-yong and his Japanese wife, Koike Kideko, "returned" to North Korea in February 1962. Cho had been a physiology student at the Tohoku University graduate school and was convinced by Chongyron, the pro-DPRK Association of Korean Residents in Japan, that if he went to North Korea the government would send him to Moscow for further graduate study. Initially assigned as a physiology instructor at a medical college in Hamhung, rather than being sent to Moscow, Cho was re-assigned to an orchard as an agricultural worker. In 1967 he wrote to his family still in Japan that he was about to undertake "re-education." In 1973, after three years of silence his family received a letter from Koike that she and the children had been living alone for six years. Then all letters stopped.

Alerted by her family in Japan, in 1994, AI took up their cases as disappearances, and via the DPRK Ambassador to the UN and in a mission to Pyongyang in 1995, AI raised Cho and Kozo's cases with North Korea. The DPRK informed AI that the Kozo family had been killed in a train accident. It also reported that in 1973 Cho had been detained as a spy at the Chonnae Prison, but he escaped and two days later, he and his wife and children were shot by Korean border guards during an attempt to flee North Korea after killing a North Korean soldier while stealing a boat to make their escape.

AI found the North Korean explanations to be internally inconsistent and contradicted other information in AI's possession, which indicated that both were still in detention. These discussions and the background information on these cases were summarized in an AI Report, "Human Rights Violations Behind Closed Doors" (AI Doc # ASA/24/12/95) an appendix to which contains the names of fifty North Koreans of concern to AI, the majority of whom were Korean-Japanese.

## Hidden Gulag (first edition)

As noted in the introduction, the first edition of *Hidden Gulag: Exposing North Korea's Prison Camps* (2003), was widely recognized as the first systematic and comprehensive account of political prisons, prison camps and the subsidiary systems of arbitrary detention in the DPRK. It was the first time that satellite photographs were used by an NGO report to precisely document the sites of human rights violations. *Hidden Gulag* was translated into Korean and Japanese, and published in Seoul and Tokyo.

## Google Earth: Mapping the Fences

In 2006, as earlier noted, Google Earth's improved technology allowed detailed online viewing of satellite images of the Korean peninsula. Many of these images are of much higher resolution than the images previously available. Initially using the coordinates of the prison camps as published in *Hidden Gulag*, Google Earth enabled viewers to zoom in on the prison camps, and with its clearer resolution even trace the barbed wire fences surrounding the encampments, and additional facilities.[66] Former prisoners confirmed these markings as the fences and guard posts tracing the outside perimeters of the camps. (For prison camp satellite photograph identifications of more recently escaped political prisoners interviewed for this report, see pages 197-229.)

# Contemporary Witnesses and Testimonies

## *Kwan-li-so* Camp No. 14, Kaechon, South Pyongan Province

Operated by the *Bo-wi-bu* (State Security Agency) police, *Kwan-li-so* No. 14 is located in Kaechon-kun, (*kun* is a geographic area roughly equivalent to a county) in South Pyongan province, so the camp is referred to as "Kaechon." Located in a mountainous area, it is some 40-50 kilometers (25-31 miles) long and some 30 kilometers (19 miles) wide, and is estimated to hold 15,000 prisoners. It is located on the north side of the Taedong River. It is across the river from another prison camp, No. 18 at Bukchang-kun, South Pyongan.[67]  Enterprises at Camp 14 include mining, clothing manufacturing, farming, and livestock-raising. The latter was considered as the occupation of choice, as the prisoners had the opportunity to steal animal food and even pick through animal droppings for undigested grains.

---

66 Two persons who have examined the satellite photographic images of North Korea including the prison camps in great detail have websites where images and/or information are placed online as they become available. See the websites of a Washington DC-based attorney, Joshua Stanton "OneFreeKorea," and "North Korea Economy Watch," by a Miami-based graduate student, Curtis Melvin.

67  A former prisoner from Camp 18, Mrs. Kim Hye-sook, whose testimony appears below, (p. 71) reports that following the discovery of valuable mineral deposits in Camp 18, just south of the Taedong River, the boundaries of Camp 14, which is run by the more powerful *Bo-wi-bu* political police agency, and Camp 18 were redrawn with Camp 14 acquiring the chunk of territory below the Taedong River with the mineral deposits, so that the mineral extractions would accrue to the more powerful political police agency.

**WITNESS AND TESTIMONY:**
**Shin Dong-hyuk,** *Kwan-li-so* **No. 14 (1982–2005)**



Shin Dong-hyuk spent 23 years at Camp 14, Kaechon, located on the north side of the Taedong River in South Pyongan province under very unusual circumstances. He was born there in 1982 to two model prisoners whom the prison guards had coupled together. According to Shin, some sections of Camp 14 had an unusual reward system for young prisoners, the most exemplary of whom would be allowed to have sex three or four times a year with another prisoner chosen for them by the prison staff. The term "you're married" was used, though the mated parents were not allowed to live together with the children, like Shin Dong-hyuk. The young prisoners welcomed these unions for obvious reasons, especially since women who became pregnant outside of these guard-chosen "marriages" were taken away and never returned to their previous work or residence units. Shin also believes that an additional motive for the arranged matings was a labor shortage in the prison camp owing to high prisoner death rates from malnutrition and work accidents.

Shin's father's family, his grandmother, grandfather, his father and two of his uncles were deposited in Camp 14 in 1965 following a pre-dawn raid during which the police descended on the household and just took the family and their furniture away by truck. Shin later learned that this was

because two of his father's brothers had defected to South Korea. Shin lived with his mother until age 12, during which time he rarely saw his father who was held in another part of the camp. And he saw little of his mother, an agricultural laborer who worked in the fields from early morning until the nighttime work criticism session. Shin had an older brother, eight years his senior, who had already been transferred to a "singles barrack" by the time Shin reached primary school age. Shin met his brother only three or four times that he can remember. Shin had so little family life that, regrettably, he notes, he developed no bond of affection for his parents or brother.

The section of Camp 14 where Shin grew up had six areas or "villages," five for families and one "village" for singles, which could not be visited by people from the family villages. His prison home, called "main village," had forty houses with one hundred sixty households, as each house contained four households of women and young children. For the children of these Camp 14 couplings, there was an elementary school where the children learned reading and writing, addition and subtraction, but only that. Multiplication or division are not taught, he relates, having learned of these basic mathematical tools after he escaped from North Korea. At school, there were two or three classes per grade with about thirty pupils per class up through fifth grade, making for roughly four hundred children in all.

Camp life was harsh. Once, when he was nine, *Bo-wi-bu* police officers assigned as teachers, searched the children and found a small amount of wheat in the pocket of a girl. She was made to kneel and was beaten on the head for almost an hour until she fainted. Her classmates carried her home, but were told the next day that the girl died

during the night. A year later, at age ten, during the rice-planting season, Shin, like the other children followed his mother into the fields to assist in planting. Unwell, his mother could not keep up the pace for her group's work quota. Instead of being allowed to have lunch, his mother was compelled to kneel with her hands raised above her head for an hour and a half. Without lunch, even weaker, his mother fainted in the field around three o'clock in the afternoon. Again that evening, at the mutual criticism session, she was compelled to kneel for another two hours while, her fellow workers were compelled to accuse her repeatedly of being lazy and not fulfilling her work quota.

At age 12, Shin entered what was dubbed "middle school." But there was no instruction; the "classes" were organized child labor squads for weeding, harvesting, carrying fertilizer, etc.

In 1996, Shin was handcuffed, blindfolded and taken by car to an underground interrogation and detention facility where he was held for some six or seven months. In the course of his interrogations, Shin was informed of the reasons for his father's initial detention at Camp 14: two of his father's brothers had fled to South Korea. Shin's detention in the punishment cells at the Camp was related to an apparent escape attempt or plan by his mother and older brother. Shin was tortured repeatedly—being suspended over a fire, burning his backside, while pierced in the folds of his stomach to stop his squirming from the flames at his back—to confess details of his mother's and brother's escape plot. His wounds festered badly, and he was placed in the adjacent cell of an elderly prisoner long held in the punishment cell within the prison camp, who nursed Shin back to reasonable health. Shin

accounts this as the one piece of human kindness he encountered in 23 years at Camp 14.

Shin was taken outside where he saw his father, who unbeknownst to Shin, had also been detained in the underground cells at Camp 14. Shin and his father were blindfolded and driven away. When the blindfolds were removed, father and son were at the camp execution site, where Shin had previously witnessed multiple executions every year. He figured that he and his father were to be executed. But they were placed in the front row as two wretched prisoners were dragged forward. At close range, to his shock, Shin recognized his mother and brother, though his brother was just skin and bones and his mother's face and body were swollen with bruises. They were denounced as enemies of the people. His mother was executed by hanging and his brother killed by firing squad. Shin looked at the ground or over at his father, who was also looking down at the ground with tears rolling down his cheeks.

Shin's father was sent off to a construction site elsewhere in the camp and Shin was returned to his middle school labor brigade. Between the spring of 1998 and the autumn of 1999, along with other young teenagers, Shin was mobilized to build a dam connected to a small electrical generator. There, he was struck by the number of children killed in work accidents while constructing the dam. Shin and other teenagers from the middle-school labor brigade were also sent deep into the mines at Camp 14 to load loose pieces of coal that the adult prisoners had dug up into carts that were pushed by hand up the inclined shafts.

Shin was later assigned to work in a sewing machine repair shop at a large garment factory within the camp where he estimated that some 2,000 prisoners, mostly young women, produced military uniforms. At one point, Shin dropped a sewing machine base he was carrying to the second floor of the factory. In punishment for damaging the machine, the guards cut off the tip of his middle finger at the first knuckle.

To avoid the kicking and beating for unmet work quotas, young women at the garment factory sought the jobs of cleaning prison officials' offices, even though the provision of sexual services could be part of the assignment. A young woman, who had been in the same classes as Shin, was among those cleaning women. When the girl became pregnant, Shin and some other former classmates tried to cover up her pregnancy. But her pregnancy was soon discovered. She was taken away and never returned. Fellow prisoners believed she had been executed to eliminate the evidence of the prison officials' sexual abuse of the female prisoners.

In 2004, another prisoner who was assigned to the garment factory became Shin's close friend. This prisoner had grown up in the outside world, and had even seen Pyongyang and visited China. Learning about the world outside Camp 14 fired Shin's imagination. Shin grew to hate the life he knew in the camp and became determined to escape and see the outside world he was learning so much about. Six months later, in early 2005 the two young men were assigned to gather firewood high in the mountain at the far border of the camp. Seeing the barbed wire fence, the two ran for it. His friend went through first but got caught in the electrified fence and slumped over the barbed wire. Shin scrambled through.

Sleeping in the forest or abandoned buildings and stealing food and clothes for a month Shin made his way north, to and across the China border. He worked for a year and a half tending cows in rural China, while trying to listen to South Korean radio broadcasts. He went into the South Korean consulate in Shenyang. After evacuation to South Korea, Shin was hospitalized for two months for depression and anxiety. His story was published in South Korea under the title, Escape to the Outside World. His biography in English, *Escape from Camp 14*, by former Washington Post reporter, Blaine Harden, will be published (Viking Press) in March 2012.

*See pages 214 to 215 for the locations Shin identified on satellite photos of Camp No.14*

## WITNESS AND TESTIMONY: Kim Yong, *Kwan-li-so* No. 14 (1995–1996)



Kim Yong was born in 1950 in Hwanghae province. When he was seven years old, unbeknownst to him at the time, his father and older brother were accused of spying for the United States and executed. To spare him the collective guilt attributed by North Korean officials to the families of political wrongdoers, Kim's mother placed him in an orphanage under a false name. Kim grew up to become the Korean equivalent of a lieutenant colonel in the *Bo-wi-bu* (National Security Agency) police. Like other military

departments and security police units, his unit set up income-generating businesses, and Kim became a vice president in the Sohae (West Sea) Trading Company, which operated three fishing vessels, exporting flounder and sole to Japan. As a hard-currency earner for the regime, Kim had access to foreign currency, goods and culture, and a chauffeur driven car.

Unfortunately, Kim's true parentage was discovered, quite by accident, after someone else turned up bearing his assumed name. He was arrested and interrogated for three months at the Maram *Bo-wi-bu* detention/interrogation facility in the Yongsong district of Pyongyang and at another *Bo-wi-bu* jail, called Moonsu, also in Pyongyang. The torture at Moonsu was particularly severe. Accused of deliberately infiltrating the security service, Kim was forced to kneel for long periods with a wooden bar placed behind and between his knees and calves. He was suspended by his handcuffed wrists from his prison-cell bars, and he was submerged up to his waist for long periods in tanks filled with cold water.

In 1995 and part of 1996, Kim Yong was imprisoned in *Kwan-li-so* No. 14 at Kaechon district, South Pyongan province, where he worked in a coal mine. In 1996 he was transferred, he believes through the intervention of his supervisor at his former trading Company, to the adjacent Labor Camp No. 18, located on the other side of the Taedong River, where unbeknownst to Kim Yong, his mother was imprisoned. (His testimony about his experience at Camp No. 18 resumes below on page 76.)[68]

_____

68  In 2009, Kim Yong's biography (with Kim Suk-Young), *Long Road Home: Testimony of a North Korean Camp Survivor,* was published by Columbia University Press, New York.

At Camp 14, daily meals, according to Kim Yong, were limited to 20-30 kernels of corn and watery cabbage soup. When he first arrived at *Kwan-li-so* No. 14, he was assigned to coal mining at *Mujin II Gang*—No. 2 Cutting Face mine entrance. He was shocked by the skinniness and discoloration of the other prisoners, who looked to him like soot-covered stickmen.

For nearly two years, all Kim saw was the inside of mine shafts, and the adjacent barracks, which contained six rooms with fifty persons per room sleeping on three tiers of wooden bunks. Fortunately, as this was a coal mine, the barracks were heated. Next to the barracks was an eating room/washroom, a sawmill, and a pumping station. The mining work was divided among tunneling/digging teams, loaders, tracklayers, railcar operators, and sawmill workers. The leader of Kim's tunneling team was a former major general, Kim Jae-keun, who had been purged and sent to *Kwan-li-so* 14 for having sided with Kim Il-sung's stepbrother Kim Pyong-il against the succession of Kim Jong-il.

Men and women were segregated from each other. In fact, the only time Kim saw women during his two years of imprisonment at Camp 14 was when all the workers were taken outside the mine area for road construction.

In Kim Yong's section of Camp 14, guards executed some twenty-five prisoners. In one execution, a prisoner by the name of Kim Chul-min was executed for collecting, without authorization, ripe chestnuts that had fallen to the ground from a tree at the mine entrance. Another hunger-crazed prisoner, Kal Li-yong, died after having his mouth smashed by a feces-covered stick for having stolen a leather whip, which he soaked in water and then ate the softened leather.

More prisoners died of malnutrition and disease than from execution, and even more died from accidents in the mines.

*See pages 209 to 213 for Kim Yong's identifications on satellite photographs of Kwan-li-so No. 14.*

## *Kwan-li-so* Camp No. 15, Yodok, South Hamgyong Province

Yodok is the most well known of North Korea's prison camps, primarily because it has sections known as "revolutionizing processing zones" (*hyeok-myong-hwa-koo-yeok*). Prisoners judged to have been "re-revolutionized" or "re-educated through labor" from being "counter-revolutionaries" to being again potential loyal participants in the "Kim Il-sung nation" are thus eligible for release. Once released from Camp 15, a number of the former prisoners concluded that they would always be under suspicion and surveillance and had no possibility of a good future if they remained in the DPRK, so they fled to China with the intention of going on to South Korea. The first edition of *Hidden Gulag* contained the testimonies of four such former prisoners. Their testimony covered the camp from 1977 through 1999. During the research for the second edition, five additional former Yodok prisoners were interviewed. Their testimony, in chronological order, provides information on this camp from 1970 to 2006.

According to former prisoner An Hyuk (below), Yodok, which is shorthand for Yodok district, an area of land measurement within a province that would be comparable to a district or county, is located in South Hamgyong prov-ince. Yodok-kun[69] contains twenty *ris* [70] (also sometimes transliterated as "li" or "ni"), five of which comprise Yodok. The re-revolutionizing zones include Ipsok-ri (or Yipsok-ri), Knup-ri (or Gnup-ri) for Korean families from Japan, and Daesuk-ri (or Taesuk-ri), and a newer section called Sorimchon or Kumchon-ri, where several former prisoners interviewed for this report were held in "singles" villages. Other sections include Pyongchang-ri, a punishment or detention area within the prison camp called Yongpyong-ri, a secluded killing area called Kouek, and other areas for prisoners imprisoned for life.

The whole encampment is surrounded by a barbed-wire fence measuring 3 to 4 meters (10 to 13 feet) in height. In some areas there are walls 2 to 3 meters (7 to 10 feet) tall, topped with electri-cal wire. Along the fence there are watchtowers measuring 7 to 8 meters (23 to 26 feet) in height, set at 1-kilometer (0.62-mile) intervals, and patrolled by 1,000 guards armed with automatic rifles and hand grenades. Additionally, there are teams with guard dogs. Inside the camp, each village has two guards on duty at all times.[71]

According to Mrs. Kim Young-sun, Yodok was opened in 1970 following a July 1969 speech by Great Leader Kim Il-sung on the need to "revo-lutionize" the Korean Workers' Party. Mrs. Kim was taken to Yodok during its first year of opera-tion. The areas she was familiar with included Knup-ri and Ipsok-ri sections of the camp, of

---

69   "Kun" (or "Gun") is a larger North Korean administrative unit.

70   "Ri" (or "Ni" or "Li") is a smaller North Korean administra-tive unit.

71   These figures come from pages 48–59 in An Hyuk's Yodok List, translated into English in Life and Human Rights in North Korea, Volume 1, Autumn 1996, a publication of the Citizen's Alliance for Human Rights in North Korea, Seoul, pp. 18–19.

which the former had many persons who had held high-level positions in Pyongyang or who had studied abroad. However, she reports that many of the former high level officials were not well suited to agricultural or industrial production in the labor camps and quickly succumbed to malnutrition, illness and disease.

These sections were broken down into work units and each work unit into seven work groups. Each work unit was overseen by a *Bo-wi-bu* Lt. Colonel "security guidance officer" (*Bo-wi-ji-do-won*), who was called "teacher." From amongst the prisoners, the camp officials appointed a prisoner work unit leader (*jak-up-ban-jang*) as work unit record keeper (*tong gye won*) and often a livestock work group leader (*chuk-san-goon-jo-jang*).

Initially, Mrs. Kim and her family were assigned to Work Unit 3 at Knup-ri, which farmed corn. In 1971 she was transferred to Work Unit 1 of an "industrial battalion" (*kong-up-dae*) that had six "companies" (*so dae*) overseen by a supervising commissioner (*kwan-li-wi-won-hwe*). At first she worked in a wood drying plant next to a furniture factory. But she was shortly transferred to a construction company that built prisoner housing. Because her handwriting was very neat she was made the record keeper or statistician for the work unit. From her work as a record keeper, she believes that the population of the camp in the early 1970s numbered 20,000, some 60 percent of whom were the families of the presumed "wrong-doers."

In 1975 there was a re-registration of camp prisoners. At that time a "total control zone" (*wan-jeon-tong-je-kuyuk*) named Yongpyong-ri was

constructed at Yodok.[72] And Mrs. Kim and several others from the Knup-ri section were selected to be work unit leaders at the total control zone section of Yongpyong-ri, which held some 5,000 prisoners, mostly the family members of other North Koreans who had fled to South Korea, including family members of Christian pastors and elders. For three years, until her release from Camp 15, Mrs. Kim resided in Yodok's "total control zone."

When asked if there were any arranged marriages or couplings at Camp 15, comparable to Shin Dong-hyuk's parents at Camp 14, Mrs. Kim scoffed. To begin with, she responded, there were very few men. And very few women, including herself, had not ceased menstruation cycles. To her, the idea of bringing a child into the hellish world of the prison-labor camps was preposterous.

Kang Chol-hwan, who entered Yodok in 1977, remembers a sign at the front gate of the colony reading, "Border Patrol Unit 2915." The colony is bound to the north by Mt. Paek (1,742 meters, or 5,715 feet, high), to the northeast by Mt. Modo (1,833 meters, or 6,014 feet, high), to the west by Mt. Tok (1,250 meters, or 4,101 feet, high) and to the south by Mt. Byoungpung (1,152 meters, or 3,780 feet, high). The valley is entered from the east by the 1,250-meter (4,101-foot) Chaebong Pass. The streams from the valleys of these mountains form the Ipsok River, which flows downstream into the Yonghung River, which flows into the sea near Wonsan City.

---

72  See page 197 for a satellite photograph overview of Yodok in which the Knup-ri, Ipsok-ri and Yongpyong-ri sections of Camp 15 can be seen.

During An Hyuk's year-and-a-half imprisonment, there were, he thought, some 30,000 prisoners in the lifetime area, and 1,300 singles and 9,300 family members in the re-revolutionizing zone along with some 5,900 Koreans, including Kang's family, who had voluntarily repatriated from Japan. They were later judged not to fit into the "Kim Il -sung nation."[73]  By the time of Kim Tae-jin's release from Yodok in 1992, the number of persons in this re-revolutionizing zone had decreased to somewhere between 2,000 and 3,000 because of releases of prisoners to society and because of transfers of other prisoners to the lifetime-imprisonment zones.

According to Kang Chol-hwan, labor operations at the Knup-ri section of Yodok included a gypsum quarry and a re-opened gold mine (which was originally opened during the Japanese occupation of Korea), where some 800 men worked in groups of five. Assignments in these mines were considered the worst form of labor because of the frequency of work accidents. The section for ethnic Koreans who had voluntarily migrated from Japan also had textile plants; a distillery for corn, acorn, and snake brandy; and a coppersmith workshop. The prisoners raised rabbits for the lining of soldiers' winter coats, worked on agricultural teams, and were periodically organized to look for hard woods and gather wild ginseng in the forest hillsides.

During Kang's ten-year imprisonment there were somewhere between 2,000 and 3,000 persons in his village area, and about one hundred deaths per year from malnutrition and disease, particularly from severe diarrhea leading to dehydration.

While Kang's was a family village, sexual contact between men and women was not allowed, as it was thought this could result in another generation of counter-revolutionaries. Such contact did occur, but, with two exceptions in ten years, all pregnancies were forcibly aborted. The involved men would be physically punished and the women would be humiliated by being compelled to recount their sexual encounters to the entire village.

Kang's village was a "re-revolutionizing" area, so it included "re-education," which consisted of readings from *Rodong Shinmun*, the Workers' Party newspaper.

Described by Lee Young-kuk, the singles area in Daesuk-ri was a valley 4 kilometers (2.5 miles) long by 0.5 kilometers (0.3 miles) wide next to a small 600-700-meter high (1,969-2,297-foot) mountain. During Lee's imprisonment, the area held roughly 1,000 prisoners, of which only 50 were women. The women's cells were heated, but the men's were not, so male prisoners suffered from frostbitten ears and swollen legs during the winter months. Roughly 200 prisoners died each year during the four years when Lee was imprisoned, mostly from starvation and related disease. But there were always new arrivals each month.

Both areas within Yodok where Kang, Lee, An, and Kim were imprisoned—Knup-ri and Daesuk-ri—had public executions by hanging, shootings, and sometimes worse for prisoners who had tried to escape or who had been caught "stealing" food. Lee witnessed one public killing of an attempted escapee, a Mr. Hahn Seung-chul, who was tied and dragged behind a car in front of the assembled prisoners until dead, after

---

73  Ibid.

which time the other prisoners were required to pass by and place their hands on his bloodied corpse. Another prisoner, a Mr. Ahn Sung-un, shouted out against this atrocity, and he was immediately shot to death. Kim witnessed a public execution by firing squad, after which the assembled prisoners were required to pass by and throw a stone at the corpse still slumped and hanging from the post to which the victim had been tied. Several women prisoners fainted as they were pressed to further mutilate the corpse. Kang witnessed some fifteen executions during his ten years at Knup-ri.

Nonetheless, according to Kang, prisoners who were brought to Yodok from other *kwan-li-so* said it was much better there than at their previous prison-labor camps. He reports that several prisoners committed suicide before they were to be transferred to other camps, where they feared they would just die a slow death.

Camp 15 itself evolved over the years. And our knowledge of it grows from additional former prisoners who have made their way to South Korea. From Former Prisoner # 27, we have learned of a long existing sub-section of Ispok-ri named Baeksan, where prisoners farm corn and engage in logging in nearby mountain slopes. From former prisoners Kim Eun-chol and Jung Gwang-il, we learned of a newer sub-section in one of the re-revolutionizing zones called Sorimchon to which "border-crossers," North Koreans who were forcibly repatriated from China were sent along with various government officials being punished for one reason or another. For reasons unknown, the name of this area of the camp was changed from Sorimchon to Kumchon or Kumchon-ri.

## WITNESS AND TESTIMONY: Mrs. Kim Young-sun, *Kwan-li-so* No. 15 (1970–1978)



Mrs. Kim Young-sun was born in Shenyang, China in 1937. Her family had moved to Manchuria in the late 1920s following the Japanese occupation of Korea. After the Japanese occupation of Manchuria, the family moved deeper into China and her brother became a high-ranking anti-Japanese partisan in the "Yan'an faction" of the Chinese communist army fighting the Japanese under the command of Mao Tse Tung. In 1945, when Mrs. Kim was seven years old, her family returned to Korea, as her brother was a committed communist party member.

Back in Pyongyang, Mrs. Kim studied dancing at the Pyongyang Arts University. She was was a professional dancer for thirteen years at the Korean People's Military Art Center. One of her classmates and fellow dancers was Mrs. Sung Hye-rim, who later became Kim Jong-il's secret consort, then wife, and the mother of Kim Jong-il's first son, Kim Jong-nam. Following her retirement as a professional dancer, Mrs. Kim held a post at a foreign tourist shop in Pyongyang, where foreigners and Pyongyang's political and social elite were able to shop for high quality, often imported, goods not generally available to the North Korean public. Because of her family background, and her long friendship with Sung Hye-rim, Mrs. Kim traveled in Pyongyang's highest social circles. Her first husband was, like her brother, a high-ranking official in the

"Yan'an faction" of the Korean Workers Party. But they divorced when, following the Korean War, Kim Il-sung purged the "Yan'an faction" of the Korean Workers' Party, which was suspected of being amenable to Chinese influence.

In July 1970, her second husband, who worked at the publishing house of the Korean Encyclopedia, disappeared. To this day, she has no knowledge of his whereabouts or fate, but she assumes he was sent to another prison camp. One month later, in October 1970, the *Bo-wi-bu* State Security Agency came for her. She was detained and interrogated for two months by the *Bo-wi-bu* Preliminary Investigation Unit (Ye-shim) Department # 312. Even though she refused food for a week to protest her detention, she was not mistreated. But she was required to write out her life story in great detail, particularly her long friendship with the woman who had become Kim Jong-il's wife. After two months, five *Bo-wi-bu* officers came and told her they could not assume responsibility if her knowledge about Kim Jong-il's wife fell into the wrong hands.

In October 1970, she was taken to her home to pick up, in accordance with the *yeon-jwa-je* (the three generation guilt-by-association collective-punishment system), her two parents and four children (then aged 3,5,7, and 10) after which the whole family was deported *incommunicado* to Yodok, Camp 15, where she remained until 1978. During that time, her parents died of malnutrition and untreated diseases, and one of her three sons drowned at the age of eleven.

Her testimony provides a great deal of information on how Camp 15 operated in its early years.

And while most information on Yodok[74] comes from former prisoners from the *hyuk-myung-hwa-koo-yeok* "re-revolutionizing" sections of Camp 15, three of her years in the prison camp were spent in one of the *wan-jeon-tong-je-koo-yeok*, the "total control zone" areas of the camp, from which no prisoners were released. According to Mrs. Kim, Camp 15 was established following a 1969 speech by Kim Il-sung on the need to further revolutionize the Korean Workers' Party members. Upon her arrival, her family shared a two-room (one room with a separate kitchen) shack with another family. She was assigned to the 3rd work unit out of ten in the Knup-ri section of Yodok, where she worked in the wood drying section of a factory that made furniture for use in Pyongyang. She only had contact with three of the ten work groups, one of which was for single, unmarried, prisoners. The other two work groups, including hers, were for imprisoned families. In 1971, she was assigned to a construction work unit that built houses and a food factory within the camp. Because her handwriting was very neat she was made a statistical record keeper for the construction unit. This position gave her considerable knowledge of the organization and workings of the labor camp.

During this time she met other "high level" people she had known in Pyongyang. There were persons who had high-ranking positions, former diplomats, military officers, and others who had studied abroad. While not informed of specific "charges," some of the prisoners were accused during their pre-prison camp interrogations of mishandling portraits or busts of the Great Leader Kim Il-sung. Others had been over-

---

74  See p. 197 for satellite photographs.

heard or suspected of "complaining." According to Mrs. Kim, the three tiered *songbun* citizen classification system (loyal, neutral or antagonistic) with fifty-one subcategories, all based on the grandparents' political position and stance toward the Japanese occupation and the post liberation socialist regime, had been instituted in the late 1960s. There was dissatisfaction, even within relatively high standing ranks, that an insufficiently high *songbun* would limit the future aspirations of the family. Overheard, or reported to the police, such complaints about assigned socio-political status could, and did, lead to banishment to the labor camps.

In 1975, Mrs. Kim and ten other prisoners from the "re-revolutionizing zone" areas of Yodok were chosen to be work unit leaders in the "total control zone" area of Yodok, Yongpyong-ri No.7. Mrs. Kim and her family, and the families of the ten other so chosen "work leaders" were transferred to the area of the camp from where prisoners deemed to be incapable of "re-revolutionizing" would spend the rest of their lives doing a variety of forced labor: planting and harvesting food and tobacco and raising pigs, in this particular work unit.

This part of the "total control zone" area of Yodok in those years was filled with the families of the 2nd or 3rd generation of Koreans deemed hard core counter-revolutionaries. Generally, the male heads of these families were previously executed, or sent to another prison camp, or defected to South Korea. These generations included the families of former landowners and "rich" farmers, policemen during the Japanese occupation, pastors or elders in Protestant Christian churches, and the families of the "traitors to the nation" who fled south. Most of the prisoners in Yongpyong-ri No.7 had come from North

and South Pyongan, and North and South Hwanghae provinces.

These prisoners were all "skin and bones." Their clothes were rags and they were constantly dirty, not being allowed to wash very often. Persons whose pigs died were taken away. People whose paddies dried out were treated as beasts. They were told they were criminals who would, nonetheless, be kept alive even though they did not appreciate the blessings and mercy of the Workers' Party.

In late 1978, Mrs. Kim and her family, along with the families of the other ten families who had been previously selected to be work unit leaders in the total control zone, were released from Camp 15 after they had been fingerprinted and made to promise never to tell anyone about the prison-labor camp. This was a pledge Mrs. Kim kept as long as she remained in North Korea. Upon release from the camp, Mrs. Kim and her family were assigned to work in a gold mine located in the mountains near Chongjin. The work there was less arduous than in the labor camp. She was able to send and receive letters, and allowed to travel with the permission of local party officials. In 1979, she was allowed to travel to Pyongyang where she looked up her old friends, not one of whom had known where she had been sent nine years earlier, or why. In 1980, she was able to move to Hamhung where she worked in a tailor shop. In 1988 one of her sons tried to flee North Korea but was caught and executed. In 2001, she successfully fled to China, where she was a domestic worker for two and one-half years. In 2002, she left Harbin, in China's far northeast, starting a five month journey through southwest China and Southeast Asia before reaching Seoul in November 2003.

58

**WITNESS AND TESTIMONY: Kang Chol-hwan, *Kwan-li-so* No. 15 "Yodok" (1977–1987)**



Kang Chol-hwan was born in Pyongyang in 1968. His Korean–Japanese grandfather, who made a fortune in Japanese *pachinko* parlors (pinball/slot machine casinos), and his Korean-Japanese grandmother, a stalwart supporter of Kim Il-sung's Korean Workers' Party, had voluntarily migrated to Pyongyang to contribute to the building of socialism in North Korea. Gradually the bank accounts, cars, and furniture the family had brought with them to North Korea were seized.

One day, Kang's grandfather simply disappeared without a word or trace. Several weeks later, agents came to Kang's father's home, announced that the grandfather had committed an (unspecified) act of high treason, and took the entire family—except for Kang's mother—to *Kwan-li-so* No. 15 at Yodok. The mother, coming from a high level political family, was required to divorce Kang's father at that point. Initially the family had no idea where they were. The sign above the entry gate only said "Border Patrol of the Korean People, Unit 2915." Subsequently, they learned that they were in a guarded "village" surrounded by barbed wire and reserved for the families of ethnic Koreans from Japan who had voluntarily repatriated to North Korea. They also learned that they were in the rehabilitation section—the "revolutionizing zone"—of a sprawling prison-labor camp. Three years later, they learned from a prisoner who had been transferred into Yodok *kwan-li-so* from Sungho-ri prison camp, some forty miles from Pyongyang, that Kang's grandfather had been imprisoned at Sungho-ri.

Kang was imprisoned from age nine to nineteen, in what is North Korea's most well known political prison-labor camp. After being released without explanation in 1987 (Kang suspects that his grandfather had died), Kang lived in several places in North Korea. He eventually met up with another former prisoner, An Hyuk, whom he had first met in Yodok, and the two of them fled North Korea. They went to to Yanji, Shenyang, Beijing, and finally Dalian, from where, in 1992, they went by boat to South Korea.

In Seoul, Kang co-authored with historian Pierre Rigoulot a superlative and ably translated prison memoir, *Aquariums of Pyongyang: Ten Years in the North Korean Gulag*,[75] the first detailed account of a North Korean prison-labor camp to be published in the West. The book describes the horrors and deprivations of life at Yodok without losing the sense of puzzlement with which a young boy, subsequently a teenager, attempted to comprehend the perniciously bizarre and cruel situation in which he grew up. Today, Kang is a reporter for Chosun Ilbo, a large daily newspaper in Seoul.

---

75  Kang Chol-hwan and Pierre Rigoulot. *Aquariums of Pyongyang: Ten Years in the North Korean Gulag* (New York, N.Y.: Basic Books, 2001); originally published in France as Les Aquariums de Pyongyang (Editions Robert Laffont, 2000).

## WITNESS AND TESTIMONY: An Hyuk, *Kwan-li-so* No. 15 "Yodok" (1987–1989)



An Hyuk was born in Manpo City, Jakang province, in 1968 into a loyal party family. At the age of twelve, he received a government scholarship to a school for physical education. In 1986, when he was nineteen, after skiing in Hyesan near Mt. Paekdu on the Chinese border, An crossed into China largely out of curiosity. Arrested in China, he was repatriated to North Korea. He was detained for one year and eight months in solitary confinement in an undersized, underground cell in the Maram *ku-ryu-jang* (detention facility) at Yongsong, Pyongyang, and for another year and a half at the Daesuk-ri singles prison area at Yodok, one of the villages in the "re-revolutionizing" section of *Kwan-li-so* No. 15.

While at Maram, An was subjected to sleep deprivation and compelled to sit motionless for days. He saw only forty other detainees, but believes there were as many as 1,000. Among those in nearby cells were prisoners detained for spilling ink on or failing to adequately dust photographs of Kim Il-sung, charges that, according to An Hyuk, even the prison guards regarded as lacking seriousness. An relates that when he was transferred to Yodok, the guards there told him that he had been sitting down for too long and that it was time for him to do some work. During his year and a half at Yodok, there were some 2,000 prisoners in the Daesuk-ri section of the prison camp for unmarried prisoners.

At Yodok, An's first labor assignment was construction work at a water-driven electric power plant at the camp. His duties entailed breaking ice and wading waist-deep into a frozen stream to gather stones, and laying boards to re-channel the water. It was literally a "murderous" construction project, as scores died from exposure, and even more lost fingers and toes to frostbite. His next work assignment was cutting down and carrying rare hardwood trees from high mountains for export to Japan. Deaths resulted from injuries during this project as well. His last work project was gathering wild mushrooms in the mountains, also for export.

In 1992, An escaped to Seoul along with his former fellow prisoner at Yodok, Kang Chol-hwan. In 1995, Chongji Media in Seoul published his Korean-language prison memoirs, *Yodok List*.

## WITNESS AND TESTIMONY: Kim Tae-jin, *Kwan-li-so* No. 15 "Yodok" (1988–1992)



Kim Tae-jin was born in 1956 in China, where his father worked in the Chinese military. He returned with his mother to North Korea in 1961. After reaching adulthood, he worked in a leather factory in South Pyongan province. In 1986, he went to visit relatives in China and stayed for eighteen months before being arrested,

in July 1987. In mid-August he was repatriated to the Musan-kun *In-min-bo-an-seong* (People's Safety Agency) detention center in Chongjin, where he was tortured during interrogation. After four months, he was transferred to the *Bo-wi-bu* (State Security Agency) police *ku-ryu-jang* interrogation facility in Chongjin. He was again tortured during interrogation and accused of treason, even though he had gone to China only to visit his family. He was beaten, deprived of sleep, and forced to kneel or sit motionless for hours on end. Because Kim was not permitted to wash, he found the fleas and lice in the jail cells as bad a problem as the torture and freezing cold temperatures.

In March 1988, Kim was sent to the *hyuk-myung-hwa-koo-yeok* re-revolutionizing process zone of Daesuk-ri section at Yodok, where he was imprisoned for four years and six months, until April 1992. At Yodok, he farmed corn, cut trees into firewood, and worked in a furniture factory.

After having spent eight months in confinement in provincial jail cells, Kim thought Yodok an improvement in that he was at least allowed to move around. But food rations were meager, consisting of steamed salty corn dishes—this was before famine conditions afflicted North Korea. To stay alive, he ate plants and grasses, rats, snakes, and frogs. Kim saw deaths from malnutrition and related diseases "every week." He also personally witnessed five public executions of persons who attempted to escape. While at Yodok, he was beaten and forced to endure a sit-down-stand-up punishment until he could barely sit up. Even though Yodok was a "living hell," he still regarded these as the "golden years" for prisoners at Yodok compared with what longer-term prisoners told him about previous conditions.

After four and a half years, Kim was released. His wife divorced and denounced him. After five years, he became convinced things would never improve for him in North Korea and fled to China. He came to Seoul in June 2001 via Mongolia. He now heads a Seoul-based NGO of former North Korean political prisoners.

## WITNESS AND TESTIMONY: Lee Young-kuk, *Kwan-li-so* No. 15 "Yodok" (1995–1999)



Lee Young-kuk was born in 1962 in Musan, North Hamgyong province, into a politically loyal family. During his ten years of compulsory military service, from 1978 to 1988, he became a bodyguard to Kim Jong-il and got to know the "Dear Leader" personally. After returning to his hometown in 1988, Lee reports that he was struck by the discrepancies between the lifestyles of the privileged in Pyongyang and the living conditions of the people of Musan. From 1991 to 1994, he was sent to the Central Military College in Pyongyang, after which time he was posted to a senior party position in Musan District. Because of his privileged status, he had a radio capable of receiving KBS (South Korean radio) broadcasts. Soon he became disillusioned with the political indoctrination he had been taught at the Military College, and from the KBS broadcasts, he came to believe that South Korea had become a real democracy with real freedom.

In 1994, Lee fled to China hoping to defect to South Korea. However, he was discovered missing, and because of his personal association with the "Dear Leader," North Korean security agents chased after him. Entrapped in Beijing and wrongly thinking he was talking to a South Korean diplomat who could assist with his defection, Lee confessed his true opinions about the North Korean regime. Under the impression that he was being escorted to the South Korean Embassy, he was whisked instead into the Embassy of North Korea, where he was bound, drugged, and put on a plane to Pyongyang.

Lee was held in Pyongyang for six months in an underground detention cell by the *Bo-wi-bu* (National Security Agency) police. He was subjected to kneeling torture (made to kneel motionless, not even turning his head, for hours at a time) and waterboarding torture (held down by five or six agents who poured water into his mouth and nose until he gagged and nearly suffocated) and was severely beaten on the shins, eyes, ears, head, and mouth. Six of his teeth and one of his eardrums were broken. Years later, he still suffers double vision in his left eye and his shins are still black and blue. Lee believes his torture was solely intended as punishment for having fled to China. While in Beijing, he had freely expressed unfavorable opinions about the regime, leaving no further information for the North Korean police to beat out of him.

Because other members of his family continued to serve Kim Jong-il—one of his cousins was one of Kim's chauffeurs—Lee's family was not punished along with him. In March 1995, Lee alone was sent to a singles camp in the *hyuk-myung-hwa-kyoo-yeok* (re-revolutionizing process) section of Yodok, where he quarried stones for fourteen hours each

day for four years. Before his capture in Beijing, he weighed 94 kilos (207 pounds). While at Yodok, he also cut logs, cleared rocks, and farmed. Released from Yodok in January 1999, Lee weighed 58 kilos (128 pounds).

In April 1999, Lee again fled to China and reached South Korea in May 2000, smuggled aboard a ship from Dalian with three other North Koreans. Nearly two years passed before Lee was willing and able to tell his story. He had arranged during that time for an ethnic Korean in China to go to Musan to tell his parents that he was in Seoul, but his parents could not be found, so Lee decided to tell his story.

### WITNESS AND TESTIMONY: Former Prisoner # 27, *Kwan-li-so* No. 15 "Yodok" (1999–2000)



Former Prisoner # 27 was born in North Pyongan province in 1966.[76] In the mid 1990s, he earned money selling used cars in China. Along with his wife and son, he was among a small group of North Koreans seeking to defect to South Korea who were caught by the Chinese police in Kunming, near the Chinese-Vietnamese border area. Former Prisoner # 27, along

---

76  As noted above, former prisoners who requested not to be identified by name for fear of jeopardizing family members remaining in North Korea, are designated numerically in the order of their original interview.

with his wife and son, was sent all the way back to the Tumen River area in northeast China. He was forcibly repatriated to North Korea at Onsong, and sent to the Chongjin *Bo-wi-bu* office where he and his wife were detained for eight months, while their four-year-old son was sent to an orphanage (*gu-ho-so*).

At the beginning of his detention, Prisoner # 27 was interrogated daily and later weekly. In order to force his confession, interrogators beat him in the face, causing him to lose his front teeth. And they handcuffed him to the cell bars so that he could not sit or lie down. Because food rations at the *Bo-wi-bu* interrogation facility were so scant, prisoners kept the corpse of a prisoner who died in detention within the cell to get the deceased prisoner's food ration.

Unusually, Prisoner # 27 was processed by what he described as a *Bo-wi-bu* "prosecutor" and "judge." He was accused of violating Articles 46 and 47 of the Criminal Code for "betrayal of the nation." And he was originally "sentenced" to ten years of imprisonment, though this was dropped to one year because, he says, his relatives were "higher ups," who knew he was detained by the Chongjin *Bo-wi-bu*. While others in his group of repatriates were sent to *Song Pyong Kuyok, Song Gok Dong* "Susong *Kyo-hwa-so*," or what he informally called Chongjin political prison (*jung-chi-bum kyo-hwa-so*) No. 25., Prisoner # 27 was sent to the Baeksan sub-section of the Yipsok-ri "re-revolutionizing" Section of Camp 15, where he logged and grew corn.

The Baeksan section of Yodok had existed for 20 years and was originally only for females. However, during his stay, it functioned as a location for both single men and single women.

Of the 180 people held there, only twenty some were women. People in the Baeksan unit area stayed a maximum of three years.

Prisoner # 27's barrack cell room at Yodok was shared by 20-25 men. He recalls that most of the prisoners who had been incarcerated with him were higher-level government employees. Many women at Baeksan were also government workers though some had worked overseas as dancers and singers. Because this section of the camp had a small hydroelectric dam and a generator, there was electricity. These prisoners were even able to watch North Korean TV at night, following the self-criticism and re-education sessions.

But otherwise, conditions were "really horrible." Because there was not enough food, he witnessed fifteen hunger related deaths among the 180 prisoners. Stealing food after being warned resulted in transfer to the "total control zone" (life-time incarceration) area of Camp 15. Prisoner # 27 saw three persons so transferred. Within the year he spent there, one woman and two men were publicly executed for attempting to escape.

He was released from Camp No. 15 in 2000. He arrived in South Korea in November of 2003 after traveling through China and Thailand.

## WITNESS AND TESTIMONY: Kim Eun-chol, *Kwan-li-so* No. 15 "Yodok"  (June 2000–August 2003)



Mr. Kim Eun-chol was born in March 1980 at Musan-gun, North Hamgyong province of North Korea. In 1999 he fled to China "to survive" where he met South Koreans who told him he could go to South Korea from Russia. So he made his way to Ussuriysk, about eighty kilometers north of Vladivostok. However, on the first day he was arrested along with six other North Koreans for illegal immigration. Held in Russia for twenty days, he was visited by staff of the UN High Commissioner for Refugees (UNHCR) from Vladivostok whom he hoped would provide some sort of travel documents for the group. He was also visited by North Korean consular officials who rebuked him, asking how he and the others could turn their backs on their motherland, which under the warm care of its loving leader, had given Mr. Kim eleven years of education. However, they were told that if they went back to North Korea they would be forgiven. Russian authorities sent the group of North Koreans back to Milsan, China en route to return to North Korea. While still in China, they all tried to run away to avoid repatriation to the DPRK. Six others were caught, but Mr. Kim hid in a temple where Falun Gong practitioners were also hiding out. Later, Mr. Kim decided to return to North Korea to see his father. The Falun Gong practioners gave him eighty yuan (about twelve US dollars), which he used to return to North Korea at Musan.

While going to see his father he was arrested by *An-jeon-bu* police, but after two days he was turned over to the Musan *Bo-wi-bu* police where he was held for 6 months. During interrogation, Mr. Kim was beaten with wooden sticks and metal rifle cleaning rods. He lost 2 teeth and has scars on his head, ear and knees. Mr. Kim was repeatedly asked what he did while in China, if he participated in any religious activities, met South Koreans, watched South Korean video and TV, or complained about the North Korean system. Mr. Kim initially denied all of the charges, but to stop the beatings he confessed that he had met South Koreans.

Mr. Kim did not receive what he regarded as a trial, but he did have a "session" with a *Bo-wi-bu* "prosecutor" (*komsa dam hwa*). In the session, the prosecutor reviewed the interrogation documents and asked if they were correct. Afraid of more beatings Mr. Kim said that they were. The prosecutor told him, "under the care of our Leader, you will be placed under three years of 're-revolutionizing process.'" Transported to Camp No. 15, walking through the entry gates, Kim doubted the length of his sentence thinking he would never get out of the camp.

At Yodok, Mr. Kim was assigned to a construction team in a small section of the re-revolutionizing zone called Sorimchon where from June 2000 to August 2003 he was assigned to a construction work unit where 19 men constructed farm houses for pigs and chickens, and also some homes for the *Bo-wi-bu* prison camp officials. There were about two hundred persons in this section of the camp, each work unit sharing a cell with wooden beds like in military barracks. There was, however, a wood burning stove for heat, and even occasional TV privileges. The women prisoners in this singles section of Camp 15 did farm work.

Mr. Kim was given two sets of used clothes, one for summer and another for winter, formerly worn by *Bo-wi-bu* guards. People who brought clothes with them from China bartered the clothes for food because everyone was so hungry. Mr. Kim said he was constantly hungry and that there were a number of deaths in detention from starvation and malnutrition-related diseases.

Most prisoners in this section of the camp did not know for how long they would be held, but some prisoners were told the length of their imprisonment during political dialogue sessions (*jeong-chi-dam-hwa*). Only a few of the prisoners in the Sorimchon section were imprisoned for "border crossing," although these included all of the seven who were repatriated together from Russia. Other prisoners included students who had studied abroad, and government officials and bureaucrats. In February 2002, two prisoners who attempted to escape were executed by firing squad. One of those executed was a 26-year-old man called Kim Ho-seok. Other prisoners were forced to watch the execution.

Just outside the Sorimchon section there was a punishment facility for "rule violators." Rule breakers were sent to this prison within the prison camp for 10-45 days and almost everyone died shortly after release. Mr. Kim described this as "killing people by drying them out" because these prisoners lost so much weight they could not even walk. He knew three persons sent to the punishment cells, one person for "stealing" honey, another for eating raw corn intended for the animals, and one woman who had sex with another prisoner. All three died upon release from the punishment cells.

Mr. Kim thought Sorimchon was the only "re-revolutionizing zone" in Yodok when he was there. He was aware of prisoners at the "total control zones" at Yodok, but never met or talked to any of them. During his imprisonment he met another former prisoner interviewed for this report, Mr. Jung Gwang-il (see below).

After release, Mr. Kim worked as a miner in Musan for 2 years. When Mr. Kim attempted to escape to China again, he was caught and sent to a Musan mobile training brigade (*ro-dong-dan-ryeon-dae*) for 3 months. However, the Musan mobile labor brigade did not have enough sleeping facilities for all the detainees, and Mr. Kim escaped while awaiting transfer to a larger facility. He again fled to China, made connections for travel onward through Vietnam and Cambodia, and arrived in South Korea in March 2006.

### WITNESS AND TESTIMONY: Mr. Jung Gwang-il, *Kwan-li-so* No. 15 "Yodok" (April 2000–April 2003)



Mr. Jung Gwang-il was born in Yanji, China. His family moved to North Korea when he was seven. Following military service in the North Korean army, Mr. Jung was involved in exporting high quality mushrooms to China, where he sold the mushrooms directly to South Korean businessmen, rather than going through a Chinese middleman. Because of his direct business contacts

with South Koreans, he was accused of spying for South Korea. He had made the mistake of making remarks critical of the Kim regime to a dinner companion in China who turned out to be a North Korean police informant.

In July 1999, he was picked up by the Hoeryong *Bo-wi-bu* State Security Police for interrogation at a large underground detention facility. For some six or seven months, he was beaten and tortured to confess to spying for South Korea. He was beaten with a wooden stick, which broke many of his teeth and scarred the back of his head. Much more painful was the so-called "pigeon torture" which pinned the arms behind the back and attached the prisoner to cell bars in ways that made it impossible to either sit down or stand up and caused paralyzing pain in the shoulders. During these torture sessions he was not allowed to go to the toilet, and had to urinate and defecate in his pants. During his time in the underground cells, two fellow prisoners died in detention.

He was also deprived of food, and his weight dropped from 75 to 38 kg (165 to 84 pounds). Driven by hunger, he agreed to confess in exchange for some food. After eating he recanted his false confession, for which he was again beaten severely. Shortly thereafter he was visited by what he described as a "prosecutor," who asked him if the spying charges he confessed to were true. At first, he claimed that he confessed falsely under duress, but the charges were accepted as true. Like other prisoners, he also hoped that even a false confession would result in a transfer to a *kyo-hwa-so* prison or *kwan-li-so* labor camp where at least he would be able to walk around.

In late March or early April, 2002 Jung was transferred to a "re-revolutionizing" area of Yodok, in a sub-section called "Sorimchon," which had been set up in October of 1999 following the closing of the "singles" section of Baeksan "village" area. Before deportation toYodok, *Bo-wi-bu* police stopped off at his home to pick up bedding, clothes, eating utensils and other belongings. So his family knew he was being taken somewhere, but they were never told where or why.

This small "village" within the sprawling camp held some 230 prisoners, about thirty of who were women. Mr. Jung was assigned to agricultural labor and construction, most notably at a fish farm. He could see people working in the adjacent "total control zones" within the Yodok camp, though there was barbed wire between the various sections and people in the different zones were not allowed to talk to one another.

Sorimchon was administered by Bureau Seven, the "enlightenment" or "re-education" bureau. He witnessed beatings by the guards, but not systematic torture. He believes, however, that there was systematic torture at the *ku-ryu-jang* punishment facilities of Camp 15's central *Bo-wi-bu* headquarters because the prisoners sent there for infractions of camp rules came back "in such very bad shape." Notwithstanding such leniencies as watching television every other Sunday, Mr. Jung witnessed twenty-six fellow prisoners die and another six taken away which he believes was for execution in this relatively privileged re-education section during his three years of detention. Of the twenty-six known deaths, twenty-three were from malnutrition, two were from public execution, and one as a result of torture.

66

Released from Yodok in April 2003, Mr. Jung again fled to China and made his way to South Korea via the long escape route through Southeast Asia, arriving in South Korea in April of 2004. Gifted with a remarkable memory, he provided a Seoul-based NGO of former North Korean political prisoners a listing of 121 names and descriptions of fellow prisoners in the Sorimchon section of Yodok. This publication provided a snapshot of the *wrong-doing*, *wrong-thinking* or *wrong-knowledge* that sent these North Koreans to the labor camp for "re-revolutionizing."

Thirty-four were imprisoned for "border crossing" after being forcibly repatriated from China or Russia, or for suspicion of departure. Thirty-six were imprisoned for "reactionary discourse"—criticism of the party or government. Another six were imprisoned for talking about matters deemed secret. Thirteen were detained for other political or religious problems. Four had been students studying in East Germany during the collapse of the socialist regime. Another had been posted abroad in Eastern Europe during the collapse of the socialist bloc and was taken to Yodok directly from the airport upon return to North Korea. Among the prisoners for wrong-doing related to religion were two "lightly punished" couples who had been part of a Bible study group, whose leader had been executed, while other group members had been sent to the "total control zone" area within Yodok.

*See pages 197-208 for satellite photographs of this section of Yodok during Mr. Jung's time of imprisonment.*

## WITNESS AND TESTIMONY: Former Prisoner # 28, *Kwan-li-so* No. 15 "Yodok" (1999–2006)



Former Prisoner # 28 was born in Onsong-kun, Sambong-ku, North Hamgyong province in 1970. She went to China in 1998 and was in a group of nine defectors caught in December 2002 trying to enter Mongolia en route to South Korea. She was detained for 20 days in Mongolia and the group was sent to Tumen detention facility in China and detained for another 20 days.

She was repatriated to the Onsong *Bo-wi-bu* where she was detained for six months. Since the Onsong *Bo-wi-bu* guards knew her family, initially, she was not treated harshly. But another person in the group confessed that they were trying to go to South Korea. After this confession, Pyongyang *Bo-wi-bu* sent interrogators for more questioning.

She told the interrogators from Pyongyang that she left North Korea to earn money. But those *Bo-wi-bu* agents responded that they knew her group was trying to defect to South Korea. During interrogation, they beat her in the face with wooden rulers and books. In between interrogations they made her kneel motionless from 5 am to 10 pm, which made her legs swell badly. Alternatively, she was compelled to do stand-up and sit-down exercises three hundred times. When she failed to complete this punishment, the jailers hit her fingers and made her

butt her head repeatedly against the iron bars. The Onsong *Bo-wi-bu* detention-interrogation facility was extremely crowded. There were, she believed, perhaps as many as five hundred men and women spilling out of the cells and sitting in the hallways of the building. When prisoners were allowed to sleep, people lay down on each other's hips because there was no room to stretch out.

After confessing that she was trying to enter Mongolia, *Bo-wi-bu* officers came from her hometown to transport her to Camp 15. She was not told what particular law she had broken, but she was told that she would be detained in Yodok for three years. Her father was called to bring her some clothing. When he did, her father did not know if he would see his daughter again, as persons sent off to the camps were not expected to return.

The area she was sent to within Yodok was the "re-revolutionizing zone" section, previously called Sorimchon, but renamed Kumchon-ri. About 200 people were there in the singles' barrack, many of whom were "border crossers." However, after 2003, most prisoners sent to this section were "high level people," including, she reports, former *An-jeon-bu* police who had made comments against the system or regime. There were also a number of former professional singers. Her barrack had 7 cells, 1 cell for women, 5 for men and a separate cell for former "higher ups."

No marriages or children were allowed in the camp. Two women had babies from male prisoners but the babies were abandoned in the mountains. Prisoner # 28 witnessed guards bury one baby in the ground. The women prisoners who got pregnant were imposed an additional six

months in prison and their male lovers an additional two months. However, one of the men was later transferred to the "total control zone." Prisoner 28 could see people in the "total control zone," but was not allowed to talk with them. Sexual abuse of the female prisoners by prison guards took place. Fortunately, a prison staff member who tried to take advantage of Prisoner # 28 was transferred.

She was assigned to farm corn and beans for prisoners and staff. There was also a livestock farm for pigs, goats, ducks, dogs and sheep. She was always very hungry because all she got to eat was three or four spoons of corn for each meal. Even this small amount was reduced when she could not meet her work quota. About ten people out of two hundred in her barrack died of malnutrition. Even the sick people were compelled to work and some prisoners died while working.

Normally she worked from 6 am to noon and 1 pm to 7pm. There was a *saeng-hwal-chong-hwa* (study on political ideology) once a month for the whole barrack, and smaller after dinner study sessions every 10 days for smaller groups. Oil lamps were lit at night for the political ideology sessions because there was no electricity at that time.

There was an execution site under a bridge and a *ku-ryu-jang* (punishment cell) for the singles' work area. The *ku-ryu-jang* and execution sites were for the people who tried to escape, steal food, etc. Some people never came back from the punishment cell, and others who returned, particularly men, died soon after release from the *ku-ryu-jang* cell because they were so weakened.

68



Keumchun-ri Prisoner Dormitory
*Kwanliso* No. 15 "Yodok", South Hamgyong Province

Prisoner 28 was released from Yodok in 2006, her length of imprisonment having been extended from three to five years. She was taken back to Onsong *Bo-wi-bu* where her brother came to the police station to guarantee that she would not flee again. However, she feared that, as a former *kwan-li-so* prisoner, she would always face persecution. So she and her father fled to China despite knowing that they would be under surveillance.

She confirmed the prisoners' barracks and guards' dormitories on satellite photographs. See page 199.

*See pages 197-208 for satellite photographs of Kwan-li-so No. 15 Yodok.*

## *Kwan-li-so* Camp No. 18, Dukchang-ri, Bukchang-kun, South Pyongan Province

Located on the other side of the Taedong River from *Kwan-li-so* No. 14, *Kwan-li-so* No. 18 is something of an anomaly among the *kwan-li-so*. It is run by the *In-min-bo-an-seong* People's Safety Agency police (still generally referred to as *An-jeon-bu*, the former name for the regular police) rather than by the *Bo-wi-bu* (State Security Agency) police.[77] It is a somewhat less strict and less severe prison-labor colony. According to former prisoners, the camp holds some 27,000 prisoners including the families of the presumed wrongdoers imprisoned in *Kwan-li-so* No. 14. Camp No. 18 is somewhat unusual in that civilians from outside the camp, employed as camp administrators called *dae-ne-min*, run various subsections of the camp.

Like Camp No. 15, Camp No. 18 had a "re-revolutionizing zone" for prisoners that were eligible for release back into society. Camp No. 18 also had a "liberation zone" with some 3,000 persons, called *hae-je-min* (literally "lifted people" or "cleared people") who had been released from imprisonment, but continued to live at the camp. The "cleared people" can seek employment outside the camp. They have access to small plots of land for growing crops outside the camp, and are able to send and receive mail, go to the local markets, and obtain travel permits for domestic travel. The *hae-je-min* even received a gift of liquor on the occasion of Kim Il-sung's birthday, apparently in recognition of their restored citizenship. According to one of the former prisoners from Camp No. 18 interviewed

for this report, these persons were allowed to leave the prison camp entirely if they could find some other locality where they could register and be assigned work and housing. (It is suggested in the Conclusion to this report that the *hae-je-min* section of Camp 18 could be instructive for the dismantlement of the entire labor camp system in the DPRK.)

Extraction and manufacturing work at *Kwan-li-so* No. 18 included coal mining, brick making, and cement making, along with work in a glass factory and a distillery. Prison laborers were paid varying token amounts in won. One former prisoner interviewed for this report received 30 won a month—barely the cost of a pack of cigarettes. Families were allowed to live together, and privileged prisoners were allowed to marry and have children. And unlike the guard-arranged couplings at Camp 14 across the river, young prisoners at Camp 18 were allowed to choose their own marriage partners. At some points during the forty years of imprisonment at Camp No. 18, there were also radio broadcasts, and copies of *Rodong Shinmun and the Workers' Daily* posted at the entrances to worksites (according to the four former prisoners whose stories are presented below). Some prisoners were allowed outside the gates to collect herbs.

Sizeable numbers of prisoners at Camp No. 18, like the other prison camps, died of malnutrition, disease, and work accidents. And there were public executions, as elsewhere, usually for escape attempts.

---

77   And thus is not considered a *kwan-li-so* by some.

## WITNESS AND TESTIMONY: Mrs. Kim Hye-sook, *Kwan-li-so* No. 18 (December 1974–February 2001)



Born in 1962, Mrs. Kim Hye-sook had been sent as a young child to live with her maternal grandmother in Pyongyang. While living with her maternal grandmother, for reasons unbeknownst to her at the time in 1970, the rest of her family—mother, father, sister, brother and paternal grandmother—were deported to Camp No. 18. For several years, Mrs. Kim's maternal grandmother successfully harbored young Hye-sook, but in December of 1974, when she was thirteen years old, Hye-sook was also taken away to Camp No. 18. (Decades later, following her release from the camp, Mrs. Kim learned that her paternal grandfather had fled to South Korea, the presumed reason for the family's banishment and incarceration—all three generations, according to the *yeon-jwa-je* "guilt by association" system of collective punishment.)

When she got to Camp No. 18, she learned that her father had been previously taken away by *Bo-wi-bu* police within the camp. The family did not know, and never found out, his whereabouts, or even if he was dead or alive. At Camp No. 18, Kim Hye-sook attended *Duk-chang-in-min* school from ages 13 to 15 and *Shim-san* high school, where she was taught rudimentary reading, writing and math, from ages 15 to 17. But mostly, Mrs. Kim relates, the Camp No. 18 schools served as gathering points for mobile child labor

brigades, often cutting trees or gathering wood. However, unlike the prison-camp schools attended by Shin Dong-hyuk and Kang Chol-hwan at Camps Nos. 14 and 15 respectively, the pupils were provided with Korean school uniforms every three years.

During her two-and-a-half decades at the camp, Mrs. Kim resided in the Suksan-ri, the Shim-san and the Bong-chang-ri sections of the camp. For most of her time in the camp, Hye-sook, like other girls and their mothers in the Shim-san area, were assigned to gather coal in the Hong-je mine. Men and boys dislodged the coal with picks and shovels, and the women and girls picked up the coal pieces and transported coal in buckets, wheelbarrows and coal trolleys which they would then carry, push or pull up ramps leading to the surface of the mine-face. There were many accidents in the mines, with the injured prisoners then being assigned to construction brigades or other work. Most of the workers doing forced labor in the mines contracted what is now called "black lung disease," a condition for which Mrs. Kim is currently being treated in hospitals in South Korea.

According to Mrs. Kim, most families at Camp No. 18 lived in residence units that contained four rooms, though a few barracks had up to 20 rooms. There was one family per room, each of which had rudimentary kitchen facilities, but no bathroom or toilet. All family members slept on the floor, sharing one blanket between them. After Mrs. Kim married another prisoner, he moved into the one room shared with the rest of her family. A few of the units had tile roofs, but most of the roofs were wooden and leaked when it rained. The prisoners lived mostly on thin "corn porridge" with occasional small amounts

of salt or bean paste. For vegetables, people ate grass or plant leaves they could gather whenever they got the opportunity.

Mrs. Kim and the other members of her family were released from Camp No. 18 in February 2001. Her brother and sister remained at Camp No. 18, though they were free to leave. Mrs. Kim re-settled in Sunchon, South Pyongan province, where she resided as a nurse and housekeeper in the home of an elderly woman. Subsequently, the house was destroyed in a flood. Homeless, Mrs. Kim fled to China and found work in a restaurant. To supply the restaurant in 2007, Mrs. Kim returned to North Korea to purchase piglets that were being raised and sold surreptitiously by a group of North Korean soldiers. While waiting in Musan for some of the piglets to finish weaning, Mrs. Kim was picked up by the police.

The soldiers from whom she bought the piglets threatened her against revealing their illegal side-business. So she remained quiet and faced the police on her own. The police took her back to Camp No. 18, but having officially "released" her several years earlier, the Camp No. 18 officials refused to re-imprison her. She was then sent to the formerly industrialized, but now impoverished and destitute city of Chongjin where she was supposedly "registered." But Chongjin officials, having no residence or job to which to assign her, also refused to accept her. So she was again sent back to Camp No. 18, where they again refused to re-admit her. While temporarily at Camp No. 18, she re-established contact with her brother and sister who had remained at the camp even after they were officially released. But they were desperately impoverished and unable to help her. Having no future in North Korea, but resourceful nonethe-

less, Mrs. Kim made her way back to China where she made the connections to travel on to South Korea.

With more than two decades of incarceration at Camp No. 18, Mrs. Kim provides valuable testimony on its operation. As previously noted, unlike the other *kwan-li-so* political penal labor colonies, which are run exclusively by the *Bo-wi-bu*, the political police agency, the *An-jeon-bu* regular police play a major role in running Camp No. 18. There are *Bo-wi-bu* police officials present around the camp, although Mrs. Kim describes their function mostly as the surveillance of the *An-jeon-bu* police. The operating office for Camp No. 18 is called the *an-jeon-song*.

By all four accounts from the former prisoners at Camp 18 interviewed for this report, Camp No. 18 is a less "strict regime" than the other labor camps for suspected political undesirables and their families. Those who broke prison camp regulations were sometimes subjected to mobile labor brigades rather than the torturous miniscule punishment cells common to the *Bo-wi-bu*-run encampments. In some sections of the camp, men at age 30 and women at age 28 were allowed to marry. And unlike the privileged sexual "couplings" described by Shin Dong-hyuk at Camp No. 14 across the river, the men and women were allowed to choose their own mates and live together with the children born to them within the camp. There were no wedding "ceremonies," but the couples could register themselves as couples with the camp authorities. As noted above, school age children would occasionally be given school uniforms, as is the practice in Korean primary and secondary education.

Most significantly, there are three categories of persons at Camp No. 18. The largest category, containing some 27,000 persons, are prisoners euphemistically termed "moved people" or "migrants" (*e-ju-min*). The sections of the camp for the *e-ju-min* are surrounded by electrified barbed wire. The second category includes civilians from neighboring towns who were hired for administrative duties within the camp, titled *dae-nae-min*. According to Mrs. Kim, these civilian camp administrators would, on occasion, quietly approach the prisoners and apologize for the way they were being treated.

Lastly, there was a category of *hae-je-min*, "cleared people" whose restrictions are removed. In fact, they were free to leave the camp if they could find a place to go. The *hae-je-min* often had small farming plots in the mountains outside the camp to which they could come and go. They could also obtain travel passes, often three to five days duration, to travel more widely outside the camp. But mostly, they lived and ate the same as the restricted, imprisoned *e-ju-min*. As noted above, after Mrs. Kim's brother and sister were released, they remained at Camp 18 as *hae-je-min*. There were statues of Kim Il-sung and Kim Jong-il within the *hae-je-min* areas, in front of which the prisoners had social events, even dances, on national holidays. On Kim Jong-il's birthday, the *hae-je-min* would assemble in front of the statues to receive small gifts (fruit, candy, or liquor) from the Great General, as is the general practice throughout the DPRK.

While Camp No. 18 is a less "strict regime" prison camp than the other *kwan-li-so* forced labor encampments described in this report, the brutality of the place is plainly evident in Mrs.

Kim Hye-sook's list of priorities of what should be provided to those imprisoned there:

1. Food and nutritional supplements, bearing in mind, Mrs. Kim says, that the prisoners never eat "regular" or "real" food.

2. Respiratory medicines for "black lung disease."

3. Rib fracture treatments for prisoners whose ribs are damaged from the severe coughing associated with black lung disease.

4. Amputee doctors and medicines for people who have lost toes or feet to frostbite (as they do not have proper shoes) or lost hands and arms to mining accidents.

5. Shoes and clothing.

6. Soap.

7. Anti-intestinal worm treatment.

Mrs. Kim's grandmother, mother and father, husband, and one brother died in detention at Camp No. 18.

## WITNESS AND TESTIMONY: Lim Jung-soo, *Kwan-li-so* No. 18 (1967–1987)



Imprisoned by virtue of guilt-by-association, Mr. Lim was thrown into Camp No. 18 in 1967 and spent two decades there. His father had been a South Korean soldier in the Korean War who

was captured by the North early in the war, who then subsequently served for three years in the North Korean army. His mother was from a formerly well to do family that benefitted from association with Japan. Mr. Lim's maternal grandfather, who earlier studied photography at Waseda University in Tokyo, had been publicly executed because of his association with Japan.

During the 1970s and 1980s, there were many repatriated Japanese-Koreans who were sent to Camp No.18. Mr. Lim recalled a Japanese-Korean man named Jung Bong-sun who was well known within the camp because he taught karate to security guards. However, he was publicly executed when he tried to escape in May 1982.

The major industry of Camp No. 18 was mining. Men worked in the mines and women were organized into work units, laboring from 5 am to 9 pm, collecting coal or doing other construction work. Mr. Lim describes four categories of residents in the camp. The first two categories were termed *cola-min* (political prisoners) and *e-ju-min*, a euphemism literally meaning migrant or immigrant. They were people who had done harm to the socialist system or economy by mistake. These two groups were the lowest level of prisoners in the labor colony. They lived in houses or barracks without the portraits of the Great Leader. Children from these two groups went to primary schools that also had no portraits, where the education was minimal, and where the children also had work assignments every day. The absence of portraits was an indication that these people were not going to be released back into North Korean society, though some of the *e-ju-min* were subject to "re-revolutionizing" and eventual release.

The ethnic Koreans who "repatriated" from Japan and who were subsequently sent to Camp No.18 were classified as *cola-min*. Mr. Lim's family was treated as *cola-min*, but after his father worked very hard in the coal mines for more than 10 years, they were reclassified as *e-ju-min*. Mr. Lim himself was released after 20 years in the camp.

He describes a separate detention facility within the *kwan-li-so* to imprison persons within the prison camp who disobeyed internal rules or did not work hard enough. Mr. Lim called the prison within the prison camp a *chong-hwa*.[78] Mr. Lim witnessed multiple public executions of people who were caught while attempting to escape. Most public executions included three or four persons at a time, but Mr. Lim witnessed larger public executions where fifteen to twenty persons were put to death. He estimates the number of executions yearly to have been fifty to sixty people.

Mr. Lim also recalled the sexual harassment of women and the ban on sexual relationships between men and women in the lower ranking sections of Camp No. 18. The prisoners in his section of the camp were not allowed to mate. Mr. Lim witnessed the death of a Japanese-Korean man with the family name of Yoon. He fell in love with a daughter of the chief of the labor squad at the mine and she became pregnant. When authorities at the camp found out, they tied the man naked behind a bicycle and made him run through the entire camp multiple times a day. Other prisoners were ordered to curse him and stone him. After ten days, the man died from exhaustion and wounds from the

---

78  Literally meaning "political indoctrination."

The Hidden Gulag Second Edition

stoning. All women prisoners were considered property of the authorities who could take whatever advantage of them they wanted.

This testimony was presented at a December 7, 2008 conference in Tokyo attended by the present author. Mr. Lim's story and testimony in Korean and Japanese is available on the website of the Japanese NGO "NO FENCE."

**WITNESS AND TESTIMONY: Former Prisoner # 29, *Kwan-li-so* No. 18 (1977–1983)**



Former Prisoner # 29 was a twelve-year-old student in 1978 when the police came for him at his school in Pyongyang and told him to come with them, as he would be moving to a nice place. Returning home with the police, he saw his mother crying while the family belongings were being packed into a truck. When his mother told him not to say a word, he realized that something was very wrong and that they were not going to a nice place.

Departing around lunchtime, the truck arrived around midnight at what appeared to be an apartment complex at Seok-son-ri, Bukcheong, South Pyongan province for the night. The next morning his mother and three siblings were taken to what looked like a beggar's hut as it had holes in the walls and where another family

of four was already living. That night, Former Prisoner # 29's family was joined by the father, who had been picked up earlier and transported separately to the camp. For six months they shared the "beggar's hut." For the next five years, his dwindling family would reside in the "re-revolutionizing zone" in Camp No. 18.

His father had been born and raised in China, but had moved to Sinuiju where he met and married a soloist in an artists group with a particularly beautiful voice. His mother was appointed as a soloist for a newly formed orchestra, so the family moved to Pyongyang where his father then worked as a Korean-Chinese translator for a military company that imported Chinese machinery for the Pyongyang subway system. His father had come under suspicion because he missed three of the compulsory ideological seminars that all male North Koreans were required to attend. But his greater error, Former Prisoner # 29 believes, was to have purchased a tape recorder from a Korean-Japanese, who had brought the recorder to North Korea. His father wanted to record his wife's singing so it could be presented to Kim Il-sung. But somehow, the purchase of a tape recorder made him a decadent capitalist and he and his immediate family were sent off to Camp No. 18 for "re-revolutionizing."

This small "re-revolutionizing area" at Camp No. 18 had, in those years, about five hundred families in it. His father was assigned work as a digger in the coal mine, the major production and occupation at Camp No. 18, while his mother was made a singer in a morale building propaganda unit within the camp. His father was in a three person digging unit. He made the mistake of saying to his two co-workers that he missed

The Hidden Gulag Second Edition

his mother and father in China, and that coming to North Korea had been a mistake. One of his two co-workers reported this disloyalty. *Bo-wi-bu* police agents, who ran a *ku-ryu-jang* punishment/detention facility within the generally *An-jeon-bu* administered camp, came to take his father away, never to return. The agents told the family that their father was a traitor to the nation.

Former Prisoner # 29 was assigned to a school in the mornings, and had to do various work assignments in the afternoon. If there was no productive work available, the children were required to dig holes, only to fill them up again.

He was constantly hungry, saying that there were more days when he didn't eat than days when he did. In the winter he was constantly cold, as the family had bartered away all the clothes they brought with them from Pyongyang for food. He lost fingernails to frostbite, and his front teeth to beatings. In his five years in the camp he was compelled to watch ten executions by firing squad, eight for escape attempts and two for "destructive behavior," that is, sabotage of camp machinery.

In some respects however, the "re-revolutionizing zone" was better than life in the "total control zone" areas of the camp. While there were no newspapers from the outside, there was an occasional two page internal camp newsletter. It mostly contained production statistics from the various coal faces and pits within the camp. It was occasionally possible for the residents of the "re-revolutionizing zone" to watch television sets that were set up near the coal mine entrances.

In November 1983, he and his mother were called in with a group of forty others and told

that under the consideration of the Great Leader and the Party they were being returned to society. "From now on, never forget this blessing and always be loyal to the Party," they were told. Former Prisoner # 29 was assigned to be a miner at the Culsan iron ore mine in Bukchang County, South Hamgyong province. This was the site, he said, of former *Kwan-li-so* No. 17. But he was never allowed to return to Pyongyang.

During the decade, he mined iron ore. Knowing his father had relatives in China, he tried to contact them since he could send and receive letters by mail. In 1993, he received a response to a letter he sent two years earlier. After several exchanges of letters, in 1997, owing to the severe food shortage in North Korea, he traveled to Musan to get help from his relatives in China. Shortly thereafter he fled to China, and arrived in South Korea in October of 2000.

### Kim Yong Testimony about *Kwan-li-so* No. 18 (1996–September 1998)

(Continued from his testimony on Camp 14, page 51 above)

As noted above, in 1996, Kim Yong was transferred from Camp No. 14 to the adjacent Camp No. 18, located on the other side of the Taedong River in Dukchang-ri, Bukchang-kun, South Pyongan. Mr. Kim believes he was transferred through the intervention of his boss at the Asahi Trading Company, which as noted above, was a foreign currency raising enterprise within the *Bo-wi-bu* police agency. At Camp No. 18, he was assigned to repair coal trolleys. There, to his surprise—as he did not know if or where

she was imprisoned—he was reunited with his mother, with whom he was allowed to live.

Subsequently, Kim's mother was severely beaten by camp guards for returning late to the camp after gathering edible weeds outside the prison gate. Arguing that they were both just going to die in the camp anyway, she encouraged him to escape, even if it meant risking his life. And so he did, in September 1998, by hiding in a coal train bound for the coal-fired electrical generating plant to which most of the coal mined at Camp No. 18 was sent. He soon crossed the Tumen River into China and, in October 1999, went to South Korea via Mongolia.

*See pages 216-221 for satellite photographs of Kwan-li-so No. 18.*[79]

79 Subsequent to the completion of research for this report, several former residents of South Pyong-an province arrived in South Korea. Some of these new arrivals reported to South Korean human rights activist colleagues that large portions of Camp 18 at Bukchang have been effectively dismantled. Some parts of Camp 18 may have been incorporated into Camp 14, which is just across the Taedong River. Or possibly, some prisoners were transferred to other prison camps or detention facilities. But apparently, large numbers of former prisoners were essentially "cleared," and large portions of the former prison camp changed to the *"hae-je-min"* areas for cleared or released persons described above in the testimony of Mrs. Kim Hye-sook (p. 70-73). That is, the former prisoners continue to live and work in the same places as before. However, they are no longer imprisoned behind gated walls and barbed wire fences, and apparently have the same limited and constrained rights, freedoms and privileges as other North Korean citizens. It is suggested in the recommendations of this report (p. 168-175) that this should be considered by the North Korean authorities as a model for disabling and dismantling the rest of the prison camp system.

## *Kwan-li-so* No. 22, Hoeryong, North Hamgyong Province

### WITNESS AND TESTIMONY: Former Guard, Ahn Myong-chol, *Kwan-li-so* No. 22 (and Camps Nos. 11, 13, 26)



Unlike the witnesses just described, who were released or escaped prisoners, Ahn Myong-chol was a *kwan-li-so* guard. Ahn was born in 1969 in Hongwon-kun, South Hamgyong province. Ahn came from a good Korean Workers' Party family. For his compulsory military service, he became a *Bo-wi-bu* (State Security Agency) police guard assigned, consecutively, to four different *kwan-li-so*: No. 11, at Kyungsun, North Hamgyong province, from May to August 1987; No. 13, at Jongsong, North Hamgyong province, from August 1987 to the winter of 1990, except for four months during this time when he was sent to the much smaller prison No. 26 in Pyongyang; and No. 22 at Hoeryong, North Hamgyong province, from late 1990 to mid-1994. Of the four places, as of 2011, only *Kwan-li-so* No. 22 remains operational.

Ahn's father had worked at a public distribution center. During the 1990s famine, he was caught giving extra food to one of his neighbors and was labeled a "reactionary element." When he learned of his father's situation, Ahn fled with his wife across the Tumen River into China. After he reached Seoul, he was interviewed by the monthly magazine *Chosun Wolgan* (*Chosun*

*Monthly*). Portions of the resulting article were published in English in *Political Prison Camps in North Korea*, by the Center for the Advancement of North Korean Human Rights, Seoul. Ahn's Korean-language memoir, *They Are Crying for Help*, was published by Chungji Media, Seoul, but the book is out of print, and the publisher closed. In 1998, Ahn testified before the U.S. Congress. In December 2002, he was able to identify the buildings and grounds on several satellite photographs of *Kwan-li-so* No. 22 for publication in the *Far Eastern Economic Review* (December 12, 2002).

Ahn's guard duties included making deliveries by truck to various parts of *Kwan-li-so* No. 22. This assignment gave him unusual mobility within the camp, even for a guard. He learned much from his conversations with other guards while making deliveries to various sections of the camp. His work at four of the *kwan-li-so* camps over a period of seven years provided him with comparative insight into the functioning of the *kwan-li-so* system.

His guard training and indoctrination provides insight into the operation of the prison camp system. Ahn reports that the prisoners were referred to as "emigrants." Great stress was placed on the harm and threat that "factionalists" posed to the revolution: how factionalism produces class enemies; how factionalists and class enemies have to be destroyed like weeds, down to their roots through the *yeon-jwa-je* three-generation family-incarceration system; and how guards have to exercise their control duties so as to reveal the "dictatorship of the proletariat" to the class enemies. Like some of the former prisoners, Ahn recalls the shock he felt upon his first arrival at a camp, where he likened the prisoners to walking skeletons, dwarfs, and cripples in rags.

Identified as Hoeryong, after the name of the nearby city, the official designations for *Kwan-li-so* No. 22 are "Chosun People's Security Unit 2209" or "Paeksan-ku Ministry of State Security." No. 22 covers an area, according to Ahn, some 50 kilometers (31 miles) in length and 40 kilometers (25 miles) in width. There are roughly 1,000 guards and 500–600 administrative agents for as many as 50,000 prisoners, including the families of alleged wrong-doers.

Ahn reports that the annual agricultural production quotas for *Kwan-li-so* No. 22 were as follows: 400 tons of corn, 100,000 tons of potatoes, 50,000 tons of lima beans, and 10,000 tons of red peppers per year. The camp also grew Chinese cabbages, radishes, cucumbers, and eggplants, and had a distillery that produced soy sauce and whiskeys. Camp No. 22 mined coal that was shipped to the Chongjin Thermal Power Plant and the Chongjin and Kimchaek Steel Mills.

Notwithstanding the agricultural production, Ahn estimates that 1,500 to 2,000 prisoners at *Kwan-li-so* No. 22, mostly children, died from malnutrition yearly during his years as a guard there. Executions were not public but were carried out at a site named "Sugol." He estimates that there were ten executions per year, mostly in October, of people who had been caught eating from recently harvested food stocks. People were fed corn and potatoes, almost no vegetables, and no meat. The only meat in their diets came from the rats, snakes, and frogs they could catch. There were also deaths from beatings of prisoners who had not been meeting their production quotas. In fact, Ahn says, there were so many deaths from beatings that at one point, the guards were urged to be less violent.

Only a few privileged prisoners were allowed to conjugate. Otherwise, sex was prohibited. Ahn is aware of one pregnant woman who was executed as a punishment for her pregnancy. *Kwan-li-so* No. 22 had a notorious detention barrack for prisoners who disobeyed camp regulations. Ahn was a guard nearby and heard the screams of the prisoners as they were beaten.

The prisoners at *Kwan-li-so* No. 22 were paid approximately 500 won per year. Youth at the colony received basic schooling in elementary reading, writing, and arithmetic. The camp had nine holidays per year.

*See page 222 for satellite photographs of Kwan-li-so No. 22.*

## Other *Kwan-li-so*

Reputable South Korean sources such as the National Human Rights Commission, the Korean Bar Association and the Korean Institute for National Unification (KINU), and leading scholars, such as Prof. Heo Man-ho of Kyungpook University, report additional political penal labor camps.

The (South) Korean Bar Association's 2008 *White Paper on Human Rights in North Korea* identifies Camp No. 16 at Hwasong, North Hamgyong province,[80] and Camp No. 25 at Susong-dong, Chongjin, North Hamgyong province.  The KINU 2009 *White Paper* also notes *Kwan-li-so* No. 16 and *Kwan-li-so* No. 25

for offending prisoners.[81] The National Human Rights Commission study also notes these same two prison camps.[82]

Professor Heo Man-ho of Kyungpook National University, Daegu, reports that *Kwan-li-so* No. 16 at Cochang-ri, Hwasong-kun (located in North Hamgyong province), contains about 10,000 "anti-revolutionary and anti-Party elements." They are held on charges of opposing the succession to Kim Jong-il, and he adds that former Vice-Chairman of State Kim Dong-gyu is imprisoned there. Professor Heo further notes a Susong Center in Sunam district, Chongjin City, run by the *Bo-wi-bu* (National Security Agency) police. Reportedly, the center holds about 3,000 detainees and their families, including pastors and church leaders from South Hwanghae province, and Mr. Heo Taek, a Korean repatriate from Japan.[83] The National Human Rights Commission Survey Report estimates the number of prisoners at Camp No. 16 at 20,000, and the population at Camp No. 25 at 5,000.

Former *kwan-li-so* prisoners interviewed for this report have mentioned that there is at least one former prisoner from Camp No. 16 currently in South Korea, although he declines to be interviewed by journalists or other researchers. No former prisoners or guards were accessible to provide first-person accounts or eyewitness confirmation during the preparation of this report, so these camps are not further discussed herein.

---

80  2008 *White Paper on Human Rights in North Korea*, Korean Bar Association, Seoul, p. 539.

81  Ibid. p. 130.

82  Survey Report on Political Prison Camps in North Korea, Seoul, 2009, p. 38.

83  "Political Detention Camps in Relation to Socio-Political Change in North Korea," paper presented at the 4th International Conference on North Korean Human Rights and Refugees, 2003, Prague, Czech Republic.

79

However, a Washington DC-based attorney has scoured Google Earth sateillite photographs looking at prison camp sites. In so doing, he ascertained the barbed-wired perimeters of many sections of the prison camps discussed above and found a penitentiary-like structure just north of Chongjin city. A South Korean human rights NGO showed satellite photos of this structure and its surrounding areas to several former residents of Chongjin, two of whom identified the structure in the photographs as Camp 25. One of the former Chongjin residents had gone out to the prison camp to visit a friend who was a guard there. The other former resident had driven a truck to the prison camp to pick up a shipment of the bicycles made there by the prison laborers.

*Satellite photos of Camp 25 can be seen on pages 223-224.*[84]

## Closed *Kwan-li-so*

South Korean sources also list five additional political prison labor camps that were closed between 1989 and 1991. Persons interviewed for this report witnessed three of these closed camps.

### Closed Camp No. 11, Kyongsong, North Hamgyong Province

### WITNESS: Yoshio Kinoshita



Yoshio Kinoshita is the Japanese name of a second generation Korean-Japanese who "returned" to North Korea in 1961. He studied engineering at a technical college in Chongjin. He was one of over 2,000 workers assigned in 1990 to close *kwan-li-so* Camp No. 11, in order to convert the area into a villa for Kim Il-sung. He worked there for seven months to disassemble a brick and furniture factory in the camp. He reported that it took a total of two years to convert the prison camp to the palace property, part of which involved the construction of an underground railroad leading to and from the villa.

He was able to provide details about the camp. It had held some 20,000 prisoners and was divided into three sections or settlement areas: one for the more serious offenders; one for the less serious offenders; and one for the families of those placed in the first two sections. Upon closing, some prisoners were transferred to Camp No. 15 and the others to Camp No. 22. The section for the more serious offenders was some 2,000 meters high in the mountains. There were rows and rows of tiny (1.2 meters wide, 2 meters long and 1.5 meters high) houses built half above ground, half below ground, with each row holding about 400 prisoners. There were adjacent pigpens that were exactly the same size as the

---

84  The Washington-based attorney, Joshua Stanton, operates a website, OneFreeKorea, which has several displays of prison-camp satellite photographs. The South Korean human rights NGO, North Korea Database (NKDB), has published several studies referred to earlier in the present report.

---

### Testimony About Yoshio Kinoshita's Sister

Mr. Kinoshita was interviewed in Tokyo in 2009 about his sister who "disappeared" in *Bo-wi-bu* custody in Chongjin in April 2002. His younger sister had gone from North Korea to China to receive money sent by other relatives still in Japan. While in China she wrote a return letter to her relatives in Japan describing the poverty and destitution in North Korea and her harsh judgment of Kim Jong-il. She mistakenly gave the letter to another North Korean to take to the post office, who gave it to North Korean police instead. Upon return to Chongjin, she was called to the police office for "some questions." That was the last her family ever saw of her. The family went to the *Bo-wi-bu* office repeatedly for information, but they were told that the police had no information about her. Later, *Bo-wi-bu* officers came to the house to collect food, clothing and medicine for Kinoshita's sister. Her children took the food and clothing to the police station but were not allowed to see their mother. Other *Bo-wi-bu* officials came to the house for more food and clothing. The family again went to the police station inquiring about the reasons for the ongoing detention. They were told they would never see their mother/sister again, as she had died of illness and had been "disposed of in house" (*shil-nae-cheo-ri*). Another former detainee later told the family that Kinoshita's sister had been sent to Camp No. 22 as she had damaged the honor of Kim Jong-il. Mr. Kinoshita fled North Korea and returned to Japan in 2007.

---

prisoner houses that held about 1,200 pigs, he reported. There were also other facilities for storing corn and potatoes, all surrounded by barbed, electrified wire.

### WITNESS: Former Guard Choi Dong-chul



Choi Dong-chul is the son of Lee Soon-ok, whose story appears below.[85] At the time of his mother's arrest, Choi was a student at Kim Il-sung University in Pyongyang. Prior to his mother's arrest, when the family was still in very high standing within the Korean Workers' Party, Choi fulfilled a portion of his compulsory military service, from February 1985 to June 1986, as a guard at *Kwan-li-so* No. 11 for families of political wrongdoers, located in Kyongsong, North Hamgyong province. This is the same encampment of 15,000–20,000 inmates where Ahn Myong-chol was a guard in 1987.

Though *Kwan-li-so* No.11 was closed in 1989 and its inmates transferred to other political penal-labor colonies, Choi's testimony, along with that of Ahn, provides an additional glimpse into the operation of North Korea's *kwan-li-so*.

---

85  See p. 103.

81

Both Ahn Myong-chol and Choi Dong-chul were guards at *Kwan-li-so* No. 11 at Kyongsong, North Hamgyong province, from May to August 1987 and from February 1985 to June 1986, respectively. In this camp, some 20,000 family prisoners engaged in potato farming and logging.

Ahn Myong-chol was also a guard at *Kwan-li-so* No. 13 at Jongsong, North Hamgyong province, from 1987 to 1990. No. 13 held some 30,000 prisoners, he estimates. According to the KINU *White Paper* on Human Rights in North Korea, *Kwan-li-so* No. 13 was closed at the end of 1990 because it was too close to the Chinese border, tempting prisoners to try to escape.

For one four-month period while he was a guard at *Kwan-li-so* No. 13, Ahn was briefly transferred to guard the much smaller political prison No. 26 at Hwachon-dong, Sungho-ri, Pyongyang. The KINU White Paper on Human Rights notes that No. 26 closed in January 1991.

The KINU *White Paper* also notes that *Kwan-li-so* No. 12 at Changpyong, Onsong, North Hamgyong province, was closed in 1989, also because of its proximity to the border with China. Further, *Kwan-li-so* No. 27 at Chonma, North Pyongan province, was closed in 1990 for unknown reasons.

One of the anonymous former prisoners from a *kyo-hwa-so* prison discussed in the next section of this report was transferred to a *kwan-li-so* at Danchun, South Hamgyong province in the mid-1980s. He reports that this camp closed in the late 1980s.

The 2009 KINU *White Paper* identifies additional closed Camps: No. 12, Changpyong, Onsong-

kun, North Hamgyong province, and Camp No. 13, Jongsong, Eunsung, North Hamgyong province, closed in May 1987 and December 1990 respectively. They were too close to the border with China. Camp No. 26, Hwanchun-dong, Sungho District, Pyongyang, where former guard An Myong-chol worked briefly, was reportedly closed in January 1991. And Camp No. 27, Chunma, North Pyongan province was reportedly closed in November 1990 for unknown reasons.[86]

---

86  2009 *White Paper on Human Rights in North Korea*, KINU, Seoul, p.131.

# PART THREE

# THE *KYO-HWA-SO* LONGTERM PRISON-LABOR FACILITIES (FELONY LEVEL)

## Introduction

The Korean word transliterated phonetically as *kyo-hwa-so* literally translates as "a place to make a good person through education." North Korea has *kyo-hwa-so* prisons in every province, holding both political prisoners and persons convicted of criminal offenses as are commonly understood. *Kyo-hwa-so* is the term used for prisons in South Korea. The term is sometimes translated into English as an "enlightenment center," "edification center," "re-education center," or "re-socialization center." In light of the testimony below, these are but cruel euphemisms given the conditions and practices in the North Korea *kyo-hwa-so*. Some of the former prisoners interviewed for this report used the term *ro-dong* (labor) *kyo-hwa-so,* indicating "re-education through labor." There is also a variation of *kyo-hwa-so* termed *kyo-yang-so,* which is literally translated as "a place to make a good person through nurturing." On the basis of available data, there does not appear to be substantial differences between these two facilities.

Viewed in satellite photographs, these *kyo-hwa-so* appear as compounds with several buildings surrounded by high walls, often with clearly visible guard towers, not unlike what felony level penitentiaries in the United States look like in aerial photography. The first edition of *Hidden Gulag* also referred to *kyo-hwa-so* as "prison camps." To distinguish them more clearly from the *kwan-li-so* encampments, the present second edition, simply refers to these facilities as prisons or penitentiaries.

Translated literally, *kyo-hwa-so* means "a place to make a good person through education." However, the literal translation bears no relation to the *kyo-hwa-so* described by the former North Korean prisoners interviewed for this report. The education component of the imprisonment, according to the former prisoners, consists mostly of: 1) forced memorizing of Kim Il-sung's speeches or the New Year's Day Joint Editorials (carried in North Korean newpapers to set forth the regime's priorities and political line for the coming year), and 2) organized "self-criticism" sessions, mostly in regard to work teams and production quotas. These "education" sessions are conducted in the evenings, and the exhausted prisoners are not, they report, allowed to return to their cells to sleep until they can recite the speeches or editorials. During the self-criticism sessions, prisoners kneel in front of their work-units and face the prison officials. The prisoners doing self-criticism frequently falsely confess to imaginary mistakes, which the prison officials or prison-group leaders can then criticize, so that the work unit can conclude the sessions and go back to their often overcrowded cells.

*Kyo-hwa-so* are run by the *In-min-bo-an-seong* (People's Safety Agency) police, formerly called the *Sa-hoe-an-jeon-bu* (Social Safety Agency) and still commonly referred to in North Korea as *An-jeon-bu.* Some of the *kyo-hwa-so* resemble large penitentiaries: a large compound surrounded by high walls and barbed- or electrified-wire fencing and containing several buildings for manufacturing various products, prisoner housing, and offices for guards and prison officials. Other *kyo-*

*hwa-so* are barbed-wire-enclosed facilities, located in rural areas where prisoners toil in mines or cut lumber in nearby mountains.

In many aspects of day-to-day prison life, the *kyo-hwa-so* resemble the *kwan-li-so* described in the previous section of this report. The prisons are harsh "strict-regime" places (virtually no prisoner privileges) where prisoners are forced to do hard, often heavy and dangerous labor while being provided food rations insufficient to sustain even sedentary life. The combination of hard labor and below-subsistence-level food provisions results in rapid weight-loss, industrial or mining work accidents, malnutrition-related diseases, and death. The so-called prison "hospitals" or "clinics," that, according to former prisoners, rarely have doctors or medicines, are essentially places where the sick and injured, who can no longer work, are sent to await death. Loss of life occurs at such high rates that many of the *kyo-hwa-so* are perceived by prisoners as death camps, as they expect to die before the completion of their sentences.

There are several substantial differences between *kyo-hwa-so* prisons and *kwan-li-so* prison camps. As noted, the *kyo-hwa-so* contain persons imprisoned for criminal offenses as well as political offenses. The *kwan-li-so* are only for political offenders. In the *kyo-hwa-so* system there is no imprisonment of the families of the perceived or convicted wrongdoer. Many, though certainly not all, persons imprisoned in the *kyo-hwa-so* have been subjected to some form of judicial process and given a fixed term sentence. Incarceration is not incommunicado. The families of the imprisoned persons know where their relative is being detained. In an important respect, *kyo-hwa-so* prisons and prison camps are, by

design, correctional facilities for persons convicted of "heavy crimes," the equivalent of what would be felony offenses in the United States.

But some of those sentenced to the *kyo-hwa-so* prisons are convicted of offenses that would not normally be criminalized: private economic transactions not undertaken within an officially appointed workstation or offenses that are, in essence, political crimes. For example, some interviewed for this report were driven to engage in private economic transactions such as transporting goods across the North Korea-China border to survive following the breakdown in the state-run production and distribution systems. Another was arrested for singing a South Korean song. And still another was arrested for getting caught up in a power struggle between Workers' Party functionaries staffing the production/distribution facilities and police units that were dissatisfied with their share of goods and/or bribes.

This section includes testimony by former *kyo-hwa-so* prisoners who admitted that they were justly convicted of what would be criminal offenses in most countries around the world as well as the testimony of former prisoners who were sent to the *kyo-hwa-so* for what are essentially political offenses or economic transactions that according to international human rights standards, should not be criminalized. The former prisoners convicted of legitimately criminal offenses report that there were "political prisoners" incarcerated along with the common criminals.

Some persons sent to the *kyo-hwa-so* felony-level penitentiaries are arrested in North Korea, interrogated, charged, and convicted. Many others, including persons whose stories are told below,

84

enter the DPRK penal system via forced repatriation from China. They are usually interrogated, and very often beaten or tortured, at one or more police *ku-ryu-jang* interrogation-detention facilities before being consigned, with or without trial, to the *kyo-hwa-so* penitentiaries. The system and process of forced repatriation from China and the brutal punishments perpetrated against the repatriated North Koreans are described in Part Four of this report. However, if the repatriated North Koreans end up in *kyo-hwa-so* penitentiaries, their stories are told below in order to detail the *kyo-hwa-so* prisons and their role in the overall North Korean system of political imprisonment. However, their pre-*kyo-hwa-so* detentions are described also. Since, it should be noted, the brutalizations and inhuman treatment endured in the *kyo-hwa-so* prisons are preceded by months and months of pre-trial, pre-sentence brutality at one or more of the local police detention facilities.

## *Kyo-Hwa-So* Witnesses and Testimony

### WITNESS: Former Prisoner # 37

### *Kyo-hwa-so* No. 12, Chongo-ri, North Hamgyong Province (April 2003–March 2006)



Former Prisoner # 37 was born in Onsong-kun, North Hamgyong province in July 1971. After

his parents died in the famine, his two sisters fled to China in 1997. A year later, he also crossed the North Korean border to meet his sisters in the Jilin area of China to get food, money, and clothes. Having no work in North Korea, and sensing the opportunity to earn a living, he began trading curios, gold and wild animal meats back and forth across the China-North Korea border.

After three or four border crossings, Former Prisoner # 37 was arrested by North Korean police in September of 2002. He was detained at the Onsong *Bo-wi-bu* office for a month, and then transferred to the Onsong *An-jeon-bu* office where he was confined and interrogated for 6 months. After a very short trial for form's sake, he was given a sentence of 15 years to be served at the Chongo-ri *Kyo-hwa-so* No. 12. However, due to severe illness, he was released after three years.

### TESTIMONY:

### Onsong *Bo-wi-bu* Interrogation/Detention Facility

*Bo-wi-bu* authorities came and arrested Former Prisoner # 37 at his home, saying that they had things to "check with him." Detained at the police station for a month, he was ordered to write down everything he had done wrong in his life and was beaten with wood sticks for no apparent reason, which resulted in severe damage to his left eardrum. Former Prisoner # 37 saw authorities confiscate medicines that families had brought in for their imprisoned relatives. Prisoners, he noted, are given medicine only when they are "barely breathing."

The Hidden Gulag Second Edition

## Onsong *An-jeon-bu* Interrogation/Detention Facility

When Former Prisoner # 37 was transferred to Onsong *An-jeon-bu* in October 2002 for six months, he was again interrogated and beaten with wooden clubs, particularly when he asserted that he had not done anything wrong. These beatings damaged his right eardrum. He saw others at the *An-jeon-bu* facility with broken teeth and torn eyelids from these beatings. During his detention, through March of 2003, he was confined in a small room, barely two meters by three meters, with ten other persons. During his detention, he barely saw the sun.

Meager amounts of food left the detainees malnourished almost to the point of starvation. Former Prisoner # 37 was given boiled corn-husks, corn powder gruel and some soybeans in a dirty plastic bowl. Guards cut the handle of spoons so that prisoners could not use them to commit suicide. Prisoners secretly drank unsanitary water from the toilet when they were not provided with drinking water. While he was detained at the *An-jeon-bu ku-ryu-jang*, he heard about, but did not personally witness, forced abortions and violence against pregnant women, particularly if the fathers were suspected of being Chinese.

During his interrogation, Former Prisoner # 37 was again asked about meeting South Koreans or attending church while in China. More importantly, he was shown a list written by a then un-identified person that included Mr. Kim and his sisters' names. Later it turned out that the list was created by a person whose home he had visited on his trips to China. The *An-jeon-bu* authorities decided he was guilty of smuggling and "kidnapping" his sisters.

*See page 144 for Former Prisoner # 37's sketch of Onsong An-jeon-bu and Bo-wi-bu Police Interrogation-Detention complex.*

## Former Prisoner #37's "Trial"

As the police had already decided Former Prisoner # 37 was guilty of smuggling and kidnapping, he was assigned to stand trial publicly in the main market square in Onsong, where several thousand persons were gathered to witness the hour-long proceeding. Former Prisoner #37 was assigned a lawyer who told him that he had recommended to senior officials a reduction in Former Prisoner # 37's fifteen-year sentence but his appeal was rejected. He believes the trial was very unfair. However, Former Prisoner # 37 felt relief at the thought of leaving behind the beatings and extremely cramped confinement in the *ku-ryu-jang*, and going to a prison where he would have a work assignment and a little more mobility.

## *Kyo-hwa-so* No. 12, Chongo-ri

Former Prisoner # 37 was confined in Chongo-ri[87] *kyo-hwa-so* from 2003 to 2006. He was originally sentenced to 15 years in prison because authorities thought he would flee North Korea again unless he was sent to prison for a long time.[88]

---

87  In the first edition of *Hidden Gulag*, *Kyo-hwa-so* No. 12 was transliterated into English as "Jeonger-ri."

88  While he was staying at Chongo-ri *kyo-hwa-so*, Mr. Kim noted that there were 10-15 people who were caught on their way to South Korea and received lifetime sentences.



***Kyohwaso* No.12**
**Chongo-ri, North Hamgyong Province**

Roughly 1,300 prisoners live and work in the area 1-6.
Unit 1: Furniture and tools production facilities and prisoner area surrounded by electrified wire barbs. Other prison sections are several kilometers distant.
Unit 2 and 3: Farming / Unit 4, 5 and 6: Mining

Computer generated drawing based on hand drawn sketch by Mr. Kim Won Gil

There were about 1,700 male prisoners at Chongo-ri. These prisoners worked 14 hours a day in a copper mine, on a potato farm, or in workshop factories to make furniture. The antiquated machines used for making furniture caused many accidents. There was an accidental death every several days, as the prisoners seldom got more than five hours of sleep per night. In the evenings, after working all day, the prisoners had to memorize *kyo-hwa-so* rules and engage in "mutual criticism" virtually every night.

Falling logs at his work site injured Former Prisoner # 37. Both eardrums were already broken in the *ku-ryu-jang* before he was sent to

*kyo-hwa-so*. Unable to work, he was sent home to "recover." Outside, he obtained false medical documents contending ongoing illness, and he bribed the *An-jeon-bu* "sick-leave control agent" so that his improved health was not reported to the authorities.

He learned that his sisters had gone from China to South Korea. Former Prisoner # 37 concluded he could not live in North Korea anymore (pending a return to prison, if authorities saw through his ruse of continuing illness). His sisters hired a "broker" on the China-North Korea border who assisted him in fleeing North Korea. A series of brokers assisted him to transit

China, and pass through Vietnam and Cambo-dia. After 4 months of escaping North Korea, he arrived in South Korea in 2009.

*He drew this sketch of Chongo-ri.  See also satellite photograph on page 227.*

**WITNESS: Former Prisoner # 28**

*Kyo-hwa-so* **No. 12, Chongo-ri, North Hamgyong Province (December 1998–July 1999)**



A young man in his early twenties from Chongjin City, North Hamgyong province, Former Prisoner # 28 has a straightforward story. As the food situation in North Korea deteriorated in the 1990s, he took to buying and selling goods between North Korea and China to stay alive and to provide food for the family with whom he was living. Arrested in December 1997, he was held in a local jail for three months and then transferred to an *An-jeon-bu* (People's Safety Agency) *ka-mok* [89] in Onsong. He was held at the ka-mok for another eight months before being sentenced to three years, including time served in ka-mok, to *Kyo-hwa-so* No. 12 at Chongo-ri, North Hamgyong province, for violating, he says, Penal Law 117, Article 2: illegally crossing the North Korea–China border and illegally transporting money and goods.

89  As noted, some former North Koreans use the term *ka-mok* (jail) and *ku-ryu-jang* (interrogation-detention facilities) interchangeably.

Fortunately, Former Prisoner # 28 was pardoned after serving only eight months (December 1998 through July 1999). In August 1999, he fled to China, making his way to Mongolia, where he joined a group of five North Koreans, who made their way to Seoul in October 2001.

**TESTIMONY:** *Kyo-hwa-so* **No. 12, Chon-go-ri, North Hamgyong Province**

Sometimes also called Onsong-kun *kyo-hwa-so*, although it is not located there, *Kyo-hwa-so* No. 12 at Chongo-ri holds some 1,300 to 1,500 men, who mine copper and iron, cut logs, make bricks, and farm. The most salient features of *Kyo-hwa-so* No. 12 were the deplorable conditions and the high rate of deaths in detention. Out of twenty-three other prisoners who entered on the same day as Former Prisoner # 28, only two survived. The rest died within eight months of arrival, from hard labor and sub-subsistence level food rations—small mixtures of corn and beans, with rice added only on holidays. Former Prisoner #28 believes that eight hundred prisoners died while he was there—so many, according to what another prisoner told him, that the guards had to burn the corpses.

There were no "self-criticism" sessions for him at *Kyo-hwa-so* No. 12. However, each night, the prisoners had to gather at the gates around nine in the evening, at which time the guards would order one of the prisoners to recite the prison rules. Rule-breakers were beaten. Former Prison-er # 28 witnessed two public executions of other prisoners who had tried to escape.

*See page 228 for satellite photographs of kyo-hwa-so No. 12 at Chongo-ri.*

The Hidden Gulag Second Edition



### Oro *Kyoyangso* Penitentiary for Women
#### Hamhung, Youngwang-kun
#### Dongjung-ri, South Hamgyong Province

Guards' Houses

Oro *Kyoyangso* Building
(See close up below)

Guard Post

M
o
u
n
t
a
i
n

Road

Brook

Threshing Ground

Wooden Bridge

Prisoner Family Meeting Place:
Family brings food, cloth etc.
Meeting time is 10 minutes

Vegetable Field

Main Road to Village

Bean and Corn Field

Field

Many human bones are found at the
prisoner burial ground near the
mountain

Computer generated drawing based on hand drawn by Ms. Seo Jin



### Main Building, "Oro" *Kyoyangso* Penitentiary
#### Dongjung-ri, South Hamgyong Province

Waist high toilet door
upper part open to allow
toilet user to be observed.

Toilet

Guard Post

Warehouse

Dining
Area

Education
Room

Prison
Cell

Washing
Place

Prison
Cell

Prison
Cell

Prison
Cell

Prison
Cell

Guards'
Room

Very small
window close
to the ceiling

Electrified
Metal Door

Small
Courtyard

Computer generated drawing based on hand drawn sketch by Ms. Seo Jin

89

**WITNESS: Ms. Seo Jin**

*Kyo-yang-so* No. 55 "Oro" South Hamgyong Province, (June 2004–July 2005)



**A Malnutrition Death in Korea; Trafficked in China**

Ms. Seo was born at Myongchon-kun, North Hamgyong province in 1970. During the famine, she was too malnourished to breast-feed her five-month-old baby, who died of starvation. Despondent, Ms. Seo fled to China. Almost immediately, she was kidnapped by traffickers who sold her for roughly US $1,500 to a Chinese farmer, with whose family she lived and worked for four years until she had "paid off" the amount of her purchase. The farmer's family was also worried, she relates, about being punished for harboring illegal North Korean immigrants if this commercially arranged "marriage" was discovered during Chinese police sweeps, often termed "strike-hard" campaigns.

Ms. Seo then worked for three years in a restaurant in Yanbian prefecture to earn enough money to flee to South Korea. But she was caught trying to enter Mongolia in May of 2003, and taken by Chinese police to a detention facility in Tumen for illegal immigrants where she was held for six months. All of the money she had saved and carried with her to flee to South Korea was confiscated, and she was unable to wash during her six-month detention. She commented that prisoners there were an abnormal color due to severe malnutrition.

**TESTIMONY: Forced Repatriation: Brutalization at Three Interrogation/Detention Facilities**

In December 2003 Ms. Seo was repatriated to the Onsong *Bo-wi-bu ku-ryu-jang*. Guards stripped her naked and made her do a "squat-down-stand-up-run around" routine to see if she was hiding any money in her rectal and vaginal cavities, even though all her money had already been confiscated by the Chinese police. She was interrogated relentlessly, beaten during interrogation, and given very little food.

After fifteen days she was transferred to the Musan *Bo-wi-bu ku-ryu-jang*, where there were about fifty women and ten men detained. She was kicked and again beaten with wooden staves so that she could hardly walk. That was not as bad, she says, as the "sitting-motionless-torture," which was extremely painful. She was overwhelmed by fear and bitter cold, as it was January and the detention facility was barely heated. She continued to be unable to wash.

Ms. Seo saw pregnant women being sent out one by one from the Musan *ku-ryu-jang*. She was not sure where they were taken, but the common understanding was that after their abortions, the women were sent to a labor training center/mobile labor brigade called "Kop-ba-koo" and that some of the women were able to escape from the hospital where the abortions took place.

After about 40 days she was transferred to the Musan *An-jeon-bu ku-ryu-jang*.

Upon arrival at the *An-jeon-bu* police station, female guards made Ms. Seo stand up, bend over, and touch the ground with her hands for a vaginal inspection to find hidden money. When she resisted the examination, she was cursed and hit by the female guards, which Ms. Seo considered insulting, as the guards were much younger women. The humiliations continued. When Ms. Seo had diarrhea she had to cry and beg the guards to let her use the toilet. Guards followed her to the toilet, which had a very small door providing little privacy. She was required to raise her hands above her head while using the toilet, and guards checked her stool for hidden money. While held for 50 days in the *An-jeon-bu* police station, two elderly women died from illness and malnutrition. She also heard the guards curse the pregnant detainees for carrying "the Chinese seed."

During her months of interrogation and detention, she never admitted her intent to defect to South Korea, even though Chinese police at the Mongolian border had apprehended her. Frustrated by her refusal to confess, a police official cursed her saying "You go to Oro!" as if he had been saying, "Go to hell." With that, and without any trial or judicial proceeding, in June of 2004 she was transferred to *Kyo-yang-so 55.*

## TESTIMONY: "Oro" *Kyo-yang-so* No. 55

## Dongjoong-ri, South Hamgyong Province (June 2004–July 2005)

There were, Ms. Seo said, about 1,000 men and 250 to 300 women. She worked about twelve hours a day sometimes cutting grass but usually transporting bags of sand and stone. Evenings were taken up with "ideological struggle" and "mutual criticism" sessions. The prison guards hit her on the back or kicked her legs when she did not work fast enough.

Ms. Seo was very ill for two months with a high fever, but she was never treated with any medication. She just lay on the cold floor. Ms. Seo often saw an oxcart that carried the corpses of dead prisoners. The dead bodies were all put in a large box together and were dumped into a pit in the ground. She could see human bones washed away from the burial ground following rainstorms.

Ms. Seo hunted for rats living in toilets to supplement her meager food rations. She shared the rat meat with the weak people because they could not move well enough to collect any extra food for themselves. Prison hygiene was problematic. There was no toilet paper and the women who had not stopped menstruation cycles, had to rip up their clothing to make sanitary napkins.

In June 2005 she was released, and returned to her hometown. But appalled by the ongoing lack of food, ten days later, she again fled to China. She worked for a year to earn money, and returned to North Korea to give her savings to her family. She again went to China for work, but used her earnings to pay for a broker who assisted her to flee to South Korea via Thailand. She arrived in South Korea in April 2007.

The Hidden Gulag Second Edition

**WITNESS: Former Prisoner # 31**

**Chung-san** *Kyo-hwa-so***, South Pyongan Province  (May 2004–July 2005)**



Former Prisoner # 31 was born in 1978 in Kyounsong-kun, an area near Chongjin City, North Hamgyong province, where her Korean-Chinese parents had previously migrated in order to escape Mao's Cultural Revolution in China.

At the height of the late 1990s famine in North Korea, at age 19, she went to China. She lived in China for five years before she was arrested and repatriated to Onsong *Bo-wi-bu* in 2003, where she was held for six months before being trans-ferred to a *ro-dong-dan-ryeon-dae* mobile labor brigade at Kyongsong for a month. Upon release in November 2003, she returned to China to rejoin her Korean-Chinese mother who had moved back to China.

But she was caught by Chinese police imme-diately after crossing the border and was again forcibly repatriated to Onsong *Bo-wi-bu*. As this was her second attempt to leave North Korea, even though it was to join her mother in China, her punishment was more extensive. She was held at Onsong *Bo-wi-bu* for three months, and then sent to a mobile labor brigade at Onsong for a month. In 2004, she was sent to the Kyong-song *Bo-wi-bu* for two months, followed by ten days at the Sungnam *Bo-wi-bu*, before being returned to the Kyongsong *An-jeon-bu ku-ryu-jang*

for three months. She was not given a trial, but told she would "have to suffer for a year," and they took her by train to the Chung-san *kyo-hwa-so* for one year and two months.

At the Onsong *Bo-wi-bu* in 2003, female guards subjected her to a naked body search and the male interrogators twice whipped her with a belt, but she was not asked the usual interroga-tors' questions about meeting South Koreans or going to church. At that time, there were about 80-90 prisoners: 50-60 women and about 20 men. Some women had their young children with them. Some of the women were in advanced states of pregnancy. One aborted during interro-gation due to the stress. Some women gave birth in the jail, but most were sent to the hospital. She heard of one case of forced abortion, very early in a pregnancy. However, she did not know the fate of the pregnant women taken to the hospital while she was being detained.

**TESTIMONY: Chung-san** *Kyo-hwa-so***, South Pyongan Province (May 2004–July 2005)**

Chungsan *kyo-hwa-so*, (also transliterated as "Jungsan") which she also called a "*kyo-do-so*," is a sprawling largely women's penitentiary closely resembling a prison camp. There are some ten or eleven separate agricultural areas each of which hold about 500-600 prisoners, about 50-60%, or even more of whom are "border crossers." Other women prisoners were incarcerated for theft, prostitution, spreading superstition (a reference to fortune-telling), or for unauthorized selling of North Korean materials in China. The sprawling plots, almost due west of Pyongyang, adjacent

92

to the West Sea (sometimes labeled on maps as the Yellow Sea), are bounded in the east by several reservoirs. A few of the plots seem to have been maintained as short term labor training sections (what this report terms mobile labor brigades), although most of the agricultural plots were worked by laborers imprisoned for periods of several years. Scattered on the field were settlements in which the prison officials and guards lived. Virtually all of the agricultural output was sent to the Ministry of Public Security in Pyongyang.[90]

In the farming seasons, the women grew rice and corn. Outside of the planting and harvesting cycles, the women made fertilizer by mixing dried straw with human feces, and made rope out of the rice plant stalks. In spite of being a prison farm, food rations were abysmal. Former Prisoner # 31 reports that she lost half of her body weight. She believes that a third of the prisoners died that year from combinations of malnutrition, disease, and forced labor. There was also a lack of heat and hot water. Former Prisoner #31 had only the clothes in which she was arrested, until a guard gave her a blanket she used as a coat.

Prisoners were often beaten if they did not work hard enough. Too weak from malnutrition to work hard enough, she was beaten on the legs and hips with an iron bar. Her wound got infected, and she was treated, though without an antiseptic, in the prison clinic. Very ill, she was released in July 2005 to die elsewhere, she

related. Women who died at the prison camp were buried without coffins or grave markers on a hill the women termed the "flower mountain."

It took Former Prisoner # 31 five months to recover her strength, but in December 2005, she again fled to China and reunited with her mother for the first time in ten years. In March 2006, she arrived in Seoul after traveling through Ulan Bator.

## WITNESS: Mrs. Bang Mi-sun

### *Kyo-hwa-so* No. 15, Hamhung, South Hamgyong Province (June 2000–December 2001)

### Trafficked Three Times



Born in Musan County, North Hamgyong province in 1954, Mrs. Bang's husband, a miner by profession, died of starvation during the mid-1990s famine in North Korea. Unable to maintain communications with a daughter who was studying dance and acting in Pyongyang, and fearful of losing the rest of her family to famine or disease, Mrs. Bang fled to China in 1998 with her nineteen year old daughter and sixteen year old son. Apprehended by a gang of traffickers who threatened to turn over her children to the Chinese police for repatriation to North Korea, Mrs. Bang agreed to a "brokered marriage" and

---

90  "Rimjim-gang: News from Inside North Korea," edited by Ishimaro Jiro, AsiaPress, Osaka, Japan, contains interviews with two other former inmates from Chungsan prison, who were interviewed inside China.

was sold to a handicapped Chinese farmer for 7,000 Chinese yuan (roughly US $1,000).

Shortly thereafter, while her "husband" was out in the field, she was kidnapped by another gang of traffickers and sold a second time. She ran away but was again apprehended by traffickers who sold her "like livestock" she says for a third time to a thirty-four year old bachelor who was still living with his parents. He demanded that Mrs. Bang, then forty-eight years old, bear him a child, a prospect she thought preposterous to begin with. She told her third "husband" that she had received an intra-uterine contraceptive device in North Korea following the birth of her third child. Her "husband" and his friends held her, spread-eagled on the floor, while a "doctor" of some sort "rolled up his sleeves" and manually removed the "ring." Bleeding profusely she became infected, and could not walk or stand up. She spent a month on the floor recovering, mostly in tears, she relates, at the "cruelty and shamefulness" that enveloped her.

### Forcibly Repatriated

Upon recovery, she again ran away to the Yanbian Autonomous Prefecture in Yanji province in China to search for her children. But this time she was caught by the Chinese police during an identity card check in Nampyon. She was forcibly repatriated back to North Korea into the custody of the Musan county *Bo-wi-bu* State Security Agency police.

### Musan *Bo-wi-bu* Interrogation/Detention Facility (October 1999)

At the Musan *Bo-wi-bu ku-ryu-jang* detention facility in October of 1999, there were some thirty detainees, mostly women, and perhaps ten men. The women detainees were required to strip naked with their hands tied behind their backs, and do the "sit-down/stand-up/run-around" exercises in front of female guards in order to dislodge valuables that may have been hidden in vaginal or rectal cavities. During interrogation she was asked the usual questions: "Where, why, and how did she get to China?" "Did she meet any Christians or South Koreans? Did she see South Korean movies or TV?" After three days of questioning, she convinced her interrogators that her "border crossing," occasioned by the starvation of her husband, was innocent of political motivations or implications.

### Musan *An-jeon-bu Ro-dong-dan-ryeon-dae* Mobile Labor Brigade (November–December 1999)

It was deemed a serious offence, nonetheless, as she had taken her children with her.[91] So she was taken to the Musan County *An-jeon-bu* (People's Safety Agency) *ro-dong-dan-ryeon-dae* labor-training center, a mobile labor brigade, where she was held for two months in November and December 1999. Upon arrival there was more of the sit-down/stand-up/run-around routine. At that

---

91  Nothing in the Universal Declaration of Human Rights or International Covenant on Civil and Political Rights indicates that the right to leave and return to one's country of origin is compromised or negated if a parent exercises the right to leave in the company of his or her children.

time in this labor training center, the detainees, constituting an unpaid, corvee labor force, were tasked with preparing fields for farming in the spring. As at many of the labor training centers, the detainees either jogged or marched briskly to and from their work sites, often singing patriotic "praise songs" to the Great General, Kim Jong-il. Still weak from her vaginal ring removal infections, Mrs. Bang was unable to keep up. Falling down, a guard beat her on the head and leg with a wooden stave. Her leg became infected to the bone, a kind of osteomyelitis resulting in deep scars, which caused her to limp pronouncedly ten years later.

*See page 147 for sketch of Musan Mobile Labor Brigade Facility.*

## Musan *An-jeon-bu* Pretrial Detention *Ku-ryu-jang* (January–June 2000)

Following treatment at a local hospital, in January 2000, she was taken to the Musan county *An-jeon-bu* People's Safety Agency detention center (*ku-ryu-jang*), where she was detained six months awaiting trial for "border crossing." Most of her fellow detainees were also held for "border crossing." This detention center was built in a semi-circle (see chart) of ten cells—six for women and four for men—that could easily be monitored by guards at the center point. The small cells were crowded to the point of overflowing. Mrs. Bang felt that she might suffocate. Prisoners were required to sit motionless for days on end, with prisoners forced to hit other prisoners who moved, even a little.

*See page 147 for sketch of Musan An-jeon-bu Police Interrogaiton-Detention Facility.*

## Forced Abortion and Violence against Women

In early 2002, at Musan *An-jeon-bu*, there was a group of ten pregnant women who were going to be taken to the local hospital to abort their "half-Chinese" babies. One twenty-one year old, who was seven months pregnant, refused to go to the hospital to give up the baby growing inside her. The guards put her on the floor on her back and placed a board over her swollen womb, and pistol-whipped two male prisoners until they agreed to jump up and down on the board. After five minutes or so, the baby was aborted, and the woman was taken to the hospital where she died. Mrs. Bang learned of her death when she was taken to the hospital for more treatments for her infected leg.

## "Trial"

Mrs. Bang was brought to trial at the Musan-kun (county) Court. Eight men sat behind a long table. Two or three were dressed in Kim Jong-il style jump suits, the others in regular shirts and jackets. Using *An-jeon-bu*-prepared paperwork, the man in the center of the long table read the charges against her: illegal border crossing and taking other persons (her children) with her across the border. Another man asked her if the charges were true. She was told that one of the eight men was her lawyer, but she did not know which one he was, though she believes it was the one who asked her if the charges were correct. She was sentenced to five years at the women's *Ro-dong Kyo-hwa-so*[92] labor penitentiary No.15

---

92  Literally, "a place to make a good person through education

near Hamhung, South Hamgyong province, minus the time already served in her various pre-trial detentions. Her trial took ten minutes.

## TESTIMONY: *Kyo-hwa-so* No. 15

## Near Hamhung, South Hamgyong Province (June 2000–December 2001)

A prison farm located in Sungwon-ri, Hyesan district, South Hamgyong not far from the industrial city of Hamhung, Penitentiary No. 15 held some five hundred women organized into five groups (*ban*) of prison laborers. Group 1 grew vegetables. Groups 2 and 3 grew corn. Group 4 cut wood. And Group 5 did construction and repair. At the time of her entry in June 2000, the prison was still under construction, and her dormitory cell was covered only in tree branches. When it rained, they all got wet. Upon entry she turned in her civilian clothes and was given old clothes from former prisoners and prisoners who had died. Mrs. Bang was in Group 3. There were fifty-three women in her group, ranging in ages from twenty-one to seven. Most were in their thirties or forties. Four-fifths of the women in her group were there for "illegal border crossing." The same held true for the entire prison, where, according to Mrs. Bang, only some ten percent were incarcerated for "ordinary crimes."

The prison day began, except in the dead of winter, at 4:30 AM, with farm work from 5:00 to 9:00 AM; breakfast from 9 to 9:30 AM; farm work from 9:30 AM to 12:30 PM; lunch from 12:30 to 1:30 PM; farm work from 1:30 to 7:00

PM; 7 to 10PM "re-education" and mutual self-criticism, which could result in reduced food rations if the criticism of prison work was severe. The "education" utilized a prison newspaper that carried stories of the Great General Kim Jong-il, stories about exemplary Korean Workers' Party members, about prisoners who were doing well on the outside upon release, and stories about model prisoners currently in the penitentiary.

Without variation, each meal consisted of fourteen beans per meal mixed with powdered corn. For the year and one-half she was detained (before early release), she was always hungry. Her body constantly craved salt and protein. After one month she was reduced to "skin and bones"—her body weight dropped from fifty-four to forty kilos (roughly 119 to 88 lbs.). Her skin turned black and wrinkled. Like other women, while doing farm work, she constantly searched for snakes, frogs, and insects that could be eaten raw. The women prisoners constantly tried to hide seeds and food in their clothing. The prison guards constantly searched under their clothes for hidden food, with kickings or beatings with rifle butts when hidden food was found. Out of her work group of fifty-three persons, ten women died during the year and one-half remained at Women's Penitentiary No. 15. It was the same, she said, for the other Work Groups.

Fearful of reduced food rations, Mrs. Bang worked as hard as she could, but with her damaged leg she could hardly bend over to work the short handled hoe. After five months she could not move her leg. So she was confined to the dorm cell, blanket-less, where her leg wounds continued to fester. She did sewing for

and labor."

The Hidden Gulag Second Edition



*Kyohwaso* Penitentiary No. 15
Near Hamhung, South Hamgyong Province

Computer generated drawing based on hand drawn sketch by Ms. Bang Mi Sun

**Unit 3, *Kyohwaso* Penitentiary No.15
Near Hamhung, South Hamgyong Province**



Computer generated drawing based on hand drawn sketch by Mrs. Bang Mi Sun.

97

the prison guards to avoid beatings for not work-ing. A year later, on October 10, the anniver-sary of the founding of the Workers' Party, she was told that because she had observed prison rules and because of the Great General's grace (*eunhye*), she was granted amnesty.

Upon release, she went back to Musan to recover at the home of her deceased husband's parents. In March, a Korean-Chinese man came to the house looking for her. During the time of her post-repatriation imprisonment, her son had made it from Yanbian China to South Korea. Using his government resettlement grant and employment income, he hired a Korean-Chinese agent to search for his mother, and bring her to Seoul. Mrs. Bang could not yet walk, but with her son's money she bought food and medicine to restore her health. By October, she was able to travel. On October 27, she bribed a border guard and crossed again into China. In Novem-ber 2003, she sought refuge in the South Korean Embassy in Beijing. On January 8, 2004 she came to Seoul. At the Hanawon orientation center for North Korean refugees newly reset-tled in South Korea, she met another defector whom she married. Reunited with her children, she now lives just outside Seoul with her new husband. She is hoping to form an NGO to assist North Korean women trafficked in China.

## WITNESS: Yoo Chun-shik

### *Kyo-hwa-so* No. "Two-Two," South Hamgyong Province



Mr. Yoo Chun-shik was born in November 1963 in Onsong, North Hamgyong Province. Follow-ing completion of his military service, in which he held the rank of platoon commander, he worked for a construction company in Onsong. His long string of encounters with the North Korean prison and detention system began in 1996.

After food distribution ceased at his place of employment, Yoo went to Kangwon Province to buy fish to sell to Koreans in China. He made "good money" and also began buying personal effects and selling them in China. Caught by the North Korean police, he was sentenced in January 1996 to six months' hard labor at the Onsong *An-jeon-bu* People's Safety Agency *ro-dong-dan-ryeon-dae* labor training camp. His sentence was for not working at his designated workplace, for unauthorized buying and selling, and for an old assault they dredged up from his military record. (Mr. Yoo thinks he would have been given a longer sentence if not for his mili-tary service record.)

In May 1995, with one month left to go in his six-month sentence, Yoo was given a temporary holiday release. But he became inebriated during the holiday festivities and was late returning to the labor-training camp. For this infraction,

he was hung upside-down for three hours. All of the other one-hundred-odd prisoners at the labor-training center/mobile labor brigade had to march past and hit him while he was hanging. Following his collective beating, Mr. Yoo was taken to an *An-jeon-bu* detention center and then sent in a group of nine prisoners to *Kyo-hwa-so* No. 22 (called "two-two" by the prisoners) in Oro-kun, South Hamgyong province, for a one-year prison term. All eight of the other prisoners in his entering group died of malnutrition and beatings from guards and other prisoners during Yoo's yearlong sentence.

Released from *Kyo-hwa-so* No. 22 in September 1997, Yoo fled to China that October. He worked in Shenyang for a South Korean company until February 2000, when he was caught by Chinese police and held in Shenyang for six weeks and then in a detention center in the town of Dandong, near the North Korean border, for another month. The Dandong police turned him over to the Sinuiju *Bo-wi-bu* State Security Agency police, who held him in an interrogation-detention facility for six weeks of questioning. Mr. Yoo was accused of working for a South Korean company; fearing execution, he initially denied the accusation.

While in the Sinuiju *ka-mok*, Yoo was kicked, beaten, and, along with five or six other prisoners in his cell, made to sit motionless under a surveillance camera for the whole day, except during meals. If the prisoners moved, they were beaten on their fingers. If observed talking, they were forced to slap each other. Only a few of the guards allowed the prisoners to stretch. Yoo described the sitting-motionless torture as being more painful than the beatings.

Mr. Yoo reports that the majority of prisoners at the Sinuiju *Bo-wi-bu* interrogation facility were women, most of whom were later sent to other detention facilities in their hometowns. While he was detained in Sinuiju in mid-2000, seven newly repatriated women were brought in, four of whom were pregnant and shortly after taken away. He later met one woman from this group in China; she told him that the four who had been taken away were subjected to forced abortions.

Yoo finally admitted to his jailers that he had worked in China for a South Korean-owned company. He also convinced them all that the other employees were Chinese or Korean-Chinese, which seemed to matter to his jailers. He was taken to Pyongyang *Bo-wi-bu* State Security Agency center for additional interrogations, where, he reports, other imprisoned persons were high-ranking officials and where there was no torture.

After enduring two weeks of interrogation in Pyongyang, he was sent to a State Security Agency detention facility in his hometown of Onsong for the month of August. He was then transferred to the Onsong *An-jeon-bu* police jail for twenty days, before being sent in October to the *ro-dong-dan-ryeon-dae* labor-training center No. 55 in Youngkwang-kun, South Hamgyong province. This was for a one-year sentence of hard labor. Yoo became so ill that in January 2001, he was released on temporary home sick leave.

Upon recovery, he was supposed to return to the labor-training camp/mobile labor brigade to complete his term, but he slipped across the Tumen River and fled to China instead. Mr. Yoo recovered in Shenyang for two months and then

made his way to Mongolia. He was caught by the Mongolian border police and held for three days without food, but was then released.

He went to Ulan Bator, and with the help of South Koreans at the consulate there, was able to board a plane to Seoul on May 20, 2001.

## TESTIMONY: *Kyo-hwa-so* No. "Two-Two," Oro-kun, South Hamgyong Province

Work in 1996 at *Kyo-hwa-so* No. 22 consisted mostly of carrying rocks to a nearby river and constructing stone embankments that would allow a hydroelectric station to generate electricity. Eight hundred to 1,000 men and up to 100 women labored there while serving unusually short (for *kyo-hwa-so* prisoners) sentences of one to two years.

As at other *kyo-hwa-so*, there was, Mr. Yoo reports, a very high turnover rate at *Kyo-hwa-so* No. 22, owing to the high rate of deaths in detention. Yoo entered prison in a group of nine prisoners. Within the year, he was the only one of the nine who had not died from malnutrition, forced labor, and beatings by guards and other prisoners. The prisoners were organized to beat each other, most commonly by prison work-group or sub-group leaders, who would beat other prisoners if they worked too slowly or walked too slowly to or from their worksites.

Prisoners were provided several spoonfuls a day of powdered corn mixed with wheat, along with salted cabbage-leaf soup. Those who died of malnutrition were mostly prisoners whose families did not visit them to bring extra food.

Of twenty persons in Cell No. 7 at the *kyo-hwa-so*, four died of malnutrition within a year. Other overcrowded cells held up to sixty or seventy prisoners, often with two persons sharing one blanket. The cells were categorized by offense or the number of convictions. Prisoners at *Kyo-hwa-so* No. 22 had been sentenced for theft, assault, fraud, gambling, or opium addiction, as well as "border crossing." There were no public executions at *Kyo-hwa-so* No. 22 during Yoo's year long there, although there were suicides and attempted suicides by prisoners seeking to end their suffering.

## WITNESS: Ms. Ji Hae-nam

### *Kyo-hwa-so* No. 1, Kaechon, South Pyongan Province (July 1993–September 1995)



Ms. Ji Hae-nam was born in 1949 in Namun-ri, Hamhung City, South Hamgyong province. At one point, she worked as a Korean Workers' Party propaganda cadre, visiting factories to explain party policy and exhort factory workers, sometimes through patriotic work songs, to meet their production quotas. But after the 13th Party Congress in 1989, her faith in the Party began to waver. A decade of hardship began shortly thereafter.

At the time, a North Korean TV show mocking former South Korean President Park Chung-hee featured one of Park's concubines singing

an apparently popular South Korean pop song, "Don't Cry for Me, Younger Sister (*Hong-do*). Ms. Ji was taken with the song and its melody and memorized it. On a lunar calendar holiday coinciding with Christmas day, December 25, 1992, Ji and four other women had an evening song party in Hamju-kun, South Hamgyong province. At this party, she taught the song to the other women. Overheard by neighbors, she was reported to the authorities, and arrested for singing a South Korean song. First, Ji was taken to the *An-jeon-bu* (People's Safety Agency) jail in Hamju-kun for fifteen days, and then to the *An-jeon-bu* police jail in Myungchon-kun, North Hamgyong province. During her pre-trial detention, she was beaten and sexually abused by a detention-facility guard. Mortified at her mistreatment by the young guard, who was in his early twenties, Ji tried to commit suicide by swallowing pieces of cement.

The other four women at the song party were sentenced to eight months of forced labor. During the investigation of Mrs. Ji's role as the song leader, the charge of falsifying documents to get more food rations was added to the charge of "disrupting the socialist order"—"Article fifty-something," she recalls. She was sentenced to three years of rehabilitation-through-labor at the woman's prison *Kyo-hwa-so* No. 1 at Kaechon, South Pyongan province (for her Testimony about No. 1, see below).

After serving two years and two months of her three-year sentence, in September 1995, Mrs. Ji, along with fifty other "light crime" prisoners, was released on the occasion of the fiftieth anniversary of Korea's liberation from Japanese occupation. She returned to Hamju-kun, but as a former prisoner, felt that doors were closed to her. As the economy deteriorated, she was unable to make ends meet as a peddler and resorted to selling her blood at transfusion centers. Hungry and disillusioned about her future prospects, she fled to China in September 1998, but she was almost immediately caught by a trafficker and sold to a physically deformed Chinese man who locked her up as a "sex toy" for seven months before she was able to escape. She then made her way to Weihai, where she worked in a restaurant and saved what little money she could. She eventually teamed up with six other North Koreans in China and stole a boat to try to get to South Korea by sea, but the engine broke down. The boat filled with water on rough seas and had to be towed back to shore by Chinese fishermen. Shortly thereafter, Ji and her fellow Korean escapees stole another boat and again set out to sea, but this boat was intercepted by the authorities and the amateur sailors turned them over to Chinese border guards.

Taken to the Dandong detention center in China, Mrs. Ji was forcibly repatriated to North Korea and sent to the *Bo-wi-bu* (National Security Agency) police jail in Sinuiju, where there were twenty-five women and thirty men—all *tal-buk-ja* ("escaped North persons"). While in this *Bo-wi-bu* jail, she was beaten with broomsticks, forced to kneel for hours at a time, and made to do the "stand-up-sit-down" exercise to the point of collapse, usually after thirty to forty minutes. Some of the younger women were kept in solitary confinement and sexually abused, Ji reports. After a month, she was sent to the Sinuiju *jip-kyul-so* (detention center). But a week later on December 25, 1999, she was released as part of a larger pardon for persons repatriated from China.

Fearing she would be constantly watched and possibly re-arrested, Ji made her way to

Musan. In January 2000, she crossed the frozen Tumen River back into China. This time, her luck turned. She found work in a company managed by a South Korean. She then met a South Korean pastor who assisted a group of North Korean refugees, including Ji, in making their way to South Korea. The group went from Weihai to Beijing to Kunming in southern China. Caught by the Chinese police near the Vietnam border, they successfully passed themselves off as Korean-Chinese and walked overnight over a mountain path into Vietnam. By train, by motor-bike, and on foot they made their way down through Southeast Asia and on to Seoul, where they obtained asylum.

During her interview for this report, which lasted all afternoon in a human rights NGO office in Seoul, Ji spoke in rapid anger as she described the conditions of *Kyo-hwa-so* No. 1 at Kaechon. She laughed as she recounted her misadventures on the high seas in stolen, leaky boats that had almost no chance of actually crossing the West Sea (also called the Yellow Sea) to South Korea. And she fought back tears as she referred to the sexual harassments and violations she endured in custody and as a trafficked person. For the last question of the interview, the Korean-English translator asked Mrs. Ji if she ever again sang the song, "Don't Cry for Me, *Hong-do*." Straightaway she replied, "Oh yes, and now without fear."

## TESTIMONY: *Kyo-hwa-so* No. 1, Kaechon, South Pyongan Province

Surrounded by a 4-meter (13-foot) wall topped with barbed wire, *Kyo-hwa-so* No. 1 held roughly 1,000 women prisoners who made clothing and leather goods during Ji's imprisonment. (Shortly before her arrival, hundreds of women had been transferred to another prison, she was told by other inmates.) The prisoners were divided into nine work divisions and smaller work units. Two work divisions made shoes and leather bags. Men from another prison were brought in to prepare the leather. As the leatherwork was the worst work, it was the repeat offenders and prison rule-breakers—some seventy to eighty women—who were assigned to the leather divisions. Ji's offense was essentially political, but many other prisoners had been convicted of theft, fraud, murder, adultery, and prostitution.

While most women worked in sewing lines, other work units were organized for cooking, construction, cleaning, maintenance, farming outside the prison compound, and a mobile "day-labor unit." Each work unit was given a production quota that required hard, fast work. Talking was not allowed on the sewing lines, and "on a daily basis," the women guards or wardens would kick or beat women prisoners who worked too slowly in front of the other prisoners. Minor rule-breakers were given less desirable jobs or reduced rations. Worse offenders were placed in tiny punishment cells where they were unable to lie down or stand up.

Working hours were from eight in the morning until six in the evening, followed by hour-and-a-half unit-wide self-criticism sessions, both *saeng-hwal-chong-hwa* (daily-life criticism) and *sang-ho-*

*bi-pan* (mutual criticism). There were incentives and rewards for the prisoners to spy and tattle on each other, and the prisoners did so. According to Ji, the theory of the prison was that with their strength and spirit broken by hard labor, the prisoners would repent through self-criticism and change their way of thinking.

The most salient characteristic of this prison was the inadequate food rations. Each day, prisoners were given a palm-sized ball of cornmeal and some cabbage-leaf soup. According to Ji, seventy percent of the prisoners suffered from malnutrition, and during her two years of imprisonment, a fifth of the prisoners—namely those without nearby families to bring them extra food—died of starvation and malnutrition-related disease.

## WITNESS: Mrs. Lee Soon-ok

### *Kyo-hwa-so* No. 1, Kaechon, South Pyongan Province (1987–1994)



Mrs. Lee Soon-ok was born in 1947 into a privileged and stalwart Korean Workers' Party family. Her grandfather had fought in Kim Il-sung's Manchurian army against the Japanese occupation of Korea. Her son was enrolled in Kim Il-sung University in Pyongyang, open only to children of the elite. Trained as an accountant, Mrs. Lee rose to become a supervisor in the No. 65 Distribution Center in Onsong, North Hamgyong province, which distributed Chinese-manufactured fabrics to party and state officials. She was arrested in 1986 in what she believes was a power struggle between the Workers' Party, whose members run the nationwide distribution system, and the public security bureau police, who were not satisfied with the amount of goods being provided to them by the distribution centers. She was charged with theft and bribery and held for seven months in the Onsong *Bo-wi-bu* State Security Agency jail, where she was tortured severely because she refused to confess to the allegations against her. Then, upon her expulsion from the Party, she was transferred to a People's Safety Agency provincial interrogation center, where she was held for another seven months and further tortured.

To escape even further torture and threats against her family members, Mrs. Lee ultimately agreed to sign a confession. Afterwards, she was given a public trial and sentenced to fourteen years at *Kyo-hwa-so* No. 1, located at Kaechon, South Pyongan province, where, among other things, the prisoners manufactured garments. Though she originally worked in the ordinary sewing lines, she was eventually transferred because of her accounting and managerial experience to the administrative office of the prison. Here, she had the opportunity to observe and learn a great deal more about how the forced-labor penitentiary was run.

After her release, in February 1994, Mrs. Lee and her son fled from North Korea to China, eventually arriving in South Korea in December 1995 via Hong Kong. Once in South Korea, she wrote a prison memoir, *Eyes of the Tailless Animals:*

*Prison Memoirs of a North Korean Woman*,[93] which names numerous persons who died under torture in the jails of Onsong and from various mistreatments at Kaechon prison labor camp.

Mrs. Lee's testimony for this report was drawn from her published prison memoir as well as from a personal interview.

## TESTIMONY: *Kyo-hwa-so* No. 1, Kaechon, South Pyongan Province

Located in the corner of a valley surrounded by mountains in Kaechon, South Pyongan province, *Kyo-hwa-so* No. 1 is a prison complex holding, at the time of Mrs. Lee's imprisonment, about 6,000 prisoners. A high wall with an electrified wire fence surrounds the complex. It includes prisoner dormitories, a large two-story factory, and office buildings for guards and prison officials.[94]

The other prisoners, at the time of Mrs. Lee's imprisonment, included convicted criminals, citizens convicted of not obeying government rules, and Mrs. Lee reports, some 250 Korean women who had voluntarily "repatriated" from Japan in November of 1987. Some women, reportedly, were housewives convicted of stealing food for their families as the North Korean production and distribution system started its decline.

---

93  Published in Korean by Chunji Media, Seoul, in 1996, and in English by Living Sacrifice Book Company, Bartlesville, Oklahoma, in 1999.

94  Mrs. Lee Soon-ok was imprisoned at the same place as Mrs. Ji Hae-nam, whose testimony precedes Mrs. Lee's in this report, and only several months apart. The two women were interviewed separately and did not know each other. Lee's figures for the prison population at *Kyo-hwa-so* No. 1 include both male prisoners from a nearby prison and women prisoners.

Prisoners were supposed to get rations of some 700 grams (25 ounces) per day consisting of corn, rice, and beans. Instead, the guards ate the rice and beans, leaving each prisoner with only some 100 grams (3.5 ounces) of corn per meal, or a meager 300 grams (11 ounces) per day. Constant and severe hunger was the norm, and the dehumanizing environment led the prisoners to fight each other for scraps of food.

The primary prison-labor occupations at *Kyo-hwa-so* No.1 during Lee's imprisonment were garment and shoe manufacturing. Shoemaking was considered by the prisoners to be the worse of the two occupations because of the hard labor involved in cutting and sewing leather and because of the toxic glue used in the shoes. The garment factory initially made army uniforms. Later, it produced bras for export to the Soviet Union, doilies for export to Poland, hand-knit sweaters for export to Japan, and paper flowers for export to France.

The women's garment factories were organized into various departments: fabric cutting, sewing lines, machinery maintenance, and facility services. Most departments had some 250 to 300 members, and each department had a supervisor, record-keeper, and messenger. The departments were organized into units of fifty to sixty prisoners, and each unit divided into work teams of five to seven prisoners, with one prisoner assigned to be the work-team leader. Each work team did everything as a group: eating, sleeping, even toilet breaks. Newcomers had difficulty adjusting to the group toilet-break regimen. Initially unable to contain themselves, these prisoners would have to remain sitting at their sewing line workstations in their soiled clothing.

The whole group would be punished for the infraction of one of its members, a common infraction being the failure to meet individual or group production quotas. The most common and immediate punishment was reduced food rations. Frequently the threat of reduced food rations drove the women prisoners to work through constant pain. In winter, hands and fingers numb from cold were prone to accidents from the sewing needles and scissors. Mindful of their production quotas, prisoners continued at their workstations, doubly fearful that their dripping blood would soil the garments.

## WITNESS: Former Prisoner # 6

### *Kyo-hwa-so* No. 77, Danchon, South Hamgyong Province (Late 1980s)



Former Prisoner # 6 was born in 1960 in South Pyongan province. While in the North Korean military, he was a low level participant in a scheme within his military unit. It diverted the profit from goods that had been imported to North Korea from Japan and then re-exported to China to personal gain. Dismissed from the army after almost a year of military detention, he was convicted by a civilian "People's Judiciary" in Dukchun and sentenced for two years to *Kyo-hwa-so* No. 77 near Danchon, South Hamgyong province. The camp was a gold-mining labor camp where some 2,000 out of

roughly 7,000 to 8,000 prisoners died of mining accidents, malnutrition, and malnutrition-related diseases during the two years Former Prisoner # 6 was imprisoned there, in the late 1980s.

Former Prisoner # 6 mined gold for three months and then spent six months in the prison "health clinic" before serving the remainder of his sentence working in the prison cafeteria. He was released in 1987. He later fled to China, where he lived for several years before arriving in South Korea in 2001.

## TESTIMONY: *Kyo-hwa-so* No. 77

According to Former Prisoner # 6, there was a large prison-labor *Kyo-hwa-so* No. 55 at Chunma, South Hamgyong province. However, that camp was so overcrowded that a number of prisoners there were transferred to *Kyo-hwa-so* No. 77, a *kyung-jae-bum* (economic criminal) re-education prison-labor campsite. The camp was located in the mountains between Daeheung and Geomtuk in South Hamgyong province. During the time when Former Prisoner # 6 was imprisoned, *Kyo-hwa-so* No. 77 held some 7,000 to 8,000 prisoners, all male, most of whom were serving three-year sentences.

The *kyo-hwa-so* was divided into units of 800 to 1,000 prisoners, and these units were divided into sub-units of 60 to 100 prisoners. In the unit of Former Prisoner # 6, some 15 to 20 prisoners were persons imprisoned for going to China, but most were prisoners convicted of what would be criminal offenses in any country. About half of the prisoners who came into this unit were already malnourished and ill from below-subsist-

ence-level food rations while under pre-trial and pre-sentence detention. At *Kyo-hwa-so* No. 77 the prisoners were fed daily only a small coffee-cup-sized ball of mixed corn, rice, and beans along with a watery salted-cabbage soup. (These below-subsistence-level food rations preceded the mid-1990's famine in North Korea.) The prisoners slept in wooden dormitories holding between 60 and 70 persons.

Most prisoners at *Kyo-hwa-so* No. 77 mined gold. Some of the mineshafts dated back to the early days of the Japanese occupation of Korea in the early 1900s. Accessing the veins of mineable gold required descending and, later, ascending a wooden staircase 500 meters (1,640 feet) in length, using gas lanterns for light. Deaths from mining accidents were a daily occurrence, including multiple deaths resulting from the partial collapse of mineshafts.

Huge numbers of prisoners were so severely malnourished that after a short period of hard labor, they could no longer work in the mines and were sent to the clinic or "hospital" section of the prison camp. At times, this section would hold up to 1,000 prisoners. Some prisoners intentionally injured themselves to get out of the mines. Prisoners stayed at the clinic from one to six months, but the clinic was mostly a place to await death. During the detention of Former Prisoner # 6, nearly a third of the prisoners died within their first month at the clinic. Sometimes, if a prisoner was near death, he would be released to die at home, in an effort to reduce the extremely high number of deaths in detention. Thirty to fifty new prisoners were brought in every week to keep the mine going.

The prisoners themselves considered *Kyo-hwa-so* No. 77 to be a death camp, in that they did not expect to live until the completion of their (typically) three-year sentences. Nonetheless, the sub-units had a lecture and self-criticism session once a week, on Saturday or Sunday before the evening meal, when prisoners would confess their wrongdoings and shortcomings. During these sessions, the entire sub-unit would stand, except for the confessing prisoner, who would kneel in front of the group, facing the guards. Once every month there was a unit-wide criticism session to discuss production shortcomings.

There were public executions in front of the entire camp of persons caught trying to escape, steal from the prison warehouse, or inflict injuries on themselves. During public executions, the guards were very heavily armed.

### WITNESS: Former Prisoner # 3

### *Kyo-hwa-so* No. 3, Sinuiju, North Pyongan Province (late 1980s and early 1990s)



Former Prisoner # 3 was arrested as a young man for assault and battery. After what he described as a fair trial, he was convicted for a crime he admits he committed and was sentenced to ten years of imprisonment. He served from the early/middle 1980s to the early/middle 1990s at three separate prison facilities,

including *Kyo-hwa-so* No. 8 at Yongdam, Kangwon province; and *Kyo-hwa-so* No. 3 in Sinuiju, North Pyongan province.

At Yongdam *Kyo-hwa-so* No. 8, some 3,000 prisoners manufactured bicycles, but most of the prisoners were transferred to a Danchon, South Hamgyong province to mine kiln-fire stones to be used in steel-making furnaces. At Danchon, prisoners died daily from the fumes emanating from the kilns and heated stones. After two years, when additional stockpiles of stones were no longer needed, many prisoners, including Former Prisoner # 3, were transferred to a prison-labor camp in Sinuiju, *Kyo-hwa-so* No. 3, where the prisoners made clothes.

After his release from the Sinuiju *kyo-hwa-so* in the early/middle 1990s, Former Prisoner # 3 carefully planned an escape from North Korea. He fled to China in 1998, slowly made his way down through Southeast Asia, and arrived in South Korea in August 2000.

## TESTIMONY: *Kyo-hwa-so* No. 3, Sinuiju, North Pyongan Province

In the early 1990s, roughly 2,500 male prisoners were being held in *Kyo-hwa-so No.* 3 in Sinuiju, North Pyongan province, a city on the North Korean border with China sometimes featured in the news as the site of a future "free-enterprise zone." The inmates made prison uniforms and mined stones and gold. Some of the inmates were arrested for border crimes—visiting and/or transporting goods to and from China. However, most were ordinary convicted criminals. Rations were meager: only some 450 grams (16 ounces)

per day of rice mixed with beans. Many prisoners died in the winter from malnutrition, scabies and other skin diseases, and paratyphoid. Prisoners were beaten by guards. Other infractions and mistakes resulted in longer prison sentences. Those who attempted and failed to escape, or who initially succeeded in escaping but were caught, were brought back for public execution, after which their corpses would be displayed for a day.

## WITNESS: Former Prisoner #12

### Hoeryong *Kyo-hwa-so*, North Hamgyong Province (1991–1995)



Former Prisoner # 12, a forty-three year old native of Chongjin, North Hamgyong province, was a truck driver when he was involved in a fistfight in 1991. A day after the altercation, the other person involved died from injuries sustained during the fight. As a result, Former Prisoner # 12 was tried, convicted, and sentenced to six to ten years imprisonment in a *ro-dong-kyo-hwa-so* (labor-prison) located in a mountainous area, roughly 40 kilometers (25 miles) from Hoeryong in North Hamgyong province. Prisoners mined copper, logged, manufactured furniture, and did farming work. Because of his previous occupation, Former Prisoner #12 was made a truck driver and repairman. It was a prison job that provided much greater mobility

within the prison camp than that afforded to most other prisoners.

Former Prisoner # 12 did not protest his trial or conviction. While he had not intended to fatally injure the man he had fought, he admitted he had committed a crime for which he should be punished. He was imprisoned for four years, from 1991 to 1995. According to his testimony, so many prisoners died of malnutrition and related diseases in 1993 that prison officials allowed gravely ill prisoners home-leave in 1994 and 1995, to cut down on the number of deaths in detention. Former Prisoner # 12's weight declined from 80 kilograms (176 pounds) in 1991 to 35 kilograms (77 pounds) in 1995. He admits that, knowing of the sickness-release policy, he did not engage in the frantic search for anything edible that characterized most prisoners' experiences.

After returning to his home for two months to regain his strength, he fled to China where he lived among Korean-Chinese in Harbin for five years, before going to South Korea by a dangerous ship route in 2000.

## TESTIMONY: Hoeryong *Kyo-hwa-so*, North Hamgyong Province

Hoeryong *kyo-hwa-so* is located in a mountainous area of North Hamgyong province and associated with the town of Hoeryong, even though it is some 40 kilometers (25 miles) away. Former Prisoner # 12 used the term *ro-dong-kyo-hwa-so* when describing the prison because the roughly 1,500 prisoners there were required to do hard labor: primarily copper mining, but also logging and furniture making. Convicts

reportedly labored from five in the morning until five in the evening, mining not all that much copper but suffering many accidents to get it. Every day after work there was a self-criticism session, which Former Prisoner # 12 described as extremely petty, and at which time prisoners always had to find some mistake to confess.

Most prisoners at the camp were convicted criminals sentenced to anywhere from one to fifteen years, although in 1992, a number of "political prisoners" arrived. Some sixty prisoners shared a sleeping dormitory. The prison camp also had 1.5-meter by 1.5-meter (5-foot by 5-foot) "punishment cells," where scantily clad prisoners were placed on one-quarter food rations for one week or more. Confinement in the tiny punishment cells was extremely painful.

Prisoners were also organized and compelled to beat other prisoners who committed various infractions. The highlight of prison-camp life was the rare occasion when prisoners would be taken outside the prison walls for exercise walks, at which time they were able to eat plants and grass. The most salient feature of Hoeryong *kyo-hwa-so* was its death rate. Below-subsistence-level food rations coupled with harsh living conditions and hard labor resulted between 1991 and 1995 in the deaths of one-quarter to one-third of the inmates. So many prisoners died in 1993 that near-dead prisoners were allowed home-leave in 1994 and early 1995 to reduce the number of deaths in detention. Others were released in 1995 as part of an amnesty in honor of Kim Jong-il's birthday.

**WITNESS: Former Prisoner #19**

**TESTIMONY:** *Kyo-hwa-so* No. 4

### *Kyo-hwa-so* No. 4, Kangdong-kun, South Pyongan Province (Late 1996)



Former Prisoner # 19 grew up near Danchon, South Hamgyong province. In the mid-1990s, when North Korea's production/distribution system broke down and he was without employment or income, he set up a stall to make and sell what he called "Chinese style" rice and corn liquor. Arrested in late 1996, he was tried, convicted, and sentenced to a six-year term at *Kyo-hwa-so* No. 4. After working for three months at a limestone furnace, he contracted a lung disease and was transferred to the prison-camp clinic. In those three months, his weight had dropped nearly 30 kilograms (66 pounds). Believing that he would not survive his six-year sentence and observing that, to reduce the number of deaths in detention, extremely sick prisoners were being sent home to recuperate, he drank dirty water. He developed chronic diarrhea as a result and was given a temporary sick release. Away from the limestone furnace, his lungs recovered, and after regaining fifteen kilograms (33 pounds), he fled to China instead of returning to prison.

*Kyo-hwa-so* No. 4 is located in Samdung-ri, Kangdong-kun, in South Pyongan province. During Former Prisoner # 19's detention there, some 7,000 convicts mined limestone and made cement in a factory originally built by the Japanese during their occupation of Korea. The prison camp was roughly two kilometers (1.24 miles) long by 1.5 kilometers (0.93 miles) wide and was surrounded by a barbed-wire fence.

All of the prisoners at *Kyo-hwa-so* No. 4 were men, most of them sentenced to anywhere from five to twenty years. The prisoners considered their sentences a cruel hoax, as they did not expect to live long enough to serve their time. Some prisoners mined limestone in the adjacent mountain. Others crushed the rocks or fired the lime in large kilns. Work started at seven in the morning and lasted until five in the evening, except in the crushing and heating units, where work often continued until ten at night. All aspects of the work were hard labor in dangerous conditions, with prisoners frequently suffering chest ailments and lung diseases from limestone dust.

Once a week there was an evening criticism session in groups of up to 500 men where the prison officials would criticize the prisoner called to stand in front of the group of prisoners. There were also lectures on Kim Jong-il and his policies. Infractions were punished with reduced rations, nominally extended sentences, and detainment in miniature punishment cells. During the eight months that Former Prisoner # 19 was held at *Kyo-hwa-so* No. 4, there were eight public executions in the prison. He did not recall the particular offenses of these eight

executed persons. However, he did cite the four types of persons who would be executed at the prison camp: prisoners caught trying to escape, prisoners caught after they escaped, persons who committed crimes while on "sick leave," and prisoners who had committed capital crimes elsewhere and were brought to *Kyo-hwa-so* No. 4 for execution.

Food rations consisted of a mere 50 grams (under 2 ounces) per meal of mixed corn and wheat, plus cabbage-leaf soup. Former Prisoner # 19 weighed 76 kilograms (168 pounds) upon his entry into the prison camp. After three months, his weight had plummeted to somewhere around 45 kilograms (99 pounds). He was sure that most prisoners weighed less than 50 kilograms (110 pounds).

Prisoners slept head to toe on wooden floors in groups of 50 to 100. The unsanitary living conditions—there was no bathing or changing of clothes, and Former Prisoner # 19 says he was able to wash only his face two to three times a month—led to *Kyo-hwa-so* No. 4's particular idiosyncrasy: the cement dust in the prisoners' clothing, commingled with dirt and sweat, would cause the tattered fabric to harden, resulting in skin abrasions and infections.

The most salient prison characteristic, however, was more common: exorbitantly high death rates. In Former Prisoner # 19's eight months there, of the eighty persons in his work unit, three prisoners died in work accidents, ten died of malnutrition and disease, and twenty were sent home on "sick leave" in order to reduce the high numbers of deaths in detention.

*See page 226 for the satellite photograph of Kangdong Kyo-hwa-so No. 4. The satellite photograph was located by Curtis Melvin of North Korea Economy Watch using the prisoner's sketch below.*



# PART FOUR

## DETENTION FACILITIES AND PUNISHMENTS FOR NORTH KOREANS FORCIBLY REPATRIATED FROM CHINA: VIOLENCE AGAINST WOMEN

Part Four examines in greater detail testimony from North Koreans who were forcibly repatriated from China back to North Korea. After being handed over to North Korean police, the repatriated persons are detained and interrogated in one or more police facilities generally known as *ku-ryu-jang*. Following interrogation and detention, which frequently includes beatings and systematic torture, many of the forcibly repatriated Koreans are assigned, often without judicial process, to short-term forced labor. This occurs in frequently brutalizing detention facilities known as *jip-kyul-so* (provincial or sub-provincial detention facilities) or to mobile corvee labor brigades known as *ro-dong-dan-ryeon-dae* (labor training centers). Other repatriated persons, whose cases are deemed more serious and often involve a political dimension, are sent to the longer term, felony level, forced-labor penitentiary-like *kyo-hwa-so* prisons, or "re-revolutionizing areas" of the *kwan-li-so* political penal labor colonies.

In recent years, young women have comprised a substantial portion of repatriated persons.[95] Their testimonies report sexual humiliation, trafficking and violence, and the unconscionable abuse of racially motivated forced abortion and infanticide.

This section will first provide a description of North Koreans who cross into China and their situation there, followed by testimonies of those forcibly repatriated and arbitrarily detained in North Korea for having exercised their human right to leave their country.

## Why They Go: The Flow of North Koreans to China

For several reasons, over the last fifteen to twenty years, large numbers of North Koreans have been going to China. The largest number of North Korean "border crossers" were people simply seeking to survive,[96] by searching for food or employment to help sustain their families in North Korea, particularly during the acute famine in the 1990s. In the late 1990s, estimates of the number of North Koreans who fled to China ran as high as 200,000 to 300,000 persons. Almost all observers estimate the current number to be considerably lower.

Additionally, many North Koreans crossed, and continue to cross, the China border to engage in small-scale import-export commerce – bartering or trading Korean goods, often food or forest products of one sort or another, for processed food or consumer goods manufactured in China.

Other North Koreans, having a well-founded fear of persecution should they remain within North Korea, cross the border to seek asylum.

---

95 By some accounts, women comprise some 70 to 75 percent of forcibly repatriated persons in recent years.

96 See *The North Korean Refugee Crisis: Human Rights and International Response*, HRNK, Washington DC, 2006; *Perilous Journeys: The Plight of North Korean Refugees in China and Beyond*, International Crisis Group, Brussels, 2006; *Acts of Betrayal: The Challenge of Protecting North Koreans in China*, Refugees International, Washington DC, 2005.

These asylum-seekers include persons who previously went to China for food or employment, but were apprehended by Chinese police and repatriated to North Korea. Upon completion of their post-repatriation imprisonment and forced labor, they conclude that they will always be under suspicion, surveillance, and persecution in their country of origin, so they again flee to China. But now, they are in search of asylum, ultimately in South Korea.

To these "push factors" should be added "pull-factors" such as family reunions. North Koreans who have already found refuge and asylum in South Korea use their resettlement grants from the South Korean government, or their employment income, to finance the escape and transit of their family members still in North Korea.

To an extent, these outward flows of persons from North Korea are the Northeast Asian manifestation of global labor migrations from poorer, often rural areas, to more developed, often urbanized areas, where there is a demand for industrial or service workers. These labor migrations operate irrespective of domestic or international borders. Young Chinese from rural areas of Northeast China migrate to the manufacturing cities and sites along the Chinese coast. Ethnic Koreans in northeast China migrate to South Korea to work in construction trades or as waitresses and domestic workers. And young North Koreans, particularly from North and South Hamgyong provinces, where industrial production and the state-run public food distribution system substantially collapsed, migrate to Northeast China in search of food or employment.

However, labor flows in Northeast Asia involving North Korea differ from this global phenom-

*"Upon completion of their post-repatriation imprisonment and forced labor, they conclude that they will always be under suspicion, surveillance, and persecution in their country of origin, so they again flee to China."*

enon in two ways. First, unlike most countries that export labor and welcome the hard currency remittances from its citizens who work in foreign countries, the DPRK often confiscates (sometimes brutally, as can be seen in the testimonies below) such earnings when it can. Second, even more fundamentally, North Korea prohibits its citizens from leaving the DPRK. This is a direct violation of Article 13(2) of the Universal Declaration of Human Rights, which asserts, "Everyone has the right to leave any country, including his own, and to return to his country." It is a direct violation of the same provision in Article 12 of the International Covenant on Civil and Political Rights to which the DPRK, as a ratifying State Party, has a legal obligation to respect.[97] There is, it should be noted, no corresponding "right to enter" an adjacent state, as control over immigration remains within the sovereignty of states. However, the DPRK is unique in criminalizing emigration. The severe punishments inflicted on North Koreans who have exercised their "right to leave" their country of origin are described below.

---

97  Thus, the UN Human Rights Committee, which oversees the implementation of the International Covenant on Civil and Political Rights, has long recommended the DPRK to rectify its domestic laws in conflict with this provision of the Covenant.

112

Notwithstanding the risks of severe punishment, North Koreans continue to exercise their "right to leave." They do so by surreptitiously wading across the shallow areas of the Tumen River that constitute the border between North Korea and China, or by crossing the frozen river on foot during the winter. Border crossing often includes bribes to the border guards.

## The Situation of North Koreans in China

Having entered China without visas or formal travel documents, irrespective of the validity of their claims for protection (see below), the North Koreans are officially regarded as illegal immigrants. They are subject to deportation if apprehended by Chinese police. As the North Koreans seek food, employment, shelter and temporary asylum, they strive to blend into the communities of the approximately two million ethnic Koreans long resident in China, along with the Han ethnic majority in the area of Northeast China formerly known as Manchuria.[98]

There is also a great deal of cross-border commerce between North Korea and China, some of which is officially organized by and through North Korean state enterprises or state import-export companies. But when the North Korean production system broke down in the 1990s and people were no longer being compensated for their assigned work, large numbers of North Koreans resorted to buying and selling various goods across the border. Technically, private cross-border buying and selling by North Koreans does not have legal standing as the North Koreans have crossed into China without DPRK permission or authorization.

Three social phenomena in the northeast provinces of China directly affect the situation of North Koreans residing, working or doing business there. First is the ease of encountering South Koreans and South Korean culture such as TV or radio programs, movies, newspapers and magazines. Second is the coming into contact with ethnic Korean-Chinese religious believers and their churches, which often help the border crossers. Third is the likelihood of North Korean women being lured or caught by traffickers and forced into prostitution or sold as brides, often to rural Chinese farmers in areas where women are in short supply.

Border crossing to China without authorization from state or party officials is considered a criminal offense. Furthermore, contact by North Koreans with Chinese-Korean churches, contact with South Korean (or Korean-American) citizens, or exposure to South Korean culture are regarded by DPRK authorities as political offenses as well as a technical violations of North Korean law.

*"Border crossing to China without authorization from state or party officials is considered a criminal offense."*

---

98  The Yanbian Korean Autonomous Prefecture is located in Jilin province. There are also numbers of ethnic Koreans in Liao-ning and Heilongjiang provinces, and Korean communities in the Chaoyang district in Beijing.

## Encountering South Koreans or South Korean Culture

Northeast China hosts large numbers of visiting South Koreans working, studying or traveling in the three northeast provinces of Liaoning, Jilin, and Heilongjiang: businessmen and women, students, famine relief and refugee workers, ministers and missionaries, journalists and tourists. (Mt. Paektu, a famous mountain considered the source of Korean civilization, straddles the Chinese-DPRK border, and large numbers of South Koreans visit Mt. Paektu from the Chinese side).[99] With an existing large ethnic Korean-Chinese population, and substantial numbers of visiting or transient South Koreans, South Korean TV shows, movies, radio programs, pop-music videos and recordings are all easily accessible in northeast China, as are internet cafes with easy access to Korean language, South Korean-based websites.

Along with encountering South Koreans and South Korean radio, pop songs, TV or movies, it has become commonplace for North Koreans arriving in China to seek out Korean-Chinese churches. In the late nineteenth century and throughout the twentieth century, Protestant Christianity was embraced by many Koreans, including ethnic Koreans in China, and particularly in the northern part of the Korean peninsula. In northeast China, as in South Korea, it is the practice of the Protestant Christians to afix a simple red neon cross to their church buildings and to the otherwise secular or commercial buildings in which they rent rooms to hold worship services. Upon arrival in China, hungry, fearful, or lost North Koreans have long known to seek out the buildings with the red neon crosses to find people who will help them find food, shelter or employment.

## Trafficking of North Korean Women

North Korean women are particularly vulnerable to trafficking. Persons leaving North Korea know well the severe punishment that awaits them if they are caught in China and forcibly repatriated to the DPRK. Forced repatriation is a powerful, coercive lever used by traffickers against North Korean women who are in China without North Korean travel documents. Second, the gender imbalance due to China's one-child policy and the fact that rural Chinese women are leaving Northeast China to get factory jobs in the southern coastal cities drive demand for women as "wives" for rural Chinese men. Lastly, women are lured from North Korea with false promises of gainful employment.

At grave risk if turned over to the Chinese police and repatriated to North Korea, the women are preyed upon by traffickers. They have no protection against being sold as brides. These women accept this fate as preferable to immediate forced repatriation, hoping either that they can make a go of their commercially brokered, involuntary marriages in China, or else flee when the chance arises.[100] However, even when the North Korean "brides" accept their forced, involuntary marriages and bear children, they are not often

---

99  In comparison with the two or three weekly flights from Beijing to Pyongyang, there are literally scores of direct, non-stop flights every day from Seoul and Busan to the key cities of Northeast China, and scores more daily flights from South Korea to Northeast China that transit through Beijing.

100      See HRNK, *Lives for Sale: Personal Accounts of Women Fleeing North Korea to China*, Washington, DC, 2009 for details.

eligible for Chinese citizenship. In some cases, the Korean wives receive a "*hukou*" certificate, which enables some residential rights such as allowing children of this union to attend school. However, many other North Korean women are picked up by the Chinese police and forcibly repatriated. There is a noticeable frequency of pregnant women among the North Koreans forcibly repatriated to the DPRK.

### Protection Denied[101]

Some of the North Koreans who flee to China are "refugees" or "asylum seekers" within the precise definition of the 1951 Refugee Convention. Many more, indeed almost all, North Koreans who flee to China fall within the definition of *refugees sur place* or "refugees in place": persons who may not have fled North Korea out of a well founded fear of persecution, but who will face severe persecution, as the testimonies below indicate, if returned to North Korea against their will.

Police in China periodically sweep through areas where undocumented North Koreans work and reside, to arrest and deport them. Foreign famine-relief workers on the Chinese side of the border have observed Chinese police buses and vans transporting deportees to North Korea. But the buses and vans often have darkened or curtained windows, so an accurate count of the deportees, even when witnesses have observed the deportations, is not possible. Neither the number of forcibly repatriated North Koreans

nor trends over time can be specified in detail, but there are literally hundreds of former North Koreans now living in South Korea who were previously refouled from China or Russia to North Korea, severely persecuted, tortured and imprisoned and who, upon release, again fled to China, intent on finding asylum in South Korea. They report that there were scores or hundreds of other "border-crossers" detained with them following their forced repatriation. These policies and practices have been in place for fifteen years or more. The numbers of North Koreans *refouled* and persecuted over this fifteen-year period for having left North Korea number in the tens of thousands.[102]

To the best available knowledge, the severe persecutions and punishments detailed below continue unabated. Absent UN High Commissioner for Refugees (UNHCR) access to the North Korean border areas inside China, and absent International Committee of the Red Cross (ICRC) access to the North Korean detention facilities along the China-DPRK border, there is no dispository or conclusive evidence that the practices described below are in remission.

While it is not presently possible to cite the

---

101  See Roberta Cohen, "Legal Grounds for Protection of North Korean Refugees," *Life and Human Rights in North Korea*, Citizen's Alliance, Vol. 57, Fall 2010.

102  In the absence of Chinese or North Korean police statistics, the number of repatriations cannot be quantified more precisely; in the late 1990s and the early 2000s, it is believed to number in the thousands per year. In the later years of the first decade of the new millenium, the numbers may have dropped to the multiple hundreds per year, reflecting the decrease in the number of North Koreans seeking refuge, shelter, food or employment in China. Journalists operating along the Chinese side of the DPRK-China border believe that the numbers increased in 2011, resulting in a renewed crackdown by special North Korean units called "Storm Corps" (*Pok-pung-gun-dan*) against border crossing and trading. Many of the formerly repatriated North Koreans interviewed for this report indicate that the police detention facilities for repatriated persons were severely overcrowded, with dozens of persons packed into cells, and sometimes overflowing into the hallways and corridors.

**Protection Denied**

> Anyone has the right to leave any country, including his own, and to return to his country.
> Article 13.2 Universal Declaration of Human Rights

> Everyone shall be free to leave any country, including his own.
> Article 12.2 International Covenant on Civil and Political Rights

> "No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture. For the purposes of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights."
>
> Article 3, Convention Against Torture, Cruel, Inhuman or Degrading Treatment or Punishment (ratified by China 4 October 1988)

> [T]he term "refugee" shall apply to any person who:…owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.
>
> Article 1, Convention relating to the Status of Refugees, 1951

116

The Hidden Gulag Second Edition

… A person who was not a refugee when he left his country, but who becomes a refugee at a later date, is called a refugee "*sur place*."

… A person may become a refugee "*sur place*" as a result of his own actions, such as ….expressing his political views in his country of residence. Whether such actions are sufficient to justify a well-founded fear of persecution must be determined by a careful examination of the circumstances. Regard should be had in particular to whether such actions may have come to the notice of the authorities of the person's country of origin and how they are likely to be viewed by those authorities.

Paragraphs 94 and 96 of the UN High Commissioner for Refugees Handbook: Procedures and Standards for Registration, 2003

No contracting state shall expel or return ("*refouler*") a refugee in any manner whatsoever to the frontier of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

Article 33, Convention relating to the Status of Refugees, 1951

117

precise number of forcibly repatriated North Koreans, it is possible to know what happens to many of those who are repatriated. Having been exposed to the relative freedom and prosperity in China, and completely alienated by their brutal mistreatment after being handed back to the North Korean police, many of those who survive their mistreatment flee back to China upon their release from detention and recovery from detention-related illnesses and injuries. A small number of those North Koreans who have fled the DPRK a second, or even third, time have obtained asylum in South Korea, usually after a harrowing, months-long trek south through China and then further south through Southeast Asia, before flying to Seoul. Some defectors go through Mongolia or Hong Kong. The stories of some of these individuals are told on the following pages.[103]



**Forced Repatriation Corridors**

The Repatriation Corridors through which North Koreans interviewed for this report were apprehended by police in China and *refouled* to North Korea where they were detained and severely mistreated.

## Corridors of Forced Repatriation: Pathways to Pain, Suffering and Violence Against Women

North Koreans typically go to China by walking across the frozen river or fording the shallow stretches of the Tumen River separating China from the DPRK. Denied the protection offered by international law, they are forcibly repatriated by van or bus across the bridges that connect the two countries.[104]

On the Chinese side of the repatriation corridors are detention facilities where the North Koreans are held until a large enough group is collected for repatriation by bus or van. On the Korean side of

103  For more information on the situation of North Koreans in China, see "A Field Survey Report of the North Korean Refugees in China," Dr. Christine Y. Chang, The Commission to Help North Korean Refugees (CNKR), December 1999, Seoul, and "The Invisible Exodus: North Koreans in the People's Republic of China," Human Rights Watch, New York, 2002. For an expansive recent survey, see Stephan Haggard and Marcus Noland, *Witness to Transformation: Refugee Insights into North Korea*, Peterson Institute of International Economics, Washington DC, 2010.

104  Interviews for this report included fourteen persons repatriated at Onsong, six at Sinuiju, six at Musan, and one each at Hoeryong and Hyesan. Reportedly, there are also repatriations at Manpo, and small numbers of repatriations at Rason, Saebyol, and Samjang, but no repatriated persons from these places were located or interviewed for this report.

the repatriation corridors there are police stations for detaining and interrogating the repatriated Koreans. They are from the two major police agencies in North Korea: one run by the *Kuk-ga-bo-wi-bu* State Security Agency police, commonly shortened to "*Bo-wi-bu,*" which administer the *kwan-li-so* prison camps described above and another interrogation/detention facility administered by *In-min-bo-an-seong* People's Safety Agency police (commonly referred to as "*An-jeon-bu*"), who run the *kyo-hwa-so* prisons described above.

According to the testimony of former *Bo-wi-bu* agents who defected to South Korea, and who were interviewed for a report by this author for the US Commission on International Religious Freedom, the *Bo-wi-bu* interrogation-detention facilities at the repatriation corridors are administered by the counter-intelligence ("anti-spy" *ban-tam-gwa*) department of *Bo-wi-bu*.[105] Their ostensible concern is that the South Korean National Intelligence Service (NIS) is running spy networks into North Korea from the China border; and it is *Bo-wi-bu*'s job to disrupt those networks. However, it is clear from the statements made by DPRK diplomats at the United Nations that North Korean concern is far wider than "counter-intelligence" as normally understood. Rather, the concern encompasses contact with or exposure to "foreign forces."[106] And this includes virtually any contact with South Koreans or Korean-Americans or exposure to any artifact of South Korean culture (radio, TV, movies, songs, videos, etc).

The testimonies of formerly repatriated North Koreans indicate that prior to 2000, persons

forcibly returned from China could be sent either to a *Bo-wi-bu* or *An-jeon-bu* detention-interrogation facility. Since 2000, forcibly repatriated persons are sent first to the *Bo-wi-bu* interrogation/detention facilities.

Whether the interrogations are conducted by the *Bo-wi-bu* State Security Agency police or the *An-jeon-bu* police, the interrogations described by former prisoners all follow a pattern clearly outlined by Former Detainee # 22, a young man originally from Kaesong. Essentially, the authorities ask: "Why did you go to China, where did you go, and what did you do in each place?"



105  See Chapter 5, "The Policies and Practices of Repression: Testimonies of Former Security Agency Officials," *A Prison Without Walls*, US Commission on International Religious Freedom, March 2008.

106  See DPRK statement at UN on page 7 above.

And then, more ominously: "Did you meet any South Koreans?" "Did you go to a Christian church?" "Did you watch or listen to South Korean TV or radio?" and "Were you trying to go to South Korea?"

All the former detainees interviewed for this report firmly believed that an affirmative answer to any of these questions would result in execution or their being sent to a *kwan-li-so* or *kyo-hwa-so*. Therefore, they typically denied any contact with South Koreans or Christians while in China. Their denials, however, were not considered credible by their interrogators, who attempted to starve and beat admissions out of the detainees. Some of the former prisoners interviewed for this report stuck to their denials; others, broken by hunger or torture, admitted that they had met South Koreans or gone to a Christian church. One interviewee said she was in such pain that she begged her jailers to kill her to end her suffering.

At the *Bo-wi-bu* detention-interrogation station, a determination is made if the person had simply gone to China for food or employment, in which case the detainee is transferred to *An-jeon-bu*. If the case has a political component—if the person admits to having met South Koreans or watched South Korean TV or movies, or sometimes having gone to a Korean-Chinese church—the *Bo-wi-bu* police retain the detainee.

Presently, after interrogation by *Bo-wi-bu* (which can last a matter of days, or many months) the detainee is transferred to one of four places: (1) the nearby *An-jeon-bu* interrogation/detention police stations; (2) the "re-revolutionizing" zones of *kwan-li-so* Camps 15 or 18[107]; (3) one of the *kyo-hwa-so* or *kyo-yang-so* prison[108]; or, (4) one of the *ro-dong-dan-ryeon-dae* labor training centers/mobile forced-labor brigades, described further below. Sometimes detainees are sent temporarily to other interrogation/detention police stations located in their hometown for additional questioning, prior to being sent to one of the four forced-labor facilities named above.

On the basis of presently available testimony, determinative criteria that govern whether the



**Schematic Repatriation Corridor**

---

107  Described in Part Two as is seen on pages 25-82 above.

108  Described in Part Three on pages 83-110 above.

detainee is sent to a *kwan-li-so* or a *kyo-hwa-so* cannot be discerned. It appears to be essentially arbitrary. This is both in the legal sense of arbitrary and capricious (extra-judicial and without any "due process"), and arbitrary in the sense that the police agency interrogators seem to have considerable discretion over the prisoners' fate. The designated additional detentions appear largely a matter of happenstance.

It is possible that some repatriated detainees are sent away to the lifetime imprisonment, "total control zone" areas of *Kwan-li-so* 15 or 18, or to one of the prison-labor camps that only have lifetime "total control zones" such as Camp 22. But there is no direct testimony on this. It is also sometimes asserted that some repatriated persons are taken away for execution. But no such direct, eyewitness testimony on such executions was obtained during the research for this report. In news accounts, some publicly executed persons are denounced as "traffickers" by North Korean police officials prior to execution. It is not known if persons publicly executed for "trafficking" had been previously processed at the police stations that abut the repatriation corridors.

Detainees who are transferred from the *Bo-wi-bu* to the *An-jeon-bu* facilities are subjected to additional interrogation. Then, they are commonly transferred to police stations in their home towns. They are then transferred again to: (1) a *kyo-hwa-so* or *kyo-yang-so* prison, described in Part Three; (2) a *jip-kyul-so*, short term labor-detention facility; (3) a *ro-dong-dan-ryeon-dae* labor training centers/mobile forced-labor brigade; or, (4) on occasion to the "re-revolutionizing" section of a *kwan-li-so* political penal labor colony, described in Part Two.

***Jip-kyul-so*** literally translates as a "gathering place." A *do-jip-kyul-so* is a provincial detention center. In reality, these are short-term hard-labor detention facilities for those serving up to six-month sentences. Several interviewees reported that the police use the *jip-kyul-so* detention centers for "small-crime" persons as well as for North Koreans forcibly repatriated from China. *Jip-kyul-so* are characterized by hard labor, such as construction work or brick-making and below-subsistence food rations, a combination that causes large numbers of deaths in detention, notwithstanding the short period of incarceration. Alternatively, prisoners receive "sick-releases," so that gravely ill prisoners will either die at home, thus reducing the number of deaths in detention, or, through the help of their families, recover at home before returning to the *jip-kyul-so* to complete their sentences.

***Ro-dong-dan-ryeon-dae*** literally translates as "workers training corps" or "labor-training center." A descriptive translation for the *ro-dong-dan-ryeon-dae* labor training centers would be "mobile *corvee* (forced-labor) brigades." The labor-training centers for mobile labor brigades are even shorter-term *jip-kyul-so*, initially set up to accommodate the over-flow from the established detention centers caused by the large numbers of North Koreans forcibly repatriated from China. One interviewee for the first edition of *Hidden Gulag* described the labor-training centers as localized "feeder" facilities for the *jip-kyul-so*. Another interviewee for the first edition described the labor-training centers as a "not-in-the-statute-books" response to the burgeoning numbers of North Koreans traveling without authorization. These North Koreans work at enterprises other than their assigned occupations at idled state-run factories, or flee to China in

121

response to famine in North Korea. One inter-viewee stated that it was becoming the practice to have separate facilities for Koreans forcibly repatriated from China because the repatriated prisoners were telling the common "light crime" criminals in the *jip-kyul-so* about the "freedom and prosperity" in China.

The labor-training centers are local, sub-district facilities where various labor or production functions are not performed on-site, but where the corvee labor brigades are housed overnight. Every morning the detainees are made to march rapidly or jog to their various and changing worksites—chanting political slogans or singing what they describe as "silly songs" praising Kim Jong-il as they march or jog along. However, it now appears that recent revisions to the DPRK legal codes have recognized the labor-training centers as part of the North Korean penal system.

Some of the repatriated persons going through this series of detention facilities have legal proceedings brought against them, although those "trials" would not meet international standards for "fair trial" or "due process." However, many of these detentions and incarcer-ations are entirely extra-judicial and without any legal process. On the basis of available testimony, it cannot be determined why some prisoners are given a trial while others are not. This too appears to be arbitrary, and apparently at the discretion of local police authorities.

It should not be assumed that the lifetime prison camps or the longer-term penitentiaries described in Parts Two and Three of this report are "worse" or more brutal than the short-term interrogation/detention facilities and the short-term forced-labor facilities to which the detained

repatriated North Koreans are subjected. As can be seen in the testimony, much of the worst and most systematic torture occurs in the *Bo-wi-bu* and *An-jeon-bu* interrogation facilities to which repatriated North Koreans are routinely subjected.

Nor should it be assumed that the repatriated persons deemed to have committed a politi-cal offense, such as meeting South Koreans, exposure to South Korean films, songs or TV programs, or having attended Korean-Chinese churches, are treated "worse" or more brutally than those North Koreans deemed "non-politi-cal" or "non-politicized," who went to China for food or employment. Indeed, some of the most demeaning, inhumane and brutal mistreatments are inflicted in the *An-jeon-bu* detention facilities. These are inflicted against North Korean women who have had no connection to "foreign forces" deemed hostile to the Kim Jong-il regime, such as South Koreans or Korean-Americans. North Korean women are routinely subjected to sexual humiliations. Pregnant women, including the victims of trafficking who are suspected of being impregnated by Han Chinese men, are subjected to forced abortions and infanticide.

## Racially Motivated Forced Abortions and Infanticide

Indeed, along with the torture during interroga-tion and the high levels of deaths in detention reported by the former detainees, a particularly reprehensible phenomenon of repression is the gender-based sexual violence and racially moti-vated forced abortion and infanticide perpetrated against forcibly repatriated pregnant women.

According to all the refugee accounts, the North Korean police authorities make no secret of the DPRK's objective: preventing women who became pregnant in China from giving birth to "half-Chinese" babies fathered by Han Chinese, China's major ethnic group. It makes no difference if the pregnancies resulted from trafficking, or coerced or voluntary marriages between Korean women and Han Chinese men in China. In these testimonies, there seems little difference between forced-abortion and infanticide; many of the aborted fetuses are not "still born" but viable and able to survive if they had been treated as premature births.

Many of the testimonies that follow reveal how half-Chinese babies were killed.

## FORCED REPATRIATION: SINUIJU CORRIDOR



## WITNESS: Ms. Choi Yong-hwa

### *Refouled* at Sinuiju, 2002



Ms. Choi Yongh-hwa is a shy and soft-spoken woman from Hoeryong, North Hamgyong province. Before fleeing to China, Choi had lived with her father and younger brother while working in a distribution center. But as the food situation in North Korea deteriorated between 1996 and 1998, and as the country's distribution system broke down, she left that work to become a petty trader, mostly selling cuttlefish, in order to make enough money to provide food for her family. When the petty marketing did not generate enough money for food, she paid a trafficker 200 *won* to take her to China in 1998. She worked at a restaurant in Yanji, China, and then as a tour guide for visiting South Koreans in Dalian. Caught by Chinese police in Dalian, she was held for a month before being sent to Dandong, where she was turned over to North Korean police.

Interrogated by the *Bo-wi-bu* State Security Agency police in Sinuiju, Choi convincingly denied meeting South Koreans in China. She was also explicitly questioned about attending Christian churches in China. Her interrogators threatened to send her to Chongo-ri *kyo-hwa-so* in North Hamgyong province,[109] which she had heard about from a neighbor who had been sent

---

109  Described on p. 85 of this report.

there, but she ended up being sent to the *do-jip-kyul-so* provincial detention center in Sinuiju. After only ten days there, she became too ill to work, from malnutrition and exhaustion: she had been unable to sleep at night owing to infestations of maggots and lice in her sleeping quarters. Choi was released after serving two months, during which time two other detainees had died. Choi's jailers simply did not want another death in detention.

Upon release, after regaining her health, Choi crossed again into China and made her way to Dalian. She traveled west by train to Beijing, and on New Year's Day 2002, she took a train to Kunming. She was part of a group of five North Korean refugees who crossed into Myanmar (Burma) but were apprehended and turned over to the police in China, who fortunately released them after being persuaded that they were Korean-Chinese, not North Koreans. After their release, they successfully made their way through Southeast Asia. Choi obtained asylum in South Korea in March of 2002 and was interviewed for this report in Seoul in August 2002.

## TESTIMONY: South Sinuiju *Do-jip-kyul-so* Provincial Detention Center (May and June 2000)

The South Sinuiju *do-jip-kyul-so* in North Pyongan province held roughly 100 detainees during Choi's detention, most of them between twenty and thirty years of age, more of them women than men. The facility was primarily for North Koreans repatriated from China who had successfully claimed no contact with South Koreans. Two cells were for men and women accused of minor crimes, and four cells held repatriated persons. Detainees performed supervised agricultural and construction work at off-site locations. Their workday began between four-thirty and five in the morning and lasted until seven or eight at night, with half-hour breaks for breakfast, lunch, and dinner.

Meals consisted of dried corn, which the prisoners would wet, and salted radish-leaf soup. The inmates were also allowed to eat grass and other plants while working outside the detention center. Still, nourishment was insufficient. During Choi's two months in detention, two women who had been detained for three to four months died of malnutrition. Also during these two months, one female detainee was coerced into having sex with a guard.

Among the detainees were ten pregnant women, three of whom were in the eighth to ninth month of pregnancy. Choi and two other non-pregnant women were assigned to assist these three pregnant women, who were too weak to walk alone, by walking with them to a military hospital outside the detention center. The woman assisted by Choi was given a labor-inducing injection and shortly thereafter gave birth. While Choi watched in horror, the baby was suffocated with a wet towel in front of the mother, who passed out in distress. When the woman regained consciousness, both she and Choi were taken back to the detention center. The two other non-pregnant women who assisted the two other pregnant detainees told Choi that those newborns were also suffocated in front of the mothers. The explanation provided was that "no half-Han [Chinese] babies would be tolerated."

**WITNESS AND TESTIMONY:**

**Former Detainee # 24**

*Refouled* at Sinuiju



When interviewed for this report, Former Detainee # 24 was a sixty-six-year-old grand-mother from Chulan-district, North Hamgyong province. In 1997, her children were starving, so she fled to China with her husband, who was a former soldier, and five of her children. Two of her children were caught crossing the border, but the rest of the family lived in China for three years. Two of the children who made it with her to China were later caught and repatriated to North Korea, and her husband eventually died of natural causes. Afterward, she lived with her granddaughter in Yanji until apprehended by Chinese police while visiting Dandong.

Former Detainee # 24 was forcibly repatriated in a group of fifty North Koreans, some of whom were pregnant women, bound together by their wrists. They were taken, initially, for eighteen days to the Namin-dong *Bo-wi-bu* State Security Agency police *ku-ryu-jang* in Sinuiju. Initially, the police accused Former Detainee # 24 of being corrupted by capitalism in China. She convinced them that she had gone to China only for food, so she was sent for one month to the *do-jip-kyul-so* in South Sinuiju run by the *An-jeon-bu* People's Safety Agency police. Though she had heard that Kim Jong-il had recently said North Korean

repatriates should not be treated harshly, there were beatings.

Detainees were fed the usual steamed corn, and as it was midsummer, most prisoners were sent out to work in the rice fields. This grandmother was too old and weak for such labor, and as she herself had had seven children, she was taken in the mornings to a nearby medical building to help care for the pregnant detainees. She helped deliver seven babies, some of whom were full-term and others, injection-induced abortions. All of the babies were killed.

The first baby was born to a twenty-eight-year-old woman named Lim, who had been married to a Chinese man. The baby boy was born healthy and unusually large, owing to the mother's ability to eat well during pregnancy in China. Former Detainee # 24 assisted in hold-ing the baby's head during delivery and then cut the umbilical cord. But when she started to hold the baby and wrap him in a blanket, a guard grabbed the newborn by one leg and threw him in a large, plastic-lined box. A doctor explained that since North Korea was short on food, the country should not have to feed the children of foreign fathers. When the box was full of babies, Former Detainee # 24 later learned, it was taken outside and buried.

She next helped deliver a baby to a woman named Kim, who also gave birth to a healthy full-term boy. As Former Detainee # 24 caressed the baby, it tried to suckle her finger. The guard again came over and yelled at her to put the baby in the box. As she stood up, the guard slapped her, chipping her tooth. The third baby she delivered was premature—the size of an ear of corn—and the fourth baby was even smaller. She

The Hidden Gulag Second Edition

gently laid those babies in the box. The next day she delivered three more premature babies and also put them in the box. The babies in the box gave her nightmares.

Two days later, the premature babies died but the two full-term baby boys were still alive. Even though their skin had turned yellow and their mouths blue, they still blinked their eyes. The agent came by, and seeing that two of the babies in the box were not dead yet, stabbed them with forceps at a soft spot in their skulls. Former Detainee # 24 says she then lost her self-control and started screaming at the agent, who kicked her so hard in the leg that she fainted. Deemed unsuitable for further hospital work, she was returned to the detention center until her release several weeks later.

Upon release, Former Detainee # 24 returned to China but was again caught and this time repatriated to Hoeryong. Separated from her granddaughter, she became hysterical and started singing Christian hymns that she had learned in China, and ranting against Kim Jong-il for the ruinous conditions that forced Koreans to have to flee their native villages—while God took care of Korean people in China. Fortunately, her guards regarded her as a crazy old woman, not an enemy of the regime. Indeed, they took pity on her, even reuniting her with her granddaughter and helping the two of them to again cross the Tumen River into China. This time, she met some South Korean Christian relief workers who helped her and her granddaughter to make the trek through China to Southeast Asia. She arrived in South Korea in March 2001.

*See satellite photograph of the South Sinuiju Detention Center on page 228.*

*For additional testimony about, and an analysis of forced abortions for women impregnated in China, see below and Part Five.*

### WITNESS AND TESTIMONY:

### Mr. Yoo Chun-shik

### *Refouled* at Sinuiju, early 2000



Mr. Yoo Chun-shik was repatriated to Sinuiju in early 2000. He had already been previously imprisoned in *Kyo-hwa-so* "Two-Two" at Oro, and after release he went to China for several years before being caught and repatriated. After repatriation and torture in several police facilities he was sent to a mobile labor brigade for a year of hard labor. His full testimony is on page 98 with the accounts of other former prisoners at *kyo-hwa-so* penitentiaries.

126

**WITNESS and TESTIMONY:**

**Mrs. Koh Jyon-mi**

*Refouled* at Sinuiju, early 2003



Mrs. Koh Jyon-mi's parents were originally from Jeju Island, South Korea, before migrating to Osaka, Japan. In 1963 they took their three year old daughter Jyon-mi and her older sister to North Korea in a group of 41 Korean-Japanese participants in the "repatriation" program that began in 1959. Mrs. Koh attended school in Sinuiju earning a college degree in physical education. She taught physical education and trained young athletes for participation in North Korea's mass gymnastic games. When she was 22, Mrs. Koh married a Korean-Japanese doctor from Nagasaki who graduated from the University of Tokyo before "repatriating" to North Korea in 1978. After 16 years of marriage, her husband passed away in 1998, and the family fell into hard times.

Mrs. Koh fled to China with her son and daughter in December 2000, and first settled in a rural area near Dandong City, China. Mrs. Koh's family moved to Shindo Island from there and again to Yantai, a city on the Shantung peninsula. Mrs. Koh was caught by traffickers, but managed to escape from them. She found a job cooking for 70 South Korean exchange students from Masan in South Korea who were studying at Shandong University. Her son was caught by Chinese police while traveling to Shenyang. Fearful of being separated from both her son and daughter (who remained in China), Mrs. Koh turned herself in to the Chinese police so she would be repatriated with her son.

Mrs. Koh was repatriated from Dandong, China to Sinuiju, North Korea in early 2003 and was detained for five months at the North Pyongan province *Bo-wi-bu* interrogation facility, as this was near to her sister's residence in North Korea. While detained by *Bo-wi-bu*, she was tortured so severely from beatings to the eyes, head, and mouth that she required hospitalization, where she was unconscious for ten days. While in the hospital, the *An-jeon-bu* police contacted her sister to bring her medicine and food, and to take her home when she regained consciousness. At her sister's house, Mrs. Koh learned that her son was at a local *rodong-dan-ryon-dae* mobile labor brigade.

In July 2003, Mrs. Koh and her son were sent to a rural farming village where there was no food. In August, Mrs. Koh and her son went to Sinuiju again to flee to China, where her daughter still remained. Mrs. Koh and her son made connections to enter the Japanese consulate in Beijing in March 2005. They were able to travel to Japan in late July 2005, and several months later, were joined by her daughter.

Mrs. Koh now teaches the Korean language in Osaka and lives with her children. Her son is working and her daughter is a university student.

The Hidden Gulag Second Edition

**WITNESS and TESTIMONY**

**Mr. Lee Yoo-keum**

***Refouled* at Sinuiju, early 2003**



Born in Sinuiju in 1984, Mr. Lee Yoo-keum went to China in December 2000 with his mother, Mrs. Koh Jyon Mi, interviewed above, and his sister. Mr. Lee and his family separated to find work. Mr. Lee went to Shenyang and worked in a noodle plant for a year. His sister worked in a restaurant washing dishes. One day, Mr. Lee heard that their mother was in Yanji. In Decem-

ber 2001, Mr. Lee and his sister went to see their mother, and the family rented an apartment together.

In May 2002, Mr. Lee travelled to Beijing. However, when he reached Beijing, he was caught by the police and sent to Beijing foreigners' prison with five or six other North Koreans apprehended by the police. Mr. Lee was then sent to Dandong by train and was interrogated there for 2 days.

Upon repatriation, Mr. Lee was sent to Sinuiju *Bo-wi-bu* with about 50 people where he was held for three months. His stay was longer than other repatriates because he was from a Korean-Japanese family. Mr. Lee was interrogated at length but was not beaten because, he says, he was clever in his answers.



**Bowibu Police Kuryujang Interrogation-Detention Facility**
**Shinuiju, North Pyong-an Province**

Entrance to Prison cell area

Main Entrance

Storage

Prison

Computer generated drawing based on hand drawn sketch by Mr. Kim Myong Ho.

128

He was transferred to an *An-jeon-bu* detention facility some five kilometers away from Sinuiju, where there were four cells for men and one for women. Perhaps a hundred persons passed through this detention facility while he was there. Because he had no one to come and vouch for him, he remained in detention for three months, becoming very sick and malnourished to the point of losing half his body weight. He was beaten by the *An-jeon-bu* guards, who gave no reasons or explanation for the beatings. After he collapsed from malnutrition and the beatings, the police contacted a relative to come pick him up, so he did not die in detention.

After two months recovering at his aunt's house, he was sent to a *ro-dong-dan-ryon-dae* mobile labor brigade for 6 months where he crushed rocks to be used for building housing foundations.

When Mr. Lee was released, through his aunt, he met up again with his mother. With support from his sister, who had remained in China, Mr. Lee and his mother again fled to China, with intent to seek asylum in Japan. In 2005 along with his mother, who was Korean-Japanese, he was able to travel to Japan and now resides in Osaka.

**WITNESS and TESTIMONY:**

**Mr. Kim Myong-ho**

***Refouled* at Sinuiju, March 2003**



Mr. Kim Myong-ho was born in 1967 in Musan city, North Hamgyong province. He crossed the North Korean border and went to Shenyang, China in 2000.

He was repatriated in March 2003 to Sinuiju *Bo-wi-bu* with a group of three women and two men who were caught in Dandong. Mr. Kim spent 25 days at the Sinuiju *Bo-wi-bu* which has ten prison cells and had five prisoners incarcerated in each cell.

Mr. Kim explained that *Bo-wi-bu ku-ryu-jang* is the place where authorities filter out people with political associations or motives. However, Mr. Kim's major reason for leaving the country was for food. His interrogation was concerned with basic biographic information: how he was caught, if he watched South Korean TV, if he met Christians or went to a Korean-Chinese church. During his week of interrogation, he denied having been exposed to South Korean culture. He was hit and kicked if he did not answer the questions right away.

The worst was the sitting motionless torture, where he was hit on the fingers or knees if he talked, or even moved a little.

After twenty-five days in the *Bo-wi-bu* detention/interrogation facility he was transferred to an *An-jeon-bu*-run *ro-dong-dan-ryeon-dae* mobile work brigade where he did three months of forced labor: a mixture of logging and farming corns and beans. The prisoners were fed, he said, worse than pigs and dogs.

Repatriated persons at the labor-training center were kept separate from other prisoners who were detained for ordinary crimes.

129

## FORCED REPATRIATION: HYESAN CORRIDOR



### WITNESS and TESTIMONY:

### Mrs. Lee Chun-shim

*Refouled*, November 2004



Mrs. Lee Chun-shim was born in Pyongyang. Having spent a decade (1982-1992) as a nurse and First Lieutenant in the North Korean People's Army, she provides expert eyewitness testimony on violence against women. In November 2004, she was caught by the Chinese police and forcibly repatriated to the North Korean *Bo-wi-bu* State Security Agency police detention facilities at Hyesan in Yangang Province.

The *Bo-wi-bu ku-ryu-jang* at Hyesan was a simple rectangular building with a corridor behind a narrow metal door. Upon arrival men and women detainees were separated as the women were compelled to undress and stand naked and humiliated in front of their children (those ten years and younger were kept with them) and the guards who were in their twenties and thirties. Non-pregnant women were made to do the squat and jump up exercises to dislodge any money hidden in rectal or vaginal cavities. Some women were subjected to vaginal searches by hand, and those who cried out in pain or humiliation were beaten with a wooden stick. Women who admitted to swallowing money or valuables were made to drink detergent water to induce vomiting or diarrhea. These women were then isolated and given buckets to collect vomit or excrement until the swallowed valuables were recovered.

According to Mrs. Lee, a drug that in diluted form is used to treat skin wounds was injected into pregnant women's wombs, inducing labor within hours. As there had not been the normal widening of the hipbones during the advance stages of pregnancy to enlarge the birth canal, the labor pains were the same as when delivering a fully grown baby. When the women moaned or cried out in pain as they lay on wooden and cement cell floors, they were hit with wooden staves and cursed as "bitches who got Chinese sperm and brought this on themselves."

To Mrs. Lee's surprise, the fetuses were not killed in the uterus by the concentrated injections. Even three to four months premature babies were born alive, crying, and moaning. The babies were wrapped in newspaper and put in a bucket to die, after which they were buried in a yard behind the jail.

No medical care was provided following the forced abortions. No tissues or towels were provided. Nor were the women allowed to bathe or wash. They had to use their own clothes to

130

wipe themselves. The cells in which the women gave birth were infested with lice, which even got into the women's vaginas. The women's skin festered and cracked from being scratched with dirty hands.

Mrs. Lee thought that the women subjected to these mistreatments suffered mental as well as physical harm.

Mrs. Lee's testimony was given at a conference in Tokyo in December 2008 attended by the present author.[110]

### FORCED REPATRIATION: MUSAN CORRIDOR



### WITNESS and TESTIMONY: Mr. Kim Tae-jin

#### *Refouled* at Musan, August 1987.

Mr. Kim Tae-jin was repatriated to Musan in August 1987. After interrogation and torture at the Musan *An-jeon-bu ku-ryu-jang*, he was transferred to the Chongjin *Bo-wi-bu ku-ryu-jang* where

---

110  Her testimony in Korean and Japanese languages can be found at the "NO FENCE" website, http://nofence.netlive.ne.jp/.

he was again interrogated and tortured. Following that, he was sent to the "re-revolutioning zone" at the No. 15 *Kwan-li-so* political penal labor colony at Yodok. His photograph and testimony appears on page 60, along with other former prisoners from Yodok.

### WITNESS: Former Detainee # 1

#### *Refouled* at Musan, 1997



Former Detainee # 1 was born in 1967 in Chongjin, North Hamgyong province. He served ten years as a radio operator in the North Korean military. Upon discharge, he became a low-level courier in business transactions between North Korea and China. In 1997, he was arrested in Yanji, where he had gone to collect money owed in return for goods imported from Japan and re-exported to China without North Korean authorization. Turned over to the *Bo-wi-bu* (National Security Agency) police at Musan, he was interrogated for a day and then turned over to the *An-jeon-bu* People's Safety Agency police for a week of interrogation. He was then turned over again to the *Bo-wi-bu* at Chongjin, who placed him in a police jail in Song-pyong district in Chongjin. There, for twenty days he was shackled and forced to kneel without moving whenever he was not undergoing additional interrogation sessions. During these multiple interrogations, Former Detainee # 1 was ques-

tioned about listening to South Korean radio while in the military and accused of wanting to go to South Korea. He convincingly denied having listened to South Korean radio while in the North Korean military, even though he had. He completely denied allegations of espionage. He did not disclose information about others involved in the unauthorized re-export scheme that the officials and staff of the state enterprise had organized.

Finally, Former Detainee # 1 was sent to a *do-jip-kyul-so* provincial detention center at Nongpo. At one point, driven by hunger, he slipped away to his family home to get some food. Caught while trying to sneak back into the provincial detention center, he was beaten unconscious for having escaped. Emaciated from forced labor making bricks, his legs became numb. He was unable to walk up or down stairs and unable to carry bricks. In fact, he reports that he was so "skin and bones" that he could not even sit. Unable to change clothes or bathe, he became covered with lice. As his jailers did not want him to die in custody, Former Detainee # 1 was released in October after only two months in detention.

It took until May of the following year for Former Detainee # 1 to recover movement in his legs. At that point, accompanied by his mother, he fled to China. They gradually made their way south through China and Southeast Asia, arriving in South Korea in March 2000. This former detainee still has scars on his shoulder and hip from the chemicals in the hot, freshly fired bricks he was required to carry while in detention.

## TESTIMONY: Nongpo Provincial Detention Center, Chongjin

Nongpo, now sometimes also called Eunjung, is a sub-district of Song-pyong district in Chongjin, North Hamgyong province. Nongpo held some 120 detainees during Former Detainee # 1's imprisonment: roughly seventy men and fifty women. Some inmates were single. Some were married couples, but the husbands and wives slept separately in the different men's and women's cells, where roughly twenty persons slept head-to-toe in small rooms. Conditions were highly unsanitary, with many detainees covered with lice.

Most of the female detainees were held for up to six months for having gone to China. Some of the men detainees were also held for going to China, but most of them were held for "selling" state property. Detainees were required to perform hard labor: brick-making from morning to evening, in addition to agricultural work (planting and harvesting crops). The harsh chemicals used in making bricks left the detainees with bruised and sore hands. The freshly fired bricks were heavy to lift and exhausting to carry. Rations were extremely meager: salty, watery cabbage-leaf soup and small cakes made of wheat chaff. Evenings were occupied with group self-criticism and silent, motionless self-reflection. A criticism session would not end until detainees proclaimed their own or someone else's wrongdoing. The detainees would make up wrongdoings to end the sessions.

A typical day started at five in the morning with a thirty-minute jog to an agricultural worksite for two hours of farming work followed by a half-hour breakfast. Detainees then made bricks

until noon, when they were given a half-hour for lunch. Lunch was followed by repair and work preparation until one. Then came six-and-a-half more hours of brick making followed by a half hour for dinner. Dinner was followed by a self-criticism session, which lasted from eight until ten and was sometimes followed by interrogations. The work was so hard, with slow workers beaten with shovels, that the detainees wanted to be transferred from the detention-labor facility to a "real prison," meaning a *kyo-hwa-so*.

Within his two months of detention at Nongpo, Former Detainee # 1, witnessed, out of a total of 120 inmates, one public execution (a man who had sold cable in China), three deaths from malnutrition and related diseases, and one death from tetanus.

*See a sketch of Nongpo Detention Center on page 134 and a satellite photograph on page 229.*

## WITNESS and TESTIMONY: Mrs. Bang Mi-sun

### *Refouled* at Musan, October 1999.

Mrs. Bang was repatriated through Musan in late 1999. She was transferred from a *Bo-wi-bu* detention-interrogation facility to an *An-jeon-bu* mobile labor brigade and again to a pre-trial detention facility for six months before transfer to *Kyo-hwa-so* No. 15. Her full testimony appears on pages 93 above, along with the testimony of other former prisoners at the *kyo-hwa-so* penitentiaries.

## WITNESS: Former Detainee # 26

### *Refouled* at Musan, April 2002



A native of Chongjin City, North Hamgyong province, Former Detainee # 26 is a mother of four and a grandmother of two. In the mid-1990s, her husband died of natural causes. As the family slowly ran out of money and food in the late 1990s, she sent two daughters to China for work, but they were caught by traffickers and sold to Korean-Chinese men. Former Detainee # 26, along with her son and a grandchild, then went to China to try to rescue her daughters and reunite her family. She found her daughters in Wongchun and took them to Yanji, where they lived for a year and a half before being caught by the Chinese police in April 2002.

First repatriated to the Musan *jip-kyul-so*, this grandmother was sent to the Onsong *Bo-wi-bu ku-ryu-jang* detention center for "heavy interrogation." She believes that a whole family together in China was deemed a more politicized desertion than a single-family member in China trying to earn money to support the rest of the family back in North Korea.

She was then transferred to the Nongpo *jip-kyul-so* detention center, where after a month, a guard pushed her to the ground, breaking one of her ribs. She was sent home for forty days of "sick leave" in order for her rib to heal. However, after thirty days on leave, in June, she again crossed



Nongpo *Anjeonbu* Detention Center, Chongjin, North Hamgyong Province

the Tumen River to look for her remaining daughter, who had not been caught in April and remained in China. Within the month, Former Detainee # 26 was caught again and this time repatriated to Hoeryong *Bo-wi-bu* jail, where she was made to sit motionless for six days. Her next destination was the Onsong Sambong-ku *Bo-wi-bu* police station, where she was heavily interrogated and threatened with being sent to Oro No. "Two-Two" penitentary. She begged and bribed the guards, who sent her instead to the *An-jeon-bu* jail for a week of solitary confinement in a dark cell (without windows or lights). After becoming ill, she was given a sick release.

After a week at home, she again fled to China in August 2001, where she remained in hiding until December. This time her luck turned when she met a Korean-American missionary in Yangji who helped her join a group of nine persons on the "underground" land-route. After traveling through Beijing and Kunming, the group made their way through Southeast Asia. In June 2002, she reached Seoul and obtained asylum.

When interviewed for this report in Seoul in November 2002, Former Detainee # 26, who had tried so hard to help her family avert starvation and keep them together, was accompanied

134

by her young granddaughter. Former Detainee # 26's daughter, the granddaughter's mother, had been located in China and joined another group of North Korean refugees on the long overland trek to Thailand. Unfortunately, she was caught crossing the Vietnamese border and turned over to the Chinese police. At the time of this interview, her fate and whereabouts were unknown.

were born, they were placed face down on the ground. Some babies died right away; others lay there breathing longer. If any babies were still alive after two days, the guards would smother them in wet vinyl. The babies lying on the ground could be seen by the women standing at the front of the other cells. The guards would say that the mothers had to see and hear the babies die because these babies were Chinese.

## TESTIMONY: Nongpo Detention Center, Chongjin

According to Former Detainee # 26, in May 2000, the Nongpo *jip-kyul-so* in Chongjin[111] held roughly 75 men, 175 women, and a few orphans and teenagers. The women detainees were held in three rooms: one room for paratyphoid sufferers, one room for pregnant women, and the third room for 130 female prisoners, whose quarters were so cramped that there was not space for all of them to simultaneously lie down for sleep. Detainees were fed some 70–75 kernels of boiled corn per meal.

In May 2000, 28 women among the detainees were from three to nine months pregnant. Former Detainee # 26 saw three eight-month-old fetuses aborted and seven babies killed. Several women from Cell No. 1 (see sketch above and satellite photograph on page 229), including Former Detainee #26, were brought over to Cell No. 3 to help deliver the babies. When the babies

## FORCED REPATRIATION: HOERYONG CORRIDOR



## WITNESS and TESTIMONY:

### Former Detainee # 34

### *Refouled* at Hoeryong, 2004



Former Detainee # 34 was born in South Hamgyong province in 1966. He was trading in China when arrested in Longjiang in October

---

111  Some former prisoners referred to this detention center as Nongpo, and some referred to it as Chongjin. Nongpo is a section of Chongjin City. Some former prisoners referred to it as a provincial detention center, and some referred to it as a detention center. The author has tried to preserve each reference according to the way in which each former prisoner referred to this facility. For ease of reference, each visual image of this facility is referred to as Nongpo Detention Center.

2004. Held in China for fifteen days, he was forcibly repatriated to the Hoeryong, North Hamgyong province *Bo-wi-bu* interrogation/detention facility, where he was held two and one-half months for questioning.

The Hoeryong *Bo-wi-bu* detention/interrogation facility is near to a locally famous statue of Mrs. Kim Jong-suk, Kim Il-sung's first wife. The Hoeryong *Bo-wi-bu* detention/interrogation facility had 8 cell rooms on opposite sides of a central corridor. Two rooms were for men and three for women. He doesn't know about the use of the other rooms. His cell held about thirty people, and he believes the other cells did as well. The entrances to the cell rooms were less than waist high, so that prisoners had to crawl out backwards on their hands and knees. He once crawled out head first, and was beaten for the infraction.

He was interrogated five times, and beaten twice, one time losing a tooth. But he describes the sitting motionless torture—each and every day in his cell for ten weeks—as being much more painful than the beatings. The interrogation questions were the usual ones: Did he meet South Koreans or attend churches in China? He had done so, although he initially denied it, until another prisoner told on him. He then admitted that he had, but only to get food and money.

He believes he was treated better than most fellow prisoners because he had told the State Security Agency police that he had been ten years in the army and was a member of the Korean Workers' Party. However, he complained about the unsanitary conditions: being unable to wash and having to wear the same clothes for ten weeks, and having to drink dirty, contaminated

water as collective punishment, which then made the toilets extremely foul.

He was turned over to the Chongjin provincial *An-jeon-bu* People's Safety Agency police to await the local police to pick him up and escort him to Onsong, a town of more than 100,000 people on the border with China. He was again questioned and legal documents were prepared. He was taken to the prosecutor's office where charges were read against him. The charges were from the "legal code" but he did not recognize them and does not remember the specific charges except that "border crossing" was among them.

He was sentenced to one year at the Onsong *ro-dong-dan-ryeon-dae* labor-training center (mobile labor brigade) where he and his fellow prisoners collected sand and rock for construction sites, and collected excrement for use as fertilizer. He was released after four and one-half months for illness. While at Onsong mobile labor brigade in 2005, a fellow prisoner was beaten so severely that he was taken away almost dead. The prisoner never returned.

## FORCED REPATRIATION: ONSONG CORRIDOR



**WITNESS: Former Detainee # 27**

*Refouled* **at Onsong, 1998.**

After Former Detainee # 27 was caught by Chinese police at the Vietnamese border, he was sent all the way back to the far northeast corner town of Tumen before being repatriated through Onsong in 1998. He was sent to Chongjin *Bo-wi-bu* where he was tortured and beaten before being sent to Yodok *kwan-li-so*. His story appears on page 137 with the other testimonies from the political penal labor colonies.

**WITNESS: Former Detainee # 25**

*Refouled* **at Onsong, mid-1999**



A young woman in her mid-thirties at the time of her interview, Former Detainee # 25 was born in Saetbyol district, North Hamgyong province. In April 1998, when the food shortage in North Korea became extremely severe where she was living, she went to China to make enough money to buy corn. A year later, she was caught and repatriated to North Korea. She was sent first to the *An-jeon-bu* People's Safety Agency police *jip-kyul-so* provincial detention center for *wirl-gyong-ja*—"illegal border crossers"—at Onsong, North Hamgyong province, for five weeks in the autumn of 1999, and then taken for the month of December to the Nongpo *jip-kyul-so* detention center in Chongjin City.

When she was released from Nongpo, a local police officer escorted her back to her hometown. She was made to promise not to go to China again, but since there was no food at home, she waded across the icy Tumen River on December 31, 1999. She forded the icy stream because there were too many guards at the spots where the river was frozen. She lived in China for two years before going by bus and on foot down through China and Southeast Asia. She arrived in Seoul in June of 2002.

**TESTIMONY: Onsong *Jip-kyul-so* Detention Center, North Hamgyong Province**

At Onsong, during the time of Former Detainee # 25's detention, roughly 150 persons were held in two rooms. The detainees, who were assigned to make bricks, were told that they were not human beings but dogs and pigs. They were made to sing "silly songs" to honor Kim Jong-il. Detainees were asked the usual question: had they met any South Koreans or Christians while in China? Two women confessed to having converted to Christianity while in China and were taken away by police agents, who told the remaining women that the two Christian converts had been executed and that the rest of the women should consider themselves warned.[112]

When she was first taken to Onsong, Former Detainee # 25 thought she was looking at ghosts because the detainees were so skinny. She herself lost 5 kilograms (11 pounds) during

112  There is no available evidence other than the reported statements of the police officials as to whether these executions actually took place or not. While technically "hearsay," such assertions from DPRK authorities lead to the belief that North Koreans who convert to Christianity are executed for so doing.



Computer generated drawing based on hand drawn sketch by Lee Young Sook

the five weeks she was detained, being fed only half-bowls of corn soup.

## Nongpo *Jip-kyul-so* Detention Center, Chongjin City

At the Nongpo *jip-kyul-so* in Chongjin, in December 1999, roughly 180 detainees were required to construct a fish farm outside the detention center. During the month that Former Detainee # 25 was there, several detainees who had been arrested in China while seeking to enter Mongo-

lia were transferred. North Korean officials presumed, perhaps not incorrectly, that they were attempting to reach South Korea rather than work for food in China. The Nongpo detainees were taken to *Kyo-hwa-so* No. 22 (commonly identified as "*Kyo-hwa-so* Two-Two"), described in Part Three. Another female prisoner, a former teacher who had also been in Mongolia, was beaten almost to death, and the next day was taken out either to die or to be transferred to "Two-Two." A four-year-old boy, who was imprisoned with his mother, died of malnutrition. According to Former Detainee # 25, almost eighty percent of the detainees at Nongpo

*jip-kyul-so* were women, ten to twelve of whom were pregnant. The women were told they would not be allowed to leave the detention center still carrying "children of betrayers" in their wombs.

Former Detainee # 25 observed that the pregnant women were denied food and water and were kicked in the stomach to induce bleeding. She saw several women taken away for abortion-inducing injections before they were brought back to Nongpo. Four babies were born in a room set aside for birthing. The babies were put in a wicker basket in an adjacent storeroom, covered in vinyl cloth, and left to die.

*See page 134 for a sketch of Nongpo.*

## Witness and Testimony: Former Detainee # 21

### *Refouled* at Onsong, August 1999



A forty-three year-old native of Kangwon province, Former Detainee # 21 formerly worked at a state-run fertilizer factory. But production slowed and then stopped completely in 1997. Without work and running out of food, she and her husband fled to China in January 1999. They were caught by the Chinese police and repatriated to North Korea in August. She was held seven months for interrogation at the *An-jeon-bu* People's Safety Agency police *ku-ryu-jang* at Namyang-ku, Onsong district, North Hamgyong province.

At that time, the *An-jeon-bu* jail at Onsong held about 130 detainees, forty to fifty of whom were women. Former Detainee # 21's husband was put in a men's cell, and she was put in one of the women's cells. Her husband was beaten so badly that he confessed their desire to go to South Korea, after which time he died in detention from paratyphoid, a lice-borne disease that results in acute diarrhea, leading, if untreated, to dehydration and death. Her husband was left medically unattended for three days in men's Cell Block No. 8. She was beaten with sticks, and the police agents beat her head against cement walls until she screamed at them to get it over and kill her too.

According to Former Detainee # 21, beatings were common and harsh. Detainees were beaten so badly that they confessed to things they had not done. Women were beaten on the fingertips. One woman, who was very ill, near death, was made to stand up and sit down repeatedly until she collapsed and died. Among the fifteen women with Former Detainee # 21 in Cell Block No. 2, there were two repatriated pregnant women: one, six months pregnant; the other, eight months. Both were taken out for abortions. Upon return, both women said that their babies had been born alive and then were suffocated in vinyl cloth.

After seven months detention at Onsong in 1999-2000, Former Detainee # 21 was transferred to Chongjin *Bo-wi-bu jip-kyul-so* detention center in Chongjin, where she was held for another three months. Following her release from Chongjin, she again fled to China, even more determined to seek asylum in South Korea.

**Witness: Former Detainee # 8**

*Refouled* at Onsong, May 2000



At the time of her interview, Former Detainee # 8 was a thirty-eight-year-old woman from Musan, North Hamgyong province. She went to China in 1998 and married a Chinese citizen of ethnic Korean origin. Caught by Chinese police in May 2000, she was sent back to North Korea in June and interrogated by Onsong State Security Agency personnel. They asked her why and how many times she had left Korea and if she had met South Koreans or went to Christian churches while in China.

Satisfied that she had done none of these things, while threatening her with death if she went to China again, they sent her for two months detention at the Chongjin *jip-kyul-so*. Upon release, Former Detainee # 8 nevertheless went back to China. Believing it was unsafe to remain with her Korean-Chinese husband, she decided to try to get to South Korea. Starting her journey in late October 2001, she reached Seoul in mid-2002, after travelling to southern China and then through Southeast Asia.

**TESTIMONY: Chongjin *Jip-kyul-so* Detention Center, North Hamgyong Province**

Located in North Hamgyong province, this provincial detention center held roughly ninety detainees—some thirty men and some sixty women—nearly all of whom had been repatriated from China. Detainees worked from six in the morning until seven in the evening on seasonal agricultural work or collecting firewood, on a diet of dried corn and radish-leaf soup. Detainees often worked for up to three months while waiting for local police to come escort them back to their assigned places of residence.

According to Former Detainee # 8, guards did not hit women at the Chongjin *jip-kyul-so*, but men were, though "only" with fists, not clubs. However, upon entry, the women were asked if they were pregnant. If less than three to four months pregnant, the women detainees were subjected to surgical abortions. If more than four months pregnant, female detainees were given labor-inducing injections, after which, it was believed by Former Detainee # 8, the babies were killed. During Former Detainee # 8's two months of detention in mid-2000, six women were subjected to forced abortions.

Reportedly, there was no interrogation at Chongjin *jip-kyul-so*. Instead there were nightly classes on North Korean rules and regulations, accompanied by nighttime self-criticism sessions in groups of fifteen. If one member of the group of fifteen made some mistake or error during labor, or did something against the rules, the whole group would be punished.

**WITNESS and TESTIMONY: Former Detainee # 9**

*Refouled* at Onsong, June 2000



At the time of his interview, a thirty-eight-year-old native of Shinpo, South Hamgyong province, Former Detainee # 9 was desperate for work in 1998. So he went to China and spent two years in Yanji and almost a year in Harbin before being caught by the Chinese police in June 2000. Deported to Onsong, he was jailed for ten days, during which time he convincingly denied having met any South Korean Christians while in China, even though he had. He was sent to the Onsong *ro-dong-dan-ryeon-dae* labor training center mobile labor brigade while awaiting transfer to the Chongjin *jip-kyul-so* detention facility. While again being transferred by train,

he escaped from his guards. He fled to China and then made his way down through southern China to Southeast Asia before gaining asylum in South Korea in January 2002.

In July 2000, when Former Detainee #9 was detained at the Onsong labor-training camp, run by the Onsong *An-jeon-bu* People's Safety Agency police, there were roughly seventy detainees: some forty repatriates from China and some thirty petty criminals. Detainees began work at half past four in the morning, cultivating crops. In the afternoons and evenings, they did heavier labor—making bricks, sometimes until half past ten at night. At other times of the year, the detainees were sent to the mines, even though their detention was short-term, while they waited to be transferred elsewhere.

After he was transferred to the *An-jeon-bu* People's Safety Agency *do-jip-kyul-so* provincial detention facility at Chongjin, Former Detainee # 9's labor assignment in mid-2000 was additional agricultural work. There was no bathing, brushing teeth, or changing clothes. He was



141

The Hidden Gulag Second Edition

still wearing the same clothes he was wearing when arrested in China. Food rations were small amounts of boiled mashed corn and salty radish-leaf soup. Farm animals, he said, ate better.

The detainee population at the Chongjin detention center at that time was made up of thirty to forty men and fifty to sixty women. The guards would force the detainees to hit each other, a practice that Former Detainee # 9 believed was designed to allow the North Korean authorities to assure the Chinese that the police were not beating the prisoners. There were no deaths in detention during his brief stay at Chongjin, though he mentioned that the petty criminals there, who had been detained longer, complained that those who died at the center were not given proper burials. Former Detainee # 9's biggest complaint regarded "the inhumane treatment of pregnant women." He saw a group of ten taken away for mandatory abortions, and the women were returned to hard labor the very next day.

## WITNESS: Former Prisoner # 31

### *Refouled* at Onsong, twice in 2003.

Her story when she was sent to Chung-san *kyo-hwa-so* is told on page 92.

## WITNESS: Ms. Seo Jin

### *Refouled* at Onsong, December 2003.

She was repatriated through Onsong in December 2003. As a punishment for leaving North Korea she was sent to No. 55 *Kyo-yang-so* without trial. Her story is told on page 90.

## WITNESS and TESTIMONY:

## Former Detainee # 32

### *Refouled* at Onsong three times (2001, 2002 and 2004)



Former Detainee # 32 was born in July 1962 at Deoksong-eup, Deoksong district in South Hamgyong province. She was repatriated three times from China through the Onsong corridor.

She first crossed into China in 2000 to get help from her relatives in China. She stayed in the Yanji and Wanquing areas of China. When first repatriated in 2001 to Onsong *Bo-wi-bu*, she was strip-searched by female guards and subjected to interrogation for 15 days. She was asked how she went to China, what kind of life she had in the country, and if she were involved in any Christian activities. Her male interrogators did not believe her answers so she was kicked and slapped around. At that time Onsong *Bo-wi-bu*

142

The Hidden Gulag Second Edition

had three very crowded prison cells that held 30 people in each. She was sent briefly to an Onsong *ro-dong-dan-ryeon-dae* labor-training center, en route to being sent to the Sunam district *jip-kyul-so* detention facility in Chongjin. But not closely guarded on the train south to Chongjin, she simply got off, and made her way back to China.

In a second forced repatriation at Onsong in July 2002, Former Detainee # 32 convinced her interrogators that it was her first repatriation to North Korea. She was held by *Bo-wi-bu* for two months. She was again heavily pressed about meeting South Koreans or attending church, and beaten to force her to confess. After two months at *Bo-wi-bu* this time she was effectively transferred to the Chongjin *jip-kyul-so* detention facility for one month. During this time, July 2002, she witnessed forced abortions. Because there was too little food to feed prisoners in the facility, her home village area police came to pick her up. She worked in a farm field with about 150 men and women. At the tiny local police station, police were preparing paper work on her case. But she got very sick, and rather than deal with her illness, they just let her go.

Once recovered, she again fled to China. She lived in the mountains and got help from Korean-Chinese Christians. Caught again, she was repatriated a third time in March 2004. She was five months pregnant but, fortunately, the *Bo-wi-bu* guards could not tell from her appearance even after they strip-searched her body for hidden money. She was fearful knowing that the guards would force an abortion if they found out she was pregnant and thought the baby was half-Chinese. Guards hit her face with fists and kicked her while she was kneeling. Since the

*Bo-wi-bu* facility was again over-crowded, and short of food, she was briefly sent to a labor training center mobile labor brigade for 10 days, then released.

She again fled to China, went hiding in the mountains again, and gave birth to her child. Later in 2004 she made the connections to reach South Korea.

### WITNESS and TESTIMONY: Mrs. Lee Young-suk

*Refouled* at Onsong, April 2006



Mrs. Lee was born in 1971 at Daeheung-ri, Bochun district, Yanggang province and lived in Hyesan in North Korea.

Her husband escaped to South Korea in 2005. In March 2006, she and her four-year-old daughter set out to follow him to South Korea. But Chinese police in Inner Mongolia caught her. Mrs. Lee was taken to the Tumen Yanji Chinese detention center and held 15 days, with three other detainees. Chinese guards strip searched her, confiscated some 600 Yuan (slightly more than 100 US$) and roughed her up to obtain an admission that she was on her way to South Korea. But she would not confess to this.

143





144

When repatriated to Onsong *Bo-wi-bu*, Mrs. Lee and all other women were made to do "stand-up, sit-down jump around" exercises in groups of five persons. Male and female prisoners were packed together inside the small police station. They were interrogated on their whereabouts in China. For 15 days she stayed in the corridor outside of the prison cell row because of her child. A supervisor (*kyo-ho-won*) saw her breast-feeding her 4-year-old daughter and gave her rice. Guards grouped people into 25 and beat them harshly with thick sticks until they confessed that they were attempting to go to South Korea. But Mrs. Lee stuck to her story and did not break. While she was at Onsong *Bo-wi-bu* there were three pregnant women who were taken away, but Mrs. Lee did not know their fate.

She provided the sketch of the Onsong *Bo-wi-bu* interrogation-detention *ku-ryu-jang* holding room within the sketch drawn by Former Prisoner # 37, whose story is told on page 84 above (Former Prisoner # 37 was also detained and harshly tortured at the Onsong police facilities for repatriated border crossers).

Mrs. Lee was sent to the *An-jeon-bu-run* Onsong *ro-dong-dan-ryeon-dae* labor training center for 17 days and then to the Chongjin *jip-kyol-so* detention facility for four days. After this, the police from her hometown of Hyesan came to pick her up and took her there. She was again interrogated by police agents but bribed her release for about 400 Chinese Yuan (roughly 60 $US). When the police came to her for more money she fled again across the river to China.

She arrived in South Korea in 2006.

## WITNESS and TESTIMONY: Former Detainee # 33

### *Refouled* at Onsong, 2004



Former Detainee # 33 was born in 1973 in Kimchaek, North Hamgyong province and raised in Hoeryong city. She worked at the post office but needed more money to support her daughter, so she went to China in 2004. Caught in Yanji only 15 days after arriving in China, Chinese authorities held her at Tumen before repatriating her to the Onsong *Bo-wi-bu*.

The Onsong *Bo-wi-bu ku-ryu-jang* detention-interrogation facility was then very crowded, holding she thought some 200 persons, about four-fifths of whom were women. She could barely lie down in her cell to sleep. Like everyone she was forced to take off all her clothes and do the sit-down-jump up exercise. Guards also followed her to the toilet to make sure she had not hidden any money. After seven days her interrogations began. These sessions took place three to four times a day, every other day.

Interrogators asked the same questions repetitively, to which Mrs. Cho did not answer and thus, was beaten severely. Guards made her kneel down with her hands tied at the front and hit her head with fists and kicked her with their shoes. Each interrogation session lasted only an hour, much shorter than most others. She thinks that her interrogation was shorter

because she was caught only fifteen days after she went to China, and because she kept falling to the ground in pain from the beatings. They mainly asked her who had helped her to go to China, particularly, which border guards, but she refused to answer, which is why they beat her.

Food was in short supply, and detainees who were being held for longer periods already looked malnourished. A number of the women detainees were pregnant. Although Mrs. Cho did not see abortions herself, she witnessed guards beating pregnant women and yelling at them for their half-Chinese babies.

After 25 days, the local *Bo-an-so* (police station) police from Hoeryong, where she had been living, came for her. They took her to a local clinic and then sent her back home. She again fled to China, and arrived in South Korea in December 2007.

## WITNESS and TESTIMONY: Former Detainee # 35

### *Refouled* at Onsong, 2007



Born in 1979 in the Musan district of North Hamgyong province, Former Detainee # 35 went to China in May 1998 to find his mother and sister who had fled to China a year earlier.

But unable to locate his family, as a loyal citizen, he returned to North Korea to vote in the election for the Supreme People's Assembly. En route back home, he was caught by a security agent in Musan in August of 1998. Under interrogation at the Musan *Bo-wi-bu ku-ryu-jang* interrogation-detention facility, he was beaten with wooden poles if he failed to answer questions "correctly."

Because of overcrowding at the Musan *Bo-wi-bu* police station, he was sent to a Musan *Ro-dong-dan-ryeon-dae* mobile labor brigade for ten days in October 1998. There, he and the other prisoners were subjected to an intensely demanding labor project demolishing an iron reinforced concrete building with hammers, leaving his hands covered with blisters. Severely underfed, he suffered from constant hunger. During and after their "meal" of corn gruel, the detainees had to sing patriotic songs and shout out propaganda slogans. The worst though were the freezing cold, blanket-less nights as he was still wearing only the summer clothes he had on coming back from China. At the mobile labor brigade, he observed a pregnant woman being taunted about her "Chinese seed" for her unborn child, whom they named "Kim Cho (North Korea)-joong(China)," before forcing her to abort the half-Chinese baby. Former Detainee # 35 saw other pregnant women beaten by the guards as well.

Released from the mobile labor brigade in April 1999, he went back to China again in search of his mother and sister. Through an acquaintance from his first visit to China, he found his family and lived in China for eight years without getting caught, even taking a Chinese wife in 2002. But in 2007, he was reported to the police by another Chinese acquaintance, apprehended and repat-

The Hidden Gulag Second Edition

### *Rodongdanryondae* Mobile Labor Brigade
#### Musan–kun, North Hamgyong Province



### *Anjeonbu* Police *Kuryujang* Interrogation–Detention Facility
#### Musan-kun, North Hamgyong Province



The Hidden Gulag Second Edition

riated at Onsong and delivered to the *Bo-wi-bu ku-ryu-jang* interrogation-detention facility.

There, he was held for 21 days in a very small cell; it was so crowded that the prisoners had to sleep on their sides squeezed against each other. During interrogation, he was asked the usual questions about meeting South Koreans or Christians in China, and required to write down his life history. When he was slow to answer interrogators' questions about his written history, he was beaten on the legs.

In March 2007 he was transferred to the Onsong *An-jeon-bu* interrogation-detention facility for one day. Then he was transferred to the Onsong *ro-dong-dan-ryeon-dae* mobile labor brigade for two days, where he was slapped and punched during additional interrogations. He was again transferred to the Chongjin provincial *do-jip-kyul-so* detention facility for about 20 days where he was again beaten with sticks and chairs before being transferred to his Musan hometown *An-jeon-bu* police station. His health, by this point, was so bad he was immediately put on trial, lest he die in detention. His "trial" lasted less than an hour, during which time his "lawyer" offered no defense, and in late April 2007, Former Detainee # 35 was sentenced to two years at the Musan *ro-dong-dan-ryeon-dae* mobile labor brigade.

Through the help of family friends, he escaped after 20 days and immediately again fled to China. He rejoined his wife, regained his health, and met up with his mother. She had also been caught by Chinese police and repatriated in 2004 whereupon, she was imprisoned for a year at the Oro *kyo-yang-so* prison for women, described on page 91.

Former Detainee # 35 drew sketches of the Musan Mobile labor brigade and the Musan *An-jeon-bu* police detention-interrogation facility.

# PART FIVE

# SUMMARY OF TORTURE AND INFANTICIDE INFORMATION

## Torture

According to almost all of the former prisoner testimony gathered for this report—from Ali Lamada's 1967 Sariwon prison testimony to the post-2000 testimonies of North Koreans forcibly repatriated from China—the practice of torture permeates the North Korean prison and detention system. Because it is so widespread and systematic, it clearly is not the work alone of sadistic elements, but reflects state policy intended to punish, degrade, intimidate and humiliate the prisoners in an effort to root out political disloyalty, connections to South Korea or belief in banned religions. At the same time, the practice of torture is intended to help amass widespread confessions that demonstrate threats to state security, thereby rationalizing or making essential constant vigilance, police presence and the use of torture. Notwithstanding, awareness that torture involves serious human rights transgressions has also led to the practice of requiring prisoners to discipline and beat other prisoners.

The following summary shows that torture is practiced in many prisons and detention facilities:

148

• Shin Dong-hyuk witnessed beatings of children at his primary "school" and saw his mother subjected to "kneeling motionless" punishments in the field for failing to meet work quotas. He himself was subjected to prolonged and systematic torture, including burnings and skin piercings, in an interrogation-punishment cell within *Kwan-li-so* Prison Camp No. 18. Also, he was required to sit in the front row to observe the public execution of his mother and brother, and his finger was cut off at the knuckle for an accidental error during his forced labor in a textile factory in Camp 18.

• Kim Yong reported that he was beaten at the *Bo-wi-bu* police jail at Maram and was subjected to water torture and hung by his wrists in the *Bo-wi-bu* police jail at Moonsu in 1993. Both jails are located in Pyongyang. He reports that his mother was beaten severely for being late in returning from gathering edible weeds just outside the gates of Camp No. 18.

• Kang Chol-hwan reported the existence of separate "punishment cells" within *Kwan-li-so* No. 15, Yodok, from which few prisoners returned alive.

• An Hyuk was subjected to sleep deprivation and "sitting motionless" torture for days at a time during the year-and-a-half he was detained at the Maram *Bo-wi-bu* police *ku-ryu-jang* interrogation-detention facility in the Yongsong section of Pyongyang, prior to being deported to Camp No. 15.

• Kim Tae-jin reported that he was beaten, deprived of sleep, and made to kneel motionless for many hours at the *Bo-wi-bu* police detention/interrogation facility in Chongjin in late 1998/early 1999, prior to being deported to Camp 15.

• Lee Young-kuk reported that he was subjected to motionless-kneeling and water torture and facial and shin beatings with rifle butts at a *Bo-wi-bu* interrogation/detention facility in Pyongyang in 1994, leaving permanent damage in one ear, double vision in one eye, and his shins permanently bruised and discolored.

• Former Prisoner # 27 had his front teeth knocked out from beatings administered at the Chongjin *Bo-wi-bu* police office following his repatriation at Onsong.

• Kim Eun-chol lost teeth and has permanent scars on his head, ears, and knees from beatings with wooden staves and rifle cleaning rods at the Musan *Bo-wi-bu* police detention facility.

• Jung Gwang-il lost teeth and has head scars from beatings with wooden staves. He was also subjected to prolonged food deprivation and "pigeon torture" with his arms pinned behind his back and attached to cell bars in ways that made it impossible either to stand up or sit down during his detention at the Hoeryong *Bo-wi-bu* police interrogation-detention facility.

• Former Prisoner # 28 was beaten in the face with rulers and books at a *bo-wi-bu* police interrogation facility in Pyongyang. She was also subjected to the "kneeling motionless" torture for days, causing her legs to swell painfully. This was alternated with being forced to do deep knee bends with her fingers outside the bars of the cell. When she could not continue the deep knee bends she was beaten on the fingers.

• Former Prisoner # 29 lost teeth to beatings while a teenage pupil at a school in *Kwan-li-so* Camp No. 18.

149

The Hidden Gulag Second Edition

• Ahn Myong-chol, a former guard, reported that all three of the *kwan-li-so* at which he worked had isolated detention facilities in which many prisoners died from mistreatment, and that at *Kwan-li-so* No. 22 there were so many deaths by beatings from guards that the guards were told to be less violent.

• Former Prisoner # 37 was beaten at the Onsong *An-jeon-bu* police facility during his six month interrogation prior to being tried and sentenced to Chongo-ri *kyo-hwa-so* for smuggling food back and forth from China.

• Seo Jin was beaten so badly with wooden staves at the Onsong *Bo-wi-bu* interrogation center, and again at the Musan *Bo-wi-bu* interrogation center, that she could hardly walk. After transfer to the Musan *An-jeon-bu* detention facility, she was beaten by younger women guards when she objected to her third vaginal examination. And she was kicked on the legs and beaten on the back by guards at the Oro *Kyo-yang-so* penitentiary No. 55 when she did not keep up the required pace in her prison labor.

• Former Prisoner # 31 was whipped with a belt by male guards at the Onsong *Bo-wi-bu* interrogation facility, and severely beaten on her legs and back when,  because of severe malnutrition, she was unable to maintain the pace of her prison labor.

• Bang Mi-sun was severely beaten on her legs with a wooden stave because she could not keep up with the work pace at the Musan *An-jeon-bu-run ro-dong-dan-ryeon-dae* mobile labor brigade owing to injuries she suffered while trafficked in China prior to her repatriation. Infection from this beating left her partially crippled. At the

Musan *An-jeon-bu* pre-trial detention *ku-ryu-jang*, she and other prisoners were required to sit motionless for days, with fellow detainees forced to beat other detainees who moved.

• Yoo Chun-sik was beaten while being hung upside down at the Onsong *An-jeon-bu* run mobile labor brigade. He was kicked, beaten and subjected to the sitting-motionless torture at the Sinuiju *Bo-wi-bu* interrogation-detention facility. Additionally, he witnessed beatings of other prisoners at *Kyo-hwa-so* No. 22.

• Ji Hae-nam confirmed the existence of grossly undersized punishment cells at *Kyo-hwa-so* No. 1 where detainees could not stand up or lie down and where beatings and kicking of women prisoners were a daily occurrence in the mid-1990s. She also reported beatings during interrogation or for prison regulation infractions that she experienced in late 1999 at the Sinuiju *Bo-wi-bu* interrogation-detention facility. She was forced to kneel motionless, was hit with broomsticks and required to do stand-up/sit-down positions to the point of collapse, in her case thirty to forty minutes.

• Lee Soon-ok reported that she experienced beatings, strappings, and water torture leading to loss of consciousness, and was held outside in freezing January weather at the Chongjin pre-trial detention center in 1986. The beatings and brutalities in the early-to mid-1990s at Kaechon women's prison, *Kyo-hwa-so* No. 1, recorded in her prison memoirs are too numerous to detail here.

• Following repatriation, Koh Jeon-mi was beaten so severely on the head at the North Pyongan province *Bo-wi-bu* detention facility that she was unconscious for ten days and required hospitalization.

150

• Following repatriation, Lee Yoo-keum was beaten at the Sinuiju *An-jeon-bu* detention facility.

• Following repatriation, Kim Myong-ho was hit and kicked at the Sinuiju *Bo-wi-bu* interrogation-detention facility and then subjected to even more extreme sitting-motionless torture during which he was hit on the fingers or knees if he moved even slightly.

• Following repatriation, Former Detainee # 34 lost a tooth from beatings on the face at the Hoeryong *Bo-wi-bu* interrogation-detention facility, though, like other former prisoners, he describes the sitting-motionless torture as much more painful.

• Former Detainee # 32 was hit in the face and kicked while kneeling at the Onsong *Bo-wi-bu* facility in March 2004.

• Lee Young-suk witnessed other detainees being beaten with thick staves at the Onsong *Bo-wi-bu* detention facility, though she herself was not beaten as she was detained along with her young child whom she was breast feeding.

• Former Detainee # 33 was hit in the face and kicked by Onsong *Bo-wi-bu* interrogators because she refused to identify North Korean border guards who had assisted her flight to China. She witnessed beatings of pregnant women for carrying "Chinese babies."

• Former Detainee # 1 was beaten unconscious for hunger-related rule infractions in 1997 at the Nongpo *jip-kyul-so* detention center in Chongjin City. He also reported that detainees there were beaten with shovels if they did not work fast enough.

• Former Detainee # 3 reported the use of an undersized punishment box at the Danchun prison camp in which camp rule-breakers were held for fifteen days, unable to stand up or lie down. He also reported that beatings of prisoners by guards were common.

• Former Prisoner #6 reported that prisoners were beaten to death by prison work unit leaders at Danchun *Kyo-hwa-so* No. 77 in North Hamgyong province.

• Former Detainee # 8 reported that male prisoners were beaten by guards at the Chongjin *jip-kyul-so* in mid-2000.

• Former Detainee # 9 reported that detainees at the Onsong *ro-dong-dan-ryeon-dae* mobile labor brigade were compelled to beat each other.

• Kim Sung-min reported that in 1997 at the Onsong *Bo-wi-bu* detention center, his fingers were broken and he was kicked and beaten on the head and face until his ears, eyes, nose, and mouth bled.

• Ryu Young-il saw, in 1997, that out of six persons in an adjacent cell in the *bo-wi-bu* interrogation facility where he was detained in Pyongyang, two were carried out on stretchers, two could walk only with the assistance of guards, and two could walk out by themselves. Detainees who moved while they were supposed to be sitting motionless and silent for long periods were handcuffed from the upper bars of their cells with their feet off the floor. Detainees who talked when they were supposed to be sitting motionless and silent were compelled to slap and hit each other.

• Former Prisoner # 12 reported that at Hoery-ong *kyo-hwa-so* in the early to middle 1990s, minor rule-breakers were beaten by their cell-mates on the orders of the guards, and major rule-breakers were placed in a 4x4 foot punishment cell for a week or more.

• Lee Min-bok reported being beaten "many times" on his fingernails and the back of his hands with a metal rod during interrogation at the Hyesan detention center in 1990. He also reported that at the Hyesan *An-jeon-bu* detention facility, where he was subsequently held, prisoners were compelled to beat each other. Lee witnessed one prisoner, Kim Jae-chul, beaten to death.

• Former Detainee # 15 reported that he was beaten with chairs and sticks at both the Hoery-ong and Onsong *An-jeon-bu* detention facilities in early 2002.

• Former Detainee # 21 reported that she was beaten unconscious in mid-1999 at the *An-jeon-bu* detention/interrogation facility at Onsong, where detainees were beaten so badly that they confessed to doing things they had not done. Women were hit on their fingertips. She witnessed one very ill woman compelled to do stand-up/sit-down repetitions until she passed out and died.

• Former Detainee # 22 reported that he was beaten with chairs at Onsong *Bo-wi- bu* police jail in late 2001 and beaten even worse at the Chongjin *An-jeon-bu* detention center in early 2002.

• Former Detainee # 24 reported that there were beatings at the *Bo-wi-bu* police jail in Sinuiju in January 2000.

• Former Detainee #25 reported that one woman, a former schoolteacher who had been caught in Mongolia and repatriated to China and North Korea, was beaten nearly to death at the Onsong *An-jeon-bu* detention center in November 1999 and then taken away either to die or, if she recovered, to be transferred to *Kyo-hwa-so* No. 22.

• Former Detainee # 26 was made to kneel motion-less at the Onsong *Bo-wi-bu* police jail in June 2000 and was made to sit motionless for six days at the Hoeryong *Bo-wi-bu* police jail in July 2001.

• Former Detainee # 28 reported that prisoners were beaten to death at the *Kyo- hwa-so* No. 12 at Chongo-ri in North Hamgyong province in 1999.[113]

## Racially Motivated Forced Abortion/Infanticide

Former prisoners interviewed for this report provided testimony about forced abortions and killings of babies at the *kwan-li-so* political penal labor colonies, where, except for a very few privileged couples, the prisoners were not allowed to have sex or children. There are also reports of killings of pregnant women who had been raped or coerced into sex by prison guards. However, this report focuses on the forced abortions and infanticide against and inflicted on women forcibly repatriated from China because of the racial and policy components of these atrocities. The women impregnated by Chinese men were routinely punished and their babies

---

113  For additional information on torture, see *North Korea: Republic of Torture*, Citizen's Alliance for North Korean Human Rights, Seoul, 2007.

The Hidden Gulag Second Edition

killed, accompanied by racial slurs and refusal to accept children who were part Han Chinese.

### Sinuiju, North Pyongan Province

• Choi Yong-hwa assisted in the delivery of babies, three of whom were promptly killed, at the Sinuiju *do-jip-kyul-so* (provincial detention center) in mid-2000. The explanation given was that "no half-Han [Chinese] babies would be tolerated."

• Yoo Chun-sik reported that four pregnant women at the *bo-wi-bu* National Security Agency police station in Sinuiju were subjected to forced abortions in mid-2000.

• Former Detainee # 24 helped deliver seven babies who were killed at the Bakto-ri, South Sinuiju *An-jeon-bu* police detention center in January 2000. A doctor explained that since North Korea was short on food, the country should not have to feed the children of foreign fathers.

### Chongjin

• Former Detainee # 8 witnessed six forced abortions at Chongjin *do-jip-kyul-so* in mid-2000.

• Former Prisoner # 35 was informed by another prisoner that in 2002 a repatriated pregnant woman at the Chongjin *jip-kyul-so* was subjected to a forced abortion because she could not prove that the father was Korean rather than Han Chinese.

• Former Detainee # 25 witnessed four babies killed at Nongpo *An-jeon-bu* police detention

center in Chongjin in late 1999 and another six pregnant women subjected to forced abortion. The women were told they would not be allowed to leave the detention center still carrying "children of betrayers" in their wombs.

• Former Detainee # 26 witnessed three forced abortions and seven babies killed at the Nongpo *jip-kyul-so* detention center, Chongjin City, in May 2000. The guards insisted that the mothers see and hear the babies die because the babies were Chinese

### Hyesan, Yanggang Province

• Following her repatriation in November 2004, Lee Chun-shim, a former nurse in the North Korean army, observed in the detention facility for repatriated persons multiple abortions through the injection of the concentrated form of the drug ravenol into the womb of the pregnant women. To her surprise, even three to four month premature fetuses were born crying and moaning, but the fetuses were wrapped in newspapers and put in a bucket until buried in a yard behind the jail. North Korean guards reportedly cursed the women as "bitches who got Chinese sperm and brought this on themselves."

### Onsong, North Hamgyong Province

• Former Detainee # 21 reported two baby killings at the Onsong *An-jeon-bu* police station in late 1999.

• Former Detainee # 9 witnessed ten forced abortions at Onsong *ro-dong-dan-ryeon-dae* mobile labor brigade in mid-2000.

• Former Prisoner # 31 witnessed pregnant women losing their babies from stress during interrogations at the Onsong *Bo-wi-bu* detention facility in 2003. A few women gave birth while in the jail. Other pregnant women were taken to the hospital, but it is not known if they were forced to abort or allowed to give birth.

• Former Prisoner # 37 was informed by another detainee at the Onsong *An-jeon-bu* interrogation facility in 2003 of a pregnant woman who aborted after being kicked in her stomach by guards.

• Ms. Moon-suk witnessed the infanticide of a baby born in the Onsong *Bo-wi-bu* interrogation facility in 2003. The mother was beaten for begging for the life of her baby. Other pregnant women were cursed and slapped around for having received "foreign seed" and taken to a hospital, presumably for abortions.

• In 2004, Former Detainee # 32 carefully hid her five-month pregnancy at the Onsong *Bo-wi-bu* detention facility, as she feared a forced abortion if the police observed or learned of her pregnancy.

**Musan, North Hamgyong Province**

• In 1998, Former Prisoner # 35 saw guards insulting a pregnant woman at the Musan *ro-dong-dan-ryeon-dae* mobile labor brigade for receiving "Chinese seed" after which the woman was subjected to forced abortion. He saw other pregnant women slapped around by guards.

• Mrs. Bang Mi-sun observed ten pregnant women in early 2002 taken to a hospital from the Musan *An-jeon-bu* detention facility for the purpose of aborting their "half-Chinese babies." Another seven month pregnant woman adamantly refused to go to the hospital and guards compelled male prisoners to jump on her stomach until the woman aborted on the floor. The woman was then taken to the hospital where she died.

• In early 2004, Mrs. Seo Jin saw pregnant women being led away from the Musan *Bo-wi-bu* detention facility. Their destination was kept secret, but following her own release she learned that several women escaped from the hospital.

154

The Hidden Gulag Second Edition

# ROME STATUTE OF THE INTERNATIONAL CRIMINAL COURT

## ARTICLE 7

1. For the purpose of this Statute, "crime against humanity" means any of the following acts when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack:

a.      Murder;

b.      Extermination;

c.      Enslavement;

d.      Deportation or forcible transfer of population;

e.      Imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law;

f.      Torture;

g.      Rape, sexual slavery, enforced prostitution, forced pregnancy, enforced sterilization, or any other form of sexual violence of comparable gravity;

h.      Persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender, … or other grounds that are universally recognized as impermissible under international law in connection with any act referred to in this paragraph or any crime within the jurisdiction of the Court;

i.      Enforced disappearance of person;

j.      The crime of apartheid;

k.      Other inhumane acts of a similar character intentionally causing great suffering or serious injury to body or to mental or physical health.

Adopted by the United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, Rome, Italy. Entered into force June 2002.

155

## PART SIX

## CONCLUSION: THE NORMATIVE AND LEGAL FRAMEWORK FOR ANALYZING HUMAN RIGHTS VIOLATIONS IN NORTH KOREA

The first edition of *Hidden Gulag*, published in 2003, evaluated human rights problems in the DPRK using the international human rights standards contained in the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, and the subsequent series of declarations and conventions dealing with particular phenomena of repression—such as torture and the persecution of particularly vulnerable groups such as women, children, and refugees. Based on these international norms and standards, that report outlined "a consistent pattern of gross violations of internationally recognized human rights" or, more simply, "gross violations."

The present, second edition, continues to use the evaluative framework of international human rights law.[114] However, just as the first edition of *Hidden Gulag* was being readied for publication, an additional normative and legal framework for evaluating especially severe "gross violations" was taking effect: the Rome Statute of the International Criminal Court. The Rome Statute contains a revised and updated definition of "crimes against humanity" that takes into fuller account contemporary phenomena of severe repression.

There has long been a considerable gap in the normative human rights framework between "gross violations" (serious contraventions of the standards set forth in the twin International Covenants) and "genocide" (as defined in international law). This normative framework failed to adequately provide for a variety of atrocities that are more severe and atrocious than "violations," but do not constitute "genocide," which is narrowly defined in the Convention on the Prevention and Punishment of the Crime of Genocide as the intentional destruction in whole or in part of a national, ethnic, racial or religious group, as such.[115]

It was recognized in the 1980s and 1990s that various atrocities and very severe violations were insufficiently delineated and proscribed in the twin Covenants when they were being negotiated in the 1950s and 1960s. Examples of insufficiently delineated phenomena of repression in existing international human rights legal instruments include, for example, "enforced disappearances" (extra-judicial abductions by state authorities, followed by *incommunicado* detention and, often, secret political killings),[116] "extra-judicial executions" (political killings and civilian massacres by State authorities without any trials or judicial proceedings), deportations and prolonged detention without trial,[117] and

---

114  See, for example, the listing of the Articles of the International Covenant on Civil and Political Rights violated in the process of arbitary detention on page 160.

115  Recognition of this normative gap was occasioned in part by the massacres in Guatemala in the mid-60s, Uganda in the 1970s and the wholesale slaughter in Cambodia under Khmer Rouge rule in the mid-to-late 1970s. These atrocities were clearly much worse than the standard "gross violations." But there was doubt and debate about whether or not such terrible and large scale massacres constituted "genocide" as defined in the 1948 Genocide Convention, with its omission of "political groups," its failure to cover "cultural genocide," and its restrictive "as such" intent provision.

116  A practice used by military dictatorships in the "dirty wars" in the southern cone of Latin America.

117  Such as the "B category" prisoners on Buru Island in Indone-

"ethnic cleansing" (deportations of ethnic or religious minorities from areas where they were previously lawfully resident).[118]

The ad hoc tribunals for Rwanda and Yugoslavia that were established by the UN Security Council in the early and mid-1990s recognized and tackled these gaps in the international human rights normative, legal, and analytical framework. Subsequent multilateral treaties such as the International Convention for the Protection of all Persons from Enforced Disappearance also tackled these gaps. And the normative gaps noted above were addressed in the 1997 negotiations to draft the Statute for the International Criminal Court (ICC). These juridical proceedings and diplomatic and legal negotiations made an invaluable adjustment to the normative framework for analyzing contemporary phenomena of repression: an inclusionary and more workable definition of "crimes against humanity."

The Nuremberg Tribunal placed crimes against humanity in the context of international armed conflict—atrocities committed against civilians in a time of war (in parallel with war crimes, which were atrocities committed against enemy combatants in time of war). The International Criminal Tribunal for the Former Yugoslavia (ICTY) retained the connection to armed conflict, but the armed conflict no longer needed to be international in character. The International Criminal Tribunal for Rwanda (ICTR) established no connection to armed conflict. At the Rome negotiations for the statutes of a permanent international criminal court, the link to armed conflict remained severed. Drawing heavily on what jurists and legal scholars refer to as customary international law and the judicial rulings and determinations of the ad hoc tribunals for Rwanda and Yugoslavia, "crimes against humanity" were defined as: murder; extermination; enslavement; deportation or forcible population transfer; imprisonment or severe deprivations of physical liberty (in violation of fundamental rules of international law); torture; rape or sexual slavery; persecution on political, racial, national, ethnic, cultural, gender or religious grounds; enforced disappearances; apartheid; and other inhumane acts of a similar character when knowingly committed as part of a widespread or systematic course of conduct against a civilian population in furtherance of state policy.

These phenomena of repression—now recognized and proscribed as atrocity crimes—are part and parcel of the systems of repression described by the former prisoners and torture victims interviewed for this report, in addition to a very large number of "gross violations" of the norms and standards set forth in the International Covenants. As noted above, this updated normative framework entered into force as the first edition of *Hidden Gulag* was being readied for publication. The present edition is able to use the updated normative framework and incorporate the judgments and proceedings of the Ad Hoc Tribunals and the standards set forth in the Rome Statute of the International Criminal Court, which, as of November 2011, has been signed by 139 UN Member States and ratified by some 117.

---

sia, to which tens of thousands were deported and detained in the late 1960s and 1970s because the Indonesian government admitted, there was no evidence of criminal acts that could be used to bring these people to trial.

118  As practiced in the Balkan conflicts in the early 1990s.

Jurisdictional issues would likely prevent the International Criminal Court from holding those most responsible for the atrocities in North Korea accountable.[119] That said, the provisions of the Rome Statute defining crimes against humanity in the contemporary era provide clear terms of reference and an invaluable framework for analyzing the consistent pattern of gross violations that are documented in this report. The fact that the Rome Statute has been recognized by three-quarters of the member states of the UN means that the norms and standards so recognized will become part of what lawyers call "customary international law" applicable to all nation states, and hence, usable as a framework for analysis for this report.

Specifically, ten of the eleven prohibited criminal actions and the introductory provision setting out the overarching requisite circumstances[120] for crimes against humanity in the Rome Statute provide a clear and precise framework for analyzing, step-by-step, the succession of gross, now criminalized, violations that take place in the *kwan-li-so* political prison-forced labor camps in the DPRK. These criminal actions are summarized below. They can be tracked throughout the stories and testimonies of the former *kwan-li-so* prisoners interviewed for this report.[121]

This analysis also applies to some of the persons imprisoned and subjected to forced labor in the *kyo-hwa-so* camps and penitentiaries who have been detained, without trial, for what are internationally recognized as essentially political, not criminal, acts.[122]

The terms and provisions of Article 7 of the Rome Statute, which defines crimes against humanity, also apply to the serial atrocities inflicted by the DPRK authorities on the North Koreans who are forcibly repatriated from China, as can be seen, step-by-step, atrocity-by-atrocity, in the testimonies of the forcibly repatriated persons summarized in this report.

## Clear and Massive Crimes against Humanity: The *Kwan-li-so* Political Penal Labor Colonies

In the Democratic People's Republic of Korea, crimes against humanity are committed against persons sent to the political penal labor colonies. Evidence shows that:

1. Perceived or suspected "wrong-doers" or "wrong-thinkers," or in some instances, persons with "wrong-knowledge,"[123] and/or their family members are subjected to enforced disappearance. These persons are picked up by police officials

---

119  ICC Jurisdiction would require DPRK accession to the Rome Statute or a referral from the UN Security Council, the latter of which is subject to a veto by China or Russia.

120  What lawyers call the "*chapeau*."

121  For more detailed applications of Article 7 of the Rome Statute to the *kwan-li-so* system of political imprisonment and forced labor in North Korea see Vaclav Havel, Kjell Bondevik and Elie Wiesel, *Failure to Protect: A Call for the UN Security Council to Act in North Korea*, DLA Piper and the Committee for Human Rights in North Korea, Washington DC, 2006; *Concentrations of Inhumanity*, Freedom House, New York, 2007; and *North Korea: A Case to Answer, A Call to Act*, Christian Solidarity Worldwide, London, 2007.

122  It should be noted that the kyo-hwa-so system in North Korea also incarcerates persons tried and convicted for violations for what are internationally recognized criminal acts, and properly specified as such in the DPRK Criminal Law and Criminal Procedures Code.

123  For example, some of the North Korean diplomats who were posted to Eastern Europe, and North Korean students who were studying in Eastern Europe at the time of the collapse of the communist regimes, were recalled to the DPRK and immediately sent to the labor camps to prevent knowledge about the collapse of the DPRK's socialist allies from spreading to the general public.

from the DPRK State Security Agency,[124] which refuses to acknowledge the deprivation of freedom and refuses to provide information on the fate or whereabouts of those persons with the intent of removing those persons from the "protection of law" for a prolonged period of time.[125]

2. The abducted persons are subjected to deportation or forcible transfer[126] from the area in which they were lawfully present[127] without grounds permitted under international law.[128]

3. The abducted and deported persons are deposited at distant, remote, penal labor colonies or encampments, where they are subjected to "imprisonment or severe deprivation of physical liberty in violation of fundamental rules of international law."[129] These abductions, deportations and the subsequent imprisonments all take place without any judicial process. There is no arrest, charge, trial, conviction or sentence, as provided in the DPRK Criminal Code and the DPRK Criminal Procedures Code. Perceived or suspected criminals are entitled to judicial proceedings conducted in accordance with *due process* and fair trial as detailed in Article 14 of the International Covenant on Civil and Political Rights (ICCPR), in international law, and in the

legal systems of most nations around the world. "Wrong-thinking" is not recognized in international law as a permissible criminal offense. The practice of forcible transfer and imprisonment of the children and/or grandchildren of perceived (though untried and unconvicted), "wrong-doers" or "wrong-thinkers" is far outside the permissible grounds of international law. These are blatant violations of Article 9(1) and (4) of the ICCPR, "…no one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedures as are established by law… Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that such court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful."

4. The prolonged, indefinite detention of family members is a violation of Article 26 of the ICCPR, "…the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status." The imprisonment of family members amounts to what the ICC Statute terms as "persecution." Most family members of suspected wrong-doers or wrong-thinkers are detained for the rest of their lives in sections of the prison camps termed "total control zones." The small numbers who are released from sections of the prison camps termed "revolutionizing process zones" are subjected to discrimination even after their release.[130] This also is "persecution" within

---

124  The North Korean term for the political police, *Kuk-ga-bo-wi-bu*, is also sometimes translated as the National Security Agency.

125  This is precisely the definition of "enforced disappearance" in Articles 7.1(i) and 7.2(i) of the Statute of the International Criminal Court.

126  ICC Statute, Article 7.1(d).

127  Almost all such persons would have been previously assigned to their former residential areas by state authorities.

128  ICC Statute, Article 7.2(d).

129  ICC Statute, Article 7.1(e). A group of attorneys have enumerated the "fundamental rules of international law" that are violated in "the severe deprivation of physical liberty" within the DPRK political penal labor colonies. See box below.

130  Thus, many former North Korean political prisoners, possessed of a well-founded fear of persecution should they remain

---

## Fundamental Rules of International Law

Articles of the International Covenant on Civil and Political Rights violated in North Korea's political penal labor colonies:

Article 6 (right to life);

Article 7 (right not be subjected to torture or to cruel, inhuman, or degrading treatment);

Article 8 (right not to be held in slavery or servitude);

Article 9 (right not be held in arbitrary detention):

Article 10 (right for all persons deprived of liberty to be treated with humanity);

Article 12 (right to free movement);

Article 16 (right to recognition as a person before the law);

Article 17 (right not to be subjected to arbitrary interference with privacy, family, home or correspondence);

Article 18 (right to freedom of thought, conscience and religion);

Article 19 (right to hold opinion without interference);

Article 21 (right to peaceable assembly);

Article 22 (right to freedom of association);

Article 26 (rights to equal protection and non-discrimination, including on grounds of political or other opinion, birth, or other status.)

*Failure to Protect*, *op cit.*, page 91.

---

the meaning of the ICC Statute. The camp system in its entirety can be characterized as a massive and elaborate system of persecution on political grounds.[131]

5. Once cut off from any contact with the country or world outside of the prison camp, includ-ing former family and friends, the imprisoned persons are subjected, usually for a lifetime, to arduous forced labor under extremely severe circumstances. This begins with the provision of below subsistence level food rations. These prac-tices contravene Article 10(1) of the Internation-al Covenant on Civil and Political Rights, "All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person." The conditions of detention in the labor camps contravene, to an astonishing extent, the UN Standard Minimum

---

in their country of origin (in the language of the 1951 Refugee Convention) flee North Korea in search of refuge abroad after their release from detention. There are hundreds of former North Korean political prisoners now residing in South Korea, sixty of whom were interviewed for this report.

131  ICC Statute, Article 7.1(h) and 7.2(g).

Rules for the Treatment of Prisoners. The forced labor in the prison camps violates Article 8 (3.1.) of the ICCPR, "No one shall be required to perform forced or compulsory labor."[132] As noted, while some forms of prison labor are permitted under international law, exacting such extreme forms of forced labor under such severe conditions has been judged by the Ad Hoc International Criminal Tribunals to constitute enslavement.[133] Food ration policies in the labor camps violate Article 11 of the International Covenant on Economic, Social and Cultural Rights (CESCR). Deprivation of liberty does not negate the right to "adequate food" and "freedom from hunger." Indeed, states have even more direct responsibility (and State Parties to the ICESCR have the legal obligation) to provide "adequate food" to those residing involuntarily in state institutions where such persons are denied the ability to obtain or provide food for themselves and their families.

6. The political penal camp system itself is entirely outside the DPRK legal framework or DPRK laws. North Korean laws and courts do not cover or reach into the prison camps, which are thus "extra-judicial." The prisoners have been "removed from the protection of the law" for the duration of the imprisonment, which for most prisoners is a lifetime. Actions that

should be subject to the law[134] and legal proceedings even when a person is deprived of his or her physical liberty, such as the execution of prisoners, are carried out extra-judicially. These extra-judicial executions, many of which are carried out publicly, constitute murder,[135] a crime against humanity. The executions in the camps, which have been witnessed by virtually all former prisoners interviewed for this report, violate Article 6(1) of the ICCPR, "Every human being has the inherent right to life…No one shall be arbitrarily deprived of his life." The executions in the camps violate Article 6(2) which further stipulates that "for countries which have not abolished the death penalty…this penalty can only be carried out pursuant to a final judgment rendered by a competent court."

7. Prisoners are regularly subjected to beatings and sometimes more systematic torture for infractions of prison camp regulations and during interrogations. "Torture, cruel, inhuman or degrading treatment or punishment" is prohibited by Article 7 of the International Covenant on Civil and Political Rights. Torture and the cruel, inhuman or degrading punishments experienced or witnessed by virtually all former prisoners in the DPRK forced-labor camps are crimes against humanity.[136]

8.On numerous occasions, prisoners compelled to observe executions (which are carried out publicly to demonstrate to other prisoners the severe consequences of escape attempts and/or non-compliance with camp regulations) were also compelled to pass close by and defile the hanging

---

132  Article 8 of the ICCPR further stipulates that when hard labor is punishment for a crime, it must be pursuant to the lawful order of a competent court.

133  See, for example, *Kunarac, Kovac and Vokovic*, Appeals Chambers, International Criminal Tribunal for the Former Yugoslavia (ICTY), June 12, 2002, para. 119 "In determining whether or not enslavement has been established, the indicia of enslavement… include: control of someone's movement, control of physical environment, psychological control, measures taken to prevent or deter escape, force, threat of force or coercion, duration, assertion of exclusivity, subjugation to cruel treatment and abuse, control of sexuality, and forced labor."

134  ICC Statute 7.2(i).

135  ICC Statute 7.1(a).

136  ICC Statute 7.1(f) and 7.2(e).

or slumped-over corpse of the just-executed prisoner. This practice constitutes an "other inhumane act… causing great suffering and injury to… mental health."[137] The severe working conditions imposed on deliberately underfed prisoners, particularly in the mining and lumber processing sectors of the labor camps (which lead to a large number of industrial accidents and deaths) could also be deemed "other inhumane acts."

9. Prison camp officials and guards are regularly able to exact sexual relations with female prisoners under circumstances that have been judged to constitute rape or sexual violence[138] as defined by judges at the Ad Hoc Tribunals, namely, "any act of a sexual nature which is committed on a person under circumstances which are coercive…. [noting further that] coercive circumstances need not be evidenced by a show of physical force. Threats, intimidation, extortion and other forms of duress which prey on fear or desperation may constitute coercion, and coercion may be inherent in certain circumstances."[139]

10. Extermination,[140] as defined by the ICC Statute, "includes the intentional infliction of conditions of life, inter alia the deprivation of access to food and medicine, calculated to bring about the destruction of a part of the population."[141] The high rates of deaths in detention from combinations of malnutrition, starvation, exhaustion (from forced labor) and disease would likely constitute the crime against humanity of extermination in the views of legal scholars and judges[142] to constitute the crime against humanity of extermination.

The high rate of deaths-in-detention is accompanied by a prohibition on procreation by prisoners. With rare exception, young men and women sent to, or growing up in the prison camps, are not allowed to marry or have children.[143] Such pregnancies as inevitably occur are terminated by involuntary abortion and severe punishment for the woman, including execution. It is the clear and stated intention of the political prison camp system to terminate up to three generations of the families of these perceived or imagined opponents of the Kim family dynasty. The prevention of births or the deliberate termination of the family lineage of the scores of thousands of prisoners in the gulag camps would also likely qualify as the crime against humanity of extermination.[144]

11. With the exception of the crime of apartheid,[145] virtually all of the particular criminal acts included within the various iterations of crimes against humanity in modern international law are committed in North Korea. However, while most of these acts are criminal under most domestic laws, penal codes and legal systems of most UN Member States, it is only when these acts are conducted under specified conditions that they become "crimes against humanity." Those conditions

---

137  ICC Statute 7.1(k).

138  ICC Statute 7.1(g).

139  Akayesu, (Trial Chamber, International Criminal Tribunal for Rwanda (ICTR), September 2, 1998, paras. 686-688). ICC Statute 7.1(b).

140  ICC Statute 7.2(b).

141  ICC Statute 7.2(b).

142  See *Failure to Protect*, op cit., pp. 91-93.

143  See pages 48-51 for one such exception.

144  It should be noted that the "intent" (*mens rea*) requirements for extermination are much more manageable than the highly restrictive intent requirements for genocide.

145  ICC Statute, Article 7.1(j): systematic, institutionalized racial oppression (ICC Statute, Article 7.2(h))

The Hidden Gulag Second Edition

apply when these acts are "committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack."

The specific use of the word "attack" reflects the historical association of crimes against humanity with war crimes: war crimes being specified atrocities committed against enemy soldiers or combatants, crimes against humanity being committed against civilians. Hence, the retention of the word "attack."[146]

However, "attack" is carefully defined as "a course of conduct involving the multiple commission of acts [as specifically described above] against any civilian population, pursuant to or in furtherance of State or organizational policy…."[147] And the judges at the UN-established International Tribunals have made further clarifications: "An attack may also be non-violent in nature, like imposing a system of apartheid…, or **extending pressure on the population to act in a particular manner** (emphasis added)."[148]

This is obviously one of the intended consequences of the *kwan-li-so* gulag system in North Korea both for the victim populations in the camps, and for the general population which is well aware of the "people who are sent to the mountains," a euphemism for people who disappear into the prison camps.

12. Prisoners in the *kwan-li-so* camps are subjected to widespread and systematic abuse. "Widespread or systematic" has been defined by judges

at the Ad Hoc International Criminal Tribunals as "massive, frequent, large scale actions, carried out collectively with considerable seriousness against a multiplicity of victims"[149] and as a reference to the "scale of the acts perpetrated and the number of victims."[150] According to the judges of the International Tribunal for Rwanda, "The concept of 'systematic' may be defined as thoroughly organized, and following a regular pattern on the basis of a common policy involving substantial public or private resources."[151]

Further, the judges have noted that the conditions—*widespread or systematic*—are intended to "exclude isolated or random inhumane acts committed for purely personal reasons."[152] It is not required that the inhumane acts be both widespread and systematic. However, any system such as the *kwan-li-so* political prison camp system in North Korea that involves hundreds of thousands of victims, exists over a period of at least forty years, and necessitates thousands of military and police personnel to operate, administer, and control, is obviously both widespread *and* systematic.

13. Lastly, the Statute of the International Criminal Court specifies that to be a crime against humanity the proscribed inhumane acts have to be conducted "with knowledge of the attack."[153] This formulation is the "mental element," "intent" or "guilty mind" (*mens rea*) requirement for crimes against humanity. The purpose of

---

146  ICC Statute, Article 7.1.

147  ICC Statute, Article 7.2(a).

148  *Akayesu*, (Trial Chamber, ICTR, September 2, 1998, para. 581).

149  Ibid, para. 580.

150  *Blaskic*, (Trial Chamber, ICTY, March 3, 2000, para. 206).

151  *Akayesu* (Trial Chamber, ICTR, September 2, 1998, para. 580).

152  *Kayishema and Ruzindana* (Trial Chamber, ICTR, May 21, 1999, para. 122-123, n.28).

153  ICC Statute, Article 7.1.

this provision is to exclude inhumane acts that have occurred accidentally, inadvertently or for personal reasons. In short, it means that the perpetrators had to have known what they were doing and did it on purpose. Obviously, again, the construction and continued operation of a large-scale prison forced-labor camp system is deliberate and purposeful.

These separate and distinct phenomena of repression, now defined in international law as crimes against humanity, are clearly apparent in the testimony and brief biographies of the former prisoners interviewed for this report.

## Serial Atrocities Inflicted on Forcibly Repatriated Koreans

Just as the severe human rights violations perpetrated against hundreds of thousands of North Koreans deported to the political penal labor colonies constitute clear and massive crimes against humanity, there is also a strong case that the series of severe punishments inflicted on North Koreans forcibly repatriated from China exceeds the characterization of "a consistent pattern of gross violations of internationally recognized human rights" and meets the threshold requirements for characterization as crimes against humanity.

As noted above, reflecting 'crimes against humanity's' historic usage as atrocities committed against civilians in time of war, the revised and updated approach retains the wording of such crimes as "a *widespread or systematic* attack

conducted against a civilian population..."[154] While "attack" is defined as a "course of conduct involving the multiple commission of acts against any civilian population, pursuant to or in furtherance of State or organizational policy,"[155] "attack" seems exactly the right word for what the North Korean police agencies do to the DPRK citizens who are repatriated from China, revealed in the testimonies of the formerly repatriated persons.

The threshold requirement for a crime against humanity is that the course of conduct pursued in furtherance of state policy be either systematic or widespread. In the case of the *kwan-li-so* slave labor camps, the practice of processing hundreds of thousands of prisoners over the course of the half-century of the camps' operation is both *systematic and widespread*. The repatriated North Koreans, severely mistreated in the ways detailed in this report, number in the thousands. There are literally hundreds of forcibly repatriated North Koreans who fled the DPRK a second time and now reside in South Korea. And there are hundreds more who again fled to China and who have been interviewed there. These numbers may or may not merit the designation *widespread*.

But the phenomena of repression against the North Koreans forcibly repatriated from China are, on the basis of the available evidence, systematic. While the system of detention-interrogation-torture-and forced labor to which the repatriated persons are subjected, as described in this report,

---

154  ICC Statute, 7.1.

155  ICC Statute, 7.2(a).

is certainly "arbitrary," it is also a well-delineated, well-honed, and carefully coordinated system that operates in the same way in multiple locations along the China-DPRK border. It has been going on for fifteen to twenty years and continues at present. The two North Korean police forces, the *Bo-wi-bu* State Security Agency and the *An-jeon-bu* People's Safety Agency, operate the system together in coordinated ways. And the punishment system operates across a multiplicity of state-operated detention, interrogation and forced labor facilities in dozens of cities and localities in the northern portions of North Korea.

The economic logic of the DPRK state policy is questionable.[156] But the political logic of the North Korean system is straightforward. Leaving North Korea requires written permission from DPRK and/or Korean Workers' Party authorities. And state policy is to severely punish those who have left the country without state or Party authorization, as part of its strenuous efforts to control and limit its citizens' knowledge of the world outside "the Kim Il-sung nation," and prevent them from participating in the booming capitalist cash economy on the Chinese side of the China-DPRK border. Practices include:

1. Repatriated Koreans are detained by DPRK police authorities for having exercised their right to leave their country of origin, a right recognized in Article 13(1) of the Universal Declaration of Human Rights. The imprisonment of repatriated persons— violates Article 12(2) of the International

Covenant on Civil and Political Rights.[157] The UN implementation review committee for this covenant has notified the DPRK of the incompatibility between its policy and practice and the international legal standards North Korea formally accepted. Detention can, for a few people, last only several days. But for many, as is seen in the testimony in this report, imprisonment for having exercised the "right to leave" stretches out into months or years across a variety of harsh penal and brutal forced-labor institutions and facilities. This "severe deprivation of physical liberty" is a direct "violation of fundamental rules of international law."[158]

Most of the detention and related imprisonment takes place without any trial or judicial process. The rare trials that occur fall far short of what international law posits as "fair trial" or "due process."[159]

2. Nearly all repatriated persons interviewed for this report tell of prolonged and repeated kicking and beatings, usually with wooden staves or clubs, or the metal rods used for cleaning rifle barrels (sometimes even prior to the beginning of interrogation to soften-up the prisoners) and other systematic tortures, most commonly the "sitting-still-for-hours" or "kneeling-motionless-for-hours" (sometimes with a circulation-cutting bar between the legs), which the former detain-

---

156  Most countries welcome and some may even rely on the hard currency remittances earned by their citizens who work in neighboring countries, even if those laborers are working abroad without documentation or legal status.

157  Normally, it is the legal obligation of ratifying States Parties to bring their domestic law into conformity with the provisions of the convention acceded to by the State Party.

158  ICC Statute, 7.1(e); Article 9.1 of the International Covenant on Civil and Political Rights.

159  Articles 9.1-4 and 14.3(1)-(7) of the International Covenant on Civil and Political Rights.

ees describe as much more painful than the beatings. These punishments constitute torture, cruel and inhuman treatment and punishment as defined and prohibited in Article 7.1(f) of the Rome Statute and Article 7 of the International Covenant on Civil and Political Rights.

3. The punishments against North Koreans who met South Koreans, watched South Korean movies or television programs, or attended churches while in China would likely constitute a violation of Article 7.1(h) prohibiting "persecution against any identifiable group or collectivity on *political, racial, national, ethnic, cultural, religious*… or other grounds that are universally recognized as impermissible under international law…."

4. Bearing in mind that a large majority of North Koreans repatriated from China are women, several aspects of the violence against women to which they are routinely subjected constitute a number of different crimes against humanity. Virtually all forcibly repatriated women report that they were required to strip naked and go through what they describe as the "sit-down-stand-up-jump-around" routine (comparable to "squat-thrusts" warm-up exercises for athletes) to dislodge any money earned while in China that might have been hidden in rectal or vaginal cavities.

On the face of it, the attempted confiscation itself seems economically illogical and wantonly cruel to the individuals involved. It is clear from their testimony that the women forced to bend over and jump around naked regard this as "inhuman or degrading treat-

ment or punishment,"[160] as is the practice of requiring them to defecate under observation or with their hands in the air so that any ingested valuables cannot be retrieved.[161]

5. The racially motivated infanticide against babies born in custody who are believed to have been fathered by Han Chinese men is a brutal form of ethnic cleansing and constitutes the crime of murder.[162] (As noted in the testimony of former nurses compelled to act as mid-wives in the detention facilities, even many of the forcibly aborted fetuses are "born alive.") In the words of one legal expert, "One particular category of official murder which is singled out for special condemnation by international law is that carried out on racial grounds."[163]

6. The racially motivated forced abortions carried out on repatriated women who are believed to be carrying "half-Chinese" fetuses would likely qualify as "persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender… or other grounds that are universally recognized as impermissible under international law…"[164] The racially motivated

---

160  Article 10 of the ICCPR states that "All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person."

161  The full title of the torture convention is "The Convention Against Torture, and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment," and the full provision of Article 7 of the International Covenant on Civil and Political Rights is "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment…"

162  ICC Statute, 7.1(a).

163  Nigel Rodley and Matt Pollard, *The Treatment of Prisoners under International Law*, (Third Edition), Oxford University Press, 2009, p. 251.

164  ICC Statute, 7.1(h).

abortions forced on these North Korean women would also qualify as a violation of Article 7.1(k) of the Rome Statute prohibiting "Other inhumane acts … intentionally causing great suffering or serious injury to body or to mental or physical health."

7. Seventeen persons interviewed for this report provided testimony on upwards of sixty instances of forced abortion or infanticide between 1998 and 2004 occurring at five different locations along the China-DPRK border in three different kinds of detention facilities (*ku-ryu-jang* police interrogation units, *jip-kyul-so* provincial and sub-provincial detention facilities and *ro-dong-dan-ryeon-dae* labor training centers) operated by two different police forces (both the *An-jeon-bu* regular police and the *Bo-wi-bu* political police).

A recent survey by the Seoul-based NGO, Database Center for North Korea Human Rights (NKDB) of some 460 former North Korean women who fled to China and made their way to South Korea in 2010 and 2011 found that eighteen women had themselves been subjected to forced abortion, and forty women had been eyewitnesses to forced abortions performed on other women, most recently in a Chongjin *jip-kyul-so* police holding facility in 2010. Another 135 women had heard accounts of forced abortion. The NKDB survey shows high levels of forced abortion continuing through 2007, with decreasing levels in 2008, 2009 and 2010. These arose, not from a discernable change in policy, but, rather, from the decrease in the number of North Korean women fleeing to and living in China, and the concomitant diminution in the number of forced repatriations. In addition to the forced abortion

testimony, the NKDB Central Database has information on forty-five cases of reported infanticide, continuing through 2008.[165]

If these testimonies on forced abortion and infanticide are insufficient in number and size to constitute a "widespread" course of conduct against a civilian population in pursuit of state policy, it would seem likely to qualify as "systematic" in terms of the "organized nature of the pattern, that is, the non-accidental repetition of similar criminal conduct and the improbability of their random occurrence… [taking] into account the existence of a political objective.., or an ideology, in the broad sense that contemplates the destruction, persecution or weakening of a community,... the use of public or private resources, the participation of high-level political or military authorities"[166] or as "acts committed…as part of a public policy against a segment of the population, acts committed with the consent of the government…and exceptionally serious crimes of international concern."[167]

165  Lee Ja-Eun, "The Current Human Rights Situation of North Korean Women," paper presented at the Johns-Hopkins School of Advanced International Studies (SAIS), Washington DC, November 15, 2011, pp. 8-9.

166  William Schabas, *The UN International Criminal Tribunals*, Cambridge University Press, 2006, pp. 192-193.

167  M. Cherif Bassiouni, *The Statute of the International Criminal Court: A Documentary History*, Transnational Publisher, Ardsley NY, 1998, p. 398.

# PART SEVEN

# RECOMMENDATIONS

The measures that North Korea could take and the measures that other UN member states should take to encourage North Korea to end the human rights violations documented in this report are outlined in the following recommendations.

The following recommendations are made with that hope or expectation in mind. Many recommendations can and should be implemented on an immediate basis whereas others are part of a longer-term process. Many of the recommendations are based on the international standard to end imprisonment or other severe deprivation of liberty in violation of the fundamental rules of international law.

## I. To the Democratic People's Republic of Korea

Following the death of Kim Jong-il in December 2011, North Korea entered a leadership transition as Kim Jong-un succeeded his father. In due course, North Korea's new leadership constellation might facilitate an altered policy orientation, particularly if the DPRK seeks to achieve the growth and prosperity common to other states in East Asia.

Additionally, North Korea may choose to seek greater integration with the international community and improved relations with neighboring states bilaterally or multilaterally, possibly via a "peace regime" for the Korean peninsula, or possibly through a peace and security mechanism for Northeast Asia in conjunction with progress toward a coordinated effort to resolve the security concerns of all states in the region. In almost all other areas of the world, conflict resolution and the construction of new regional orders for peace, mutual security and cooperation have involved humanitarian and human rights issues and considerations. This certainly should also be the case in Northeast Asia.

### Regarding the *Kwan-li-so* Political Penal Labor Colonies

1. Allow the International Committee of the Red Cross (ICRC) access to the *kwan-li-so* "managed places" that are, in fact, detention facilities as defined by international standards.[168]

2. Stop further *incommunicado* deportations to the *kwan-li-so* "managed places." North Korean citizens suspected of violating North Korean laws should be subject to prosecutions carried out in accordance with both international standards and the DPRK Criminal Code and Criminal Procedures Code, and if convicted, sent to a penal facility as specified in DPRK criminal law and procedure.

3. Immediately release those persons held within the *hyuk-myung-kwa-koo-yeok* "re-revolutionizing

---

168  As many of the following recommendations are addressed directly to the DPRK, the literal English translation of *kwan-li-so* ("managed places") is frequently used herein. Similarly, according to former prisoners interviewed for this report, the formal term used by *kwan-li-so* officials for those held in the "managed places" is not "prisoner" but *e-ju-min* "migrants" or *ju-min* "residents." The English language term "resident" is sometimes used in these recommendations, particularly for the series of measures that would restore to these "residents" the liberties to which they are so severely deprived.

zones" within the labor camps, who are eligible for eventual release. Those persons should be freed immediately according to what the North Koreans term *gwang-bok-jung-chi* ("generous politics") releases or amnesties such as are implemented within the present management system. (Unlike the lifetime deportees in the *wan-jeon-tong-je-koo-yeok* "total control zones" of the *kwan-li-so* "managed places," most of the residents of the "re-revolutionizing zones" retain their ties and connections to North Korean society from which they were summarily deported, and can be re-integrated into North Korean society with relative ease.)[169]

4. Release children and family members deported to the *kwan-li-so* because of *yeon-jwa-je* "guilt by association."[170]

5. Release all other persons deported to and deposited in the *kwan-li-so* "managed places" who have not been convicted of a violation of a specific provision of the DPRK Criminal Code in a North Korean court in the course of a judicial process conducted in accordance with the DPRK Criminal Procedures Code and international standards by which North Korea is bound. Take the measures necessary to enable camp residents to return to their previous place of lawful residence.

6. Prior to the release of persons arbitrarily

detained within the *kwan-li-so* (which will take some time, given the tens of thousands of persons involved), begin a process of restoring the liberties to which the residents in the camps have been so severely deprived. This process should begin with allowing the detained residents to have greater access to the food crops grown within the sprawling encampments. Provide foods sufficient to relieve what former prisoners describe as constant, unrelenting hunger and end the high incidence of deaths in detention from combinations of prolonged and severe malnutrition and disease within the labor camps. Recognizing that "persons deprived of their liberty" are regarded by the United Nations as a "vulnerable group," request that the World Food Program provide residents of the *kwan-li-so* "managed places" with humanitarian food aid, as has been requested for other vulnerable groups within North Korea.

7. End virtual slave labor within the *kwan-li-so* "managed places." Agricultural, mining and industrial laborers, production record keepers, and service workers (such as the women deportees assigned to clean the offices of camp officials and guards) within the *kwan-li-so* should earn the same wages and/or remuneration in goods and services provided to workers in comparable occupations outside of the labor camps—whether the compensation is provided in wages or in food and clothing dispensed by the state-run Public Distribution System (PDS) should the PDS be reconstituted. If markets—the provision of goods and services in exchange for denominations of currency—are being allowed to function in the general society, they should be allowed to function within the encampments as well, on the same terms as markets outside the *kwan-li-so* "managed places."

---

169  See p. 27-28 for descriptions of "re-revolutionizing zones" and the existing release procedures.

170  In his most recent report to the General Assembly, the Special Rapporteur for human rights in the DPRK recommended starting releases with certain categories of prisoners, such as the elderly, those having medical conditions, long-serving prisoners, women who have children and persons imprisoned due to guilt by association. See "Report to the General Assembly," UN Doc. A/66/322, 24 August 2011, para 62.

Ending forced labor should also include reforming prohibitive work hours and unsafe working conditions, taking measures to prevent the large number of industrial and work related deaths and accidents, and requesting that the International Labour Organization (ILO) visit the "managed places"[171] to ensure that working conditions are brought into line with international standards.

8. End the extra-judicial nature of the *kwan-li-so* "managed places" by extending the jurisdiction of the DPRK constitution, Criminal Code, Criminal Procedures Code, and court system to the labor camps and the residents within the *kwan-li-so* "managed places." This measure would extend the "protection of law" provided to North Korean citizens as a whole to the residents of the encampments.

9. Observe and enforce within the areas of the encampments the standards against torture and assault provided for in the updated DPRK legal codes and specified in the international conventions that the DPRK has ratified. This includes preventing prisoners (rather than encouraging them) from assaulting other prisoners for purported failure to maintain daily per capita production quotas.

10. To end the present *incommunicado* nature of residence within the *kwan-li-so* "managed places," the residents therein should be allowed the same correspondence rights and privileges by mail and telephone that most persons deprived of their physical liberty are entitled to in most detention facilities in most countries around the world. Residents of the *kwan-li-so* should be entitled to receive packages by mail (with food, medicines and clothing) from friends, families, and co-workers outside the encampments. They also should be allowed visits by their families and friends.

11. Allow residents within the *kwan-li-so* encampments access to the radio, television, newspapers, magazines, books and motion pictures to which citizens of North Korea are allowed access[172] and to which many persons deprived of their physical liberty are entitled in detention facilities in other countries around the world.

12. Until such time when all children are released from the *kwan-li-so*, provide them with education through the middle and high school levels. Use the same learning curricula for primary schools within the *kwan-li-so* that are used outside the encampments.[173] Make the schools within the encampments places of learning rather than organizational focal points for child labor projects.

---

171  Prior to the economic collapse in the 1990s, North Korea made very little use of money as a medium of exchange or store of value. Citizens were assigned to houses and jobs and provided with food and clothing via the state-run Public Distribution System (PDS), the quantity and quality determined in part by occupation and in part by *songbun* socio-political status rankings. During the famine, when the PDS lacked food to distribute to the populace, various barter arrangements emerged followed by markets without government planning or approval. The regime has repeatedly taken measures to restrict or close the markets, and confiscate currency in the hands of the populace. However, these measures have not succeeded, and the use of money and markets has continued.

172  As the country with the single most restrictive approach to freedoms of expression and opinion, the DPRK does not allow the general North Korean population access to any newspapers, magazines, books, radio or TV programs that are not produced or authorized by the Party, the government bureaucracy, or the army. The recommendation above is that the residents of the camps should be allowed the same limited access to newspapers, magazines, radio and TV programs as the rest of the North Korean population.

173  For example, former child prisoners who attended primary schools within the camps report they were only taught simple mathematical addition and subtraction, but not multiplication or division. See p. 48.

13. As long as the present labor camp system remains in operation, fully restore the right to marry persons within the encampments. Allow men and women to select husbands and wives of their own choosing, to marry with legal recognition, and to have children and live together as families.

14. Finally, to fully restore the liberties that are so severely lacking for camp residents, the residents of the encampments should be allowed the same, albeit limited, internal travel within the DPRK as North Korean citizens are otherwise allowed.

It is important to note that there is an existing model within North Korea for the above series of recommendations in the *hae-je-min* (cleared people) arrangement at Camp No. 18 at Bukchang, South Pyongan province, described on pages 213 to 218 of this report, where former prisoners who have been "cleared" continue to remain at the camp. (Most of those who remain were subjected to *incommunicado* detention for multiple decades and have lost connections with their former residences and places of work [the latter connection is needed for access to the Public Distribution System]. Rather than face unemployment and itinerant homelessness, these former prisoners chose to remain in the camps but with the [albeit limited] rights and freedoms of communication and travel available to the general public).[174]

---

174  See the story of Mrs. Kim Hye-sook, page 70 above, for a prisoner released after almost three decades of *incommunicado* detention and who was subsequently unable to find a local North Korean authority who would provide her with a residence, job and registration with the PDS, and who then, to survive, resorted to cross border trading with China for which she was arrested by the local police.

## Regarding the *Kyo-hwa-so*, *Jip-kyul-so*, and *Ro-dong-dan-ryeon-dae* Penitentiaries, Prisons and "Labor Training" Facilities

15. Release all persons in detention who have not been charged and tried according to provisions of the DPRK criminal codes, and convicted in a DPRK court of law operating under international standards for due process and fair trial.

16. Bring all prisons and places of detention in line with the provisions of the UN Standard Minimum Rules for the Treatment of Prisoners and the UN Body of Principles for the Protection of All Persons under any Form of Detention or Imprisonment. (See the Appendix for these Rules and Principles.)

17. Invite the International Labour Organization (ILO) to observe the operation of the mobile labor brigades known as "labor training centers."

## Regarding the Treatment of Persons Repatriated from China

18. Allow access by the ICRC to the *ku-ryu-jang* detention-interrogation facilities along the DPRK-China border area.

19. As recommended by the UN Human Rights Committee, end requirements for an exit visa in order for citizens to travel abroad, a provision the UN Committee held to be incompatible with Article 12 of the International Covenant on Civil and Political Rights. De-criminalize the right to leave, and release all persons currently being detained for having crossed the border with China in search of food, employment, seeing relatives or seeking asylum.

20. Cease persecuting, prosecuting, and punishing North Koreans repatriated by police authorities of neighboring countries. North Koreans should not be punished by their government for exercising their right to leave the DPRK.

21. Observe the provisions of the DPRK Criminal Code and Criminal Procedures Code on arrests, trials, and treatment of detained persons—particularly prohibiting the use of torture or confessions obtained by the police under torture or forced starvation in order to justify the detention and imprisonment of North Koreans who crossed the DPRK-China border. The disregard by both North Korean police agencies of the DPRK's own Criminal Code and Criminal Procedures Code should be ended.

22. Ratify the Convention on the Elimination of All Forms of Racial Discrimination, and immediately cease performing involuntary abortions on pregnant repatriated women who are suspected of having ethnic Chinese spouses, and immediately end the practice of suffocating new-born infants or fetuses suspected of ethnic Chinese fathers.

### Regarding International Standards and Procedures

23. Implement the recommendations made to the DPRK by the UN Human Rights Committee, the UN Committee on Economic, Social and Cultural Rights, the Committee on the Rights of the Child and the Committee on the Elimination of Discrimination Against Women.

24. Implement the key recommendations made by other UN Member States during the Universal Periodic Review at the UN Human Rights Council in 2009. Report to the Council on the measures taken to implement the recommendations that the DPRK has acted upon.

25. Ratify the Convention against Torture and other forms of Cruel, Inhuman and Degrading Treatment and Punishment, and implement those standards, and all standards against torture and related practices in the International Covenants and DPRK domestic legislation in all places of detention within the DPRK.

26. Initiate a dialogue with the UN High Commissioner for Human Rights, and the relevant thematic UN rapporteurs and working groups, including the Special Rapporteur on the situation of human rights in the DPRK. Renew a human rights dialogue with the member states of the European Union that have diplomatic representation in Pyongyang. Invite the U.S. Special Envoy for North Korean Human Rights Issues to Pyongyang for regular discussions of humanitarian and human rights issues.

## II. Recommendations To the People's Republic of China

1. In accordance with recommendations made to China by the UN Committee on the Elimination of Discrimination against Women and the UN Committee on the Rights of the Child, review the situation of North Korean women and asylum seekers to ensure that they do not become victims of trafficking and marriage enslavement because of their status as illegal

172

aliens. Ensure that no unaccompanied child from North Korea is returned to a country where there are substantial grounds to believe that there is a real risk of irreparable harm to the child.

2. Cease the forcible repatriation of North Koreans found inside China to the DPRK until it is verified that North Korea has ceased its abuse and imprisonment of repatriated North Koreans. Immediately stop repatriating pregnant women under all circumstances.

3. Allow the UN High Commissioner for Refugees (UNHCR) access to North Koreans in China; enable the UNHCR to extend its concern and protection to those North Koreans who possess a well founded fear of persecution if returned to their country of origin. The UNHCR has already made known that it considers North Koreans in Northeast China to be "persons of concern." Until international protection policies are in place, China should comply with the Refugee Convention, which it signed, regarding North Koreans in northeast China. These persons can be adequately tended to by UNHCR and by humanitarian NGOs until the food situation in North Korea stabilizes and its human rights situation has substantially improved, including government recognition of the right of North Koreans to leave their country.

4. Allow North Korean women who have "married" Chinese men and have had children in China to obtain documentation (*hukous*) necessary for residence, and allow the children of such unions to have access to schools and hospitals.

## III. Recommendations To UN Member States

1. Continue to support, and vote for the resolutions on the human rights situation in North Korea at the UN Human Rights Council and General Assembly. Include within the General Assembly or Council resolution a request for the Secretary-General or High Commissioner for Human Rights to appoint a commission of inquiry or group of experts to make a prima facie determination if the human rights violations cited in previous General Assembly resolutions, detailed in the reports of the Special Rapporteur on the situation of human rights in the DPRK, and in the reports of reputable non-governmental organizations constitute crimes against humanity or other grave breaches of international humanitarian, criminal, and human rights law.[175]

---

175 "Commissions of inquiry," "groups of experts," "expert panels," "fact-finding teams," and "boards of inquiry" have been launched by the UN Secretary General, the High Commissioner for Human Rights, or the President of the Human Rights Council, usually at the request of the Security Council, the General Assembly or the Human Rights Council, to investigate possible breaches of international humanitarian, criminal or human rights law in, for example, East Timor, Rwanda, Burundi, Darfur, Lebanon, Togo, the Jenin Refugee Camp, Guinea, Cambodia, the former Yugoslavia, Gaza, Sri Lanka, and the Democratic Republic of Congo. When, in 2005, the Government of Uzbekistan refused to cooperate with a UN investigation of the massacres at Andijan, the High Commissioner for Human Rights sent a team of investigators to gather information from eyewitnesses who had fled to neighboring Kyrgyzstan. Commissions of inquiry have also been established for Cote d'Ivoire, Libya and Syria.

NB: the mandate of the Special Rapporteur on Human Rights in the DPRK is to assess the overall situation of human rights in North Korea. The variety of UN mechanisms listed above usually have the more specific mandate to ascertain, *prima facie*, if there have been breaches or violations of international humanitarian, criminal or human rights law. The panels are usually composed of several legal experts from three to five, regionally balanced, UN Member States who work for several months or sometimes more, and report their findings, often via the Secretary General, back to the Security Council, General Assembly or Human Rights Council for further action.

A commission of inquiry is especially important in the case of North Korea because the International Criminal Court cannot extend its application to crimes against humanity in North Korea. The DPRK does not recognize the jurisdiction of the Court and it is unlikely that the Security Council will refer the case of North Korea to the Court (China in particular can be expected to veto a referral). The Prosecutor of the ICC advised a group of survivors from North Korea's prison camps, detention facilities and torture centers (including some of the interviewees for this report) to consider raising these serious violations with "appropriate national or international authorities."[176] A move by the General Assembly or the Human Rights Council to set up a commission of inquiry or panel of experts would be an important step forward.

Recognition by the international community that crimes against humanity are being perpetrated on a massive scale in North Korea would make it more difficult for North Korean authorities to deny that the prison camps exist and to defy international standards regarding its criminal mistreatment of a substantial portion of its population.

2. Encourage the DPRK to allow the ICRC access to all places of detention within North Korea, including the *kwan-li-so* "managed places."

3. Encourage the World Food Program to find ways to provide humanitarian food aid to those persons residing within the *kwan-li-so* and *kyo-hwa-so* prison facilities, given that the UN system, particularly the Office of the High Commissioner for Human Rights, recognizes "persons deprived of their liberty" to be among what the UN designates as a "vulnerable group."

4. Strengthen the annual resolutions in the General Assembly and Human Rights Council by endorsing the applicability of the "Responsibility to Protect" doctrine to the situation in North Korea.[177] In 2005, 193 heads of state adopted the World Summit Outcome document, which endorsed a collective responsibility to protect persons when their own governments fail to do so and they are subjected to crimes against humanity, genocide, war crimes or ethnic cleansing. There is a strong case that North Korea's human rights violations constitute crimes against humanity and should be part of deliberations in the Security Council. North Korea's recurring security threats—along with its human rights issues, endemic food insecurity and refugee outflows—should be examined and discussed in a more integrated and comprehensive framework internationally, preferably via Chapter VI proceedings at the UN Security Council.[178]

---

176  This recommendation was in response to a request from former political prisoners in North Korea, including some of those interviewed for this report. The Prosecutor's Office responded that in the absence of DPRK's recognition of the ICC or a referral from the UN Security Council, the "serious allegations will be beyond the reach of this institution to address." However, the ICC Prosecutor advised the petitioners to consider raising these matters with "appropriate national or international authorities." (5 November 2010 Office of the Prosecutor, International Criminal Court, Reference OTP-CR-946/09.)

177  See Paragraph 139, World Summit Outcome Document, 16 September 2005: "The international community, through the United Nations, also has the responsibility to use appropriate diplomatic, humanitarian and other peaceful means in accordance with Chapter VI and VII of the Charter, to help protect populations from genocide, war crimes, ethnic cleansing and crimes against humanity….We stress the need for the General Assembly to continue consideration of the responsibility to protect populations from genocide, war crimes, ethnic cleansing and crimes against humanity and its implications, bearing in mind the principles of the Charter and international law." See also Kjell Magne Bondevik and Kristen Abrams, "Democratic Peoples Republic of Korea," in Jared Genser and Irwin Cotler, The Responsibility to Protect, Oxford University Press, 2011.

178  Unlike Chapter VII proceedings, which can authorize the use

## IV. To UN Member States Enjoying Diplomatic Relations with the DPRK

1. Reiterate to DPRK officials that North Korea must address the human rights concerns expressed by the international community, including the matters discussed in this report, if their countries are to improve relations with the DPRK.

2. Seek discussions with the DPRK on a series of practical measures, such as those outlined above that can restore liberties to those presently imprisoned in the camps.

## V. To the United States, the Republic of Korea, and Japan

1. Take human rights issues, including the problems cited in this report, into consideration in any process leading to improved relations and the normalization of diplomatic relations with the DPRK. In the event that the Six Party Talks resume, include relevant human rights concerns in the various working groups, particularly the working groups on economic cooperation and a security system or framework for Northeast Asia, and in subsidiary, four party discussions to convert the Korean War armistice into a peace agreement.

2. Continue to provide asylum, residence and/or citizenship to North Koreans who present themselves to consulates, embassies or officials in third countries, as well as North Koreans who arrive in the US, the Republic of Korea, and Japan by boat, plane, or other means of transportation.

3. Offer a voluntary orderly departure program and third country resettlement program for those released from the prisons and labor camps who cannot remain in North Korea without facing persecution stemming from their previous confinement in the camps. It should be noted that, as described in the text of this report,[179] all of the persons previously released from the "re-revolutionizing" sections of the labor camps are required to take an oath never to disclose any information about the "managed places" to other citizens within the DPRK. It also should be noted that a number of the persons previously released from the "re-revolutionizing" sections of the labor camps subsequently sought asylum outside of North Korea because of a well founded fear of persecution should they remain in their country of origin. An offer should thus be made to the DPRK of a voluntary orderly departure program and third country resettlement program for former prisoners. Such a program, comparable to the one organized in the early 1980s to end the Vietnamese "boat people" crisis, would avoid burdening neighboring countries with a potential influx of asylum seekers transiting across multiple borders in search of refuge or re-settlement. Countries with sizable Korean communities should inform the DPRK of their willingness to cooperate with respect to third country resettlement.

---

of armed force, Chapter VI deliberations prescribe the seeking of solutions "by negotiation, enquiry, mediation, conciliation, arbitration, judicial settlement, resort to regional agencies or arrangements, or other peaceful means of their own choice."

179  See p. 53.

# APPENDIX

# UN STANDARD MINIMUM RULES FOR THE TREATMENT OF PRISONERS

Adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held at Geneva in 1955, and approved by the Economic and Social Council by its resolutions 663 C (XXIV) of 31 July 1957 and 2076 (LXII) of 13 May 1977

## PRELIMINARY OBSERVATIONS

1. The following rules are not intended to describe in detail a model system of penal institutions. They seek only, on the basis of the general consensus of contemporary thought and the essential elements of the most adequate systems of today, to set out what is generally accepted as being good principle and practice in the treatment of prisoners and the management of institutions.

2. In view of the great variety of legal, social, economic and geographical conditions of the world, it is evident that not all of the rules are capable of application in all places and at all times. They should, however, serve to stimulate a constant endeavour to overcome practical difficulties in the way of their application, in the knowledge that they represent, as a whole, the minimum conditions which are accepted as suitable by the United Nations.

3. On the other hand, the rules cover a field in which thought is constantly developing. They are not intended to preclude experiment and practices, provided these are in harmony with the principles and seek to further the purposes which derive from the text of the rules as a whole. It will always be justifiable for the central prison administration to authorize departures from the rules in this spirit.

4. (1) Part I of the rules covers the general management of institutions, and  is applicable to all categories of prisoners, criminal or civil, untried or convicted, including prisoners subject to "security measures" or corrective measures ordered by the judge.

(2) Part II contains rules applicable only to the special categories dealt with in each section. Nevertheless, the rules under section A, applicable to prisoners under sentence, shall be equally applicable to categories of prisoners dealt with in sections B, C and D, provided they do not conflict with the rules governing those categories and are for their benefit.

5. (1) The rules do not seek to regulate the management of institutions set aside for young persons such as Borstal institutions or correctional schools, but in general part I would be equally applicable in such institutions.

(2) The category of young prisoners should include at least all young persons who come within the jurisdiction of juvenile courts. As a rule, such young persons should not be sentenced to imprisonment.

## Part I: Rules of General Application
### Basic Principle

6. (1) The following rules shall be applied impartially. There shall be no discrimination on grounds of race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

(2) On the other hand, it is necessary to respect the religious beliefs and moral precepts of the group to which a prisoner belongs.

## Register

7. (1) In every place where persons are imprisoned there shall be kept a bound registration book with numbered pages in which shall be entered in respect of each prisoner received:

( a ) Information concerning his identity;

( b ) The reasons for his commitment and the authority therefor;

( c ) The day and hour of his admission and release.

(2) No person shall be received in an institution without a valid commitment order of which the details shall have been previously entered in the register.

## Separation of Categories

8. The different categories of prisoners shall be kept in separate institutions or parts of institutions taking account of their sex, age, criminal record, the legal reason for their detention and the necessities of their treatment. Thus,

( a ) Men and women shall so far as possible be detained in separate institutions; in an institution which receives both men and women the whole of the premises allocated to women shall be entirely separate;

( b ) Untried prisoners shall be kept separate from convicted prisoners;

( c ) Persons imprisoned for debt and other civil prisoners shall be kept separate from persons imprisoned by reason of a criminal offence;

( d ) Young prisoners shall be kept separate from adults.

## Accommodation

9. (1) Where sleeping accommodation is in individual cells or rooms, each prisoner shall occupy by night a cell or room by himself. If for special reasons, such as temporary overcrowd-ing, it becomes necessary for the central prison administration to make an exception to this rule, it is not desirable to have two prisoners in a cell or room.

(2) Where dormitories are used, they shall be occupied by prisoners carefully selected as being suitable to associate with one another in those conditions. There shall be regular supervision by night, in keeping with the nature of the institution.

10. All accommodation provided for the use of prisoners and in particular all sleeping accommodation shall meet all requirements of health, due regard being paid to climatic conditions and particularly to cubic content of air, minimum floor space, lighting, heating and ventilation.

11. In all places where prisoners are required to live or work,

( a ) The windows shall be large enough to enable the prisoners to read or work by natural light, and shall be so constructed that they can allow the entrance of fresh air whether or not there is artificial ventilation;

( b ) Artificial light shall be provided sufficient for the prisoners to read or work without injury to eyesight.

12. The sanitary installations shall be adequate to enable every prisoner to comply with the needs of nature when necessary and in a clean and decent manner.

13. Adequate bathing and shower installations shall be provided so that every prisoner may be enabled and required to have a bath or shower, at a temperature suitable to the climate, as frequently as necessary for general hygiene according to season and geographical region, but at least once a week in a temperate climate.

14. All parts of an institution regularly used by prisoners shall be properly maintained and kept scrupulously clean at all times.

## Personal Hygiene

15. Prisoners shall be required to keep their persons clean, and to this end they shall be provided with water and with such toilet articles as are necessary for health and cleanliness.

16. In order that prisoners may maintain a good appearance compatible with their self-respect, facilities shall be provided for the proper care of the hair and beard, and men shall be enabled to shave regularly.

## Clothing and Bedding

17. (1) Every prisoner who is not allowed to wear his own clothing shall be provided with an outfit of clothing suitable for the climate and adequate to keep him in good health. Such clothing shall in no manner be degrading or humiliating.

(2) All clothing shall be clean and kept in proper condition. Underclothing shall be changed and washed as often as necessary for the maintenance of hygiene.

(3) In exceptional circumstances, whenever a prisoner is removed outside the institution for an authorized purpose, he shall be allowed to wear his own clothing or other inconspicuous clothing.

18. If prisoners are allowed to wear their own clothing, arrangements shall be made on their admission to the institution to ensure that it shall be clean and fit for use.

19. Every prisoner shall, in accordance with local or national standards, be provided with a separate bed, and with separate and sufficient bedding which shall be clean when issued, kept in good order and changed often enough to ensure its cleanliness.

## Food

20. (1) Every prisoner shall be provided by the administration at the usual hours with food of nutritional value adequate for health and strength, of wholesome quality and well prepared and served.

(2) Drinking water shall be available to every prisoner whenever he needs it.

## Exercise and Sport

21. (1) Every prisoner who is not employed in outdoor work shall have at least one hour of suitable exercise in the open air daily if the weather permits.

(2) Young prisoners, and others of suitable age and physique, shall receive physical and recreational training during the period of exercise. To this end space, installations and equipment should be provided.

## Medical Services

22. (1) At every institution there shall be available the services of at least one qualified medical officer who should have some knowledge of psychiatry. The medical services should be organized in close relationship to the general health administration of the community or nation. They shall include a psychiatric service for the diagnosis and, in proper cases, the treatment of states of mental abnormality.

(2) Sick prisoners who require specialist treatment shall be transferred to specialized institutions or to civil hospitals. Where hospital facilities are provided in an institution, their equipment, furnishings and pharmaceutical supplies shall be proper for the medical care and treatment of sick prisoners, and there shall be a staff of suitable trained officers.

(3) The services of a qualified dental officer shall be available to every prisoner.

23. (1) In women's institutions there shall be special accommodation for all necessary pre-natal and post-natal care and treatment. Arrangements shall be made wherever practicable for children to be born in a hospital outside the institution. If a child is born in prison, this fact shall not be mentioned in the birth certificate.

(2) Where nursing infants are allowed to remain in the institution with their mothers, provision shall be made for a nursery staffed by qualified persons, where the infants shall be placed when they are not in the care of their mothers.

24. The medical officer shall see and examine every prisoner as soon as possible after his admission and thereafter as necessary, with a view particularly to the discovery of physical or mental illness and the taking of all necessary measures; the segregation of prisoners suspected of infectious or contagious conditions; the noting of physical or mental defects which might hamper rehabilitation, and the determination of the physical capacity of every prisoner for work.

25. (1) The medical officer shall have the care of the physical and mental health of the prisoners and should daily see all sick prisoners, all who complain of illness, and any prisoner to whom his attention is specially directed.

(2) The medical officer shall report to the director whenever he considers that a prisoner's physical or mental health has been or will be injuriously affected by continued imprisonment or by any condition of imprisonment.

26. (1) The medical officer shall regularly inspect and advise the director upon:

( a ) The quantity, quality, preparation and service of food;

( b ) The hygiene and cleanliness of the institu-tion and the prisoners;

( c ) The sanitation, heating, lighting and venti-lation of the institution;

( d ) The suitability and cleanliness of the pris-oners' clothing and bedding;

( e ) The observance of the rules concerning physical education and sports, in cases where there is no technical personnel in charge of these activities.

(2) The director shall take into consideration the reports and advice that the medical officer submits according to rules 25 (2) and 26 and, in case he concurs with the recommendations made, shall take immediate steps to give effect to those recommendations; if they are not within his competence or if he does not concur with them, he shall immediately submit his own report and the advice of the medical officer to higher authority.

### Discipline and Punishment

27. Discipline and order shall be maintained with firmness, but with no more restriction than is necessary for safe custody and well-ordered community life.

28. (1) No prisoner shall be employed, in the service of the institution, in any disciplinary capacity.

(2) This rule shall not, however, impede the proper functioning of systems based on self-government, under which specified social, educational or sports activities or responsibilities are entrusted, under supervision, to prisoners who are formed into groups for the purposes of treatment.

29. The following shall always be determined by the law or by the regulation of the competent administrative authority:

( a ) Conduct constituting a disciplinary offence;

( b ) The types and duration of punishment which may be inflicted;

( c ) The authority competent to impose such punishment.

30. (1) No prisoner shall be punished except in accordance with the terms of such law or regulation, and never twice for the same offence.

(2) No prisoner shall be punished unless he has been informed of the offence alleged against him and given a proper opportunity of presenting his defence. The competent authority shall conduct a thorough examination of the case.

(3) Where necessary and practicable the prisoner shall be allowed to make his defence through an interpreter.

31. Corporal punishment, punishment by placing in a dark cell, and all cruel, inhuman or degrading punishments shall be completely prohibited as punishments for disciplinary offences.

32. (1) Punishment by close confinement or reduction of diet shall never be inflicted unless the medical officer has examined the prisoner and certified in writing that he is fit to sustain it.

(2) The same shall apply to any other punishment that may be prejudicial to the physical or mental health of a prisoner. In no case may such punishment be contrary to or depart from the principle stated in rule 31.

(3) The medical officer shall visit daily prisoners undergoing such punishments and shall advise the director if he considers the termination or alteration of the punishment necessary on grounds of physical or mental health.

**Instruments of Restraint**

33. Instruments of restraint, such as handcuffs, chains, irons and strait-jackets, shall never be applied as a punishment. Furthermore, chains or irons shall not be used as restraints. Other instruments of restraint shall not be used except in the following circumstances:

( a ) As a precaution against escape during a transfer, provided that they shall be removed when the prisoner appears before a judicial or administrative authority;

( b ) On medical grounds by direction of the medical officer;

( c ) By order of the director, if other methods of control fail, in order to prevent a prisoner from injuring himself or others or from damaging property; in such instances the director shall at once consult the medical officer and report to the higher administrative authority.

34. The patterns and manner of use of instruments of restraint shall be decided by the central prison administration. Such instruments must not be applied for any longer time than is strictly necessary.

**Information to and Complaints by Prisoners**

35. (1) Every prisoner on admission shall be provided with written information about the regulations governing the treatment of prisoners of his category, the disciplinary requirements of the institution, the authorized methods of seeking information and making complaints, and all such other matters as are necessary to enable him to understand both his rights and his obligations and to adapt himself to the life of the institution.

(2) If a prisoner is illiterate, the aforesaid information shall be conveyed to him orally.

36. (1) Every prisoner shall have the opportunity each week day of making requests or complaints to the director of the institution or the officer authorized to represent him.

(2) It shall be possible to make requests or complaints to the inspector of prisons during his inspection. The prisoner shall have the opportunity to talk to the inspector or to any other

The Hidden Gulag Second Edition

inspecting officer without the director or other members of the staff being present.

(3) Every prisoner shall be allowed to make a request or complaint, without censorship as to substance but in proper form, to the central prison administration, the judicial authority or other proper authorities through approved channels.

(4) Unless it is evidently frivolous or groundless, every request or complaint shall be promptly dealt with and replied to without undue delay.

## Contact with the Outside World

37. Prisoners shall be allowed under necessary supervision to communicate with their family and reputable friends at regular intervals, both by correspondence and by receiving visits.

38. (1) Prisoners who are foreign nationals shall be allowed reasonable facilities to communicate with the diplomatic and consular representatives of the State to which they belong.

(2) Prisoners who are nationals of States without diplomatic or consular representation in the country and refugees or stateless persons shall be allowed similar facilities to communicate with the diplomatic representative of the State which takes charge of their interests or any national or international authority whose task it is to protect such persons.

39. Prisoners shall be kept informed regularly of the more important items of news by the reading of newspapers, periodicals or special institutional publications, by hearing wireless transmissions, by lectures or by any similar means as authorized or controlled by the administration.

## Books

40. Every institution shall have a library for the use of all categories of prisoners, adequately stocked with both recreational and instructional books, and prisoners shall be encouraged to make full use of it.

## Religion

41. (1) If the institution contains a sufficient number of prisoners of the same religion, a qualified representative of that religion shall be appointed or approved. If the number of prisoners justifies it and conditions permit, the arrangement should be on a full-time basis.

(2) A qualified representative appointed or approved under paragraph (1) shall be allowed to hold regular services and to pay pastoral visits in private to prisoners of his religion at proper times.

(3) Access to a qualified representative of any religion shall not be refused to any prisoner. On the other hand, if any prisoner should object to a visit of any religious representative, his attitude shall be fully respected.

42. So far as practicable, every prisoner shall be allowed to satisfy the needs of his religious life by attending the services provided in the institution and having in his possession the books of religious observance and instruction of his denomination.

## Retention of Prisoners' Property

43. (1) All money, valuables, clothing and other effects belonging to a prisoner which under the regulations of the institution he is not allowed to retain shall on his admission to the institution be placed in safe custody. An inventory thereof shall be signed by the prisoner. Steps shall be taken to keep them in good condition.

(2) On the release of the prisoner all such articles and money shall be returned to him except in so far as he has been authorized to spend money or

The Hidden Gulag Second Edition

send any such property out of the institution, or it has been found necessary on hygienic grounds to destroy any article of clothing. The prisoner shall sign a receipt for the articles and money returned to him.

(3) Any money or effects received for a prisoner from outside shall be treated in the same way.

(4) If a prisoner brings in any drugs or medicine, the medical officer shall decide what use shall be made of them.

### Notification of Death, Illness, Transfer, etc.

44. (1) Upon the death or serious illness of, or serious injury to a prisoner, or his removal to an institution for the treatment of mental affections, the director shall at once inform the spouse, if the prisoner is married, or the nearest relative and shall in any event inform any other person previously designated by the prisoner.

(2) A prisoner shall be informed at once of the death or serious illness of any near relative. In case of the critical illness of a near relative, the prisoner should be authorized, whenever circumstances allow, to go to his bedside either under escort or alone.

(3) Every prisoner shall have the right to inform at once his family of his imprisonment or his transfer to another institution.

### Removal of Prisoners

45. (1) When the prisoners are being removed to or from an institution, they shall be exposed to public view as little as possible, and proper safeguards shall be adopted to protect them from insult, curiosity and publicity in any form.

(2) The transport of prisoners in conveyances with inadequate ventilation or light, or in any way which would subject them to unnecessary physical hardship, shall be prohibited.

(3) The transport of prisoners shall be carried out at the expense of the administration and equal conditions shall obtain for all of them.

### Institutional Personnel

46. (1) The prison administration shall provide for the careful selection of every grade of the personnel, since it is on their integrity, humanity, professional capacity and personal suitability for the work that the proper administration of the institutions depends.

(2) The prison administration shall constantly seek to awaken and maintain in the minds both of the personnel and of the public the conviction that this work is a social service of great importance, and to this end all appropriate means of informing the public should be used.

(3) To secure the foregoing ends, personnel shall be appointed on a full-time basis as professional prison officers and have civil service status with security of tenure subject only to good conduct, efficiency and physical fitness. Salaries shall be adequate to attract and retain suitable men and women; employment benefits and conditions of service shall be favourable in view of the exacting nature of the work.

47. (1) The personnel shall possess an adequate standard of education and intelligence.

(2) Before entering on duty, the personnel shall be given a course of training in their general and specific duties and be required to pass theoretical and practical tests.

(3) After entering on duty and during their career, the personnel shall maintain and improve their knowledge and professional capacity by attending courses of in-service training to be organized at suitable intervals.

48. All members of the personnel shall at all times so conduct themselves and perform their

duties as to influence the prisoners for good by their example and to command their respect.

49. (1) So far as possible, the personnel shall include a sufficient number of specialists such as psychiatrists, psychologists, social workers, teachers and trade instructors.

(2) The services of social workers, teachers and trade instructors shall be secured on a permanent basis, without thereby excluding part-time or voluntary workers.

50. (1) The director of an institution should be adequately qualified for his task by character, administrative ability, suitable training and experience.

(2) He shall devote his entire time to his official duties and shall not be appointed on a part-time basis.

(3) He shall reside on the premises of the institution or in its immediate vicinity.

(4) When two or more institutions are under the authority of one director, he shall visit each of them at frequent intervals. A responsible resident official shall be in charge of each of these institutions.

51. (1) The director, his deputy, and the majority of the other personnel of the institution shall be able to speak the language of the greatest number of prisoners, or a language understood by the greatest number of them.

(2) Whenever necessary, the services of an interpreter shall be used.

52. (1) In institutions which are large enough to require the services of one or more full-time medical officers, at least one of them shall reside on the premises of the institution or in its immediate vicinity.

(2) In other institutions the medical officer shall visit daily and shall reside near enough to be able to attend without delay in cases of urgency.

53. (1) In an institution for both men and women, the part of the institution set aside for women shall be under the authority of a responsible woman officer who shall have the custody of the keys of all that part of the institution.

(2) No male member of the staff shall enter the part of the institution set aside for women unless accompanied by a woman officer.

(3) Women prisoners shall be attended and supervised only by women officers. This does not, however, preclude male members of the staff, particularly doctors and teachers, from carrying out their professional duties in institutions or parts of institutions set aside for women.

54. (1) Officers of the institutions shall not, in their relations with the prisoners, use force except in self-defence or in cases of attempted escape, or active or passive physical resistance to an order based on law or regulations. Officers who have recourse to force must use no more than is strictly necessary and must report the incident immediately to the director of the institution.

(2) Prison officers shall be given special physical training to enable them to restrain aggressive prisoners.

(3) Except in special circumstances, staff performing duties which bring them into direct contact with prisoners should not be armed. Furthermore, staff should in no circumstances be provided with arms unless they have been trained in their use.

**Inspection**

55. There shall be a regular inspection of penal institutions and services by qualified and experienced inspectors appointed by a competent authority. Their task shall be in particular to ensure that these institutions are administered in accordance with existing laws and regulations and with a view to bringing about the objectives of penal and correctional services.

## Part II: Rules Applicable to Special Categories

### A. Prisoners under Sentence
### Guiding principles

56. The guiding principles hereafter are intended to show the spirit in which penal institutions should be administered and the purposes at which they should aim, in accordance with the declaration made under Preliminary Observation 1 of the present text.

57. Imprisonment and other measures which result in cutting off an offender from the outside world are afflictive by the very fact of taking from the person the right of self-determination by depriving him of his liberty. Therefore the prison system shall not, except as incidental to justifiable segregation or the maintenance of discipline, aggravate the suffering inherent in such a situation.

58. The purpose and justification of a sentence of imprisonment or a similar measure deprivative of liberty is ultimately to protect society against crime. This end can only be achieved if the period of imprisonment is used to ensure, so far as possible, that upon his return to society the offender is not only willing but able to lead a law-abiding and self-supporting life.

59. To this end, the institution should utilize all the remedial, educational, moral, spiritual and other forces and forms of assistance which are appropriate and available, and should seek to apply them according to the individual treatment needs of the prisoners.

60. (1) The regime of the institution should seek to minimize any differences between prison life and life at liberty which tend to lessen the responsibility of the prisoners or the respect due to their dignity as human beings.

(2) Before the completion of the sentence, it is desirable that the necessary steps be taken to ensure for the prisoner a gradual return to life in society. This aim may be achieved, depending on the case, by a pre-release regime organized in the same institution or in another appropriate institution, or by release on trial under some kind of supervision which must not be entrusted to the police but should be combined with effective social aid.

61. The treatment of prisoners should emphasize not their exclusion from the community, but their continuing part in it. Community agencies should, therefore, be enlisted wherever possible to assist the staff of the institution in the task of social rehabilitation of the prisoners. There should be in connection with every institution social workers charged with the duty of maintaining and improving all desirable relations of a prisoner with his family and with valuable social agencies. Steps should be taken to safeguard, to the maximum extent compatible with the law and the sentence, the rights relating to civil interests, social security rights and other social benefits of prisoners.

62. The medical services of the institution shall seek to detect and shall treat any physical or mental illnesses or defects which may hamper a prisoner's rehabilitation. All necessary medical, surgical and psychiatric services shall be provided to that end.

63. (1) The fulfilment of these principles requires individualization of treatment and for this purpose a flexible system of classifying prisoners in groups; it is therefore desirable that such groups should be distributed in separate institutions suitable for the treatment of each group.

(2) These institutions need not provide the same degree of security for every group. It is desirable to provide varying degrees of security according to the needs of different groups. Open institu-

The Hidden Gulag Second Edition

tions, by the very fact that they provide no physical security against escape but rely on the self-discipline of the inmates, provide the conditions most favourable to rehabilitation for carefully selected prisoners.

(3) It is desirable that the number of prisoners in closed institutions should not be so large that the individualization of treatment is hindered. In some countries it is considered that the population of such institutions should not exceed five hundred. In open institutions the population should be as small as possible.

(4) On the other hand, it is undesirable to maintain prisons which are so small that proper facilities cannot be provided.

64. The duty of society does not end with a prisoner's release. There should, therefore, be governmental or private agencies capable of lending the released prisoner efficient after-care directed towards the lessening of prejudice against him and towards his social rehabilitation.

## Treatment

65. The treatment of persons sentenced to imprisonment or a similar measure shall have as its purpose, so far as the length of the sentence permits, to establish in them the will to lead law-abiding and self-supporting lives after their release and to fit them to do so. The treatment shall be such as will encourage their self-respect and develop their sense of responsibility.

66. (1) To these ends, all appropriate means shall be used, including religious care in the countries where this is possible, education, vocational guidance and training, social casework, employment counselling, physical development and strengthening of moral character, in accordance with the individual needs of each prisoner, taking account of his social and criminal history,

his physical and mental capacities and aptitudes, his personal temperament, the length of his sentence and his prospects after release.

(2) For every prisoner with a sentence of suitable length, the director shall receive, as soon as possible after his admission, full reports on all the matters referred to in the foregoing paragraph. Such reports shall always include a report by a medical officer, wherever possible qualified in psychiatry, on the physical and mental condition of the prisoner.

(3) The reports and other relevant documents shall be placed in an individual file. This file shall be kept up to date and classified in such a way that it can be consulted by the responsible personnel whenever the need arises.

## Classification and individualization

67. The purposes of classification shall be:

( a ) To separate from others those prisoners who, by reason of their criminal records or bad characters, are likely to exercise a bad influence;

( b ) To divide the prisoners into classes in order to facilitate their treatment with a view to their social rehabilitation.

68. So far as possible separate institutions or separate sections of an institution shall be used for the treatment of the different classes of prisoners.

69. As soon as possible after admission and after a study of the personality of each prisoner with a sentence of suitable length, a programme of treatment shall be prepared for him in the light of the knowledge obtained about his individual needs, his capacities and dispositions.

185

## Privileges

70. Systems of privileges appropriate for the different classes of prisoners and the different methods of treatment shall be established at every institution, in order to encourage good conduct, develop a sense of responsibility and secure the interest and co-operation of the prisoners in their treatment.

## Work

71. (1) Prison labour must not be of an afflictive nature.

(2) All prisoners under sentence shall be required to work, subject to their physical and mental fitness as determined by the medical officer.

(3) Sufficient work of a useful nature shall be provided to keep prisoners actively employed for a normal working day.

(4) So far as possible the work provided shall be such as will maintain or increase the prisoners, ability to earn an honest living after release.

(5) Vocational training in useful trades shall be provided for prisoners able to profit thereby and especially for young prisoners.

(6) Within the limits compatible with proper vocational selection and with the requirements of institutional administration and discipline, the prisoners shall be able to choose the type of work they wish to perform.

72. (1) The organization and methods of work in the institutions shall resemble as closely as possible those of similar work outside institutions, so as to prepare prisoners for the conditions of normal occupational life.

(2) The interests of the prisoners and of their vocational training, however, must not be subordinated to the purpose of making a financial profit from an industry in the institution.

73. (1) Preferably institutional industries and farms should be operated directly by the administration and not by private contractors.

(2) Where prisoners are employed in work not controlled by the administration, they shall always be under the supervision of the institution's personnel. Unless the work is for other departments of the government the full normal wages for such work shall be paid to the administration by the persons to whom the labour is supplied, account being taken of the output of the prisoners.

74. (1) The precautions laid down to protect the safety and health of free workmen shall be equally observed in institutions.

(2) Provision shall be made to indemnify prisoners against industrial injury, including occupational disease, on terms not less favourable than those extended by law to free workmen.

75. (1) The maximum daily and weekly working hours of the prisoners shall be fixed by law or by administrative regulation, taking into account local rules or custom in regard to the employment of free workmen.

(2) The hours so fixed shall leave one rest day a week and sufficient time for education and other activities required as part of the treatment and rehabilitation of the prisoners.

76. (1) There shall be a system of equitable remuneration of the work of prisoners.

(2) Under the system prisoners shall be allowed to spend at least a part of their earnings on approved articles for their own use and to send a part of their earnings to their family.

(3) The system should also provide that a part of the earnings should be set aside by the administration so as to constitute a savings fund to be handed over to the prisoner on his release.

## Education and recreation

77. (1) Provision shall be made for the further education of all prisoners capable of profiting thereby, including religious instruction in the countries where this is possible. The education of illiterates and young prisoners shall be compulsory and special attention shall be paid to it by the administration.

(2) So far as practicable, the education of prisoners shall be integrated with the educational system of the country so that after their release they may continue their education without difficulty.

78. Recreational and cultural activities shall be provided in all institutions for the benefit of the mental and physical health of prisoners.

## Social Relations and after-care

79. Special attention shall be paid to the maintenance and improvement of such relations between a prisoner and his family as are desirable in the best interests of both.

80. From the beginning of a prisoner's sentence consideration shall be given to his future after release and he shall be encouraged and assisted to maintain or establish such relations with persons or agencies outside the institution as may promote the best interests of his family and his own social rehabilitation.

81. (1) Services and agencies, governmental or otherwise, which assist released prisoners to re-establish themselves in society shall ensure, so far as is possible and necessary, that released prisoners be provided with appropriate documents and identification papers, have suitable s and work to go to, are suitably and adequately clothed having regard to the climate and season, and have sufficient means to reach their destination and maintain themselves in the period immediately following their release.

(2) The approved representatives of such agencies shall have all necessary access to the institution and to prisoners and shall be taken into consultation as to the future of a prisoner from the beginning of his sentence.

(3) It is desirable that the activities of such agencies shall be centralized or co-ordinated as far as possible in order to secure the best use of their efforts.

## B. Insane and Mentally Abnormal Prisoners

82. (1) Persons who are found to be insane shall not be detained in prisons and arrangements shall be made to remove them to mental institutions as soon as possible.

(2) Prisoners who suffer from other mental diseases or abnormalities shall be observed and treated in specialized institutions under medical management.

(3) During their stay in a prison, such prisoners shall be placed under the special supervision of a medical officer.

(4) The medical or psychiatric service of the penal institutions shall provide for the psychiatric treatment of all other prisoners who are in need of such treatment.

83. It is desirable that steps should be taken, by arrangement with the appropriate agencies, to ensure if necessary the continuation of psychiatric treatment after release and the provision of social-psychiatric after-care.

## C. Prisoners Under Arrest or Awaiting Trial

84. (1) Persons arrested or imprisoned by reason of a criminal charge against them, who are detained either in police custody or in prison custody (jail) but have not yet been tried and sentenced, will be referred to as "untried prison-

ers" hereinafter in these rules.

(2) Unconvicted prisoners are presumed to be innocent and shall be treated as such.

(3) Without prejudice to legal rules for the protection of individual liberty or prescribing the procedure to be observed in respect of untried prisoners, these prisoners shall benefit by a special regime which is described in the following rules in its essential requirements only.

85. (1) Untried prisoners shall be kept separate from convicted prisoners.

(2) Young untried prisoners shall be kept separate from adults and shall in principle be detained in separate institutions.

86. Untried prisoners shall sleep singly in separate rooms, with the reservation of different local custom in respect of the climate.

87. Within the limits compatible with the good order of the institution, untried prisoners may, if they so desire, have their food procured at their own expense from the outside, either through the administration or through their family or friends. Otherwise, the administration shall provide their food.

88. (1) An untried prisoner shall be allowed to wear his own clothing if it is clean and suitable.

(2) If he wears prison dress, it shall be different from that supplied to convicted prisoners.

89. An untried prisoner shall always be offered opportunity to work, but shall not be required to work. If he chooses to work, he shall be paid for it.

90. An untried prisoner shall be allowed to procure at his own expense or at the expense of a third party such books, newspapers, writing materials and other means of occupation as are compatible with the interests of the administration of justice and the security and good order of the institution.

91. An untried prisoner shall be allowed to be visited and treated by his own doctor or dentist if there is reasonable ground for his application and he is able to pay any expenses incurred.

92. An untried prisoner shall be allowed to inform immediately his family of his detention and shall be given all reasonable facilities for communicating with his family and friends, and for receiving visits from them, subject only to restrictions and supervision as are necessary in the interests of the administration of justice and of the security and good order of the institution.

93. For the purposes of his defence, an untried prisoner shall be allowed to apply for free legal aid where such aid is available, and to receive visits from his legal adviser with a view to his defence and to prepare and hand to him confidential instructions. For these purposes, he shall if he so desires be supplied with writing material. Interviews between the prisoner and his legal adviser may be within sight but not within the hearing of a police or institution official.

### D. Civil Prisoners

94. In countries where the law permits imprisonment for debt, or by order of a court under any other non-criminal process, persons so imprisoned shall not be subjected to any greater restriction or severity than is necessary to ensure safe custody and good order. Their treatment shall be not less favourable than that of untried prisoners, with the reservation, however, that they may possibly be required to work.

### E. Persons Arrested or Detained Without Charge

95. Without prejudice to the provisions of article 9 of the International Covenant on Civil and Political Rights, persons arrested or imprisoned without charge shall be accorded the same

protection as that accorded under part I and part II, section C. Relevant provisions of part II, section A, shall likewise be applicable where their application may be conducive to the benefit of this special group of persons in custody, provided that no measures shall be taken implying that re-education or rehabilitation is in any way appropriate to persons not convicted of any criminal offence.

# UN BODY OF PRINCIPLES FOR THE PROTECTION OF ALL PERSONS UNDER ANY FORM OF DETENTION OR IMPRISONMENT

A/RES/43/173 76th plenary meeting 9 December 1988 43/173.  Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment

The General Assembly,
Recalling its resolution 35/177 of 15 December 1980, in which it referred the task of elaborating the draft Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment to the Sixth Committee and decided to establish an open-ended working group for that purpose,
Taking note of the report of the Working Group on the Draft Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, which met during the forty-third session of the General Assembly and completed the elaboration of the draft Body of Principles,
Considering that the Working Group decided to submit the text of the draft Body of Principles to the Sixth Committee for its consideration and adoption,
Convinced that the adoption of the draft Body of Principles would make an important contribution to the protection of human rights,
Considering the need to ensure the wide dissemination of the text of the Body of Principles,

1.   Approves the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, the text of which is annexed to the present resolution;

189

2. Expresses its appreciation to the Working Group on the Draft Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment for its important contribution to the elaboration of the Body of Principles;

3. Requests the Secretary-General to inform the States Members of the United Nations or members of specialized agencies of the adoption of the Body of Principles;

4. Urges that every effort be made so that the Body of Principles becomes generally known and respected.

**ANNEX**

Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment Scope of the Body of Principles

These principles apply for the protection of all persons under any form of detention or imprisonment.

**Use of Terms**

For the purposes of the Body of Principles:

(a) "Arrest" means the act of apprehending a person for the alleged commission of an offence or by the action of an authority;

(b) "Detained person" means any person deprived of personal liberty except as a result of conviction for an offence;

(c) "Imprisoned person" means any person deprived of personal liberty as a result of conviction for an offence;

(d) "Detention" means the condition of detained persons as defined above;

(e) "Imprisonment" means the condition of imprisoned persons as defined above;

(f) The words "a judicial or other authority" mean a judicial or other authority under the law whose status and tenure should afford the strongest possible guarantees of competence, impartiality and independence.

**Principle 1**

All persons under any form of detention or imprisonment shall be treated in a humane manner and with respect for the inherent dignity of the human person.

**Principle 2**

Arrest, detention or imprisonment shall only be carried out strictly in accordance with the provisions of the law and by competent officials or persons authorized for that purpose.

**Principle 3**

There shall be no restriction upon or derogation from any of the human rights of persons under any form of detention or imprisonment recognized or existing in any State pursuant to law, conventions, regulations or custom on the pretext that this Body of Principles does not recognize such rights or that it recognizes them to a lesser extent.

**Principle 4**

Any form of detention or imprisonment and all measures affecting the human rights of a person under any form of detention or imprisonment shall be ordered by, or be subject to the effective control of, a judicial or other authority.

**Principle 5**

1. These principles shall be applied to all persons within the territory of any given State, without distinction of any kind, such as race,

colour, sex, language, religion or religious belief, political or other opinion, national, ethnic or social origin, property, birth or other status.

2.   Measures applied under the law and designed solely to protect the rights and special status of women, especially pregnant women and nursing mothers, children and juveniles, aged, sick or handicapped persons shall not be deemed to be discriminatory.  The need for, and the application of, such measures shall always be subject to review by a judicial or other authority.

### Principle 6

No person under any form of detention or imprisonment shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.*  No circumstance whatever may be invoked as a justification for torture or other cruel, inhuman or degrading treatment or punishment.

*    The term "cruel, inhuman or degrading treatment or punishment" should be interpreted so as to extend the widest possible protection against abuses, whether physical or mental, including the holding of a detained or imprisoned person in conditions which deprive him, temporarily or permanently, of the use of any of his natural senses, such as sight or hearing, or of his awareness of place and the passing of time.

### Principle 7

1.   States should prohibit by law any act contrary to the rights and duties contained in these principles, make any such act subject to appropriate sanctions and conduct impartial investigations upon complaints.

2.   Officials who have reason to believe that a violation of this Body of Principles has occurred or is about to occur shall report the matter to their superior authorities and, where necessary,

to other appropriate authorities or organs vested with reviewing or remedial powers.

3.   Any other person who has ground to believe that a violation of this Body of Principles has occurred or is about to occur shall have the right to report the matter to the superiors of the officials involved as well as to other appropriate authorities or organs vested with reviewing or remedial powers.

### Principle 8

Persons in detention shall be subject to treatment appropriate to their unconvicted status.  Accordingly, they shall, whenever possible, be kept separate from imprisoned persons.

### Principle 9

The authorities which arrest a person, keep him under detention or investigate the case shall exercise only the powers granted to them under the law and the exercise of these powers shall be subject to recourse to a judicial or other authority.

### Principle l0

Anyone who is arrested shall be informed at the time of his arrest of the reason for his arrest and shall be promptly informed of any charges against him.

### Principle ll

1.   A person shall not be kept in detention without being given an effective opportunity to be heard promptly by a judicial or other authority.  A detained person shall have the right to defend himself or to be assisted by counsel as prescribed by law.

2.   A detained person and his counsel, if any, shall receive prompt and full communication of any order of detention, together with the reasons therefore.

3.   A judicial or other authority shall be empowered to review as appropriate the continuance of detention.

**Principle 12**

1.   There shall be duly recorded:

(a)  The reasons for the arrest;

(b)  The time of the arrest and the taking of the arrested person to a place of custody as well as that of his first appearance before a judicial or other authority;

(c)  The identity of the law enforcement officials concerned;

(d)  Precise information concerning the place of custody.

2.   Such records shall be communicated to the detained person, or his counsel, if any, in the form prescribed by law.

**Principle 13**

Any person shall, at the moment of arrest and at the commencement of detention or imprisonment, or promptly thereafter, be provided by the authority responsible for his arrest, detention or imprisonment, respectively, with information on and an explanation of his rights and how to avail himself of such rights.

**Principle 14**

A person who does not adequately understand or speak the language used by the authorities responsible for his arrest, detention or imprisonment is entitled to receive promptly in a language which he understands the information referred to in principle 10, principle 11, paragraph 2, principle 12, paragraph 1, and principle 13 and to have the assistance, free of charge, if necessary, of an interpreter in connection with legal proceedings subsequent to his arrest.

**Principle 15**

Notwithstanding the exceptions contained in principle 16, paragraph 4, and principle 18, paragraph 3, communication of the detained or imprisoned person with the outside world, and in particular his family or counsel, shall not be denied for more than a matter of days.

**Principle 16**

1.   Promptly after arrest and after each transfer from one place of detention or imprisonment to another, a detained or imprisoned person shall be entitled to notify or to require the competent authority to notify members of his family or other appropriate persons of his choice of his arrest, detention or imprisonment or of the transfer and of the place where he is kept in custody.

2.   If a detained or imprisoned person is a foreigner, he shall also be promptly informed of his right to communicate by appropriate means with a consular post or the diplomatic mission of the State of which he is a national or which is otherwise entitled to receive such communication in accordance with international law or with the representative of the competent international organization, if he is a refugee or is otherwise under the protection of an intergovernmental organization.

3.   If a detained or imprisoned person is a juvenile or is incapable of understanding his entitlement, the competent authority shall on its own initiative undertake the notification referred to in the present principle. Special attention shall be given to notifying parents or guardians.

4.   Any notification referred to in the present principle shall be made or permitted to be made without delay.  The competent authority may however delay a notification for a reasonable period where exceptional needs of the investigation so require.

The Hidden Gulag Second Edition

## Principle 17

1.   A detained person shall be entitled to have the assistance of a legal counsel.  He shall be informed of his right by the competent authority promptly after arrest and shall be provided with reasonable facilities for exercising it.

2.   If a detained person does not have a legal counsel of his own choice, he shall be entitled to have a legal counsel assigned to him by a judicial or other authority in all cases where the interests of justice so require and without payment by him if he does not have sufficient means to pay.

## Principle 18

1.   A detained or imprisoned person shall be entitled to communicate and consult with his legal counsel.

2.   A detained or imprisoned person shall be allowed adequate time and facilities for consultations with his legal counsel.

3.   The right of a detained or imprisoned person to be visited by and to consult and communicate, without delay or censorship and in full confidentiality, with his legal counsel may not be suspended or restricted save in exceptional circumstances, to be specified by law or lawful regulations, when it is considered indispensable by a judicial or other authority in order to maintain security and good order.

4.   Interviews between a detained or imprisoned person and his legal counsel may be within sight, but not within the hearing, of a law enforcement official.

5.   Communications between a detained or imprisoned person and his legal counsel mentioned in the present principle shall be inadmissible as evidence against the detained or imprisoned person unless they are connected with a continuing or contemplated crime.

## Principle 19

A detained or imprisoned person shall have the right to be visited by and to correspond with, in particular, members of his family and shall be given adequate opportunity to communicate with the outside world, subject to reasonable conditions and restrictions as specified by law or lawful regulations.

## Principle 20

If a detained or imprisoned person so requests, he shall if possible be kept in a place of detention or imprisonment reasonably near his usual place of residence.

## Principle 21

1.   It shall be prohibited to take undue advantage of the situation of a detained or imprisoned person for the purpose of compelling him to confess, to incriminate himself otherwise or to testify against any other person.

2.   No detained person while being interrogated shall be subject to violence, threats or methods of interrogation which impair his capacity of decision or his judgement.

## Principle 22

No detained or imprisoned person shall, even with his consent, be subjected to any medical or scientific experimentation which may be detrimental to his health.

## Principle 23

1.   The duration of any interrogation of a detained or imprisoned person and of the intervals between interrogations as well as the identity of the officials who conducted the interrogations and other persons present shall be recorded and certified in such form as may be prescribed by law.

2.   A detained or imprisoned person, or his coun-

sel when provided by law, shall have access to the information described in paragraph 1 of the present principle.

## Principle 24

A proper medical examination shall be offered to a detained or imprisoned person as promptly as possible after his admission to the place of detention or imprisonment, and thereafter medical care and treatment shall be provided whenever necessary. This care and treatment shall be provided free of charge.

## Principle 25

A detained or imprisoned person or his counsel shall, subject only to reasonable conditions to ensure security and good order in the place of detention or imprisonment, have the right to request or petition a judicial or other authority for a second medical examination or opinion.

## Principle 26

The fact that a detained or imprisoned person underwent a medical examination, the name of the physician and the results of such an examination shall be duly recorded. Access to such records shall be ensured. Modalities therefor shall be in accordance with relevant rules of domestic law.

## Principle 27

Non-compliance with these principles in obtaining evidence shall be taken into account in determining the admissibility of such evidence against a detained or imprisoned person.

## Principle 28

A detained or imprisoned person shall have the right to obtain within the limits of available resources, if from public sources, reasonable quantities of educational, cultural and informational material, subject to reasonable conditions to ensure security and good order in the place of detention or imprisonment.

## Principle 29

1.   In order to supervise the strict observance of relevant laws and regulations, places of detention shall be visited regularly by qualified and experienced persons appointed by, and responsible to, a competent authority distinct from the authority directly in charge of the administration of the place of detention or imprisonment.

2.   A detained or imprisoned person shall have the right to communicate freely and in full confidentiality with the persons who visit the places of detention or imprisonment in accordance with paragraph 1 of the present principle, subject to reasonable conditions to ensure security and good order in such places.

## Principle 30

1.   The types of conduct of the detained or imprisoned person that constitute disciplinary offences during detention or imprisonment, the description and duration of disciplinary punishment that may be inflicted and the authorities competent to impose such punishment shall be specified by law or lawful regulations and duly published.

2.   A detained or imprisoned person shall have the right to be heard before disciplinary action is taken. He shall have the right to bring such action to higher authorities for review.

## Principle 31

The appropriate authorities shall endeavour to ensure, according to domestic law, assistance when needed to dependent and, in particular, minor members of the families of detained or

194

imprisoned persons and shall devote a particular measure of care to the appropriate custody of children left without supervision.

## Principle 32

1.   A detained person or his counsel shall be entitled at any time to take proceedings according to domestic law before a judicial or other authority to challenge the lawfulness of his detention in order to obtain his release without delay, if it is unlawful.

2.   The proceedings referred to in paragraph 1 of the present principle shall be simple and expeditious and at no cost for detained persons without adequate means.  The detaining authority shall produce without unreasonable delay the detained person before the reviewing authority.

## Principle 33

1.   A detained or imprisoned person or his counsel shall have the right to make a request or complaint regarding his treatment, in particular in case of torture or other cruel, inhuman or degrading treatment, to the authorities responsible for the administration of the place of detention and to higher authorities and, when necessary, to appropriate authorities vested with reviewing or remedial powers.

2.   In those cases where neither the detained or imprisoned person nor his counsel has the possibility to exercise his rights under paragraph 1 of the present principle, a member of the family of the detained or imprisoned person or any other person who has knowledge of the case may exercise such rights.

3.   Confidentiality concerning the request or complaint shall be maintained if so requested by the complainant.

4.   Every request or complaint shall be promptly dealt with and replied to without undue delay.

If the request or complaint is rejected or, in case of inordinate delay, the complainant shall be entitled to bring it before a judicial or other authority.  Neither the detained or imprisoned person nor any complainant under paragraph 1 of the present principle shall suffer prejudice for making a request or complaint.

## Principle 34

Whenever the death or disappearance of a detained or imprisoned person occurs during his detention or imprisonment, an inquiry into the cause of death or disappearance shall be held by a judicial or other authority, either on its own motion or at the instance of a member of the family of such a person or any person who has knowledge of the case.  When circumstances so warrant, such an inquiry shall be held on the same procedural basis whenever the death or disappearance occurs shortly after the termination of the detention or imprisonment.  The findings of such inquiry or a report thereon shall be made available upon request, unless doing so would jeopardize an ongoing criminal investigation.

## Principle 35

1.   Damage incurred because of acts or omissions by a public official contrary to the rights contained in these principles shall be compensated according to the applicable rules on liability provided by domestic law.

2.   Information required to be recorded under these principles shall be available in accordance with procedures provided by domestic law for use in claiming compensation under the present principle.

## Principle 36

1.   A detained person suspected of or charged with a criminal offence shall be presumed inno-

cent and shall be treated as such until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defence.

2.   The arrest or detention of such a person pending investigation and trial shall be carried out only for the purposes of the administration of justice on grounds and under conditions and procedures specified by law.  The imposition of restrictions upon such a person which are not strictly required for the purpose of the detention or to prevent hindrance to the process of investigation or the administration of justice, or for the maintenance of security and good order in the place of detention shall be forbidden.

**Principle 37**

A person detained on a criminal charge shall be brought before a judicial or other authority provided by law promptly after his arrest.  Such authority shall decide without delay upon the lawfulness and necessity of detention.  No person may be kept under detention pending investigation or trial except upon the written order of such an authority.  A detained person shall, when brought before such an authority, have the right to make a statement on the treatment received by him while in custody.

**Principle 38**

A person detained on a criminal charge shall be entitled to trial within a reasonable time or to release pending trial.

**Principle 39**

Except in special cases provided for by law, a person detained on a criminal charge shall be entitled, unless a judicial or other authority decides otherwise in the interest of the administration of justice, to release pending trial subject to the conditions that may be imposed in accord-

ance with the law.  Such authority shall keep the necessity of detention under review.

**General Clause**

Nothing in this Body of Principles shall be construed as restricting or derogating from any right defined in the International Covenant on Civil and Political Rights.

The Hidden Gulag Second Edition

# SATELLITE PHOTOGRAPHS

**Camp 15:**



197



The Hidden Gulag Second Edition



The Hidden Gulag Second Edition





Kwan-li-so No.15 Yodok
Knup-ri District

FEATURE
1. Donsa Valley
2. Honey-Gathering Place
3. Where Kang Chol Hwan's Family Lived
4. SSPA Office
5. Workplace
6. Singles' Dorm
7. Burial Site for Dead Bodies
8. Unit 3 Bridge
9. Threshing House
10. Prison Workers' Unit 8 Village
11. Flour Mill
12. Pig Breeding Farm

The Hidden Gulag Second Edition





203







206



207



The Hidden Gulag Second Edition

**Camp 14:**



The Hidden Gulag Second Edition



Kwan-li-so No.14 Kaechon and No.18 Bukchang

Taedong River

Feature
1. Mujin 1 Coal Mine Entrance
2. Prisoner Housing
3. Execution Site
4. Rifle Range
5. Hospice for Dying Prisoners
6. Guard Facilities
7. Guard Facilities

The Hidden Gulag Second Edition



The Hidden Gulag Second Edition



212

The Hidden Gulag Second Edition



The Hidden Gulag Second Edition





The Hidden Gulag Second Edition



**Camp 14 – Location of Shin's Escape**

FEATURE
1. Rubber Factory
2. Shoe Factory
3. Village No. 2
4. Ceramic Factory
5. Cement Factory
6. Camp 14 East Gate
7. Location of Shin's Escape

215

*Kwan-li-so* No. 18 Bukchang:



Kwan-li-so No.18
Bukchang
6th Division

**Feature**
1. Pig Farm
2. Han Ryong Gang Mine Entrance
3. Food Distribution for Camp Management
4. Kim Yong's House for 3 Years('96-'99)
5. Bo-wi-bu Police Building
6. The "Respect for Elders" Furniture Factory
7. Hospital
8. Farm Managers' Housing
9. Prisoner Housing

The Hidden Gulag Second Edition



Kwan-li-so No.18 Bukchang
6th Division

Feature
1. Prisoner Housing(Families)
2. Single Prisoners' Dorm
3. Coal Trolley Repair Shop
   (Kim Yong's Work Site)
4. Carbonite Supply House
5. Mine Tunnel Entrance
6. Highest Official's Office
7. Mine Cable Head
8. Workers' Bath Site
9. Restaurant for High Officials
10. Bo-wi-bu Office
11. Railroad Loading Yam

217

The Hidden Gulag Second Edition



Kwan-li-so No.18 Bukchang
6th Division

Feature
1.Han Jae Gang Mine Entrance
2.Dynamite Warehouse



Kwan-li-so No.18 Bukchang
4th and 5th Divisions

Feature
1. Housing for Former Ranking Officials
   Currently Sentenced for Three Year Imprisonment
   for Disloyalty
2. Bong Chang Gang Mine Entrance Tunnel
3. Bob Bul Gang (Tiger Creek) Mine Entrance
4. Prisoner Housing
5. Prisoner Housing

The Hidden Gulag Second Edition



**Kwan-li-so No.18 Bukchang**
4th and 5th Divisions

**Feature**
1. Factory for Farming and Mining Tools
2. Cement Factory
3. Self Criticism at Night and Hard Labor Punishment
4. Kwan-li-so No.18 Branch Office
5. Guards' Center
6. Security Department
7. Area for Cabbage Fermentation
8. Guards' Family Housing
9. Soy Sauce Factory
10. Hospital for Accident Victims
11. Prisoner Housing
12. Prisoner Housing

The Hidden Gulag Second Edition



Kwan-li-so No.18 Bukchang Periphery

**Feature**
1. Hospital
2. Elementary School for Prisoner's
   Children (Under Age 12)
3. Pig Farm (Formerly a Chicken Farm)

221

*Kwan-li-so* No. 22:





*Kwan-li-so* No. 25 Chongjin:





Close up of Kwan-li-so No.25
Near Chongjin

41°50′01.04″ N
129°43′38.16″E

FEATURE
1. Guard Tower
2. Trucks
3. Gate

The Hidden Gulag Second Edition

*Kyo-hwa-so* **No. 1**



*Kyo-hwa-so* **No. 4 Kangdong:**





***Kyo-hwa-so* No. 12 Chongo-ri:**





**South Sinuiju Detention Center:**



**Nongpo Detention Center:**



Nongpo Detention Center, Chongjin City
Overview

41.738 N
129.722 E

Feature
1. Back Gate
2. Back Yard where Prisoners make bricks
3. Toilet and Washing Stands
4. Piled up bricks
5. Prison Cells for Man (First Floor)
6. Prison Cells for Women (First Floor)
7. Brick-making Machines
8. Dining Hall for Prison Guards
9. Dining Hall for Prisoners
10. Well
11. Carpentry Room
12. Guards' Room
13. Front Gate
14. Storage Room
15. Parking Place

229

# Exhibit B



**Committee for Human Rights in North Korea**



The Hidden Gulag IV

# GENDER REPRESSION & PRISONER DISAPPEARANCES

## David Hawk

*Satellite image of the new women's section in Jongo-ri Prison*

The Hidden Gulag IV

# GENDER REPRESSION & PRISONER DISAPPEARANCES

## DAVID HAWK

Copyright © 2015 by the Committee for Human Rights in North Korea

All rights reserved
Printed in the United States of America

ISBN: 9780985648046
Library of Congress Control Number: 2015947712

The Hidden Gulag IV

# GENDER REPRESSION &
# PRISONER DISAPPEARANCES

Committee for Human Rights in North Korea
1001 Connecticut Avenue, NW, Suite 435
Washington, DC 20036
www.hrnk.org

I

# About the Committee for Human Rights in North Korea (HRNK)

*HRNK* is the leading U.S.-based bipartisan, non-governmental organization in the field of North Korean human rights research and advocacy, tasked to focus international attention on human rights abuses in that country. It is *HRNK*'s mission to persistently remind policy makers, opinion leaders, and the general public in the free world and beyond that more than 20 million North Koreans need our attention.

Since its establishment in 2001, *HRNK* has played an important intellectual leadership role on North Korean human rights issues by publishing twenty-one major reports (available at http://hrnk.org/publications/hrnk-publications.php). *HRNK* became the first organization to propose that the human rights situation in North Korea be addressed by the UN Security Council. *HRNK* was directly, actively, and effectively involved in all stages of the process supporting the work of the UN Commission of Inquiry. On many occasions, HRNK has been invited to provide expert testimony before the U.S. Congress.



# BOARD OF DIRECTORS

**Roberta Cohen** (Co-Chair)
Non-Resident Senior Fellow, *Brookings Institution*
Specializing in Humanitarian and Human Rights Issues

**Andrew Natsios** (Co-Chair)
Former Administrator, *USAID*
Director, Scowcroft Institute of International Affairs and
Executive Professor, The Bush School of Government &
Public Service, *Texas A&M University*
Author of *The Great North Korean Famine*

**Suzanne Scholte** (Vice-Co-Chair)
President, *Defense Forum Foundation*
Seoul Peace Prize Laureate

**Gordon Flake** (Vice-Co-Chair)
Chief Executive Officer, Perth USAsia Centre,
*The University of Western Australia*
Co-author, *Paved with Good Intentions: The NGO
Experience in North Korea*

**Helen-Louise Hunter** (Secretary)
Attorney
Author, *Kim Il-Song's North Korea*

**John Despres** (Treasurer)
Consultant on International Financial & Strategic Affairs

**Morton Abramowitz**
Senior Fellow, *The Century Foundation*

**Jerome Cohen**
Co-Director, US-Asia Law Institute, *NYU Law School*
Adjunct Senior Fellow, *Council on Foreign Relations*

**Lisa Colacurcio**
Advisor, *Impact Investments*

**Rabbi Abraham Cooper**
Associate Dean, *Simon Wiesenthal Center*, LA

**Jack David**
Senior Fellow, *Hudson Institute*

**Paula Dobriansky**
Chair, *World Affairs Council of America*
Adjunct Senior Fellow, Belfer Center for Science and
International Affairs, Kennedy School of Government,
*Harvard University*
Distinguished National Security Chair, *U.S. Naval Academy*

**Nicholas Eberstadt**
Henry Wendt Chair in Political Economy, *American
Enterprise Institute*
Author of books on North Korea including *The End of
North Korea*

**Carl Gershman**
President, *National Endowment for Democracy*

**Stephen Kahng**
President, *Kahng Foundation*

**David Kim**
Coordinator, *The Asia Foundation*

**Debra Liang-Fenton**
*U.S. Institute of Peace*
Former Executive Director, *HRNK*

**Winston Lord**
Former Assistant Secretary for East Asia, *Department of State*
Former Ambassador to China
Former Director of Policy Planning Staff,
*Department of State*
Former President, *Council on Foreign Relations*
Former Chairman, *National Endowment for Democracy*

**Kevin C. McCann**
Formerly of Counsel, *Paul Hastings LLP*

**Marcus Noland**
Executive Vice President and Director of Studies, *Peterson
Institute for International Economics*
Author of books on North Korea including *Avoiding the
Apocalypse: the Future of the Two Koreas*

**Jacqueline Pak**

**Katrina Lantos Swett**
President and CEO, *Lantos Foundation for Human
Rights and Justice*

# EXECUTIVE DIRECTOR

**Greg Scarlatoiu**

**II**

III

# TABLE OF CONTENTS

I.  ABOUT THE AUTHOR ..................................................................................... 1

II.  ACKNOWLEDGEMENTS ............................................................................... 2

III.  PREFACE ....................................................................................................... 3

IV.  EXECUTIVE SUMMARY ............................................................................... 4

  A.  The Recent Addition of a Women's Section at *Kyo-hwa-so* No. 12 Jongo-ri, North Hamgyong Province .................................................................................. 4

  B.  The Double Disappearance of Prisoners in the Sorimchon Section of *Kwan-li-so* No. 15 Yodok, South Hamgyong Province ........................................................ 5

V.  BACKGROUND ............................................................................................... 6

  *Kwan-Li-So* and *Kyo-Hwa-So* Prison Camps ...................................................... 7

VI.  THE EXPANSION OF *KYO-HWA-SO* NO. 12 JONGO-RI: WRONGFUL IMPRISONMENT AND THE OPPRESSION OF NORTH KOREAN WOMEN ........................................... 12

  A.  Claims about Prisons by North Korean Officials: "Warm Love," "Extra Care," and "A TV in Every Room" ........................................................................... 13

  B.  Prisoner Testimony on Conditions at *Kyo-hwa-so* No. 12 Jongo-ri .............. 14

  C.  Gender and Repression: *Kyo-hwa-so* No. 12 Expands in Order to Imprison Women ... 16

    1.  Mrs. Choi Min-gyang ..................................................................... 18

    2.  Ms. Kim Min-ji ............................................................................... 20

    3.  Anonymous Former Female Prisoner ............................................. 21

  D.  Recommendation ................................................................................... 22

  E.  The Post-2007 Addition of the Women's Section of *Kyo-hwa-so* No. 12: Emblematic of North Korea's Oppression of Women ....................................... 23

VII.  THE DEMOLITION OF THE SORIMCHON/KUMCHON-RI SECTION OF *KWAN-LI-SO* NO. 15 YODOK, SOUTH HAMGYONG PROVINCE: THE FATE AND WHEREABOUTS OF THE FORMER PRISONERS ........................................................................................ 28

  A.  The Demolition of Sorimchon/Kumchon-ri ........................................... 28

  B.  Previous Sources of Information on Sorimchon ..................................... 29

1. Mr. Kim Eun-chol .................................................................... 29

2. Mr. Jung Gwang-il ................................................................. 29

3. Former Prisoner #28 ............................................................. 30

C. The Fate and Whereabouts of the Former Prisoners .................................... 32

D. Pursuing Accountability ............................................................... 34

VIII. List of 181 Former Prisoners at Sorimchon ..................................... 35

IX. Satellite Imagery of the Prison Camps ............................................ 46

A. *Kyo-hwa-so* No. 12 Jongo-ri in 2008 (before the addition of a women's section) .......... 46

B. *Kyo-hwa-so* No. 12 Jongo-ri in 2013 (after the addition of a women's section) ............. 47

C. Sorimchon Location within *Kwan-li-so* No. 15 ....................................... 48

D. Sorimchon Section of *Kwan-li-so* No. 15 in 2009 ..................................... 49

E. Sorimchon Section of *Kwan-li-so* No. 15 in 2014 (showing demolition of prisoner residence and work units) ........................................................ 50

**IV**

# I. ABOUT THE AUTHOR

David Hawk is a former Executive Director of *Amnesty International USA* and a former UN human rights official in charge of the Cambodia Office of the UN High Commissioner for Human Rights. He has written numerous reports on human rights issues, most notably on genocide in Cambodia, massacres in Rwanda, and severe violations in North Korea.

On North Korea, Hawk has researched and authored the following reports: the first and second editions of *Hidden Gulag: Exposing Prison Camps in North Korea* (Committee for Human Rights in North Korea (HRNK)), which were translated into Korean and Japanese and also published in Seoul and Tokyo; *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps* (HRNK); *Thank You Father Kim Il Sung: Eyewitness Accounts of Severe Violations of Freedom of Thought, Conscience and Religion in North Korea* (U.S. Commission on International Religious Freedom (USCIRF)); *Concentrations of Inhumanity: An Analysis of the Phenomena of Repression Associated with North Korea's Political Prison Camps* (Freedom House); *Pursuing Peace While Advancing Rights: The Untried Approach to North Korea* (U.S.-Korea Institute at the Johns Hopkins School of Advanced International Studies—SAIS); "International Human Rights Law and the Democratic People's Republic of Korea," *China's Internal and External Relations and Lessons for Korea and Asia*, eds. Jung-ho Bae and Jae Ku (Korea Institute for National Unification—KINU); and "North Korea's Response to the UN Commission of Inquiry Report on the Situation of Human Rights in the DPRK," *Law and Policy on Korean Unification: Analysis and Implications*, eds. Jong-chul Park and Jeong-ho Roh (KINU and the Center for Korean Legal Studies of the Columbia Law School).

From 2011–2013, Hawk was a Visiting Scholar at the Columbia University Institute for the Study of Human Rights. He currently teaches at Hunter College, City University of New York.

# II. ACKNOWLEDGEMENTS

The author wishes to thank the following people for their work in assisting with this report:

Thank you very much to the ten former North Korean *kwan-li-so* and *kyo-hwa-so* prisoners I interviewed in Seoul in April 2015. Without their willingness to recount their experiences in North Korea's prison camps, I could not have documented and discussed the details of abuse that North Korean prisoners face.

Thank you to Mr. Jung Gwang-il, Founder and Executive Director of *No Chain: The Association of North Korean Political Victims and Their Families*, for arranging the interviews and accompanying me in Seoul. Mr. Jung also prepared a list and biographies of Sorimchon prisoners, which is appended to this report, on the basis of his three-year imprisonment in the Sorimchon section of *Kwan-li-so* No. 15 Yodok and his impressive memory. Mr. Jung graciously agreed to allow HRNK to reprint this list of prisoners.

Thank you to Ms. Jeonghyun Kang, a former intern at HRNK, who translated during these interviews and assisted me during my research in Seoul.

Thank you to *AllSource Analysis*, and specifically Mr. Joseph S. Bermudez Jr., for providing satellite imagery and analysis of North Korea's prison camps.

I appreciate the work of the *Committee for Human Rights in North Korea* (*HRNK*) in Washington, D.C., specifically: Executive Director Greg Scarlatoiu for overseeing this report and ensuring its publication; Co-Chair Roberta Cohen for reviewing and editing the report; Project Officer Amanda Mortwedt Oh, who edited the report and assisted the author; Rosa Park, Director of Programs and Editor, who designed the computer-generated version of hand-drawn prison sketches and overall layout and cover of this report; Raymond Ha, Office Manager, for his translation and research assistance; Min Baek, *HRNK* intern, who translated the Minjok TV interview of the North Korean Ministry of People's Safety police generals into English; Eun Si Lee and Dam Young Hong, *HRNK* interns, for checking the translation of the list of Sorimchon prisoners; and Hee Jong Choi, *HRNK* intern, for her research on arbitrary detention.

Special thanks to Joan Libby Hawk, for her unflagging patience, valued advice, and editing assistance during the research and writing of this report.

**David Hawk**

**2**

## III. Preface

The title of this report includes "Hidden Gulag IV" as it is the fourth in a series of *Committee for Human Rights in North Korea* (*HRNK*) reports on arbitrary detention and forced labor in the Democratic People's Republic of Korea (DPRK or North Korea). This title is dated in some respects. In 2003, when the first edition of *Hidden Gulag* was published, the existence of a multifaceted network of large-scale political prison camps was indeed *hidden*—known primarily to a small number of Korea specialists, mostly scholars who tried to track Kim Il-sung's purges of the party, the army, the government ministries, and the general population of North Korea.

*Hidden Gulag* sought to expose North Korea's prison camp system to a much larger international public by providing descriptions of the prisons and labor camps based on the interview testimonies of 30 former prisoners who fled North Korea and resettled in South Korea. And, for the first time in a human rights report, satellite photographs of the prison camps, in which the former prisoners identified their residence units, work sites, and other landmarks, buttressed the prisoners' testimony.

Nowadays, North Korea's network of political prisons and labor camps is not so *hidden*, notwithstanding the on-going denials by DPRK officials that the political prison camps exist.  Many of the prison camps are plainly visible on Google Earth. Former North Korean prisoners have testified to various UN panels, the U.S. Congress, British and Canadian Parliaments, and numerous public gatherings in North America, Western and Eastern Europe, and several parts of Asia. Former North Koreans have written well-received memoirs. The phenomena of repression associated with the prison camps were a core element in persuading an overwhelming majority of Member States at the 2014 UN General Assembly to recommend that the Security Council refer North Korea to the International Criminal Court to be prosecuted for crimes against humanity. In discussions of North Korean violations at the UN Security Council, Member States even cited the North Korean term *kwan-li-so* (political prison), a core element of the prison camp system.

In another sense, the title *Hidden Gulag* is not at all dated. What remains *hidden* are the scores of thousands of North Korean persons who continue to be deprived of their liberty and subjected to forced labor under extremely brutal conditions. Thousands of those arbitrarily deprived of their liberty are subjected to incommunicado detention, many for the rest of their lives. Likewise, the deaths in detention of scores of thousands of North Korean citizens remain *hidden*. For that reason, *HRNK* continues to use the name *Hidden Gulag*.

# IV. Executive Summary

Since the founding of North Korea, its system of arbitrary detention and forced labor has been subject to constant changes. And owing to the extreme secrecy in which North Korea envelops itself, our information about the prison camps and detention facilities is often subject to a two- to five-year lag between the time when the changes occur and the moment the international community learns of them.

This report first provides the history and process behind the *Hidden Gulag* series followed by background information about North Korea's prison camp system, in particular the differences and similarities between the *kwan-li-so* (political prison) and the *kyo-hwa-so* (labor camp). It then describes two changes in North Korea's system of enforced disappearances, arbitrary detention, and forced labor:

- The recent addition of a women's section at *Kyo-hwa-so* No. 12 Jongo-ri in North Hamgyong Province, and

- The demolition of the Sorimchon/Kumchon-ri section of *Kwan-li-so* No. 15 Yodok in South Hamgyong Province and the double disappearance of prisoners.

## A. THE RECENT ADDITION OF A WOMEN'S SECTION AT *KYO-HWA-SO* NO. 12 JONGO-RI, NORTH HAMGYONG PROVINCE

One of the components of North Korea's vast system of arbitrary detention is termed in Korean as *kyo-hwa-so*, where scores of thousands of North Koreans are subjected to forced labor under extremely harsh conditions. Many thousands of those detainees are arbitrarily detained for essentially political offenses.

*Kyo-hwa-so* No. 12 Jongo-ri has existed for decades as a labor camp for men. It is described in the first edition of *Hidden Gulag* (2003) and can be seen in satellite photos in the second edition of *Hidden Gulag* (2012).

Sometime after December 2008, *Kyo-hwa-so* No. 12 was expanded to include, for the first time, a women's section that holds upwards of a thousand women. The expansion reflected a wave of arbitrary detention of thousands of North Korean women, a large majority of whom were imprisoned after being forcibly repatriated from China. The imprisonment of those women stands in violation of their right to leave their country of origin—a right guaranteed by conventions to which North Korea has acceded. Their forced return also is in contravention of international laws to which China has acceded that forbid the return of persons to countries where they will be persecuted. At Jongo-ri, these women political prisoners are subjected to forced labor under brutally harsh conditions.

This report tells the story of the expansion of *Kyo-hwa-so* No. 12 Jongo-ri to accommodate the large influx of women. Their wrongful imprisonment is emblematic of the contemporary oppression against women in North Korea.

## B. THE DOUBLE DISAPPEARANCE OF PRISONERS IN THE SORIMCHON SECTION OF *KWAN-LI-SO* NO. 15 YODOK, SOUTH HAMGYONG PROVINCE

Located at the southwest periphery of *Kwan-li-so* No. 15 (often referred to as "Camp 15"), Sorimchon was one of several "revolutionizing zones" within the sprawling prison camp, often called by the name of a nearby city, Yodok. While located deep within North Korea, a sign above the main gate read, "Border Patrol of the Korean People, Unit 2015." "Revolutionizing zones" are, or were, areas or "villages" within the prison camp where the prisoners were considered to be eligible for eventual release back into North Korean society once they were deemed cured of their perceived "counter-revolutionary" tendencies, ideas, or associations. This is in contradistinction to the "total control zones" within the political prison camps that hold prisoners deemed irremediably tainted by their "counter-revolutionary" tendencies or associations and who are imprisoned for life.

The Sorimchon "revolutionizing zone" differed from the other "revolutionizing zones" within the prison camp in that many persons imprisoned in Sorimchon were often released after three years, whereas prisoners in the other revolutionizing zones were frequently detained for as long as nine or ten years.

The Sorimchon section of *Kwan-li-so* No. 15 Yodok was set up in the late 1990s. Several former Sorimchon prisoners, who fled to China and travelled on to South Korea after release from the prison camp, were interviewed for the second edition of *Hidden Gulag* (2013). That 229-page report also contains a satellite photograph of Sorimchon, along with satellite images of other sections of the Yodok prison camp.

In late 2014, satellite photographs of *Kwan-li-so* No. 15, available in an *HRNK* and *AllSource Analysis* (*ASA*) report,[1] showed that the buildings within the Sorimchon area of the prison camp had been demolished. In fact, over the last fifty years, North Korea's prison camps have undergone a continuing series of consolidations, during which time a number of camps have been closed and/or relocated. In all of these consolidations, closures, and relocations, the world outside North Korea has practically no knowledge of the fates or whereabouts of the former and present prisoners. What is different about the closure of Sorimchon is that we have the names and biographies of many of the former prisoners.

This report examines the demolition of Sorimchon and provides the names of many of the former prisoners, whose fate and present whereabouts remain largely unknown.  These North Koreans are doubly disappeared: first, in their deportation without trial or judicial process into incommunicado detention; and second, in regards to their fate and whereabouts following the demolition of the Sorimchon section of Camp 15.

---

1          Joseph S. Bermudez Jr., Andy Dinville, and Mike Eley, North Korea: Imagery Analysis of Camp 15 "Yodok"–Closure of the "Revolutionizing Zone" (Washington, D.C.: HRNK, 2015).

# V. BACKGROUND

This present report follows a 2013 *HRNK* report, *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps*, which describes the closure of *Kwan-li-so* No. 22 in North Hamgyong Province and the unknown, unaccounted for fate and whereabouts of thousands of former prisoners there. It also discusses the dismantlement and decommissioning (*madang haeje* or "broad clearance") of *Kwan-li-so* No. 18 Bukchang, South Pyongan Province, with the exception of a group of prisoners moved to an area north of the Taedong River known as Tonglim-ri, just west of *Kwan-li-so* No. 14.[2] Additionally, that report covers a revision of the estimates of the number of *kwan-li-so* prison camp population owing to the large numbers of deaths in detention over the past two and a half decades.

North Korea does not allow the *International Committee of the Red Cross* (*ICRC*), non-governmental organizations (NGOs) such as *Amnesty International* or *Human Rights Watch*, United Nations human rights experts, or any foreign diplomats or journalists to have access to its places of detention, even those places of detention that are posited in the North Korean criminal and criminal procedure codes. Nor does North Korea allow the overwhelming majority of its citizens to have telephone or Internet contact with the outside world.

Apart from what can be observed from satellite imagery, the international community learns about the general or particular situation of North Korea's brutal prison camp system only after a prisoner is released and then flees from North Korea to China, and following that, when he or she then makes his or her way to South Korea. But it may take a released prisoner several months or several years to plan and organize the journey from North Korea to China. Although escapes facilitated by paid brokers reportedly take less time than before, it can still take the former prisoners several months or even years in China to make the connections necessary for the multi-month underground travel. They travel from northeast China, either via Mongolia, or much more frequently through central and southwest China, and then down through Laos, Thailand, Vietnam, and Cambodia, before claiming *de facto* asylum at the South Korean consulate in Bangkok.

Only after the former prisoner has arrived in South Korea, and subsequently graduated from the three-month Hanawon training program, is he or she accessible to journalists, scholars, and human rights investigators. An example of this delay can be seen in the research and publication of *Hidden Gulag Second*

---

2  The 2014 KINU White Paper on Human Rights regards Camp 18 as operational, despite a dramatic reduction in the prison population and the transfer of prisoners to Dongrim-ri, Kaechon, South Pyongan. *See* Center for North Korean Human Rights Studies, ed., *White Paper on Human Rights in North Korea 2014* (Seoul: Korea Institute for National Unification (KINU), 2014), 186-87. Also, "Dongrim-ri" is the way this area is written under the latest South Korean "Revised System of Romanization." "Tonglim-ri" above, however, is more common under the older system, as names of North Korean cities/provinces/administrative areas are more commonly Romanized in English under the older system.

*Edition*.[3] The research for this report was done in Seoul, Tokyo, and Osaka in 2010 and 2011. The report was published in 2012. Information about political imprisonment in this report covered a time frame from 1970 to 2006, which was the latest date that a former prisoner interviewed for that report was released from detention.

Hence, there is the need for periodic updates on the phenomena and circumstances of severe repression in North Korea, specifically based on the information provided by former victims of repression who have arrived in South Korea most recently. It is only they who can update the international community on the continuing systematic and severe violations of internationally-recognized human rights, including those now recognized as crimes against humanity by the UN Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea (henceforth the "Commission of Inquiry").[4]

The present report describes ongoing crimes against humanity that have been and are currently being committed in North Korea, subsequent to the research for the second edition of *Hidden Gulag*: the second unaccounted for "enforced disappearance" of prisoners in the Sorimchon/Kumchon-ri section of *Kwan-li-so* No. 15 Yodok, and the harsh brutalities and serial atrocities inflicted on women imprisoned in the post-2008 women's section of *Kyo-hwa-so* No. 12 Jongo-ri for previously having exercised their right to leave their country of origin.

## *KWAN-LI-SO* AND *KYO-HWA-SO* PRISON CAMPS

North Korea has a complex variety of facilities for detention and forced labor. The two large-scale facilities that are both usually termed "prison camps" in English are termed in Korean as *kwan-li-so* and *kyo-hwa-so*.

---

3        David Hawk, *Hidden Gulag Second Edition*, (Washington, D.C.: HRNK, 2012), available at http://hrnk.org/uploads/pdfs/HRNK_HiddenGulag2_Web_5-18.pdf.

4        The UN Commission of Inquiry stated in its February 2014 detailed findings report:
>   [I]nhumane acts perpetrated in the DPRK's political prison camps occur on a large scale and follow a regular pattern giving rise to the inference that they form part of an overarching State policy. Across the various political prison camps in the DPRK and over a timespan of six decades, hundreds of thousands of inmates have suffered a very similar pattern of starvation, forced labour and other inhumane acts. Today, between 80,000 and 120,000 prisoners are detained in political prison camps. This represents approximately 1 in every 200 citizens of the DPRK.

United Nations, General Assembly, *Report of the detailed findings of the commission of inquiry on human rights in the Democratic People's Republic of Korea*, A/HRC/25/CRP.1 (7 February 2014), available from http://www.ohchr.org/EN/HRBodies/HRC/CoIDPRK/Pages/ReportoftheCommissionofInquiryDPRK.aspx.

*Kwan-li-so* are, with one exception,[5] sprawling encampments, encompassing mountain ranges and valleys, located deep in the interior of central and north-central North Korea, which are surrounded by barbed wire fences and guard towers.[6] These detention and forced labor facilities are administered by the powerful State Security Department (or Agency).

There is no standard English translation for the Korean term *kwan-li-so*, which is variously translated as "concentration camp," "political penal labor colony," or most commonly, "political prison camp" or "prison camp." The literal translation of *kwan-li-so* is "a managed place." According to former prisoners, prison guards and officials used the term *ju-min* (resident) or *e-ju-min* (migrant) to the extent that prisoners were not called dehumanizing expletives.

Irrespective of the terminology, North Korea has long, formally and officially, denied that these political prison camps even exist, most recently in a 2015 letter from the DPRK Permanent Representative to the UN to the Geneva-based UN Human Rights Council.[7] North Korea has never provided an explanation for any of the well-documented detention facilities easily recognizable on Google Earth[8] and other satellite imagery.[9]

But based on ample and credible testimony from former prisoners, prison camp guards, and former North Korean police officials who defected to South Korea, there were initially eight or more *kwan-li-so* prison camps. Over time, several of these were consolidated into larger facilities. One large prison camp, Camp 22 near Hoeryong, North Hamgyong Province, was closed in 2014, with the prisoners transferred to other camps. And Camp 18, often called Bukchang, in South Pyongan, was progressively dismantled with most

---

5       The exception is *Kwan-li-so* No. 25 Chongjin (Camp 25), located nearby Chongjin city, North Hamgyong Province, which appears in satellite photographs as a typical walled penitentiary, not a sprawling encampment.

6       See pages 25 to 82 of *Hidden Gulag, Second Edition* (2013) for detailed descriptions of the *kwan-li-so* prison camps, based on, and including, the accounts of fourteen former prisoners and additional former prison guards and workers at the camps.

7       Letter of 5 February 2015, signed by So Se Pyong, Permanent Representative of the DPRK to the United Nations/Geneva, to the President of the UN Human Rights Council, A/HRC/28/G/5, 18 February 2015.

8       Geo coordinates of the four known operational political prison camps: Camp 14: 39.55781, 126.011499; Camp 15: 39.671450, 126.852357; Camp 16: 41.231091, 129.412216; and Camp 25: 41.50061, 129.433434.

9       HRNK has published numerous reports with satellite imagery and escapee testimony showcasing North Korea's prison camps. For more information, see HRNK's publications, available from http://hrnk.org/publications/hrnk-publications.php?page=1.

prisoners released-in-place except for a small number of unreleased prisoners transferred to a new prison camp facility located nearby still existing Camp 14.[10]

In the 1990s, the *kwan-li-so* prison camp population numbered between 150,000 and 200,000 persons. Owing to the very high numbers of deaths in detention and including the dismantlement of Camp 18, the most recent estimate of *kwan-li-so* prisoners ranges between 80,000 and 120,000.[11]

In addition to *kwan-li-so* political prison camps, North Korea also operates prison labor camps called *kyo-hwa-so*. *Kyo-hwa-so* labor camps are long-term "serious crimes" penitentiaries or prison camps, sometimes appearing in satellite photographs as a number of buildings surrounded by typical prison walls, and sometimes appearing as prison camps with widely separated prison sections surrounded by barbed wire and guard towers. *Kyo-hwa-so*, literally translated as "a place to make a good person through education," can also be translated as "labor correctional facilities."[12]

The *kyo-hwa-so* penitentiaries and prison camps differ from *kwan-li-so* prison camps in a number of ways. To begin, imprisonment in a *kyo-hwa-so* is not incommunicado, as it is in a *kwan-li-so*, which means the families and friends know of the fate and whereabouts of the detained. Families can bring food to the prisoner. Indeed, this is frequently a primary factor protecting the prisoner from severe malnutrition or death in detention.

Additionally, North Korea does not deny the existence of its *kyo-hwa-so* prison system. To the contrary, correctional labor facilities are specified in Article 30 of the *Criminal Law of the Democratic People's Republic of Korea*.[13] Another difference is that many, though by no means all, of the persons sent to the *kyo-hwa-so* have been subjected to a (sometimes rather perfunctory) judicial process. Most, or at least many, persons sent to *kyo-hwa-so* prisons have been investigated, charged, convicted, and sentenced.

*Kyo-hwa-so* prisons also differ from the *kwan-li-so* political prison camps in that the *kyo-hwa-so* contain persons charged and convicted of what would be criminal offenses in any UN Member State, as well as

---

10      These changes are described in David Hawk, *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps* (Washington, D.C.: HRNK, 2013), 24-29, available at http://hrnk.org/uploads/pdfs/NKHiddenGulag_DavidHawk(2).pdf.

11      The *kwan-li-so* prison population decreases are also discussed in David Hawk, *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps* (Washington, D.C.: HRNK, 2013), 22, 34, available at http://hrnk.org/uploads/pdfs/NKHiddenGulag_DavidHawk(2).pdf.

12      Less serious offenders are sent for shorter periods of time to "labor training centers" (*ro-dong dan-ryeon-dae*), which are akin to locally designated mobile labor brigades.

13      Citizens' Alliance for North Korean Human Rights, trans., *The Criminal Law of the Democratic People's Republic of Korea* (2009).

persons charged and convicted of "crimes that are not really crimes," as former North Koreans frequently put it. In contrast, all the prisoners in the *kwan-li-so* prison camp system were "forcibly disappeared" and are political prisoners as considered by international norms.[14]

Further, a person imprisoned in a *kyo-hwa-so* has the possibility of release back into North Korean society once his or her sentence is complete. In fact, many prisoners are released before their sentences are complete, often because of severe malnutrition, so that the prison authorities do not have to dispose of so many dead bodies. Additionally, North Korea has issued amnesties to commemorate events such as the birthday of a Kim Family leader or the founding of the Korean Workers' Party. These releases are meant to demonstrate the magnanimity of the Kim "leaders," but likely also in part to relieve the severe overcrowding in the North Korean prison system.

It is open to speculation whether full citizenship rights (however severely limited they may be) are restored upon release. Many released former prisoners are given a certificate noting their release rather than their North Korean citizen identification card.

Many released prisoners conclude that they have no possibility of a good future in North Korea. After spending time with their families or relatives to regain their health, many again cross the border into China because of the discrimination they report after being released in North Korea. This time, however, they do not escape to China in search of food or employment. Rather, knowing that they are unsafe in China, the former prisoners are now determined to flee to South Korea. A Seoul-based government-related think tank, the *Korean Institute of National Unification* (*KINU*), has interviewed 81 former prisoners from *Kyo-hwa-so* No. 12 Jongo-ri, all of whom entered South Korea between 2010 and 2014.[15]

What the *kyo-hwa-so* prison camps share with the *kwan-li-so* prison camps is extremely brutal conditions. The brutality affects both those convicted of legitimate offenses and those sentenced for essentially political offenses. A state can deprive its citizens of their liberty for what are universally regarded as criminal acts. A state may not, under contemporary international norms and standards, fail to provide food to those unjustly, or even justly, deprived of their liberty or subject them to forced labor so intense and dangerous that it leads to widespread deaths in detention.

---

14      "'[E]nforced disappearance' is considered to be the arrest, detention, abduction or any other form of deprivation of liberty by agents of the State…followed by a refusal to acknowledge the deprivation of liberty or by concealment of the fate or whereabouts of the disappeared person, which place such a person outside the protection of the law." *International Convention for the Protection of All Persons from Enforced Disappearance*, Article 2 (20 December 2006), available from http://www.ohchr.org/EN/HRBodies/CED/Pages/ConventionCED.aspx.

15      Keum-Soon Lee, "Human Rights Conditions of the Ordinary Prison Camps (*Kyohwaso*) in North Korea," in *The 4th Chaillot Human Rights Forum 2014: North Korean Human Rights and Happiness for a Unified Korea.* (Seoul: KINU, 2014), 16. *KINU* publishes annually, in Korean and in English, a "White Paper on Human Rights in North Korea."

## Kwan-li-so
### Political Penal Labor Colonies

• North Korea denies the existence of the political prison camps (*kwan-li-so*)
• Controlled by the State Security Department (*Guk-ga An-jeon Bo-wi-bu*)
• Prisoners are "forcibly disappeared" (deported to the *kwan-li-so* without any judicial process or legal recourse)
• Incommunicado detention (no contact with the outside world)
• Most inmates are imprisoned for life in "total control zones" (*wan-jeon-tong-je-gu-yeok*)
• Historically, up to three generations of family members imprisoned under "guilt by association" (*yeon-jwa-je*) system
• All prisoners detained for political offenses

**• Malnutrition and starvation due to below-subsistence food rations**
**• Arduous forced labor**
**• Brutal and inhumane conditions**
**• Large numbers of deaths in detention**
**• Subjected to innumerable crimes against humanity**

## Kyo-hwa-so
### Long-Term Prison Labor Facilities

• North Korea recognizes the existence of the *kyo-hwa-so* in the DPRK Criminal Law (Article 30)
• Controlled by the Ministry of People's Security (*In-min Bo-an-bu*)*
• Many prisoners undergo minimal judicial procedures
• Not incommunicado; families can sometimes bring food to the prisoner
• Usually fixed-term sentences after which the prisoner is released
• Some released early due to severe illnesses or as part of a nationwide amnesty to commemorate the birth of the "Great Leader" or the founding of the Korean Workers' Party
• Prisoners detained for criminal and political offenses

*Venn diagram of the kwan-li-so versus the kyo-hwa-so*

# VI. The Expansion of *Kyo-Hwa-So* No. 12 Jongo-Ri: Wrongful Imprisonment and the Opression of North Korean Women

The first edition of *Hidden Gulag* (2003) contains an interview with a former prisoner from *Kyo-hwa-so* No. 12 Jongo-ri in North Hamgyong Province. During the North Korean famine in the 1990s, when there was no food being provided by the North Korean Public Distribution System in North Hamgyong Province along the China-North Korea border, this former prisoner took to trading back and forth across the border to survive and feed his family. Arrested in late 1997 for transporting goods and money across the border, he was sentenced to three years at *Kyo-hwa-so* No. 12, including the year or more he had already spent in police jails prior to sentencing.[16]

The second edition of *Hidden Gulag* (2012) contains a satellite photograph and a prisoner-provided sketch of *Kyo-hwa-so* No. 12.[17] The information in *Hidden Gulag Second Edition*, however, only extends up to 2006. As noted above, this is because there is a delay between the time human rights violations occur and the time the outside world can find out about them.

Up to 2006, *Kyo-hwa-so* No. 12 was a men's prison, centered on copper mining and processing, woodworking (a furniture factory), and agricultural cultivation, mostly for food products to be shipped to Pyongyang.

Sometime after 2008, however, a women's section was added to *Kyo-hwa-so* No. 12, reflecting the huge increase of *refouled* (forcibly repatriated) North Korean women from China. Five additional former prisoners from *Kyo-hwa-so* No. 12 Jongo-ri interviewed in Seoul in March 2015 update this enlargement of the Jongo-ri prison. This reflects North Korea's ongoing policy to wrongfully imprisoned persons for reasons not permitted under contemporary international law. Many of the North Koreans who are deprived of their liberty and subjected to forced labor and inhumane conditions suffer this punishment for having taken actions that are explicitly provided for and protected in international law, including conventions that North Korea has acceded to.[18]

---

16      David Hawk, *The Hidden Gulag First Edition* (Washington, D.C.: HRNK, 2003), 54, available at http://hrnk.org/uploads/pdfs/The_Hidden_Gulag.pdf.

17      Hawk, *The Hidden Gulag Second Edition*, 87, 227.

18      Deprivation of liberty is arbitrary if "the deprivation of liberty results from the exercise of the rights or freedoms guaranteed by articles 7, 13, 14, 18, 19, 10 [*sic*] and 21 of the Universal Declaration of Human Rights and, insofar as States parties are concerned, by articles 12, 18, 19, 21, 22, 25, 26 and 27 of the International Covenant on Civil and Political Rights (Category II)." UN Working Group on Arbitrary Detention, Resolution 1991/42, as clarified by resolution 1997/50, http://www.ohchr.org/Documents/Publications/FactSheet26en.pdf.

## A. CLAIMS ABOUT PRISONS BY NORTH KOREAN OFFICIALS: "WARM LOVE," "EXTRA CARE," AND "A TV IN EVERY ROOM"



*Credit: Minjok TV*

While this current report was being prepared, three identified high-ranking officials from the *An-jeon-bu* (Ministry of People's Safety)[19] were interviewed on Minjok TV[20] making a series of claims about the North Korean *kyo-hwa-so* prison system.  Eschewing even the term "prisoner," the interviewed generals used the term "*kyo-hwa-persons*" instead. *An-jeon-bu* Colonel General (three-star general) Jung Young-kwon stated:

> Although the country is in a poor economic condition, Marshall Kim Jong-un, with warm love and consideration of the people, takes extra care to feed the *kyo-hwa-persons* and provide summer and winter clothes, necessities of life, medicines, and other supplies to them…We conduct

---

19        *An-jeon-bu* is shorthand for *In-min-bo-an-seong*, which is North Korea's Ministry of People's Safety. The Ministry of People's Safety is also referred to as the Ministry of People's Security.

20        *Minjok TV* is the video section of *Minjok Tongshin*, a California-based, Kim Il-sung prize-winning online news outlet operated by Korean-Americans that takes positions favorable to or closely aligned with the viewpoint of North Korean state media.

monthly health checkups to find any disease and provide the right treatment at the right time. We also distribute workload according to the checkups.[21]

Lieutenant General (two-star general) Kim Sung-il stated, "When they have dinner we let them study and watch TV. About twice a week we also show them interesting TV soap operas or films." Colonel General Kim Kyul added, "Now there is a TV in every room. We also provide newspapers, magazines, and *Rodong Sinmun*…"[22]

There are literally hundreds of former *kyo-hwa-so* prisoners who defected to South Korea following their release. These statements by North Korean officials starkly contradict the testimony of countless former prisoners, including those in this report.[23]

## B. PRISONER TESTIMONY ON CONDITIONS AT *KYO-HWA-SO* NO. 12 JONGO-RI

As summarized in a recently published book on North Korea by two British journalists with extensive experience on the Korean peninsula:

> Life in a *gyohwaso*[24] is exceptionally tough. Testimony from former prisoners of *Gyohwaso* Number 12, located at Jonggo-ri in North Hamgyong Province (near the Chinese border), reveals that food rations there are so pitiful as to be below subsistence level, forcing inmates to eat whatever insects and rodents they are able to trap for themselves… *Gyohwaso* Number 12, which houses around 3,000 to 4,000 inmates, including 1,000 women, is far from the exception in this regard.

> At the same time, *gyohwaso* prisoners must also endure forced labor. Men at *Gyohwaso* Number 12 may be sent to work for 14 hours per day in the camp's copper mine. Safety equipment is non-existent, and thus fatalities and severe injuries are common. There is also an on-site furniture factory,

---

21      *Minjok TV*, June 1, 2015. The Korean language interview is accessible on YouTube.

22      Ibid.

23      The former *kyo-hwa-so* prisoners interviewed for this current HRNK report talked in such detail about the chronic lack of food and medical care, that, frankly, it did not occur to the present author to ask them if there was "a TV in every room." Nor did it occur to the present author to ask them to confirm Colonel General Jung Young-kwon's assertion that, "[w]hen our Great General Kim Jong-il passed away… *Kyo-hwa-persons* showed their grief fasting, weeping, hitting the ground, and bleeding in their hands."

24      The present report has adhered to the transliteration introduced by the first edition of the *Hidden Gulag* report; i.e. *kyo-hwa-so*.

in which accidents are very frequent. Prisoners sleep for five hours per night, so the combination of tiredness and antiquated equipment results in around one death every few days.[25]

The first edition of *Hidden Gulag* (2003) cited the testimony of a former prisoner on the deplorable conditions and high rates of death in detention at *Kyo-hwa-so* No. 12.[26] Between December 1998 and July 1999, "Out of twenty-three prisoners who entered on the same day… only two survived. The rest died within eight months of arrival, from hard labor and sub-subsistence food rations–small mixtures of corn and beans, with rice added only on holidays." A former prisoner interviewed for that report believes that eight hundred prisoners died while he was there; so many, according to what another prisoner told him, that the guards had to burn the corpses.

This former prisoner reported that he weighed 50 kilograms (kg) (110 pounds (lb)) prior to his arrest and only 30 kg (66 lb) upon his release from *Kyo-hwa-so* No. 12.[27] This was fifteen years ago during North Korea's "great famine." Reportedly, not all that much has changed in this regard at *Kyo-hwa-so* No. 12. Tudor and Pearson, publishing in 2015, wrote that "it is common for men serving time there to lose 30 kilograms [66 lb] in body weight. Many end up starving to death."[28]

One of the former women prisoners at Jongo-ri interviewed for this present report in March 2015, Ms. Kim Min-ji, reported that during her time in *Kyo-hwa-so* No. 12 from 2009 to 2011, nearly all people lost weight and many died of malnutrition and related diseases.[29]

Another former female prisoner at Jongo-ri interviewed for this report in March 2015, Ms. Choi Min-gyang, went from 57 kg (125 lb) to 27 kg (60 lb) during her time at *Kyo-hwa-so* No. 12 Jongo-ri (mid-2008 to September 2010). She was put in the *ho-yak-ban* (severely sick) unit and lost consciousness. Her condition was so severe that prison officials called her family to come get her rather than deal with her death. It took her a year to regain her health, after which she fled to China and on to South Korea.[30]

---

25       Daniel Tudor and James Pearson, *North Korea Confidential: Private Markets, Fashion Trends, Prison Camps, Dissenters and Defectors* (China: Tuttle Publishing, 2014), 117.

26       This former prisoner was imprisoned from 1998 to 1999, and testified that the prison was sometimes also referred to as "Onsong-kun *Kyo-hwa-so*."

27       Hawk, *Hidden Gulag First Edition*, 55.

28       Tudor and Pearson, *North Korea Confidential*, 117.

29       *See* Ms. Kim Min-ji's testimony below on page 20.

30       *See* Ms. Choi Min-gyang's testimony below on page 18.

Another woman prisoner interviewed for the present report stated that she weighed 79 kg (174 lb) while in China, but her weight during pre-trial detention in North Korea dropped to 34 kg (74 lb). She arrived at *Kyo-hwa-so* No. 12. Jongo-ri in 2010 already so weak that the prison authorities initially did not want to accept her. Nonetheless, even though she was clearly weak and sick, she was assigned to the logging work unit and fed only rotten corn. She never regained her weight until she was released in 2012.[31]

Two male former prisoners at Jongo-ri interviewed for this report in March 2015 indicate that, for men, *Kyo-hwa-so* No. 12 has operated almost the same for several decades.[32]

## C. GENDER AND REPRESSION: *KYO-HWA-SO* NO. 12 EXPANDS IN ORDER TO IMPRISON WOMEN

The major change to Jongo-ri was the addition of a women's section to imprison the large number of forcibly repatriated women from North Hamgyong Province. Women prisoners were introduced in late 2007 and soon numbered roughly 1,000, about 80% of whom, according to the former prisoners interviewed for this report, were "border crossers."

According to a report by the Seoul-based *Database Center for North Korean Human Rights (NKDB)*, "Women prisoners were generally interned at Kaechon, Hamheung, Cheungsan and Oro prisons, but a Kim Jong-il order in 2007 made it so prisoners were imprisoned in prisons located within the county of their origin."[33]

At *Kyo-hwa-so* No. 12 Jongo-ri, women prisoners were apparently initially held in one of the previously male work unit cells and spilled over into the halls. As more and more women prisoners arrived, a new building entirely for women was constructed by prison labor and expanded to accommodate more and more women. Hand-drawn sketches of the women's building by former prisoners indicate the L-shaped structure was extended to a U-shaped structure with a large gate opening at the mouth of the U. The rooms along the sides of the building were devoted to prison cells, rooms for work units, a kitchen, eating area, meeting rooms, and guards' offices. Satellite imagery with identifications made by former prisoners are enclosed below, together with a computer-generated composite sketch. (See page 47 for satellite imagery.)

---

31      *See* Anonymous Former Prisoner's testimony below on page 21.

32      Former male and female prisoners at other *kyo-hwa-so* interviewed for the present report indicate that Jongo-ri prison is not atypical.

33      NKDB, *Prisoners in North Korea Today* (Seoul: NKDB, 2011), 66.



*Composite graphic of Kyo-hwa-so No. 12 Jongo-ri women's section*

The women's section was divided into work units for tree and log cutting, agricultural production (beans, potatoes, and corn), livestock or animal husbandry, cooking (for the prisoners), which are the typical prison work units,[34] plus a wig-making unit and an eyelash-making unit. The younger women (in their twenties and thirties) were assigned to wig and eyelash making, while the older women were assigned to the tree and log cutting, livestock, and agricultural production. "About 100 women were in the wig-making work unit."

One of the former prisoners interviewed for this report worked in the wig-making unit. Unlike the agricultural and tree and log-cutting work units, the wig unit had no fixed schedule. A box of hair would arrive from Pyongyang, but the hair, she thought, came from China. The boxes contained a mixture of hairs of various colors and lengths. The hairs would be sorted by color and length, threaded through needles, and sewn into the fabric that would become the base of the wig. "About 80% of the wigs were for women; 20% for men." The hairpieces were not finished but were packed and sent to Pyongyang (and then perhaps somewhere else) for "finishing."

When they had a "production order," the wig-sewers would work non-stop day and night until the order was completed. The former prisoner described this as "mentally exhausting work." In-between orders, the best and fastest wig sewers were allowed to rest. Other sewers were assigned to assist the tree and log-cutting and agricultural production work units.

---

34      The women's prison at Kaechon had a textile production unit.

When the agricultural work units were not planting or harvesting, they would make fertilizer by collecting refuse from the prison toilets and mixing it with dirt.

The work units of women prisoners had weekly mutual self-criticism sessions, where the prisoners would confess their production shortcomings and criticize the shortcomings and inadequacies of other workers in their production unit. Larger groups of the women prisoners were gathered for what is termed "re-education." Examples of prisoners from other *kyo-hwa-so* who worked hard and well, and were purportedly released early in reward for there exemplary labor were read aloud to the women prisoners. The literal translation for this *saeng-hwal-chong-hwa* is "daily life re-education," but "ideology struggle sessions" or "struggle for ideology sessions" better captures the intent.[35] The women would read aloud and then chant slogans taken from the New Year's Day Joint Editorials.[36] Asked for an example, one of the former prisoners interviewed for this report, Ms. Kim Min-ji, cited the slogan, "Let us build power plants throughout the country"–an admirable national goal, no doubt, but one that had little to do with these wrongfully imprisoned women. And the women had very little to do with it, too.

This brief account of *Kyo-hwa-so* No. 12 Jongo-ri, however, does not convey the succession of misfortunes endured by the North Korean citizens who enter its gates. Most of these North Korean women have not committed acts recognized as crimes under contemporary international law.[37] Serial atrocities can be seen in the personal accounts below of those who end up at Jongo-ri and have already suffered multiple human rights violations at the brutal and inhumane *ku-ryu-jang* (detention-investigation facilities) and *jip-kyul-so* (collection-detention facilities) before being sent to *Kyo-hwa-so* No. 12.

### 1. Mrs. Choi Min-gyang (Imprisoned mid-2008 to late 2010)

Mrs. Choi Min-gyang was born in Kyongwon, North Hamgyong Province.[38] In 1998, she fled to China owing to the acute famine conditions in North Hamgyong Province. She lived in Yanbian, the Korean Autonomous Prefecture in China, for ten years. Caught as an illegal immigrant by the Chinese police in

---

35      Each and every person in North Korea must participate in *saeng-hwal-chong-hwa* sessions, whether on the job or at the place of residence, through the local *in-min-ban* (neighborhood watch unit).

36      Kim Jong-un has returned to the practice of his grandfather, Kim Il-sung, in making a major address on New Year's Day. Kim Jong-il, on the other hand, rarely spoke in public. During his years in power, the North Korean newspapers would publish a New Year's Day Joint Editorial. In these speeches and editorials, the Leader's outlook and goals for the coming year were set forth, often in the form of slogans, which the populace then studied (through repetition and recitation) during their workplace and neighborhood ideological guidance meetings.

37      One of the former prisoners interviewed for this report mentioned that some of the North Korean police tasked with ushering the prisoners to the prison camp told her that they did not think that "border-crossing"—leaving North Korea without the written permission of the Korean Workers' Party—was really a crime either.

38      Gyungwon was formerly called Saebyul.

**18**

2008, she was forcibly repatriated to the Onsong *Bo-wi-bu* (State Security Department) *Ku-ryu-jang* (detention-investigation facility) and held for twenty-five days.

At that time, according to Mrs. Choi, there were about 300 *refouled* persons under detention and investigation by the Onsong *Bo-wi-bu*, about 80% of whom were women suspected to have been en route to South Korea. A few of the detainees were in single cells, but most were held in very crowded cells spilling into the hallways. Mrs. Choi reports no personal mistreatment but recalls that there was very little to eat.

As Mrs. Choi had lived in China for ten years, it seemed she was not in the process of defecting to South Korea. As a result, she was transferred to the Chongjin *An-jeon-bu* (Ministry of People's Safety) *Jip-kyul-so* (collection- detention facility) awaiting charges of "border crossing"—leaving North Korea without permission. During the month she was held there, there were, she reports, some 400 to 500 persons detained. Again, about 80% were women. And again, there was very little to eat.

Mrs. Choi spent an additional 100 days at the Ranam *Gu-yeuk* District *Ku-ryu-jang* (detention-investigation facility) in Chongjin awaiting "trial," a lawyer-less five minute proceeding where the judge merely asked her if she admitted to the crime. She did and affixed a thumbprint to her confession. She was sentenced to three years at *Kyo-hwa-so* No. 12 Jongo-ri.

Arriving at *Kyo-hwa-so* No. 12 in mid-2008, there were already about 1,000 women and 4,000 men, although the women had just been introduced the year before. Mrs. Choi's cell was so crowded that the women could barely sit down. Her first work assignment was at a construction unit to build more cells for the women prisoners. She worked in the construction unit for a year and had to sleep sitting on the floor during that time.

Mrs. Choi was then assigned to the "corn work unit," which made fertilizer in the winter time by mixing the frozen toilet waste with dirt. She was able to eat only watery soup made with beans and corn stalks. While Mrs. Choi weighed 57 kg (125 lb) before being forcibly repatriated, food deprivation, hunger, and weight loss began immediately upon repatriation. This continued during "pre-trial" detention and at *Kyo-hwa-so* No. 12 Jongo-ri, resulting in significant weight loss. Due to starvation, Mrs. Choi was transferred to the *ho-yak-ban* (sick unit) and then to the *byung-ban* (very sick unit). The prison authorities eventually sent for her family to come get her once she lost consciousness when they believed she was near death. At that point, Mrs. Choi had served two years and three months of her three-year sentence. She weighed 27 kg (59.5 lb) upon release and was unable to walk. It took her a full year to regain her health.

Fed up with North Korea, Mrs. Choi's husband successfully fled to South Korea and used his resettlement grant from South Korea to hire a broker to bring his wife to Seoul, where she arrived in October 2012.[39] Mrs. Choi was interviewed by *HRNK* in April 2015.

---

39      A "broker" is a person, often Korean-Chinese, who receives a fee in China and then picks up an escaping North Korean at the China-North Korea border to arrange the escapee's clandestine travel from Northeast China to South Korea. Korean-Chinese brokers are also hired as agents to clandestinely carry letters and funds from China to persons inside North Korea.

## 2. Ms. Kim Min-ji (Imprisoned late 2008 to late 2011)

Ms. Kim Min-ji went to China in July 2005 at the age of 19. She was caught by human traffickers and sold to a rural Chinese man. Ms. Kim lived with him in Liaoning Province in northeast China until late 2008. Knowing what would happen to her if repatriated to North Korea, she more-or-less accepted her fate. Her former trafficker, however, was arrested and gave the Chinese police her name and location. As a result, Ms. Kim was arrested and sent to Dandong, China, where "illegal immigrants" were held for repatriation (often monthly) to Sinuiju.

She was held for a month at the Sinuiju *Bo-wi-bu* (State Security Department) *Ku-ryu-jang* (detention-investigation facility). Living in China for three and a half years as a trafficked bride, her case had no ostensible political connection, such as meeting South Koreans or participating in a Korean-Chinese church while in China. So, Ms. Kim was transferred to the *An-jeon-bu* (Ministry of People's Safety) *jip-kyu-lso* (collection-detention facility) to wait for the police from Hoeryong to take her back to her hometown for trial. She was held for only ten days at a *bo-wan-so ku-ryu-jang* (detention-investigation police station) before a judge told her that since she spent three and a half years in China, she would be sentenced to two and a half years at *Kyo-hwa-so* No. 12 Jongo-ri.

In late 2008/early 2009, there were about 1,000 women prisoners at Jongo-ri, according to Ms. Kim. Soon after, 200 additional women prisoners were detained there as well. Then, in 2010, a number of women were released because they had contracted a communicable disease. In October 2010, on the occasion of the 50th anniversary of the founding of the Korean Workers' Party, a large-scale amnesty brought the women prisoner population down to about 800.

At Jongo-ri, Ms. Kim was assigned to the wig-making work unit (described above on page 17). Because she was one of the better wig sewers, Ms. Kim was allowed to eat more food than the other prisoners. Therefore, she was much better off than other women prisoners at Jongo-ri. "Lots of women lost weight," and "many died of malnutrition." Ms. Kim was held for two years and one month, and released in September 2011. Upon release, rather than being given back her North Korean citizen ID card, she received a document certifying that she had been released from the *kyo-hwa-so*. This document would let any police or other official know immediately that she was formerly imprisoned as a "serious crime" lawbreaker.

Ms. Kim waited just two months before fleeing again to China. She returned to the man who had bought her six years earlier, but someone in the village reported her to the Chinese police and she was again arrested and sent to Dandong for repatriation to Sinuiju. She was again turned over to the Sinuiju *An-jeon-bu* (Ministry of People's Safety) *Jip-kyul-so* (collection-detention facility) to await the Hoeryong police who would take her back to Hoeryong by train.

In China, Japan, or South Korea, traveling the distance from Sinuiju to Hoeryong by train would take several hours. In North Korea, however, it can take up to ten days. En route, while waiting three days for a railroad bridge to be repaired and fearing what she would face if convicted of leaving North Korea without

permission for a second time, Ms. Kim talked the police into removing the handcuffs from the group of women prisoners being taken back to Hoeryong. While the police guards were sleeping off a night of drinking, she and another woman prisoner escaped and immediately fled to China. In April 2014, Ms. Kim arrived in South Korea. In April 2015, she was interviewed by *HRNK*.

Ms. Kim witnessed forced abortions at the Sinuiju *An-jeon-bu* (Ministry of People's Safety) *Jip-kyul-so* (collection- detention facility) during both of her forcible repatriations. The first time, in 2008, a pregnant woman was forced to take some medicine, after which the baby was aborted. The second time, in 2012, the holding center authorities had a baby surgically removed from the womb of a woman who was in the "last days of pregnancy." The baby was killed.

## 3. Anonymous Former Female Prisoner (Imprisoned March 2010 to November 2012)

A third former female prisoner at *Kyo-hwa-so* No. 12 Jongo-ri asked to remain anonymous.[40] In 1998, she first went to China to earn money. At that time, however, her children remained in North Korea, so she would travel back and forth to see them and share her earnings. One of her daughters later fled to China and defected to South Korea. This anonymous former prisoner was arrested by Chinese police and repatriated to Sinuiju with a group of thirty other North Koreans in 2010.

The *Bo-wi-bu* (State Security Department) police beat her and banged her head against a wall because her daughter had "defected" to South Korea. After fifteen days, this former prisoner was sent to the Sinuiju *An-jeon-bu* (Ministry of People's Safety) *jip-kyul-so* (collection-detention facility), where she was held for two months with about twenty men and about fifty women. At Sinuiju, she collected feces for fertilizer and developed severe frostbite due to the extreme cold. This former prisoner was transferred to Chongjin *Jip-kyul-so* (collection-detention facility) and held for another two months. She received food only once every five days. After Chongjin, she was transferred to the Songpyong district *An-jeon-bu* (Ministry of People's Safety) *Ku-ryu-jang* (detention-investigation facility) for another three months and was sentenced to five years at *Kyo-hwa-so* No. 12 Jongo-ri. Based on her recollection, there may have been lawyers and sentencing at her 30-minute trial, but she was too malnourished and sick to talk to them. Further, "only people with money could talk to lawyers," she said.

The former prisoner weighed 79 kg (174 lb) at the time she was forcibly repatriated from China to North Korea. But after these successive detentions, her weight dropped to just 34 kg (74 lb). Because of this, the authorities did not want to take her in when she first arrived at Jongo-ri. They changed their minds, however, when bribed with a gift of some fish by the *an-jeon-bu* agents who brought her in. This former prisoner had a son who had previously been sent to *Kyo-hwa-so* No. 12 Jongo-ri. She found out, though, that he had died there before she arrived.

---

40    Many North Korean refugees or "defectors" adopt a new name when they obtain South Korean citizenship papers in order to protect their relatives remaining in North Korea. Other "defectors" do not want even their "South Korean name" to be used, lest they can be traced by North Korean authorities to their family members in North Korea.

Fed only rotten corn and watery soup, she was unable to regain weight. Nonetheless, she was initially assigned to the tree and log-cutting work unit where she dragged cut logs to be used as firewood for the prison authorities. At the time, there were about ten work units of roughly 100 or more female prisoners—just over 1,000 women prisoners overall. She was then assigned to one of the agricultural work units. She said that the male prisoners mined copper to be sold in China and farmed wheat to be sold locally to buy food for the prisoners.

Her daughter in South Korea sent money to brokers so relatives could bring food to her mother in prison. Her daughter also sent more money to a broker to arrange the former prisoner's release. The prison authorities gave the broker a list of tools they needed at the prison, and upon the delivery of shovels and other tools, they released her. After release, she was kept under police surveillance because she had not completed her sentence. Fearful of re-arrest, she donned a wig to disguise herself and again fled to China. Her daughter sent money to a broker to bring her mother to South Korea, but the broker tricked the former prisoner, now again in China, and ran off with the money. Her daughter sent more money, and this time, an honest broker arranged her trip to South Korea via Laos and Thailand.

Arriving in South Korea in July 2014, this former prisoner now lives in suburban Seoul, close by the daughter who kept her alive and rescued her. She still has thrombosis, a circulatory ailment, stemming from the severe frostbite incurred while in detention in North Korea. She was interviewed by *HRNK* in April 2015.

Two former male prisoners from *Kyo-hwa-so* No. 12 Jongo-ri were interviewed for this report, as were persons from two other *kyo-hwa-so*. As this report focuses on the women's section of *Kyo-hwa-so* No. 12, their testimonies are not included herein, but the three testimonies briefly presented above are entirely typical. The second edition of *Hidden Gulag* (2012) has some 60 prisoner interviews. Hundreds of former North Koreans testified to the UN Commission of Inquiry. Many of these testimonies are available online.[41]

## D. RECOMMENDATION

The *Committee for Human Rights in North Korea* (*HRNK*) and many others have long recommended that North Korea allow the *International Committee of the Red Cross* (*ICRC*) access to its prison camps. Thus far, North Korea has explicitly rejected this recommendation.[42] Considering the huge discrepancy between recent statements of North Korean prison officials cited above and the testimony from recently released prisoners, *HRNK* renews its recommendation for North Korea's cooperation with the *ICRC*.

---

41      "Human Rights Council: Commission of Inquiry Hearings," UN Web TV, accessed June 19, 2015, http://webtv.un.org/meetings-events/human-rights-council/commissions-of-inquiry-hearings/watch/human-rights-in-north-korea-excerpts-from-the-public-hearings-of-the-commission-of-inquiry-23mins/3339582047001.

42      In 2014, North Korea rejected the 2009 recommendation by other UN Member States (as part of a UN Human Rights Council procedure known as the Universal Periodic Review) that it "Provide unlimited access to ICRC to all detention facilities in the country" by stating that this was one of fifteen "[r]ecommendations which do not enjoy the support of the DPRK." *Annex to the National Report*, A/HRC/WG.6/19/PRK/1, http://www.upr-info.org/sites/default/files/document/korea_dpr/session_19_-_april_2014/a_hrc_wg.6_19_prk_1_annex_e.pdf.

Without on-site confirmation of the accuracy of the statements made by North Korean prison system officials—corroboration by the *ICRC*, by reputable human rights organizations such as *Amnesty International or Human Rights Watch*, by UN human rights experts, or by a group of ambassadors residing in Pyongyang—the voluminous and consistent testimony of the former prisoners stands.

## E. THE POST-2007 ADDITION OF THE WOMEN'S SECTION OF *KYO-HWA-SO* NO. 12: EMBLEMATIC OF NORTH KOREA'S OPPRESSION OF WOMEN

The expansion of *Kyo-hwa-so* No. 12 Jongo-ri, to include a section for women prisoners, is emblematic of a core element of North Korea's systematic persecution of women wherein human rights violations are piled on top of one another.[43]

The root cause of this component of oppression of women is North Korea's blatant violation of Article 13 (2) of the Universal Declaration of Human Rights:

> Everyone has the right to leave any country, including his [her] own, and to return to his [her] country.

This fundamental right was codified into positive international law in Article 12 (2) of the International Covenant on Civil and Political Rights (ICCPR), to which North Korea acceded in 1981:

> Everyone shall be free to leave any country, including his own.[44]

Global labor migrations that affect scores of countries in today's world also impact North Korea. Workers migrate from areas of their country with lower income and few jobs to higher-income areas with more plentiful job prospects.

Many of these labor flows have a significant gender component. Just as large numbers of women from Southeast Asia travel to Hong Kong and the Persian-Arabian Gulf in search of employment, within Northeast Asia, women from China's impoverished northeast rust belt migrate to the immense manufacturing zones in China's southern coastal areas. Following the breakdown of North Korea's public food distribution system

---

43    For a complete description of these phenomena of severe repression, *see* David Hawk, "Part Four: Detention Facilities and Punishments for North Koreans Forcibly Repatriated from China: Violence Against Women," in *Hidden Gulag Second Edition* (Washington, D.C.: HRNK, 2013), 111-154.

44    This right can be restricted only as is necessary to protect national security, public health and order, morals, or the rights and freedoms of others, and is consistent with other rights posited in the ICCPR. The repressions depicted herein are obviously injurious to public health and morals and inconsistent with other rights prescribed in international law. It would seem hard to argue, by any normal consideration of national security, that a few thousand women from North and South Hamgyong Province working or living in China threaten the security of a state armed with nuclear weapons and fielding a million-soldier army.

in the 1990s, women from North Korea's impoverished northeast provinces went to China in search of food and any income for the survival of their families back in North Korea. Korean-Chinese women go to South Korea where the wage scale is higher than in China. And South Korean women have gone to North America, Europe, and Australia for higher education or temporary employment at higher-wage scales than in South Korea. North Korea treats the right to leave one's country of origin as a criminal offense.

North Korea has a large-scale program to export labor to earn hard currency. In these state-organized labor export programs, men and women deemed very loyal to the Kim Regime (what North Koreans term "high *songbun*") are sent abroad to work. Men often work in construction, mining, or logging. Women work in textile or other manufacturing or service trades. In these state-run labor export schemes, the official North Korean agency in charge of the worker dispatch[45] is paid directly in hard currency and the participating individual workers receive wages, usually at a very small percentage of the wage scale paid directly to the state. North Korean women who seek employment in China as individual workers are usually of "middle" or "low *songbun*," and hence, are ineligible to participate in the state-run labor-export schemes. However, bribery has reportedly eroded the influence of the *songbun* system.

There is, it should be noted, no right to enter another (not just the next) neighboring country, corresponding to the right to leave one's country of origin; nation states regard control over the borders of their territory as a core element of sovereignty. Thus, were it not for the way North Korea severely mistreats forcibly repatriated North Koreans, China could be justified at times in claiming that the North Koreans who crossed into China without entry visas are "illegal immigrants" or "economic migrants," which is what China continues to claim.

However, in reality, a significant number of North Koreans who cross the border into China qualify as asylum seekers—refugees with a well-founded fear of persecution should they remain in or return to their country of origin—under international law and hence are entitled to international protection.[46] And, as has been long recognized and documented in multiple NGO reports, legal analyses, the reports of the UN Special Rapporteur on human rights in the DPRK, and most authoritatively by the Commission of Inquiry, virtually all North Koreans in China without entrance visas qualify as "*refugees sur place*"—persons who may not have left their country of origin out of a fear of persecution, but who would, irrespective of their

---

45      North Korea's Central Labor Administrative Guidance Committee reports directly to the Cabinet. It reportedly deals with occupational safety (including educational programs) and working hours, decides on recipients of safety supplies, and is tasked with conducting scientific research relevant to labor protection. However, the agency in charge of the worker dispatch differs based on the nature of the work. For example, the Forestry Agency (*Rim-up-bu*) is in charge of dispatching loggers to the Russian Far East.

46      *See* the following: Article 14 of the Universal Declaration of Human Rights 1948, which recognizes the right of persons to seek asylum from persecution in other countries; the 1951 UN Convention Relating to the Status of Refugees; and the 1967 Protocol Relating to the Status of Refugees.

reasons for leaving, face persecution if forcibly returned to their country of origin.[47] Indeed, the Commission of Inquiry states, "[M]any such nationals of the Democratic Peoples [sic] Republic of Korea should be recognized as refugees fleeing persecution, or refugees sur place. They are thereby entitled to international protection."[48] For North Korean women without visas in China, brutal repression upon repatriation to North Korea is not a fear but—unless mitigated by bribery or exceedingly good luck—a reality.

Nonetheless, the migration of North Koreans to northeast China continues. This is driven by the "supply push" of food and job shortages for Korean women in its northeast provinces and the "demand pull" in rural northeast China, from where Chinese women have flocked to Beijing, Shanghai, and Guangzhou, resulting in a gender imbalance. There is also a long-term gender imbalance throughout China owing to its decades-long "one child" policy, which favored the male child, creating a "demand pull" for the purchase of trafficked North Korean brides.

Economic rationality would seem to welcome the remittances to families in North and South Hamgyong provinces from wages earned in China. That is the case of most nation states whose citizens seek employment abroad. However, North Korean policy is to severely punish those North Koreans, including a large portion of women, who see getting food or earning wages in China as essential to their families' survival. The post-2007 expansion of a women's section in Kyo-hwa-so No. 12 Jongo-ri exemplifies the ongoing imprisonment of more and more women, whose core "offense" was to have exercised their basic human right to leave their country of origin.

Furthermore, these expanded women's prisons, such as *Kyo-hwa-so* No. 12, even if regarded as "labor correction facilities," are a gross violation of Article 10 of the International Covenant on Civil and Political Rights (ICCPR):

> "All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person."

In addition to this gross violation of internationally recognized human rights, other egregious violations include: systematic torture and beatings during investigation and interrogation immediately following forced repatriation; severe deprivation of food; the sexual humiliation of naked strip searches and the naked compulsory exercises ("squat thrusts" and "jumping-jacks") to dislodge money or valuables that might be

---

47      *See* the 1951 UN Convention Relating to the Status of Refugees, available from http://www.unhcr.org/3b66c2aa10.html.

48      United Nations, General Assembly, *Report of the detailed findings of the commission of inquiry on human rights in the Democratic People's Republic of Korea*, A/HRC/25/63 (7 February 2014), 10, available from http://www.ohchr.org/EN/HRBodies/HRC/CoIDPRK/Pages/ReportoftheCommissionofInquiryDPRK.aspx.

hidden in anal or vaginal cavities; and the barbaric practices of forced abortions or infanticides committed against repatriated pregnant North Korean women suspected of carrying babies fathered by Chinese men.[49]

The Commission of Inquiry concluded:

> 42. The State imposes a virtually absolute ban on ordinary citizens travelling abroad, thereby violating their human rights to leave the country.  Despite the enforcement of this ban through strict border controls, nationals still take the risk of fleeing, mainly to China.  When they are apprehended or forcibly repatriated, officials from the Democratic Peoples [sic] Republic of Korea systematically subject them to persecution, torture, prolonged arbitrary detention, and in some cases, sexual violence, including during invasive body searches. …

> 44. Discrimination against women and their vulnerable status in the Democratic People's Republic of Korea, as well as the prospect of refoulement, make women extremely vulnerable to trafficking in persons. Many women are trafficked by force or deception from the Democratic People's Republic of Korea into or within China for purposes of exploitation in forced marriage or concubinage, or prostitution under coercive circumstances. …[50]

Scant wonder the UN Commission of Inquiry found the severe mistreatment and serial atrocities against such women to amount to criminal inhumanity:[51]

> 1068. … the Commission finds that crimes against humanity extend to the ordinary prison system, in particular the ordinary prison camps (*kyohwaso*) and, to a lesser degree, the various types of short-term forced labor detention.

> 1083. … The Commission finds that, across the vast prison system inhumane acts follow regular patterns that victimize tens of thousands of inmates at any point in time.

> 1055. The imposition of forced abortions on female inmates who become pregnant without authorization not only results in immediate physically harm, [*sic*] it also interferes with the victim's reproductive rights and causes severe emotional suffering.  Systematic or widespread forced abortions must therefore be considered a form of sexual violence of a gravity amounting to crimes against humanity.

---

49      *See Hidden Gulag Second Edition* for a fuller description of these gross violations and serial atrocities, available from http://hrnk.org/uploads/pdfs/HRNK_HiddenGulag2_Web_5-18.pdf.

50      United Nations, *Report of the commission of inquiry*, 9, 10.

51      United Nations, *Report of the commission of inquiry*, 3.

**26**

1056. The severe pain and suffering of the incarcerated victims of rape and forced abortion, who are targeted on discriminatory political and gender grounds, regularly reach the threshold of torture as defined under the Rome Statute and customary international criminal law.

1077. …The forced abortions to which pregnant inmates have been subjected constitute a form of sexual violence of a gravity that meets the threshold required for crimes against humanity.[52]

The international community should continue to press North Korea to rectify these policies and practices, beginning with allowing the ICRC to have access to the places of detention en route to and including North Korea's *kyo-hwa-so* prisons.

---

52        United Nations, *Report of the detailed findings*, 328, 330, 331, 333.

# VII. The Demolition of the Sorimchon/Kumchon-ri Section of *Kwan-Li-So* No. 15 Yodok, South Hamgyong Province: The Fate and Whereabouts of the Former Prisoners

## A. THE DEMOLITION OF SORIMCHON/KUMCHON-RI

Sorimchon, a small *hyeok-myong-hwa-koo-yeok* ("revolutionizing processing zone"), was established in or around 1999 in the southern corner of Camp 15. Camp 15 is 365 square kilometers and is the most well-documented *kwan-li-so* political prison camp in North Korea. (See a satellite image of Sorimchon in relation to Camp 15 on page 48.)

Sorimchon held a smaller number of single prisoners for shorter periods of incarceration and forced labor compared to the much larger "revolutionizing" sections for incarcerating families deeper within Camp 15. Prisoners in the Sorimchon section were released back into North Korean society after enduring roughly three years of forced labor. Sorimchon was fenced off from the immediately adjacent *wan-jeon-tong-je-ku-yuk* ("total control zone"), from which prisoners deemed irremediably tainted by real or imagined "counter-revolutionary" thoughts or affiliations were held for forced labor for the rest of their lives.

Sorimchon held 300-400 prisoners, including a mixture of "high-level people," former officials and diplomats, students previously studying abroad, and "common citizens" forcibly repatriated from China for "illegal border crossing" (leaving North Korean territory without official permission) whose cases had political implications—often for contact with South Koreans or Korean-Chinese Christian churches while in China.[53]

The men and women detained at Sorimchon lived in dormitories and performed agricultural labor and animal husbandry. Sorimchon contained two clusters of buildings, one of dormitories and prison official offices, and another comprised of animal pens, stables, and sheds for agricultural equipment. For unknown reasons, Sorimchon was renamed, or also called, Kumchon-ri.[54]

---

53    As described above, North Korean "border crossers" whose cases do not involve political implications, such as those North Korean citizens deemed by North Korean police authorities to have gone to China for food, trading business, or employment, are usually sent to *kyo-hwa-so* prisons or to *ro-dong dan-ryeon-dae* ("labor training centers"), which are akin to locally designated mobile labor brigades.

54    The Korean word *chon* means a little river or creek.

28

The second edition of *Hidden Gulag* (2012) contains interviews with three former prisoners in the Sorimchon/Kumchon-ri section of Camp 15: Mr. Jung Gwang-il; Mr. Kim Eun-chol; and a young woman, "Former Prisoner #28," whose testimony to HRNK was provided under conditions of anonymity to protect her family members still in North Korea. *Hidden Gulag Second Edition* also contains satellite imagery of Sorimchon/Kumchon-ri with building identifications provided by the former prisoners.[55]

## B. PREVIOUS SOURCES OF INFORMATION ON SORIMCHON

### 1. Mr. Kim Eun-chol (Imprisoned 2000–2003)

Mr. Kim Eun-chol explained that he had been arrested in Ussuriysk, Russia, along with other North Koreans, all deemed illegal immigrants. Deported by Russia to China, Kim then voluntarily returned to North Korea to see his father. Arrested by the *An-jeon-bu* (Ministry of People's Safety), he was turned over to the Musan *Bo-wi-bu* (State Security Department), the more powerful political police, where he was held for six months and severely beaten until he confessed that he met with South Koreans in China. While he did not have a "trial" with a judge, he did have a "session" with a *Bo-wi-bu* "prosecutor" he called a "*kom-sa dam-hwa*," who said he would be placed under three years of "revolutionizing process." Deported to Camp 15 in June 2000, doubting he would ever be released, he was assigned to reside in a small, new section for single men and women prisoners called Sorimchon, where his work unit built the farm sheds for chickens and pigs and the homes for prison officials. During his three years in Sorimchon, two persons were executed for escape attempts, three died after being released from nearby punishment cells (one for "stealing honey," one for eating corn intended for the animals, and one for having sex with another prisoner), and several others died in detention from starvation and malnutrition-related disease. Everyone was constantly hungry.

After his release from Camp 15, Mr. Kim fled to China and then to South Korea.

### 2. Mr. Jung Gwang-il (Imprisoned 2000–2003)

Mr. Jung Gwang-il had been engaged in exporting high quality mushrooms, which he sold directly to South Korean businessmen in China, cutting out Korean-Chinese middlemen. He was suspected of having become a South Korean spy for meeting with South Koreans. Picked up by the Heoryong *Bo-wi-bu* (State Security Department), he was beaten for ten months, subjected to systematic torture, and denied food. After his weight dropped from 75 kg (165 lb) to 38 kg (84 lb), driven by hunger, he confessed to spying in exchange for food. After satisfying his chronic hunger pains, he recanted his confession but was subsequently deported to the Sorimchon section of Camp 15, where he was initially assigned agricultural labor and then to assist in the administration of Sorimchon. During his short time in this small section of the prison camp, he observed twenty-six persons die in detention and another six taken away for execution elsewhere, he

---

55        *See* Hawk, *Hidden Gulag Second Edition*, 63-69. The satellite photograph is on page 198.

believed. Of the twenty-six victims, two were executed, one died as a result of torture, and twenty-three from malnutrition-related disease.

Upon release, Mr. Jung fled to China and then to South Korea.

### 3. Former Prisoner #28 (Imprisoned 2002–2006)

Former Prisoner #28 fled to China in 1998, initially in search of food and employment. In December 2002, she and eight other North Koreans were caught trying to enter Mongolia to defect to South Korea. Repatriated to Onsong, she was held by the *Bo-wi-bu* (State Security Department) for six months. Not initially, but upon the arrival of *Bo-wi-bu* officials from Pyongyang, she was systematically tortured until the members of the group admitted they were attempting to flee to South Korea. In mid-2002, she was sent to Camp 15 where the Sorimchon section was then called Kumchon-ri. There were then about 200 persons in the singles' barracks, many of whom were "border crossers." After 2003, most of the incoming detainees were "high-level people," including *An-jeon-bu* police officials who had been overheard and picked up for making comments against the regime. She was assigned to a work unit growing corn and beans. Ten persons out of about 200 in her barracks died of malnutrition.

Former Prisoner #28 was released in 2006 and again fled to China and then to South Korea.

The Sorimchon/Kumchon-ri "village" of single prisoners differed from the much larger "revolutionizing zones" detaining families within Camp 15, such as Ipsok-ri, Kuup-ri, or Taesuk-ri. Prisoners in the Sorimchon "revolutionizing zone," as noted above, were eligible for release back into North Korean society after three years, whereas internment and forced labor in the larger "revolutionizing zones" within Camp 15 was usually much longer.[56]

---

56       It is important to note that it is not known if there are any areas of Camp 15 functioning in 2015 as "revolutionizing zones" from which prisoners can be released. The last known release was in 2006. Although it is dangerous for North Koreans to talk to people in South Korea over illegal cell phones smuggled in from China with international calling capacity, former North Korean prisoners now residing in South Korea remain in touch with enough friends and family members still in North Korea. Thus, it is believed that if releases were still taking place the former prisoners would hear and know of it. The "revolutionizing zones" differed from the "total control zones" within Camp 15, such as Pyongchon-ri and Yongpyong-ri, from which no prisoners were ever released. If it is the case that there are no longer any prisoners being released from the "revolutionizing zones," then the entire prison camp is, in effect, now a "total control zone."

Sorimchon/Kumchon-ri is also marked by the fact that one of the former prisoners there, Mr. Jung, has a photographic memory. At Camp 15 he became the manager of his large work unit, assigning tasks to others in his unit. He talked at length to the other prisoners in his unit to relieve the boredom of his own detention. After he was released and escaped to South Korea, consulting in Seoul with other former prisoners and South Korean human rights specialists, he produced a list of more than 180 names of his fellow prisoners at Camp 15, along with biographical information on many of them. The listing was first published by a non-governmental organization, *Free the NK Gulag*, comprised of former North Korean political prisoners.[57]

This list and information provides a snapshot of the perceived, suspected, or actual political offenses that sent these North Koreans to the labor camp for their "revolutionizing" process. A large number were repatriated from China and deemed to be in the process of defecting to South Korea.[58] Many others were suspected or known to have had contact with South Koreans while in China. Seven prisoners, who had entered Russia from China and were sent back to China, were then subsequently repatriated to North Korea. Several were apprehended by North Korean security police agents operating in China and taken back to North Korea.

Several were "lightly punished" Christian believers who were part of an unauthorized "home church," a Bible reading group, the leader of which was executed. The more ardent members received a lifetime sentence and were confined within the "total control zone" at Camp 15. Two were imprisoned for the presumed political offense of their mother. Quite a few were punished for having been overheard and reported for making critical comments on food policy or the Kim regime more generally. Some were apparently caught up in bureaucratic disputes between the state security police and other ministries or bureaucratic entities. Reportedly, Kim Jong-il reviewed such cases and personally ordered several released. One such case was Shim Cheol-ho, who had been a vice minister of information and communication. Upon release, he was returned to his ministry and became minister of information and communication.

Several had been studying in East Germany at the time of its collapse and were ordered to return to North Korea. Quite a few were punished for making personal gains from state trading enterprises, for unauthorized sales of state property, or taking bribes—possibly criminal offenses but deemed political in nature for damaging the dignity of the Korean Workers' Party. Others were punished for the failure of their state trading enterprises. And a few were accused of listening to South Korean radio broadcasts or meeting Christian

---

[57]    The name of this former prisoner's NGO was also sometimes translated as *NK Gulag for Democracy*. The group divided in late 2014. One section became NK Watch, focusing on a broader range of human rights related issues. The other section continued as a network of former prisoners under the name of *No Fence: Association of North Korean Victims and their Families. NK Gulag/No Fence* assisted the current author in interviewing other former prisoners for the second (2012) edition of *Hidden Gulag*, the follow-up August 2013 *HRNK report, Interpreting Reports of Changes in the Prison Camps* (available from http://hrnk.org/uploads/pdfs/NKHiddenGulag_DavidHawk(2).pdf), and the present report.

[58]    North Koreans forcibly repatriated from China who were deemed to have crossed the China border in search of food or employment, rather than defection to South Korea, are sent to other prison facilities such as *Kyo-hwa-so* No. 12 Jongo-ri, as described earlier in this report.

believers in China. One low-ranking police official was accused of concealing the death of a suspect during interrogation.  One was suspected of being a "broker," helping other North Koreans flee to China. Another was punished for receiving money from a sister in South Korea.

Of the 181 former prisoners whose names begin on page 35 below, two were executed and one died from torture and beatings. Twenty-three died of malnutrition or starvation. Five were taken away, and their fate is unknown.[59] Fifteen are known to be alive. Several are in South Korea. One is believed to be in the United States. Seven are believed to have been personally ordered released by Kim Jong-il. The status, fates, and whereabouts of 121 are completely unknown.

In fact, none of these prisoners, like all the persons detained in the *kwan-li-so* political prison camps, had been subjected to formal charges or any judicial process. The prisoners deduce their perceived or presumed wrong-doing, wrong-thinking, wrong knowledge, or wrong associations from the questions asked during their interrogations prior to being deported—"forcibly disappeared" in technical human rights terminology—into the prison camps. In the case of family members, they deduce their perceived political offenses based on the prior disappearance of the head of the family. All the former *kwan-li-so* prisoners interviewed by the author confirm that they and their fellow prisoners devoted considerable mental and emotional energy to trying to figure out what they had done that resulted in such brutal and severe punishment.

Satellite photographs from 2009 and 2012 show the Sorimchon area of Camp 15 to be intact and as this area had appeared for the preceding decade. (See satellite image from 2009 on page 49.) More recent satellite images of Sorimchon show the partial demolition of facilities between April and September of 2013, and that the remaining prisoner-related buildings were demolished between September 2013 and October 2014.[60] (See satellite image on page 50.)

## C. THE FATE AND WHEREABOUTS OF THE FORMER PRISONERS

This leaves, of course, the question of the fate and whereabouts of the former prisoners. Were they released back into North Korean society? Were some or all transferred to other sections of the sprawling prison camp? Were some executed? Did others die in detention?

There were also rumors and brief press accounts that the demolition of the Sorimchon/Kumchon-ri section was the first step in the closing of Camp 15 in its entirety. However, high resolution satellite imagery as recent as December 2014 shows the rest of Camp 15 to be fully operational, with the camp perimeter

---

59     They could have been executed secretly, transferred to a "total control zone," or released.

60     Joseph S. Bermudez Jr., Andy Dinville, and Mike Eley, *North Korea: Imagery Analysis of Camp 15 "Yodok"– Closure of the "Revolutionizing Zone"* (Washington, D.C.: HRNK, 2015).

barriers and the guard towers still in place, and the interior of the camp showing ongoing activity.[61] Speculation followed in Seoul that Camp 15 may be kept open to accommodate purged elements of Jang Song-taek's[62] network of supporters, as Camp 15 is the prison camp where "high-level" people and other purged officials from the capital are deported.[63]

*HRNK*'s August 2013 publication, *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps*, reported on the closure of *Kwan-li-so* No. 22, near Hoeryong, North Hamgyong Province. In that case, according to local residents from Hoeryong, an unknown number of prisoners from Camp 22 were trucked at night to the Hoeryong train station. From there the train departed south. It is believed that the train went to *Kwan-li-so* No. 14 in Kaechon and *Kwan-li-so* No. 16 in Hwasong.[64] Also, according to Hoeryong residents, leftover supplies from Camp 22 were being sold at local markets by the family members of Camp 22 guards, who had not yet been transported to the places where the former prisoners and guards were sent. Thus far, the number and names of transferred prisoners are unknown.

In the case of the small, demolished section of Camp 15, the names of many of the persons formerly imprisoned there have been recorded and reported by other former prisoners, especially Mr. Jung. These persons, like all prisoners in the *kwan-li-so* political penal labor colonies, were deprived of their liberty without any of the formal judicial processes outlined in North Korea's criminal law and criminal procedure code and subjected to forced labor under conditions so harsh as to result in high rates of death in detention. The Commission of Inquiry determined that the operation of these prison camps constitutes crimes against humanity:

> 1033. … the Commission finds that DPRK authorities have committed and are committing crimes against humanity in the political prison camps, including extermination, murder, enslavement,

------

61      Joseph S. Bermudez Jr., Andy Dinville, and Mike Eley, *North Korea: Imagery Analysis of Camp 15*, (Washington, D.C.: HRNK, 2015), 2, http://hrnk.org/uploads/pdfs/ASA_AnalysisReport_HRNK_Camp15_Final.pdf. Note: In Seoul, March 2015, large high resolution satellite photographs of Camp 15 (courtesy of AllSource Analysis) were shown to former Camp 15 prisoners, including Kang Chul-hwan, the protagonist of the biography, *Aquariums of Pyongyang* and current head of the NGO *North Korea Strategy Group*. Kang pointed out many new buildings and dramatically improved roads and bridges within Camp 15 compared to the ten years he spent there.

62      Note: Jang Song-taek was Kim Jong-un's uncle by marriage and widely thought to be the second most powerful official in North Korea. His public humiliation and rushed, brutal execution, attracted considerable worldwide attention.

63      According to noted North Korea historian Andrei Lankov, "In the last three years the North Korean military, political and security police bureaucracy have been subjected to a purge on a scale not seen since at least the late 1960s." Andrei Lankov, "No one is safe in Kim Jong Un's court: When it comes to ruthlessness, North Korea's leader surpasses his father and grandfather," *NK News*, June 23, 2015, www.nknews.org/2015/06/no-one-is-safe-in-kim-jong-uns-court/.

64      However, satellite photographs of those camps did not indicate at the time sufficient new buildings to accommodate the numbers of prisoners possibly transferred from Camp 22.

torture, imprisonment, rape and other grave sexual violence and persecution on political, religious and gender grounds.

1066. … [DPRK] authorities continue to devote considerable energy to concealing the existence of political prison camps and to prevent information about the crimes committed in them from reaching the international community….

1067. The Commission finds that the closest analogies, although with shorter duration and different destructive features, are the camps of totalitarian states of the twentieth century. That such political prison camps continue to exist at present in the DPRK is an affront to universally shared human rights values and a crime against humanity. It is the duty of the DPRK and the international community to ensure that these camps are dismantled and the surviving prisoners released without further delay.[65]

## D. PURSUING ACCOUNTABILITY

The missing persons from the Sorimchon/Kumchon-ri section of Camp 15 are doubly disappeared: first, into the prison camp, and again, upon the demolition of the section of the camp where they were subjected to forced labor and political "re-education."

The international community needs to continue to press North Korean authorities for an explanation of the facilities described in great detail by the former prisoners and guards. Further, there is concern that, owing to the growing international recognition and condemnation of these unlawful and brutal detention facilities—the term *kwan-li-so* itself was mentioned during the discussion of the North Korean human rights situation at the December 22, 2014 meeting of the UN Security Council—North Korea may now close and/or relocate the encampments that the regime denies exist at all. In this case, the international community needs to insist on an accounting of the fate and whereabouts of the North Korean persons formerly deprived of their liberty for reasons not permitted under contemporary international law, including conventions to which North Korea has subscribed. In this process, the North Korean authorities may attempt to erase evidence and eliminate witnesses. In order to protect the prisoners, it is essential that the international community insist on accountability.

In the case of the demolished Sorimchon/Kumchon-ri section of Camp 15, such an accounting should include information regarding the fate and whereabouts of the individually named prisoners detailed and attached to this report. The names follow:

---

65        United Nations, *Report of the detailed findings*, 330. Note: Subsequently, the UN Member States on the Human Rights Council and General Assembly voted in overwhelming numbers to recommend the referral of these matters to the International Criminal Court for further investigation and prosecution.

34

# VIII. List of 181 Former Prisoners at Sorimchon

| Name | Gender | Age Upon Imprisonment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|------|--------|------|----------|----------------------------------|-------------------|--------|
| Huh Young-il | M | 38 | Gilju, North Hamgyong Province | None | June 2000 | Unknown |
| Lee Dong-myung | M | 27 | Mangyongdae District, Pyongyang | Worker at a sports equipment factory | July 2000 | Unknown |
| Jang Ho-young | M | 27 | Mangyongdae District, Pyongyang | None | July 2000 | Unknown |
| Kim Eun-cheol | M | 18 | Musan, North Hamgyong Province | Student | July 2000 (imprisoned at 20) | Unknown |
| Kim Chul-beom | M | 26 | Musan, North Hamgyong Province | None | June 2001 | Unknown |
| Kim Il-tae | M | 43 | Pungsan-gun, Yanggang Province | Laborer at the Fishery Department in Rason | April 2000 | Unknown |
| Choi Kyung-hee (Wife of Kim Il-tae) | F | 40 | Saetbyul-gun, North Hamgyong Province | Propaganda Unit of Rason Staff | April 2000 | Unknown |
| Son Young-ok | F | 36 | Hwasong-gun, North Hamgyong Province | Housewife | February 2000 | Unknown |
| Lee Seol-hwa | F | 26 | Unknown | Laborer in a Convenient Cooperative Store in Secheon-dong, Hoeryong | November 1999 | Unknown |
| Kim Young-chun | M | 28 | Junghwa-gun, Pyongyang | Border guard for the MPAF | July 2001 | Unknown |
| Eom Cheol-su | M | 40 | Musan, North Hamgyong Province | Company Commander in the MPAF First Corps | July 2000 | Unknown |
| Kim Myung-cheol | M | 43 | Hyesan, Yangkang Province | Driver | November 1999 | Unknown |
| Kim Gwang-jin | M | 24 | Buyun District, Chongjin, North Hamgyong Province | Student | March 2000 | Unknown |
| Noh Young-ki | M | 37 | Hyesan, Yanggang Province | Unknown | March 2000 | Unknown |
| Ahn Sung-chul | M | 16 | Ontan Workers' District, Onseong-gun, North Hamgyong Province | Student | December 2001 | Unknown |
| Kim Young-chun | F | 36 | Sinheung-gun, South Hamgyong Province | Laborer at the Sinheung Machinery Factory | February 2000 | Unknown |
| Son Gi-bok | M | 43 | Wawoodo District, Nampo, South Pyongan Province | Crew member of the "Jeonjin" ship under the Ministry of Marine Transport | September 2000 | Unknown |
| Yu Jong-cheol | M | 37 | Nampo | Laborer of the Forestry Mission stationed in Russia | December 2000 | Unknown |
| Kim Chul-min | M | 35 | Hoeryong, North Hamgyong Province | None | 2000 | Unknown |
| Cha Jeong-cheol | M | 27 | Unknown | KPA Soldier | June 2003 | Unknown |

| Name | Gen-der | Age Upon Impris-onment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|---|---|---|---|---|---|---|
| Jeon Man-su | M | 44 | Seungho District, Pyongyang | Staff at the Seungho Cement Factory in Pyongyang | April 2000 | Unknown |
| Noh Gwang-cheol | M | 37 | Namyang Workers' District, Onseong-gun, North Hamgyong Province | None | September 2001 | Unknown |
| Kim Seung-cheol | M | 35 | Musan, North Hamgyong Province | Test engineer at Musan Station | July 2001 | Unknown |
| Eom Yong-yeon | M | 45 | Hoeryong, North Hamgyong Province | Driver at the Hoeryong Hotel | November 1999 | Unknown |
| Kim Nam-cheol | M | 36 | Chongjin, North Hamgyong Province | None | March 2000 | Unknown |
| Yang Myung-sung | M | 22 | Unknown | Laborer in Sariwon, North Hwanghae Province | September 2003 | Unknown |
| Lee Chun-ki | M | 48 | Unknkown | Laborer in Gyeongseong County, North Hamgyong Province | May 2003 | Unknown |
| Seo Jae-suk | M | 42 | Sansong Workers' District, Onsong-gun, North Hamgyong Province | Agricultural worker | December 2003 | Unknown |
| Lee Chul-ho | M | 35 | Unknown | Laborer for the Farmland Construction Group in Hoeryong City, North Hamgyong Province | February 2000 | Unknown |
| Lee Eun-ju | F | 28 | Gwanhae-dong, Sinam District, Chongjin, North Hamgyong Province | None | December 2000 | Unknown |
| Seo Myung-ok | F | 38 | Namyang Workers' District, Onseong-gun, North Hamgyong Province | Telephone operator at the Namyang Telecommunication Office | December 2001 | Unknown |
| Kim Young-suk | F | 48 | Daedong-gun, South Pyongan Province | Housewife | September 2000 | Unknown |
| Ham Sun-jeong | F | 25 | Unknown | Laborer at the Deokcheon Coal Mine in Deokcheon-gun, South Pyongan Province | February 2002 | Unknown |
| Park Myung-hee | F | 35 | Songpyeong District, Cheongjin, North Hamgyong Province | Housewife | November 1999 | Unknown |
| Lee Geum-nam | F | 35 | Dancheon, South Hamgyong Province | Housewife | December 1999 | Unknown |
| Kang Mi-sook | F | 35 | Bongsan-gun, North Hwanghae Province | None | November 1999 | Unknown |
| Unknown (Kang Mi-sook's mother) | F | 56 | Unknown | Housewife | November 1999 | Unknown |
| Hwang Mi-ran | F | 38 | Unknown | Housewife | January 2003 | Unknown |
| Kim Yeon-hee | F | 28 | Unknown | Laborer in Eundeok-gun, North Hamgyong Province | January 2004 | Unknown |

**36**

| Name | Gender | Age Upon Imprisonment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|---|---|---|---|---|---|---|
| Kim Kyung-ok | F | 28 | Unknkown | Laborer in Eundeok-gun, North Hamgyong Province | January 2004 | Unknown |
| Cho Sung-hye | F | 35 | Eundeok-gun, North Hamgyong Province | Housewife | February 2004 | Unknown |
| Bang Eun-suk | F | 39 | Eundeok-gun, North Hamgyong Province | Housewife | January 2004 | Unknown |
| Kim Guk-hwa | F | Unknown | Unknown | Unknown | Unknown | Unknown |
| Yu Sung-geum | F | 24 | Unknown | Laborer at the Musan Mine in North Hamgyong Province | November 2002 | Unknown |
| Heo Eun-sook | F | 35 | Songpyeong District, Chongjin, North Hamgyong Province | Housewife | February 2004 | Unknown |
| Bang Geum-seon | F | 42 | Eundeok-gun, North Hamgyong Province | Housewife | April 2004 | Unknown |
| Jeon Young-sook | F | 58 | Pyeongseong, South Pyongan Province | Housewife | May 2004 | Unknown |
| Kim Chun-ok | F | 60 | Anju, South Pyongan Province | Housewife | April 2004 | Unknown |
| Kim Seong-hee | F | 30 | Unknown | Laborer in the Seong Cheongang District, Hamheung, South Hamgyong Province | May 2004 | Unknown |
| (50) Kim Hye-ok | F | 28 | Unknown | Laborer in Uiju-gun, North Pyongan Province | June 2004 | Unknown |
| Kim Hye-young | F | 30 | Unknown | Laborer in the Fishing Department in Sinpo, South Hamgyong Province | July 2004 | Unknown |
| Woo Mok-lan | F | 25 | Unknkown | Laborer in a pottery factory | January 2005 | Unknown |
| Kim Sun-hee (2nd generation Korean Japanese) | F | 40 | Unknown | Instructor at the Korean Children's Union of the Ohsandeok People's School (elementary school) in Hoeryong, North Hamgyong Province | | Unknown |
| Kim Young-soon | F | 28 | Unknown | Laborer in the Musan Mine, North Hamgyong Province | January 2004 | Unknown |
| Lee Gwang-myung | M | 25 | Unknown | Farmer in Musan | February 2002 | Unknown |
| Park Kyung-soo | M | 50 | Pyongyang | Director of the KWP 414 Liaison Office | June 2000 | Unknown |
| Kim Jong-min | M | 48 | Pyongyang | Instructor at the KWP 414 Liaison Office | June 2000 | Unknown |
| Ahn Won-kil | M | 50 | Nampo | Secretary for Seo Yun-seok, a Chief Secretary of the Party Committee in South Pyongan Province | May 2002 | Unknown |

| Name | Gender | Age Upon Imprisonment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|------|--------|------------------------|----------|----------------------------------|-------------------|--------|
| Kim Young-gil | M | 43 | Ganggye, Jagang Province | Sports instructor of the Eighth Division, People's Security Forces | March 2000 | Unknown |
| Kim Chang-wan | M | 40 | Pyongyang | Instructor at the Second Division of the SSD and interpreter for the North Korean mission to the UN until 1999 | August 2001 | Unknown |
| Kim Sung-joon | M | 40 | Deokcheon, South Pyongan Province | Instructor at the Second Division of the SSD | May 2001 | Unknown |
| Park Sun-hyup | M | 58 | Hamheung, South Hamgyong Province | Chief of a construction material company in Hamheung | April 2000 | Unknown |
| Kim Eun-ho | M | 52 | Yeonggwang-gun, South Pyongan Province | Director of the Ministry of Trade | March 2000 | Unknown |
| Yeom Jun-shik | M | 60 | Pihyeon-gun, North Pyongan Province | Laborer | July 2000 | Unknown |
| Hwang Jong-ho | M | 47 | Unknown | Medical doctor in the First Aid Division of the Municipal People's Hospital, Kaesong | November 1999 | Unknown (released after 3 years of detention) |
| Shin Young-sook | F | 38 | Sinpo, South Hamgyong Province | Announcer at the Sinpo Fishery Department | November 1999 | Unknown |
| Cho Cheol-shik | M | 48 | Unknown | Instructor at the Business Management Office in Pyongyang | September 2002 | Unknown |
| Kim Ran-young | F | 35 | Unknown | Laborer in Onseong-gun, North Hamgyong Province | May 2004 | Unknown |
| Shim Cheol-ho (Son of Shim Chang-han, a former Minister of People's Security) | M | 42 | Pyongyang | Vice Minister of the Ministry of Information and Communication | September 2001 | Alive and the incumbent Minister of Information and Communication |
| Kim Seung-gon | M | 44 | Sinuiju, North Pyongan Province | Chief of the MPAF Reconnaissance Division | February 2000 | Alive |
| Maeng Gyung-nam | M | 43 | Jeongju, North Pyongan Province | MPAF Foreign Business Division | May 2000 | Alive |
| Kim Gwang-shik | M | 46 | Pyongyang | Secretary of the North Korean Embassy in Australia | May 2000 | Unknown |
| Kim Seok-cheol | M | 40 | Sinuiju, North Pyongan Province | Colonel of the KPA Reconnaissance Division | June 2000 | Unknown |
| Kang | M | 62 | Daean District, Nampo | Director of the MPS in Daean District | October 2000 | Unknown |
| Cho Seok-cheon | M | 65 | Pyongyang | Director of the SSD in charge of the Ministry of Railways | September 2001 | Unknown |
| Jang Chi-eok | M | 44 | Nampo | Preliminary Judge of the Preliminary Investigation Department of the MPS in Nampo | October 2000 | Unknown |

**38**

| Name | Gen-der | Age Upon Impris-onment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|---|---|---|---|---|---|---|
| Han | M | 59 | Ryonggang-gun, South Pyongan Province | Vice Director of the People's Safety Ministry in Ryonggang-gun | October 2000 | Unknown |
| Yoo Soon-cheol | M | 44 | Nampo | Preliminary Judge of the Prelimi-nary Investigation Department of the MPS in Ryonggang-gun | November 2000 | Unknown |
| Park Myung-cheol | M | 40 | Nampo | Official of the Resident Registra-tion Department of the MPS in Ryonggang-gun | October 2000 | Unknown |
| Kim Bong-seon | F | 65 | Pyongyang | SSD Vice Director of the Conspiracy Research Office | December 2001 | Unknown |
| Yeom Jeong-je | M | 52 | Hyesan, Yanggang Province | Chief Prosecutor of Morangbong District, Pyongyang | February 2000 | Alive |
| Kim Yun-sik | M | 52 | Pyongyang | Chief Prosecutor of Jung District, Pyongyang | February 2000 | Alive |
| Kang Hak-geun | M | 67 | Pyongyang | Chief Prosecutor of Sosong District, Pyongyang | February 2000 | Alive |
| Shim Eun-taek | M | 65 | Gapsan-gun, Yanggang Province | Yanggang Province Chief Prosecutor | November 2000 | Alive |
| Kim Byung-nam | M | 66 | Chongjin, North Hamgyong Province | Organizational Secretary of the Party in Yanggang Province | February 2000 | Alive |
| Jang Chun-kwon | M | 66 | Gangdong-gun, South Pyongan Province | Brigade Commander of the Seventh Division in the People's Security Forces | November 1999 | Alive |
| Lee Myung-ho | M | 68 | Hwangju, North Hwanghae Province | Political Director of the SSD, the Forestry Mission to Russia | November 1999 | Alive |
| Kang Young-seon | M | 45 | Nampo | Agent of the SSD in Nampo | February 2000 | Alive |
| Kim Cheol-jun (Son of the Vice Director of the General Bureau of Reconnaissance | M | 43 | Pyongyang | Representative of the Civil Aviation of North Korea Mission to Russia | September 2001 | Alive |
| Choi Young-kil | M | 50 | Pyongyang | Instructor at the Yukyung Branch Office of the Chosun Pyongyang Trade Company | November 1999 | Alive |
| Ahn Chang-nam | M | 51 | Ganggye, Jagang Province | Director of the Justice Department in  the KWP Central Committee | November 1999 | Alive |
| Lee Myung-hak | M | 36 | Hamheung | Laborer in the No. 66 Company in South Hamgyong Province | October 2001 | Unknown |
| Kim Jong-seok | M | 60 | Pyeongseong, South Pyongan Province | President of the Seokyung Trading Company affiliated with the FAD in the KWP Central Committee | February 2000 | Unknown |
| Unknown | M | 59 | Unknown | Director of the SSD in Rangnang District, Pyongyang | September 2002 | Unknown |

| Name | Gender | Age Upon Imprisonment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|---|---|---|---|---|---|---|
| Han Myung-cheol | M | 58 | Unknown | Director of the MPS | May 2004 | Unknown |
| Cha Bok-soon | F | 58 | Pyongyang | Manager of Buheung Company's Pyongyang Branch of the Second Economic Committee, which deals with the military economy | November 1999 | Unknown |
| Cho Bong-ae | F | 42 | Unknown | Office worker in the business center in Suncheon, South Pyongan Province | September 2000 | Unknown |
| Yun Yang-kwon | M | 54 | Nampo | Counselor of the Trade Representative in France | November 1999 | Alive |
| Jang Pa | M | 40 | Chongam District, Chongjin, North Hamgyong Province | None | March 2000 | Unknown |
| Kang Chul-ho | M | 39 | Sinuiju, North Pyongan Province | Instructor at the Trade Division in North Pyongan Province | February 2000 | Alive |
| Park Soo-hyun | M | 45 | Musan, North Hamgyong Province | Miner in the Musan Mine | November 1999 | Unknown |
| Kim Cheol-yong | M | 38 | Hyesan, Yanggang Province | Interpreter at the Trade Division in Yanggang Province | November 2000 | Unknown |
| Kim Gwang-ho | M | 44 | Hamheung, South Hamgyong Province | Instructor in Division 2 of the MPS | September 1999 | Unknown |
| Park Si-ae | F | 38 | Mangyongdae District, Pyongyang | Choreographer at the Pyongyang Students' and Children's Palace | February 2000 | Unknown |
| Kwak Gwang-ho | M | 40 | Dongmyung-dong, Hoeryong, North Hamgyong Province | None | June 2000 | Died of malnutrition |
| Kim Jeong-soo | M | 38 | Chollima District, Nampo | Vice Director of the Kim Il-sung Socialist Youth League in the Chollima District | February 2000 | Unknown |
| Yeom Young-cheol | M | 38 | Chollima District, Nampo | Chair of the Kim Il-sung Socialist Youth League of the City Construction Office in Chollima District | February 2000 | Unknown |
| Jang Gwang-ok | F | 35 | Chollima District, Nampo | Housewife | February 2000 | Unknown |
| Kim Young-hwa | F | 35 | Chollima District, Nampo | Housewife | February 2000 | Unknown |
| Goh Eun-hee | F | 24 | Chollima District, Nampo | Laborer at the City Construction Business Center | February 2000 | Unknown |
| Kim Ik-soo | M | 58 | Japan | Instructor at the Maebong Trade Company in the General Staff of the MPAF | February 2000 | Unknown |
| Kim Deok-won | M | 55 | Japan | Instructor at the Weolmyungsan Trading Company in the KWP Central Committee | November 2000 | Unknown |
| Kim Yun-gil | M | 43 | Unknown | Senior Officer at the Food Supply Office in Pyongyang | February 2000 | Unknown |

**40**

| Name | Gen-der | Age Upon Impris-onment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|---|---|---|---|---|---|---|
| Kim Jong-myung | M | 46 | Unknown | Engineer at the Communication Maintenance Bureau in Pyongyang | February 2000 | Unknown |
| Kim Young-il | M | 48 | Unknown | Agent of KWP Office 35 | February 2000 | Unknown |
| Jin Cheol-kwon | M | 25 | Kaesong | Unknown | November 2000 | Unknown |
| Kim Il-hyun | M | 40 | Kimchaek, North Hamgyong Province | Miner at the Musan Mine | December 1999 | Escaped from North Korea |
| Kim Yeol-mo | M | 58 | Unknown | Colonel of the KPA | September 2003 | Unknown |
| Yu Guk-jin | M | 55 | Kimchaek, North Hamgyong Province | Director of Foreign Affairs, SSD in North Hamgyong Province | February 2000 | Released in February 2002 |
| Jang Hyun-soo | M | 48 | Unknown | Laborer for the Forestry Business Center in Russia | May 2003 | In South Korea |
| Shin Jeong-ae (Japanese-Korean) | F | 50 | Unknown | Housewife | April 2000 | In the U.S. |
| Kim Young-cheol | M | 43 | Pyongyang | Instructor at the Mankyungbong 92, Division No. 2 in the SSD | May 2001 | Unknown |
| Cheon Chang-hee | M | 35 | Anbyeon-gun, Kangwon Province | Squad leader at the No. 131 Instruction Division in charge of the KWP nuclear facility construction unit | November 1999 | Unknown |
| Kim Seok-cheol | M | 30 | Jonchun-gun, Jagang Province | Soldier of the No. 131 Instruction Division in charge of the KWP nuclear facility construction unit | November 1999 | Unknown |
| Yun Seong-min | M | 40 | Pyongyang | Vice Director of the Buheung Company of the Second Economic Committee | September 2001 | Unknown |
| Kim Kyung-il | M | 34 | Saetbyul-gun, North Hamgyong Province | Programmer for the Academy of Science for Defense in Yongsung District, Pyongyang | August 2001 | Unknown |
| Kim Sun-cheol | M | 37 | Unknown | Pilot of the Division 4 Air Force Headquarter, MPAF | September 2002 | Unknown |
| Seo Chun-bo | M | 55 | Unknown | Manager of Division 12 in the SSD | August 2002 | Unknown |
| Kim Hwa-soon | F | 40 | Unknown | Office worker at Hwadae-gun, North Hamgyong Province | January 2005 | Unknown |
| Jeong Hyo-sook | F | 40 | Kaesong | Housewife | November 1999 | Unknown |
| Huh Geum-joo | F | 29 | Hamheung, South Hamgyong Province | Master of Taekwondo in Hamheung | March 2000 | Unknown |
| Huh (Father of Huh Geum-joo) | M | 60 | Hamheung, South Hamgyong Province | Instructor at the Machine Factory in Hamheung | March 2000 | Unknown |
| Yang Weon-jong | M | 59 | Saetbyul-gun, North Hamgyong Province | Director of Counterintelligence for the SSD in Onseong-gun, North Hamgyong Province | May 2000 | Unknown |
| Kim Jong-soo | M | 51 | Hwaseong-gun, North Hamgyong Province | Head of the MPAF Operational Department | May 2001 | Unknown |

| Name | Gender | Age Upon Imprisonment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|---|---|---|---|---|---|---|
| Kim Byung-soon | M | 61 | North Hamgyong Province | Vice Minister of Foreign Affairs | November 1999 | Released by an order of Kim Jong-il in October 2000 |
| Kim Dong-ho | M | 64 | Cheongam District, Chongjin, North Hamgyong Province | Chief Director of Eundeok Headquarters, which deals with gasoline for the MPAF | September 2000 | Unknown |
| Jeong Ho | M | 44 | Unknown | Chief agent of the Operations Team for KWP Office 35 | July 4, 2000 | Released on the order of Kim Jong-il on July 4, 2002 |
| Jung Kwang-il | M | 40 | China | Agent of the Operations Team for KWP Office 35 | July 4, 2000 | Released on the order of Kim Jong-il on July 4, 2002 |
| Cho Chang-kil | M | 42 | Unknown | Agent of the Operations Team for KWP Office 35 | July 4, 2000 | Released on the order of Kim Jong-il on July 4, 2002 |
| (140) Kim Guk-sung | M | 60 | Unknown | Agent of the Operations Team for KWP Office 35 | July 4, 2000 | Released on the order of Kim Jong-il on July 4, 2002 |
| Goh Eun-kyung | M | 42 | Unknown | Agent of the Operations Team for KWP Office 35 | July 4, 2000 | Released on the order of Kim Jong-il on July 4, 2002 |
| Yang Sang-guk | M | 42 | Unknown | Agent of the Operations Team for KWP Office 35 | July 4, 2000 | Released on the order of Kim Jong-il on July 4, 2002 |
| Kim Myung-soo | M | 48 | Unknown | Agent of the Operations Team for KWP Office 35 | July 4, 2000 | Unknown |
| Kang Seok-chul | M | 43 | Unknown | Instructor at the KWP Liaison Office 131 | October 2002 | Unknown |
| Kim Sun-cheol | M | 19 | Sakju-gun, North Pyongan Province | Soldier of the Guard Command | October 2001 | Unknown |
| Bang Young-sil | F | 35 | Komusan, Buryeong-gun, North Hamgyong Province | Station staff member at Gilju Station | June 2000 | Died of starvation |

**42**

| Name | Gen-der | Age Upon Impris-onment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|------|------|------|------|------|------|------|
| Kim Chang-rok | M | 35 | Hoeryong, North Hamgyong Province | None | November 1999 | Died on February 16, 2000 due to diseases contracted in prison |
| Lee Il-nam | M | 41 | Unknown | Commander of Hoeryong Station, Chongjin Railway Department | June 2000 | Died of mal-nutrition |
| Kim Yong-il | M | 42 | Nanam District, Chongjin, North Hamgyong Province | Laborer at Kim Chaek Iron and Steel Complex | September 2000 | Died of starvation |
| Kim Young-sil | F | 25 | Unknown | Worked in a propaganda team in Bocheon-gun, Yanggang Province | November 1999 | Died of malnutrition in April 2000 |
| Kim Ho-seok | M | 37 | Yeonsa-gun, North Hamgyong Province | Laborer in the Sangha Coal Mine in Onseong-gun | May 2001 | Executed for trying to escape the camp |
| Cha Gwang-ho | M | 65 | Wonsan, Gangweon Province | Reporter for KCNA | November 1999 | Died of malnutrition in December 2001 |
| Kim Kyung-cheon | M | 60 | Pyongyang | Cameraman for the Central Broadcasting Committee | March 2000 | Died in May 2001 |
| Park Young-gi | M | 52 | Sinuiju, North Hamgyong Province | Head of the Sinuiju branch of the Birobong Trading Company under the Intelligence Department of the MPAF | November 2001 | Died of malnutrition in December 2002 |
| Kim Jong-bok | M | 52 | Yangdeok-gun, South Pyongan Province | Manager of the Secretariat of the People's Committee in Yang-deok-gun | March 2000 | Died of malnutrition in December 2001 |
| Kim Su-won | M | 47 | Juwon-ri, Onseong-gun, North Hamgyong Province | Farmer in Juwon Collective Farm | June 2000 | Died |
| Park Kyung-il | M | 45 | Hamheung, South Hamgyong Province | Laborer at the Heungnam Chem-ical Factory in Hamheung | April 2000 | Died of colitis in June 2001 |
| Choi Gwang-ho | M | 47 | Buryeong-gun, North Hamgyong Province | Manager of the Chemical Material Company in Buryeong-gun | April 2001 | Publicly executed in the camp |
| Park In-shik | M | 38 | Pyongyang | Manager of a material management unit at a side farm affiliated with the Escort Bureau | September 2001 | Died |
| Kim Gwang-yeon | M | 32 | Wonsan, Gangweon Province | Researcher at the Science Center in Pyeongseong | July 2001 | Died of malnutrition in January 2002 |

| Name | Gender | Age Upon Imprisonment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|---|---|---|---|---|---|---|
| Jeong Hak-su | M | 42 | Unknown | Laborer in Gwangpo Duck Factory in Jeongpyeong-gun, South Hamgyong Province | September 2000 | Died of starvation in January 2003 |
| Kim Gwang-il | M | 18 | Unknown | High school student in Suncheon, South Pyongan Province | October 2002 | Dragged somewhere at night with his younger brother, Kim Gwang-sik. Maybe executed or sent to a total control zone |
| Kim Gwang-sik (Brother of Kim Gwang-il) | M | 16 | Unknown | Student in Suncheon, South Pyongan Province | October 2002 | Dragged somewhere at night with his older brother, Kim Gwang-il. Maybe executed or sent to a total control zone |
| Lee Gwang-seong | M | 38 | Unknown | Football player for the Provincial Sports Team, North Hamgyong Province | September 2002 | Dragged somewhere at night around March 2003 |
| Noh Chun-sam | M | 27 | Unknown | Mining and forestry laborer in Samjiyeon-gun, Yanggang Province | June 2000 | Sent to an unknown location in August 2000 |
| Seo Jin | M | 44 | Hwangju, North Hwanghae Province | Foreign Business Division of the MPAF | February 2000 | Died of malnutrition in June 2002 |
| Kim Geon-ki | M | 44 | Pyongyang | Foreign Business Division of the MPAF | February 2000 | Died of malnutrition in 2001 |
| Unknown | M | 66 | Yanggang Province | Director of the SSD in Yanggang Province | November 2000 | Died of torture and beatings by the Defense Security Command in December 2000 |

**44**

| Name | Gen-der | Age Upon Impris-onment | Hometown | Occupation Prior to Imprisonment | Date of Detention | Status |
|------|---------|------------------------|----------|----------------------------------|-------------------|--------|
| Song Geun-il | M | 67 | Pyongyang | Brigade Commander of the Seventh Division of the People's Security Forces | February 2000 | Died of malnutrition in December 2001 |
| Kim Sung-do | M | 67 | Hamheung, South Hamgyong Province | Chief Instructor of Division No. 2 of the SSD in Shinpo | March 2000 | Dragged somewhere in 2001 |
| Hwang Sung-jin | M | 55 | Wonsan, Gangweon Province | President of the Haegeum Trade Company of the MPAF | May 2001 | Died of disease in detention |
| Han Young-tae | M | 60 | Chongjin, North Hamgyong Province | Director of the SSD of the Haegeum Trade Company | May 2001 | Died of malnutrition in 2002 |
| Jang Myung-hwa | F | 39 | Hyesan, Yanggang Province | Reconnaissance Division of the MPAF | April 2000 | Died of mal-nutrition in April 2003 |
| Kim Geun-chil | M | 38 | Jeoncheon-gun, Jagang Province | Shoe repairman in Ganggye, Jagang Province | November 2001 | Died of mal-nutrition |
| Kim Gwang-nam | M | 38 | Hoeryeong, North Hamgyong Province | Laborer at the Hoeryong Station | April 2000 | Died of mal-nutrition in June 2002 |
| Joo Il | M | 50 | Hamheung, South Hamgyong Province | Violinist in the Merits Chorus of the MPAF | May 2001 | Died of mal-nutrition in March 2002 |
| Kim Young-jun | M | 35 | Cheongam District, Chongjin, North Hamgyong Province | Engineer at Chongjin Station | July 2001 | Died of malnutrition on June 21, 2002 |
| Oh Kyung-hwan | M | 56 | Unknown | Instructor at Division 2 of the SSD | December 1999 | Died of malnutrition in December 2000 |
| Yun Young-cheol (Korean-Japanese) | M | 56 | Japan | Dalian Branch Chief of the Baekyang Company in the MPAF | December 2000 | Died of malnutrition in 2002 |
| Jang Ki-bok | M | 51 | Dancheon, South Hamgyong Province | Chief of Investigation of the SSD in Hoeryong | January 2001 | Died of mal-nutrition in August 2001 |
| Kim Sang-cheol | M | 27 | Unknown | Soldier | June 2000 | Died of malnutrition in 2002 |

# IX. Satellite Imagery of the Prison Camps



*Google Earth © 2015 DigitalGlobe*
*Kyo-hwa-so No. 12 Jongo-ri in 2008 (before the addition of a women's section)*

46



*Google Earth © 2015 CNES/Astrium*
*Kyo-hwa-so No. 12 Jongo-ri in 2013 (after the addition of a women's section)*



*© 2015 AllSource Analysis, Inc. and*
*© 2015 2014 Airbus Defense and Space*
*Sorimchon Location within Kwan-li-so No. 15*

48

**49**







*Sorimchon Section of Kwan-li-so No. 15 in 2009*





*Sorimchon Section of Kwan-li-so No. 15 in 2014*
*(showing demolition of prisoner residence and work units)*

# Exhibit C

# THE PARALLEL GULAG

## NORTH KOREA'S
## *"AN-JEON-BU"* PRISON CAMPS



## DAVID HAWK

### With

### AMANDA MORTWEDT OH



# THE PARALLEL GULAG

## NORTH KOREA'S "*AN-JEON-BU*" PRISON CAMPS



## DAVID HAWK

With

AMANDA MORTWEDT OH

*The symbol on the cover is the uniform insignia of the "*An-jeon-bu*," translated as the Ministry of People's Security, North Korea's police force that administers the *kyo-hwa-so* prison system through its Prisons Bureau.

Copyright © 2017
Committee for Human Rights in North Korea

Printed in the United States of America.
All rights reserved.

No part of this publication may be reproduced, distributed, or transmitted in any form or by any means, including photocopying, recording, or other electronic or mechanical methods, without the prior permission of the Committee for Human Rights in North Korea, except in the case of brief quotations embodied in critical reviews and certain other noncommercial uses permitted by copyright law.

Committee for Human Rights in North Korea
1001 Connecticut Avenue, NW, Suite 435
Washington, DC 20036
P: (202) 499-7970
www.hrnk.org

ISBN: 978-0-9995358-0-6
Library of Congress Control Number: 2017957916

# BOARD OF DIRECTORS

Gordon Flake, Co-Chair

Katrina Lantos Swett, Co-Chair

John Despres, Co-Vice-Chair

Suzanne Scholte, Co-Vice-Chair

Helen-Louise Hunter, Secretary

Kevin McCann, Treasurer

Roberta Cohen, Co-Chair Emeritus

Andrew Natsios, Co-Chair Emeritus

Morton Abramowitz

Jerome Cohen

Lisa Colacurcio

Rabbi Abraham Cooper

Jack David

Paula Dobriansky

Nicholas Eberstadt

Carl Gershman

Stephen Kahng

David Kim

Robert King

Debra Liang-Fenton

Winston Lord

David Maxwell

Marcus Noland

Jacqueline Pak

**Greg Scarlatoiu, Executive Director**

# TABLE OF CONTENTS

About the Committee for Human Rights in North Korea (HRNK) ................................................................... II

About the Authors ........................................................................................................................................... III

Acknowledgements ......................................................................................................................................... IV

Abbreviations .................................................................................................................................................. IV

Map of Known *Kyo-hwa-so* Prisons and Prison Camps ................................................................................. V

List of Satellite Imagery ................................................................................................................................. VI

Foreword: The Honorable Michael Kirby, Chair, UN Commission of Inquiry ............................................... VII

Introduction ..................................................................................................................................................... 1

    Additional Prisoner Data ........................................................................................................................ 2

    New Satellite Imagery ............................................................................................................................. 2

    The 2012 North Korean Criminal Code .................................................................................................. 4

    Comparative Phenomena of Repression: Political Purges vs. Population Control ................................. 5

The *Kyo-hwa-so* Prison Camp System and Related Hard Labor Facilities Administered by the

Ministry of People's Security .......................................................................................................................... 9

    The Misnomer of "Re-education Through Labor" ................................................................................... 9

    Regime's Claims vs. Prisoner Testimony ............................................................................................. 10

    Related Hard Labor Facilities ............................................................................................................... 12

    The Brutal Feeder System to *Kyo-hwa-so* Imprisonment .................................................................. 13

    Wrongful Imprisonment ....................................................................................................................... 13

The United Nations' Legal Analysis: Crimes Against Humanity in the *Kyo-hwa-so* ................................... 15

    Prisoner Testimony and the United Nations' Legal Analysis ............................................................... 15

    Violations of Fundamental Rules of International Law .......................................................................... 16

    Extermination and Murder ................................................................................................................... 16

    Torture, Rape, and Other Grave Sexual Violence ................................................................................ 17

Enforcing the "One-and-Only Ideology" System: A Glance at the 2012 North Korean Criminal Code

and the Blatant Contradictions with the International Covenants on Civil and Political Rights as well as

Economic, Social and Cultural Rights ............................................................................................................ 18

    "Illegal" Border Crossing vs. the Freedom to Leave ............................................................................ 19

    "Impairing Socialist Culture" vs. Freedoms of Opinion and Expression .............................................. 19

    "Violating the Order of Socialist Collective Life" vs. Freedoms of Thought and Religion ..................... 20

    Violating Freedoms of Expression and Assembly ............................................................................... 21

    "Crimes That Are Not Really Crimes" ................................................................................................... 21

Provincial Chart of *Kyo-hwa-so* Prison Camps ........................................................................................... 23

Working Survey of Known *Kyo-hwa-so* Prison Camps ................................................................................ 24

    *Kyo-hwa-so* Identified by Number ..................................................................................................... 26

    *Kyo-hwa-so* Identified by Name ......................................................................................................... 44

    *Kyo-hwa-so* Believed to be Closed .................................................................................................... 50

    Other Possible Prison Facilities ........................................................................................................... 54

*The Parallel Gulag:* Next Steps ................................................................................................................... 55

Appendix I: *Kwan-li-so* Political Prison Camps Not Included in *The Parallel Gulag* .................................. 56

Appendix II: The 2012 North Korean Criminal Code ..................................................................................... 70

# ABOUT THE COMMITTEE FOR
# HUMAN RIGHTS IN NORTH KOREA (HRNK)

HRNK is the leading U.S.-based bipartisan, non-governmental organization in the field of North Korean human rights research and advocacy, tasked to focus international attention on human rights abuses in that country. It is HRNK's mission to persistently remind policymakers, opinion leaders, and the general public that more than 20 million North Koreans need our attention.

Since its establishment in October 2001, HRNK has played an important intellectual leadership role in North Korean human rights issues by publishing thirty-three major reports (available at http://www.hrnk.org/publications/hrnk-publications.php). Recent reports have addressed issues including political prison camps, the dominant role that Pyongyang plays in North Korea's political system, North Korea's state sponsorship of terrorism, the role of illicit activities in the North Korean economy, the structure of the internal security apparatus, the *songbun* social classification system, and the abduction of foreign citizens.

HRNK was the first organization to propose that the human rights situation in North Korea be addressed by the UN Security Council. HRNK was directly, actively, and effectively involved in all stages of the process supporting the work of the UN Commission of Inquiry on North Korean human rights. Its reports have been cited numerous times in the report of the Commission of Inquiry, the reports of the UN Special Rapporteur on North Korean human rights, a report by the UN Office of the High Commissioner for Human Rights, a report of the UN Secretary-General António Guterres, and several U.S. Department of State Democratic People's Republic of Korea Human Rights Reports. On several occasions, HRNK has been invited to provide expert testimony before the U.S. Congress.

# ABOUT THE AUTHORS

## DAVID HAWK

In addition to *North Korea's Parallel Gulag*, David Hawk has previously researched and authored a series of reports for HRNK: the first (2003) and second (2012) editions of *The Hidden Gulag: Exposing Prison Camps in North Korea*, which were translated into Korean and Japanese and published in Seoul and Tokyo; *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps* (2013); and *The Hidden Gulag IV: Gender Repression and Prisoner Disappearances* (2015).

Additionally, Hawk authored *Thank You Father Kim Il Sung: Eyewitness Accounts of Severe Violations of Freedom of Thought, Conscience and Religion in North Korea* (U.S. Commission for International Religious Freedom (USCIRF)); *Concentrations of Inhumanity: An Analysis of Phenomena of Repression in North Korea's Prison Camps According to the Provisions of Article 7 of the Rome Statute of the International Criminal Court* (Freedom House); *Pursuing Peace While Advancing Rights: The Untried Approach to North Korea* (U.S.-Korea Institute, Johns Hopkins School of Advanced International Studies (SAIS)); "International Human Rights Law; and the D.P.R.K.," *China's Internal and External Relations and Lessons for Korea and Asia*, eds. Jung-ho Bae and Jae Ku, (Korea Institute for National Unification (KINU)); and "North Korea's Response to the UN Commission of Inquiry Report on the Situation of Human Rights in the D.P.R.K." (in *Law and Policy on Korean Unification: Analysis and Implications*, eds. Jong-chul Park and Jeong-ho Roh, KINU and the Korean Legal Studies Department of the Columbia University Law School).

David Hawk is a former Executive Director of Amnesty International, USA and a former UN human rights official in charge of the Cambodia Office of the UN High Commissioner for Human Rights. He has written numerous reports on human rights issues, most notably on genocide in Cambodia, massacres in Rwanda, and the severe violations of human rights in North Korea. Hawk has taught at Hunter College, City University of New York and was a visiting Scholar at the Institute for the Study of Human Rights, Columbia University. Currently he teaches in the International Relations Department at the University of South Florida.

## AMANDA MORTWEDT OH

Amanda Mortwedt Oh is HRNK Project Officer in charge of satellite imagery analysis. She was the desk officer for the series of satellite imagery analyses of North Korean prisons and prison camps published by HRNK and DigitalGlobe Analysis Center, and subsequently AllSource Analysis. She prepared the HRNK "Submission of Information & Documentation on the Situation of Human Rights in North Korea" to the UN Commission of Inquiry, and co-authored *Rights Up Front*, for HRNK and the Robert F. Kennedy Center for Justice and Human Rights.

Amanda Mortwedt Oh holds a JD from the University of St. Thomas School of Law (Minneapolis) and an LL.M. from the Fletcher School of Law and Diplomacy at Tufts University. She also serves as an attorney in the U.S. Army Reserve Judge Advocate General's Corps.

# ACKNOWLEDGEMENTS

Amanda Mortwedt Oh played an indispensable role in the preparation of this report. Drawing on her previous research and familiarity with satellite photographs of North Korea's prison camps, she was able to match previously unidentified images of prisons and prison camps with my compilation of published data on the *kyo-hwa-so* prison camps. Amanda assisted in the review of the compiled data in the "Working Survey" and Provincial Chart of *kyo-hwa-so* prison camps, and copy-edited text. Special thanks also to Joseph S. Bermudez Jr. for his analyses of the satellite images of the prisons pictured in this report.

Ms. Rosa Park, HRNK's Director of Programs and Editor, completed editing, designed the formatting and layout for this report, and organized the valuable input of several interns: Chloe Pulfer was instrumental in the design of the provincial chart and map of the *kyo-hwa-so* and *kwan-li-so*, and assisted with other design and editing aspects; Amanda Won translated and Jihye Lee edited the 2012 North Korean Criminal Code; Hyebin Jeon did translations of the Korean language reports by the Database Center for North Korean Human Rights (NKDB); Grace Warwick and Soohyun Chang did fact-checking and cross-checking for the data compilation in the "Working Survey"; and Elizabeth Yang assisted in editing and formatting footnotes.

Mr. Jung Gwang-il, Founder and Director of NO CHAIN: The Association of North Korean Political Victims and their Families, organized interviews for the author with former *kyo-hwa-so* prisoners now resident in South Korea. Jeonghyun Kang, former HRNK intern, and Ashley Youngsun Eom translated for my interviews in Seoul.

Many thanks to Roberta Cohen for her valuable insights and editorial review.

Appreciation to Greg Scarlatoiu, Executive Director of HRNK, for overseeing this report and ensuring its publication.

And special thanks to Joan Libby Hawk for her unflagging patience, valued advice, and editing assistance during the research and writing of this report.

*David Hawk*
October 26, 2017

# ABBREVIATIONS (Alphabetical Order)

| | |
|---|---|
| HRNK | Committee for Human Rights in North Korea |
| KINU | Korea Institute for National Unification |
| KWP | Korean Workers' Party |
| LTC | Labor Training Camp |
| MPS | Ministry of People's Security |
| MSS | Ministry of State Security |
| NGO | Non-governmental organization |
| NKDB | Database Center for North Korean Human Rights |
| UN COI | United Nations Commission of Inquiry |

# MAP OF *KYO-HWA-SO* AND *KWAN-LI-SO* PRISON CAMPS



**DAVID HAWK**
With Amanda Mortwedt Oh

v

# LIST OF SATELLITE IMAGERY

Figure 1:        *Kyo-hwa-so* No. 1, Kaechon, South Pyongan Province

Figure 2:        *Kyo-hwa-so* No. 2, Dongrim (Sowol-ri), North Pyongan Province

Figure 3:        *Kyo-hwa-so* No. 2, Dongrim (Obong Workers' District), North Pyongan Province

Figure 4:        *Kyo-hwa-so* No. 3, Sinuiju (Tosong-ri), North Pyongan Province

Figure 5:        *Kyo-hwa-so* No. 4, Kangdong, Pyongyan

Figure 6:        Sariwon City Prison, North Hwanghae Province

Figure 7:        *Kyo-hwa-so* No. 6, Sariwon (Osu-ri), North Hwanghae Province

Figure 8:        Kanggye City Prison, Chagang Province

Figure 9:        Hamhung City Prison, South Hamgyong Province

Figure 10:       *Kyo-hwa-so* No. 9, Hamhung Women's Prison (Sungwon-ri Branch), South Hamgyong Province

Figure 11:       *Kyo-hwa-so* No. 11, Chung-san, South Pyongan Province

Figure 12:       *Kyo-hwa-so* No. 12, Jongo-ri, North Hamgyong Province

Figure 13:       *Kyo-hwa-so* No. 88, Wonsan (Sokhyol-ri), Kangwon Province

Figure 14:       *Kyo-hwa-so* No. 88, Wonsan (Chuksal-ri), Kangwon Province

Figure 15:       Facility at Ungbong-dong, South Pyongan Province

Figure 16:       Camp 607, KPA Security Command, Chidong-ri (Hoechang Labor Training Camp), South Pyongan Province

Figure 17:       *Kyo-hwa-so* No. 8, Sungho-ri, Pyongyang

Figure 18:       Yongdam *Kyo-hwa-so*, Kangwon Province

Figure 19:       Tongjung-ri *Kyo-hwa-so*, South Hamyong Province

Figure 20:       Facility at Pungho-ri, South Hamgyong Province

Figure 21:       Facility at Sangtong-ri, South Hamgyong Province

Figure 22:       Facility at Danchon (Hangguil-dong), South Hamgyong Province

Figure 23:       Facility at Danchon (Sangjang), South Hamgyong Province

Figure 24:       Facility at I-gol, South Hamgyong Province

Figure 25:       Facility at Udan, North Hamgyong Province

# FOREWORD

**THE HONORABLE MICHAEL KIRBY**

**Chairman of the UN Commission of Inquiry on Human Rights Violations in the Democratic People's Republic of Korea (2013–2014)**

In 2013, I was appointed by the President of the UN Human Rights Council to be the Chair of the Commission of Inquiry on the Democratic People's Republic of Korea (DPRK). With two brilliant and dedicated colleagues and an excellent secretariat, we produced our report in little more than half a year. We found that:

> *"Systematic, widespread and gross human rights violations have been, and are being, committed by [the DPRK], its institutions and officials…The gravity, scale and nature of these violations reveal a state that does not have any parallel in the contemporary world. [It is]…a totalitarian state…[that] seeks to dominate every aspect of its citizens' lives and terrorises them from within."*

From the start of our work, we resolved to fulfil our mandate in a way different from most such inquiries. As an antidote to the extreme secrecy of the DPRK, we decided to place emphasis on transparency. We conducted public hearings, which were filmed and placed online. We engaged with media. Throughout our report, we quoted the testimony of our witnesses, in order to allow them to speak directly to power. Our first public hearing was held in Geneva, followed by others in Seoul, Tokyo, London and Washington, DC. Amongst the first witnesses who gave evidence before us was David Hawk. I had known him partly whilst performing other UN duties in Cambodia. He helped us to overcome the refusal of the DPRK to permit a visit to their country. He did so through his words, photographs and satellite imagery, he helped the UN COI to leap fearsome barriers of isolation, so that we would understand the system of detention camps that had been established in the DPRK. That country denied the existence of any such camps.  His testimony was compelling. It was little wonder that the DPRK did not want a vigilant and independent UN commission to enter their territory and inspect the camps.

The UN COI found the existence and grim features of the camps, detention facilities and prisons in the DPRK. It concluded:

> *"That such political prison camps continue to exist at present in the DPRK is an affront to the universally shared human rights values and a crime against humanity.  It is the duty of [the] DPRK and the international community to ensure that these camps are dismantled and the surviving prisoners released without further delay."*

Our recommendations extended both to the political prison camps (*kwan-li-so*) and the labor re-education camps (*kyo-hwa-so*). Magically, there is no reason to believe any substantive change in the situation reported by the UN COI in 2014. Now, continuing his invaluable work for human rights, David Hawk has published *The Parallel Gulag*. It is a report providing additional evidence. It updates the record contained in the UN COI report. It shows that North Korea's system of political oppression remains in place as an affront to the conscience of humanity. As the DPRK has itself failed to rectify this grave problem, the duty, by international law, falls upon the organised international community in the United Nations. If the problem was urgent in 2014, it is doubly so today.

DAVID HAWK
With Amanda Mortwedt Oh

VII

David Hawk has been providing reports on the "hidden gulags" of the DPRK for 15 years. His reports have become a kind of clarion voice for the men, women and children who have lived and died in these atrocious and inhuman places. His reports have revealed what the thousands of victims of the DPRK regime have tried to hide by isolating the camps; terrorising the detainees and those who survive; and exhibiting violence, famine and countless and endless propaganda to demoralise an entire people. Through David Hawk's research and dedication, we in the outside world, have come to know the gulags for what they are: instruments of fear and control by the leadership of the DPRK that has imposed on North Korea a huge system of detention that breaches United Nations law and universal, civilised standards.

In this book, David Hawk provides never-before-seen imagery of labor re-education camps, both suspected and confirmed. He reveals a parallel network of prisons controlled by the DPRK's Ministry of People's Security (*An-jeon-bu*). These revelations suggest the imposition of degrees of suffering even more pervasive than the UN COI described in 2014. Although these labor camps might be described as "ordinary prisons", there is nothing "ordinary" in the treatment of those incarcerated there. Differences in the treatment of prisoners and political detainees are often merely "matters of degree, not principle. Policies that combine forced labour with deliberate starvation, inadequate medical care and poor hygiene conditions cause the death of thousands of inmates annually."

The world must be grateful to David Hawk for his vigilance and persistence. Through his efforts, the voices of those suffering reach the outside world. Ultimately, those voices will strengthen the resolve of the international community to demand accountability; to denounce the perpetrators; and to punish those who are guilty of crimes against humanity and other serious human rights abuses.

As the world knows, recent developments in the DPRK have added to the urgent need to improve the lot of the political detainees and prisoners. I refer to the development of a dangerous armoury of nuclear weapons and the refinement of intercontinental and other ballistic missiles that endanger not only North Korea itself but also the region and the wider world. As is apparent from the opening words of the *Charter* of the United Nations of 1945, new world order has been established on the foundation of universal human rights; international peace and security and the principle of justice. History teaches that violent and totalitarian states are dangerous not only to their own people but to neighbours and others. It is not possible to solve the problems of peace and security in relation to the DPRK without addressing the deep home-grown problems of human rights violations and affronts to the principle of justice. The three objectives of the United Nations are not separate and distinct. They are interconnected and interdependent.

This is why *The Parallel Gulag* and the story it tells are so important for Korea and the World as it is today. It is why the work of David Hawk is essential. It tells us the kind of state the DPRK is. And the grave danger it presents derives from more than the weapons it has created.

*Michael Kirby*
1 October 2017



# INTRODUCTION

North Korea operates two systems of arbitrary detention and political imprisonment. Both systems feature forced labor and brutal conditions, leading to high rates of deaths in detention in both systems. One system is a group of *kwan-li-so* political penal labor colonies and at least one large penitentiary. The *kwan-li-so* are commonly termed political prison camps or concentration camps in English and administered by the "*Kuk-ga-bo-wi-bu*," which is translated as the Ministry of State Security (MSS).[1] This police agency, commonly called *Bo-wi-bu* by North Koreans, is also termed the secret police in English as it administers a number of intelligence and counter-intelligence operations, including the powerful and dreaded investigation and interrogation units that are feeder institutions for the political prison camps. Updated satellite imagery of these *kwan-li-so* political prison camps is included in Appendix I.

The second system is the network of distinctively calibrated prison camps and penitentiaries, termed *kyo-hwa-so* or *kyo-yang-so* as well as other detention and hard labor facilities usually termed *jip-kyul-so* or *ro-dong-dan-ryeon-dae*. These are administered by the *In-min-bo-an-seong*, which is translated as the Ministry of People's Security (MPS).[2] This police force continues to be called *An-jeon-bu* by former North Koreans, who use an earlier title for this ministry or department.[3] The incarceration facilities run by the *An-jeon-bu* police force, like the prison camps run by the *Bo-wi-bu* police force, also prescribe hard labor under brutal conditions. They, too, feature an elaborate system of brutal investigations and interrogations that are feeder and transit institutions, where egregious human rights violations take place.

Previously, *The Hidden Gulag* series by HRNK described both systems of political imprisonment and forced labor as the "hidden" penal labor colonies administered by the MSS and the nationwide multiplex political incarceration system administered by the MPS.[4] The aim was to identify and elucidate the different systems and institutions of severe repression in North Korea.

This present report by HRNK focuses a much more comprehensive spotlight than previously possible on North Korea's *parallel* system of arbitrary detention and severe repression: the prison and prison camp system run by the *An-jeon-bu* (MPS).[5] Three particular developments have enabled a more comprehensive update and examination of the prison system used for population control: 1) additional prisoner testimony; 2) the discovery of previously unidentified and unpublished satellite imagery of the *kyo-hwa-so* prisons; and 3) a translation of the 2012 North Korean Criminal Code.

---

[1]    Also termed State Security Agency or State Security Department.

[2]    Also termed the People's Security Agency or Department.

[3]    Prior to 1998, this police force was called *Sa-hoe-an-jeon-bu*, the Social Safety Ministry or Department.

[4]    The 2003 edition of *The Hidden Gulag* and the 2012 revised and updated edition provided examples, descriptions, and analyses of the variety of detention and forced labor facilities. Subsequent HRNK reports have tracked changes in both political incarceration systems. *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps* (2013) described the closure of *Kwan-li-so* Camps 18 and 22, and provided a revised estimate of the number of prisoners in the *kwan-li-so* political prison camps. *The Hidden Gulag IV: Gender Repression and Prisoner Disappearances* (2015) described the dismantlement of the Sorimchon section of *Kwan-li-so* Camp 15 "Yodok" and the addition of a large women's detention facility at *Kyo-hwa-so* No.12, "Jongo-ri."

[5]    There is an up-to-date, as of August 2017, survey of the *kwan-li-so* prison camps in Appendix I to this report.

DAVID HAWK
With Amanda Mortwedt Oh

## ADDITIONAL PRISONER DATA

In comparison to the smaller number of former *kwan-li-so* political prisoners, guards, and MSS police officials who fled to South Korea, there are hundreds of former North Koreans, among the more than 30,000 North Korean refugees now residing in South Korea, who were previously incarcerated in the *kyo-hwa-so* and related prison and prison camp systems administered by the MPS.

Two Seoul-based research organizations, the Korea Institute for National Unification (KINU) and the Database Center for North Korean Human Rights (NKDB)[6] have unparalleled access to newly arriving North Korean refugees in South Korea. They have access even before these refugees, usually termed "defectors" in South Korea, complete their initial investigations and orientation programs, and then settle into the general population throughout South Korea.[7] This access to incoming refugees has enabled KINU and NKDB to publish information on a larger number of penal facilities in North Korea, frequently including detailed information on locations. The data from these sources, along with the information obtained by HRNK, is surveyed in the section entitled "Working Survey of Known *Kyo-hwa-so* Prison Camps" below.

A substantial portion of this data was available to the UN Commission of Inquiry (UN COI) on human rights in North Korea.[8] Indeed, the UN COI had sufficient information on the *kyo-hwa-so* prison system to conclude that the repression therein constituted crimes against humanity.[9] However, there is now, in 2017, additional information that was not available to the UN COI when it conducted its hearings and research in 2013 and 2014.

The survey of known *kyo-hwa-so* is not presented as a definitive list of such penal facilities, but is a more comprehensive summary than previously available to the world outside of North Korea. Again, this is possible because, as of 2017, there are hundreds of former North Korean citizens currently residing in South Korea who were previously imprisoned in the detention and forced labor facilities operated by the MPS.

## NEW SATELLITE IMAGERY

The second development is locating geo-coordinates and finding satellite imagery of many more prisons and prison camp facilities in North Korea. The 2003 edition of *The Hidden Gulag* was the first human rights report to utilize satellite imagery of North Korea's prison camps to reinforce the testimony of former prisoners, even before the availability of Google Earth.[10] Beginning in 2013, HRNK utilized the expertise of professional satellite imagery analysts to publish a series of reports containing quality analysis of the much higher resolution

---

6    NKDB is a Seoul-based human rights non-governmental organization (NGO). KINU is a Seoul-based government-funded research organization and think tank.

7    Once settled into the general Korean population, recently arriving refugees from North Korea, who might have more recent information about human rights issues in North Korea have to be located through the efforts of other NGOs run by defectors.

8    UN General Assembly, *Report of the detailed findings of the commission of inquiry on human rights in the DPRK,* UN Doc. A/HRC/25/CPR.1, February 7, 2014, 246-248 [henceforth, COI Report].

9    Ibid., 330-333.

10    The prison camp satellite imagery published in HRNK's *The Hidden Gulag* report series have been confirmed by former prisoners or prison guards, or other former North Koreans who have had the occasion to personally visit the prison camps.

imagery that is now publically available.[11] Other NGOs and websites also map prison camp facilities in North Korea, including Amnesty International, North Korean Economy Watch, One Free Korea, and organizations based in Seoul such as KINU and NKDB, along with other South Korean NGOs run by defectors.

Because North Korean authorities continue to refuse to allow UN officials or the International Committee of the Red Cross to visit places of detention in North Korea, satellite imagery of the prisons and prison camps remain tremendously important. Satellite imagery allows the outside world to track expansions of some prison camps or the removal of specific zones of other camps, including changes about which there is not yet former prisoner or eyewitness testimony.[12]

HRNK's recent investigation of expansive as well as close-up satellite imagery located North Korean facilities with the tell-tale identifying characteristics of prison camps and penitentiaries—security enclosures with gated high walls and barbed wire fences, guard towers, dormitories, and workshops or mines located within or adjacent to the prisons and prison camps. In some cases, these images of suspected, but unconfirmed, penal labor facilities were shown to former North Korean prisoners interviewed for this report. In other cases, the images of penal labor facilities have been matched with the more detailed location information provided in refugee testimony-based research. In other cases, HRNK researchers used the more detailed location information to further scour satellite imagery of North Korea, finding previously unidentified and unpublished satellite imagery of these additional penal labor facilities.[13]

Prior to this present HRNK report, only a handful of satellite images of the *kyo-hwa-so* prisons and prison camp facilities administered by North Korea's MPS were publicly known or published.[14] The "Working Survey of Known *Kyo-hwa-so* Prison Camps" section of this report contains previously unpublished satellite images of numerous additional prisons and prison camps. That section indicates which facilities have been confirmed by former prisoners or other former North Koreans who had the occasion to visit those prisons and which facilities have not yet been confirmed by eyewitness testimony from North Korean escapees.

The publication of these new satellite images of prisons and prison camps may help to enable former North Korean prisoners or residents from nearby localities to provide eyewitness confirmation of these penal labor facilities.

---

11      See *North Korea's Camp No. 25, Update 2*, November 2016; *North Korea: Flooding at Kyo-hwa-so No. 12*, September 2016; *North Korea: Kyo-hwa-so No. 12, Jongo-ri*, August 2016; *North Korea: Ch'oma-bong Restricted Area*, March 2016; *North Korea: Imagery Analysis of Camp No. 16*, December 2015; *North Korea: Imagery Analysis of Camp No. 14*, November 2015; *Imagery Analysis of Camp No. 15 "Yodok," Closure of the Revolutionizing Zone*, September 2015; *North Korea's Camp No. 25 Update*, June 2014; *North Korea's Camp No. 25*, February 2013; *North Korea's Camp No. 22 – Update*, December 2012; and *North Korea's Camp No. 22*, October 2012. All are accessible on HRNK's website at http://www.hrnk.org/publications/hrnk-publications.php.

12      See, for example, David Hawk, *The Hidden Gulag IV: Gender Repression and Prisoner Disappearances* (Washington, DC: Committee for Human Rights in North Korea, 2016).

13       HRNK researchers utilized Google Earth Pro; 38 North's DPRK Digital Atlas; Wikimapia; and, North Korean Economy Watch's "North Korea Uncovered, version 18," (2009).

14      Primarily, *Kyo-hwa-so* No. 1, Kaechon; *Kyo-hwa-so* No. 3, Sinuiju; *Kyo-hwa-so* No. 4, Kangdong; and *Kyo-hwa-so* No.12, Jongo-ri.

# THE 2012 NORTH KOREAN CRIMINAL CODE

The third development is the newly translated and recently revised North Korean Criminal Code. The 2012 Criminal Code, replacing the 2009 version, was originally published by the North Korean Supreme People's Assembly. HRNK obtained a copy from a South Korean government website,[15] and translated the 2012 North Korean Criminal Code into English. The revised 2012 version, like its predecessors, makes it abundantly clear that many of its articles and provisions allow authorities to deprive North Korean citizens of their liberties for, essentially, political offenses. These articles are inconsistent with or are directly contrary to contemporary international human rights standards, including those set forth in the international human rights conventions that North Korea has acceded to or ratified.

The enforcement of this Criminal Code, with its myriad political as well as criminal offenses, is manifestly intended to keep the citizenry in line and results in the imprisonment of thousands of North Koreans at any one time, and cumulatively thousands of North Koreans over the last decade.

Because the prison camps and penitentiaries administered by the MPS also detain North Koreans for what are genuinely criminal offenses, it is not possible to provide more precise statistics on the number of political prisoners. However, according to the testimony of former prisoners, there are *An-Jeon-bu* prisons and prison camps where a majority of inmates are imprisoned for "crimes that are not really crimes" as the North Korean refugees express it.

The political nature of the North Korean Criminal Code is outlined in the section entitled "Enforcing the 'One-and-Only Ideology' System: A Glance at the 2012 North Korean Criminal Code" below. The complete 2012 North Korean Criminal Code in the original Korean language and HRNK's English translation appear in Appendix II to this report.

---

[15]     Korea Ministry of Government Legislation, "Laws," *North Korea Laws Information Center*, http://world.moleg. go.kr/KP/law (accessed August 2017).

# COMPARATIVE PHENOMENA OF REPRESSION: POLITICAL PURGES VS. POPULATION CONTROL



## Kwan-li-so
### Political Penal Labor Colonies

- North Korea denies the existence of the political prison camps (kwan-li-so)
- Controlled by the State Security Department (Guk-ga An-jeon Bo-wi-bu)
- Prisoners are "forcibly disappeared" (deported to the kwan-li-so without any judicial process or legal recourse)
- Incommunicado detention (no contact with the outside world)
- Most inmates are imprisoned for life in "total control zones" (wan-jeon-tong-je-gu-yeok)
- Historically, up to three generations of family members imprisoned under "guilt by association" (yeon-jwa-je) system
- All prisoners detained for political offenses

**Shared (overlap):**
- **Malnutrition and starvation due to below-subsistence food rations**
- **Arduous forced labor**
- **Brutal and inhumane conditions**
- **Large numbers of deaths in detention**
- **Subjected to innumerable crimes against humanity**

## Kyo-hwa-so
### Long-Term Prison Labor Facilities

- North Korea recognizes the existence of the kyo-hwa-so in the North Korean Criminal Law (Article 30)
- Controlled by the Ministry of People's Security (In-min Bo-an-bu)
- Many prisoners undergo minimal judicial procedures
- Not incommunicado; families can sometimes bring food to the prisoner
- Usually fixed-term sentences after which the prisoner is released
- Some released early due to severe illnesses or as part of a nationwide amnesty to commemorate the birth of the "Great Leader" or the founding of the Korean Workers' Party
- Prisoners detained for criminal and political offenses

Before examining the details of the *kyo-hwa-so* prison and prison camp system administered by the *An-jeon-bu* MPS, it is useful to briefly compare it to the *kwan-li-so* political prison camp system run by the *Bo-wi-bu* MSS , as there are important differences in the phenomena of repression within these two different systems of political imprisonment. Some important differences are:

- The prison camp system administered by the MSS is extra-judicial, extra-legal, secret, and incommunicado, while the prison system administered by the MPS is not, although its legal and judicial underpinnings fall far short of international standards.
- MSS prison camps incarcerate family members along with the principal offender, while the MPS prison camps do not.[16]

---

[16]      There is little empirical data, but it seems quite possible that the imprisonment of the children and grandchildren of political and ideological offenders is now less routine than in previous decades.

DAVID HAWK
With Amanda Mortwedt Oh

5

- Those deported to the prison camps, mostly for life-long sentences, by the MSS police are political prisoners by definition. The prisons and prison camps run by the MPS police incarcerate and punish North Koreans for both criminal and political offenses, and usually for fixed-term sentences.

However, the major difference between these two systems is their functionality in North Korean social and political life.

The *kwan-li-so* political prison and prison camp system run by the *Bo-wi-bu* (MSS) police is used to pre-emptively purge, punish, and remove from North Korean society political elements or factions from the Korean Workers' Party (KWP), the army, and the state administrative structures that the Kim regime leadership surmises or suspects might challenge their dictatorial rule, their "monolithic" ideology, or their "revolutionary" and extreme policies and practices. The international community has learned most of what is known about this system of political imprisonment from former prisoners, former prison guards, and former officials of the MSS police who fled to South Korea during the rule of Kim Il-sung and Kim Jong-il.

From these sources, researchers can ascertain who was being sent to the *kwan-li-so* political prison camps and why.[17] Kim Jong-un has also brutally purged and executed suspected or insufficiently loyal members of the KWP, the army, and the government bureaucracy, including his own uncle and half-brother. Nevertheless, except for several high-level executions publicized by the regime, the fate and whereabouts of these purged individuals, their network of supporters, and their families are mostly unknown to the international community.

The political purpose of the *kyo-hwa-so* prison and prison camp system run by the *An-jeon-bu* (MPS) police is general population control. In addition to the "normal" criminal offenses for which persons can be legitimately deprived of their liberty and punished—murder, assault, theft, kidnapping, drug distribution, and other crimes—the North Korean Criminal Code has a very long list of political offenses. This list enables the regime to severely punish its citizens for reasons that are not compatible with, or are directly contrary to, contemporary international standards, including the provisions of human rights conventions that North Korea has acceded to or ratified.

Along with protecting the lives and property of the citizenry, the MPS is charged by the Supreme People's Assembly with defending the sovereignty and socialist system of North Korea. The MPS maintains the complex citizen registration system, keeping extensive and in-depth files on each North Korean citizen. The MPS maintains a large network of informants for the surveillance of the populace.[18] The Ministry's local offices issue internal travel documents to control the movement of citizens. If there is a crackdown on internal travel without proper authorization, as was recently reported by Radio Free Asia, it is the MPS that enforces it.[19]

---

17    See David Hawk, "Successive Waves of Political Imprisonment: A Historical Overview," in *The Hidden Gulag Second Edition*, (Washington, DC: Committee for Human Rights in North Korea, 2012), 37–41 for a brief account.

18    For further information on the Ministry of People's Security, see Ken Gause, *Coercion, Control, Surveillance, and Punishment: An Examination of the North Korean Police State* (Washington, DC: Committee for Human Rights in North Korea, 2012), 27–35; and Fyodor Tertitskiy, "Daily duty: Inside North Korea's regular police force," *NK News*, August 10, 2016, https://www.nknews.org/2016/08/daily-duty-inside-north-koreas-regular-police-force/.

19    Jieun Kim, "North Korean Police Restrict Citizen Movements Across Country," *Radio Free Asia*, March 30, 2017, http://www.rfa.org/english/news/korea/north-korean-police-restrict-citizen-movements-across-country-03302017163907.html.

North Korea scholars describe the Kim regime as resting on three foundations. The first is the attempt at complete control of the knowledge and information that the populace is allowed access to. The second is effectively omnipresent and even overlapping systems of surveillance over the citizenry. The third foundation is the certainty of harsh punishment for non-compliance with the totalitarian dictates of the regime.[20] This foundation is the political function of the MPS police and the North Korean Criminal Code and criminal procedure codes on which its operations are based, and the system of incarceration that administers certainly assured harsh punishments.[21]

Provisions of the North Korean Criminal Code, discussed in more detail below in the section entitled "Enforcing the 'One-and-Only Ideology' System: A Glance at the 2012 North Korean Criminal Code" allows the Kim regime to severely punish North Korean citizens for the following acts:

- gatherings not authorized by Party and state authorities
- criticizing or expressing dissatisfaction even privately, especially anti-state propaganda or agitation
- demonstrating with an anti-state purpose
- the import, possession, or use of decadent drawings, written materials, periodicals, music, movies, or videos, particularly "enemy" broadcasting or propaganda
- foul, hostile, or superstitious activities
- "illegally" crossing the border of North Korea
- suppressing the people's struggle for national liberation and re-unification, or harboring or failing to report people who do

There are also criminal prohibitions against these acts:

- failing to comply with the instructions of a state agency
- concocting false rumors that may lead to the distrust of the state or its agencies
- violations of the order of socialist collective life
- management workers who execute superiors' orders in a careless manner
- drawing up a plan for the economy in a haphazard manner, and
- not rightly selecting winning athletes for important competitions

HRNK does not have the capability to independently determine the exact number of prisoners in the *kyo-hwa-so* prisons and prison camps or the ratio of political prisoners to criminal prisoners. However, it is clear that at any one time, there are thousands of North Koreans who are deprived of their liberty for what the North Korean refugees now in South Korea describe as "crimes that are not really crimes." They are subjected to imprisonment and forced labor under very brutal conditions, beginning with the provision of below-subsistence-level food rations. The UN COI estimated that the number of prisoners in the *kyo-hwa-so* prison and prison camp system could be 70,000 or more.[22]

---

20   Some Korea scholars would add a fourth foundation of the regime: the loyalty of the political elite.

21   Perhaps given the changes in North Korean society owing to widespread marketization, the qualification should now be added: certain punishment unless sufficient payments or payoffs can be offered.

22   COI Report, 246.

Cumulatively, thousands of North Koreans have been imprisoned in the *kyo-hwa-so* and related prisons for essentially political offenses. Even without including the number of prisoners in the *kwan-li-so* political prison camps administered by the MSS, North Korea would place at or near the top of the list of countries with the largest number of political prisoners.

# THE *KYO-HWA-SO* PRISON CAMP SYSTEM AND RELATED HARD LABOR FACILITIES ADMINISTERED BY THE MINISTRY OF PEOPLE'S SECURITY

Each province in North Korea, with the possible exception of sparsely populated Ryanggang Province, has one or more prisons or prison camps that detain North Korean men and women in extremely harsh conditions and subject them to forced labor. These prisons and prison camps hold both political prisoners and persons convicted of criminal offenses as commonly understood. Some of these facilities have a numerical designation. Others are identified by a name, usually the nearest city or town that would be known by most North Koreans.

Some of the *kyo-hwa-so* resemble large penitentiaries, compounds surrounded by high walls with guard towers and contain several buildings for prisoner housing and manufacturing, and offices for guards and prison officials. Other *kyo-hwa-so* are encampments surrounded by barbed wire fences in more rural areas. Sometimes, the prison facility is located on the outskirts of a city or town, although more are located in the countryside or in mountainous areas. Prisoners work in mining, logging, agricultural labor, crop production, or animal husbandry. Some prisoners manufacture products such as furniture, cement, or brick from the raw materials mined, logged, or gathered at the prison or prison camp. Other prisoners are involved in factory production of textiles, leather and shoe manufacturing, or labor-intensive production of wigs, false eyelashes, or other goods.

The survey of known *kyo-hwa-so* prisons in North Korea that follows below in the section entitled "Working Survey of Known *Kyo-hwa-so* Prison Camps" is not a definitive list. It is a summary of information that has been provided by North Korean refugees now residing in South Korea. It is not possible to provide a definitive count of the number of such prisons because several *kyo-hwa-so* prisons have a number of satellite facilities located several miles from the main prison or camp. Some former prisoners identify these detention facilities as satellite prisons, while others describe them as independent facilities.

## THE MISNOMER OF "RE-EDUCATION THROUGH LABOR"

*Kyo-hwa-so* literally translates as "a place to make a good person through education." Sometimes, the term *ro-dong kyo-hwa-so* is used meaning "re-education through labor." *Kyo-hwa-so* is sometimes translated into English as a "re-education camp," or even "edification center" or "enlightenment center."

> *The large number of testimonies provided by former prisoners incarcerated at these facilities makes it clear that these are cruel euphemisms for a prison system that the UN COI found to extend to the level of crimes against humanity.*[23]

---

23      "Based on the body of testimony and other evidence received, the Commission finds that crimes against humanity extend to the ordinary prison system, in particular the ordinary prison camps (*kyohwaso*) and to a lesser degree the various types of short-term forced-labour facilities." COI Report, para. 1068, p. 330.

A recent publication by the South Korean National Human Rights Commission uses the translation "Correctional Labor Camp."[24] The 2014 UN COI translates *kyo-hwa-so* as "ordinary prison camp."

The "education" component of imprisonment in the *kyo-hwa-so* prison system has two components. The first is the *saeng-hwal-chong-hwa,* translated as mutual self-criticism, which is held at least weekly. It is commonly practiced at nearly all North Korean work units, where colleagues gather, usually in the evening or at the end of the workday, to confess their inadequate work habits and criticize the work habits of their co-workers. According to former prisoners, the person being criticized would face fellow prisoners or a prison official and often falsely confess to imaginary or invented mistakes swiftly so the work unit could conclude these sessions as quickly as possible.

The second "education" component of *kyo-hwa-so* imprisonment is the memorization and recitation of North Korea's most important annual political statements. During Kim Il-sung's and Kim Jong-il's reign, the most important statement was the New Year's Day speech that outlined the regime's policy objectives and political priorities for the coming year. Because Kim Jong-il rarely spoke publicly during his rule, the annual January 1st regime statement was given in the form of a "New Year's Day Joint Editorial" in the Party, the military, and the government newspapers. Even now, the prisoners are required to memorize the speeches and recite them individually or in unison. The priorities are often set forth in slogans such as, "Let us build…" or "Let us carry out...," which the prisoners shout out together. Former prisoners interviewed by HRNK viewed themselves, quite correctly, as unjustly imprisoned and thought these propaganda sessions were far removed from their reality and life experiences—they were just another form of punishment.

## THE REGIME CLAIMS VS. PRISONER TESTIMONY

Unlike the *kwan-li-so* political prison camps run by the MSS, which the North Korean diplomats formally deny even exist, North Korean authorities do not deny the existence of the *kyo-hwa-so* prisons and prison camps. Rather, North Korean police officials make extraordinary claims about the prisons that contradict the testimonies of hundreds of former prisoners who, after release, fled to South Korea.

According to Colonel General Jung Young-wook of the MPS:

> *"Although the country is in a poor economic condition, Marshall Kim Jong Un, with warm love and consideration of the people, takes extra care to feed the kyo-hwa-so persons and provide summer and winter clothes, necessities of life, medicine and other supplies to them… We conduct monthly health checkups to find any disease and provide the right treatment at the right time. We also distribute workload according to the checkups."[25]*

---

24    National Human Rights Commission of Korea, *Korean-English Glossary of North Korea Human Rights Terms*, (Seoul, 2016), 59.

25    *Minjok Tongshin*, June 1, 2015. *Minjok Tongshin* is a Korean language television service accessible on YouTube.

According to Lieutenant General Kim Sung-il, also of the MPS:

> *"When [prisoners in the kyo-hwa-so] have dinner we let them study and watch TV. About twice a week we also show them interesting TV and soap operas or films… Now there is a TV in every room. We also provide newspapers, magazines and Rodong Shinmun…"[26]*

To the contrary, the most common *kyo-hwa-so* prison camp realities cited by former prisoners include:

• grossly inadequate food rations
• arduous and frequently dangerous labor
• the absence of medical treatment
• high rates of deaths in detention with offensive and culturally improper burial of the dead
• widespread and wrongful imprisonment

The grossly inadequate food rations keep prisoners in a persistent state of hunger and malnutrition. How much financial support, food subsidies, or medicine and medical equipment, if any, these penal institutions receive from central, provincial, or municipal governments is not well known. Nevertheless, many prisons and prison camps have agricultural and animal husbandry components. Some of the agricultural production goes to the prison guards, and perhaps a small amount goes to the prisoners. However, large parts of the harvests are taken away, either for other government officials or, many suspect, for sale in local markets. Notwithstanding the agricultural labor and production by the prisoners themselves, numerous former prisoners have relayed that health, or even life, in the *kyo-hwa-so* and related hard labor facilities depend on the abilities of a prisoner's family to bring food and medicine to the prison or prison camp for the prisoner's use.

Prison labor is arduous and sometimes dangerous manual labor. Mining is done with picks and shovels, and logging is done by axes and handsaws. Even with the safety equipment and precautions unheard of in North Korean prisons, mining and logging is dangerous work. Farming is done with only the most basic farm tools. Prisoners often have to walk a great distance to get to the mines, forests, or agricultural plots. Prison work units have production quotas and failure to meet the quotas can frequently result in a further reduction in food rations and even beatings.

Coal and other minerals mined by prison labor go to higher authorities for either domestic use or export to China. The same is likely the case for timber and timber products, and for varied manufactured goods such as textiles, shoes, bricks, or cement. Prison officials or higher KWP authorities have contracted prison labor for products such as textiles, wigs, and false eyelashes. Female prisoners who only did the early and most labor-intensive parts of producing wigs and false eyelashes believed that the partially sewn or glued wigs and eyelashes were then sent to China for finishing and marketing.

Former prisoners further describe the absence of medicine and medical facilities. Some of the prisons and prison camps have sick rooms for seriously ill prisoners, but former inmates report that there is hardly any medicine. Female prisoners report the complete unavailability of provisions or products for their menstrual cycles.

---

[26]    Ibid., June 1, 2015.

Overall, the brutal and arduous labor, grossly inadequate diet, and lack of medicine lead to a dreadfully large number of deaths in detention. The bodies of deceased prisoners are frequently dumped into unmarked graves near the prison or prison camp without the traditional Korean funeral rites or arrangements. This is a deep cultural offense frequently commented on by prisoners who survived their sentence. Other former prisoners report that when they were very sick, and appeared close to death, the prison authorities would send for their families to come and take them home for either recovery or death. Upon recovery, though, the prisoners were supposed to return to prison. Although, several of HRNK's interviewees reported that upon recovery, they fled to China or South Korea instead, fearing recurring hunger and disease if they returned to the prison or prison camp.

## RELATED HARD LABOR FACILITIES

There are additional and related detention and forced hard labor facilities termed *kyo-yang-so* and *ro-dong-dan-ryeon-dae* that are also administered by the *An-jeon-bu* (MPS). *Kyo-yang-so* translates literally as "a place to make a good person through nurturing." *Ro-dong-dan-ryeon-dae* is usually translated as labor training center or camp (LTC). Some of these are in fixed locations. Others seem to function as mobile forced labor brigades attached to local municipalities. In theory or on paper, there may be some difference between these related penal labor institutions and the *kyo-hwa-so* in terms of the relative retention of citizen rights during or after detention. Mostly, it is a matter of the length of sentence: the *ro-dong-dan-ryeon-dae* LTCs detain prisoners for six months or under; the *kyo-yang-so* detain prisoners between one and two years; and the *kyo-hwa-so* detain prisoners for two years or more. According to the testimony of former prisoners, hard and often dangerous labor, brutal conditions and treatment, and grossly inadequate food provisions are common to all of these facilities.

## THE BRUTAL FEEDER SYSTEM TO *KYO-HWA-SO* IMPRISONMENT

The *kyo-hwa-so* and related forced labor prison facilities have an elaborate and brutal feeder system. A person is arrested by the MPS police or, in some cases, handed over to the MPS police by the *Bo-wi-bu* (MSS) political police. In police custody, the arrested person is held in a local detention facility known as a *ka-mok*, which is usually in the same building as the interrogation rooms known as *ku-ryu-jang*.[27] The detention facilities are sometimes overcrowded. Then, detention and interrogation can last for a few days or for months on end. Former prisoners frequently complain about extreme confinement and grossly inadequate food provisions. In addition, those detained a long time frequently report horrific weight loss. Many express relief at the prospect of being sent to a *kyo-hwa-so* prison or prison camp, where they can at least walk around and forage for grass, insects, or rodents to eat.

It is not until later in the process that local police may notify their families of their detention. Their families may then be able to bring food or medicine to the detained. Many former prisoners report having to kneel motionless in their detention cells for hours on end. Many report being beaten or subjected to systematic torture during detention and interrogation if their jailers are not satisfied with their confession, which may have to be written over and over again until their interrogators are satisfied.

---

27     Former North Korean prisoners use these terms interchangeably as the facilities are usually in the same building.

The trial and long-term imprisonment are supposed to take place, and usually do take place, in or very near the detainee's hometown or place of legal residence. If the detainee is arrested and held in some other location, once the interrogators have sufficient records, the detainees are sent to a holding facility known as a *jip-kyul-so* to wait for police to come and transport them back to their town of residence for trial. This process can take weeks. Former prisoners again report continued grossly inadequate food provisions and continued loss of body weight.

It is in the *ka-mok* and *jip-kyul-so* where some of the most egregious human rights violations take place. While there are beatings and systematic torture reported in the prisons and prison camps, often for failure to meet production quotas or for violations of prison regulations, former prisoners report routine beating and systematic torture following and during their initial arrest and interrogation. It is in the *ka-mok* and *jip-kyul-so* where forcibly repatriated women who are found or discovered to be pregnant—it is presumed by Chinese husbands—are subjected to forced abortion or infanticide if the pregnancy is too far advanced for an abortion.[28]

## WRONGFUL IMPRISONMENT

Unlike the extra-judicial enforced disappearances and incommunicado detention of persons deported to the *kwan-li-so* political prison camps administered by the MSS secret police,[29] persons arrested or turned over to the MPS police are subject to the provisions of the North Korean Criminal Code and criminal procedure codes. After the initial detention and interrogation are complete, and local police authorities become aware of the incarceration of the accused, they can—although, it is reported that sometimes they do not—notify the prisoner's family. The prisoner's family may then have the ability to bring food and medicine to the incarcerated family member. Given the meager food rations provided by the authorities, former prisoners state that this can be a key element of survival.

Persons arrested by the *An-jeon-bu* (MPS) also, by statute, are supposed to have access to legal counsel during or at their trial. However, in actual practice, this is questionable. Some former prisoners report that they did not have a lawyer. Other former prisoners were not sure. One former prisoner interviewed by HRNK stated that she thought her lawyer was the person who asked her if she had committed the offense she was charged with. Another former prisoner related that she thought she had a lawyer, but she could not tell which of the men sitting at the table with her was her lawyer. This is obviously far removed from the "fair trial" or "due process" standards enumerated in the International Covenant on Civil and Political Rights that North Korea has acceded to.

Most importantly, North Koreans currently detained under the authority of the MPS are usually, but not always, charged with offenses detailed in the North Korean Criminal Code. They are then subjected to a judicial process, however inadequate, and found innocent or convicted by a judge. If convicted, they are sentenced to a fixed term of imprisonment and are released after serving their time.[30] Numerous prisoners are released before their

---

28    See *The Hidden Gulag Second Edition*, 111-167 and *The Hidden Gulag IV: Gender Repression and Prisoner Disappearances* (2015), 12-27 for detailed accounts and analysis of the gender aspects of political imprisonment and the appalling infanticide violations.

29    With the exception of *Kwan-li-so* Camp 18, "Bukchang" that is likely still administered by the MPS.

30    The short-term *ro-dong-dan-ryeon-dae* LTCs were originally created during the famine of the 1990s to informally handle the large number of North Koreans forcibly repatriated from China after fleeing there to obtain food. Initially, the forcibly repatriated North Koreans were sent directly to the LTCs without charges or trials. Subsequently, the LTCs were

sentence has been completed as part of general amnesties offered on the birthdays of the Kim regime leaders or important Party or state anniversaries. Prisoners indicate that the frequently considerable time spent in pre-trial detention is sometimes included as time served within the length of a sentence.

---

 recognized and incorporated into the legal system, and the provisions of the North Korean Criminal Code related to "illegal" border crossing were applied.

# THE UNITED NATIONS' LEGAL ANALYSIS: CRIMES AGAINST HUMANITY IN THE *KYO-HWA-SO*

## PRISONER TESTIMONY AND THE UNITED NATIONS' LEGAL ANALYSIS

There are different, though complimentary, ways to examine and take measure of the North Korean *kyo-hwa-so* prison system. One way is to review the stories and testimonies of individual former prisoners. These reveal the serial atrocities inflicted on these North Koreans as they are processed through the feeder system outlined above, followed by the serial atrocities of the phenomena of repression at the *kyo-hwa-so* prisons themselves. The 2012 second edition of HRNK's *The Hidden Gulag* provides three dozen testimonies and personal accounts of former prisoners in the MPS prison facilities.[31] Three individual prisoner accounts of the post-2008 women's section at *Kyo-hwa-so* No. 12, Jongo-ri, are available in *The Hidden Gulag IV: Gender Repression and Prisoner Disappearances*.[32]

The other essential way to take measure of the North Korean *kyo-hwa-so* prison system is by briefly reviewing the legal analysis undertaken at the request of the UN Human Rights Council by the 2014 UN COI on human rights in North Korea. This formal UN review determined that the *kyo-hwa-so* prison system and, to a lesser degree, the various types of short-term forced labor detention facilities, constitute multiple crimes against humanity.

According to the *Report of the detailed findings of the commission of inquiry on human rights in the Democratic People's Republic of Korea*:

> *"In the DPRK, the criminal justice system and its prisons serve not merely to punish common crimes. They also form an integral part of the state's systematic and widespread attack against anyone considered a threat to the political system and its leadership. Many inmates of ordinary prisons in the DPRK are, in fact, political prisoners…"[33]*

> *"The inhumane acts that detainees suffer within the ordinary prisons are not isolated incidents that can be traced back to individual guards or particular facilities. The Commission finds that, across the vast prison system, inhumane acts follow regular patterns that victimize tens of thousands of inmates at any one time."[34]*

> *"Deliberate starvation and forced labour follow the same patterns in different prisons across the country, making it likely that acts are based on orders originating at the central level. Very similar types of punishment practices and torture facilities… are used across different detention installations. According to the Commission's findings, thousands of*

---

31      Hawk, *The Hidden Gulag Second Edition*, 84-147.

32      Hawk, *The Hidden Gulag IV,* 18-22.

33      COI Report, para. 1082, p. 332.

34      Ibid., para. 1083, p. 333.

*ordinary prison inmates die every year in the DPRK from starvation, exhaustion, beatings, preventable work accidents and curable diseases…"[35]*

Inhumane acts, constituting crimes against humanity, committed against ordinary prisoners include:

## VIOLATIONS OF FUNDAMENTAL RULES OF INTERNATIONAL LAW[36]

*"Imprisonment in an ordinary prison camp (kyo-hwa-so) is usually based on a judicial process. However, this is a process that falls far short of a fair and public hearing by a competent, independent and impartial tribunal established by law…[37] Many inmates in ordinary prisons are imprisoned without substantive reason that would be compatible with international law. Often they are imprisoned for conduct that constitutes a protected exercise of human rights and should never been criminalized."[38]*

## EXTERMINATION AND MURDER

*"…Policies that combine forced labour with deliberate starvation, inadequate medical care and poor hygiene conditions cause the deaths of thousands of inmates annually. The DPRK does not lack the capacity or resources necessary to operate a more humane penitentiary system. Most ordinary prison camps are net producers of food, but food is not given to the prisoners who remain hungry. Moreover the output of mining and manufacturing carried out in the camps generate revenue that is apparently not used for the benefit of establishing decent conditions of detention [emphasis added]. The Commission therefore finds that the inhumane conditions in the camps are a result of deliberate State policy."[39]*

*"Ordinary prison camps in the DPRK may not have the general objective of eliminating the inmates. Their legally stated purpose at least is to re-educate inmates through labour. Policies emanating from the central government to manage ordinary prisons, however, including the deliberate denial of adequate food and medical care, are being pursued despite awareness that they will cause the death of a large portion of the prison population in the ordinary course of events. This level of criminal intent is sufficient, in the view of the Commission, to establish that crimes against humanity of extermination and murder have been committed."[40]*

---

35   Ibid., para. 1084, p. 333.
36   Ibid., para. 1070, p. 330.
37   Ibid., para. 1071, p. 330.
38   Ibid., para. 1072, p. 330.
39   Ibid., para. 1073, p. 331.
40   Ibid., para. 1074, p. 331.

*"According to the findings of the Commission individual acts of murder have taken place in the ordinary prison camps including summary executions of persons who attempt to escape as well as instances of secret executions."[41]*

## TORTURE, RAPE, AND OTHER GRAVE SEXUAL VIOLENCE

*"Torture, as defined in international criminal law, is an established feature of the ordinary prisons in the DPRK. Torture manifests itself in the form of solitary confinement in tiny cells, the deliberate imposition of extreme levels of starvation as a disciplinary measure, and the infliction of severe beatings and other atrocities to punish inmates. The suffering resulting from the prolonged starvation, coupled with other inhumane conditions of detention, imposed on inmates to aggravate their punishment generally often also meets the threshold of torture…"[42]*

*"The forced abortions to which pregnant inmates have been subjected constitutes a form of sexual violence of a gravity that meets the threshold required for crimes against humanity."[43]*

These are the concluding summary findings of the UN COI. The factual bases, obtained from the hearings and interviews of the Commission, for these conclusions are presented in the detailed report of the UN COI.

---

41      Ibid., para. 1075, p. 331.

42      Ibid., para. 1076, p. 331.

43      Ibid., para. 1077, p. 331.

# ENFORCING NORTH KOREA'S "ONE-AND-ONLY IDEOLOGY" SYSTEM: A GLANCE AT THE 2012 CRIMINAL CODE AND THE BLATANT CONTRADICTIONS WITH THE INTERNATIONAL COVENANTS ON CIVIL AND POLITICAL RIGHTS AS WELL AS ECONOMIC, SOCIAL AND CULTURAL RIGHTS

While the North Korean Criminal Code contains provisions that prohibit universally recognized criminal acts, it is also replete with provisions that criminalize acts commonly regarded as fundamental freedoms of thought, expression, assembly, association, and movement. Some of these provisions clearly and explicitly contradict fundamental freedoms stipulated in the International Covenant on Civil and Political Rights, which North Korea acceded to in 1981. Other provisions in the North Korean Criminal Code override other rights and freedoms. A glance at the North Korean legal code makes it clear how easy it is for the leadership and its police organs to use the penal system to compel obedience from the citizenry. A review of the North Korean Criminal Code confirms that a significant number of those deprived of their liberty in the *kyo-hwa-so* prison system detailed in this report are political prisoners.

The 2012 North Korean Criminal Code sustains the findings of the UN COI on the basis of its review of the 2009 Criminal Code. The UN COI cites Kim Il-sung's 1958 statement that "the DPRK's laws should serve as a weapon to champion socialism" and that "all the workers of the judicial organs should be true to the Party's leadership and intensify the struggle against counter-revolutionaries…"[44] The UN COI further notes that:

> *"The political function of the law and the justice system has also been entrenched in the DPRK's criminal legislation, starting with the 1950 Criminal Code, which borrowed language from the Criminal Act of the Soviet Union that was in force under Joseph Stalin… Many of the overt references to the function of criminal law as a tool of political control were removed in subsequent revisions. However, the present criminal law of [North Korea] the DPRK still requires the state to carefully identify friends and enemies of the state in its struggle against 'anti-state and anti-people crimes'… Moreover, the Criminal Law currently in use defines 'Crimes against the state or the People' (called anti-revolutionary crimes in the past) in such broad and vague terms that the exercise of any number of human rights can be prosecuted as a crime."[45]*

The political and politicized nature of the 2012 North Korean Criminal Code is made evident in Chapter 1, "The Fundamental Principles of Criminal Law," Article 1, "Objectives of Criminal Law," which even before stating that "the system of penal codes of crimes ensures that people can lead independent and creative lives," states

---

44    Ibid., para. 121, p. 31, citing Kim Il-sung, *Condensed Biography*, 207-208.
45    Ibid., para. 122, p. 31.

that the "Criminal Law of the DPRK defends the sovereignty of the state and the socialist system." The Criminal Code includes chapters and sections with the titles "Crimes Against the State," "Crimes Against the Nation," "Crimes of Impairing Socialist Culture," and "Criminal Violations of the Order of Socialist Collective Life," as well as provisions such as "Criminal Violations of the Regulations for General Administration."

## "ILLEGAL" BORDER CROSSING VS. THE FREEDOM TO LEAVE

There are thousands of North Koreans, who are mostly women, imprisoned for "illegal" border crossing following their forced repatriation from China, where these North Korean citizens go in search of food or employment, to reach South Korea, or to reunify with family members in South Korea.[46] These North Koreans are convicted and sentenced for violations of North Korea's Criminal Code Article 221:

> *"A person who illegally crosses a border of the Republic shall be punished by reform through short-term labor for less than one year. In cases where the foregoing act is a grave offense, punishment shall be reform through labor for less than two years."*

"Illegal" here means without the permission of Party officials, which many poor North Koreans without close connections to KWP officials, or the money necessary to bribe these officials, cannot obtain. However, for the survival of their families, many go regardless. This provision sends repatriated North Koreans to the *ro-dong-dan-ryeon-dae* LTCs for less than a year, to the *kyo-yang-so* prisons for one year, or to the *kyo-hwa-so* prisons for two or more years.

This blatantly contradicts Article 12.2 of the International Covenant on Civil and Political Rights, which states that "Everyone shall be free to leave any country *including [one's] own* [emphasis added]."[47]

## "IMPAIRING SOCIALIST CULTURE" VS. FREEDOMS OF OPINION AND EXPRESSION

North Korea's Criminal Code Articles 183 and 184 criminalize importing, listening to, keeping, or distributing drawings, photos, books, recordings, or electronic media that "reflect decadent, carnal or foul content." Article 185 criminalizes a person "who [even] without anti-state motives listens, keeps or distributes enemy broadcasting that is hostile to the Republic."

---

46   It should be noted that there is no automatic corresponding right to enter the neighboring country, as immigration remains under the sovereignty of the neighboring state. However, in this case, the UN COI and the Special Rapporteurs on the situation of human rights in North Korea have long noted that North Koreans in China should be treated as "refugees" or "refugees sur place" because of their brutal imprisonment upon forced repatriation from China to North Korea. Therefore, China, as a signatory to the 1951 "Convention and Protocol Relating to the Status of Refugees," has a legal obligation to provide protection to those fleeing North Korea. Many are doing so in order to seek asylum or have a reasonable fear of persecution based on one of five facts upon return. Forcibly repatriating North Koreans with legitimate asylum claims violates the principle of *non-refoulement*. See Roberta Cohen, "China's Forced Repatriation of North Korean Refugees Incurs United Nations Censure," July 2, 2014, https://www.hrnk.org/uploads/pdfs/Art%20%20KEI%20China%20Repats%202014%20(1).pdf.

47   Article 12 does enumerate exceptional situations to this right, but none that North Korea comes close to meeting.

These provisions contradict Article 19.2 of the International Covenant on Civil and Political Rights, which states that:

> *"[T]he right to freedom of expression includes "freedom to seek, receive and import information and ideas of all kinds regardless of frontiers [emphasis added], orally, in print, in the form of art, or through any form of media of his [or her] choice."*

These provisions of the North Korean Criminal Code also disregard Article 15.4 of the International Covenant on Economic, Social and Cultural Rights, which posits that:

> *"States Parties to the present Covenant recognize the benefits to be derived from the encouragement and development of international contacts and co-operation in the scientific and cultural fields."*

Articles 183, 184, and 185 effectively prohibit and criminalize a huge array of media material not produced by the state and KWP organs of North Korea, and any media or opinions other than those specified in the Ten Basic Principles of the [Kimilsungist] Unitary (which is also translated as the "Monolithic" or "One-and-Only") Ideology System. This criminalizes not only the possession of materials prepared in the Korean language by ethnic Koreans in South Korea, China, Japan, and the U.S., but also any art, music, and literature in other languages that can be understood by North Koreans, such as Chinese, Japanese, Russian, and German. According to Russian Korea scholars such as Andrei Lankov, such prohibition on possession of foreign materials even extended to magazines from the Soviet Union and Eastern Europe at a time when they were North Korea's principal allies.

As previously noted, the above international conventions allow certain exemptions to some of the rights and freedoms stipulated therein, but North Korea stretches the exemptions in ways that the conventions themselves do not allow.[48]

## "VIOLATING THE ORDER OF SOCIALIST COLLECTIVE LIFE" VS. FREEDOMS OF THOUGHT AND RELIGION

Article 256 of the 2012 North Korean Criminal Code criminalizes engaging "in superstitious activities in exchange for money or goods." This law is specifically intended to prohibit fortune-telling and enable the imprisonment of fortune-tellers. Fortune-telling is a residual practice of Shamanism, a Korean and pan-Asian religion that holds that all animate and inanimate objects have spirits with the power to influence destiny, and that shamans, who are almost always women, have the ability to discern these spirits and predict their determination for the future. Shamanism is a recognized religion in South Korea, and fortune-telling remains a popular pursuit. By many accounts, in North Korea during the Great Famine of the 1990s, fortune-telling became a widespread practice. In particular, one former prisoner stated that "even the police" consulted

---

[48]     It should be noted that South Korea's National Security Law also criminalizes the possession of soft or hard copies of information and materials printed in North Korea. However, there is a stark contrast between the degree of punishment in North Korea, where lives are on the line, and South Korea, where there is rule of law possibly resulting in a trial and sentence by a judge.

fortune-tellers for predictions as to whether their families would survive the famine. Nevertheless, the 2012 Criminal Code continues this prohibition.

Article 256 allows for the imprisonment of persons who import other religious materials with the intent to sell, although this is also banned under the aforementioned Articles 183 and 184. One of the former prisoners interviewed by HRNK was imprisoned in *Kyo-hwa-so* No. 1, "Kaechon" for fortune-telling. However, in her case, this seemed to be a secondary charge as her primary offense reported to authorities was for singing a South Korean pop song, which is designated as "decadent" or "foul," as noted above.

## VIOLATING FREEDOMS OF EXPRESSION AND ASSEMBLY

Numerous articles in the 2012 North Korean Criminal Code enable imprisonment, property confiscation, and execution for political acts, including non-violent political expression. Article 60, "Conspiracy to Subvert the State," stipulates:

> *"[A] person, who with anti-state purposes, participates in a coup-d'état, riot, demonstration or assault, or takes part in a conspiracy, shall be punished…. Where a person commits a grave offence, he or she shall be punished for life-term, or the death penalty and confiscation of property."*

Coups d'état, riots, or assaults could be violent, and hence legitimately criminalized. However, a "demonstration" is, by international standards, considered to be a right to freedom of expression and assembly.

Article 62 (Anti-State Propaganda and Political Agitation) states that a "person who with anti-state intent launches propaganda and agitation shall be punished."

Article 63 (Treason Against the Fatherland) criminalizes:

> *"A Korean national, who under the control of imperialists, suppresses our people's struggle for national liberation or the struggle for reunification of the country…In cases where the offense is grave, he or she shall be punished by life term reform through labor or the death penalty and the confiscation of property."*

North Korea casts a wide net when criminalizing anti-state political actions. Articles 71, 72, and 73 criminalize harboring or concealing evidence, failure to inform relevant authorities, and the neglect or failure to prevent crimes against the state.

## "CRIMES THAT ARE NOT REALLY CRIMES"

Former *kyo-hwa-so* prisoners, interviewed by HRNK for having exercised their right to leave their country of origin in search of food or income-generating employment in China, report that many others not imprisoned for border crossing were also deprived of their liberty and subjected to hard labor under extremely harsh

conditions for "crimes that are not really crimes," as the former prisoners express it. The North Korean Criminal Code contains a number of unusual offenses for which North Koreans can be punished according to law. They are:

> Article 190 (Disregard of Writings, Inventions and Technical Innovations) states that a "person who makes an incorrect assessment of writings, inventions or technical innovations and ignores them out of greed, jealousy or other mean motives shall be punished."

> Article 209 (Collective Disturbance) states that a "person who, as part of a group, fails to comply with the instructions of a state agency shall be punished."

> Article 211 (Fabrication and Distribution of False Rumor) criminalizes a "person who concocts a false rumor that may lead to distrust of the state shall be punished."

> Article 222 (Illegal Cooperation) states that "A person who illegally cooperates with a person against the state shall be punished."

> Article 237 (Dereliction of Duty) criminalizes a "Management worker who does not execute his or her superior's orders or directions, or his or her normal duty, or executes the aforementioned in a careless manner, thereby causing grave consequences shall be punished."

> Article 240 (Damaging the Prestige of State Agencies) states that a "Management worker, who through acting unlawfully or misconduct, damages the prestige of state agencies shall be punished."

> Oddly, Article 196 (Unjust Selection of Athletes) states that "A person who does not rightly select athletes for important competitions, resulting in serious consequences, shall be punished."

This HRNK report focuses on provisions of the Criminal Code that criminalize elementary civil and political rights involving opinion, expression, assembly, and movement. These provisions are regularly used to unjustly deprive thousands of North Koreans of their liberty and subject them to forced labor under very brutal conditions. However, readers of the full text of the 2012 Criminal Code, which is in Appendix II, below will note that there are also a large number of prohibitions on economic activity. Many of these prohibitions are enforced sporadically at best. Nearly all of the commentators on North Korea's marketization from below note that the economic activity in the ubiquitous markets, from which most North Koreans get most of their food, clothing, and consumer goods, is still technically "illegal." Enforcing criminal prohibitions on economic activity appears to be highly discretionary at the local level, impacted by corruption, bribery, and formal and informal business and political network protection.

Readers are encouraged to read through the full 2012 North Korean Criminal Code in Appendix II of this report.

# PROVINCIAL CHART OF *KYO-HWA-SO* PRISON CAMPS

## KNOWN *KYO-HWA-SO* PRISONS AND PRISON CAMPS BY PROVINCE

### North Hamgyong
- ● *Kyo-hwa-so* No. 12, Jongo-ri*
- O Hoeryong *Kyo-hwa-so*+
- ● Facility at Udan+

### South Hamgyong
- ● Hamhung City Prison*
- ● *Kyo-hwa-so* No. 9, Hamhung Women's Prison (Sungwon-ri Branch)
- O Kadam *Kyo-hwa-so*
- O Wangjang *Kyo-hwa-so*
- O Yonggwang *Kyo-hwa-so*
- O Gumya *Kyo-hwa-so*^ *Kyo-hwa-so* No. 55/ Oro *Kyo-yang-so* +x
  - ● Facility at Pungho-ri
  - ● Facility at Sangtong-ri
  - ● Tongjung-ri *Kyo-hwa-so*
  *Kyo-hwa-so* No. 77, Danchon#x
  - ● Facility at Hangguil-dong
  - ● Facility at Sangjang
- ● Facility at I-gol

### North Pyongan
- ● *Kyo-hwa-so* No. 2, Dongrim (Sowol-ri)**
- ● *Kyo-hwa-so* No. 2, Dongrim (Obong Workers' District)**
- ● *Kyo-hwa-so* No. 3 , Sinuiju* *Kyo-hwa-so* No. 55, Cheonma•
- O Cholsan *Kyo-hwa-so*•

### South Pyongan
- ● *Kyo-hwa-so* No. 1, Kaechon*
- ● *Kyo-hwa-so* No. 11, Chung-san*
- ● Camp 607, KPA Security Command, Chidong-ri (Hoechang Labor Training Camp)
  Sunchon• /Sukchon^ *Kyo-hwa-so*
  - ● Facility at Unbong-dong

### Chagang
- ● Kanggye City Prison
- O *Kyo-hwa-so* No. 7, Kanggye**
- O Chagang *Kyo-hwa-so*^
- O Songgan *Kyo-hwa-so*^

### Kangwon
- O *Kyo-hwa-so* No. 5
- ● Yongdam *Kyo-hwa-so* #
- ● *Kyo-hwa-so* No. 88, Wonsan (Sokhyol-li)**
- ● *Kyo-hwa-so* No. 88, Wonsan (Chuksal-ri)**

### North Hwanghae
- ● *Kyo-hwa-so* No. 6, Sariwon (Osu-ri)**
- ● Sariwon City Prison
- O Geumok *Kyo-hwa-so*^ (Perhaps the same as *Kyo-hwa-so* No. 8, Sungho-ri)

### South Hwanghae
- O Haeju *Kyo-hwa-so*^

### Ryonggan
- *No information*

### Pyongyang
(Administrative area)
- ● *Kyo-hwa-so* No. 4, Kangdong*
  - O Hyungsan *Kyo-hwa-so* **
  - O Hwachon *Kyo-hwa-so* •
  - O Sokchu *Kyo-hwa-so* •
  - O Jakgol *Kyo-hwa-so* •
  - O Hoichang *Kyo-hwa-so* •
  - O Yongguang *Kyo-hwa-so* •
  - O Holdong *Kyo-hwa-so* •
- ● *Kyo-hwa-so* No. 8, Sungho-ri#
  - O Cheongwun-dong *Kyo-hwa-so*

## Legend

- ● Location and image available herein
- O Location and image presently unavailable

- \* : Based on research by HRNK, KINU, and NKDB
- \*\* : Based on research by KINU and NKDB
- \# : Based on research by HRNK and NKDB
- \+ : Based on research by HRNK
- • : Based on research by NKDB
- ^ : Based on research by KINU
- x : Reported closed

Some *kyo-hwa-so* prisons and prison camps are known by a designated number. Others are termed by former North Koreans only by their proximate location. The UN Commission of Inquiry interviewed former prisoners from or confirmed from previous North Korea reports the following: *Kyo-hwa-so* Nos. 1, 4, 6, 9, 11, 12, and 22.
(See A/HRC/25/CPR.1, 7 Feb. 2014, page 247.)

# WORKING SURVEY OF KNOWN *KYO-HWA-SO* PRISON CAMPS

The survey that follows below is based on published information currently available from HRNK, KINU, and NKDB. It is not an exhaustive list, but it is a list of relatively large scale forced labor facilities for offenses deemed by North Korean authorities to be the equivalent of felony-level crimes, for which information, based on interviews with former North Korean citizens, is currently available.

It is presently not possible to obtain or provide a definitive accounting or list. As can be seen below, many of the *kyo-hwa-so* prison camps are numbered. Others are not, as many former North Koreans identify the prison camp facilities only according to the name or town they are affiliated with. A number of the prison camps have satellite facilities several miles away from the main penitentiary, but some of these satellite detention facilities and prisoner work sites may be regarded in some accounts as separate labor camps. Additionally, some of the prisons have men's and women's sections within the same penitentiary enclosed by a wall. Others, such as the *Kyo-hwa-so* No. 9, "Hamhung," have a men's prison and a women's prison several miles apart, and so they can be counted as one or two prisons. Further, there is considerable fluctuation as facilities merge or close, district borderlines change, and area names change.

Estimates of the number of prisoners within the facilities are subject to a great deal of flux as well. There is a large number of deaths in detention and also a large number of releases throughout the entire system of penal labor facilities. This is either on account of time served or because substantial amnesties are granted on the birthday anniversaries of the Kim dynastic leaders or other major political celebrations.

For some of these prison camps, there are scores of former prisoners who, upon release from prison in North Korea, fled to China and made their way to South Korea. This is particularly the case for the *kyo-hwa-so* used for imprisoning North Korean women forcibly repatriated from China. For other prison camps, currently available information is limited.

Due to the fact that North Korea continues to reject requests from the United Nations to allow on-site access to its detention facilities by the International Committee of the Red Cross or appropriate UN officials, satellite imagery of North Korea's prisons and prison camps is essential as supportive evidence for the testimony provided by former prisoners. To date, approximately half a dozen of the *kyo-hwa-so* prisons and prison camps have been located using satellite imagery of the facilities identified by former North Korean prisoners or former nearby residents, including one prison camp facility not publically identified prior to this HRNK report.

Satellite images of detention facilities that have been corroborated and identified by former prisoners are noted as such below. In searching for and analyzing satellite imagery of prisons and prison camps in North Korea that have not yet been identified by former prisoners or former North Korean residents from those

localities, HRNK has drawn on the expertise of Joseph S. Bermudez Jr., a pre-eminent satellite imagery analyst of North Korean sites.[49]

In regards to the series of previously unpublished satellite images of prisons and prison camps, mostly located thanks to coordinates provided in recent NGO reports cited below, it should be noted that the cameras used in today's commercial satellites vary significantly in terms of image quality. As a result, the imagery collected for any given area in North Korea can vary considerably from high-resolution (less than 1 meter per pixel) to medium-resolution (1 to 100 meter(s) per pixel) to low-resolution (greater than 100 meters per pixel).

Each increasing level of resolution—30 centimeters per pixel is the best available commercially—allows for the ability to progress from detection to recognition to identification and ultimately to technical analysis. The further analysis moves along this chain, the higher the level of confidence. For the reports produced by HRNK, medium-resolution was occasionally employed for detection while high-resolution imagery, which can also range considerably from 30 centimeters to 70 centimeters per pixel, was used exclusively for recognition, identification, and technical analysis.

Even with high-resolution imagery, it is not always possible to definitively confirm suspected prisons or prison camps. This is why HRNK provides numerous images in its reports. Wide dissemination of these images, along with the accompanying testimony, will enable North Korean refugees to provide confirmation of, identification of, and insight on suspected prisons and prison camp facilities.

The following survey includes neither *kwan-li-so* political prison camps nor, with some noted exceptions, the smaller scale *ro-dong-dan-ryeon-dae* LTCs or mobile labor brigades, *ka-mok* or *ku-ryu-jang* detention-interrogation facilities, or *jyp-kyul-so* detention facilities. However, updated images of the *kwan-li-so* political prison camps are detailed in Appendix I below.

---

49      Joseph S. Bermudez Jr. was a Co-founder and Chief Analytics Officer of AllSource Analysis, and a former Senior Analyst at DigitalGlobe and Jane's Information Group. DigitalGlobe is a leading commercial purveyor of satellite imagery. Jane's Information Group is a leading source of information on military facilities, forces, and weapons around the world. His analyses of satellite imagery of North Korea's nuclear and missile test facilities are regularly published in 38 North, a website affiliated with the U.S.-Korea Institute at the School of Advanced International Studies of Johns Hopkins University, and are frequently cited in The New York Times. During his tenures as an analyst at DigitalGlobe and at AllSource Analysis, HRNK and DigitalGlobe, and HRNK and AllSource Analysis published a series of reports on satellite imagery of the *kwan-li-so* political prison camps in North Korea.

## *KYO-HWA-SO* IDENTIFIED BY NUMBER (Arranged in numerical order)

**Kyo-hwa-so No. 1, Kaechon**
**South Pyongan Province**

*Kyo-hwa-so* No. 1, Kaechon is also transliterated as Gaechon, which is located in Yaksu-dong, Kaechon City and thought to be one of the oldest *kyo-hwa-so* prison camps. Two former prisoners were interviewed for the 2003 edition of *The Hidden Gulag*.[50] This report contained a 2002 DigitalGlobe satellite image of the penitentiary with site identifications by former prisoners.[51]

In early 2016, NKDB published a Korean language report on *Kyo-hwa-so* No. 1, Kaechon based on interviews with 31 former prisoners. The earliest interviewed former prisoner was detained in 1986.[52] There is an extended discussion of *Kyo-hwa-so* No. 1, Kaechon in the 2016 KINU report, *Prison Camps in North Korea*,[53] based on multiple interviews, which also contains a 2014 Google Earth satellite image with sites identified by former prisoners. A discussion of *Kyo-hwa-so* No. 1, Kaechon in a 2014 paper by a senior KINU researcher, "Human Rights Conditions of the Ordinary Prison Camps (*Kyo-hwa-so*) in North Korea,"[54] based on interviews with North Korean escapees who entered South Korea between 2010 and 2014, contains more wide-angle satellite imagery by V-World, a South Korean satellite imagery firm.[55]

*Kyo-hwa-so* No. 1, Kaechon appears in satellite imagery as an easily recognizable large-scale penitentiary. Estimates of the number of prisoners range from 4,000 to 6,000, with an estimated 2,000 women. It is not possible for the former prisoners to know more precise numbers because the prison was divided into men's and women's quarters, and again into isolated sections for fixed-term prisoners and sections for life-time sentence prisoners. Prisoners from one section could see prisoners in other sections, but communication between sections was impossible.

In addition to persons deprived of their liberty for political offenses—one of the interviewees from 2002 for first edition of *The Hidden Gulag* was imprisoned because she was reported to authorities for singing a South Korean pop song at a private party, and there were numerous interviewees who were imprisoned as "illegal" border crossers—there are prisoners convicted of genuine criminal offenses such as theft, fraud, drug possession, murder, and other crimes. At one point, there were reportedly between 200 and 250 former Japanese-Koreans imprisoned at *Kyo-hwa-so* No. 1, "Kaechon."[56]

---

[50]    David Hawk, *The Hidden Gulag: Exposing North Korea's Prison Camps* (Washington, DC: Committee for Human Rights in North Korea, 2003), 43-48 [henceforth, Hawk, *The Hidden Gulag*].

[51]    Ibid., 119.

[52]    Lee Seung-joo, *A Series of Detention Facilities in North Korea: Kaechon Kyo-hwa-so No.1, 'Message from Survivors'* [in Korean] (Seoul: NKDB, 2016).

[53]    Han Dong-ho, Do Kyoung-ok, Lee Wootai and Rim Je Joon, *Prison Camps in North Korea* (Seoul: KINU, 2016).

[54]    Lee Keum-soon, "Human Rights Conditions of the Ordinary Prison Camps (*Kyo-hwa-so*) in North Korea," paper presented at the 4th Chaillot Human Rights Forum, Seoul, South Korea, 2014. Of the 1,125 former residents of North Korea interviewed by KINU between 2010 and 2014, nearly 130 had been imprisoned in North Korea.

[55]    Ibid., 27.

[56]    Many of the nearly 100,000 ethnic Koreans who migrated from Japan to North Korea in the 1960s—most of the families had actually come to Japan from the southern areas of South Korea—were deemed unsuitable for the Kim Il-sung nation. There were also "villages" or sections of former Japanese-Koreans in the *kwan-li-so* prison camps such as

Prison labor is used for textile production and leather manufacturing of shoes, belts, holsters, and other goods, including those for export. Leather goods production is considered the most dangerous because of the heavy machinery used to cut and stitch leather, and the toxicity of the glues used. There were ten different work units, also including smaller units for food preparation, farming and livestock, and construction. Some of the prisoners' cells were so overcrowded that some women preferred to sleep under their sewing machines in the textile factory. Prison hygiene was reportedly appalling and food rations were inadequate, leading to high rates of death from malnutrition-related illness, particularly for those prisoners whose families did not or could not bring them food.

**Figure 1**



Location: 39° 42'34.72"E, 125° 55'24.78"E.

---

Kwan-li-so Camp 15, "Yodok." Why some of this unfortunate group were sent to *kyo-hwa-so* prison camps while others were sent to *kwan-li-so* prison camps is not clear.

***Kyo-hwa-so* No. 2, Dongrim**
**North Pyongan Province**

Both the 2011 NKDB Report[57] and 2016 NKDB Korean language listing[58] name *Kyo-hwa-so* No. 2, Dongrim, which is also transliterated as Tongrim, and identify its location as Obong-ro-dong-ja-gu, which is translated as Obong Workers' District in Dongrim-gun, North Pyongan Province. However, they have no other specific information about its current state of operation. Similarly, both the 2014[59] and the 2016 KINU listings[60] name *Kyo-hwa-so* No. 2, Dongrim, but likewise, have no further information on its current state of operation. HRNK has not interviewed any former prisoners from *Kyo-hwa-so* No. 2, Dongrim.

Two facilities that look similar to other *kyo-hwa-so* identified by former prisoners and local residents are provided below. Although these are high-resolution satellite images, it is not possible to definitively confirm the function of the two facilities. HRNK includes them here in order for former North Korean residents from these localities to confirm the nature and identity of these facilities.

**Figure 2**



*KYO-HWA-SO* NO. 2, DONGRIM
(SOWOL-RI)
NORTH PYONGAN PROVINCE
• Not yet confirmed by former prisoners or North Koreans from that locality.
• Satellite imagery analysis by Joseph S. Bermudez Jr. and Amanda Mortwedt Oh.
• Imagery date: 2/16/2017

Location: 39° 52'39.30"N 124° 43'46.58"E.

---

57      Yoon Yeo-sang, Ku Hyun-ja, Kim In-sung, and Lee Ji-hyun, *Prisoners in North Korea Today* (Seoul: Database for North Korean Human Rights, 2011), 69.

58      NKDB, *Current Situation of Detention Facilities in North Korea Focused on Kyo-hwa-so* [in Korean] (Seoul: The Database for North Korean Human Rights, 2016), 40-41.

59      Lee, "Human Rights Conditions," 19.

60      Han et al., *Prison Camps*, 16.

*Kyo-hwa-so* No. 2, Dongrim (Sowol-ri) in North Pyongan Province is located in the northern part of the town of Dongrim. Jambong-ri is to the west and Obong Workers' District is to the southeast.

**Figure 3**



Location: 39° 52'5.42"N 124° 44'59.35"E.

### *Kyo-hwa-so* No. 3, Sinuiju
### North Pyongan Province

Between 2002 and 2003, HRNK interviewed a former prisoner from *Kyo-hwa-so* No. 3, "Sinuiju" who was imprisoned for an admitted criminal offense and sentenced to ten years for assault and battery during the mid-1980s to the mid-1990s.[61] According to his testimony, about 2,500 prisoners mined rock and gold, and made prison uniforms. Both KINU and NKDB list this prison,[62] but no further or more recent information is available. KINU locates this prison at Paekto-dong.[63]

---

**Figure 4**



Location: 40° 3'43.00"N 124° 24'34.65"E.

**_Kyo-hwa-so_ No. 4, Kangdong**
**Pyongyang City**

Also transliterated as Gangdong, _Kyo-hwa-so_ No. 4, Kangdong is located in Chael-kol on the eastern outskirts of Pyongyang close to South Pyongan Province. A former prisoner in the 1990s was interviewed for the 2003 edition of _The Hidden Gulag_.[64] This former prisoner identified its location as Kangdong-gun, South Pyongan Province, a common designation prior to the extension of the administrative boundaries of Pyongyang. A satellite image of it appears in the 2012 edition of _The Hidden Gulag_.[65] _Kyo-hwa-so_ No. 4, Kangdong is noted in the 2016 KINU report.[66] The 2016 Korean language NKDB report on _Kyo-hwa-so_ No. 4, Kangdong is based on interviews with seven former prisoners, whose time of imprisonment ranges from 1988 to 2012.[67]

The satellite image below, which appeared on page 226 of _The Hidden Gulag Second Edition_, was first located and identified by Curtis Melvin of North Korean Economy Watch on the basis of a detailed drawing from a former prisoner interviewed by HRNK. The drawing by the former prisoner appears on page 110 of _The Hidden Gulag Second Edition_.

---

64       Hawk, _The Hidden Gulag,_ 53.

65       Hawk, _The Hidden Gulag Second Edition_, 226.

66       Han et al., _Prison Camps_, 16-17.

67       Yoo Hye-jung, _A Series of Detention Facilities in North Korea: Kangdong Kyo-hwa-so No. 4, 'Another Face of Pyongyang'_ [in Korean] (Seoul: NKDB, 2016).

A prison for men, reportedly established as a limestone and cement factory during the long Japanese occupation of Korea, *Kyo-hwa-so* No. 4, Kangdong has a clearly visible limestone quarry just outside the penitentiary walls. There is a conveyor belt to transport the limestone rocks into the prison camp. Some prisoner work units were assigned to crush and pulverize the rocks, and other work units fire the crushed limestone in large kilns with twelve work units or *kwan-ri-ga*, which is translated as divisions, in all.

According to NKDB's research, in addition to the main prison at Dae-ri, Rodong-ja-gu, Kangdong-gun, *Kyo-hwa-so* No. 4, Kangdong has satellite or sub-branches at the following seven locations: 1) Hwachon; 2) Sokchu; 3) Jakgol; 4) Hoichang; 5) Yongguang; 6) Holdong; and 7) Hyungsan, which is also transliterated as Hyongsan and Heongsan. These sub-branches hold between 150 and 200 prisoners.[68] The 2011 NKDB Report notes that the Hyungsan branch, located in the Hyungjaesan area of Pyongyang, is considered a "model prison." The Hwachon prison branch, located in the Seungho area, Hwachon 1-dong, Pyongyang, is located near the Hwachon coal mine and includes both military and civilian prisoners.[69] The main branch prison population is estimated to be between 1,000 and 4,000. In the 1990s, the prison was severely overcrowded and the population estimates even higher.

Food rations were well below minimum subsistence levels and prison hygiene was almost non-existent. The former prisoner interviewed by HRNK spoke of a particular problem: prison clothing was permeated by cement dust that hardened from rain or sweat leading to chaffing and skin diseases. Rates of deaths in detention were very high, particularly in the 1990s during the Great Famine. Presently, prisoners' families are allowed to bring food to their relatives in *Kyo-hwa-so* No. 4, Kangdong.

**Figure 5**



The geo-coordinates are 39° 0'31.24"N 126° 9'12.42"E.

---

68          Ibid.

69          Yoon et al., *Prisoners in North Korea Today*, 70.

**Kyo-hwa-so No. 5**
**Kangwon Province**

The 2014 KINU list mentions a *Kyo-hwa-so* No. 5 in Kangwon, along with several un-named prisons in Kangwon Province, also transliterated as Gangwon Province.[70] No other information is available on *Kyo-hwa-so* No. 5.

**Kyo-hwa-so No. 6, Sariwon**
**North Hwanghae Province**

*Kyo-hwa-so* No. 6, Sariwon was one of the earliest North Korean prison camps to become widely known about outside of North Korea because of the involvement of Amnesty International in the release of Ali Lameda and Jacques Sedillot. They were members in good standing in the Venezuelan and French, respectively, communist Parties. In 1967, both were recruited to Pyongyang by the North Korean Foreign Ministry to translate the writings of Kim Il-sung into Spanish and French. Lameda was a poet and author whose writings were well known throughout Latin America.

Lameda and Sedillot believed that, under secret surveillance, they were overheard discussing amongst themselves that Kim's *Juche* ideology was incompatible with Marxism-Leninism. Accused of being a French spy, Sedillot was arrested in September 1967. Initially, no charges were brought against Lameda, but he was subjected to solitary confinement in a one-by-three meter cell for a year on below subsistence level food rations. Having lost 50 pounds and covered in sores, he also confessed to espionage.

Lameda and Sedillot were sent to *Kyo-hwa-so* No. 6, Sariwon, where, while held in unheated cells, they labored making jeep parts manufactured at the prison until 1974. Lameda's toenails dropped off due to frostbite. Prison guards there told him the name of the prison camp and that there were between 6,000 and 8,000 prisoners, and an additional 1,000 persons in a sick ward.

They were told by prison guards and "orderlies" (privileged prisoners, some of whom had been previously held in other prison camps) that there were some twenty other prison labor camps. They estimated at the time that there were roughly 150,000 prisoners all together.

Informed by Latin American and French colleagues, Amnesty International took up their cases. The government of Venezuela and, according to Amnesty International, the President of Romania intervened on behalf of Sedillot and Lameda. They were then released from prison. Sedillot died in Pyongyang from prison-related illnesses before he could return to France. Lameda recuperated in Eastern Europe and returned to Venezuela where he published an account of his imprisonment. Amnesty International translated excerpts into English and published, "Ali Lameda, A Personal Account of the Experience of a Prisoner of Conscience in the DPRK" in 1979.[71]

KINU's 2016 research lists *Kyo-hwa-so* No. 6, Sariwon as a currently operating prison camp.[72] The NKDB 2011 report and the 2016 Korean language report on prison camps note that *Kyo-hwa-so* No. 6, Sariwon is now

---

70      Lee, "Human Rights Conditions," 19.

71      Amnesty International, *Democratic People's Republic of Korea: Ali Lameda: A Personal Account of the Experience of a Prisoner of Conscience in the Democratic People's Republic of Korea*, AI Index: ASA 24/002/1979, January 1979, 14.

72      Han et al., *Prison Camps*, 16-17.

divided into three sections: 1) Shinheung-dong, a clothing and shoe factory; 2) Shinchang-dong, a large farm; and 3) Dorim-ri, which NKDB reports to be a "model detention facility."[73] KINU's 2014 listing treats Shinchang, also transliterated as Shinsang, as a separate facility.[74] According to NKDB's 2011 research, there were 3,000 to 4,000 persons imprisoned in the *Kyo-hwa-so* No. 6, Sariwon prison camp.

Two facilities that look similar to other *kyo-hwa-so* identified by former prisoners and local residents are provided below. Although these are high-resolution satellite images, it is not possible to definitively confirm the function of the two facilities. HRNK includes them here in order for former North Korean residents from these localities to confirm the nature and identity of these facilities.

**Figure 6**



Location: 38° 30'45.41"N 125° 46'26.59"E.

---

[73]     Yoon et al., *Prisoners in North Korea Today*, 41.

[74]     Lee, "Human Rights Conditions," 20.

**Figure 7**



KYO-HWA-SO NO. 6, SARIWON (OSU-RI)
NORTH HWANGHAE PROVINCE
• Not yet confirmed by former prisoners or North
  Koreans from that locality.
• Satellite imagery analysis by Joseph S.
  Bermudez Jr. and Amanda Mortwedt Oh.
• Imagery date: 4/22/2017

Location: 38° 29'0.94"N 125° 49'3.31"E.

This may be the "model detention facility" at Dorim-ri reported by NKDB.

### *Kyo-hwa-so* No. 7, Kanggye
### Chagang Province

Also transliterated as Kangkye and Ganggye, *Kyo-hwa-so* No. 7, Kanggkye, in the city of that name, is on KINU's and NKDB's lists of *kyo-hwa-so* prisons and prison camps. However, according to NKDB, the current status and number of prisoners is not known. HRNK has not interviewed any former prisoners from *Kyo-hwa-so* No. 7, Kanggkye.

**Figure 8**



Location: 40° 57′15.56″N 126° 34′4.31″E.

### *Kyo-hwa-so* No. 8, Yongdam
### Kangwon Province

Between 2002 and 2003, HRNK interviewed a former North Korean imprisoned in *Kyo-hwa-so* No. 8, Yongdam in Wonsan City, Kangwon Province in the early- to mid-1980s.[75] At that time, prisoners manufactured bicycles. KINU's research notes that *Kyo-hwa-so* No. 8, Yongdam was relocated and incorporated into *Kyo-hwa-so* No. 10.[76] The 2011 NKDB volume, *Prisoners in North Korea Today*, lists a Prison No. 8 located in the Seungho area of Pyongang, but has no further information on the operation of this prison.[77]

For additional information on *Kyo-hwa-so* No. 8, "Yongdam," see pages 48-49 for an image and geo-coordinates of a facility that has not yet been confirmed.

### *Kyo-hwa-so* No. 9, Hamhung
### South Hamgyong Province

Also transliterated as Hamheung, the 2011 NKDB report locates *Kyo-hwa-so* No. 9, Hamhung Men's Prison at Hoeyang, Hoesang Area, Hamhung City, while Hamhung Women's Prison is located at Songwon Village, which is also spelled as Sungwon, Hoesang Area, Hamhung City. It further notes that the men's prison was a sewing machine factory that was originally constructed during the Japanese occupation of Korea. It was

---

75    Hawk, *The Hidden Gulag*, 51.

76    Lee, "Human Rights Conditions," 19.

77    Yoon et al., *Prisoners in North Korea Today*, 70.

then converted into a prison factory in the mid-1990s. According to that NKDB report, in addition to the men's prison main facility at Yoesang-dong, there is a men's prison unit at a gold mine in Chongpyong County, South Hamgyong Province, and a prison unit at a coal mine in Kowon County, South Hamgyong Province. The 2016 NKDB Korean language report on *Kyo-hwa-so* No. 9, Hamhung is based on testimony from 30 former prisoners incarcerated there from 1998 to 2012.[78]

The 2011 NKDB report includes a 500 person women's prison at Songwon-ri, Hoesang Area, which was established in the late 1990s to accommodate the growing number of women forcibly repatriated from China.[79] Although the report identifies the facility as *Kyo-hwa-so* No. 9, Hamhung Women's Prison, it is also reportedly known as the "3rd Department of Hamhung Prison."[80] The 2014 KINU list of *kyo-hwa-so* notes a prison at Sungwon-ri and Dongchun-ri, Hamhung City, and also enumerates it as *Kyo-hwa-so* No. 9, along with another facility at Hoesang Area, Hamhung City, also listed as *Kyo-hwa-so* No. 9. That list also notes a *Kyo-hwa-so*, Yonggwang in Hamhung and prison facilities at Dongyrung-ri and Seomun-ri, in addition to the main facility in Hoesang District.[81]

A former prisoner, whose testimony is provided in the 2012 second edition of *The Hidden Gulag,* described the prison farm at Sungwon-ri, Hyesan District, South Hamgyong Province,which is not far from Hamhung City. This is reportedly where an estimated 500 women grew corn and other vegetables, cut wood, and worked on construction and repair. However, this former prisoner identified the prison farm numerically as *Kyo-hwa-so* No. 15.[82]

The 2014 KINU list describes two prisons at Sungwon-ri and Dongchun-ri, with the main branch at Hoesang Area with sub-units at Seomun-ri, Hamhung City and Dongryung-ri, Yonggwang County.[83] The 2016 KINU report lists the facilities together as Hamhung *Kyo-hwa-so*.[84]

HRNK has obtained two satellite images. One facility is located inside Hamhung City and a second structure is located at Sungwon-ri, where NKDB reported the Hamhung Women's Prison was located.

---

78      Ahn Hyun-min, *A Series of Detention Facilities in North Korea: Hamhong Kyo-hwa-so No.9, 'Memory of No Return'* [in Korean] (Seoul: The Database for North Korean Human Rights, 2016).

79      Ibid., 71.

80      Yoon et al., *Prisoners in North Korea Today*, 94.

81      Lee, "Human Rights Conditions," 20.

82      Hawk, *The Hidden Gulag Second Edition*, 95-96.

83      Lee, "Human Rights Conditions," 20.

84      Han et al., *Prison Camps*, 16.

**Figure 9**



Location: 39° 57'27.67"N 127° 33'47.40"E.

**Figure 10**



Location: 40° 3'29.86"N 127° 40'34.29"E.

**Kyo-hwa-so No. 10**

The KINU listing published in 2014 notes that former *Kyo-hwa-so* No. 8 was incorporated into *Kyo-hwa-so* No. 10.[85] However, there is no other information available on that *kyo-hwa-so*, at least not under that numerical designation.

**Kyo-hwa-so No. 11, Chung-san**
**South Pyongan Province**

There is a great deal of testimony available in South Korea about *Kyo-hwa-so* No. 11, Chung-san, which is also transliterated as Chonsan, Jungsan, and Jeungsan. The prison camp is a forced labor facility that imprisoned large numbers of "illegal" border crossers, many of whom fled to China and South Korea after their release from *Kyo-hwa-so* No. 11, Chung-san.

One former prisoner from Chung-san was interviewed by HRNK for the 2012 second edition of *The Hidden Gulag*. Two additional former prisoners at Chung-san were interviewed in Seoul in July 2016 for the present report. These former prisoners were able to identify the satellite images of one of the prison facilities within this area.

KINU includes *Kyo-hwa-so* No. 11, Chung-san in both its 2014 and 2016 lists.[86] NKDB's 2016 Korean language report on *Kyo-hwa-so* No. 11, Chung-san is based on 53 testimonies that cover imprisonment periods from 1992 to 2010.[87]

*Kyo-hwa-so* No. 11, Chung-san is a fertile agricultural area southwest of Pyongyang. It is bound on the west by the "West Sea," which appears on some maps as the Yellow Sea, and on the eastern side by a number of reservoirs. The area also contains military installations. Former prisoners report target practices from shore batteries to targets in the sea. Essentially, *Kyo-hwa-so* No. 11, Chung-san is a farm with prison labor. There are ten or eleven separate plots, each with its own detention facility. Scattered amongst the agricultural plots worked on by prison laborers are clusters of housing for prison officials and guards.

Some of these detention facilities are termed *kyo-hwa-so*, *kyo-yang-so*, or *ro-dong-dan-ryeon-dae* by former prisoners. One former prisoner interviewed by HRNK used the term *kyo-do-so*, a more literary term for moral "re-education." The primary difference between these facilities appears to be the length of servitude: *ro-dong-dan-ryeon-dae* for sentences of six-months; *kyo-yang-so* for sentences of one to two years; and *kyo-hwa-so* for sentences of more than two years. There may, on paper or in theory, be a difference in the restrictions on citizens' rights between these different categories of imprisonment and forced labor, but this could not be discerned from HRNK's interviews with former prisoners. Furthermore, the designations of the same particular facility may have changed over time with internal mergers, the departure and arrival of new prisoners, or transfers from other prison camps of prisoners with different sentences. *Kyo-hwa-so* is the best term for the aggregate of these detention and forced labor facilities.

---

85    Lee, "Human Rights Conditions," 19.

86    Lee, "Human Rights Conditions," 19, and Han et al., *Prison Camps*, 16-17.

87    Lim Soon-hee, *A Series of Detention Facilities in North Korea: Chungsan Kyo-hwa-so No.11, 'Honoring the Souls of Kkotdongsan (flower garden mountain)'* [in Korean] (Seoul: NKDB, 2016).

Most of the separated facilities are reported to hold some 500 to 600 prisoners, with one-half or more of the prisoners being punished for "illegal" border crossing. Most prisoners work in the fields to grow rice or corn, tend livestock, make rope, and produce fertilizer in the agricultural off seasons. Some prisoners were engaged in landfill construction to increase the acreage available for farming. There was also some light manufacturing. One particular work unit of young women prisoners engaged in making false eyelashes. Reportedly, all of the agricultural output was sent to the MPS in Pyongyang, providing food for the regular police force.

Notwithstanding *Kyo-hwa-so* No. 11, Chung-san being a prison farm, a former prisoner interviewed by HRNK indicated that the prison food rations were appalling. Prisoners who could not keep up with the pace of work were beaten and there was a large number of deaths in detention. Prisoners who died in the camp were buried without coffins or grave markers in a hill the prisoners called "flower mountain." Thus, NKDB subtitled its 2016 report on *Kyo-hwa-so* No. 11, Chung-san, "Honoring the Souls of *Kkotdongsan*," the Korean translation for "flower mountain."[88]

**Figure 11**



Location: 39° 4'40.35"N 125° 26'15.58"E.

***Kyo-hwa-so* No. 12, Jongo-ri**
**North Hamgyong Province**

Also transliterated as Chongo-ri, *Kyo-hwa-so* No. 12, Jongo-ri is another prison camp about which a great deal has long been known outside of North Korea. Once again, this is due to the large number of "illegal" border crossers formerly imprisoned there who fled North Korea to China and South Korea after release. *Kyo-hwa-so* No. 12, Jongo-ri, when it existed as a men's prison camp, was described in the 2003 first edition of *The Hidden*

---

88    An unmarked and improper burial is culturally offensive in Korean tradition.

*Gulag*.[89] Two 2008 Google Earth satellite images of Jongo-ri were featured in the 2012 second edition of *The Hidden Gulag*.[90] The 2015 HRNK report, *The Hidden Gulag IV: Gender Repression and Prisoner Disappearances*, described the addition of the women prisoners' wing to *Kyo-hwa-so* No. 12, Jongo-ri, and included a 2013 satellite image showing the expansion of the prison camp.[91] An additional former female prisoner who worked in the eyelash-making work unit at Jongo-ri was interviewed by HRNK in 2016.

The expansion of Jongo-ri, based on an extensive number of interviews with former prisoners, and including two V-World satellite images, was described in the 2014 KINU paper and in the 2016 KINU Report.[92] The 2016 NKDB Korean language report on *Kyo-hwa-so* No. 12, Jongo-ri includes information from 90 testimonies.[93]

As a solely men's prison camp prior to 2007 or 2008, the prisoners mined copper and iron, cut logs, made bricks, and grew crops. A former prisoner, who was imprisoned from December 1998 to July 1999, was interviewed by HRNK between 2002 and 2003. He indicated that the rate of deaths in detention from forced labor and below subsistence level food rations was extremely high. The prison was overcrowded, holding anywhere between 1,300 and 1,500 men.

Women prisoners were introduced in 2007 or 2008 and, at first, housed in several residence units within the prison. However, to accommodate the growing number of North Korean women forcibly repatriated from China, a women's section was built along one of the walls of the men's prison. The women prisoners' work units include farming and livestock, along with wig and eyelash production units. Additional information can be found in the several recent reports mentioned above. At one point, the women's section was believed to have held upwards of 1,000 female prisoners.

---

89      Hawk, *The Hidden Gulag*, 54-55.

90      Hawk, *The Hidden Gulag Second Edition*, 227.

91      Hawk, *The Hidden Gulag IV*, 12-27, 46-47.

92      Lee, "Human Rights Conditions," 21-26; Han et al., *Prison Camps,* 17-27. The latter has a wide-angle Google Earth satellite image, 18.

93       Kim In-sung, *A Series of Detention Facilities in North Korea: Chongo-ri Kyo-hwa-so No.12, 'Honoring Souls of the Dead at Mt. Bulmang,'* [In Korean] (Seoul: The Database Cnter for North Korean Human Rights, 2016).

**Figure 12**



Location: 42° 12'34.00"N 129° 45'18.14"E.

### *Kyo-hwa-so* No. 55, Cheonma
### North Pyongan Province

A former prisoner from *Kyo-hwa-so* No. 77, Cheonma, interviewed by HRNK between 2002 and 2003, testified that *Kyo-hwa-so* No. 55, Cheonma, which is also transliterated as Chunma, was so overcrowded that many prisoners from Cheonma were transferred to *Kyo-hwa-so* No. 77 (see below under the section entitled *Kyo-hwa-so* Believed to be Closed).[94] The 2016 NKDB Korean language report, "Current Situation of Detention Facilities in North Korea, focused on Kyohwaso," lists a *Kyo-hwa-so* No. 55 at Cheonma-gun, but reports that its current status is unknown.[95]

### *Kyo-hwa-so* No. 88, Wonsan
### Kangwon Province

The 2014 KINU listing notes three prisons in Wonsan: one without a number in Wonsan and two with the number 88. Of the latter, one is called *Kyo-hwa-so* No. 88, Dukwon and another is denominated as *Kyo-hwa-so* No. 88, located at Sokhyon-ri, Wonsan City, Kangwon Province.[96] The 2011 NKDB report also lists *Kyo-hwa-so* No. 88, Wonsan.[97] The 2016 NKDB Korean language report locates *Kyo-hwa-so* No. 88, Wonsan in Juksan-ri, which

---

94      Hawk, *The Hidden Gulag*, 48.

95      NKDB, *Current Situation…focusing on Kyo-hwa-so*, 40-41.

96      Lee, "Human Rights Conditions," 19.

97      Yoon et al., *Prisoners in North Korea Today*, 96.

is also spelled Chuksan-ri, Wonsan, noting that its current status is unknown.[98]HRNK has not interviewed any former prisoners from *Kyo-hwa-so* No. 88, Wonsan.

HRNK has located two facilities in this area with striking resemblance to well identified *kyo-hwa-so*. Although these are high-resolution satellite images, it is not possible to definitively confirm the function of the two facilities. HRNK includes them here in order for former North Korean residents from these localities to confirm the nature and identity of these facilities.

**Figure 13**



Location: 39° 9'26.46"N 127° 21'51.76"E.

---

98       NKDB, *Current Situation…focusing on Kyo-hwa-so.*

**Figure 14**



Location: 39° 11′57.43″N 127° 20′45.07″E.

## KYO-HWA-SO IDENTIFIED BY NAME (Arranged by Province)

**North Hamgyong Province**

**Hoeryong Kyo-hwa-so**

Between 2002 and 2003, HRNK interviewed a former North Korean who was imprisoned in "*Hoeryong Ro-Dong-Kyo-Hwa-So*" in the early 1990s.[99] Hoeryong *Kyo-hwa-so* is located in the mountains, about 40 kilometers from Hoeryong City, after which the prison was named. An estimated 1,500 prisoners, mostly convicts of criminal offenses, mined copper, logged, and made furniture. Reportedly, in 1992, some political prisoners were brought in. There is no recent information, so it is possible that this prison camp has been closed or subsequently termed by its more precise location, *Kyo-hwa-so* No. 12, Jongo-ri.[100]

**South Hamgyong Province**

In addition to the numbered *kyo-hwa-so* noted above, including 1-12, 55, 77, and 88, KINU has identified *kyo-hwa-so* by name in South Hamgyong Province, including:

- Kadam *Kyo-hwa-so*, located in Kowon County;
- Wangjang *Kyo-hwa-so*, located in Chungpyong County;
- Yonggwang *Kyo-hwa-so*, located in Hamhung City; and
- Hamhung *Kyo-hwa-so*, located in Haetbit-dong, Hoesang District, Hamhung City[101]
- Gumya *Kyo-hwa-so*, located in Gumya County, which is in the far south of South Hamgyong Province, just across the boundary line with Kangwon Province.[102]

**Chagang Province**

Both KINU[103] and NKDB[104] identify Kanggye, also spelled as Ganggye, which NKDB numbers *Kyo-hwa-so* No. 7. It is detailed above under the section entitled *Kyo-hwa-so* Identified by Number. KINU identifies Songgan *Kyo-hwa-so*, also spelled as Sunggan, and Chagang *Kyo-hwa-so*.[105] All three are located in the middle of Chagang province.

---

99   Hawk, *The Hidden Gulag*, 52-53.

100   *Kwan-li-so* Camp 22 may also be closed. It was located near Hoeryong on the North Korean border with China. It is likely that prisoners were moved south, further from the border.

101   Lee, "Human Rights Conditions," 20. This may be the same facility referred to earlier on page 35 under *Kyo-hwa-so* No. 9, which NKDB has located at an area designated as Yeosang.

102   Han et al., *Prison Camps*, 16-17.

103   Lee, "Human Rights Conditions," 19.

104   NKDB, *Current Situation…focusing on Kyo-hwa-so*, 40-41.

105   Han et al., *Prison Camps*, 16-17.

**North Pyongan Province**

In addition to the *kyo-hwa-so* noted with numbers above, NKDB identifies Cholsan *Kyo-hwa-so*, located in Cholsan-gun.[106]

KINU identifies Dongrim *Kyo-hwa-so*, which is also spelled as Tongrim, in Dongrim County.[107] It is designated as *Kyo-hwa-so* No. 2, Dongrim by NKDB and KINU.

**South Pyongan Province**

In addition to the two *kyo-hwa-so* identified by number above, No. 1, Kaechon and No. 11, Chung-san,[108] both KINU and NKDB list Sukchon *Kyo-hwa-so*,[109] which is also designated as Sunchon *Kyo-hwa-so*. NKDB locates Sunchon *Kyo-hwa-so* at Ungbong-dong, which is also transliterated as Eungbong-dong, Sunchon, and notes that it is a gold mine with an estimated 400 prisoners. NKDB further notes that it is a branch of *Kyo-hwa-so* No. 1, Kaechon.[110]

**Sunchon *Kyo-hwa-so***
**Figure 15**



FACILITY AT UNGBONG-DONG
SOUTH PYONGAN PROVINCE
• Not yet confirmed by former prisoners or North Koreans from that locality.
• Satellite imagery analysis by Joseph S. Bermudez Jr.
• Imagery date: 8/31/2017

Location: 39° 26'9.54"N 125° 47'44.43"E.

---

106      NKDB, *Current Situation…focusing on Kyo-hwa-so*, 40-41.

107      Both Lee, "Human Rights Conditions," 19, and Han et al., *Prison Camps*, 16-17.

108      Based on interviews with former prisoners by HRNK, NKDB, and KINU.

109      Han, *et al, op. cit.*, p. 16.

110      NKDB, *Current Situation…focusing on Kyo-hwa-so,* 40-41. Ungbong-dong is located in between Sukchon and Sunchon.

The prison facility in Figure 15 appears in between the two adjacent towns of Sukchon and Sunchon. This facility is sometimes identified as Sukchon *Kyo-hwa-so* and sometimes identified as Sunchon *Kyo-hwa-so*. HRNK located a satellite image of a small walled compound located 3.2 kilometers northwest of Ungbong-dong with what appears to be two visible guard towers. The area near this structure includes small tailings piles, some of which are marked in the satellite image.

Although this is a high-resolution satellite image, it is not possible to definitively confirm the function of this facility. HRNK includes it here in order for former North Korean residents from these localities to confirm the nature and identity of this facility.

**People's Army 607 Labor Training Camp**

NKDB notes a prison camp at Heochang termed the "People's Army 607 Labor Detention Facility," where an estimated 400 prisoners work in mining and raising livestock. NKDB also notes that there are two prison buildings, two storehouses, and a medical facility.[111] On July 9, 2015, Daily NK, a Seoul-based news service run by North Korean defectors, published a story about this facility, including a satellite image, which included identifications by their North Korean source.[112]

**Figure 16**



CAMP 607, KPA SECURITY
COMMAND, CHIDONG-RI
(HOECHANG LABOR
TRAINING CAMP)
SOUTH PYONGAN PROVINCE
• Facility confirmed by a former prisoner.
• Satellite imagery analysis by Joseph S. Bermudez Jr.
• Imagery date: 4/8/2014

Location: 39° 11'26.75"N 126°29'35.15"E.

---

111      Ibid., 40-41. It is likely that there are additional military prisons, but these are not usually listed among the prison camps for civilian citizens.

112      Seol Song-ah, "Former prisoner recounts life in 'Camp 607,'" *Daily NK*, July 9, 2015, http://www.dailynk.com/english/m/read.php?catald=nk01500&num=13331.

**Pyongyang**

In addition to *Kyo-hwa-so* No. 4, Kangdong as described above and well documented by HRNK, NKDB, and KINU, NKDB and KINU also list Heongsan, which is alternatively spelled Heongjesan,  in Heongjesan district.[113] NKDB identifies Heongsan *Kyo-hwa-so* as Branch No. 7 of *Kyo-hwa-so* No. 4, Kangdong, where the limestone processing is done along with raising livestock. NKDB lists Hwachong *Kyo-hwa-so*, Hwachon1-dong, Sungho district, located near the Hwachon coal mine, and identifies it as Branch No. 4 of *Kyo-hwa-so* No. 4, Kangdong.[114]

KINU also lists Cheongwun-dong  *Kyo-hwa-so* within the current boundary of Pyongyang.[115]

NKDB also lists Sungho-ri *Kyo-hwa-so*, which it identifies as *Kyo-hwa-so* No. 8, where roughly 2,000 prisoners mine coal on the border of North Hwanghae Province.[116] KINU's report locates *Kyo-hwa-so* No. 8, Sungho-ri within North Hwanghae Province on the border of Pyongyang.[117]

**Figure 17**



Location: 39° 0′5.25″N 126° 3′28.24″E.

---

113     Lee, "Human Rights Conditions," 19; Han et al., *Prison Camps,* 16-17; NKDB, *Current Situation…focusing on Kyo-hwa-so*, 40-41.

114     Ibid., NKDB, 40-41.

115     Han et al., *Prison Camps,* 16-17.

116     NKDB "Current Situation….Focusing on Kyohwaso", *op. cit*., p. 40-41.

117     Han et al., *Prison Camps,* 16-17.

**North Hwanghae Province**

**Geumok *Kyo-hwa-so***

As noted directly above, KINU lists Geumok *Kyo-hwa-so* in Sungho-ri, North Hwanghae Province.[118] Also noted above, *Kyo-hwa-so* No. 6, Sariwon is also located in North Hwanghae Province.

**South Hwanghae Province**

KINU lists Haeju *Kyo-hwa-so* within South Hwanghae Province.[119]

**Kangwon Province**

**Yongdam *Kyo-hwa-so***

Between 2002 and 2003, HRNK interviewed a former North Korean imprisoned in *Kyo-hwa-so* No. 8, Yongdam in Wonsan City, Kangwon Province in the early- to mid-1980s.[120] At that time, prisoners manufactured bicycles. KINU's research notes that *Kyo-hwa-so* No. 8, Yongdam was relocated and incorporated into *Kyo-hwa-so* No. 10.[121] Both NKDB and this KINU list mention Yongdam as an unnumbered *kyo-hwa-so* located in Chonnae-gun, Kangwon Province. NKDB estimates the prison population to be around 2,000, and that its current status is unknown. The 2011 NKDB volume, *Prisoners in North Korea Today*, lists a "Prison No. 8" located in the Seungho area of Pyongang, but has no further information on the operation of this prison.[122]

Satellite imagery analysis indicates that this structure was present in satellite images dating back as far as the 1980s or earlier. The facility was expanded between October 2012 and July 2014, along with a smaller expansion more recently.

---

118    Ibid., 16-17.

119    Ibid., 16-17.

120    Hawk, *The Hidden Gulag*, 51.

121    Lee, "Human Rights Conditions," 19.

122    Yoon et al., *Prisoners in North Korea Today*, 70.

**Figure 18**



Location: 39° 21'42.91"N 127° 15'53.02"E.

Although this is a high-resolution satellite image, it is not possible to definitively confirm the function of this facility. HRNK includes it here in order for former North Korean residents from these localities to confirm its nature and identity of this facility.

## KYO-HWA-SO BELIEVED TO BE CLOSED

### Kyo-hwa-so No. 22, Oro
### South Hamgyong Province

Kyo-hwa-so No. 22, Oro is referred to by former prisoners as "Two-two." Between 2002 and 2003, HRNK interviewed a former male prisoner held at Kyo-hwa-so No. 22, Oro in the mid- to late-1990s, where he reported a large number of deaths in detention.[123] He reported that there were about 1,000 men and about 100 women prisoners serving one to two year sentences, mostly hauling stones to construct a hydroelectric power dam. The 2014 KINU listing notes that Kyo-hwa-so No. 22, Oro is located at Dongchun-ri, which is also transliterated as Tongjung-ri, in Yonkwang or Yonggwang County.[124]

The 2011 NKDB report lists Kyo-hwa-so No. 22, Oro.[125]

Information provided to HRNK in July 2016, including testimony from a former prisoner who was among a group of women prisoners transferred from Oro to Kyo-hwa-so No. 11, Chung-san, indicates that Oro was closed around 2008.

The 2016 KINU listing omits Kyo-hwa-so No. 22, Oro.

The 2016 NKDB Korean language report, "Series of Detention Facilities in North Korea: Oro No. 22 Kyohwaso" is based on interviews with 17 former prisoners. There was also a No. 55 ro-dong-dan-ryeon-dae LTC, mostly for persons sentenced to six months or less, located at Oro. This report also notes a transfer of female prisoners to Kyo-hwa-so No. 11, Chung-san, and a considerable merger of prisoners and numerical designations at Oro. The ro-dong-dan-ryeon-dae was reportedly closed, and the report posits that is it likely that Kyo-hwa-so No. 22, Oro came under the management of Kyo-hwa-so No. 9, Hamhung and was renamed as the Tongjung-ri Branch of Kyo-hwa-so No. 9, Hamhung. The report has many details of Oro as it operated for decades under the numerical designation of "Two-Two." The many detailed descriptions in this report are from testimony prior to 2008.[126]

HRNK found three facilities nearby that appear to be operating prisons. These three facilities in this area bear striking resemblance to other well identified kyo-hwa-so. Although these are high-resolution satellite images, it is not possible to definitively confirm the function of the three facilities. HRNK includes them here in order for former North Korean residents from these localities to confirm the nature and identity of these facilities.

---

123    Hawk, The Hidden Gulag, 49-51.

124    Lee, "Human Rights Conditions," 20.

125    Yoon et al., Prisoners in North Korea Today, 96.

126    Suh Yoon-Hwan, A Series of Detention Facilities in North Korea: Oro Kyo-hwa-so No. 22, 'Revengeful Spirits of Bamnamu-gol,' [in Korean] (Seoul: NKDB, 2016).

**Figure 19**



Location: 40° 2'35.88"N 127° 31'24.94"E.

**Figure 20**



Location: 40° 1'19.71"N 127° 25'55.91"E.

**Figure 21**



**FACILITY AT SANGTONG-RI
SOUTH HAMGYONG PROVINCE**
• Not yet confirmed by former prisoners or
North Koreans from that locality.
• Satellite imagery analysis by Joseph S.
Bermudez Jr.
• Imagery date: 11/3/2013

Location: 40° 5'35.68"N 127° 21'26.45"E.

**Kyo-hwa-so No. 77, Danchon
South Hamgyong Province**

Between 2002 and 2003, HRNK interviewed a former prisoner sentenced to Danchon *Kyo-hwa-so*, which is also transliterated as Tanchon, in the mid-1980s. It was a large prison camp located in the mountains where male prisoners," labored in a gold mine, originally opened during the Japanese occupation of Korea.[127] Most of these men were serving three-year sentences for genuine criminal offenses, although there was a number of "illegal" border crossers.

The 2016 NKDB Korean language report notes that *Kyo-hwa-so* No. 77, Danchon was closed in 1997.[128] While NKDB reports that *Kyo-hwa-so* No. 77, Danchon was closed, HRNK found two facilities nearby that appear to be operating prisons.

These two facilities in this area bear striking resemblance to well identified *kyo-hwa-so*. Although these are high-resolution satellite images, it is not possible to definitively confirm the function of these facilities. HRNK includes them here in order for former North Korean residents from these localities to confirm the nature and identity of these facilities.

---

127    Hawk, *The Hidden Gulag*, 48.

128    NKDB, *Current Situation…focusing on Kyo-hwa-so*.

**Figure 22**



Location: 40° 26'15.36"N 128° 53'57.06"E.

**Figure 23**



Location: 40° 24'57.26"N 128° 53'46.11"E.

## OTHER POSSIBLE PRISON FACILITIES

HRNK has located satellite images of facilities that certainly share the appearance of other well documented *kyo-hwa-so*: perimeter security walls, guard towers, and other key indicators. These facilities are not referenced in any of the NGO reports on prisons and prison camp facilities cited throughout this summary.

Although these are high-resolution satellite images, it is not possible to definitively confirm the function of these facilities. HRNK includes them here in order for former North Korean residents from these localities to confirm the nature and identity of these facilities.

**Figure 24**



Location: 40° 9'51.87"N 128° 30'43.21"E.

**Figure 25**



Location: 40° 50'57.25"N 129° 34'50.45"E.

# *THE PARALLEL GULAG*: NEXT STEPS

The authors hope this Working Survey will be of use to former North Korean prisoners, refugees, and human rights advocates and investigators for ongoing and future documentation of human rights violations in North Korea.

# APPENDIX I: *KWAN-LI-SO* POLITICAL PRISON CAMPS NOT INCLUDED IN *THE PARALLEL GULAG*

As noted in the introduction, this HRNK report covers the prisons and prison camps, termed *kyo-hwa-so*, which are administered by the North Korean Ministry of People's Security (MPS). However, for the benefit of readers not familiar with the complex systems of repression in North Korea, this appendix summarizes the current situation of the prison camps and prison complexes, termed *kwan-li-so*. The *kwan-li-so* political prison camps are administered, with one exception noted below, by the MSS.

The *kwan-li-so* political prison camps are political penal labor colonies to which real, suspected and imagined, or potential adversaries of the Kim family dynasty, possibly including their families, are ostracized without any legal or judicial process. Most are given lifelong sentences of incommunicado imprisonment and forced labor. These sprawling political prison camps, with one exception, are located in mountainous areas. The prisoners are forced to labor in mines, logging enterprises, agricultural fields, and the valleys between the mountain ranges raising livestock. There also tends to be some manufacturing within the camps.

The powerful and secretive MSS political police, and the Kim regime deem *kwan-li-so* prisoners as persons who have engaged in wrong-actions, possessed wrong-ideas, wrong-knowledge, and wrong-associations. Several actions by Kim Il-sung condemned thousands of innocent people to the political prison camps shortly after the conclusion of the Korean War. He purged the KWP, the North Korean army, the administration of political factions coming from the southern part of the peninsula, those deemed to be too close or too sympathetic with the Chinese or the Russian communist parties, and those who identified with religion, land ownership, or collaborating with the Japanese during the occupation.

Prior to and during the Korean War, hundreds of thousands of Koreans fled to South Korea. In the 1960s and 1970s, the Kim regime identified the family members remaining in North Korea of those who had fled south. Many of these family members were sent to the *kwan-li-so* political prison camps. Later, there were others in North Korea who opposed replacing Marxism with *Juche* ideology along with those who opposed the dynastic succession of Kim Jong-il. There was perceived dissention and disloyalty within various elements of the army. Such dissidents and their families were deported to the *kwan-li-so* political prison camps. North Koreans caught in China attempting to flee to South Korea or even meeting with South Koreans in China were sent to the camps.

There are several remarkable phenomena related to the *kwan-li-so* political prison camps. First, North Korea continues to formally deny that they even exist. The regime has not provided any explanation as to what precisely is located where these facilities are, notwithstanding the substantial prisoner and prison guard testimony along with the detailed satellite imagery.

Second, there was a revival of the penal practice of family imprisonment for opposing the emperor or king. This was one of a number of revived feudal practices along with the "Monolithic Ideological System," the extreme isolation of the populace, and, of course, dynastic succession associated with the adoption of "*Juche* ideology." The *yeon-jwa-je* guilt-by-association system of imprisonment, which incarcerated up to three generations of families, filled the camps with more than 100,000 prisoners.

Third, this extra-judicial imprisonment and forced labor under brutal conditions is incommunicado. Prisoners are not allowed any correspondence or visits with former friends, neighbors, co-workers, or family members not imprisoned. People do not know of the fate or whereabouts of those who disappeared to the *kwan-li-so* political prison camps.

Based on information from former prisoners, prison camp guards, and former MSS officials who defected to South Korea, up until the 1990s, it had been estimated that the *kwan-li-so* political prison camp population numbered between 150,000 and 200,000. By the second decade of the new millennium, the estimated prisoner population dropped to between 80,000 and 120,000. There are two possible reasons for the decline in the prison camp population. The first reason is the high number of deaths in detention. In particular, many of those who were imprisoned from the 1960s to the 1980s have passed away. Second, it is now thought that the practice of collective punishment or *yeon-jwa-je*—this is the imprisonment of up to three generations of entire families—is much less practiced now than was the case under Kim Il-sung and Kim Jong-il.[129] If this is indeed the case, the rate of deaths in detention will continue to exceed the number of incoming new prisoners.

Initially, there had been a dozen *kwan-li-so* political prison camps. Over time, there was a consolidation into a half dozen very large camps. Recently, one large camp was closed, and another was substantially demobilized as a prison camp. There are various alterations and constructions within the existing camps, including the development of an enclosed area. In satellite imagery, the characteristics of a political prison camp are evident, but there is not yet an eyewitness or any first-person testimony. The currently operating *kwan-li-so* political prison camps are briefly surveyed below.

For more information and first-person testimony on the operation of the *kwan-li-so* political penal labor colonies, see *The Hidden Gulag Second Edition*.[130] Another useful resource is NKDB's *Political Prison Camps in North Korea Today*.[131] For the UN COI's analysis of the *kwan-li-so* political prison camps, see the *Report of the detailed findings of the commission of inquiry on human rights in the DPRK*, on pages 208-246 and 323-330.[132]

---

129   The basis of this supposition is that the North Korean defector community in South Korea remains in substantial telephone contact with North Koreans who remain in North Korea, despite how dangerous this telephone communication may be for North Koreans. While Kim Jong-un's purges of officials are well known, activists within the defector community in South Korea believes that if, as used to be the case, entire families were disappearing from society and being deported to the political prison camps, they would hear about it. They have not been hearing about this.

130   Hawk, *The Hidden Gulag Second Edition*, 7-82, 197-224. See also David Hawk, *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps* (Washington, DC: Committee for Human Rights in North Korea, 2013); and Hawk, *The Hidden Gulag IV*, 28-50.

131   Yoon Yeo-sang, Lee Ja-en and Han Sun-young, *Political Prison Camps in North Korea Today* (Seoul: NKDB, 2011).

132   COI Report, see footnote 11.

# THE *KWAN-LI-SO* POLITICAL PRISON CAMPS OPERATING IN 2017

**Camp 14, Kaechon**
**South Pyongan Province**

*Kwan-li-so* No. 14 or Camp 14, Kaechon is a sprawling penal labor colony, which is about 25 miles long and 19 miles wide, located in a mountainous area of South Pyongan Province bordering the north side of the Taedong River. On the south side of the river is Camp No. 18, Bukchang, which, among others, imprisoned family members of prisoners held at Camp 14, Kaechon. In the 1990s, an estimated 15,000 prisoners labored to mine coal, log, farm, raise livestock, and manufacture goods.

Much of our knowledge about Camp 14, Kaechon comes from two former prisoners. Kim Yong was imprisoned there in the mid-1990s before he was transferred to Camp 18, Bukchang, where his mother was imprisoned and from which he escaped.[133] A second, and more recent former prisoner, Shin Dong-hyuk, whose story is told in a well known biography, was incarcerated at Camp 14, Kaechon.[134] Shin was also imprisoned at Camp 18, Bukchang, but he told his story as if all recounted events took place at Camp 14, Kaechon. His testimony has not been sufficiently disentangled, so his descriptions of Camp 14, Kaechon are problematic.

Satellite imagery indicates that Camp 14, Kaechon remains operational.[135]

---

133      See Hawk, *The Hidden Gulag*, 36-38 for Kim Yong's descriptions of Camp 14 and Hawk, *The Hidden Gulag,* 109-112 for satellite imagery of Camp 14. For a book-length biography of Kim and his experiences at Camps 14 and 18, see Kim Yong with Kim Suk-young, *Long Road Home: Testimony of a North Korean Camp Survivor* (Columbia University Press, 2017).

134      Blaine Harden, *Escape from Camp 14* (Penguin Books, 2013). The 2015 edition has a new foreword, which partially brings Camp 18 into Shin's account.

135      See Joseph S. Bermudez Jr, Andy Dinville, and Mike Eley, *North Korea: Imagery Analysis of Camp 14,* (Washington, DC; Committee for Human Rights in North Korea, 2015) for 63 pages of wide-angle and close-up satellite imagery. Camp 14 is easily visible on Google Earth, and coordinates are 39.576 N, 126.071 E.



© Committee for Human Rights in North Korea 2017

**Camp 15, Yodok**
**South Hamgyong Province**

This sprawling political penal labor colony, formally designated as "Border Patrol Unit 2915," is the most internationally well known of North Korea's *kwan-li-so* political prison camps. In addition to lifelong imprisonment sections termed "total control zones," *Kwan-li-so* No. 15, Yodok or Camp 15, Yodok had sections, termed "revolutionizing process zones," from which prisoners could be released back into North Korean society after ten years of hard labor for some prisoners from these areas and after three years of hard labor for other prisoners from one smaller area.

Prisoners at Camp 15 labored at mining, logging, agricultural production and animal husbandry, and some manufacturing. Nine former Camp 15, Yodok prisoners, who upon release from the prison camp fled to South Korea, were interviewed by HRNK for the 2012 second edition of *The Hidden Gulag*. Their time periods of imprisonment range from 1970 to 2006, and one of these prisoners was transferred for several years to one of the lifelong imprisonment "total control zones" within Camp 15, Yodok as a record-keeper for that section

of the camp.[136] There have been several Korean language biographies by former Camp 15, Yodok prisoners published in Seoul. However, they are now very difficult to obtain. There is an account, available in English and French, of a young boy imprisoned for ten years because of the perceived wrongdoings of his grandfather.[137]

There have been no known releases from Camp 15, Yodok since 2007. Between 2013 and 2014, the small "revolutionizing zone" known as Sorimchon or Kumchon-ri was completely demolished. The fate and whereabouts of the former prisoners there is unknown.[138]

It is apparent from satellite imagery that Camp 15, Yodok continues to function, to the best of our knowledge, as a lifelong imprisonment "total control zone." Former prisoners continue to track the changes and developments in the camp landscape and buildings. The most recently available Google Earth satellite imagery indicates that some units of prisoner housing in the eastern part of the prison camp were torn down between June 2016 and February 2017. As of mid-2017, up-to-date satellite imagery is not available for the western sections of Camp 15.[139]

---

136     See Hawk, *The Hidden Gulag*, 2nd ed., 52-68 for their stories and descriptions of Camp 15, and Hawk, *The Hidden Gulag Second Edition*, 197-208 for satellite imagery.

137     Kang Chol-hwan and Pierre Rigoulot, *Aquariums of Pyongyang: Ten Years in the North Korean Gulag* (Basic Books, Paris and New York, 2000).

138     See Hawk, *The Hidden Gulag IV*, 28-50 for an account of the demolition of Sorimchon/Kumchon-ri. See also Joseph S. Bermudez Jr., Andy Dinville, and Mike Eley, *North Korea: Imagery Analysis of Camp 15 "Yodok": Closure of the "Revolutionizing Zone"* (Washington, DC: Committee for Human Rights in North Korea, 2015) for in-depth satellite imagery.

139     See *North Korean Economy Watch*; "Prison Camp 15 (Yodok) reduces prisoner housing," nkeconwatch.com/2017/04/27.




### NORTH KOREA'S CAMP 15

Figure 1



Camp 15 and the "Revolutionizing Zone"

COPYRIGHT @ALLSOURCE ANALYSIS, INC. 2015          COPYRIGHT (C) 2014 AIRBUS DEFENSE AND SPACE, OCTOBER 28, 2014   6

© Committee for Human Rights in North Korea 2017

**Camp 16, Hwasong**
**North Hamgyong Province**

Another sprawling encampment, three times the size of Washington, DC, in a heavily forested area in Hwasong County in North Hamgyong Province, lies *Kwan-li-so* No. 16, Hwasong or Camp 16, Hwasong, just to the east of the Punggye-ri nuclear weapons test site. It is usually called *Kwan-li-so* No. 16, Hwasong after the nearby city. Former North Korean officials and other defectors have disclosed its existence, but unlike other political prison camps, no former prisoners or guards have fled to South Korea and been interviewed by HRNK. There is much less known about its operation, other than that it has, at least up until recently, been a lifelong imprisonment "total control zone."[140]

However, the camp has been extensively surveyed through satellite imagery, which indicates that it was operational as far back as 1983. In 2013, Amnesty International released a number of satellite images that

---

[140]     In 2013, Amnesty International referred to an interview with a former guard from Camp 17. See Amnesty International briefing, *North Korea: Continued Investment in the Infrastructure of Repression.*

DAVID HAWK
With Amanda Mortwedt Oh

include new housing and administrative structures added in 2011 and 2012.[141] In late 2015, HRNK and AllSource Analysis published a 61-page report with scores of detailed wide-angle and close-up images of the various parts of Camp 16.[142]



© Committee for Human Rights in North Korea 2017

**Camp 25, Chongjin**
**North Hamgyong Province**

Located in Susong-dong, North Hamgyong Province, just outside of Chongjin City, *Kwan-li-so* No. 25, Chongjin or Camp 25, Chongjin is different from the other *kwan-li-so* political prison camps. While administered by the MSS and only detaining prisoners for lifelong sentences, it has the shape and form of a penitentiary, not a sprawling political prison camp. Therefore, though it is generally considered a *kwan-li-so*, some North Korean defectors refer to it as Chongjin *Kyo-hwa-so*. The prisoners reportedly manufacture well known North Korean

---

[141]     Amnesty International, *North Korea: New Satellite Images Show Continued Investment in the Infrastructure of Repression*, AI Index: ASA 24/010/2013 (London: Amnesty International publications, 2013).

[142]     Joseph S. Bermudez Jr., Andy Dinville, and Mike Eley, *North Korea: Imagery Analysis of Camp 16* (Washington, DC: Committee for Human Rights in North Korea, 2015).

bicycles. Its location has been confirmed by former local residents who had occasion to make deliveries to the political prison camp. Contemporary satellite images show expansions in 2009 and 2010.[143]



© Committee for Human Rights in North Korea 2017

## A SUBSTANTIALLY DECOMMISSIONED *KWAN-LI-SO* POLITICAL PRISON CAMP

### Camp 18, Bukchang
### South Pyongan Province

Located just south of the Taedong River, which separates Camp 18 from Camp 14, *Kwan-li-so* No. 18, Bukchang or Camp 18, Bukchang, formally designated as the "Chosun People's Guard Unit 2918," was one of the earliest massive political penal labor colonies. It was always somewhat of an anomaly because, unlike all the other *kwan-li-so* prison camps, Camp 18, Bukchang was administered by the "regular" police or the *An-jeon-bu* (MPS), rather than the the *Bo-wi-bu* (MSS) political police. Thus, Camp 18, Bukchang is sometimes referred to as a *kyo-*

---

143    See Joseph S. Bermudez Jr., *North Korea's Camp No. 25, Update* (Washington, DC: Committee for Human Rights in North Korea, 2014).

*hwa-so* similar the prison camps described earlier in this report. However, because Camp 18, Bukchang was not subject to the North Korean Criminal Code and criminal procedure codes—it was organized according to the *yeon-jwa-je* guilt-by-association collective punishment system that incarcerates up to three generations of families—it is generally considered to be a *kwan-li-so* political prison camp by virtue of this uniquely feudal phenomena of repression. Indeed, many of the political prisoners there were the family members of the primary "wrong-doers" or "wrong-thinkers" who were imprisoned in other camps.

A great deal is known about Camp 18, Bukchang because, as with Camp 15, Yodok, there are a dozen former prisoners who fled to South Korea following their "release" from imprisonment. This includes a female prisoner who was imprisoned at the age of 13 in 1974 and held there until her "release" in 2001.[144] The "release" of prisoners at Camp 18, Bukchang was, however, very differently organized than the "releases" from the "revolutionizing zones" of Camp 15, Yodok.

Roughly coinciding with the turn of the 21st Century, the civilian or "regular" police authorities administering the prison camp recognized that many or most of the prisoners in the lifelong sentence prison camp were the children and grandchildren of the principal political offenders within the family. In many cases, the primary offenders had already passed away in detention. In a process termed *madang haeje*, which is loosely translated as restricted release, the second- or third-generation prisoners, who had good work records and followed prison camp rules, were "released" in place. Select "villages" or areas within Camp 18, Bukchang were decommissioned or dismantled as prison camps for those selected. Prisoners deemed not eligible for "release" were moved to other areas within the camp that continued to function as a political prison. Prisoners who were "released" had their citizenship rights, such as they are in North Korea, restored. This included the right to leave the prison camp area, which was a very difficult undertaking, as it was extremely difficult to find residence and employment elsewhere in North Korea. Some did leave the area, and of those, some subsequently fled to China and South Korea. Other former prisoners, who had been held for decades at Camp 18, Bukchang and had lost all contact with their pre-imprisonment friends, relatives, or locality, simply remained penuriously at the houses and "villages" where they had been assigned as prisoners.[145]

It was thought that by around 2006, nearly all of Camp 18, Bukchang had been decommissioned as a prison camp, with a remainder of somewhere between 2,000 and 5,000 prisoners sent to a new area in Dongrim-ri, which is also transliterated as Tonglim-li, north of the Taedong River, bordering Camp 14.[146] Thus, sometimes

---

[144]    During her 28 years of imprisonment among other forms of forced labor, Mrs. Kim Hye-sook worked in coal mines and was successively imprisoned in several of the different sections of the sprawling prison camp. After 13 years in the coal mines, Mrs. Kim contracted black lung disease, which continues to affect her health. Her brother, also forced to work in the mines, died in a mining accident along with his entire work unit crew of seven prisoners. Her biography in the Korean language was published in Seoul. She painted a highly detailed "map" of Camp 18, Bukchang and recently identified numerous camp landmarks on high-resolution satellite imagery.

[145]    For a more detailed discussion of the process of *madang haeje* at Camp 18, Bukchang, see, Hawk, *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps*, 23-33. This report suggests that the dismantlement process at Camp 18, Bukchang could potentially serve as a model for the dismantlement of the other political prison camps in North Korea. There is limited testimony that comparable dismantlement took place at another *An-jeon-bu* administered prison camp, No. 19, Danchon in South Hamgyong Province. See Yoon et al., *Political Prison Camps in North Korea Today,* 104.

[146]    KINU, *Recent Trend of Change in North Korean Political Prison Camps* (Seoul: Korean Institute of National Unification, 2013), 31. Also cited in Hawk, ibid., 33. The construction of prison camp-like structures at Donrim-ri between 2007 and 2011 was first cited by Curtis Melvin in North Korean Economy Watch's "Speculation Time: a New *Kwan-li-so,*" and further

this new area continued to be identified as Camp 18.[147] However, there was limited former prisoner testimony that a very small area of the original Camp 18, Bukchang continues to function and operate as a prison camp.[148]

In late 2016, *North Korean Economy Watch*[149] published a substantial report with numerous satellite images reporting that there was significant building activity at the original Camp 18, Bukchang, including likely security perimeters and structures. It is speculated that the political prison camp may have been reconstituted and reopened.[150] Previous unpublished imagery analysis by HRNK and AllSource Analysis also indicates that instead of having been completely deactivated, Camp 18, Bukchang still detained a small number of prisoners, and that there are what appear to be new fortified perimeter areas with detention facilities. When new satellite imagery becomes available for comparative analysis, HRNK will publish an update on Camp 18.

The following satellite image includes the boundaries of Camp 18, Bukchang.



Google Earth 10/23/2016 / Image © CNES/Airbus
Image with border © Committee for Human Rights in North Korea

identified by DigitalGlobe analysts cited in Amnesty International, *New Satellite Images Show Blurring of Political Prison Camp and Villages in North Korea*, Amnesty International Index No. ASA/24/004/2013.

147    See *2016 White Paper on Human Rights in North Korea* (Seoul: KINU, 2016), 399.

148    HRNK interviewed a former prisoner from Camp 18, Bukchang in Seoul in 2015. This prisoner stayed in telephone contact with a sibling, who remained in North Korea and returned to their former residential area in Camp 18, Bukchang on North (and South) Korea's Confucian-inspired "grave sweeping" holiday to clean and place flowers at the grave of their mother, who had passed away in detention. This former prisoner claimed that there was still a prison section in operation, but declined to survey Google Earth imagery of the sprawling encampment because the computer screen gave him headaches. Unfortunately, the location could not be specifically located.

149    North Korean Economy Watch, a news project that utilizes satellite imagery to analyze the North Korean economy, is an affiliate of 38 North, a prominent website at the U.S.-Korea Institute of the Johns Hopkins University School of Advanced International Studies (SAIS) located in Washington, DC.

150    See North Korean Economy Watch, "Has Camp 18 been re-opened or merged with Camp 14?," http://www.nkeconwatch.com/2016/09/30/has-camp-18-been-reopened-or-merged-with-camp-14/.

## A NEW RESTRICTED AREA, POSSIBLY FUNCTIONING AS A PRISON CAMP

**Ch'oma-bong/Dongrim-ri**
**South Pyongan Province**

As noted above, a new restricted area, initially identified as Dongrim-ri, has been noticed by North Korea watchers, north of the Taedong River and adjacent to Camp 14.[151] Korea watchers continued to see construction activity next to Camp 14 in satellite images.[152] In March 2016, HRNK and AllSource Analysis, utilizing satellite images dating from 2006 to 2015, published an extensive report, *North Korea: Ch'oma-bong Restricted Area*, with scores of carefully examined satellite images.[153] As there is no officially designated name or number and there is not yet first- person or eyewitness testimony, this facility was termed Ch'oma-bong after the name of the mountain, valley, and stream at the center of the area, as well as the name of a nearby town.

In a 5.6 square mile enclosed area, there are clearly visible security perimeters: double fencing in some areas, single fencing in other areas, guard barracks and positions, entrances, and checkpoints. There are two areas of self-contained high-security areas within the encampment. Several areas feature mines and mine-related structures. Other areas include orchards and agricultural production and related structures. Imagery analysis indicates that construction began between 2006 and 2007, and that this is a currently functional forced labor facility. As of mid-2017, there is not yet former prisoner, former guard, or former nearby resident testimony about this area.

---

151    The prison camp satellite imagery published in HRNK's *The Hidden Gulag* report series has been confirmed by former prisoners or prison guards, or other former North Koreans who have had the occasion to personally visit the prison camps.

152    See Amnesty International, "North Korea: New images show blurring of prison camps and villages," news release, March 7, 2013, based on imagery analysis from DigitalGlobe.

153    Joseph S. Bermudez Jr., Andy Dinville, and Mike Eley, *North Korea: Ch'oma-bong Restricted Area* (Washington, DC: Committee for Human Rights in North Korea, 2016).



© Committee for Human Rights in North Korea 2017

## A RECENTLY CLOSED *KWAN-LI-SO* POLITICAL PRISON CAMP

**Camp 22, Hoeryong**
**North Hamgyong Province**

Another sprawling—31 by 25 miles long and wide—political penal labor colony is *Kwan-li-so* No. 22, Hoeryong or Camp 22. It is officially designated as "Chosun People's Security Unit 2209" and located near the city of Hoeryong, the heralded hometown of Kim Il-sung's wife and Kim Jong-un's mother. Originally opened in the mid-1960s, Camp 22, Hoeryong was expanded in the 1980s and 1990s to accommodate the consolidation of several smaller prison camps. A great deal of information about Camp 22 came from a former prison guard who was there from 1990 to 1994 and fled to South Korea, where he is now a human rights activist.[154] Camp 22, Hoeryong was the first political prison camp with published satellite images in a highly regarded news

---

[154]    The prison guard, Mr. Ahn Myong-chol, was also a guard at Camp Nos. 11, 13, and 26 during his decade-long tenure as a draftee in the North Korean military. At Camp 22, Hoeryong his duties included making deliveries by truck to the various parts of the expansive political prison camp.

magazine.[155] For a more detailed description and satellite images of Camp 22, Hoeryong during its years of operation, please refer to the 2012 second edition of *The Hidden Gulag* on pages 77 to 78 and 222.

The population of prisoners with a lifelong sentence has declined from 1990s levels.[156] Reportedly, the camp's mining productivity has been substantially depleted. In mid-2012, local residents reported that the camp had been closed, but the fields and mines were still open for use by nearby civilian residents. The remaining prisoners had been transported south by trains at night. Much of this information came from the family members of guards and prison officials, who brought leftover goods and provisions to Hoeryong City to sell at local markets.[157]

The fate and whereabouts of former prisoners at Camp 22, Hoeryong is unknown. Some prisoners may have been transferred to Camp 16, Hwasong, where new housing was constructed between 2010 and 2013,[158] or to Camp 25, Chongjin. See *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps* for more details on the closure of Camp 22, Hoeryong.[159] Satellite imagery confirms that several interrogation and detention facilities, as well as the guard towers within the prison camps were demolished.[160]

HRNK will publish an update on this camp with new satellite imagery. In the image below, Joseph S. Bermudez Jr. identifies the former camp's perimeter.

---

[155]   *Far Eastern Economic Review*, Dec. 12, 2002.

[156]   *Radio Free Asia* (RFA) reported that the 2009 currency devaluation affected the ability of prison camp authorities to purchase food, and that the Hoeryong area had very low food harvests in 2009 and 2010, so that many prisoners died of malnutrition and related disease.

[157]   This information was conveyed in a series of reports from Daily NK, a Seoul-based news service staffed by North Korean defectors, and RFA. Hoeryong, on the North Korean border with China, is well within the range of Chinese mobile telephone transmission towers. While it is highly illegal, many North Koreans in North Hamgyong Province use cell phones to stay in touch with relatives and friends residing in South Korea.

[158]   See North Korean Economy Watch; "Kwanliso No. 16 imagery update," NKeconwatch.com/2013/07/19/kwanliso-no-16-imagery-update/.

[159]   Hawk, *The Hidden Gulag*, 10-22.

[160]   See *North Korea's Camp No. 22* (HRNK and DigitalGlobe, Oct. 2012); and *North Korea's Camp No. 22 – Update* (HRNK and DigitalGlobe, Dec. 2012).



© Committee for Human Rights in North Korea 2017

# APPENDIX II:

# THE 2012 NORTH KOREAN CRIMINAL CODE

## CRIMINAL LAW OF NORTH KOREA

## 2012

북한 형법

Amended and supplemented by decision of the Standing Committee of the Supreme People's Assembly on December 19, 1974.

Adopted by Decision No. 2 of the Standing Committee of the Supreme People's Assembly on February 5, 1987.

Amended and supplemented by Decision No. 6 of the Standing Committee of the Supreme People's Assembly on December 15, 1990.

Amended and supplemented by Decision No. 54 of the Standing Committee of the Supreme People's Assembly on March 15, 1995.

Amended by Decree No. 953 of the Presidium of the Supreme People's Assembly on August 11, 1999.

Amended and supplemented by Decree No. 432 of the Presidium of the Supreme People's Assembly on April 29, 2004.

Amended and supplemented by Decree No. 1084 of the Presidium of the Supreme People's Assembly on April 19, 2005.

Amended and supplemented by Decree No. 1225 of the Presidium of the Supreme People's Assembly on July 26, 2005.

Amended and supplemented by Decree No. 1673 of the Presidium of the Supreme People's Assembly on April 4, 2006.

Amended and supplemented by Decree No. 2035 of the Presidium of the Supreme People's Assembly on October 18, 2006.

Amended and supplemented by Decree No. 2280 of the Presidium of the Supreme People's Assembly on June 26, 2007.

Amended and supplemented by Decree No. 2403 of the Presidium of the Supreme People's Assembly on October 16, 2007.

Amended and supplemented by Decree No. 1105 of the Presidium of the Supreme People's Assembly on October 1, 2010.

Amended and supplemented by Decree No. 1694 of the Presidium of the Supreme People's Assembly on June 7, 2011.

Amended and supplemented by Decree No. 2346 of the Presidium of the Supreme People's Assembly on April 24, 2012.

Amended and supplemented by Decree No. 2387 of the Presidium of the Supreme People's Assembly on May 14, 2012.

CHAPTER 1 THE FUNDAMENTAL PRINCIPLES OF CRIMINAL LAW
CHAPTER 2 GENERAL REGULATIONS
      SECTION 1 Offenses
      SECTION 2 Punishments
CHAPTER 3 CRIMES AGAINST THE STATE AND THE NATION
      SECTION 1 Crimes against the State
      SECTION 2 Crimes against the Nation
      SECTION 3 Crimes of Harboring, Failing to Report and  Neglecting of a Crime against the State and the Nation
CHAPTER 4 CRIMES OF VIOLATING NATIONAL DEFENSE SYSTEM
CHAPTER 5 CRIMINAL VIOLATIONS OF THE SOCIALIST ECONOMIC SYSTEM
      SECTION 1 Property Crimes Involving State and Social Cooperative Organizations
      SECTION 2 Criminal Violations of Economic Order
      SECTION 3 Criminal Violations of the Regulations for Land Administrations and Environmental Protection
      SECTION 4 Criminal Violations of the Regulations for Labor Administration
CHAPTER 6 CRIMES OF IMPAIRING SOCIALIST CULTURE
CHAPTER 7 CRIMINAL VIOLATIONS OF THE REGULATIONS FOR GENERAL ADMINISTRATION AND MAINTENANCE
      SECTION 1 Criminal Violations of the Regulations for General Administration
      SECTION 2 Management Offices
CHAPTER 8 CRIMINAL VIOLATIONS OF THE ORDER OF SOCIALIST COLLECTIVE LIFE
CHAPTER 9 CRIMINAL IMPAIRMENT OF THE LIFE AND PROPERTY OF CITIZENS
      SECTION 1 Criminal Impairment of Life, Health, and Reputation[161]
      SECTION 2 Crimes of Encroachment on Personal Property

---

161      Although the exact translation is "personality," the implied meaning is "personal reputation."

## 제1장 형법의 기본 **CHAPTER 1 THE FUNDAMENTAL PRINCIPLES OF CRIMINAL LAW**

제1조 (형법의 사명) Article 1 (Objectives of Criminal Law)

조선민주주의인민공화국 형법은 범죄 및 형벌제도를 바로 세워 국가주권과 사회주의제도를 보위하고 인민들의 자주적이며 창조적인 생활을 보장하는데 이바지한다.
The criminal law of the Democratic People's Republic of Korea defends the sovereignty of the state and the socialist system and, by establishing the system of the penal codes for crimes, guarantees that the people can lead independent and creative lives.

제2조 (범죄자의 처리원칙) Article 2 (Principle of Treating Offenders)

국가는 범죄자의 처리에서 로동계급적원칙을 확고히 견지하고 사회적교양을 위주로 하면서 이에 법적 제재를 배합하도록 한다.
In the treatment of offenders, the state shall adhere to principles that have been ascribed to the working class and apply legal sanctions with the main stress on social education.

제3조 (범죄의 미연방지원칙) Article 3 (Principle of Preventing Crime)

국가는 모든 공민들이 법을 존엄있게 대하고 엄격히 지키며 범죄와의 투쟁에 적극 나서게 하여 범죄를 미리 막도록 한다.
The state shall attempt to ensure that all citizens respect and strictly observe state laws and take an active part in the fight against crime so as to prevent crime.

제4조 (조국과 민족반역행위를 뉘우친 자의 처리원칙) Article 4 (Principle of Treating Repenters Who Once Betrayed the Country and Nation)

국가는 조국과 민족을 반역한 행위를 한 자라 하더라도 조국통일을 위하여 적극적으로 나서는 경우에는 과거를 묻지 않으며 형사책임을 추궁하지 않도록 한다.
The state will forgive even the past criminal history of a person who committed an act of betrayal of the fatherland and the people, if the person works actively for the reunification of the country, and he or she shall bear no criminal liability.

제5조 (자수자의 처리원칙) Article 5 (Principle of Treating Offender Who Surrenders Himself)

국가는 범죄를 저지른 자라 하더라도 자기의 잘못을 진심으로 뉘우치고 자수한 자에 대하여서는 관대히 용서하도록 한다.
The state shall show leniency and generously forgive an offender who repents of his wrongdoings and surrenders himself voluntarily.

제6조 (형법에 규정된 범죄에 대하여서만 형사책임을 지우는 원칙) Article 6 (Principle of Imposing Criminal Liability Only for Crimes Prohibited by Criminal Law)

국가는 형법에서 규정된 범죄에 대하여서만 형사책임을 지우도록 한다.
The state shall impose criminal liability only for crimes defined as offenses under the criminal law.

제7조 (형벌적용의 원칙) Article 7 (Principle of Imposing Penalty)

국가는 범죄행위와 범죄자의 위험성정도를 고려하여 그에 해당한 형벌을 적용하도록 한다.
The state shall impose penalties on offenders in consideration of the dangerousness of the criminal acts and the offender.

제8조 (공민, 령역, 현실원칙) Article 8 (Democratic People, Territory and Actual Principle)

이 법은 범죄를 저지른 공화국공민에게 적용한다. 공화국민이 공화국령역밖에서 범죄를 저지른 경우에도 이 법을 적용한다. 공화국령역안에서 범죄를 저지른 다른 나라 사람에게도 이 법을 적용한다. 그러나 외교특권을 가진 다른 나라 사람에 대하여서는 그때마다 외교적절차에 따라 해결한다. 공화국령역밖에서 공화국을 반대하였거나 공화국 공민을 침해한 다른 나라 사람에게도 이 법을 적용한다.
This law applies to citizens of the Democratic People's Republic of Korea who commit offenses. This law also applies to citizens of the Democratic People's Republic of Korea who commit offenses outside its territory. This law also applies to foreigners who commit offenses within our Republic. However, imposing criminal liabilities on foreigners with diplomatic immunity is settled in accordance with diplomatic procedure. This law also applies to foreigners who oppose the Democratic People's Republic of Korea outside of its territory or commit offense against citizens of the Republic in another country.

제9조 (불소급 및 소급원칙) Article 9 (Retroactivity and Non-retroactivity Principle)

범죄를 저지른 자에게는 그 범죄를 저지를 당시의 형법을 적용한다. 그러나 종전 형법에서 범죄로 보던 행위를 이 법에서 범죄로 보지 않았거나 형벌을 낮춘 경우에는 이 법을 적용한다.
2012 Punishment is imposed on offenders in accordance with the penal law in force at the time when the offense was committed. This principle applies in cases where acts that were regarded as offenses under a previous law are not considered as such under a revised law and in cases where penalty has been reduced under a revised law.

제2장 일반규정 **CHAPTER 2 GENERAL REGULATIONS**

제1절 범 죄 **SECTION 1. OFFENSES**

제10조 (범죄의 개념) Article 10 (Concept of Offenses)

범죄는 국가주권과 사회주의제도와 법질서를 고의 또는 과실로 침해한 형벌을 줄 정도의 위험한 행위이다.
Offenses are punishable, dangerous acts that violate the sovereignty of the state, the socialist system, and state laws, whether intentionally or negligently.

제11조 (형사책임 나이) Article 11 (Age of Criminal Responsibility)

범죄를 저지를 당시 14살 이상 되는 자에 대하여서만 형사책임을 지운다.
Criminal responsibility shall be imposed only on offenders who are over 14 years of age when they commit an offense.

제12조 (정신병상태에서 사회적으로 위험행한 위를 한 자에 대한 처리) Article 12 (Treatment of Offender Who Commits Socially Dangerous Acts while Affected by Mental Disorder)

2102: 만성정신병, 일시적인 정신이상 때문에 자기의 행위를 가리지 못하였거나 통제할수 없는 상태에서 사회적으로 위험한 행위를 한자에 대하여서는 형사책임을 지우지 않으며 의료처분을 적용할수 있다. 술에 취하여 범죄를 저지른 자에 대하여서는 앞항을 적용하지 않는다.

Criminal liability shall not be imposed on an offender who commits socially dangerous acts while he or she is unable to judge his or her conduct or control himself or herself because of chronic mental disease or a temporary mental disorder; medical measures may be adopted in such cases. The foregoing paragraph does not apply to a person who commits an offense under the influence of alcohol.

제13조 (정신병 상태에 있는 범죄자의 처리) Article 13 (Treatment of Offenders in a State of Mental Disorder)

정상적인 정신상태에서 범죄를 저지른 자가 수사, 예심, 재판 당시 정신병 상태에 있을 경우에는 의료처분을 적용하며 회복되였을 경우에는 형사책임을 지운다.

Should a person who has committed an offense while in a normal mental state become mentally unbalanced at the time of the investigation, preliminaries, and delivery of the verdict, medical measures shall be adopted for him or her. Criminal liability shall be imposed on him or her after his or her return to a normal mental state.

제14조 (형사책임을 지우지 않는 일반조건) Article 14 (General Requisites for Exempting an Offender from Criminal Liability)

이 법에서 범죄로 규정한 행위를 한 경우라 하더라도 가벌성이 작을 경우에는 형사책임을 지우지 않는다.

An offender shall not be attributed criminal liability in cases where the conditions required for criminal prosecution are not sufficiently satisfied, even if the act is defined as an offense under this criminal law.

제15조 (정당방위) Article 15 (Self-Defense)

이 법에서 범죄로 규정한 행위를 한 경우라 하더라도 국가 및 사회적리익이나 다른 사람 또는 자기 자신의 적법적리익을 침해하는 위급한 범죄를 막기 위한 행위로서 그것이 방위의 정도를 지나치게 넘지 않았을 경우에는 형사책임을 지우지 않는다.

Should an act that is defined as an offense under this law be committed in order to prevent an offense against the interests of the state, against the public interests, or against the legitimate interests of other persons or oneself, and should the offense be considered a reasonable defensive measure, it shall not be punished.

제16조 (긴급피난) Article 16 (Necessity)

이 법에서 범죄로 규정한 행위를 한 경우라 하더라도 위급한 사태를 피하는데 그 길밖에 없었으며 그렇게 한 결과 입은 손실이 보호한 리익보다 적을 경우에는 형사책임을 지우지 않는다.

Should an act defined as an offense under this law be committed to counter a dangerous and urgent situation, and should there be no alternative and the resultant damage be less than that which would otherwise have been caused, it shall bear no criminal liability.

제17조 (자발적으로 중지한 범죄에 대한 형사책임) Article 17 (Criminal Liability for Voluntarily Ceased Crime)

범죄를 준비하거나 저지르다가 도중에 스스로 완전히 그만둔 경우에는 형사책임을 지우지 않는다. 그러나 실지로 한 행위가 다른 무거운 범죄의 표징을 갖춘 경우에는 해당한 형사책임을 지울 수 있다.
In cases where a person stops his or her crime completely during the planning or the attempt, criminal liability shall not be imposed. However, in cases where the act committed has an indication of other serious crime, appropriate punishment may be imposed.

제 18조 (피해자의 요구에 따라 그의 인신을 침해한자에 대한 형사책임) Article 18 (Criminal Liability of Offender, Violating Victim's Physical Integrity, Who Acted upon Victim's Request)

피해자의 요구에 기초하여 그의 인신을 침해한자에 대하여서는 가별성이 작을 경우 형사책임을 지우지 않는다.
An offender who violates a victim's physical or reputational integrity upon the victim's request will not bear criminal liability only when the offense has little consequence.

제19조 (가족, 친척을 상대로 저지른 범죄에 대한 형사책임) Article 19 (Criminal Liability for Crimes Committed Against Family Members or Relatives)

가족, 친척을 상대로 저지른 범죄에 대하여서는 용서하여줄데 대한 피해자 또는 피해자측의 요구가 있을 경우에는 형사책임을 지우지 않는다. 고의적살인죄, 고의적경살인죄, 발작적격분에 의한 살인죄, 정당방위초과살인죄, 과실적살인죄, 고의적중상해죄, 강도죄, 강간죄에 대하여서는 앞항을 적용하지 않는다.
Crimes committed against a family member or relative shall bear no criminal liability when the victim himself or the victim's family demands a pardon. The foregoing paragraph does not apply to premeditated, deliberate murder; deliberate murder; voluntary manslaughter; murder in excess of self-defense; involuntary manslaughter; intentional serious injury; robbery; or rape.

제20조 (범죄의 준비와 미수에 대한 형사책임) Article 20 (Criminal Liability for Planning or Attempting a Crime)

범죄의 준비와 미수에 대한 형사책임은 범죄의 위험성 정도, 범죄의 실행정도, 기수에 이르지 못한 원인을 참작하여 지운다. 범죄의 준비와 미수에 대하여서는 기수와 같은 조항을 적용한다. 범죄의 준비는 미수, 범죄의 미수는 기수보다 가볍게 처벌한다.
Criminal liability for the planning or the attempt of a crime shall be imposed in consideration of the degree of dangerousness, the progress of execution of the offense, and the cause of failure to commit the crime. The article concerning the crime committed shall be applicable also when the crime is only planned or attempted. Lighter punishment shall be imposed on the planning of a crime than on an attempt to carry it out.

제21조 (조직체형태의 공범자들에 대한 형사책임) Article 21 (Criminal Liability of Organized Group of Accomplices)

범죄조직체의 주모자와 추종자에 대하여서는 그 조직체가 목적한 범죄에 해당되는 조항에 따라 형사책임을 지우며 주모자는 무겁게 처벌한다.
The mastermind and his assistants in a criminal group shall be punished under the article concerning the crime committed with the mastermind being punished more severely.

제22조 (단순형태의 공범자들에 대한 형사책임) Article 22 (Criminal Liability of Mere Accomplices)

단순형태의 공범사건에서 추긴자, 방조자에 대하여서는 실행자에게 적용하는 조항에 따라 형사책임을 지운다. 추긴자는 실행자와 같게 또는 무겁게, 방조자는 실행자와 같게 또는 가볍게 처벌한다.

Instigators and supporters who are mere accomplices and who are implicated in a crime shall be punished under the article applied to the offenders. The punishment for the instigator shall be equal to or heavier than that imposed on the offender, and the punishment for the supporter shall be equal to or lighter than that imposed on the offender.

제23조 (특수적 표징을 요구하는 범죄를 저지른 공범자에 대한 형사책임) Article 23 (Accomplice of Offenses Which Require Special Status)

특수적표징을 요구하는 범죄의 실행자가 해당한 표징을 갖추지 못한 자와 공모하여 범죄를 저질렀을 경우에는 그러한 표징을 갖추지 못한 다른 실행자, 추긴자, 방조자도 공동범죄실행자, 추긴자, 방조자로 형사책임을 지운다. In a case where a perpetrator of an offense that requires special status has committed the offense in collusion with another who does not fall under the incidence of that status, the other offenders, instigators, and supporters without the special status shall also be punished as co-perpetrators, instigators, or supporters.

제24조 (은닉범에 대한 형사책임) Article 24 (Criminal Liability for Harboring a Criminal)

범죄를 저지를 당시에는 관여하지 않고 범죄를 저지른 다음 범죄자 또는 범죄의 흔적을 감추어준 자에 대하여서는 이 법에 규정된 경우에만 형사책임을 지운다. In cases provided for under this law, those who, although not directly involved in the crime, hide the offender or the evidence of the crime after it was committed, shall bear criminal liability according to this [criminal] law.

제25조 (불신고범에 대한 형사책임) Article 25 (Criminal Liability for Failing to Report a Crime)

범죄를 준비하고 있거나 저지른 것을 알면서 그것을 해당 기관에 알리지 않은 자에 대하여서는 이 법에 규정된 경우에만 형사책임을 지운다. In cases provided for under this law, those who fail to report to the relevant authorities the crime or the fact that a crime was being planned in spite of having been aware of it, shall bear criminal liability.

제26조 (방임죄에 대한 형사책임) Article 26 (Criminal Liability for Neglect)

해로운 긴급한 사태를 능히 막거나 막을 대책을 세울 수 있었음에도 불구하고 내버려두어 엄중한 결과를 일으킨 자에 대하여서는 이 법에 규정된 경우에만 형사책임을 지운다. In cases provided for under this law, punishment shall be imposed on those who fail to act to prevent a crime, when such action is fully possible or who fail to take steps to prevent a crime and thus cause grave consequences to arise.

제2절 형 벌 **SECTION 2. PUNISHMENTS**

제27조 (형벌의 종류) Article 27 (Types of Punishments)

형벌의 종류는 다음과 같다. 1. 사형 2. 무기로동교화형 3. 유기로동교화형 4. 로동단련형 5. 선거권박탈형 6. 재산몰수형 7. 자격박탈형 8. 자격정지형
Punishments are 1. Death 2. Lifetime of reform through labor 3. Limited term of reform through labor 4. Short-term labor 5. Deprivation of the right to vote 6. Confiscation of property 7. Removal of qualifications 8. Suspension of qualifications.

제28조 (기본형벌과 부가형벌) Article 28 (Principal Punishments and Supplementary Punishments)

사형, 무기로동교화형, 유기로동교화형, 로동단련형은 기본형벌이다. 선거권박탈형, 재산몰수형, 자격박탈형, 자격정지형은 부가형벌이다.
The death penalty, lifetime term of reform through labor, limited term of reform through labor, and short-term labor are the principal punishments imposed on offenders. Deprivation of the right to vote, confiscation of property, deprivation of qualifications, and suspension of qualifications are supplementary punishments.

제29조 (사형) Article 29 (The Death Penalty)

사형은 범죄자의 육체적 생명을 박탈하는 방법으로 집행한다. 범죄를 저지를 당시 18살에 이르지 못한 자에 대하여서는 사형을 줄 수 없으며 임신녀성에 대하여서는 사형을 집행할수 없다.
The death penalty is executed by depriving the offender of his physical life. The death penalty shall not be imposed on those who were under 18 years of age when they committed the offense, nor shall it be executed against pregnant women.

제30조 (무기로동교화형, 유기로동교화형) Article 30 (Life and Limited Term of Reform Through Labor)

무기로동교화형, 유기로동교화형은 범죄자를 교화소에 넣어 로동을 시키는 방법으로 집행한다. 무기로동교화형, 유기로동교화형 집행기간에는 공민의 권리의 일부가 정지된다. 유기로동교화형기간은 1년부터 15년까지로 한다. 범죄를 병합하거나 형기를 합산할 경우에도 유기로동교화형기간은 15년을 넘을수 없다. 범죄자가 구속되여있은 기간 1일은 유기로동교화형기간 1일로 계산한다.
Lifetime and limited term of reform through labor shall be executed by sending an offender to a long-term prison labor camp where he or she will engage in labor. During the period of lifetime and limited term of labor reform, an offender's civil rights are partially suspended. The period of reform through labor for limited term is from 1 year to 15 years. Even in cases where crimes are combined, or the prison terms are added together, the total term may not exceed 15 years. Each day of the offender's detention shall be counted as a day of the reformation period.

제31조 (로동단련형) Article 31 (Short-term Labor)

로동단련형은 범죄자를 일정한 장소에 보내어 로동을 시키는 형벌이다. 로동단련형 집행기간에는 공민의 권리가 보장된다. 로동단련형 기간은 6개월부터 1년까지로 한다. 범죄를 병합하거나 합산할 경우에도 로동단련형 기간은 1년을 넘을 수 없다. 범죄자가 구속되여 있은 기간 1일을 로동단련형 기간 1일로 계산한다.

Short-term labor is executed by sending an offender to a designated place where the offender will engage in labor. The civil rights of an offender are guaranteed during the period of short-term labor. The period of short-term labor is from six months to 1 year. Even in cases where crimes are combined or added, the total term of short-term labor may not exceed 1 year. Each day of the offender's detention shall be counted as one day of short-term labor.

제32조 (선거권박탈형) Article 32 (Deprivation of the Right to Vote)

선거권박탈형은 반국가 및 반민족범죄를 저지른자로부터 일정한 기간 선거할 권리를 빼앗는 형벌이다. 반국가 및 반민족범죄사건을 심리할 경우에는 선거권박탈문제를 함께 심리하여야 한다. 선거권박탈형 기간은 5년이며 유기로동교화형 집행이 끝난 날부터 계산한다.

Suffrage is a punishment that takes away the right to vote for a certain period of time from those who committed anti-state and anti-people crimes. The deprivation of the right to vote must be considered when a crime against the state and the nation is being judged. The period of the deprivation of the right to vote must be five years and shall be counted from the end of the execution of the limited term of reform through labor.

제33조 (벌금형) Article 33 (Monetary Penalty)

벌금형은 반국가 및 반민족범죄를 저지른자에게 물질적제재를 가하는 형벌이다. 반국가 및 반민족범죄사건을 심리할 경우에는 벌금부과문제를 함께 심리하여야 한다. 벌금형에 따르는 벌금액수는 범죄행위의 엄중성정도에 따라 재판소가 정한다.

A monetary penalty is applied against an offender who committed crimes against the state and the nation. The monetary penalty must be considered when a crime against the state and the nation is being judged. The amount of the fines shall be defined by the court based on the severity of the offense.

제34조 (재산몰수형) Article 34 (Confiscation of Property)

재산몰수형은 유죄판결을 받은자의 재산을 무상으로 국가에 넘기는 형벌이다. 재산몰수형판결을 집행할 경우에는 유죄판결을 받은자의 가족이 최저생활을 하는데 필요한 식량과 일용필수품, 돈을 남겨놓는다.

The penalty of the confiscation of property is executed by handing the property of the convicted criminal to the state free of charge. When a property forfeiture judgment is enforced, the family of the convicted person shall keep the food, daily necessities, and money necessary for a basic standard of living, which shall not be confiscated.

제35조 (재산몰수형의 취소 및 사건기각시 재산처리) Article 35 (Compensation In Case of Cancellation of Confiscation or Dismissal of the Case)

재산몰수형이 취소되였거나 사건이 기각되였을 경우에는 몰수하였던 재산을 돌려준다.

Confiscated property shall be returned should the penalty of the confiscation of property be cancelled or should the case be dismissed.

제36조 (재산몰수당한자의 빚처리) Article 36 (Debt Treatment for a Person Whose Property is Subject to Confiscation)

재산을 몰수당한 자가 재산담보처분이 있기 전에 진 빚에 대하여서는 몰수한 재산으로 법이 정한 순위에 따라 물어준다. 그러나 재산담보처분이 있은 다음에 진 빚에 대하여서는 몰수한 재산으로 물어주지 않는다.

Any debt previously incurred by a person whose property is subjected to confiscation shall be repaid from the confiscated property prior to disposition of forfeited property according to the order provided for under the law. However, a debt contracted after seizure shall not be repaid from the confiscated property.

제37조 (자격박탈형) Article 37 (Deprivation of Qualifications)

자격박탈형은 유죄판결을 받은자가 가지고 있던 일정한 자격을 완전히 빼앗는 형벌이다. 일정한 자격을 고의적인 범죄를 저지르는데 리용한 사건을 심리할 경우 자격박탈문제를 함께 심리하여야 한다.
The penalty of the deprivation of qualifications is executed by permanently depriving a certain qualification that the convicted person had. When considering the cases of crimes in which the offender used his qualifications to intentionally commit a crime, deprivation of qualifications of the offender should be considered.

제38조 (자격정지형) Article 38 (Suspension of Qualifications)

자격정지형은 유죄판결을 받은자가 가지고있던 일정한 자격을 일시적으로 빼앗는 형벌이다. 일정한 자격을 가진자가 과실로 범죄를 저지른 사건을 심리할 경우 자격정지문제를 함께 심리하여야 한다. 자격정지형 기간은 3년이며 유기로동교화형, 로동단련형의 집행이 끝난 날부터 계산한다.
The penalty of the suspension of a qualification is executed by temporarily depriving certain qualifications that the convicted person had. When considering the cases of crimes in which the offender with a certain qualification negligently committed a crime, suspension of the qualification of the offender should be considered. The term of the suspension of qualification is three years and shall be counted from the end of the execution of the limited term of reform through labor or short-term labor.

제39조 (형벌의 량정) Article 39 (Determination of Penalties)

형벌량정은 범죄의 성격, 목적과 동기, 수단과 방법, 실행정도, 범죄적 결과, 공모관계, 범죄자의 위험성정도 같은것을 참작하여 한다. 이 경우 해당 조항에 규정된 형벌의 한도를 기준으로 한다.
Penalties are determined by considering the character of, the motives for, and the aim of the crime; the ways and means by which and the extent to which the crime was committed; the consequences of the crime, complicity, and the degree of danger to which the offender repents of his or her crime. In this case, the limits of the penalties provided by the relevant articles of this law shall be taken as the standard.

제40조 (형벌량정에서 무겁게 보는 조건) Article 40 (Conditions for Determining Aggravated Penalties)

형벌량정에서 무겁게 보는 조건은 다음과 같다.
1. 범죄의 주동분자인 경우 2. 여러번 범죄를 저질렀을 경우 3. 잔인한 수단과 방법으로 범죄를 저질렀을 경우 4. 전시 또는 재해상태를 리용하여 범죄를 저질렀을 경우
Penalties shall be aggravated in the following cases:
1. When the offender is the principal culprit in the crime; 2. When the offender has committed offenses repeatedly; 3. When the crime is committed by brutal ways and means; 4. When the offender commits a crime by taking advantage of a wartime or disaster situation.

제41조 (형벌량정에서 가볍게 보는 조건) Article 41 (Conditions for Determining Mitigated Penalties)

형벌량정에서 가볍게 보는 조건은 다음과 같다.
1. 범죄의 피동분자인 경우
2. 국가에서 맡겨준 일을 더 잘하려고 하다가 범죄를 저질렀을 경우
3. 강한 정신적자극으로 범죄를 저질렀을 경우
4. 미성인이 범죄를 저질렀을 경우
5. 정당방위, 긴급피난의 정도를 넘었을 경우
6. 자백을 하였을 경우
7. 특출한 공로를 세운 자가 범죄를 저질렀을 경우
8. 략취하였거나 파손한 재산을 스스로 보상하였거나 원상복구하였을 경우
9. 피해자에게 잘못이 있었을 경우
10. 중한 범죄를 적발하는데 협력한 경우

Penalties shall be mitigated in the following cases:
1. When the offender is a passive culprit;
2. When the crime is committed to contribute to the country;
3. When the crime is committed under the influence of strong mental pressure;
4. When the offender is a juvenile;
5. When the offense is considered to meet the conditions for self-defense or necessity;
6. When the offender confesses his or her guilt;
7. When the offender has previously contributed greatly to the country;
8. When the offender makes compensation for or restitution of the properties that he has plundered or damaged;
9. When the victim is found with fault;
10. When the offender assists in identifying serious crimes.

제42조 (형벌의 무겁게 또는 가볍게 적용하는 범위) Article 42 (Limit of Applying Aggravated or Mitigated Penalties)

형벌량정에서 무겁게 또는 가볍게 보는 조건이 있을 경우에는 주어야 할 형벌의 절반정도의 범위 안에서 그 위험성정도에 맞게 무겁게 또는 가볍게 줄수 있다. 이 경우 해당 조항에 규정된 형벌의 최고 또는 최저한도보다 높게 또는 낮게 줄 수 없다.
Aggravated or mitigated penalties may be aggravated or mitigated by up to half the original penalty based on the graveness of crimes. In such a case, the penalty may not exceed the maximum penalty or fall short of the minimum penalty prescribed in the relevant provision.

제43조 (법정형의 최저한도보다 형벌을 낮게 정하는 경우) Article 43 (Determination of Penalties Below Minimum Limit Allowed by Law)

해당 조항에 규정되어있는 형벌의 최저한도보다 더 낮게 형벌을 주어야 할 특별한 사정이 있을 경우 해당 조항에 규정되어있는 형벌보다 낮게 줄 수 있다.
In special cases, lighter penalty than the minimum limit provided for under the relevant article shall be imposed.

제44조 (범죄의 병합조건) Article 44 (Conditions for Merging of Offenses)

한 범죄자가 저지른 여러 형태의 범죄가 각각 독립적으로 형사책임을 추궁할수 있을 경우에는 병합한다. 그러나 여러 형태의 범죄들이 결합되여 하나의 범죄로 되였거나 어느 한 형태의 범죄가 다른 형태의 범죄를 저지르는 데 필수적전제로 되였을 경우에는 병합하지 못한다.

In cases where an offender commits different types of offenses that respectively entail independent criminal liability, he or she shall be merged into one crime. However, in cases where different types of crimes are combined to constitute a single offense or one crime is considered to have been an essential premise for subsequent offenses or other types of crimes, merging shall not be possible.

제45조 (범죄병합시의 형벌량정) Article 45 (Determination of Penalty In Case of Merging of Offenses)

한 범죄자가 저지른 여러 형태의 범죄를 함께 재판할 경우에는 매 범죄별로 형벌을 량정한 다음 제일 높이 량정한 조항의 형벌에 나머지 조항의 형벌을 절반정도 합한다. 이 경우 병합한 범죄에 해당한 부가형벌은 기본형벌과 함께 적용한다. 판결의 선고는 이 조로 한다.

In cases where the offender commits different types of offenses, the punishment will be determined by first deciding penalties for each offense. Then the heaviest penalty shall be added to one-half of the remaining penalties. In such a case, the supplementary penalties of the merged crimes shall be applied in line with general punishments. The rendition of judgment shall be based on this article.

제46조 (서로 다른 종류의 형벌기간계산) Article 46 (Determination of the Period of Different Penalties)

서로 다른 종류의 형벌기간을 하나의 형벌기간으로 량정할 경우에는 제재의 도수가 높은 종류의 형벌로 하며 로동단련형 기간 2일을 유기로동교화형 기간 1일로 계산한다.

In cases of multiple penalties for which a single period of penalty is determined, the penalty shall be of the heaviest kind, and two days of short-term labor shall be counted as one day of limited reform through labor.

제47조 (형벌집행이 끝나기 전에 저지른 범죄와 숨긴 범죄에 대한 형벌량정) Article 47 (Determination of Penalty for Crimes Committed or Hidden before the Term Is Over)

유죄판결을 받은자가 판결이 확정된 다음 형벌의 집행이 끝나기 전에 새로운 범죄를 저질렀거나 숨긴 범죄에 대하여서는 형벌을 량정하여 남은 형기에 합한다.

In cases where, after sentence has been passed, the offender commits or hides another crime before serving the full term of the penalty, the penalty for the new or hidden offense shall be decided and added to the remaining term of the former penalty.

제48조 (이상, 이하에 대한 해석) Article 48 (Interpretation of "More Than" and "Less Than")

이 법에서 형벌기간을 지적한 이상, 이하는 해당 수를 포함한다. 형벌기간은 범죄의 위험성정도에 따라 년뿐아니라 개월까지 정할수 있다.

The expressions "more than" and "less than" used in this law for determining the term of penalties, shall include the relevant number described. The term of penalty may be determined in months and years depending on the gravity of the offense.

제49조 (형벌집행기간계산) Article 49 (Calculation of the Period for the Execution of Penalty)

형벌집행기간은 판결이 확정된 날부터 형벌기간이 마감되는 날까지로 한다. 범죄자가 구속되여있은 기간의 형벌집행기일계산은 이 법 제30조와 제31조에 따라 형벌집행기간에 포함하여 계산한다.

The execution of a penalty begins from the day when the judgment becomes final and ends on the day of completion of the term of punishment. The criminal's detention execution period is included in the period of execution of a penalty and shall be calculated in accordance with Articles 30 and 31.

제50조 (사회적교양처분의 적용조건) Article 50 (Conditions for Applying Public Education Penalty)

미성년이 범죄를 저질렀거나 성인이 범죄를 저질렀다 하더라도 그의 개준성 정도, 범죄의 위험성정도에 비추어 사회적교양의 방법으로 고칠수 있을 경우에는 사회적교양처분을 할수 있다.

In cases where the offender is a minor or is an adult deemed suitable for reform through public education, a public education penalty shall be applied after consideration of the degree to which the offender repents and the gravity of the offense.

제51조(사회적교양처분의 법률적효과) Article 51 (Legal Effect of Re-education in Society Penalty)

사회적교양처분을 받은자가 법이 정한 기간에 새로운 범죄를 저지르지 않았을 경우에는 그범죄에 대한 형사책임을 지우지 않는다. 그러나 사회적교양처분을 받은자가 새로운 범죄를 저질렀거나 숨긴 범죄가 드러났을 경우에는 사회적교양처분을 받았던 범죄에 대하여 형벌을 량정하고 그 전부 또는 일부를 새로 저지른 범죄 또는 숨긴 범죄에 대하여 량정한 형벌에 합한다.

Should a person who has received a re-education in society penalty not commit another offense during the period of criminal law, he or she is deemed to have served his or her sentence. However, in cases where a person who has been given a re-education in society penalty commits another offense or reveals hidden crimes during the period of suspension, all or part of the penalty that was suspended shall be added to the penalty for the new offense.

제52조 (집행유예 적용조건과 기간) Article 52 (Requisites and Periods for Suspension of Sentence)

3년까지 로동교화형을 받은자의 개준성정도, 범죄의 위험성정도에 비추어 그를 교화소에 보내여 로동교화형을 집행할 필요가 없다고 인정될 경우에는 3년부터 5년까지 집행을 유예하는 판결을 내릴수 있다.

If it is deemed unnecessary to send an offender to a prison camp who receives 3 years or less of reform through labor due to their degree of repentance and the gravity of the offense, a penalty may be suspended for three to five years.

제53조 (집행유예의 법률적효과) Article 53 (Legal Effect of Suspension of Sentence)

집행유예를 받은자가 집행유예기간에 새로운 범죄를 저지르지 않았을 경우에는 그에게 내렸던 판결의 집행이 끝난것으로 인정한다. 그러나 새로운 범죄를 저질렀거나 숨긴 범죄가 드러났을 경우에는 유예한 형벌의 전부 또는 일부를 새로 저지른 범죄나 숨긴 범죄에 대하여 량정한 형벌에 합한다.

A person who has received a re-education in society penalty and does not commit another offense during the probation period, he or she is deemed to have served his or her sentence. However, in cases where a person who has been given a re-education in society penalty commits another offense or reveals hidden crimes

during the probation period, all or part of the penalty that was suspended shall be added to the penalty for the new offense.

제54조 (특사, 대사) Article 54 (Special and General Pardons)

유죄판결을 받은자의 형벌면제는 특사 또는 대사로 한다. 특사는 조선민주주의인민공화국 국방위원회 제1위원장이 실시한다. 대사는 최고인민회의 상임위원회가 실시한다.
A convicted criminal may have his or her penalty cancelled under a special or general pardon. Special pardons are granted by the First Chairman of the National Defense Commission of the Democratic People's Republic of Korea. General pardons are granted by the Presidium of the Supreme People's Assembly.

제55조 (형기단축 및 만기전석방) Article 55 (Reduction of Term and Parole)

유기로동교화형, 로동단련형판결을 받은자가 형집행기간에 생활을 모범적으로 한 경우에는 형기를 줄여줄수 있다. 무기로동교화형, 유기로동교화형, 로동단련형을 받은 자가 완전히 교양개조되었다고 인정될 경우에는 유기로동교화형, 로동단련형은 받은 형기의 절반이, 무기로동교화형은 10년이 지난 다음 형벌집행을 면제하여 줄 수 있다.
In cases where a person who has been sentenced to either a limited term of reform through labor or short-term labor has shown exemplary behavior during the execution period, his or her term for the penalty may be reduced. In cases where a person who has been sentenced to limited term of reform through labor is deemed to have become faithful in reforming himself or herself, he or she may be released after the passage of half of the period of reform through short-term labor. In the case of a life term of reform through labor, the release can take place after the passage of ten years.

제56조 (형벌집행이 끝난 자의 법적지위)

특사, 대사를 받은 자 또는 형벌집행이 끝난 자에 대하여서는 특사, 대사를 받은 날 또는 형벌집행이 끝난 날부터 범죄를 저지르지 않았던자와 같이 인정하며 법적으로 차별하지 않는다.
2009-A person who has been granted a special or a general pardon and a person who has served his or her full time is regarded as guiltless from the day of the granting of the special or general pardon or from the day on which the term ends and is not discriminated against under the law.

제57조 (형사소추시효기간) Article 57 (Prescription Period for Criminal Prosecution)

범죄를 저지른 때부터 다음의 기간이 지나면 형사책임을 지우지 않는다. 1) 1년까지의 로동단련형을 줄수 있는 범죄에 대하여서는 3년. 2) 3년까지의 로동교화형을 줄수 있는 범죄에 대하여서는 5년. 3) 3년이상 5년까지의 로동교화형을 줄수 있는 범죄에 대하여서는 8년. 4) 5년이상 10년까지의 로동교화형을 줄수 있는 범죄에 대하여서는 12년. 5) 무기로동교화형, 사형을 줄수 있는 범죄에 대하여서는 20년.
Criminal liability shall not be borne when the following periods have passed from the commission of an offense. 1. Three years for offenses that merit reform through labor for up to one year; 2. Five years for offenses that merit reform through labor for up to three years; 3. Eight years for offenses that merit reform through labor for three to five years; 4. Twelve years for offenses that merit reform through labor for up to five to ten years; 5. Twenty years for offenses that merit a life term of reform through labor or the death penalty.

제58조 (형사소추시효를 적용하지 않는 범죄) Article 58 (Offenses Excluded from Criminal Prosecution)

반국가 및 반민족범죄와 고의적중살인범죄에 대하여서는 형사소추시효기간에 관계없이 형사책임을 지운다.
Criminal liability shall be borne for crimes against the state and the nation and for premeditated murder, regardless of the passage of time.

제59조 (형사소추시효기간이 새로 계산되는 사유) Article 59 (Reasons for Counting Anew the Period of Criminal Prosecution)

이 법 제57조에 규정된 기간이 넘기 전에 범죄자가 새로운 범죄를 저질렀거나 예심 또는 재판을 회피하였거나 수사시작결정을 한 경우에는 그날부터 형사소추시효기간이 새로 계산된다.
When an offender commits a new offense before the period provided under Article 57 of this law passes, or declines a preliminary examination or trial before the period passes, the period of criminal prosecution will start anew.

### 제3장 반국가 및 반민족범죄 CHAPTER 3 CRIMES AGAINST THE STATE AND THE NATION

### 제1절 반국가범죄 SECTION 1. CRIMES AGAINST THE STATE

제60조 (국가전복음모죄) Article 60 (Conspiracy to Subvert the State)

반국가적 목적으로 정변, 폭동, 시위, 습격에 참가하였거나 음모에 가담한 자는 5년이상의 로동교화형에 처한다. 정상이 특히 무거운 경우에는 무기로동교화형 또는 사형 및 재산몰수형에 처한다.
A person who, with anti-state purposes, participates in a coup d'état, riot, demonstration or assault, or takes part in a conspiracy shall be punished by reform through labor for more than five years. In cases where the person commits a grave offense, he or she shall be punished by a life term of reform through labor or the death penalty, and confiscation of property.

제61조 (테로죄) Article 61 (Terrorism)

반국가 목적으로 간부들과 인민들을 살인, 랍치하였거나 그들에게 상해를 입힌 자는 5년이상의 로동교화형에 처한다. 정상이 특히 무거운 경우에는 무기로동교화형 또는 사형 및 재산몰수형에 처한다.
A person who, with anti-state purposes, kills, abducts, or injures cadres or people shall be punished by reform through labor for more than five years. In cases where the person commits a grave offense, he or she shall be punished by a life term of reform through labor or the death penalty, and confiscation of property.

제62조 (반국가선전, 선동죄) Article 62 (Anti-State Propaganda and Agitation)

반국가 목적으로 선전, 선동행위를 한자는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.
A person who, with anti-state purposes, launches propaganda and agitation shall be punished by reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years or death, and confiscation of property.

제63조 (조국반역죄) Article 63 (Treason against the Fatherland)

공민이 조국을 배반하고 다른 나라로 도망쳤거나 투항, 변절하였거나 비밀을 넘겨준 조국반역행위를 한 경우에는 5년이상의 로동교화형에 처한다. 정상이 특히 무거운 경우에는 무기로동교화형 또는 사형 및 재산몰수형에 처한다.
A citizen of the Republic who commits treason against the Fatherland by defection, surrender, betrayal, or disclosure of secrets shall be punished by reform through labor for more than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years.

제64조 (간첩죄) Article 64 (Espionage)

공화국공민이 아닌자가 우리 나라에 대한 정탐을 목적으로 비밀을 탐지, 수집, 제공한 경우에는 5년이상 10년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 10년이상의 로동교화형에 처한다.
A non-citizen of the Republic who detects, collects, or transmits secrets with the intention of espionage against the Republic shall be punished by reform through labor for more than five years and less than ten years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than ten years.

제65조 (파괴암해죄) Article 65 (Sabotage)

반국가 목적으로 파괴, 암해행위를 한자는 5년이상 10년이하의 로동교화형에 처한다. 앞항의 행위를 여러번 또는 공모하여 한 경우에는 10년이상의 로동교화형에 처한다. 정상이 특히 무거운 경우에는 무기로동교화형 또는 사형 및 재산몰수형에 처한다.
A person who commits acts of destruction and sabotage with anti-state purposes shall be punished by reform through labor for more than five years and less than ten years. In cases where the foregoing act has been executed repeatedly or in collusion, the offender shall be punished by reform through labor for more than ten years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for life or the death penalty, and confiscation of property.

제66조 (무장간섭 및 대외관계단절사촉죄) Article 66 (Inducement of Armed Intervention and Severance of Diplomatic Relationship)

다른 나라 사람이 다른 나라 또는 다른 나라에 있는 집단을 추겼거나 자금을 대주어 공화국에 대한 무장간섭을 하게 하였거나 외교관계를 끊어버리게 하였거나 공화국과 체결한 조약을 파기하게 한 경우에는 10년이상의 로동교화형에 처한다.
A foreign national who encourages or supplies funds to encourage a foreign country or group to perpetrate armed intervention against the Republic, break diplomatic relations with the Republic, or annul a treaty with the Republic shall be punished by reform through labor for more than ten years.

제67조 (외국인에 대한 적대행위죄) Article 67 (Aggression against Foreigners)

공화국과 다른 나라와의 관계를 약화시킬 목적으로 공화국에 체류하는 다른 나라 사람의 인신, 재산을 침해한자는 5년이상 10년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 10년이상의 로동교화형에 처한다.
A person who violates the personal liberty or property of a foreigner in the Republic in order to weaken relations between the Republic and the latter's country shall be punished by reform through labor for more

than five years and less than 10 years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than ten years.

제2절 반민족범죄 **SECTION 2. CRIMES AGAINST THE NATION**

제68조 (민족반역죄) Article 68 (Treason against the Nation)

조선민족으로서 제국주의의 지배밑에서 우리 인민의 민족해방운동과 조국 통일을 위한 투쟁을 탄압하였거나 제국주의자들에게 조선민족의 리익을 팔아먹은 민족반역행위를 한자는 5년이상의 로동교화형에 처한다. 정상이 특히 무거운 경우에는 무기로동교화형 또는 사형 및 재산몰수형에 처한다.

A Korean national, who, under the control of imperialists, suppresses our people's struggle for national liberation or the struggle for the reunification of the country or betrays the nation by selling national interests to imperialists, shall be punished by reform through labor for more than five years. In cases where the person commits a grave offense, he or she shall be punished by a life term of reform through labor or the death penalty, and confiscation of property.

제69조 (조선민족해방운동탄압죄) Article 69 (Suppression of the National Liberation Struggle of the Korean Nation)

다른 나라 사람이 조선인민의 민족해방운동과 조국통일을 위한 투쟁을 탄압한 경우에는 5년이상 10년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 10년이상의 로동교화형에 처한다.

A foreign national who suppresses the national liberation struggle of the Korean people or the struggle for the reunification of the country shall be punished by reform through labor for more than five years and less than ten years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than ten years.

제70조 (조선민족적대죄) Article 70 (Aggression against the Korean Nation)

다른 나라 사람이 조선민족을 적대시할 목적으로 해외에 상주하거나 체류하는 조선사람의 인신, 재산을 침해하였거나 민족적 불화를 일으킨 경우에는 5년이상 10년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 10년이상의 로동교화형에 처한다.

A foreign national who, with hostile intentions against the Korean nation, violates the personal liberty or property of a Korean national who resides or stays abroad, or causes national dissension, shall be punished by reform through labor for more than five years and less than ten years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than ten years.

제3절 반국가 및 반민족범죄에 대한 은닉죄, 불신고죄, 방임죄 **SECTION 3. CRIMES OF HARBORING, FAILING TO REPORT, AND NEGLECTING OF A CRIME AGAINST THE STATE AND THE NATION**

제71조 (반국가 및 반민족범죄에 대한 은닉죄) Article 71 (Harboring an Individual who Committed a Crime against the State or the Nation)

반국가 및 반민족범죄를 저지른자 또는 범죄의 흔적을 감추어준자는 4년이하의 로동교화형에 처한다.

A person who harbors another who has committed a crime against the state or the nation, or conceals the evidence of a crime or the nation, shall be punished by reform through labor for less than four years.

제72조 (반국가 및 반민족범죄에 대한 불신고죄) Article 72 (Criminal Failure to Report a Crime against the State or the Nation)

반국가 및 반민족범죄나 범죄자라는 것을 알면서 그것을 해당 기관에 알리지않은 자는 3년이하의 로동교화형에 처한다.
A person who, having known another person who has committed a crime against the state or the nation, fails to inform the relevant authorities about such other person, shall by punished by reform through labor for less than three years.

제73조 (반국가범죄에 대한 방임죄) Article 73 (Failure to Prevent a Crime against the State)

반국가범죄를 저지르고있다는것을 알면서 그것을 긴급히 막는데 필요한 대책을 능히 세울 수 있었음에도 불구하고 내버려둔 자는 3년이하의 로동교화형에 처한다.
A person who, having learned of a crime against the state being committed, fails to take steps to prevent such a crime despite his or her capacity to do so, shall be punished by reform through labor for less than three years.

### 제4장 국방관리질서를 침해한 범죄 CHAPTER 4 CRIMES OF VIOLATING NATIONAL DEFENSE SYSTEM

제74조 (명령, 결정, 지시집행태만죄) Article 74 (Negligent Execution of Orders, Decisions, and Directions)

조선민주주의인민공화국 국방위원회위원장 제1위원장 명령, 최고사령광명령, 국방위원회 결정, 지시, 당중앙군사위원회 명령, 결정, 지시를 제때에 정확히 집행하지 않은자는 1년이하의 로동단련형에 처한다. 앞항의 행위를 여러번 한 경우에는 2년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 2년이상 5년이하의 로동교화형에 처한다.
A person who fails to accurately execute in a timely manner or perfunctorily executes the orders of the First Chairman of the National Defense Commission of the Democratic People's Republic of Korea, the orders of the Supreme Commander of the Korean People's Army, the decisions and directions of the National Defense Commission, or the orders, decisions, and directions of the Central Military Committee of the Worker's Party of Korea, shall be punished by reform through labor for less than one year. In cases where the foregoing offense has been committed repeatedly, the offender shall be punished by reform through labor for less than two years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than two years and less than five years.

제75조 (전략예비물자의 조성 및 전시생산준비태만죄) Article 75 (Failure to Prepare for Strategic Reserve Supplies, Organization, and Wartime Production)

전략예비물자의 조성과 전시생산준비를 하지 않은자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
He or she who fails to prepare strategic reserve supplies or to prepare for wartime production shall be punished by reform through labor for less than one year. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for less than three years.

제76조 (무기, 탄약, 전투기술기재략취죄) Article 76 (Plundering of Weapons, Ammunition, and Combat Technology Equipment)

무기, 탄약, 전투기술기재를 략취한자는 1년이하의 로동단련형에 처한다. 여러 번 또는 대량의 무기, 탄약, 전투기술기재를 략취한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.
A person who plunders weapons, ammunition, or combat technology equipment shall be punished by short-term reform through labor for less than one year. In cases where a large amount of weapons, ammunition, or combat technology equipment is plundered or plundered repeatedly, punishment shall be reform through labor for less than five years. In cases where the offense is grave, he or she shall be punished by reform through labor for more than five years and less than ten years.

제77조 (무기, 탄약비법휴대, 양도죄) Article 77 (Illegal Occupation, Transfer of Weapons, and Ammunition)

무기, 탄약을 비법적으로 가지고 있거나 다른 사람에게 넘겨준자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who illegally possesses or transfers weapons and ammunition shall be punished by reform through short-term labor for less than one year. In cases where a foregoing act is a grave offense, punishment shall be reform through labor for less than three years.

제78조 (무기, 탄약, 전투기술기재, 군사시설고의적파손죄) Article 78 (Intentional Destruction of Weapons, Ammunition, Combat Technology Equipment, or Military Facilities)

무기, 탄약, 전투기술기재와 군사시설을 고의적으로 파손시킨 자는 1년이하의 로동단련형에 처한다. 대량의 무기, 탄약, 전투기술기재 또는 중요한 군사시설을 파손시켰거나 방화, 폭파의 방법으로 파손시킨 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다. 앞항의 행위로 정상이 특히 무거운 경우에는 10년이상의 로동교화형에 처한다.
A person who intentionally destroys weapons, ammunition, combat technology equipment or military facilities shall be punished by reform through labor for less than one year. In cases where a large amount of weapons, ammunition, combat technology equipment or important military facilities is damaged or destroyed through fire, explosion, or other means, the punishment shall be reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years. In cases where the offense of the foregoing paragraph is particularly grave, the punishment shall be reform through labor for more than ten years.

제79조 (무기, 탄약, 전투기술기재, 군사시설과실적파손죄) Article 79 (Destruction of Weapons, Ammunition, Combat Technology Equipment, or Military Facilities through Negligence)

대량의 무기, 탄약, 전투기술기재 또는 중요한 군사시설을 파손시킨 경우에는 1년이하의 로동교화형에 처한다. 앞항의 행위가 정상이 특히 무거운 경우에는 3년이상의 로동교화형에 처한다.
A person who destroys a large amount of weapons, ammunition, combat technology equipment or important military facilities, shall be punished by reform through labor for less than one year. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than three years.

제80조 (군사경비근무질서위반죄) Article 80 (Violation of Military Guard System)

민간군사훈련에 동원된자가 경비근무질서를 어겨 경비대상물에 피해를 준 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
If a person who is mobilized for civilian military training violates the military guard system and this leads to damage of a guarded object, he or she shall be punished by reform through labor for less than one year. In cases where the offense of the foregoing paragraph is particularly grave, he or she shall be punished by reform through labor for less than three years.

제81조 (군사임무수행방해죄) Article 81 (Interference with Performance of Military Duties)

경비근무, 차단근무, 단속근무, 기통임무 같은 군사임무수행을 방해하여 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who interferes with military duties, such as guard duty, policing, or secret communications duty, shall be punished by short-term labor for less than one year. In cases where the offense of the foregoing paragraph is particularly grave, the punishment shall be punished by reform through labor for less than three years.

제82조 (군수품분실죄) Article 82 (Loss of Military Supplies)

군수품을 잃어버린 자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who loses military supplies shall be punished by short-term labor for less than one year. In cases where the offense of the foregoing paragraph is particularly grave, he or she shall be punished by reform through labor for less than two years.

제83조 (군수품매매죄) Article 83 (Trading Military Supplies)

군수품이라는것을 알면서 팔았거나 산자는 1년이하의 로동단련형에 처한다.
A person who knowingly buys or sells military supplies shall be punished by short-term labor for less than one year.

제84조 (군수품생산에 지장을 준죄) Article 84 (Hindering Production of Military Supplies)

군수품생산에 필요한 설비와 원료, 연료, 전력, 자재를 제때에 생산보장하지 않았거나 그 질을 보장하지 못하여 군수품생산에 지장을 준 자는 1년이하의 로동단련형에 처한다.
A person who hinders the production of military supplies by failing to build equipment or produce raw or other materials, fuel or electric power in a timely manner or failing to ensure their qualities shall be punished by short-term labor for less than one year.

제85조 (군수품을 오작품, 불합격품으로 생산한 죄) Article 85 (Production of Defective or Disqualified Military Supplies)

군수품생산부문 일군이 기술규정, 표준조작법, 제품규격, 제품검사에 관한 질서를 어기고 오작품, 불합격품을 생산한 경우에는 1년이하의 로동교화형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A military supplies production worker who does not comply with technical regulations, a standard operation manual, product specifications or product inspection codes, and produces defective or disqualified supplies, shall be punished by reform through labor for less than one year. In cases where the offense of the foregoing paragraph is particularly grave, the punishment shall be reform through labor for less than two years.

제86조 (군수품생산용자재, 군수품류용죄) Article 86 (Misappropriation of Military Supplies or Materials for Production of Military Supplies)

군수품생산부문 책임일군이 군수품생산용자재와 군수품을 다른 목적에 쓴 경우에는 1년이하의 로동교화형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A military supplies production manager who misappropriates military supplies or materials for production of such military supplies shall be punished by short-term labor for less than one year. In cases where the offense of the foregoing paragraph is particularly grave, the punishment shall be reform through labor for less than two years.

제87조 (군사복무동원기피죄) Article 87 (Evasion of Military Service)

군사복무동원을 기피한 자는 1년이하의 로동단련형에 처한다. 앞항의 행위를 전시 또는 준전시에 한 경우에는 3년이하의 로동교화형에 처한다.
A person who evades military service shall be punished by short-term labor for less than one year. In cases where the foregoing act is committed during wartime or quasi-wartime, the punishment shall be reform through labor for less than three years.

제88조 (기피자, 탈영자은닉죄) Article 88 (Harboring of Evaders and Deserters)

군사복무동원기피자, 탈영자라는것을 알면서 숨겨준자는 1년이하의 로동단련형에 처한다.
A person who knowingly hides an evader of military service or a deserter shall be punished by short-term labor for less than one year.

제89조 (군인으로 가장한 죄) Article 89 (Impersonating a Soldier)

군인으로 가장하여 사회적으로 위험한 행위를 한 자는 1년 이하의 로동단련형에 처한다.
A person who impersonates a soldier and commits a socially dangerous act shall be punished by short-term labor for less than one year.

제90조 (국방비밀루설죄) Article 90 (Disclosure of Confidential Information Concerning National Defense)

국방비밀을 루설한자는 1년이하의 로동단련형에 처한다. 중요한 국방비밀을 루설한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.
A person who discloses confidential information or loses classified documents concerning national defense shall be punished by reform through labor for less than one year. In cases where national defense information is disclosed, the punishment shall be reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years.

제5장 사회주의경제를 침해한 범죄 **CHAPTER 5 CRIMINAL VIOLATIONS OF THE SOCIALIST ECONOMIC SYSTEM**

제1절 국가 및 사회협동단체 소유를 침해한 범죄 **SECTION 1. PROPERTY CRIMES INVOLVING STATE AND SOCIAL COOPERATIVE ORGANIZATIONS**

제91조 (국가재산훔친죄) Article 91 (Stealing State Property)

국가 및 사회협동단체의 재산을 훔친 자는 1년이하의 로동단련형에 처한다. 대량의 국가 및 사회협동단체재산을 훔친 경우에는 4년이하의 로동교화형에 처한다. 특히 대량의 국가 및 사회협동단체재산을 훔친 경우에는 4년이상 9년이하의 로동교화형에 처한다.
A person who steals the property of the state or a social cooperative organization shall be punished by short-term labor for less than one year. A person who steals a large amount of state or social cooperative organization property shall be punished by reform through labor for less than four years. Especially in cases where large amount of state or social cooperative organization property is stolen, the punishment shall be reform through labor for more than four years and less than nine years.

제92조 (국가재산빼앗은죄) Article 92 (Plundering State Property)

국가 및 사회협동단체의 재산을 빼앗은자는 1년이하의 로동단련형에 처한다. 여러 번 또는 공모하여 혹은 대량의 국가 및 사회협동단체재산을 빼앗은 경우에는 6년이하의 로동교화형에 처한다. 특히 대량의 국가 및 사회협동단체재산을 빼앗은 경우에는 6년이상 10년이하의 로동교화형에 처한다.
A person who plunders the property of the state or of a social cooperative organization shall be punished by short-term labor for less than one year. A person who plunders a large amount of property or plunders repeatedly or in collusion shall be punished by reform through labor for less than six years. In cases where an extremely large amount of state or social cooperative organization property has been plundered, the punishment shall be reform through labor for more than six years and less than ten years.

제93조 (국가재산속여가진 죄) Article 93 (Extortion of State Property)

국가 및 사회협동단체의 재산을 공갈하여 빼앗은자는 1년이하의 로동단련형에 처한다. 대량의 국가 및 사회협동단체재산을 속여가진 경우에는 3년이하의 로동교화형에 처한다. 특히 대량의 국가 및 사회협동단체재산을 속여가진 경우에는 3년이상 8년이하의 로동교화형에 처한다.
.A person who extorts the property of the state or a social cooperative organization shall be punished by short-term labor for less than one year. A person who extorts a large amount of property, or extorts repeatedly or in collusion shall be punished by reform through labor for less than three years. In cases where a large amount of state or social cooperative organization property is extorted, the punishment shall be reform through labor for more than three years and less than eight years.

제94조 (국가재산횡령죄) Article 94 (Appropriation of State Property)

기관, 기업소, 단체의 위임에 따라 일정한 의무를 실행하는자 또는 관리 일군이 직무상 또는 일시적위임에 의하여 보관관리하고있는 국가 및 사회협동단체의 재산을 횡령한 경우에는 1년이하의 로동단련형에 처한다. 대량의 국가 및 사회협동단체 재산을 횡령한 경우에는 5년이하의 로동교화형에 처한다. 특히 대량의 국가 및 사회협동단체 재산을 횡령한 경우에는 5년이상 10년이하의 로동교화형에 처한다.

In cases where a person under a duty entrusted by an institution, corporate association or organization, or a management worker appropriates the property of the state or a social cooperative organization that he or she is in charge of, either as part of his or her duty or by temporary delegation, he or she shall be punished by short-term labor for less than one year. A person who appropriates a large amount of the property shall be punished by reform through labor for less than five years. In cases where a large amount of state or social cooperative organization property has been appropriated, the punishment shall be reform through labor for more than five years and less than ten years.

제95조 (국가재산대량략취죄) Article 95 (Plundering Large Amounts of State Property)

이 법 제91조-94조에 지적된 여러가지 행위를 하여 략취한 총량이 대량인 경우에는 5년이하의 로동교화형에 처한다.
In cases where the person plunders a large amount of state property, as mentioned in the aforementioned acts in Articles 91 to 94, punishment shall be reform through labor for less than five years.

제96조 (국가재산강도죄) Article 96 (Robbery of State Property)

사람의 생명, 건강에 위험을 주는 폭행, 협박을 하여 국가 및 사회협동단체의 재산을 강도한자는 5년이하의 로동교화형에 처한다. 여러번 또는 공모하여 혹은 대량의 국가 및 사회협동단체재산을 강도하였거나 무기, 흉기를 리용하여 강도한 경우에는 5년이상 10년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 10년이상의 로동교화형에 처한다.
A person who robs the state or a social cooperative organization of its property through threats or assaults that endanger the lives and health of people shall be punished by reform through labor for less than five years. A person who employs violence to take a large amount of state or social cooperative organization property or commits the aforementioned act repeatedly, in collusion, or with weapons shall be punished by reform through labor for more than five years and less than ten years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than ten years.

제97조 (특히 무거운 형태의 국가재산략취죄) Article 97 (Extremely Grave Plunder of State Property)

국가 및 사회협동단체재산략취행위의 정상이 특히 무거운 경우에는 10년이상의 로동교화형에 처한다.
In cases where the plunder of state or social cooperative organization property is extremely grave, the punishment shall be reform through labor for more than ten years.

제98조 (국가재산공동탐오죄) Article 98 (Collective Misappropriation of State Property)

비법적으로 상금, 우대제, 생활비를 적용하였거나 각종 총화, 후방사업의 명목으로 국가 및 사회협동단체재산의 공동탐오를 지시하였거나 조직한 자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who directs or organizes the collective misappropriation of state property or a social cooperative organization under the pretext of various gatherings or welfare projects, or illegally awards a cash prize, a premium or a stipend, shall be punished by short-term labor for less than one year. In cases where the act of the foregoing paragraph is grave, the punishment shall be reform through labor for less than two years.

제99조 (국가재산고의적파손죄) Article 99 (Intentional Destruction of State Property)

국가 및 사회협동단체의 재산을 고의적으로 파손시킨 자는 1년이하의 로동단련형에 처한다.대량 또는 중요한 생산수단이나 시설물을 파손시켰거나 방화, 폭파의 방법으로 파손시킨 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.

A person who purposely destroys the property of the state or a social cooperative organization shall be punished by reform through short-term labor for less than one year. In cases where a particularly important means of production or an important facility is destroyed or in cases of arson or the use of explosives against the property of the state or a social cooperative organization, the punishment shall be reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years.

제100조 (국가재산과실적파손죄) Article 100 (Negligent Destruction of State Property)

대량의 국가 및 사회협동단체의 재산을 과실로 파손시킨 자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.

A person who commits negligent destruction of the property of the state or a social cooperative organization shall be punished by short-term labor for less than one year. In cases where the act of foregoing paragraph is grave, he or she shall be punished by reform through labor for less than three years.

제2절 경제관리질서를 침해한 범죄 **SECTION 2. CRIMINAL VIOLATIONS OF ECONOMIC ORDER**

제101조 (화폐위조 및 위조화폐사용죄) Article 101 (Forgery of Currency and Use of Counterfeit Currency)

공화국화폐와 외국화폐가 위조되였다는 것을 알면서 사용한자는 1년이하의 로동단련형에 처한다. 화폐를 위조하였거나 대량의 위조된 화폐를 사용한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다. 특히 대량의 화폐를 위조한 경우에는 10년이상의 로동교화형에 처한다.

A person who knowingly uses counterfeit Republic or foreign currency that is counterfeited shall be punished by reform through labor for less than one year. A person who counterfeits the currency or uses a large amount of counterfeit currency shall be punished by reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years. In cases where the person counterfeits a large amount of currency, the punishment shall be reform through labor for more than ten years.

제102조 (증권위조 및 위조증권사용죄) Article 102 (Forgery of Securities and Use of Counterfeit Securities)

국가의 유가증권을 위조하였거나 대량의 위조된 증권을 사용한자는 1년이하의 로동단련형에 처한다. 대량의 유가증권을 위조하였거나 특히 대량의 위조증권을 사용한 경우에는 5년이하의 로동교화형에 처한다.

A person who counterfeits state securities or uses counterfeit securities shall be punished by labor for less than one year. In cases where the person counterfeits or uses a large amount of state securities, he or she shall be punished by reform through labor for less than five years.

제103조 (무현금결제수단의 비법발급, 결제, 사용죄) Article 103 (Illegal Issuance, Payment or Usage of a Noncash Method of Payment)

무현금결제수단을 비법적으로 발급하였거나 결제하여주었거나 사용하여 대량의 재산적손실을 준자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 특히 대량의 손실을 준 경우에는 5년이하의 로동교화형에 처한다.

A person who illegally issues, pays or uses a noncash method of payment shall be punished by short-term labor for less than one year. In cases where the foregoing act results in an extremely large loss, the punishment shall be reform through labor for less than five years.

제104조 (대부질서위반죄) Article 104 (Violation of the Loan Control)

은행일군이 비법적으로 현금을 대부하여준 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위로 특히 대량의 재산적손실을 준 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.

A bank employer or employee who illegally loans cash shall be punished by short-term reform through labor for less than one year. In cases where the person commits a large amount of financial damage due to the preceding act, he or she shall be punished by reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years.

제105조 (화폐질서위반죄) Article 105 (Violation of the Currency Control)

화폐교환질서를 어겨 국가에 재산적손실을 준자는 1년이하의 로동단련형에 처한다.

A person who commits financial damage to the Republic due to violating the currency exchange control shall be punished by reform through short-term labor for less than one year.

제106조 (화폐매매죄) Article 106 (Trading Foreign Currency)

리기적목적밑에 공화국은행에서 바꿀 수 있는 화폐를 매매한자는 1년이하의 로동단련형에 처한다.

A person who illegally exchanges currency that is exchangeable in a bank of the Republic for personal gain shall be punished by short-term labor for less than one year.

제107조 (외화관리질서위반죄) Article 107 (Violation of the Regulations for Foreign Currency Control)

외화관리질서를 어긴자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.

A person who violates the regulations for foreign currency control shall be punished by reform through short-term labor for less than one year. In cases where the act of foregoing paragraph is grave, he or she shall be punished by reform through labor for less than three years.

제108조 (외화사용질서위반죄) Article 108 (Violation of the Regulations For Currency Usage)

외화사용질서를 위반한자는 1년이하의 로동단련형에 처한다.

A person who violates the regulations for currency usage shall be punished by reform through labor for less than one year.

제109조 (탈세죄) Article 109 (Tax Evasion)

2009–외국투자기업과 외국인이 고의적으로 세금을 납부하지 않았거나 적게 납부한 경우에는 3년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 3년이상 5년이하의 로동교화형에 처한다.

2009–A foreign investment company or a foreigner that intentionally fails to pay taxes in whole or in part shall be punished by reform through labor for less than three years. In cases where the company or the person commits a grave offense, he or she shall be punished by reform through labor for more than three years and less than five years.

제110조 (국가납부질서위반죄) Article 110 (Violation of State Payment Regulations)

국가납부질서를 어긴자는 1년이하의 로동단련형에 처한다.

A person who violates the regulations to make payments to the state shall be punished by reform through short-term labor for less than one year.

제111조 (암거래죄) Article 111 (Illegal Trade)

개인이 암거래행위를 하여 대량의 리득을 얻은 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위로 특히 대량의 리득을 얻은 경우에는 2년이하의 로동교화형에 처한다.

A person who commits illegal trade and creates a large amount of profits shall be punished by reform through short-term labor for less than one year. In cases where the person gains extremely large profits due to the preceding act, he or she shall be punished through labor for less than two years.

제112조 (거관죄) Article 112 (Brokerage)

거간행위를 하여 대량의 리득을 얻은 자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 특히 대량의 리득을 얻은 경우에는 3년이하의 로동교화형에 처한다.

A person who gains large profits from brokering shall be punished by short-term labor for less than one year. In cases where the profits gained from the foregoing act are particularly large, the punishment shall be reform through labor for less than three years.

제113조 (고리대죄) Article 113 (Usury)

고리대행위를 상습적으로 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.

A person who engages in usury shall be punished by short-term labor for less than one year. In cases where the preceding act is a grave offense, the punishment shall be reform through labor for less than three years.

제114조 (비법적인 영업죄) Article 114 (Illegal Commercial Activity)

개인이 국가기관의 승인없이 영업활동을 하여 대량의 리득을 얻은 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A person who gains large profits by engaging illegally in commercial activities without a state organization's permission shall be punished by reform through short-term labor for less than one year. In cases where the preceding act is a grave offense, punishment shall be by reform through labor for less than two years.

제115조 (무역 또는 외화벌이기관, 단체의 상적행위죄) Article 115 (Unfair Commercial Activity of Institutions or Trade and Foreign Currency Earning Agency or Organization)

무역 또는 외화벌이기관, 단체의 관리일군이 다른 나라에서 들여온 물자를 가지고 비법적으로 상적행위를 한 경우에는 1년이하의 로동단련형에 처한다.

In cases where a person in charge of a trade or foreign currency earnings agency or organization illegally conducts unfair commercial activities with supplies imported from other countries, the punishment shall be short-term labor for less than one year.

제116조 (법인행세죄) Article 116 (Impersonation of Corporation)

법인으로 가장하여 경제거래를 하여 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.

A person who commits a grave offense by impersonating a corporation to conduct transactions shall be punished by short-term labor for less than one year.

제117조 (특허권, 상표권, 공업도안권, 원산지명권침해죄) Article 117 (Encroachment Upon Patent, Trademark, Industrial Design, or Country of Origin Markings)

특허권, 상표권, 공업도안권, 원산지명권을 침해한 자는 1년이하의 로동단련형에 처한다. 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A person who encroaches upon patent, trademark, industrial design or country of origin markings shall be punished by short-term labor for less than one year. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for less than two years.

제118조 (귀금속, 유색금속밀수, 밀매죄) Article 118 (Smuggling and Trafficking of Precious or Non-Ferrous Metals)

귀금속 또는 유색금속을 밀수, 밀매한 자는 1년이하의 로동단련형에 처한다. 대량의 귀금속 또는 유색금속을 밀수, 밀매한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다. 앞항의 행위가 정상이 특히 무거운 경우에는 10년이상의 로동교화형에 처한다.

A person who illegally smuggles or traffics precious or non-ferrous metals shall be punished by reform through short-term labor for less than one year.  In cases where a large quantity of precious or non-ferrous metals is smuggled or trafficked, the punishment shall be reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years. In cases where the foregoing act is particularly grave, the punishment shall be reform through labor for more than ten years.

제119조 (밀수죄) Article 119 (Smuggling)

밀수행위를 한 자는 1년이하의 로동단련형에 처한다. 대량 또는 여러번 혹은 국가가 통제하는 물건을 밀수하였거나 앞항의 행위를 해당 부문 공무원이 한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.

A person who smuggles goods shall be punished by reform through short-term labor for less than one year. A government official in the relevant sector who commits the aforementioned act or smuggles goods that are under state control or smuggles goods in large quantities or repeatedly shall be punished by reform through

labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years.

제120조 (수출입질서위반죄) Article 120 (Violation of the Regulations for Import and Export)

비법적으로 수출입행위를 조직하였거나 지시한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person in charge of an institution, corporate association or organization who violates the regulations for import and export shall be punished by short-term labor for less than one year. In cases where the preceding act is a grave offense, he or she shall be punished by reform through labor for less than three years

제121조 (대외경제활동질서위반죄) Article 121 (Violation of Foreign Economic Activities Regulations)

대외경제활동을 무책임하게 하여 재산적손실을 준자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who conducts foreign economic activities in an irresponsible manner that causes large financial damage shall be punished by reform through labor for less than one year. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for less than three years.

제122조 (비법적인 외화원천동원죄) Article 122 (Illegal Payment of Sources for Foreign Currency Earnings)

비법적으로 돈 또는 물건을 주고 외화원천동원을 한자는 1년이하의 로동단련형에 처한다. 국가가 통제하는 물건을 외화원천으로 동원한 경우에는 3년이하의 로동교화형에 처한다.
A person who illegally pays money or goods as sources for foreign currency earnings shall be punished by short-term labor for less than one year. In cases where goods under state control are paid as sources for foreign currency earnings, the punishment shall be reform through labor for less than three years.

제123조 (비법적인 작업 또는 수송죄) Article 123 (Illegally Performed Work or Transportation)

기관, 기업소, 단체의 기계설비와 운수수단을 리용하여 비법적으로 작업 또는 수송을 하여주고 특히 대량의 돈 또는 물건을 받은자는 1년이하의 로동단련형에 처한다.
A person who uses machinery and transportation of an institution, corporate association or organization to illegally perform work or transportation for another and receives a particularly large amount of money or goods shall be punished by short-term labor for less than one year.

제124조 (철도, 수상, 항공운수질서위반죄) Article 124 (Violation of the Railway, Marine or Air Transportation Regulations)

운수조직과 지휘를 무책임하게 하였거나 교통운수질서를 어겨 기차, 배, 비행기를 손상시켰거나 그 정상적 운행에 지장을 주었거나 사람을 죽게 중상해를 입게 하였거나 사람을 죽게 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 기차, 배, 비행기를 전복, 파괴시켰거나 여러명이 중상해를 입게 하였거나 여러명을 죽게 한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다. 1항의 행위가 정상이 특히 무거운 경우에는 10년이상의 로동교화형에 처한다.
A person who damages a train, a ship or an airplane, hinders its regular operation or causes death or serious injury by violating transportation regulations or giving irresponsible directions shall be punished by reform

through short-term labor for less than one year. In cases where the preceding act damages or destroys a train, ship, or an airplane, and causes multiple deaths or serious injuries to multiple persons, punishment shall be by reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years. In cases where the foregoing act of Paragraph 1 is particularly grave, the punishment shall be reform through labor for more than ten years.

제125조 (화차, 짐배리용질서위반죄) Article 125 (Violation of Freight Car and Cargo Regulations)

화차, 짐배의 리용질서를 어겨 화차, 짐배를 상당한 기간 지체시킨자는 1년이하의 로동단련형에 처한다.
A person who violates regulations for freight cars and cargoes, resulting in delaying freight cars and cargoes, shall be punished by reform through short-term labor for less than one year.

제126조 (운수수단운행방해죄) Article 126 (Interruption of Transportation Utilization Service)

운수수단의 운행을 방해하여 지체시킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who interrupts the transportation utilization service shall be punished by short-term labor for less than one year. In cases where the preceding act is a grave offense, punishment shall be reform through labor for less than three years.

제127조 (인민경제계획규률위반죄) Article 127 (Violation of the People's Economic Plan Regulations)

인민경제계획을 되는대로 세웠거나 계획을 고쳤거나 계획수행정형을 거짓보고하였거나 계획대로 집행하지 않아 인민경제의 계획적, 균형적발전에 지장을 준자는 1년이하의 로동단련형에 처한다.
A person who hinders or modifies the planned and balanced development of the people's economy by drawing up a plan for the people's economy in a haphazard manner shall be punished by short-term labor for less than one year.

제128조 (계약규률위반죄) Article 128 (Violation of Contractual Regulations)

계약규률을 어겨 인민경제계획수행에 지장을 준 자는 1년이하의 로동단련형에 처한다.
A person who hinders the execution of a plan for the people's economy by violating contractual regulations shall be punished by short-term labor for less than one year.

제129조 (국가예비물자의 공급, 보관, 리용질서위반죄) Article 129 (Violation of Supply, Storage and Use of State Reserve Supply Regulations)

국가예비물자의 공급, 보관, 리용질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who violates supply, storage and state reserve supply regulations shall be punished by short-term labor for less than one year. In cases where the preceding act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제130조 (마약, 독약, 폭발물의 보관, 공급질서위반죄) Article 130 (Violation of the Regulations for Storage and Supply of Drugs, Poisons, and Explosives)

마약이나 독약, 폭발물에 대한 보관 및 공급질서를 어긴자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.

A person who violates the regulations for storage and supply of drugs, poisons, and explosives shall be punished by short-term labor for less than one year. In cases where the act of the foregoing paragraph is a grave offense, the punishment shall be reform through labor for less than three years.

제131조(비법적인 경제관리죄) Article 131 (Illegal Management of Economy)

비법적으로 경제관리를 한자는 1년이하의 로동단련형에 처한다.

A person who engages in illegal economic management shall be punished by short-term labor for less than one year.

제132조 (국가재산을 개인에게 비법적으로 꾸어준 죄) Article 132 (Illegal lending of State Property to an Individual)

화폐를 비롯한 국가 및 사회협동단체의 재산을 개인에게 비법적으로 꾸어준자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.

A person who illegally lends to an individual the property of the state or a social cooperative organization, including currency, shall be punished by short-term labor for less than one year. In cases where the preceding act is a grave offense, he or she shall be punished by reform through labor for less than five years.

제133조 (원료, 자재, 자금, 설비의 류용, 랑비, 사장죄) Article 133 (Misappropriating, Squandering or Hoarding of Raw and Other Materials, Funds and Equipment)

원료, 자재, 자금 또는 설비를 류용, 랑비하였거나 경제관리운영에 지장을 주었거나 국가 및 사회협동단체에 재산적 손실을 준자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A person who hinders the normal management of the economy or causes the loss of state property or the property of a social cooperative organization by misappropriating raw and other materials, funds or equipment shall be punished by short-term labor for less than one year. In cases where the preceding act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제134조 (국가재산의 부패변질, 류실죄) Article 134 (Spoilage and Loss of State Property)

국가 및 사회협동단체의 재산을 무책임하게 보관관리하여 대량의 재산을 부패변질, 류실시킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 특히 대량의 국가 및 사회협동단체 재산을 부패변질, 류실시킨 경우에는 2년이하의 로동교화형에 처한다.

A person who causes a large quantity of the property of the state or of a social cooperative organization to be spoiled or lost by managing such property in an irresponsible manner shall be punished by short-term labor for less than one year. In cases where the foregoing act causes a particularly large quantity of the property of the state or a social cooperative organization to be spoiled or lost, the punishment shall be reform through labor for less than two years.

제135조 (설비, 물자, 자재, 자금의 비법처분죄) Article 135 (Illegal Disposal of Equipment, Supplies, Materials, and Funds)

기관, 기업소, 단체사이에 비법적으로 설비, 물자, 자재, 자금을 주었거나 받았거나 바꾸었거나 팔고산 경우에는 1년이하의 로동단련형에 처한다.

A person who illegally trades equipment, supplies, materials, or funds with an institution, corporate association, or an organization shall be punished by short-term labor for less than one year.

제136조 (재산을 략취하여 기관에 넘겨준죄) Article 136 (Plundering and Transferring Property)

재산을 략취하여 자기 기관, 기업소, 단체에서 썼거나 다른 기관, 기업소, 단체에 넘겨준 자는 1년이하의 로동단련형에 처한다.

A person who plunders property and uses said property in his or her institution, corporate association or organization, or transfers said property to another institution, corporate association or organization, shall be punished by short-term labor for less than one year.

제137조 (오작품, 불합격품생산죄) Article 137 (Production of Sub-standard or Rejected Goods)

기술규정, 표준조작법, 규격, 공정검사에 관한 질서를 어겨 대량의 오작품, 불합격품을 생산하였거나 생산되게 한자는 1년이하의 로동단련형에 처한다.

A person who fails to meet technical regulations, standard operating regulations or specifications and produces or directs the production of a large quantity of sub-standard or rejected goods shall be punished by short-term labor for less than one year.

제138조 (품질감독질서위반죄) Article 138 (Violation of Quality Control Regulations)

품질감독질서를 어긴자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

2012; A person who violates the regulations for quality control shall be punished by short-term labor for less than one year. In cases where the preceding act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제139조 (생산수단수리질서위반죄) Article 139 (Violation of Production and Repair Regulations)

생산수단수리규정을 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.

A person who violates regulations for production and repair shall be punished by reform through labor for less than one year.

제140조 (설비점검, 보수질서위반죄) Article 140 (Violation of Inspection and Repair Equipment Regulations)

설비점검, 보수질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.

A person whose failure to conduct organized enterprises in accordance with the regulations for inspection and repair of equipment leads to equipment damage or production stoppages shall be punished by short-term

labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제141조 (오작설계, 오작시공죄) Article 141 (Sub-standard Design and Faulty Construction)

오작설계를 하였거나 오작시공하여 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who makes a sub-standard design for construction or constructs without a blueprint, causing serious injury or great loss, shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제142조 (국가건물리용질서위반죄) Article 142 (Violation of State Building Usage Regulations)

국가건물리용질서를 어긴자는 1년이하의 로동단련형에 처한다.
A person who violates regulations for using state buildings shall be punished by reform through short-term labor for less than one year.

제143조 (준공검사 및 리용허가질서위반죄) Article 143 (Irresponsible Inspection of Construction and Approval for Use)

건설물의 준공검사와 기계, 설비의 리용허가질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who commits a grave offense by violating the regulations of inspecting a building, machinery, or equipment shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제144조 (준공검사 및 사용허가를 받지 않고 건설물 또는 기계, 설비를 리용하게 한 죄) Article 144 (Usage without Inspection of Construction and Approval for Usage of a Building, Equipment, and Facilities)

준공검사와 사용허가를 받지 않고 건설물 또는 기계, 설비를 리용하게 하여 엄중한 결과를일으킨 자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who makes a sub-standard design for construction or constructs without a blueprint or without proper reference to it, causing serious great loss, shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제145조 (실리가 없는 시설건설, 기계설비제작죄) Article 145 (Unprofitable Construction of a Building, Equipment, or Facilities)

경제적으로 실리가 없거나 매우 적다는 것을 알면서 시설을 건설하였거나 기계설비를 제작하여 특히 대량의 자재와 자금, 로력을 랑비한자는 1년이하의 로동단련형에 처한다.
A person who constructs a facility or manufactures machinery knowing that there are no or very few economic benefits, thereby squandering a large amount of materials, funds or labor, shall be punished by short-term labor for less than one year.

제146조 (국가살림집리용질서위반죄) Article 146 (Violation of State-Owned Dwelling Place Regulations)

국가살림집리용질서를 어긴자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.

A person who violates regulations for state-owned dwelling places shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제147조 (농업생산질서위반죄) Article 147 (Violation of Agricultural Production Regulations)

농업생산질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.

A person who violates the regulations for agricultural production shall be punished by reform through short-term labor for less than one year.

제148조 (수의방역 및 사양관리질서위반죄) Article 148 (Violation of Veterinary Control and Breeding Regulations)

수의방역 또는 사양관리질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.

A person who violates the regulations for veterinary control or breeding, causing great loss, shall be punished by reform through short-term labor for less than one year.

제149조 (양어사업질서위반죄) Article 149 (Violation of Pisciculture Business Regulations)

양어사업질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.

A person who violates the regulations for the maintenance of fish farms shall be punished by reform through short-term labor for less than one year.

제150조 (천해양식질서위반죄) Article 150 (Violation of Mariculture Regulations)

천해양식질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.

A person who violates the regulations for mariculture, causing great loss, shall be punished by reform through short-term labor for less than one year.

제151조 (상품공급질서위반죄) Article 151 (Violation of Product Supply Regulations)

상품을 제때에 인수하지 않았거나 상품공급질서를 어겨 인민생활에 커다란 불편을 준자는 1년이하의 로동단련형에 처한다.

A person who does not receive a product in a timely manner or violates the regulations for product supply, resulting in great inconvenience to the people's lives, shall be punished by short-term labor for less than one year.

제152조 (상품판매질서위반죄) Article 152 (Violation of Product Sale Regulations)

상품판매질서를 어긴자는 1년이하의 로동단련형에 처한다.

A person who violates regulations for product sale shall be punished by reform through short-term labor for less than one year.

제153조 (량정질서위반죄) Article 153 (Violation of Crop Policy Regulations)

량정질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.
A person who violates regulations for crop policy shall be punished by reform through short-term labor for less than one year.

제154조 (밀주죄) Article 154 (Illegal Production)

장사 또는 물물교환의 목적으로 밀주행위를 한자는 1년이하의 로동단련형에 처한다.
A person who commits illegal production for sale or trade shall be punished by reform through short-term labor for less than one year.

제155조 (계량기구량목위반죄) Article 155 (Violation of Measuring Instruments Regulations)

계량기구의 눈금과 량을 비법적으로 고친자 또는 계량기구의 눈금과 량이 틀린다는것을 알면서 사용한자는 1년이하의 로동단련형에 처한다.
A person who illegally changes the scale and standard of measuring instruments or uses them knowing that their scale and standard are incorrect shall be punished by short-term labor for less than one year.

제156조 (전력공급질서위반죄) Article 156 (Violation of Production and Supply of Electricity Regulations)

전력공급질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.
A person who violates the regulations for production and supply of electricity, resulting in serious consequences, shall be punished by short-term labor for less than one year.

제157조 (전력사용질서위반죄) Article 157 (Violation of Use of Electricity Regulations)

전력사용질서를 어겨 대량의 전력을 랑비한자는 1년이하의 로동단련형에 처한다.
A person who violates the regulations for electricity use, thereby squandering a large amount of electric power shall be punished by short-term labor for less than one year.

제158조 (체신사업질서위반죄) Article 158 (Violation of Communications and Broadcasting Services Regulations)

체신사업질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.
A person who violates regulations for communications and broadcasting services, resulting in serious consequences, shall be punished by reform through labor for less than one year.

제159조 (해사감독질서위반죄) Article 159 (Violation of the Maritime Affairs Supervision Regulations)

배설계의 심의, 배의 등록과 검사, 선원의 등록과 기술자격심사를 무책임하게 하여 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.

A person who violates the regulations for maritime affairs supervision and irresponsibly conducts ship design review, ship registration and inspection, sailor registration or technical certification examination shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제160조 (해난구조의무기피죄) Article 160 (Evasion of Responsibility to Rescue)

해난구조를 의뢰받은자가 위험에 처한 사람, 배, 짐을 구조하지 않아 엄중한 결과를 일으킨 경우에는 1년이하의 로동단련형에 처한다. 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who is required to conduct rescue operations but does not rescue an endangered person, vessel or load, resulting in serious consequences, shall be punished by short-term labor for less than one year. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for less than three years.

제161조 (가격제정질서위반죄) Article 161 (Violation of Price Setting Regulations)

가격제정질서를 어긴자는 1년이하의 로동단련형에 처한다.
A person who violates the regulations for price setting shall be punished by short-term labor for less than one year.

제162조 (난방열도용죄) Article 162 (Stealing Heat)

비법적으로 난방열을 도용하여 난방열공급에 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.
A person who illegally uses heat, resulting in serious consequences in heat supply, shall be punished by reform through labor for less than one year.

제163조 (주민연료공급질서위반죄) Article 163 (Violation of Resident Fuel Supply Regulations)

주민연료확보사업을 무책임하게 하였거나 공급질서를 어겨 인민생활에 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.
A person who fails to responsibly secure residential fuel or violates the regulations for its supply, resulting in serious consequences, shall be punished by short-term labor for less than one year.

제3절 국토관리 및 환경보호질서를 침해한 범죄 **SECTION 3. CRIMINAL VIOLATIONS OF THE REGULATIONS FOR LAND ADMINISTRATION AND ENVIRONMENTAL PROTECTION**

제164조 (토지리용질서위반죄) Article 164 (Violation of Land Use Regulations)

토지리용질서를 어긴자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who violates regulations for land use shall be punished by reform through labor for less than one year. In cases where the foregoing act is a grave offense, punishment shall be reform through labor for less than three years.

제165조 (토지보호질서위반죄) Article 165 (Violation of Land Protection Regulations)

토지보호질서를 어겨 토지를 류실시킨자는 1년이하의 로동단련형에 처한다.
A person who violates regulations for land protection, causing land to be washed away, shall be punished by reform through short-term labor for less than one year.

제166조 (지하자원개발, 채굴 및 제련질서위반죄) Article 166 (Violation of Subterranean Resources Development, Mining, and Smelting Regulations)

지하자원의 개발, 채굴 및 제련질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.
A person who violates regulations for subterranean resources development, mining, or smelting, resulting in serious consequences, shall be punished by reform through short-term labor for less than one year.

제167조 (개인의 광석채취, 제련죄) Article 167 (Individual Collection and Smelting of Ores)

개인이 광석을 채취, 제련한 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who individually collects or smelts ores shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제168조 (산림조성, 보호, 리용질서위반죄) Article 168 (Violation of Regulations for Creation, Protection and Use of Forests Regulations)

산림조성, 보호, 리용질서를 어겨 산림자원에 대량의 재산적손실을 준자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who violates the regulations for creation, protection or use of forests, resulting in great damage to forestry resources, shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제169조 (산림람도벌죄) Article 169 (Abusive and Illegal Felling of Forest Trees)

개인이 산림을 람도벌한 경우에는 1년이하의 로동단련형에 처한다. 대량 또는 주요대상지의 산림을 람도벌한 경우에는 2년이하의 로동교화형에 처한다.
A person who fells trees in a forest abusively or illegally shall be punished by short-term labor for less than one year. In cases where a large number of trees are felled or trees of designated important forests are felled, the punishment shall be reform through labor for less than two years.

제170조 (과실적산불죄) Article 170 (Forest Fire Caused by Negligence)

과실로 산불을 일으켜 산림자원에 손실을 준자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who causes a large loss to forest resources by beginning a forest fire through negligence shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제171조 (비법적인 산개간죄) Article 171 (Illegal Clearing of Forest)

비법적으로 산을 개간한자는 1년이하의 로동단련형에 처한다.
A person who illegally clears a forest shall be punished by short-term labor for less than one year.

제172조 (수산 및 동식물자원보호질서위반죄) Article 172 (Violation of Marine, Animal, and Plant Resources Protection and Maintenance Regulations)

허가없이 또는 금지된 시기와 장소 혹은 금지된 수단과 방법으로 물고기와 리로운 동식물을 잡았거나 채취한 자는 1년이하의 로동단련형에 처한다.
A person who catches or collects fish and useful animals or plants without permission, during the closed season, in a prohibited area, or by banned means and methods, shall be punished by short-term labor for less than one year.

제173조 (환경보호질서위반죄) Article 173 (Violation of Environmental Protection Regulations)

환경보호질서를 어겨 대기, 물, 토양을 오염시킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who violates regulations for environmental protection and contaminates the air, water or soil to create pollution shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제174조 (하천보호질서위반죄) Article 174 (Violation of River Protection Regulations)

하천보호질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.
A person who violates the regulations for river protection, resulting in a risk of serious consequences, shall be punished by short-term labor for less than one year.

제175조 (도로관리질서위반죄) Article 175 (Violation of Road Maintenance Regulations)

도로를 정상적으로 수리, 정비, 보수하지 않아 운수수단의 운행에 지장을 준자는 1년이하의 로동단련형에 처한다.
A person who fails to duly repair or maintain roads, thereby hindering transportation service, shall be punished by short-term labor for less than one year.

제4절 로동행정질서를 침해한 범죄 **SECTION 4. CRIMINAL VIOLATIONS OF THE REGULATIONS FOR LABOR ADMINISTRATION**

제176조 (로동보호 및 로동안전시설을 갖추지 않은 죄) Article 176 (Failure to Provide Labor Protection and Labor Safety Facilities)

로동보호 및 로동안전시설을 갖추어주지 않고 로동을 시켜 사람이 중상해를 입게 하였거나사람을 죽게 하였거나 대량의 재산적손실을 가져오게 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 여러명이 중상해를 입게 하였거나 여러명을 죽게 하였거나 특히 대량의 재산적 손실을 가져오게 한 경우에는 5년이하의 로동교화형에 처한다.

A person who directs workers to work without providing labor protection and labor safety facilities, thereby causing serious injury, serious accidents, or financial damage, shall be punished by short-term labor for less than one year. In cases where the foregoing act causes multiple deaths or serious injuries to multiple persons, the punishment shall be reform through labor for less than five years.

제177조 (로동안전질서위반죄) Article 177 (Violation of Labor Safety Regulations)

로동안전질서를 어겨 사람이 중상해를 입게 하였거나 사람을 죽게 하였거나 대량의 재산적손실을 가져오게 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 여러명이 중상해를 입게 하였거나 여러명을 죽게 하였거나 특히 대량의 재산적손실을 가져오게 한 경우에는 5년이하의 로동교화형에 처한다.
A person who violates the regulations for labor safety, thereby causing serious injury, accidents, or financial damage, shall be punished by short-term labor for less than one year. In cases where the foregoing act causes multiple deaths, serious injuries to multiple persons, or extreme financial damage, the punishment shall be reform through labor for less than five years.

제178조 (화재방지규정위반죄) Article 178 (Violation of Fire Prevention Regulations)

화재방지대책을 세우지 않아 화재, 폭발 같은 엄중한 사고를 일으켜 사람이 중상해를 입게하였거나 사람을 죽게 하였거나 대량의 재산적손실을 가져오게 한자는 1년 이하의 로동단련형에 처한다. 앞항의 행위로 사람을 죽게 하였거나 여러명을 죽게 하였거나 특히 대량의 재산적손실을 가져오게 한 경우에는 5년이하의 로동교화형에 처한다.
A person who fails to take measures to prevent fire or explosions, resulting in serious accidents, death, or property loss, shall be punished by short-term labor for less than one year. In cases where the foregoing act causes death, injuries to multiple persons, or a particularly large property loss, the punishment shall be reform through labor for less than five years.

제179조 (교통사고죄) Article 179 (Traffic Accidents)

자동차와 같은 륜전기재를 운전하는 자가 통행질서를 어겨 사람에게 중상해를 입게 하였거나 사람을 죽게 하였거나 대량의 재산적손실을 가져오게 한 경우에는 1년이하의 로동단련형에 처한다. 앞항의 여러명이 중상해를 입게 하였거나 여러명을 죽게 하였거나 특히 대량의 재산적손실을 가져오게 하였거나 사고를 내고 도주한 경우에는 5년이하의 로동교화형에 처한다.
A driver of a wheeled vehicle such as a car, who violates traffic safety regulations, thereby causing serious injury, accidents, or property loss, shall be punished by short-term labor for less than one year.  In cases where the foregoing act causes deaths, injuries to multiple persons, extreme property loss, or where the persons escapes, the punishment shall be reform through labor for less than five years.

제180조 (사회주의분배질서위반죄) Article 180 (Violation of Socialist Distribution Regulations)

로동의 량과 질에 대한 평가를 고의적으로 그릇되게 하여 분배, 생활비, 상금을 부당하게 적용한 자는 1년이하의 로동단련형에 처한다.
A person who deliberately makes an inaccurate assessment of the quantity and quality of labor and makes an unjust distribution of profits, living expenses, or prize money shall be punished by short-term labor for less than one year.

제181조 (미성인에게 로동을 시킨 죄) Article 181 (Assigning Work to Minors)

로동할 나이에 이르지 못한 미성인에게 로동을 시킨자는 1년이하의 로동단련형에 처한다.
A person who assigns work to a minor under the working age shall be punished by short-term labor for less than one year.

제182조 (녀성에게 금지된 로동을 시킨 죄) Article 182 (Assigning Prohibited Work to Women)

녀성에게 법적으로 금지된 로동을 시킨 자는 1년이하의 로동단련형에 처한다.
A person who makes women do the kinds of work prohibited by law shall be punished by short-term labor for less than one year.

### 제6장 사회주의문화를 침해한 범죄 CHAPTER 6 CRIMES OF IMPAIRING SOCIALIST CULTURE

제183조 (퇴폐적인 문화반입, 류포죄) Article 183 (Importation and Distribution of Decadent Culture)

퇴폐적이고 색정적이며 추잡한 내용을 반영한 그림, 사진, 도서, 록화물과 전자매체 같은것을 허가없이 다른 나라에서 들여왔거나 만들었거나 류포하였거나 비법적으로 보관하고 있는자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.
A person who, without authorization, imports, makes, distributes or illegally keeps drawings, photos, books, video recordings or electronic media that reflect decadent, carnal or foul contents shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than five years.

제184조 (퇴폐적인 행위를 한 죄) Article 184 (Conduct of Decadent Acts)

퇴폐적이고 색정적이며 추잡한 내용을 반영한 그림, 사진, 도서, 록화물과 전자매체 같은것을 보았거나 들었거나 그러한 행위를 한자는. 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who watches or listens to drawings, photos, books, video recordings or electronic media that reflects decadent, carnal or foul contents or who performs such acts himself or herself shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제185조 (적대방송청취, 적자물수집, 보관, 류포죄) Article 185 (Listening to Hostile Broadcasting and Collecting, Keeping or Distributing Enemy Propaganda)

반국가목적이 없이 적들의 방송을 들었거나 적자물을 수집, 보관하였거나 류포한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.
A person who, without anti-state motives, listens to an enemy's broadcasting or collects, keeps or distributes enemy propaganda, shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than five years.

제186조 (력사유적, 유물, 명승지, 천연기념물고의적파손죄) Article 186 (Intentional Damaging of Historic Sites, Relics, Scenic Spots or Natural Monuments)

국가가 보존관리하는 력사유적과 유물, 명승지, 천연기념물을 고의적으로 파손시킨자는 1년이하의 로동단련형에 처한다.
A person who intentionally damages historic sites, relics, or natural monuments that are preserved and managed by the state shall be punished by short-term labor for less than one year.

제187조 (력사유적, 유물, 명승지, 천연기념물파손죄) Article 187 (Damaging of Historic Sites, Relics, Scenic Spots or Natural Monuments)

국가가 보존관리하는 력사유적과 유물, 천연기념물을 과실로 파손시킨자는 1년이하의 로동단련형에 처한다.
A person who damages historic sites, relics, or natural monuments that are preserved and managed by the state shall be punished by short-term labor for less than one year.

제188조 (력사유적도굴죄) Article 188 (Robbing of Historic Sites)

력사유적을 도굴한자는 1년이하의 로동교화형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.
A person who robs an historic site shall be punished by reform through labor for less than five years. In cases where the foregoing act is a grave offense, the punishment shall be reform through labor for less than five years.

제189조 (력사유물밀수, 밀매죄) Article 189 (Smuggling and Illegal Trafficking of Historic Relics)

력사유물을 밀수, 밀매한자는 1년이하의 로동교화형에 처한다. 국보력사유물을 밀수, 밀매하였거나 준국보력사유물을 여러 번 밀수, 밀매한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.
A person who illegally smuggles or traffics an historic relic shall be punished by reform through labor for less than one year. In cases where state historic relics are smuggled or illegally sold, or where the offense is committed repeatedly or in collusion, the punishment shall be reform through labor for less than five years. In cases where the foregoing act is a grave offense, punishment shall be more than five years and less than ten years.

제190조 (저작, 발명, 창의고안묵살죄) Article 190 (Disregard of Writings, Inventions or Technical Innovations)

탐욕, 질투 그밖의 비렬한 동기밑에 저작, 발명, 창의고안을 그릇되게 평가하여 묵살시킨 자는 1년이하의 로동단련형에 처한다.
A person who makes an incorrect assessment of writings, inventions or technical innovations and ignores them out of greed, jealousy or other pernicious motives shall be punished by short-term labor for less than one year.

제191조 (저작, 발명, 창의고안도용죄) Article 191 (Theft of Writings, Inventions or Technical Innovations)

리기적목적에서 다른 사람의 저작, 발명, 창의고안을 자기 이름으로 발표한 자는 1년이하의 로동단련형에 처한다.

A person who publishes another person's writings, inventions or technical innovations under his or her own name for personal gain shall be punished by short-term labor for less than one year.

제192조 (콤퓨터망침입죄) Article 192 (Breaking into a Computer Network)

국가관리, 국방건설, 첨단과학기술분야의 콤퓨터망에 침입한자는 1년이하의 로동교화형에 처한다.
A person who breaks into a computer network of state maintenance, national defense construction or the technology and science sector shall be punished by reform through labor for less than one year.

제193조 (정보파손죄) Article 193 (Damaging Information)

콤퓨터 같은 정보처리장치에 보존된 중요정보를 파손시킨 자는 1년이하의 로동교화형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who damages important information stored in an information-processing device such as a computer shall be punished by reform through labor for less than one year. In cases where the foregoing act is a grave offense, punishment shall be reform through labor for less than two years.

제194조 (허위정보입력, 류포죄) Article 194 (Input and Distribution of False Information)

탐욕, 질투 그밖의 비렬한 동기에서 콤퓨터망에 허위정보를 입력시켰거나 류포시켜 정보처리에 혼란을 조성한 자는 1년이하의 로동교화형에 처한다.
A person who inputs or distributes false information into a computer network out of greed, jealousy or other pernicious motives, thereby causing confusion in information processing, shall be punished by reform through labor for less than one year.

제195조 (후비양성질서위반죄) Article 195 (Unjust Execution of Next Generation Cultivation Affairs)

학교추천과 입학, 실력평가와 배치사업을 부당하게 한 자는 1년이하의 로동단련형에 처한다.
A person who unjustly executes recommendations for school, school admission, skills evaluation or school placement shall be punished by short-term labor for less than one year.

제196조 (체육선수선발질서위반죄) Article 196 (Unjust Selection of Athletes)

중요체육경기에 출전한 선수선발을 바로하지 못하여 엄중한 결과를 일으킨 자는 1년이하의 로동단련형에 처한다.
A person who does not rightly select athletes for important competitions, resulting in serious consequences, shall be punished by short-term labor for less than one year.

제197조 (어린이보호, 관리질서위반죄) Article 197 (Violation of Child Protection and Care Regulations)

탁아소, 유치원일군이 어린이보호, 관리질서를 어겨 어린이가 중상해를 입게 하였거나 어린이를 죽게 한 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A worker serving at a nursery or a kindergarten who violates the regulations for child protection and care, thereby severely injuring or killing a child, shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제198조 (의료사고죄) Article 198 (Medical Accident)

의료일군이 치료와 간호를 불성실하게 하였거나 잘못하여 환자가 중병에 걸리게 하였거나 중상해를 입게
하였거나 죽게 한 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의
로동교화형에 처한다.
A medical worker, who irresponsibly treats and nurses a patient, thereby causing death or harm to the patient,
shall be punished by reform through short-term labor for less than one year. In cases where the foregoing act
is a grave offense, punishment shall be reform through labor for less than three years.

제199조 (치료거부죄) Article 199 (Refusal to Treat a Patient)

의료일군이 특별한 리유없이 왕진과 치료를 거부하여 환자를 죽게 한 경우에는 1년이하의 로동교화형에 처한다.
A medical worker who, without a special reason, refuses to visit a patient or to treat him or her, thereby causing
the patient to die, shall be punished by reform through labor for less than one year.

제200조 (비법의료죄) Article 200 (Illegal Medical Service)

의료일군이 아닌자 또는 의료일군이라 하더라도 의무활동외에 리기적목적으로 의료행위를 하여 환자가 중병에
걸리게 하였거나 중상해를 입게 하였거나 죽게 한 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가
정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.
In cases where a person who is not a medical worker, or a person who, albeit being a medical worker, does
harm to a person's health by giving him medical treatment for personal gain, that person shall be punished
by reform through short-term labor for less than one year. In cases where the foregoing act results in serious
consequences, the punishment shall be reform through labor for less than five years.

제201조 (불량의약품생산죄) Article 201 (Production of Defective Medicine and Medical Instruments)

의약품제조를 잘못하였거나 의약품검사를 무책임하게 하여 환자가 중병에 걸리게 하였거나 환자를 죽게 한자는 1
년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who produces defective medicine or medical instruments, or irresponsibly inspects medicine or
medical instruments, thereby causing death or harm to a patient's health, shall be punished by short-term
labor for less than one year. In cases where the foregoing act is a grave offense, the punishment shall be reform
through labor for less than three years.

제202조 (가짜의약품, 식료품제조, 판매죄) Article 202 (Production of Defective Medicine and Food Products)

사람의 생명, 건강에 해로운 가짜의약품, 식료품이라는것을 알면서 만들어 판자는 1년이하의 로동단련형에 처한다.
앞항의 행위로 사람이 중병에 걸리게 하였거나 장애자로 되게 하였거나 사람을 죽게 하였거나 대량의 가짜의약품,
식료품을 제조, 판매한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의
로동교화형에 처한다.
A person who produces and sells defective medicine or food products shall be punished by reform through
short-term labor for less than one year. In cases where the foregoing act causes death or harm to a patient's
health, or in cases where the person produces a large amount of defective medicine or food products, shall be
punishable by reform through labor for less than five years. In cases where the offense is grave, punishment
shall be reform through labor for more than five years and less than ten years.

제203조 (위생방역사업태만죄) Article 203 (Negligence of Disease Control)

위생방역사업을 무책임하게 하여 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
In cases where disease control measures are executed irresponsibly, resulting in serious consequences, he or she shall be punished by reform through short-term labor for less than one year. In cases where the foregoing act is a grave offense, punishment shall be reform through labor for less than three years.

제204조 (국경검역사업태만죄) Article 204 (Irresponsible Border Quarantine)

국경을 통과하는 인원과 물품, 동식물검역을 무책임하게 하여 전염병 또는 병해충이 들어오게 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who irresponsibly executes the quarantine of persons, goods, flora or fauna, resulting in the spread of an epidemic or harmful insects, shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제205조 (사람의 장기, 태아, 혈액의 취득, 매매, 리용죄) Article 205 (Acquisition, Sales and Use of Human Organs, Fetus and Blood)

병치료 또는 리기적목적으로 사람의 장기, 태아, 혈액 같은것을 취득한자는 1년이하의 로동교화형에 처한다. 병치료를 목적으로 사람의 장기, 태아, 혈액 같은 것을 매매, 리용한 경우에는 5년 이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.
A person who acquires a human organ, a fetus or blood to treat illness or for personal gain, shall be punished by reform through short-term labor for less than one year. In cases where the person uses a human organ, a fetus or blood to treat illness, he or she shall be punished by reform through labor for less than five years. In cases where the person commits a grave offense, punishment shall be reform through labor for more than five years and less than ten years.

제206조 (비법아편재배, 마약, 독성물질제조죄) Article 206 (Illegal Cultivation of Opium, Drugs, and Manufacturing of Poisonous Substances)

비법적으로 아편을 재배하였거나 마약, 독성물질을 제조한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.
A person who grows opium poppies or manufactures drugs and poisonous substances illegally shall be punished by reform through labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than five years.

제207조 (비법마약사용죄) Article 207 (Illegal Use of Drugs)

비법적으로 마약을 사용한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.
A person who uses drugs illegally shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than five years.

제208조 (마약밀수, 밀매죄) Article 208 (Smuggling and Illegal Trafficking of Drugs)

마약을 밀수, 밀매한 자는 1년이하의 로동단련형에 처한다. 대량의 마약을 밀수 밀매한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다. 특히 대량의 마약을 밀수, 밀매한 경우에는 10년이상의 로동교화형에 처한다. 제3항의 행위가 정상이 특히 무거운 경우에는 무기로동교화형 또는 사형에 처한다.

A person who smuggles or traffics drugs illegally shall be punished by reform through short-term labor for less than one year.  In cases where the person smuggles or traffics a large quantity of drugs, the punishment shall be reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years. In cases where the person smuggles or traffics an extreme quantity of drugs, he or she shall be punished by reform through labor for more than ten years. In cases where the foregoing act is particularly grave, the punishment shall be a life term of reform through labor or the death penalty.

### 제7장   일반행정관리질서를 침해한 범죄 **CHAPTER 7 CRIMINAL VIOLATIONS OF THE REGULATIONS FOR GENERAL ADMINISTRATION AND MAINTENANCE**

제1절  일반행정관리질서를  침해한  범죄  **SECTION 1. CRIMINAL VIOLATIONS OF THE REGULATIONS FOR GENERAL ADMINISTRATION**

제209조 (집단적소동죄) Article 209 (Collective Disturbance)

국가기관의 지시에 응하지 않고 집단적으로 소동을 일으킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위를 무기 또는 흉기를 리용하여 하였거나 사람에게 중상해를 입혔거나 사람을 죽게 하였거나 대량의 재산을 파괴한 것 같은 경우에는 5년이하의 로동교화형에 처한다. 제2항의 행위를 한 주동분자는 5년이상 10년이하의 로동교화형에 처한다.

A person who, as part of a group, fails to comply with the instructions of a state agency shall be punished by reform through labor for less than one year. A person who commits the foregoing act with the use of weapons or who causes death, serious injuries, destruction or other grave consequences through the aforementioned act, shall be punished by reform through labor for less than five years. The mastermind and the principal culprits of the aforementioned act shall be punished by reform through labor for more than five years and less than ten years.

제210조 (직무집행방해죄) Article 210 (Interference with the Execution of Duty)

폭행, 협박, 모욕의 방법으로 관리일군의 직무집행을 방해한 자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 해당 부문의 사업에 혼란을 준 경우에는 3년이하의 로동교화형에 처한다.

A person who interferes with the execution of the duty of a management worker by assaults, threats, or insults shall be punished by short-term labor for less than one year. In cases where the foregoing act causes disturbance to the affairs of the relevant sector, the punishment shall be reform through labor for less than three years.

제211조 (허위풍설날조, 류포죄) Article 211 (Fabrication and Distribution of a False Rumor)

국가에 대한 불신을 조성할 수 있는 허위풍설을 꾸며냈거나 류포시켜 사회적혼란을 준자는 1년이하의 로동단련형에 처한다

A person who concocts a false rumor that may lead to distrust of the state and cause social disruption shall be punished by short-term labor for less than one year.

제212조 (공인비법사용, 위조죄) Article 212 (Illegal Use and Fabrication of Official Seals and Government Seals)

공인을 비법적으로 사용하였거나 위조하였거나 위조한것인줄 알면서 사용한자는 1년이하의 로동단련형에 처한다.

A person who makes an illegal use of an official seal or a government seal, fabricates such a thing, or uses a fabricated seal knowing that it is a fabrication shall be punished by short-term labor for less than one year.

제213조 (문서, 증명서의 비법처분, 위조, 사용죄) Article 213 (Illegal Disposal, Forging or Illegal Use of Documents and Certificates)

리기적목적 또는 비렬한 동기에서 문서, 증명서를 감추었거나 처분하였거나 위조하였거나 위조한것인줄 알면서 사용한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A person who conceals, disposes of, or forges documents or other certificates, or passes on their counterfeits knowing that they are counterfeits, for personal gain or with pernicious motives, shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제214조 (출판질서위반죄) Article 214 (Violation of Publication Regulations)

출판질서를 어기고 출판물을 인쇄, 발행, 보급하였거나 타자, 복사하였거나 전자매체의 제작, 보급질서를 어겨 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.

A person who, in violation of the regulations for publication, prints, publishes or distributes publications, types or copies them, or violates the regulations for production and distribution of electronic media, thereby causing serious consequences, shall be punished by short-term labor for less than one year.

제215조 (폭발물비법제조, 휴대, 사용, 양도죄) Article 215 (Illegal Production, Carrying, Use or Supply of Explosives)

폭발물을 비법적으로 만들었거나 가지고있었거나 사용하였거나 다른 사람에게 넘겨준 자는 1년이하의 로동단련형에 처한다. 대량의 폭발물을 비법적으로 만들었거나 가지고있었거나 사용하였거나 다른사람에게 넘겨주었거나 사람이 중상해를 입게 하였거나 사람을 죽게 한 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.

A person who illegally makes, possesses or uses explosives, or who supplies them to others, shall be punished by short-term labor for less than one year. In cases where the foregoing act causes death, serious injuries or a large amount of damage, the punishment shall be reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years.

제216조 (위험성물질수송위반죄) Article 216 (Violation of Regulations for Transportation of Radioactive, Explosive or Inflammable Materials)

방사성, 폭발성, 인화성, 독성물질수송질서를 어기고 그것을 운반하였거나 부쳤거나 부쳐준자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 사람이 중상해를 입게 하였거나 사람을 죽게 하였거나 대량의 재산적손실을 일으키게 한 경우에는 5년이하의 로동교화형에 처한다. 제1항의 행위로 여러명이 중상해를 입게 하였거나 여러명을 죽게 하였거나 특히 대량의 재산적 손실을 일으키게 한 경우에는 5년이상 10년이하의 로동교화형에 처한다.

A person who violates the regulations for the transportation of radioactive, explosive, inflammable, or poisonous materials and carries, delivers or helps to deliver them, shall be punished by short-term labor for less than one year. In cases where the foregoing act causes death, serious injuries or a large amount of damage, the punishment shall be reform through labor for less than five years. In cases where the foregoing act causes multiple deaths, serious injuries to multiple persons or a particularly large amount of damage, the punishment shall be reform through labor for more than five years and less than ten years.

제217조 (경비근무질서위반죄) Article 217 (Violation of the Regulations for Guard Duty)

경비근무질서를 어겨 경비대상물에 피해를 준자는 1년이하의 로동교화형에 처한다. 앞항의행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who violates the regulations for guard duty thus damaging the guarded object shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for more than two years.

제218조 (독립임무수행태만죄) Article 218 (Negligent Performance of Individual Duty)

관리일군이 아닌자가 자기의 독립적인 임무를 성실히 수행하지 않아 엄중한 결과를 일으킨 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who is not a manager and irresponsibly performs an individual duty, causing serious consequences, shall be punished by reform through short-term labor for less than one year. In cases where the foregoing act is a grave offense, punishment shall be reform through labor for less than three years.

제219조 (고의적비밀루설죄) Article 219 (Intentional Revealing of Secrets)

국가비밀을 고의적으로 루설한 자는 1년이하의 로동교화형에 처한다. 중요한 국가비밀을 루설하였거나 국가비밀루설로 엄중한 결과를 일으킨 경우에는 5년이하의 로동교화형에 처한다.
A person who intentionally reveals state secrets shall be punished by reform through labor for less than one year. In cases where an important state secret is revealed or results in serious consequences, the punishment shall be reform through labor for less than five years.

제220조 (과실적비밀루설죄) Article 220 (Revealing of Secrets by Negligence)

국가비밀을 과실로 루설하였거나 국가비밀문서를 잃어버린자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A person who reveals state secrets or loses classified state material by negligence shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제221조 (비법국경출입죄) Article 221 (Illegal Border Crossing)

비법적으로 국경을 출입한 자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.

A person who illegally crosses the state border shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than five years.

제222조 (비법협조죄) Article 222 (Illegal Cooperation)

공화국을 적대시하는자를 비법적으로 도와준자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A person who illegally cooperates with a person against the Republic shall be punished by reform though short-term labor for less than one year. In cases where the foregoing act is a grave offense, punishment shall be reform through labor for less than two years.

제223조 (령공, 령해침입죄) Article 223 (Trespassing on Territorial Airspace and Waters)

다른 나라 사람이 비행기 또는 배를 몰고 허가없이 공화국령공, 령해에 들어왔거나 령공, 령해밖으로 나갔거나 지정된 항로, 비행고도를 어긴 경우에는 3년이하의 로동교화형에 처한다.

A foreigner who enters or leaves the territorial airspace or waters of the Republic by airplane or by boat without permission, or violates designated courses or altitude, shall be punished by reform through labor for less than three years.

제224조 (거짓신고, 진술죄) Article 224 (False Report and Testimony)

범죄에 대하여 거짓신고를 하였거나 수사, 예심, 재판심리에서 거짓진술, 감정, 통역, 해석을 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A person who makes a false report concerning a crime or makes false testimony, assessment, translation or analysis during the investigation, preliminaries or trials, shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제225조 (증인협박죄) Article 225 (Threatening a Witness)

거짓진술, 감정, 통역, 해석을 하도록 폭행, 협박, 회유, 기만을 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.

A person who assaults, threatens, conciliates, or deludes another to force him or her to make false testimony, assessment, interpretation or analysis shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제226조 (사건관계자에 대한 복수죄) Article 226 (Revenge)

복수할 목적으로 사건관계자에게 구타, 폭행, 모욕한 자는 1년이하의 로동교화형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.

A person who beats, assaults or insults a person involved in an incident in order to gain revenge shall be punished by reform through labor for less than one year. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for less than three years.

제227조 (일반범죄은닉죄) Article 227 (Harboring of General Criminals)

유기로동교화형이상의 형벌에 처할수 있는 범죄자 또는 범죄의 흔적을 감추어준자는 1년이하의 로동단련형에 처한다. 고의적살인, 강도행위를 저지른 범죄자 또는 범죄의 흔적을 감추어준 경우에는 3년이하의 로동교화형에 처한다.

A person who harbors an offender subject to reform through labor for a definite period, or conceals the evidence of a crime, shall be punished by short-term labor for less than one year. In cases where the person conceals an offender who committed murder or robbery or conceals the evidence of such, the punishment shall be reform through labor for less than three years.

제228조 (일반범죄불신고죄) Article 228 (Failure to Report General Crime)

국가재산강도죄, 고의적중살인죄, 개인재산강도죄를 준비하고 있거나 저지른 것을 알면서 해당 기관에 알리지 않은자는 1년이하의 로동단련형에 처한다.

A person who, having learned of the planning or committing of offenses under robbery of state property, intentional murder, or robbery of personal property, and fails to report it to the relevant agency, shall be punished by short-term labor for less than one year.

제229조 (도주죄) Article 229 (Flight)

구속중에 있거나 형벌집행중에 있는자가 도주한 경우에는 1년이하의 로동단련형에 처한다. 시설을 파괴하였거나 폭행하고 도주한 경우에는 3년이하의 로동교화형에 처한다.

In cases where a person who is in custody or in the middle of serving his or her term takes flight, the punishment shall be short-term labor for less than one year. A person who, in the course of escaping, destroys facilities or commits violence, shall be punished by reform through labor for less than three years.

제230조 (뢰물죄) Article 230 (Bribery)

대량의 뢰물을 받은자는 1년이하의 로동단련형에 처한다. 특히 대량의 뢰물을 받은 경우에는 3년이하의 로동교화형에 처한다.

A person who accepts bribes shall be punished by short-term labor for less than one year. In cases where the amount of the bribe is particularly large, the punishment shall be reform through labor for less than three years.

제231조 (봉인손상죄) Article 231 (Damaging Seals)

기관, 기업소, 단체에서 한 봉인을 손상시켜 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다.

A person who damages the seal of an agency, enterprise or organization shall be punished by reform through short-term labor for less than one year.

제232조 (담보처분한 재산비법처분, 리용죄) Article 232 (Illegal Usage and Disposal of Mortgage and Property)

담보처분한 재산을 비법적으로 처분하였거나 리용한자는 1년이하의 로동단련형에 처한다.
A person who illegally disposes of his or her mortgaged property shall be punished by reform through short-term labor for less than one year.

제233조 (부당한 신소죄) Article 233 (Unjust Complaints)

리기적 목적 또는 비렬한 동기에서 과장, 날조된 신소를 하여 엄중한 결과를 일으킨 자는 1년이하의 로동단련형에 처한다.
A person who causes grave consequences by submitting exaggerated or fabricated complaints for personal gain or pernicious motives shall be punished by short-term labor for less than one year.

제234조 (대외적권위훼손죄) Article 234 (Damaging the Prestige of the Republic in Foreign Countries)

우리 나라 공민이 다른 나라 공화국의 대외적권위를 훼손시키는 행위를 한 경우에는 3년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 3년이상 8년이하의 로동교화형에 처한다.
A citizen who damages the prestige of the Republic in foreign countries shall be punished by reform through labor for less than three years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than three years and less than eight years.

제2절 직무상범죄 **SECTION 2. MANAGEMENT OFFENSES**

제235조 (직권람용죄) Article 235 (Abuse of Authority)

관리일군이 리기적목적으로 직권을 람용하여 엄중한 결과를 일으킨 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A management worker who causes grave consequence by abusing his or her authority for personal gain shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제236조 (월권행위죄) Article 236 (Ultra Vires)

관리일군이 상급의 권한에 속하는 행위를 그의 승인없이 하여 엄중한 결과를 일으킨 경우에는 1년이하의 로동단련형에 처한다.
A worker who exercises the authority of his or her superior without the superior's permission, thereby causing grave consequences, shall be punished by short-term labor for less than one year.

제237조 (직무태만죄) Article 237 (Dereliction of Duty)

관리일군이 상급으로부터 받은 명령, 지시 또는 직무상 의무를 수행하지 않았거나 되는대로 하여 엄중한 결과를

일으킨 경우에는 1년이하의 로동단련형에 처한다. 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A worker who does not execute his or her superior's orders or directions, or his or her normal duty, or executes the aforementioned in a careless manner, thereby causing grave consequences shall be punished by short-term labor for less than one year. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for less than three years.

제238조 (물질적부담을 시킨죄) Article 238 (Placement of a Material Burden)

지원, 후원, 부조, 사업보장의 명목으로 물질적 부담을 시킨 경우에는 1년이하의 로동단련형에 처한다.
A person who on the pretext of support, sponsorship, gift or a business guarantee, places a financial burden on an employee, shall be punished by short-term labor for less than one year.

제239조 (신소, 청원처리질서위반죄) Article 239 (Ignoring Petition and Complaint)

관리일군이 공민의 신소, 청원을 묵살하였거나 그 처리를 부당하게 하여 엄중한 결과를 일으킨 경우에는 1년이하의 로동단련형에 처한다.
A worker who deliberately ignores or wrongly deals with a petition or a complaint from citizens, resulting in serious consequences, shall be punished by short-term labor for less than one year.

제240조 (국가기관권위훼손죄) Article 240 (Damaging the Prestige of State Agencies)

관리일군이 위법행위를 하였거나 처신을 잘못하여 국가기관의 권위를 훼손시킨 경우에는 1년이하의 로동단련형에 처한다.
A worker who, through acting unlawfully or misconduct, damages the prestige of state agencies shall be punished by short-term labor for less than one year.

제241조 (비법체포, 구속, 수색죄) Article 241 (Illegal Arrest, Detention or Search)

법일군이 비법적으로 사람을 체포, 구속, 구인하였거나 몸 또는 살림집을 수색하였거나 재산을 압수, 몰수한 경우에는 1년이하의 로동단련형에 처한다.
A legal-sector worker who illegally detains, apprehends or arrests others, searches the body or the dwelling of a person, or confiscates or forfeits the property of a person shall be punished by short-term labor for less than one year.

제242조 (사건과장, 날조죄) Article 242 (Exaggeration and Falsification of Case)

법일군이 비법적인 방법으로 사람을 심문하였거나 사건을 과장, 날조한 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위로 사람을 죽게 하였거나 중상해를 입게 하였거나 형사책임을 지운 경우에는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다.
A legal-sector worker who interrogates a person in an illegal way, exaggerates, or falsifies a case shall be punished by reform through short-term labor for less than one year. In cases where the foregoing act causes such other person to die, sustain serious injuries, or become falsely convicted of a crime, the punishment shall be reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years.

제243조 (비법석방죄) Article 243 (Illegal Release of Criminals)

법일군이 비법적으로 범죄자를 놓아주었거나 범죄사실을 가볍게 하여준 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A legal-sector worker who illegally releases a criminal or makes the crime lighter than it is shall be punished by reform through labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제244조 (부당한 판결, 판정죄) Article 244 (Unjust Decision or Judgment)

재판일군이 부당한 판결, 판정을 한 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.

A court worker who reaches an unjust decision or judgment shall be punished by reform through labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than five years.

제245조 (판결, 판정을 집행하지 않은 죄) Article 245 (Failure to Execute Decisions and Judgments)

정당한 리유없이 확정된 판결, 판정을 집행하지 않은 자는 1년이하의 로동단련형에 처한다.

A person who fails to execute a final decision or judgment without a just reason shall be punished by short-term labor for less than one year.

제8장 사회주의공동생활질서를 침해한 범죄 **CHAPTER 8 CRIMINAL VIOLATIONS OF THE ORDER OF SOCIALIST COLLECTIVE LIFE**

제246조 (불량자적행위죄) Article 246 (Misdemeanor Acts)

파렴치한 불량자행위를 한자는 1년이하의 로동단련형에 처한다. 잔인한 방법으로 불량자적행위를 한 경우에는 5년이하의 로동교화형에 처한다. 패를 지어 사회에 불안과 공포를 조성한 주동분자는 5년이상 10년이하의 로동교화형에 처한다.

A person who is guilty of shameful acts of misdemeanor shall be punished by short-term labor for less than one year. In cases where an act of misdemeanor is committed in a cruel way, the punishment shall be short-term labor for less than five years. A person who, through forming a gang, causes anxiety and fear to society, shall be punished by reform through labor for more than five years and less than ten years.

제247조 (패싸움죄) Article 247 (Gang Fight)

집단적으로 패싸움을 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위를 무기 또는 흉기를 리용하여 하였거나 사람이 중상해를 입게 하였거나 사람을 죽게 하였거나 대량의 재산파괴와 같은 엄중한 결과를 일으킨 경우에는 5년이하의 로동교화형에 처한다.

A person who, as part of a group, engages in a gang fight shall be punished by short-term labor for less than one year. In cases where the foregoing act is committed using a lethal weapon or causes death, serious injuries, or serious consequences such as destruction of property, the punishment shall be reform through labor for less than five years.

제248조 (미성인범죄추긴 죄) Article 248 (Encouraging a Minor to Commit Crime)

17살에 이르지 못한 자에게 범죄를 저지르도록 추겼거나 범죄에 가담하게 하였거나 불량자로 되게 한자는 3년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 3년이상 5년이하의 로동교화형에 처한다.
A person who encourages a minor under the age of seventeen to commit or take part in a crime and thus to become delinquent shall be punished by reform through labor for less than three years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than three years and less than five years.

제249조 (매음죄) Article 249 (Prostitution)

매음행위를 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.
A person who has engaged in prostitution multiple times shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than five years.

제250조 (음탕한 행위죄) Article 250 (Acts of Obscenity)

여러 남녀가 모여 음탕한 행위를 한 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.
In cases where many men and women gather and engage in obscene activities, the punishment shall be reform through labor for less than one year. In cases where the foregoing act is a grave offense, the punishment shall be reform through labor for less than five years.

제251조 (직권참용죄) Article 251 (Impersonation of Authority)

관리일군이 아닌자가 관리일군으로 가장하였거나 관리일군이 다른 관리일군으로 가장하여 사회적으로 위험한 행위를 한 경우에는 1년이하의 로동단련형에 처한다.
In cases where a person who is not a manager disguises him/herself as management or commits a socially dangerous act in the guise of a management worker, and in cases where a manager commits such act in the guise of another manager, he or she shall be punished by short-term labor for less than one year.

제252조 (거짓행세죄) Article 252 (Exercise of False Authority)

검열, 단속일군으로 가장하여 사회적으로 위험한 행위를 한자는 1년이하의 로동단련형에 처한다.
A person who commits a socially dangerous act in the guise of a censor or inspector worker shall be punished by short-term labor for less than one year.

제253조 (실력행사죄) Article 253 (Exercise of Force)

자기의 인신상 또는 재산상 피해를 법에 의거하지 않고 실력을 행사하여 차지한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.

A person who unlawfully redeems his or her reputational or physical injury, or property loss by force shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, punishment shall be reform through labor for less than two years.

제254조 (명예, 칭호참용죄) Article 254 (Usage of False Honor and Titles)

리기적목적으로 국가적명예나 칭호를 참용하여 사회적으로 위험한 행위를 여러번 한자는 1년이하의 로동단련형에 처한다.
A person who commits a socially dangerous act repeatedly by exercising false state honor or titles for personal gain shall be punished by short-term labor for less than one year.

제255조 (도박죄) Article 255 (Gambling)

돈 또는 물건을 대고 도박을 한 자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who gambles with money or goods shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제256조 (미신행위죄) Article 256 (Superstitious Activities)

돈 또는 물건을 받고 미신행위를 여러번 한자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person who repeatedly engages in superstitious activities in exchange for money or goods shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제257조 (비법혼인 및 가정파탄죄) Article 257 (Illegal Marriage and Breaking Up of Family)

탐욕 그밖의 비렬한 동기에서 여러 대상과 혼인하였거나 다른 사람의 가정을 파탄시킨 자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who for greedy or other pernicious motives marries multiple spouses or breaks up another person's family shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제258조 (늙은이, 어린이보호책임회피죄) Article 258 (Neglecting the Responsibility to Protect the Elderly and Children)

늙은이, 어린이 또는 로동능력이 없는 사람을 보호할 의무를 지닌자가 자기의 책임을 회피하여 엄중한 결과를 일으킨 경우에는 1년이하의 로동단련형에 처한다.
A person who avoids taking care of an elderly person, a child or a person incapable of work that he or she is responsible for protecting, thereby resulting in serious consequences, shall be punished by short-term labor for less than one year.

제259조 (양로사업질서위반죄) Article 259 (Violation of Railroad Business Regulations)

양로사업을 잘하지 않아 엄중한 결과를 일으킨자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년이하의 로동교화형에 처한다.
A person, who violates regulations for railroad business shall be punished by reform through short-term labor for less than one year. In cases where the foregoing act is a grave offense, punishment shall be less than three years.

제260조 (학대괄시죄) Article 260 (Mistreatment)

자기의 보호밑에 있는 사람을 학대괄시한자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 보호대상자가 장애자로 되게 하였거나 중상해를 입게 하였거나 사망되게 하였거나 자살하게 한 경우에는 3년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이하의 로동교화형에 처한다.
A person who harms the health of a person under his or her protection by mistreating such person shall be punished by short-term labor for less than one year. In cases where the foregoing act causes handicap, injuries, deaths, or committing suicide, punishment shall be reform through labor for less than three years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for less than five years.

제261조 (습득물횡령죄) Article 261 (Misappropriation of Lost Property)

주은 돈 또는 물건을 국가기관에 바치지 않고 가진 자는 1년이하의 로동단련형에 처한다
A person who keeps money or goods he or she has found without handing them over to the relevant state agency shall be punished by short-term labor for less than one year.

제262조 (사례금을 바치지 않은 죄) Article 262 (Failure to Submit Reward and Profit to the State)

공무원이 거래과정에 받은 사례금을 국가기관에 바치지 않고 가진 경우에는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 3년 이하의 로동교화형에 처한다.
A public official who does not submit to the state a large amount of rewards or profits that resulted from transactions, or that he or she received during transactions and takes it for his or her own, shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than three years.

제263조 (략취물건거래죄) Article 263 (Trading Plundered Goods)

략취한 물건인줄 알면서 받아가졌거나 샀거나 팔아준자는 1년이하의 로동단련형에 처한다.
A person who receives, buys or sells plundered goods in the knowledge that they are plundered shall be punished by short-term labor for less than one year.

제264조 (묘파괴죄) Article 264 (Damaging Graves)

묘를 고의적으로 파괴한자는 1년이하의 로동단련형에 처한다. 많은 묘를 파손시킨 경우에는 2년이하의 로동교화형에 처한다.
A person who intentionally destroys a grave shall be punished by short-term labor for less than one year. In cases where many graves are damaged, the punishment shall be reform through labor for less than two years.

제265조 (엄중한 결과발생방임죄) Article 265 (Allowing Grave Consequences to Occur)

사람이 죽을 위험에 처하였거나 특히 대량의 손실을 줄수 있다는것을 알면서 해당기관 또는 관계자에게 알리지 않았거나 능히 구원하거나 막을수있는 행위를 하지 않아 사람을 죽게 하였거나 특히 대량의 손실을 가져오게 한자는 1년이하의 로동단련형에 처한다.
2012; A person who knows that a person's life is in danger or that a particularly large amount of damage may occur and does not inform the relevant agency or person or does not take possible measures to save the person or avert the consequences, to cause death or a particularly large amount of damage, shall be punished by short-term labor for less than one year.

<u>제9장 공민의 인신과 재산을 침해한 범죄 **CHAPTER 9 CRIMINAL IMPAIRMENT OF THE LIFE AND PROPERTY OF CITIZENS**</u>

제1절 생명, 건강, 인격을 침해한 범죄 **SECTION 1. CRIMINAL IMPAIRMENT OF LIFE, HEALTH, AND REPUTATION**

제266조 (고의적중살인죄) Article 266 (Intentional Murder)

탐욕, 질투 그밖의 비렬한 동기에서 사람을 고의적으로 죽인 자는 10년이상의 로동교화형에 처한다. 앞항의 행위로 정상이 특히 무거운 경우에는 무기로동교화형 또는 사형에 처한다.
A person who intentionally murders another out of greed, jealousy, or other pernicious motives shall be punished by reform through labor for more than ten years. In cases where the person commits a grave offense, he or she shall be punished by a life term of reform through labor or the death penalty.

제267조 (고의적경살인죄) Article 267 (Intentional Manslaughter)

탐욕, 질투 그밖의 비렬한 동기가 없이 고의적으로 사람을 죽인자는 3년이상 10년이하의 로동교화형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 10년이상의 로동교화형에 처한다.
A person who intentionally slaughters another without greed, jealousy, or other pernicious motives shall be punished by reform through labor for more than three years and less than ten years. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for more than ten years.

제268조 (발작적격분에 의한 살인죄) Article 268 (Homicide Induced by Fit of Rage)

피해자의 폭행 또는 심한 모욕때문에 일어난 발작적격분상태에서 사람을 죽인자는 3년이하의 로동교화형에 처한다. 앞항의 행위로 여러 사람을 죽인 경우에는 3년이상 8년이하의 로동교화형에 처한다.
A person who kills another in a fit of rage brought about by violence or serious insults from the victim shall be punished by reform through labor for less than three years. In cases where many persons are killed by the foregoing act, the punishment shall be reform through labor for more than three years and less than eight years.

제269조 (정당방위초과살인죄) Article 269 (Homicide Beyond Justifiable Self-Defense)

정당방위의 정도를 넘었거나 직무집행상, 의무실행상 필요한 정도를 넘는 행위를 하여 사람을 죽인자는 1년이하의 로동교화형에 처한다.

A person who kills another by an act that goes beyond a measure of justifiable self-defense, or beyond the measure necessary for the performance of his or her duty or responsibility, shall be punished by reform through labor for less than one year.

제270조 (과실적살인죄) Article 270 (Involuntary Manslaughter)

사람을 과실로 죽인자는 1년이하의 로동교화형에 처한다. 과실로 여러 사람을 죽인 경우에는 5년이하의 로동교화형에 처한다.
A person who is guilty of accidental killing shall be punished by reform through labor for less than one year. In cases where such a person accidentally kills multiple persons, the punishment shall be reform through labor for less than five years.

제271조 (고의적중상해죄) Article 271 (Intentional Infliction of Grave Injury)

고의적으로 사람의 생명에 위험할 정도의 중상을 입혔거나 눈, 귀 그밖의 기능을 잃게 하였거나 얼굴에 흉한 허물을 남겼거나 정신병을 일으키게 하였거나 로동능력을 현저히 떨어뜨린 자는 5년이하의 로동교화형에 처한다. 앞항의 행위를 잔인한 방법으로 하였거나 피해자가 죽게 하였거나 여러 사람에게 중상을 입힌 경우에는 5년이상 10년이하의 로동교화형에 처한다.
A person who intentionally inflicts grave injury that endangers the life of another, who causes an eye, ear, or another organ to lose its function, who causes injury to the face that leaves a permanent scar, who causes a mental disorder or who causes injury which will considerably impair the victim's working ability shall be punished by reform through labor for less than five years. In cases where the foregoing act causes the victim to die, is executed using brutal methods or causes serious injuries to multiple persons, the punishment shall be reform through labor for more than five years and less than ten years.

제272조 (발작적격분에 의한 중상해죄) Article 272 (Infliction of Grave Injury Induced by Fit of Rage)

피해자의 폭행 또는 심한 모욕때문에 일어난 발작적격분상태에서 사람에게 중상을 입힌 자는 1년이하의 로동단련형에 처한다. 앞항의 행위로 여러 사람에게 중상을 입힌 경우에는 3년이하의 로동교화형에 처한다.
A person who causes grave injury to another in a fit of rage brought about by violence or serious insult from the victim shall be punished by reform through short-term labor for less than one year. In cases where the foregoing causes serious injuries to multiple persons, the punishment shall be reform through labor for less than three years.

제273조 (과실적중상해죄) Article 273 (Infliction of Grave Injury by Accident)

사람에게 과실로 중상을 입힌 자는 1년이하의 로동단련형에 처한다. 앞항의 행위가 정상이 무거운 경우에는 2년이하의 로동교화형에 처한다.
A person who accidentally causes grave injury shall be punished by short-term labor for less than one year. In cases where the foregoing act is a grave offense, he or she shall be punished by reform through labor for less than two years.

제274조 (고의적경상해죄) Article 274 (Intentional Infliction of Light Injury)

사람에게 고의적으로 경상을 입힌 자는 1년이하의 로동단련형에 처한다.

A person who intentionally causes light injury to another shall be punished by short-term labor for less than one year.

제275조 (폭행죄) Article 275 (Assault)

사람에게 폭행을 한 자는 1년이하의 로동단련형에 처한다.
A person who assaults another shall be punished by short-term labor for less than one year.

제276조 (비법자유구속죄) Article 276 (Illegal Deprivation of Freedom)

비법적으로 사람의 자유를 구속한자는 1년이하의 로동단련형에 처한다.
A person who illegally detains other people, restricting their freedom, shall be punished by reform through short-term labor for less than one year.

제277조 (어린이 훔친죄) Article 277 (Abduction of Children)

리기적목적 또는 복수적동기에서 어린이를 훔쳤거나 감춘자는 1년이하의 로동단련형에 처한다.
A person who abducts or conceals a child for personal gain or for the sake of revenge shall be punished by reform through labor for less than one year.

제278조 (유괴죄) Article 278 (Kidnapping)

리기적목적에서 사람을 유괴한 자는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다. 여러 사람을 유괴한 경우에는 10년이상의 로동교화형에 처한다.
A person who kidnaps another for personal gain shall be punished by reform through labor for less than five years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than five years and less than ten years. In cases where multiple persons are kidnapped, the punishment shall be reform through labor for more than ten years.

제279조 (강간죄) Article 279 (Rape)

폭행, 협박하여 또는 구원을 받지 못할 상태를 리용하여 녀성을 강간한 자는 5년이하의 로동교화형에 처한다. 정상이 무거운 경우에는 5년이상 10년이하의 로동교화형에 처한다. 여러 번 륜간하였거나 앞항의 행위로 피해자에게 중상해를 입혔거나 죽게 한 경우에는 10년이상의 로동교화형에 처한다.
A man who rapes a woman by using violence or threats or by taking advantage of her helpless status shall be punished by reform through labor for less than five years. In cases where the person commits a grave offense, punishment shall be reform through labor for more than five years and less than ten years. In cases where the foregoing act is committed multiple times, resulting in injuries or deaths, the punishment shall be reform through labor for less than ten years.

제280조 (복종관계에 있는 녀성을 강요하여 성교한 죄) Article 280 (Forcing a Subordinate Woman to Have Sexual Intercourse)

복종관계에 있는 녀성을 강요하여 성교한 자는 1년이하의 로동단련형에 처한다. 앞항의 행위를 여러 녀성에 대하여 하였거나 녀성을 타락 또는 자살하게 한 경우에는 3년이하의 로동교화형에 처한다.

A man who forces a woman who is his subordinate to have sexual intercourse with him shall be punished by short-term labor for less than one year. In cases where the aforementioned act is committed against multiple women, or when the woman concerned becomes depraved or commits suicide as a result of the aforementioned act, the offender shall be punished by reform through labor for less than three years.

제281조 (미성인성교죄) Article 281 (Sexual Intercourse With a Minor)

15살에 이르지 못한 미성인과 성교한 자는 1년이하의 로동단련형에 처한다. 여러 번 성교한 경우에는 5년이하의 로동교화형에 처한다.
A person who has sexual intercourse with a minor under the age of fifteen shall be punished by reform through labor for less than one year. In cases where the person commits a grave offense multiple times, he or she shall be punished by reform through labor for less than five years.

제282조 (모욕 및 명예훼손죄) Article 282 (Insult and Slander)

사람을 모욕하였거나 그의 명예를 훼손시킨자는 1년이하의 로동단련형에 처한다.
A person who insults another or who slanders his or her good name shall be punished by short-term labor for less than one year.

제2절 개인소유를 침해한 범죄 SECTION 2. CRIMES OF ENCROACHMENT ON PERSONAL PROPERTY

제283조 (개인재산훔친죄) Article 283 (Stealing Personal Property)

개인의 재산을 훔친자는 1년이하의 로동단련형에 처한다. 대량의 개인재산을 훔친 경우에는 3년이하의 로동교화형에 처한다. 특히 대량의 개인재산을 훔친 경우에는 3년이상 8년이하의 로동교화형에 처한다.
A person who steals the property of an individual shall be punished by short-term labor for less than one year. In cases where personal property is stolen in large quantities, the punishment shall be reform through labor for less than three years. In cases where a particularly large amount of personal property is stolen, the punishment shall be reform through labor for more than three years and less than eight years.

제284조 (개인재산빼앗은 죄) Article 284 (Taking Personal Property)

개인의 재산을 빼앗은 자는 1년이하의 로동단련형에 처한다. 여러번 또는 공모하여 혹은 대량의 개인재산을 빼앗은 경우에는 5년이하의 로동교화형에 처한다. 특히 대량의 개인재산을 빼앗은 경우에는 5년이하의 로동교화형에 처한다.
A person who takes the property of another person shall be punished by short-term labor for less than one year. In cases where personal property is plundered in large quantities, multiple times or in collusion, the punishment shall be reform through labor for less than five years. In cases where a particularly large amount of personal property is plundered, the punishment shall be reform through labor for less than five years.

제285조 (개인재산속여가진죄) Article 285 (Taking Personal Property by Cheating)

개인의 재산을 속여 가진 자는 1년이하의 로동단련형에 처한다. 대량의 개인재산을 속여 가진 경우에는 2년이하의 로동교화형에 처한다. 특히 대량의 개인재산을 속여가진 경우에는 2년이상 7년이하의 로동교화형에 처한다.
A person who cheats an individual of his or her property shall be punished by short-term labor for less than

one year. In cases where a large amount of personal property is taken by cheating, the punishment shall be reform through labor for less than two years. In cases where a particularly large amount of personal property is taken by cheating, the punishment shall by reform through labor for more than two years and less than seven years.

제286조 (개인재산횡령죄) Article 286 (Appropriation of Personal Property)

개인의 재산을 횡령한 자는 1년이하의 로동단련형에 처한다. 대량의 개인재산을 횡령한 경우에는 4년이하의 로동교화형에 처한다. 특히 대량의 개인재산을 횡령한 경우에는 4년이상 9년이하의 로동교화형에 처한다.
A person who appropriates the property of an individual shall be punished by short-term labor for less than one year. In cases where personal property is appropriated in large amounts, the punishment shall be reform through labor for less than four years. In cases where a particularly large amount of personal property is appropriated, the punishment shall be reform through labor for more than four years and less than nine years.

제287조 (개인재산대량략취죄) Article 287 (Taking a Large Amount of Personal Property)

이 법 제 283조-제286조에 이르는 여러가지 행위를 하여 략취한 량이 대량인 경우에는 4년이하의 로동교화형에 처한다.
A person who takes a large amount of personal property by committing offenses aforementioned in Articles 238 to 286 shall be punished by reform through labor for less than four years.

제288조 (개인재산강도죄) Article 288 (Robbery of Personal Property)

사람의 생명, 건강에 위험을 주는 폭행, 협박을 하여 개인의 재산을 강도한 자는 4년이하의 로동교화형에 처한다. 여러번 또는 공모하여 혹은 무기, 흉기를 리용하여 하였거나 대량의 개인재산을 강도한 경우에는 4년 이상 9년이하의 로동교화형에 처한다. 앞항의 행위가 정상이 특히 무거운 경우에는 9년이상의 로동교화형에 처한다.
A person who robs an individual of his or her property by violence or threats, endangering the life and health of the victim, shall be punished by reform through labor for less than four years. In cases where the foregoing act is committed multiple times, in collusion or with the use of weapons, or where a large amount of personal property is taken, the punishment shall be reform through labor for more than four years and less than nine years. In cases where the foregoing act is particularly grave, the punishment shall be reform through labor for more than nine years.

제289조 (무거운 형태의 개인재산략취죄) Article 289 (Grave Forms of Taking Personal Property)

개인재산략취행위의 정상이 무거운 경우에는 10년이상의 로동교화형에 처한다.
In cases where the person commits a grave offense of taking personal property, he or she shall be punished by reform through labor for more than ten years.

제290조 (개인재산고의적파괴죄) Article 290 (Destruction of Personal Property)

개인의 재산을 고의적으로 파괴한 자는 1년이하의 로동단련형에 처한다. 대량의 개인재산을 파괴한 경우에는 4년이하의 로동교화형에 처한다. 특히 대량의 개인재산을 파괴한 경우에는 4년이상 10년이하의 로동교화형에 처한다.

A person who deliberately destroys the property of an individual shall be punished by short-term labor for less than two years. In cases where personal property is destroyed in large quantities, the punishment shall be reform through labor for less than four years. In cases where the person commits a grave offense, he or she shall be punished by reform through labor for more than four years and less than ten years.

# Exhibit D

*RESUME*                                                          *2018*

# David R. Hawk

1704 Pelican Cove Rd, TR-141
Sarasota, Fl 32431
Tel (941) 218-6452
Mobile (718) 644-2963
Email: hawkdavid@hotmail.com

## CAREER HIGHLIGHTS

-- Adjunct Lecturer, University of South Florida (Tampa)
-- Adjunct Lecturer, Hunter College, City University of New York.
-- Visiting Scholar, Columbia University Institute for the Study of Human Rights;
-- Path-breaking research, documentation and analysis of the political prison camp system in North Korea;
-- Directed the Cambodia Office of the UN High Commissioner for Human Rights, then the largest UN human rights field office;
-- Pioneered human rights education and training for Cambodians, and the insertion of human rights provisions into the 1991 comprehensive peace agreements and UN peace-keeping mission to Cambodia;
-- Documentation of massacres in Rwanda;
-- Path-breaking research, document and analysis of the Khmer Rouge atrocities in Cambodia under the auspices of the Columbia University Center for the Study of Human Rights;
-- Executive Director of Amnesty International, USA during its formative stages in the 1970s;
-- Leadership positions in civic opposition to the escalation of the war in Vietnam;
-- Voter registration projects in Mississippi and Georgia during the 1960's civil rights movement.

## WORK EXPERIENCE

**Adjunct Lecturer,** University of South Florida (Tampa)

Spring or Fall Semesters 2016 -2018

Taught course on International Human Rights

**Adjunct Lecturer**, Hunter College, City University of New York
Spring or Fall Semesters 2011 - 2015

Taught courses on Human Rights and Religion; and Genocide and Ethnic Conflict.

**Visiting Scholar**, Columbia University, Institute for the Study of Human Rights
2011 to 2013.

**Consultant**, **Human Rights and International Affairs**

Presentation at UN General Assembly side event organized by the U.S. Mission to the UN, New York (December 11, 2017).

Research and writing for *The Parallel Gulag: North Korea's "An-Jeon-Bu" Prison Camps,* Committee for Human Rights in North Korea, Washington DC, November 2017.

Conducted human rights education and training program for North Korean refugees currently residing in South Korea, National Democratic Institute, Seoul (February 29-March 1, 2016).

Presentations at Center for Strategic and International Studies (CSIS), Washington, February 19 and the All Party Parliamentary Group, London, February 22, 2016.

Presentation on UN Security Council deliberations on North Korea at the Asia-Pacific Research Center, Stanford University, January 14, 2016.

Made presentation the entire UN Human Rights Council at the invitation of the President of the Council, Geneva, (September 21, 2015).

Research and writing for *Hidden Gulag IV: Gender Repression and Prisoner Disappearances,* Committee for Human Rights in North Korea (HRNK), Washington, DC (September 2015).

Made presentation to select Ambassadors from Permanent Missions to the UN-NY, Jacob Blaustein Institute, New York, February 2014.

Research and writing for *North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps*, HRNK (August 2013).

Conducted human rights education and training program for North Korean refugees currently residing in Seoul, South Korea, International Republican Institute, January 2013.

Made presentations NGO parallel events at the UN Human Rights Council, Geneva, 2013, 2014.

Provided testimony to the UN Commission of Inquiry, Office of the High Commissioner for Human Right, Geneva (July 2013) and Washington DC (October 2013).

Research and writing for the second, book-length, edition of *The Hidden Gulag: Exposing North Korea's Vast System of Lawless Imprisonment,* HRNK (March 2012, Korean language edition, Seoul (December 2012).

**Reagan-Fascell Fellowship,**
International Forum for Democratic Studies
National Endowment for Democracy
        Washington, D.C.  (March to July 2008)

Investigated human rights, governance and transparency provisions regarding bi-lateral and multilateral assistance to North Korea in the event of progress toward the elimination of North Korea's nuclear weapons program.

Designed strategy for including human rights issues in the Working Groups at the Beijing-based "Six Party Talks" and interviewed past and present US negotiators to potentially discuss human rights matters in the North Korean de-nuclearization process.

**Freedom House**
        New York, NY (August 2006 to July 2007)

Analyzed the phenomena of repression associated with the North Korean gulag system according the elements of crimes against humanity as set forth in Article 7 of the Rome Statute of the International Criminal Court and parallel provisions from the Ad Hoc Tribunals for Rwanda and the former Yugoslavia.  Authored report, *Concentrations of Inhumanity*, (May 2007, July 2007 in Korean).

Presented findings at UN Human Rights Council parallel meeting, Geneva, March 2007. Made presentations in Washington, Rome, Gdansk, Seoul, Toronto and Ottawa.

Designed strategy for raising DPRK "state-responsibility," "individual accountability, and "responsibility to protect" within the UN system.

Conducted trainings for South Korean and Korean-American student activists in Seoul, Korea and Berkeley, California.

**US Commission on International Religious Freedom**
        Washington, DC (November 2004 – December 2005)

Researched freedom of thought, conscience, religion and belief in North Korea based on extensive interviews with former North Korean refugees now resident in South Korea, and authored 100 page report *Thank You Father Kim Il Sung: Eyewitness Accounts of Severe Violations of Freedom of Thought Conscience and Religion in North Korea*

published in November 2005 and in Korean in 2006.  Presented findings to UN
Ambassadors luncheon at UN Commission on Human Rights, Geneva, March 2005.

**US Committee for Human Rights in North Korea**
>    Washington, DC (August 2002 – November 2004)

Researched and authored landmark 120-page report, *The Hidden Gulag: Exposing North
Korea's Prison Camps – Prisoner's Testimonies and Satellite Photographs*, based on
extensive in-depth interviews with North Korean refugees who recently obtained asylum
in South Korea.  The report was translated into Korean and Japanese and published in
book format in Seoul and Tokyo.

Organized a successful advocacy campaign at the 2003 and 2004 UN Commission on
Human Rights to secure the first-ever UN resolutions recognizing and condemning gross
human rights violations and unsatisfactory humanitarian practices in the Peoples
Democratic Republic of Korea.

Testified on North Korean political forced labor camp system to Senate Foreign Relations
Committee.  Lectured on North Korea at numerous universities including Harvard, Yale,
Cornell, University of Pennsylvania, Columbia, Stanford, UC Berkeley, University of
Texas, Fordham, Seoul National University and Handong University, Korea.

Participated in numerous conferences, seminars and consultations on strategic and
political developments on the Korean peninsula.

**Landmine Survivors Network**
>    Washington, DC (June 1999- 2004)

Conducted needs assessment, designed program, drafted and negotiated Memoranda of
Understanding and Agreement for a program of assistance and peer group support to
amputees in Quang Binh Province, Vietnam;

Investigated the prospects and requirements for the employment of disabled persons in
Cambodia's garment industry;

Conducted feasibility study and assisted campaign strategy for United States accession to
the 1997 Landmine Ban Treaty;

Participated in the 2003 and 2004 meetings of the Ad Hoc Committee (of the General
Assembly) for Consideration of Proposals for a Convention on the Rights of Persons with
Disabilities.

**United Nations**
UN High Commissioner for Human Rights Cambodia Office, Phnom Penh
**Head of Office** (July 1996 - January 1998)
**Chief, Education, Training and Information Unit** (November 1995-June 1996;
January 1998-March 1999)

Responsibilities: Head of Office

Represented the United Nations High Commissioner for Human Rights to the Royal
Government of Cambodia, the diplomatic corps, UN Agencies, non-governmental
organizations, press and media in Cambodia.

Provided overall leadership and direction for the Cambodia Office, a UN field operation
of fifty staff persons stationed in twelve provinces and Phnom Penh, with an annual
budget of three to four million dollars.

Oversaw the implementation of technical cooperation programs, including legal
assistance to the National Assembly and Government ministries, education, training and
information programs for the judiciary, armed forces, police, teachers, other officials, and
NGO staff and members at the national, provincial and local levels.

Assured -- in cooperation with the Special Representative of the Secretary-General for
Human Rights in Cambodia -- the protection of the human rights of all persons in
Cambodia, including overseeing the monitoring, investigating and reporting of human
rights violations; advised and assisted the Special Representative on his official missions
to Cambodia and managed the necessary follow-up, including confidential
communications with the Government of Cambodia, and public reports.

Developed and implemented programs and policies of cooperation with other UN
agencies, programs and funds, intergovernmental organizations, bilateral assistance
programs, foundations and NGOs including the preparation of project documents and
funding proposals, and including the preparation of reports to the UN General Assembly
and Commission on Human Rights.


Responsibilities: Chief , Education, Training and Information Unit

Developed, managed and supervised substantial education, training and information
programs in human rights for the Cambodian Government, NGOs, and targeted publics.

Commissioned or oversaw the preparation of curricula, training and information
materials for various target groups such as police and military personnel, members of the
judiciary, school teachers, clergy, local government officials, women, minorities, and
other targeted groups.

Promoted public awareness of human rights and coordinated the translation and distribution of existing UN instruments, publications and relevant Cambodian laws.

Developed and managed a large-scale program of support to Cambodian NGOs financed through the UN Trust Fund for Human Rights Education in Cambodia.

Developed and managed programs of support to vulnerable groups such as women, children and ethnic minorities.

Assisted the Cambodian Government in the preparation of reports to UN treaty implementation review bodies for the human rights conventions ratified by Cambodia.

**Consultant, Human Rights and International Affairs**
New York, (1994 - 1995)

Principal author of chapters on ethnic minorities in Brunei, Cambodia, Indonesia, Laos, Malaysia, Philippines, Singapore, Thailand and Vietnam, *World Handbook on Minorities*, Minority Rights Group, London, England, 1996.

Participated in Amnesty International mission to Rwanda-Burundi and contributed to AI report making recommendations for action by international community (June-July 1995).

Revised, up-dated and edited report on "Ethnic Minorities in Cambodia" for the Minority Rights Group, London, England, 1995.

Investigated Rwandan genocide through detailed reconstruction of selected massacres, and prepared report for the US Committee for Refugees, Washington D.C. (July-Sept. 1994).

Organized human rights educational and training exchange programs for Cambodian and Indonesian human rights activists for the Puebla Institute and the National Forum Foundation, Washington, D.C., 1994-1995.

**Executive Director, Cambodia Documentation Commission**
New York, (1983 to 1994)

Founded NGO composed of Cambodian refugee leaders, human rights and international law specialists to promote and protect human rights in Cambodia and seek accountability for the grave violations of international law committed under Khmer Rouge rule.

Developed strategy and organized planning, fundraising, public relations, and general management; wrote or edited research papers, reports, petitions and appeals; conducted press conferences and briefing sessions for radio, TV and print media.

Monitored and reported on annual deliberations at the General Assembly and UN

Commission Human Rights, peace conferences and negotiations, and the UN peace-keeping mission in Cambodia.

Organized the translation of fifteen major international human rights conventions and declarations into the Khmer language.

Developed and conducted human rights education, teacher and monitoring training programs in Cambodia and the refugee encampments in Thailand.

Lobbied signatories to the Genocide Convention to take legal action against the Khmer Rouge at the International Court of Justice.

Successfully lobbied Permanent Members of the Security Council to include stronger human rights provisions in the 1991 Cambodian peace treaty.

Successfully lobbied Cambodian political leaders to ratify major human rights treaties, and prepared the official articles of ratification for signature and submission to UN Secretary General.

**Research Fellow**, **Columbia University Center for the Study of Human Rights New York (1982-1988)**

Conducted and organized oral histories with survivors of the Cambodian genocide, gathered archival and photographic documentation, and organized scholarly and legal research on the grave violations of international law in Cambodia under Khmer Rouge rule in order to collect and/or produce evidentiary and legal analyses necessary for potential proceedings before the International Court of Justice by State Parties to the Convention on the Prevention and Punishment of the Crime of Genocide.

Co-authored a 200-page model legal brief, *The Case Against the Standing Committee of the Communist Party of Kampuchea,* for submission to select State Parties to the Genocide Convention.

**Adjunct Lecturer, Hunter College, City University of New York**
New York (Fall and Winter 1982)

Taught course on international human rights, Dept. of Philosophy, Program on Religion.

**Director, Khmer Program, World Conference on Religion and Peace**
Bangkok, Thailand (1980-1981)

Monitored the largest (up to that time) UN refugee and humanitarian relief operation for a NGO in Consultative Status with ECOSOC.

Prepared reports for circulation within the UN system.

Provided in-depth briefings and coordinated on-site visits for parliamentarians and donor agency officials to refugee encampments along the Thai-Cambodia border. Visited massacre sites inside Cambodia, and interviewed officials in Phnom Penh.

**Consultant, Amnesty International**
New York, Washington, London (Fall 1978-Spring 1980)

Lobbied Department of State, White House and Congress and organized legal, human rights, religious and labor groups to press for U.S. ratification of UN human rights conventions.

Formulated strategy and background papers for set of hearings by Senate Foreign Relations Committee on the International Human Rights Covenants.

Researched and designed an international education and lobbying campaign on the human rights conventions for the London-based Secretariat of Amnesty International.

**Executive Director, Amnesty International, USA**
New York (1974-1978)

Planned, reorganized and directed growth of United States section of the 1978 Nobel Prize winning human rights organization.  Oversaw growth of AIUSA budget from $250,000 to $2 million per year and supervised national staff expansion from three to twenty persons.

Expanded program to include rapid response mechanisms, publicity campaigns on specific countries and global phenomena of repression as well as group letter writing campaigns for individual political prisoners.

Opened Washington D.C. office to advocate greater role for human rights considerations in formation of US foreign policy.

**Consultant, National Council of Churches**
New York (Fall and Winter 1971)

Designed ecumenical conference and commission on U.S. policy in Indochina

**Co-Founder and National Coordinator, Vietnam Moratorium Committee**
Washington D.C. (1969-70)

Organized the broad-based, large-scale public rallies known as the "Moratoriums" of

15 October and 14-16 November 1969.

**Vietnam and Draft Coordinator, National Student Association**
Washington, DC (Spring 1967 – Summer 1969)

**Case Worker, New York State Department of Social Services**
Central Harlem, New York (Fall 1967)

**Counselor and Youth Worker, Greene Avenue Methodist Church**
Bushwick/Bedford-Stuyvesant, Brooklyn, (Weekends1965-1967)

**Voter Registration and Community Organizer, Southwest Georgia Project**
Cordelle, Georgia (Summer 1966)

Organized tenant's council in low-income housing project and assisted voter registration and education drive by civil rights and church groups.

**Voter Registration and Community Organizer, Council of Federated Organizations**
Hattiesburg, Mississippi (Summer 1964)

Worked on voter registration and education campaign for coalition of civil rights and church groups known as "Mississippi Freedom Summer."


**PUBLICATIONS**

*The Parallel Gulag: North Korea's "An-Jeon-Bu" Prison Camps,* 120 pp*.,* Committee for Human Rights in North Korea, Washington DC, November 2017.

Book review of *East West Street: On the Origins of "Genocide" and "Crimes Against Humanity"* by Phillipe Sands, in Human Rights Quarterly, Vol 39, No.1, February 2017.

Book review of *Marching Through Suffering: Loss and Survival in North Korea*, Sandra Fahy, in Human Rights Quarterly, Vol. 38, No. 2, May 2016.

*Hidden Gulag IV: Gender Repression and Prisoner Disappearances*, 50 pp., Committee for Human Rights in North Korea (HRNK), September 2015

 "North Korea's Response to the UN Commission of Inquiry (COI) Report on the Situation of Human Rights in the DPRK", 34 pp., *The Future of Inter-Korea Relations*, Eds. Jeong-ho Roh, Center for Korean Legal Studies, Columbia University School of Law, New York, December 2014.

"After the Commission of Inquiry: Four Next Steps", *38 North: Informed Analysis of events in and around the DPRK*, U.S.-Korea Institute, Johns Hopkins School of Advanced International Studies, Washington DC, April 2014.

9

"International Human Rights Law and the Democratic Peoples Republic of Korea" 59 pp., *China's Internal and External Relations and Lessons for Korea and Asia*, Eds. Jung-ho Bae and Jae H. Ku, Korea Institute for National Unification, December 2013.

"A UN Commission of Inquiry for North Korea" *38 North: Informed analysis of events in and around the DPRK*, U.S.-Korea Institute, Johns Hopkins School of Advanced International Studies, Washington DC, April 2013.

*North Korea's Hidden Gulag: Interpreting Reports of Changes in the Prison Camps,* 38 pp.*,* Committee for Human Rights in North Korea, Washington, DC, August 2013.

*The Hidden Gulag (second edition): Exposing North Korea's Vast System of Lawless Imprisonment,* 229 pp.*,* Committee for Human Rights in North Korea, Washington DC, April 2012, Korean language edition, National Human Rights Commission, Seoul, December 2012.

*Pursuing Peace While Advancing Rights: The Untried Approach to North Korea*, 71 pp., U.S.-Korea Institute, Johns Hopkins School of Advanced International Studies (SAIS), Washington, DC, May 2010.

"Appendix: Human Rights Issues During Phase Three of the Six Party Talks on the Denuclearization of the Korean Peninsula" in *Failure To Protect: the Ongoing Challenge of North Korea,* Havel, Bondevik and Wiesel,  DLA Piper, the Committee for Human Rights in North Korea, and The Oslo Center for Peace and Human Rights, September, 2008.

 "Introduction", *A Prison Without Bars: Refugee and Defector Testimony of Severe Violations of Freedom of Religion or Belief in North Korea,* US Commission on International Religious Freedom, Washington DC, March 2008.

 "The Realities and Policies of Third-World Nations Regarding North Korean Defectors, with an Emphasis on Mongolia and Thailand", *International Trends Concerning Human Rights for North Korean Defectors,* National Human Rights Commission of Korea, Seoul, November 2007.

*Concentrations of Inhumanity: An Analysis of the Phenomena of Repression Associated with North Korea's Kwan-li-so Political Penal Labor Camps According to the Terms and Provisions of Article 7 of the Rome Statute of the International Criminal Court and the Parallel Provisions of Customary International Law on Crimes Against Humanity*, 65 pp., Freedom House, Washington, May 2007, Korean translation, Seoul, July 2007.

"Factoring Human Rights Into the Dismantlement of Cold War Conflict on the Korean Peninsula" in *Human Rights in North Korea*, Eds.. Kie-Duck Park and Sang-Jin Han, The Sejong Institute, Seoul, 2007.

"Human Rights and the Crisis in North Korea" in *North Korea: 2005 and Beyond*, Eds. Philip Yun and Gi-Wook Shin, Asia-Pacific Research Center (APARC), Stanford University/Brookings Press, March 2006.

*Thank You Father Kim Il Sung: Eyewitness Accounts of Severe Violations of Freedom of Thought, Conscience and Religion in North Korea*, United States Commission on International Religious Freedom, Washington DC, November 2005.

*Hidden Gulag: Exposing North Korea's Prison Camps – Prisoner's Testimonies and Satellite Photographs,* US Committee for Human Rights in North Korea, Washington DC, November 2003, 120 pp., Korean language edition, Seoul, January 2004.  Japanese language edition, Tokyo, August 2004.

"Going to Trial, Or Maybe Not: Notes on Cambodia's Tortuous and Unresolved Path to Transitional Justice," Brandeis University Center for Ethics, Justice and Public Life, January 2003.

"Confronting Genocide in Cambodia," *Pioneers in Genocide Studies*, Eds. Samuel Totten and Steve Jacobs, Greenwood Publishers, 2003.

Chapters on Brunei, Cambodia, Indonesia, Laos, Malaysia, Philippines, Singapore, Thailand and Vietnam, *World Handbook on Minorities*, Minority Rights Group, London England, 1996.

"Rwanda and Burundi: A Call for Action by the International Community," Amnesty International, London, September 1995 (co-author).

"Genocide in Rwanda: Documentation of Two Massacres during April 1994," U.S. Committee for Refugees, Washington D.C., October 1994.

"Human Rights Aspects of a Comprehensive Solution to the Conflict in Cambodia," Cambodia Documentation Commission, New York, 1990.

"Torture and Extra-judicial Execution Under Khmer Rouge Rule," Karl Jackson, ed., *Cambodia 1975-1979: Rendezvous with Death*, Princeton University Press, 1989.

"The Cambodian Genocide," Israel Charny, ed*., Genocide: A Critical Bibliographical Review*, Mansell Ltd., London, 1988.

"International Human Rights Law and Democratic Kampuchea," Ablin and Hood, eds., *The Cambodian Agony*, M.E. Sharpe, 1987.

 "How S.21 Killed 20,000 at Tuol Sleng," *Index on Censorship*, January 1986 (cover story).

"Relief and Rehabilitation in Kampuchea," Nishino and Yomaoka, eds., *Development*

*Cooperation in Asia*, Waseda University, Tokyo, 1984 (in Japanese).

Book review: *The Quality of Mercy*, William Shawcross", Washington Post Book World, July 15, 1984 (cover review).

"The Killing of Cambodia: A Report from Phnom Penh," *The New Republic*, November 15, 1982 (cover story).

"Famine Relief, Refugee Flows and Political Stalemate in Cambodia," Waseda University, Tokyo, November 1981 (in Japanese).

"Three Books on Foreign Policy and Human Rights: A Review," *Worldview*, New York, March 1980.

"Carter's Human Rights Policies at Half Time," *The New Republic*, April 1979.

(A series of reports written in Bangkok between 1980 and 1982 on the Cambodian refugee crisis, famine relief operation, and political developments regarding the international conflict in and over Cambodia is available upon request.)


## ACADEMIC BACKGROUND

Visiting Scholar, Columbia University Institute for the Study of Human Rights, 2010-2012.

Member, University Seminar on Human Rights, Columbia University, New York, 1982-1995, 2000-2016; participant in University Seminar on Peace 2006-2007.

International Fellow in Human Rights, Intervention and International Law
Brandeis University Center for Ethics, Justice and Public Life, 2001-2003.

Research Fellow, Columbia University Center for the Study of Human Rights, 1982-1988.

Research Fellow, Indochina Studies Program, Social Science Research Council
New York, 1983-84.

Magdalen College, Oxford University, Oxford England, 1972-1974
      Completed two years of graduate study in International Relations.
      Activities and Honors: Oxford University Foreign Policy Club (faculty and
      graduate students by invitation), Oxford University Strategic Studies Club.

Union Theological Seminary, New York City, 1965-67, 1972, Master of Divinity, 1972
      Area of Study: Social Ethics
      Activities and Honors: Dean's Assistant, Student Interracial Ministry.

International Fellow, School of International and Public Affairs (SIPA), Columbia University, 1970-71
> Interdisciplinary seminar program (providing full tuition scholarship to Columbia graduate school) with SIPA faculty and prominent diplomatic, military and political authorities.

Cornell University, Ithaca New, New York 1960-1965, Bachelor of Science, 1965
> Area of Study: Industrial-Labor Relations; social and political sciences
> Activities and Honors: Dean's List, Junior and Senior Men's Honorary Societies, Dorm Counselor, 1963-1965, All-American Collegiate Swimming Team 1963, First place, Eastern Intercollegiate One Meter Diving, 1963.