## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CYNTHIA WARMBIER, *et al.*,<br><br>             Plaintiffs,<br><br>v.<br><br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,<br><br>             Defendant. | Civil Action No. 18-977 (BAH)<br><br>Chief Judge Beryl A. Howell |

### <u>MEMORANDUM OPINION</u>

"What the heck did you do to my kid?"[1]  This is the anguished question voiced by the mother of Otto Warmbier when, after detaining the young man for over 17 months, the Democratic People's Republic of Korea ("North Korea") returned Otto's comatose body to the United States.[2]  Before Otto traveled with a tour group on a five-day trip to North Korea, he was a healthy, athletic student of economics and business in his junior year at the University of Virginia, with "big dreams" and both the smarts and people skills to make him his high school class salutatorian, homecoming king, and prom king.  Decl. of Cynthia Warmbier ("C. W. Decl.") ¶¶ 11–16, ECF No. 16-2; H'rg Tr. (Rough) at 50–51 (Austin Warmbier ("A. W.")); *id.* at 58 (C. W.).  He was blind, deaf, and brain dead when North Korea turned him over to U.S. government officials for his final trip home.  H'rg Tr. (Rough) at 31, 36 (Frederick Warmbier

---

[1]        Rough Transcript of Hearing (Dec. 19, 2018) ("H'rg Tr. (Rough)") at 82 (Cynthia Warmbier ("C. W.")).  Citations to the December 19, 2018 hearing are to a rough draft of the transcript, since no final transcript is yet available.  The final transcript will be posted on this case's docket when available.  Discrepancies in page numbers between the rough and final transcripts may exist.

[2]        The Warmbier family members will be referenced in the text by their first names to simplify their identification in this Memorandum Opinion, and by their initials in citations to the hearing transcript.

("F. W.")).  Otto died within a week of his return.  Decl. of Dr. Daniel Kanter ("Kanter Decl.") ¶ 20, ECF No. 16-4.

A deeply knowledgeable expert from the Fletcher School of Law and Diplomacy at Tufts University describes North Korea as "unique" in the world today: North Korea is the "most advanced, most perfected totalitarian state in world history," H'rg Tr. (Rough) at 105, 110 (Expert Prof. Sung-Yoon Lee), and has "perfected its means of terrorizing" both its own people and others, *id.* at 111.  The dictator who leads North Korea, and his cronies, "show[] no regard for human life," *id.* at 127, creating, for example, a "manmade . . . famine" in the late 1990s that killed "upwards of 2 million people," *id.*, and maintaining "political prisoner concentration camps," *id.* at 110, such that "North Korean escapees" tell "a consistent story" of "a life of extreme deprivation and repression," *id.* at 111.  Moreover, North Korea is "unprecedented" in its state sponsorship of "elicit activities, like proliferation of weapons of mass destruction, counterfeiting U.S. dollars, [and] the production and sale of drugs like opium, heroin, and meth[amphetamines]."  *Id.* at 106.  Indeed, North Korea is the world's "leading" and "best qualified candidate for indictment" at the International Criminal Court for crimes against humanity.  *Id.* at 122.  An American family, the Warmbiers, experienced North Korea's brutality first-hand when North Korea seized their son to use as a pawn in that totalitarian state's global shenanigans and face-off with the United States.  As Otto's mother said, "there's evil in this world," *id.* at 82 (C. W.), and "[i]t's North Korea," *id.*

Having been compelled to keep silent during Otto's detention in North Korea in an effort to protect his safety, Otto's parents have since promised to "stand up" and hold North Korea accountable for its "evil" actions against their son.  *Id.* at 58–60 (C. W.).  To that end, Otto's parents, Cynthia ("Cindy") and Frederick ("Fred") Warmbier, initiated this action individually

and as personal representatives of Otto's estate, seeking damages under the Foreign Sovereign

Immunities Act, 28 U.S.C. § 1602, *et seq.*, against North Korea for its torture, hostage taking,

and extrajudicial killing of Otto.  Compl. ¶¶ 1–5, ECF No. 1.  North Korea never entered an

appearance in, or defended against, this action, and the plaintiffs now move for default judgment

for the damage caused by North Korea to Otto and his parents.  For the reasons discussed below,

default judgment is granted and Otto and his parents are awarded damages totaling

$501,134,683.80.

## I.      BACKGROUND

The factual background surrounding Otto's detention in North Korea is summarized

below, followed by an overview of the procedural history of this case.  The factual background is

based upon the detailed declarations submitted by the plaintiffs in support of their motion for

default judgment, as well as exhibits and testimony presented at an evidentiary hearing held on

December 19, 2018.[3]

### A.      Otto Warmbier's Detention in North Korea

Otto Warmbier, a 21-year-old University of Virginia student, with a curiosity to learn

more about the world through travel, took a five-day trip to North Korea, between December 29,

2015 and January 2, 2016, in advance of a study abroad program in China.  H'rg Tr. (Rough) at

13–15 (F. W.); *id.* at 59 (C. W.); C. W. Decl. ¶¶ 15–16.  Otto had an "open mind" and "wanted

to explore," and he viewed the trip to North Korea as an opportunity to experience a different

culture and way of life.  H'rg Tr. (Rough) at 59, 64–65 (C. W.); C. W. Decl. ¶ 15.  Although

Otto's parents were "nervous" about Otto's trip, a University of Virginia professor advised Otto

---

[3]      Six witnesses testified at the evidentiary hearing:  Otto's parents, Fred and Cindy Warmbier, his younger siblings, Austin and Greta Warmbier, and two experts on North Korea, David Hawk and Professor Sung-Yoon Lee.

that travel to North Korea was safe with certain tour groups, and the website for the operator of Otto's tour group, Young Pioneer Tours, attested to the safety of their guided trips into North Korea.  Decl. of Frederick Warmbier ¶ 5 ("F. W. Decl."), ECF No. 16-1; H'rg Tr. (Rough) at 14 (F. W.).

On January 2, 2016, Otto's scheduled departure date from North Korea, Fred and Cindy expected Otto to call them when he arrived in China, but that call never came.  H'rg Tr. (Rough) at 14–15 (F. W.); F. W. Decl. ¶ 5.  The next morning, the tour company explained that Otto missed his flight because North Korean officials took him out of the security line at the Pyongyang Sunan International Airport, and he could not leave North Korea with the rest of his tour group.  H'rg Tr. (Rough) at 15 (F. W.); F. W. Decl. ¶ 5; C.W Decl. ¶ 16.  The tour company reassured Otto's parents that "everything was fine," adding that the president of the tour company stayed with Otto and he would be "on the next flight out."  H'rg Tr. (Rough) at 15–16 (F. W.); F. W. Decl. ¶ 5.  Over "the next day or two," the tour company again reassured Otto's parents that "everything was fine," and Otto's inability to leave North Korea "was just a misunderstanding."  F. W. Decl. ¶ 6; H'rg Tr. (Rough) at 15 (F. W.).  Shortly thereafter, however, the tour company said that Otto was sick and had been taken to a hospital, and the president of the tour company left North Korea for China, leaving Otto unaccompanied in North Korea.  H'rg Tr. (Rough) at 15–16 (F. W.); F. W. Decl. ¶ 6.

When Otto was detained, the U.S. State Department advised Fred and Cindy that Otto's detention was part of North Korea's "normal routine" when "they want something," and assured them that, "based on history," Otto would "be home in six months."  H'rg Tr. (Rough) at 17–18 (F. W.).  The State Department cautioned the Warmbiers against speaking to media outlets or publicly about Otto's detention because North Korea was "going to want something for Otto,"

and the more the family spoke publicly, "the more it's going to cost." *Id.* at 17, 22–24 (F. W.);

*id.* at 65 (C. W.). Otto's parents were also told that, at some point, North Korea would permit

Otto to call home, usually late at night, and in a statement dictated by North Korea through Otto

would provide a clue as to what North Korea wanted as a condition of his release. *Id.* at 67 (C.

W.).

Given the repeated cautions against speaking publicly, Otto's parents were "[t]errified,"

"afraid to . . . speak out or discuss" Otto "with anyone," including their neighbors and friends.

*Id.* at 16, 23 (F. W.); *id.* at 72 (C. W.). They had a "sixth sense" that "things were bad for Otto,"

but what transpired was worse than they "could have imagined." F. W. Decl. ¶ 27. Even Otto's

two younger siblings, Austin and Greta Warmbier, and Otto's friends were fearful about

speaking publicly due to the possibility that North Korea would punish Otto. H'rg Tr. (Rough)

at 45 (Greta Warmbier ("G. W.")); *id.* at 59–60 (C. W.); F. W. Decl. ¶ 7. "[S]peaking out against

North Korea would antagonize the country and prolong or worsen Otto's detention." F. W. Decl.

¶ 16. In this way, over the duration of Otto's detention, North Korea "controlled" the "dialogue

the whole time." H'rg Tr. (Rough) at 82–83 (C. W.).

Otto's parents remained in the dark about the reason for Otto's detention in North Korea

until three weeks later, on January 22, 2016, F. W. Decl. ¶ 7, when the Korean Central News

Agency ("KCNA"), North Korea's state media outlet, Expert Decl. of David Hawk ("Hawk

Expert Decl.") ¶ 11, ECF No. 16-9, released an article stating Otto was "under investigation,"

Decl. of Benjamin L. Hatch ("Hatch Decl."), Ex. A (KCNA Article titled, "American Arrested

for His Hostile Act Against DPRK"), ECF No. 16-1. The article reported that Otto had been

"arrested while perpetrating a hostile act against the DPRK," having entered the country "under

the guise of tourist [*sic*] for the purpose of bringing down the foundation of its single-minded

unity at the tacit connivance of the U.S. government and under its manipulation." *Id.*

Then, on February 29, 2016, North Korea televised Otto reciting a prepared "confession"

to "severe crimes against" the DPRK, that amounted to Otto allegedly taking down a poster with

a political slogan supporting North Korea's dictator, Kim Jong-Il, from a hotel's staff-only area,

at the behest of a church in Ohio and the CIA.  Hatch Decl., Ex. B (Tr. of Otto's "Confession");

Hatch Decl., Ex. C (Video of Otto's "Confession"); *see also* Expert Decl. of Robert M. Collins

("Collins Expert Decl.") ¶ 21, ECF No. 16-10.  The preposterous "confession" was riddled with

"totally bizarre," "completely false" statements, F. W. Decl. ¶ 8, and malapropisms tied to North

Korean cultural references that would not be used by an American, H'rg Tr. at 123–26 (Expert

Prof. Sung-Yoon Lee).  In short, the "confession" was plainly coerced and "completely

manipulated." *Id.* at 18 (F. W.).

Examples of the many untruths in the purported "confession" include: (1) Otto called his

father's company "Finishing Cincinnati Black Oxide," but that company, in fact, is called

"Finishing Technology,"  F. W. Decl. ¶ 8; (2)  Otto said he practiced for his alleged crime by

stealing street signs at the University of Virginia and storing the stolen signs under his bed, H'rg

Tr. (Rough) at 19 (F. W.); F. W. Decl. ¶ 8, yet his father never found any such stolen signs, let

alone under Otto's bed at Otto's apartment, H'rg Tr. (Rough) at 19 (F. W.); F. W. Decl. ¶ 8; (3)

Otto said he conspired with the Friendship United Methodist Church, which had assets of $42

million, even though Otto had no relationship with that church, was not Methodist, and the

church has no such extensive assets, H'rg Tr. (Rough) at 19 (F. W.); F. W. Decl. ¶ 8; (4) Otto

said he agreed to take the poster because he "'desperately' needed a car" and $200,000 to fund

his two siblings' college tuition, when Otto "had his own car and was never expected or asked to

pay for his siblings' tuition," F. W. Decl. ¶ 8; and (5) Otto said he conspired with "the Z Society," but had no connection to any such organization, *id.*

In addition to these false statements in his "confession," Otto spoke with "unnatural" language that sounded as if he had "been forced to memorize" the words. *Id.* ¶¶ 8, 9. Otto, for instance, said "I came to commit this crime task," "[t]he United States administration already knows about my act through the CIA, which is closely linked to the Z Society and connived at my crime," "[t]his was a very foolish aim," "[t]his made an innocent-minded, adventurous young man, like myself, want to show my bravery to improve my reputation and show a Western victory of the DPR Korea," and "I intentionally packed my quietest boots, the best for sneaking. I knew that I would wear them during my crime commitment." *Id.* ¶ 9.

 Otto's "strange phrases," such as the references to the "U.S. administration," "DPR Korea instead of DPRK," and his "quietest boots for sneaking" were "clumsy" North Korean "stock phrase[s]" that provide "no doubt . . . that this was a coerced confession under great duress." H'rg Tr. (Rough) at 123–25 (Expert Prof. Sung-Yoon Lee). Moreover, Otto's reference to "hostile U.S. policy" three times, and the notion that Otto, as the oldest child, would need to subsidize his younger siblings' college tuition—an expectation of the eldest son in Korean culture—are reflective of "Korean connotation," further indicating North Korea "imposed" this material in Otto's confession. *Id.* at 124–25 (Expert Prof. Sung-Yoon Lee).

Shortly after Otto's purported "confession," the U.S. State Department assured Otto's parents that Otto's detention was nearing a "mature phase," and North Korea would "finally call." F. W. Decl. ¶ 10. Fred and Cindy learned nothing, however, until KCNA reported on North Korea's "trial" of Otto, on March 16, 2016, where North Korea convicted Otto on a charge of state subversion and sentenced him to fifteen years of hard labor, based on his purported

"confession" to the crime.  Hatch Decl., Ex. E (KCNA Article on Otto's "Trial," titled

"American Student Sentenced to 15 Years of Hard Labor in DPRK").  KCNA stated Otto

committed the crime "pursuant to the U.S. government's hostile policy" towards North Korea.

*Id.*  Short video excerpts of Otto's "trial" were released, but no public court records have ever

been made available.  *See* Hatch Decl., Ex. F (ABC Good Morning America News Broadcast

Containing Clips of Otto's "Trial") ("Video of 'Trial'"); Hatch Decl. ¶ 7.  In the excerpts, Otto's

hands are "curled in," and he is "completely distressed" and "visibly upset."  *See* Hatch Decl.,

Ex. F (Video of "Trial"); F. W. Decl. ¶ 11.

North Korea continued to detain Otto for an additional 15 months after this "trial," for a

total detention period of approximately 17.5 months.  *See* F. W. Decl. ¶ 21.  During Otto's

detention, Otto's family received "almost no information about [Otto's] condition," F. W. Decl. ¶

15, and Otto's parents ultimately had no way to communicate with him, H'rg Tr. (Rough) at 21–

22 (F. W.); C. W. Decl. ¶ 17.  Although Otto's parents initially were told they could send Otto

emails through the State Department, which forwarded them to Swedish intermediaries in North

Korea for delivery to Otto, Otto's parents never heard anything directly from Otto and have no

idea if he received any of this correspondence.  H'rg Tr. (Rough) at 21–22 (F. W.); C. W. Decl. ¶

17; F. W. Decl.  ¶ 12.  By June 2016, the State Department told Otto's parents that they could no

longer email Otto because North Korea considered him a "Prisoner of War" and a "War

Criminal."  F. W. Decl. ¶ 14.

Over the course of Otto's detention, Otto's parents spoke regularly with State Department

and other senior officials, and were told "on several occasions" that Otto was being imprisoned

because "North Korea wanted something from the United States," and he "would not be released

until they obtained that."  *Id.* ¶ 15; H'rg Tr. (Rough) at 67 (C. W.).  Then-Secretary of State John

8

Kerry told Otto's family at a meeting that "Otto is being held hostage by North Korea," F. W. Decl. ¶ 15, and "they want something for Otto," H'rg Tr. (Rough) at 26 (F. W.).  Otto's parents "knew he was a hostage, a pawn, a political prisoner," "left alone" and "abandoned," *id.* at 28 (F. W.).  They lived "in fear" of talking about Otto because of the "threat" of what North Korea would do to Otto as a result.  *Id.* at 23, 25 (F. W.).

In June 2017, Joseph Yun, the former U.S. Special Representative for North Korea Policy at the State Department, and the Deputy Secretary of State informed Fred that Otto had been in a coma for over a year since April 2016.  *Id.* at 29 (F. W.); F. W. Decl. ¶ 18; C. W. Decl. ¶ 23.  Once again, however, Otto's parents were advised not to speak about Otto's condition publicly because if they mentioned Otto in the media, North Korea would not release him and there was "no guarantee" about his safety.  H'rg Tr. (Rough) at 29, 31 (F. W.); F. W. Decl. ¶ 18.

Otto's family remained silent after that call, H'rg Tr. (Rough) at 31 (F. W.), and ultimately, North Korea agreed to release Otto, after pardoning Otto for his purported crime, F. W. Decl. ¶ 20.  Representative Yun traveled to North Korea to bring Otto back.  *Id.*  Cindy "held out hope" that "Otto could be brought back" as the "young man" she once knew.  C. W. Decl. ¶ 23.  Having been told Otto was in a coma, she pictured him asleep and thought he would be able to recover with medical care.  *Id.*  These hopes were "shattered" on June 13, 2017, when Otto landed at the Cincinnati Municipal Lunken Airport.  *Id.* ¶¶ 23–24; F. W. Decl. ¶ 21.

Fred, Cindy, and Otto's younger siblings climbed the steps of the plane and immediately heard "loud inhuman sounds."  H'rg Tr. (Rough) at 33 (F. W.).  When Otto's family saw him, Otto's condition was "horrible and unrecognizable."  C. W. Decl. ¶ 24.  Otto was "jerking violently" and "howling."   F. W. Decl. ¶ 22; H'rg Tr. (Rough) at 33 (F. W.).  He wore a diaper and had a "feeding tube" and a "shaved head," "his arms . . . curled and mangled," "his eyes . . .

bulging out," and it "almost appeared that he had chewed a hole through his bottom lip."  F. W. Decl. ¶ 22; H'rg Tr. (Rough) at 33 (F. W.); *id.* at 47 (G. W.); *id.* at 54 (A. W.).  His once "perfectly straight" teeth were misaligned, H'rg Tr. (Rough) at 61 (C. W.), and Otto was blind and deaf, with severe brain damage, unable to perceive anything around him, *id.* at 36 (F. W.).

The entire family was "shocked" upon seeing Otto.  *Id.* at 35 (F. W.); *id.* at 46, 47 (G. W.); *id.* at 54 (A. W.).  Greta "ran off the plane screaming" because Otto looked like a "monster," and "not Otto"; she was scared of him.  C. W. Decl. ¶ 24; H'rg Tr. (Rough) at 47 (G. W.).  Otto's mother, too, "almost passed out" upon seeing Otto, and ran off the plane with Greta. C. W. Decl. ¶ 24; F. W. Decl. ¶ 22; H'rg Tr. (Rough) at 47 (G. W.).  Fred and Austin remained on the plane with Otto until he was transported to an ambulance, an experience that was "traumatic" and "tragic."  F. W. Decl. ¶ 22; H'rg Tr. (Rough) at 33–34 (F. W.).

Otto's mother, although distraught by the sight of her son in such a state, rode in the ambulance with Otto from the airport to the hospital because she did not want Otto "to be alone anymore."  C. W. Decl. ¶ 24.  Over the next couple of days at the hospital, Otto's family was advised by medical personnel about the severity of Otto's brain damage: he was a "vegetable," completely unresponsive to his family, blind, deaf and without "any signs of consciousness."  F. W. Decl. ¶ 25; H'rg Tr. (Rough) at 33, 36 (F. W.).  In addition to these horrendous signs of his torture, Otto also had "a large scar on his left foot," a wound not present before he left for North Korea, and his once "perfectly straight" teeth were "noticeably misaligned."  F. W. Decl. ¶ 24; H'rg Tr. (Rough) at 36 (F. W.); *id.* at 61 (C. W.).  Seeing Otto in that state "was horrible."  H'rg Tr. (Rough) at 36 (F. W.).

Otto's lead neurologist, Dr. Daniel Kanter, concluded Otto's brain damage most likely resulted from the loss of blood flow to the brain for a period of five to twenty minutes.  Kanter

Decl. ¶ 15.  Otto was in an unrecoverable state of non-responsiveness.  *Id.* ¶ 16.  After Otto's

physicians concluded that his condition would never improve, Otto's family transitioned him to

palliative care and ultimately ceased feeding and breathing assistance.  *Id.* ¶ 20; F. W. Decl. ¶ 25.

Otto died quickly on June 19, 2017, less than a week after his release from North Korea.  Kanter

Decl. ¶ 20.

Since Otto's death, North Korea has denied any responsibility, calling his death a

mystery and blaming it on "botulism" and the United States government.  F. W. Decl. ¶ 24;

Hatch Decl., Ex. G (KCNA Article titled, "DPRK FM Spokesman Accuses U.S. of Slandering

Humanitarian Measure").

### B.      Procedural History

Plaintiffs Fred and Cindy Warmbier, individually and as personal representatives of the

estate of Otto Warmbier, filed this lawsuit against North Korea, on April 26, 2018.  *See* Compl.

They served North Korea in accordance with the FSIA, which provides the procedure for

completing service upon a foreign state or political subdivision of a foreign state.  Decl. Supp.

Default, ECF No. 13; *see also infra* Part III.B for further discussion.  After the plaintiffs sought

entry of default, *see* Decl. Supp. Default, the Clerk entered default against North Korea on

September 7, 2018, *see* Entry of Default, ECF No. 14; *see also* FED. R. CIV. P. 55(a) ("When a

party against whom a judgment for affirmative relief is sought has failed to plead or otherwise

defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's

default.").  The plaintiffs subsequently filed the instant motion for default judgment, *see* Pls.'

Mot. Default J., ECF No. 16 ("Pls.' Mot."), supported by eleven declarations, as well as

testimony and exhibits presented at an evidentiary hearing on December 19, 2018, pursuant to

Federal Rule of Civil Procedure 55(b)(2).[4]  The plaintiffs' motion for default judgment is now ripe for review.

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  "[S]trong policies favor resolution of disputes on their merits," and therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Notwithstanding its appropriateness in some circumstances, "entry of a default judgment is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  Thus, the procedural posture of a default does not relieve a federal court of its "affirmative obligation" to determine whether it has subject matter jurisdiction over the action.  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.  The "plaintiffs retain 'the burden of proving personal jurisdiction, [and] they can satisfy that burden with a *prima facie* showing.'"  *Id.* (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)).  In doing so, "they may rest their

---

[4]     The plaintiffs have submitted eleven declarations, with exhibits, that detail evidence about (1) Otto's detention in North Korea, *see* Hatch Decl.; C. W. Decl.; F. W. Decl.; (2) Otto's medical and dental history, *see* Kanter Decl., Decl. of Dr. Murray Dock, ECF No. 16-5; Decl. of Dr. Todd Williams, ECF No. 16-6; Decl. of Dr. Barbara J. Walker, ECF No. 18 (sealed); (3) expert declarations on North Korean torture, hostage taking, and extrajudicial killing, *see* Expert Decl. of Professor Sung-Yoon Lee ("Lee Expert Decl."), ECF No. 16-8; Hawk Expert Decl.; Collins Expert Decl.; and (4) an expert report on lost wages, *see* Report of James V. Koch ("Koch Report"), ECF No. 16-11.  The plaintiffs also filed post-hearing evidence regarding Otto's medical expenses.  *See* Decl. of Benjamin L. Hatch ("Hatch Medical Expenses Decl."), ECF No. 23 (sealed).

argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.* at 7.

When default judgment is sought under the FSIA, a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "This provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55(e)," which has been renumbered by the 2007 amendment to Rule 55(d). *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55(e), F.R. Civ. P."). While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court,'" courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)).

With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Id.* at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (alteration adopted). Courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Uncontroverted factual allegations that are supported by admissible evidence are taken as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual

allegations that are supported by affidavits." (citing *Rimkus v. Islamic Republic of Iran*, 750 F.

Supp. 2d 163, 171 (D.D.C. 2010))); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63

(D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011) (quoting *Estate of Botvin v. Islamic Republic*

*of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007)); *accord* FED. R. CIV. P. 56(e)(2) (authorizing

court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to

properly address another party's assertion of fact").  Section 1608(e), thus, "does not require a

court to step into the shoes of the defaulting party and pursue every possible evidentiary

challenge."  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017).  "This is part of

the risk a sovereign runs when it does not appear and alert the court to evidentiary problems."

*Id.* at 786.

In a FSIA default proceeding, a district court can find that the evidence presented is

satisfactory "when the plaintiff shows 'her claim has some factual basis,'. . . even if she might

not have prevailed in a contested proceeding."  *Id.* at 785 (citations omitted).  "This lenient

standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and

eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile

sovereign."  *Id.*  Thus, courts are accorded "an unusual degree of discretion over evidentiary

rulings in a FSIA case against a defaulting state sponsor of terrorism."  *Id.*  This "broad

discretion extends to the admission of expert testimony, which, even in the ordinary case, 'does

not constitute an abuse of discretion merely because the factual bases for an expert's opinion are

weak.'"  *Id.* (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993)).

Indeed, "[t]he testimony of expert witnesses is of crucial importance in terrorism cases . . .

because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain,"

"[v]ictims of terrorist attacks, if not dead, are often incapacitated and unable to testify about their

14

experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Id.* at 787 (citations omitted). "Eyewitnesses in a state that sponsors terrorism are similarly difficult to locate and may be unwilling to testify for fear of retaliation," and "[t]he sovereigns themselves often fail to appear and to participate in discovery." *Id.* Accordingly, "[w]ith a dearth of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.*

## III.    DISCUSSION

In a FSIA case, "[a] default judgment may be entered when (1) the Court has subject matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017); *accord Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 32 (D.D.C. 2018). Each of these requirements is addressed *seriatim* below.

### A.    Subject Matter Jurisdiction

This Court may exercise "original jurisdiction" over a foreign state "without regard to amount in controversy" in "nonjury civil action[s]" seeking "relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). As the plaintiffs have not demanded a jury trial, *see* Civil Cover Sheet at 2, ECF No. 1-1, and they seek *in personam* relief, *see* Compl. at 21, the remaining question is whether North Korea is entitled to immunity under the FSIA or another international agreement.

Foreign governments are generally immunized from lawsuits brought against them in the United States unless an FSIA exception applies.  *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  The plaintiffs invoke jurisdiction under the FSIA's terrorism exception, codified at 28 U.S.C. § 1605A, *see* Pls.' Mot. at 9, which provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ," 28 U.S.C. § 1605A(a)(1).  Subject matter jurisdiction under this terrorism exception may be exercised when the plaintiff establishes the following four elements: (1) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . or was so designated as a result of such act, and . . . remains so designated when the claim is filed," *id.* § 1605A(a)(2)(A)(i)(I); (2) "the claimant or the victim was, at the time [of] the act . . . a national of the United States," *id.* § 1605A(a)(2)(A)(ii); (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," *id.* § 1605A(a)(2)(A)(iii); and (4) the plaintiff seeks monetary damages "for personal injury or death caused by 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,' if 'engaged in by an official, employee, or agent' of a foreign country," *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(1)).  These four elements, which are discussed below, have been satisfactorily proven here.

1.    **First Element: North Korea Was Timely Designated a State Sponsor of Terrorism**

With respect to the first element, North Korea was designated a state sponsor of terrorism, in part due to Otto's detention and abusive treatment resulting in his death.  North Korea was first designated as a state sponsor of terrorism by the State Department in 1988.  *See* Notice, Determination Pursuant to Section 6(j) of the Export Administration Act of 1979; North Korea, 53 Fed. Reg. 3477–01 (Feb. 5, 1988).  The State Department, however, rescinded that determination in 2008.  Notice, Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63540–01 (Oct. 24, 2008).  The State Department re-designated North Korea as a state sponsor of terrorism in November 2017, and that designation has not been rescinded.  *See* Notice, Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST), 82 Fed. Reg. 56100–01 (Nov. 27, 2017).  North Korea thus "remain[ed] so designated when" the plaintiffs filed their claims in April 2018.  28 U.S.C. § 1605A(a)(2)(A)(i)(I); *see also* Compl. at 1, 21.

Notwithstanding that North Korea was not designated as a state sponsor of terrorism "at the time" of Otto's detention in January 2016 or by the time of his subsequent release in June 2017, *see* 28 U.S.C. § 1605A(a)(2)(A)(i)(I), subject matter jurisdiction is established if the foreign state was designated as a state sponsor of terrorism "as a result of such act," *id.*  Here, the State Department's designation of North Korea as a state sponsor of terrorism was, at least in part, a result of North Korea's detention and mistreatment of Otto, which is sufficient to meet the state-sponsor-of-terrorism requirement.  *See Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 74 (D.D.C. 2008) ("North Korea has been designated a state sponsor of terrorism, in part due to its unlawful seizure of the [USS] Pueblo," an act upon which the FSIA claim was based); *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 65

(D.D.C. 2010) (concluding that 28 U.S.C. § 1605A(a)(2)(A)(i) was satisfied where Iran was designated as a state sponsor of terrorism "in partial response to the Beirut bombing," the act which gave rise to the FSIA claim).

After Otto's death, Fred and Cindy recounted Otto's story "to various government officials"—including members of Congress, State Department and Executive Branch officials— "in support of re-adding North Korea to the list of state sponsors of terrorism."  F. W. Decl. ¶ 26; *see also* H'rg Tr. (Rough) at 38–39 (F. W.).  On October 20, 2017, sixteen Congressmen wrote a letter to the Secretary of State stating, "We write to urge you to exercise your authority to relist North Korea as a State Sponsor of Terrorism," and noting that "[s]ince North Korea was removed from the State Sponsors of Terrorism list in 2008, the Kim regime has repeatedly perpetrated or supported heinous acts, the most recent example of which was the illegitimate detention, murderous mistreatment, and tragic death of Otto Warmbier."  Hatch Decl., Ex. K (Letter from Congressmen to Secretary of State).  Ultimately, President Trump announced that the United States would be re-designating North Korea as a state sponsor of terrorism on November 20, 2017, the same date that the State Department lists as the designation date for North Korea.  Hatch Decl., Ex. H (CNN Video titled "Trump: N. Korea Is a State Sponsor of Terror"); Hatch Decl., Ex. I (CNN Article titled, "Trump Names North Korea a State Sponsor of Terrorism"); *see also* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/j/ ct/list/c14151.htm (last visited Dec. 24, 2018).  In his announcement, President Trump stated, "As we take this action today our thoughts turn to Otto Warmbier, a wonderful young man." Hatch Decl., Ex. H; *see also* Hatch Decl., Ex. I.  This evidence plainly establishes that the plaintiffs meet the first element for the exercise of subject matter jurisdiction because, under 28

U.S.C. § 1605A(a)(2)(A)(i)(I), because the lawsuit was filed after North Korea was designated as a state sponsor of terrorism, in part, "as a result of" its barbaric treatment of Otto.

### 2.    Second Element: The Plaintiffs Are U.S. Citizens

As to the second element, the plaintiffs have averred in sworn declarations that they, as well as their son, Otto, have been United States citizens for their entire lives, including at the time of Otto's seizure and detention in North Korea and of his death.  F. W. Decl. ¶ 1; C. W. Decl. ¶ 1.  Thus, the second element is firmly established.

### 3.    Third Element: Plaintiffs' Offer to Arbitrate with North Korea

For the third element, the FSIA "does not require any particular form of offer to arbitrate, simply the extension of a 'reasonable opportunity.'" *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003).  The plaintiffs filed a Notice of Offer to Arbitrate on the same day they filed their Complaint.  *See* Offer to Arbitrate at 1, ECF No. 3. The Notice offered "to submit the above-captioned matter to arbitration in accordance with accepted international rules of arbitration," and stated that North Korea could accept such offer "by filing with the Clerk . . . an acceptance in lieu of filing an answer or other responsive pleading."  *Id.*  A translated copy of the Notice was served on North Korea on June 19, 2018, *see* Return of Service, ECF No. 12, and North Korea has failed to file an acceptance or contact Plaintiffs regarding their offer to arbitrate, Hatch Decl. ¶ 18.  The plaintiffs have thus satisfied the arbitration offer requirement, under 28 U.S.C. § 1605A(a)(2)(A)(iii).  *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 158 (D.D.C. 2017) ("[A]n offer of arbitration was included with the documents served on Iran . . . , which is sufficient to satisfy the FSIA's requirement."); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 66 (D.D.C. 2015)

(including an offer of arbitration in the documents served on the foreign state satisfied the

FSIA's requirement).

### 4.      Fourth Element: Actions of North Korea Qualify for the Terrorism Exception

Finally, as detailed below, the plaintiffs have provided ample evidence to establish the

fourth element: that their damages arise from North Korea's barbaric mistreatment of Otto,

including "torture," "hostage taking," and "extrajudicial killing."  28 U.S.C. § 1605A(a)(1).

#### a.      Torture

"[T]orture," for purposes of the FSIA's terrorism exception, is defined by "the meaning

given" to that term in the Torture Victim Protection Act of 1991 ("TVPA").  28 U.S.C. §

1605A(h)(7).  The TVPA, drawing from the 1984 United Nations Convention Against Torture

and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention"),

defines torture as follows:

> any act, directed against an individual in the offender's custody or physical
> control, by which severe pain or suffering (other than pain or suffering arising
> only from or inherent in, or incidental to, lawful sanctions), whether physical
> or mental, is intentionally inflicted on that individual for such purposes as
> obtaining from that individual or a third person information or a confession,
> punishing that individual for an act that individual or a third person has
> committed or is suspected of having committed, intimidating or coercing that
> individual or a third person, or for any reason based on discrimination of any
> kind.

Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 (note)); *see*

*also Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002)

(explaining that the TVPA's definition of torture "borrows extensively from the [Torture

Convention]").

To establish torture, the plaintiffs must show that the conduct was sufficiently severe and

purposeful.  *See Price*, 294 F.3d at 92–93.  As the D.C. Circuit has explained, "suffering alone is

insufficient to establish a claim under the FSIA's terrorism exception.  To qualify as torture, the mistreatment must be purposeful—that is, the defendant must have targeted the victim, for instance, to punish him for his religious or political beliefs." *Kim*, 774 F.3d at 1050.  Severity "is crucial to ensuring that the conduct proscribed by the Convention and the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Price*, 294 F.3d at 92.  "The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim," and [t]he more intense, lasting, or heinous the agony, the more likely it is to be torture." *Id.* at 93.  Thus, "torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault," as "[n]ot *all* police brutality, not *every* instance of excessive force used against prisoners, is torture under the FSIA." *Id.* (emphases in original).

The TPVA lists certain purposes for which extreme and outrageous measures might be torturous, such as "obtaining from that individual or a third person information or a confession," 28 U.S.C. § 1350 (note), although the list of purposes in the TVPA "was not meant to be exhaustive," *Price*, 294 F.3d 82 at 93.  In sum, "[i]n order to lose its sovereign immunity, a foreign state must impose suffering cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end." *Id.*

Here, ascertaining precisely what North Korea did to Otto to cut off the blood flow to his brain, rendering him blind, deaf and brain dead, is not forensically doable, but also is unnecessary.  Certainly, Otto, who was returned by North Korea to the United States with severe brain damage that eventually killed him, *see* Kanter Decl. ¶ 21, was "incapacitated" and "unable to testify about [his] experiences," *Owens*, 864 F.3d at 787.  Further, North Korea has not appeared in this case and, not surprisingly, no witnesses are available to provide any eyewitness

or even hearsay evidence on this point.  Indeed, North Korea "is known to intimidate defectors

and potential witnesses." *Kim*, 774 F.3d at 1048; *see also, e.g.*, Hawk Expert Decl. ¶ 28 ("North

Korea is known to intimidate potential witnesses to its human rights abuses to prevent

information about such abuses from reaching the outside world.").  Accordingly, "[w]ith a dearth

of firsthand evidence, reliance upon secondary materials and the opinions of experts is often

critical in order to establish the factual basis of a claim under the FSIA terrorism exception."

*Owens*, 864 F.3d at 787; *see also Kim*, 774 F.3d at 1049 ("[W]here a plaintiff has produced

compelling, admissible evidence that the regime abducted the victim and that it routinely tortures

and kills the people it abducts, the courts can assume that the defendant probably tortured and

killed the victim.").  "In these circumstances, requiring that the [plaintiffs] prove exactly what

happened to the [victim] and when would defeat the Act's very purpose" of "punish[ing] foreign

states who have committed or sponsored such acts and deter them from doing so in the future."

*Kim*, 774 F.3d at 1048.

The plaintiffs have satisfactorily established that North Korea more likely than not

barbarically tortured Otto to extract a false confession and then, after a proceeding characterized

by North Korea as a "trial," used Otto's lengthy sentence as leverage against the United States to

further North Korea's own foreign policy objectives.  Here, as in similar cases, reliance on expert

testimony is sufficient and appropriate.  *See, e.g.*, *Owens*, 864 F.3d at 787; *Kim*, 774 F. 3d at

1049 (finding sufficient evidence of torture where experts "reported that victims of forced

disappearance in North Korea usually suffer torture" and that the victim was an "especially likely

target").  Three separate experts on North Korea confirm that Otto was tortured during different

stages of his detention in North Korea.

First, Otto was likely tortured while interrogated to obtain a false confession.  David

Hawk, an expert on human rights in North Korea who has interviewed many North Korean

refugees, *see* Hawk Expert Decl. ¶¶ 1–4, and whose testimony the D.C. Circuit has previously

credited, *see Kim*, 774 F.3d at 1050, opined that Otto "was almost certainly subject to harsh

interrogation methods, including torture and/or other cruel, inhuman or degrading treatment or

punishment," Hawk Expert Decl. ¶ 37.  North Korea ultimately obtained a false confession from

Otto, and "the initial or pretrial interrogation stage, when interrogators are attempting to extract a

confession, is when torture most commonly occurs in North Korea; indeed, it would be unusual

if torture did not occur in this phase." *Id.*

Similarly, Bob Collins, an expert having extensive familiarity with North Korean

interrogation methods, *see* Collins Expert Decl. ¶¶ 1–7, noted that Otto's purported "confession,"

which was full of patently false statements and unnatural language, *see id.* ¶ 27, indicates the

confession was "most likely dictated to [Otto] in advance and the product of torture," *id.* ¶¶ 27–

28.  Professor Sung-Yoon Lee, who specializes in Korean Studies at the Fletcher School of Law

and Diplomacy at Tufts University, *see* Lee Expert Decl. ¶ 1, similarly concluded that "Otto was

likely tortured by North Korean agents while detained in order to obtain a confession from him,"

because it is a "routinized way through which North Korea obtains confessions from individuals

in its custody," *id.* ¶ 24.

Second, Otto was likely tortured based on the nature of the North Korean crime to which

he was forced to confess and for which he was convicted:  removing a poster that said, "Let's

arm ourselves strongly with Kim Jong-il patriotism!"  Collins Expert Decl. ¶ 21.  According to

Mr. Hawk, "North Korea almost certainly tortured Otto" because this crime would carry a

penalty of "particularly brutal treatment" in North Korea, Hawk Expert Decl. ¶ 38, or even the

penalty of "execution," H'rg Tr. (Rough) at 97 (Expert David Hawk).  Mr. Collins confirms that,

"[a] crime of the nature of which Otto was accused is in fact the ultimate crime in North Korea;"

and North Koreans suspected of similar political offenses "are seized and deported without

judicial process to political prison camps . . . where they are routinely tortured and mistreated."

Collins Expert Decl. ¶ 22.

Third, North Korea "most likely further tortured" Otto after his trial and sentencing "for

their own intelligence and foreign relations purposes." *Id.* ¶ 30.  Indeed, North Korea probably

"both seized and maintained custody of Otto" and then "systematically tortured" him to "further

certain policy goals: namely, in order to deter the United States from responding either with

military action or sanctions in the face of North Korea's increased nuclear and conventional

weapons testing." Lee Expert Decl. ¶¶ 20, 25.

Fourth, the general fact of Otto's detention in North Korea suggests he was tortured.  For

example, Mr. Hawk opined that in all North Korean detention facilities, prisoners "are uniformly

treated with brutality and disregard for human rights."  Hawk Expert Decl. ¶ 13.  The "practice

of torture permeates the North Korean prison and detention system," *id.* ¶ 20, and "is particularly

common . . .  during interrogations," *id.* ¶ 23.  Likewise, Mr. Collins explained that he is "aware

of hundreds of North Koreans . . . who have been subject to" torture, Collins Expert Decl. ¶ 27,

and concluded Otto was likely tortured based on that "routine" practice, *id.* ¶¶ 18, 28.  According

to Professor Lee, given the expected and routinized nature of torture in North Korean facilities,

North Korean interrogators "would have found it unpatriotic not to use torture to get what they

want."  H'rg Tr. (Rough) at 126 (Expert Prof. Sung-Yoon Lee).

Fifth, notably, several torture methods regularly employed by North Korea are

"consistent with Otto's condition when he returned." Collins Expert Decl. ¶ 31.  Dr. Daniel

Kanter, the neurologist who cared for Otto when he returned to the United States, concluded

Otto's brain damage resulted from the cessation or significant reduction of blood flow to the

brain for five to twenty minutes, which can be caused by "cessation of breathing."  Kanter Decl.

¶¶ 1, 14, 15.  "[N]ormal North Korean torture methods," which include "[w]ater-boarding,"

"manipulating teeth with pliers," and "application of electric shock," "can lead to a cessation of

breathing," and if Otto began "to resist," "interrogators would have become infuriated . . . and

suffocated him or otherwise caused him to stop breathing, only to be forced to revive him."

Collins Expert Decl. ¶ 31.  Even more, Otto "had a large scar on his foot and . . . certain of his

bottom teeth appeared repositioned," further evidence supporting that his physical condition

resulted from "[t]he application of electric shocks" to Otto's foot and the use of pliers to

rearrange Otto's teeth.  *Id.* ¶ 30.

Although "there were not any apparent visible wounds on Otto [in the video footage

available of him while in North Korean detention]," "bruises, wounds or other injury on the body

anywhere other than his hands, head and neck would not have been visible" from the "methods

of torture commonly applied to North Korean detainees in order to extract [a] confession."

Collins Expert Decl. ¶ 28.  For instance, "water-boarding, being forced to squat for several hours,

and being placed in a box too small to either stand or lie down in for long periods of time," all

"cause severe pain and suffering without leaving obvious physical evidence."  *Id.*; *see also* H'rg

Tr. (Rough) at 92–93 (Expert David Hawk) (explaining "common methods of torture and pain

infliction during the initial detention and interrogation periods," such as "string[ing] prisoners up

by their wrists from the bars in the cells just with their toes off the floor," forced kneeling or

squatting with an "iron ore wooden bar" behind the legs, putting people in a "very, very small

box so that they can't stand up or lie down," and beatings, would not leave scars).  Moreover,

United States officials have publicly confirmed that North Korea tortured Otto.  Hatch Decl. ¶ 17.

The plaintiffs, therefore, have "produced compelling, admissible evidence" that North Korea detained Otto and "routinely tortures" its detainees.  *Kim*, 774 F.3d at 1049.

### b.      Hostage Taking

The plaintiffs have also satisfactorily shown that North Korea took Otto hostage. "[H]ostage taking" is defined under Section 1605A(h)(2) as having "the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages," which in turn provides:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridicial person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

United Nations, International Convention Against the Taking of Hostages, No. 21931, Article I (Dec. 17, 1979).  "Courts thus have found 'hostage taking' in cases involving physical capture and confinement."  *Mohammadi*, 782 F.3d at 16.  "The essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the [C]onvention."  *Simpson v. Socialist People's Libyan Arab Jamahiriya ("Simpson II")*, 470 F.3d 356, 359 (D.C. Cir. 2006) (quoting *Simpson*, 326 F.3d at 234–35).  This requires "some '*quid pro quo*' arrangement whereby the hostage would have been released 'upon performance or non-performance of any action by that third party,'" and the plaintiff must identify a "nexus between what happened to [the hostage] in [the foreign state] and any concrete concession that [the foreign sovereign] *may* have hoped to extract from the outside

world.'"  *Id.* at 360 (quoting *Price*, 294 F.3d at 94).  A plaintiff, however, "need not allege that the hostage taker had communicated its intended purpose to the outside world."  *Id.*

Here, ample evidence has been presented that North Korea detained Otto and persisted in detaining him for political leverage with the United States.  For instance, Fred and Cindy spoke "regularly with representatives from the Department of State as well as other senior United States officials, and were told on several occasions that Otto was being imprisoned in North Korea because North Korea wanted something from the United States, and that he would not be released until they had obtained that."  F. W. Decl. ¶ 15.  Then-Secretary of State John Kerry, in particular, told Otto's family in a meeting, after Otto's trial and sentencing in North Korea, that "Otto is being held hostage by North Korea," and "they will want something in exchange for releasing him."  *Id.*; *see also* H'rg Tr. (Rough) at 26 (F. W. ); C. W. Decl. ¶ 19 ("Several United States officials also told us that Otto was continuing to be held because North Korea wanted something from the United States and would not let him go until they got something in return.").

The expert David Hawk, who has authored multiple reports on North Korean prison facilities for international organizations, explained that, "North Korea imprisoned and continued to imprison Otto in order to use his fifteen-year sentence of imprisonment to compel the United States to send a high level official to North Korea to increase its stature and to open a dialogue with North Korea during a time when the two countries were not communicating . . . ."  Hawk Expert Decl. ¶ 39; *see also* H'rg Tr. (Rough) at 102–03 (Expert David Hawk) (explaining Otto's detention fit North Korea's "pattern" of holding Americans hostage to serve its goal of "opening dialogue" with the United States).  This view is corroborated by the expert Bob Collins, who confirmed that, "North Korea would view" Otto's detention "as giving it leverage in its foreign policy goals, such as the ongoing development of its nuclear program during the time of Otto's

imprisonment."  Collins Expert Decl. ¶ 33; *id.* ¶ 34 ("[North Korea] would have believed the nature of [Otto's] crime as giving them a particularly strong ability to leverage their custody of him into achieving foreign policy goals with the United States as they could attribute the United States with a heinous affront to North Korean sovereignty.").  Quite transparently, North Korea made the political leverage purpose of Otto's detention clear when a spokesman for the North Korean Foreign Ministry stated after Otto's death, "Warmbier is a victim of policy of 'strategic patience' of Obama who was engrossed in utmost hostility and negation against the DPRK and refused to have dialogue with the DPRK."  Hatch Decl., Ex. G (KCNA Article titled, "DPRK FM Spokesman Accuses U.S. of Slandering Humanitarian Measure").

According to Professor Lee, for North Korea, hostage taking is "a very well-honed craft" and "a tool of North Korea's diplomacy," designed "to compel the United States to negotiate from a position of weakness."  H'rg Tr. (Rough) at 121.  "North Korea carefully plans the timing of events that it knows will have a substantial geopolitical impact."  Lee Expert Decl. ¶ 11. Otto's case is no exception, as North Korea detained Otto "to deter the United States from responding either with military action or sanctions in the face of North Korea's increased nuclear and conventional weapons testing."  *Id.* ¶ 20.  Thus, "[i]t was not an accident that Otto's arrest occurred in early January 2016," because at that time, North Korea "was then pursuing the rapid and highly public expansion of its nuclear weapons program."  *Id.* ¶ 21.  On January 6, 2016, just four days after North Korea seized Otto at the Pyongyang International Airport, "North Korea claimed to have tested the nation's first hydrogen bomb," and "[o]n September 9, 2016, North Korea announced that it successfully tested a nuclear warhead that could be mounted onto ballistic missiles."  *Id.*  Even if North Korea "may have gone ahead with these weapons tests whether or not it had Otto in its custody," North Korea "would have believed that having Otto

gave it an extra level of security that would deter the United States from being aggressive in response." *Id.*

Additionally, legislation to sanction North Korea had been pending in the U.S. Congress in 2015, which "North Korea would . . . have been aware and apprehensive of . . . before it seized Otto." *Id.* ¶ 22.  Less than two weeks after enactment in the United States of the North Korea Sanctions and Policy Enhancement Act of 2016 (H.R. 757, Pub. L. 114–122), North Korea made public Otto's purported "confession." *Id.*  Then, Otto's trial and sentencing occurred on March 16, 2016, the day after "President Obama had signed an Executive Order imposing a variety of sanctions on North Korea," with Otto's trial held on the actual day this Executive Order became effective.  *Id.* ¶ 23.

Just as in *Massie*, where North Korea took hostage the USS Pueblo crew to "extract a public apology" from the United States, in violation of the FSIA, here, too, North Korea detained, convicted and imposed a lengthy prison term on Otto in order to gain leverage as North Korea engaged in highly publicized nuclear and long-range missile tests and the United States developed its North Korea sanctions policy.  *See Massie*, 592 F. Supp. 2d at 65, 67; *see also Hekmati*, 278 F. Supp. 3d at 162 (finding sufficient proof of hostage taking under the FSIA when "Iran detained Hekmati on false espionage charges and, for four-and-a-half years, continuously threatened to kill, injure, and detain him, in an effort to compel the United States to release Iranians imprisoned in the United States or make other political or financial concessions to Iran.").  This is sufficient evidence for hostage taking.

Another pernicious purpose of North Korea's hostage taking must be highlighted.  North Korea, as a totalitarian state, exercises tight control on its own media and citizenry, and by seizing an American hostage, seeks to extend this control outside its borders by muting criticism

of its actions in the United States and the international community through the explicit and implicit threat to the safety and well-being of the hostage. *See* H'rg Tr. (Rough) at 121 (Expert Prof. Sung-Yoon Lee) (explaining that North Korea publicly portrays itself as a "high-functioning" nation "based on the . . . rule of law" to maintain "the semblance of normalcy"); *id.* at 104 (Expert David Hawk) (stating that North Korea "care[s] about its international reputation with respect to human rights"). As Otto's case illustrates, fear that public criticism of North Korea will result in reprisal against the hostage worked as North Korea intended to keep the Warmbiers and their family and friends silent about Otto's detention.

U.S. government officials repeatedly cautioned the Warmbiers that North Korea threatened to injure Otto if they spoke out publicly about Otto's confinement and questioned or criticized publicly the North Korean story about the circumstances of Otto's detention. Otto's mother stated that, "we were told by all the government officials we met with that we should stay quiet and not speak out against North Korea because doing so would probably mean that Otto would be punished for what we said." C. W. Decl. ¶ 19. In June 2017, Joseph Yun, the former U.S. Special Representative for North Korea Policy at the State Department, told Fred Warmbier that North Korean representatives "won't release Otto" if the Warmbiers spoke to the media about Otto's detention. F. W. Decl. ¶ 18. In sum, North Korea used Otto's detention to "control" the "dialogue the whole time," H'rg Tr. (Rough) at 82–83 (C. W.), and Otto's parents were "[t]errified," "afraid to . . . speak out or discuss" Otto "with anyone," *id.* at 16, 23 (F. W.). This same fear was shared by Otto's siblings, *id.* at 45 (G. W.); F. W. Decl. ¶ 7, and Otto's friends, who also declined to speak to the media about North Korea's detention of Otto, H'rg Tr. (Rough) at 59–60 (C. W.).

### c.        Extrajudicial Killing

Next, North Korea's treatment of Otto amounted to an extrajudicial killing.  Under

Section 1605A(h)(7), "extrajudicial killing" has the meaning given to it in the TVPA, which

defines an extrajudicial killing as:

> a deliberated killing not authorized by a previous judgment pronounced by a
> regularly constituted court affording all the judicial guarantees which are
> recognized as indispensable by civilized peoples. Such term, however, does not
> include any such killing that, under international law, is lawfully carried out
> under the authority of a foreign nation.

28 U.S.C. § 1350 (note).  "On its face, this definition contains three elements: (1) a killing; (2)

that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly

constituted court."  *Owens*, 864 F.3d at 770.

As to the first element, the plaintiffs acknowledge that "the precise cause of the condition

that caused Otto's death is unknowable," Pls.' Mot. at 29, but there is overwhelming evidence

that North Korea's barbaric acts were a substantial factor in causing Otto's death.  As the D.C.

Circuit has explained, "jurisdictional causation" is evaluated under a "proximate cause" standard,

which requires "some reasonable connection between the act or omission of the defendant and

the damage which the plaintiff has suffered," such that the act was a "substantial factor," and the

victim's injury was "reasonably foreseeable or anticipated as a natural consequence" of the

defendant's act.  *Owens*, 864 F.3d at 794.

Here, North Korea released Otto from his detention with such irrevocable, extensive

brain damage that this resulted in Otto's death.  Kanter Decl. ¶¶ 9, 16, 21.  Dr. Kanter opined,

"based on a reasonable degree of medical certainty," that Otto "died because of his brain injury,"

which "was caused by the sustained cessation of blood flow to the brain, an injury occurring in

North Korea after the last video that was released of him from his trial and sentencing."  *Id.* ¶ 21.

After reviewing brain scans taken when Otto returned and brain scans from North Korea, Dr.

Kanter opined that "the brain injury occurred in the weeks prior to" an April 2016 brain scan taken in North Korea. *Id.* ¶ 17. Dr. Kanter "diagnosed [Otto's] brain injury as severe and unrecoverable," concluding Otto "could have continued indefinitely with artificial" life support, "but he could not have lived without that assistance." *Id.* ¶ 20. As to North Korea's alternative public claim that Otto died from botulism, F. W. Decl. ¶ 24, Dr. Kanter's team conducted on Otto an "electromyography study," which tests for "neuromuscular junction dysfunction," "an important feature of botulism," Kanter Decl. ¶ 13. The test "was normal, indicating that [Otto] had not contracted botulism while in North Korea that would have caused respiratory failure." *Id.* ¶ 18. That Otto would die from this brain injury was also reasonably foreseeable. According to Mr. Hawk, North Korea released Otto "just before he would have died in detention," H'rg Tr. (Rough) at 98 (Expert David Hawk), deciding it "needed to get him out of the country before he [died] in detention, which would be harder for [North Korea] to explain," *id.* at 104.

With respect to the second element, North Korea deliberately caused Otto's brain damage, which resulted in his death. North Korea's torture methods "pose a substantial danger to human life," and North Korea "routinely withholds medical care from those in its custody, with such frequency that it amounts to an intentional act." Hawk Expert Decl. ¶ 40; *see also id.* ¶ 25 (explaining denial of food rations and imposition of hard labor are also "common" intentional acts resulting in death); Kanter Decl. ¶ 15 ("Because the [brain] injury was so extensive, it was unlikely that [Otto] was with medical personnel who were willing and able to intervene to resuscitate him when the injury occurred."). The expert's conclusions are "more than sufficient" evidence that North Korea deliberately caused Otto's death. *Kim*, 774 F.3d at 1050; *see also id.* at 1051. Moreover, the fact that North Korea continued to detain Otto in this severely compromised condition for over a year, rather than send him home earlier to obtain

medical care, compounds the deliberate nature of that totalitarian state's brutal treatment of Otto.
*See* F.W. Decl. ¶ 12.

Finally, as for the third element, Otto's death was not authorized by a "regularly
constituted court affording all the judicial guarantees which are recognized as indispensable by
civilized peoples."  28 U.S.C. § 1350 (note).  The North Korean criminal judgment against Otto
was illegitimate because North Korea does not have an independent judiciary, fabricated Otto's
"confession," and put on a "show trial."  H'rg Tr. (Rough) at 100–01 (Expert David Hawk);
Collins Expert Decl. ¶ 14 ("[T]he judiciary and prosecutors are thus highly controlled by the
same entity that controls all other party and state apparatuses."); *id.* ¶ 27 (concluding Otto's
"speech at the press conference purporting to confess to the alleged crime was most likely
dictated to him in advance and the product of torture").  Further, even if North Korea's judiciary
were legitimate, Otto's sentence authorized 15 years of hard labor, not death.  Hatch. Decl., Ex.
E (KCNA Article on Otto's "Trial," titled "American Student Sentenced to 15 Years of Hard
Labor in DPRK").

### B.    Personal Jurisdiction

To impose judgment on a foreign state under the FSIA, this Court must have personal
jurisdiction.  Personal jurisdiction over North Korea, as a foreign state, depends on whether
"service has been made under section 1608 of this title."  28 U.S.C. § 1330(b) (defining limits of
personal jurisdiction over foreign states).  Service may be effected under 28 U.S.C. § 1608 in one
of four ways: (1) by "special arrangement for service between the plaintiff and the foreign state,"
(2) "in accordance with an applicable international convention on service of judicial documents,"
or, if the first two options are not applicable, (3) by "sending a copy of the summons and
complaint and a notice of suit, together with a translation of each into the official language of the

foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," or, if service cannot be made under the third option, (4) by requesting the Clerk of the Court to send the aforementioned package to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." 28 U.S.C. § 1608(a).

North Korea has neither made a special arrangement for service with the plaintiffs, Hatch Decl. ¶ 19, nor entered into any international convention governing service, *see* ATTORNEY MANUAL FOR SERVICE OF PROCESS ON A FOREIGN DEFENDANT, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA 6 (July 2018) ("North Korea is not a party to the [Hague] Convention . . . ."). Instead, North Korea was served here under the third option: the necessary papers were mailed through DHL and delivered to North Korea on June 19, 2018, *see* Return of Service, ECF No. 12. Accordingly, the plaintiffs have established that service was properly effected against the defendants and, thus, personal jurisdiction is properly exercised.

### C.     North Korea's Liability

Section 1605A not only "provides federal courts with jurisdiction over, and withdraws sovereign immunity from" certain suits, *see* 28 U.S.C. § 1605A(a)(1), but "also creates a federal cause of action directly against foreign governments," *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs*, 892 F.3d 348, 352–53 (D.C. Cir. 2018). "Under § 1605A(c), 'national[s] of the United States' may sue certain foreign governments—those designated by the U.S. government as state sponsors of terrorism—for the acts described in § 1605A(a)(1)," *id.* at

353 (alteration in original) (quoting § 1605A(c)), such as torture, hostage taking and extrajudicial

killing, "causing 'personal injury or death,'" *id.* at 352–53 (quoting § 1605A(c)). The statute

specifies that, "[i]n any such action, damages may include economic damages, solatium, pain

and suffering, and punitive damages." *Id.* (alteration in original) (internal quotation marks

omitted) (quoting § 1605A(c)).

Here, the plaintiffs, who are all citizens of the United States, have established their first

claim for relief, which seeks to hold North Korea liable under § 1605A(c), the FSIA terrorism

exception's private right of action. *See* Compl. ¶¶ 57–66 (First Claim for Relief Action for

Damages Under 28 U.S.C. § 1605A(c)); Pls.' Mot. at 35–36, 38.[5] To determine liability under

Section 1605A(c), "the elements of immunity and liability . . . are essentially the same," *Kilburn*

*v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010), and liability under section

1605A(c) will, in most cases, "exist whenever the jurisdictional requirements of section 1605A

are met," *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 153 (D.D.C. 2011) (citing *Kilburn*,

699 F. Supp. 2d at 155); *see also Hekmati*, 278 F. Supp. 3d at 163 ("In concluding that there is

jurisdiction over Hekmati's claims . . . the Court has already determined all of the essential

elements for imposing liability under 1605A(c) have been established . . . ."); *Kaplan v. Cent.*

*Bank of Islamic Republic of Iran*, 55 F. Supp. 3d 189, 198 (D.D.C. 2014) ("[P]laintiffs' claims

against North Korea meet [the FSIA terrorism exception's] requirements for purposes of subject-

---

[5]     The plaintiffs bring three other claims based on common law torts. *See* Compl. ¶¶ 67–70 (Second Claim
for Relief based on wrongful death and survival); *id.* ¶¶ 71–74 (Third Claim for Relief based on intentional infliction
of emotional distress); *id.* ¶¶ 75–77 (Fourth Claim for Relief based on assault and battery). The D.C. Circuit has
explained that while a plaintiff may rely on "alternative sources of substantive law," including "state tort law," to
bring a claim against a foreign state after establishing a waiver of sovereign immunity through the FSIA's terrorism
exception, such reliance is not needed. *See Owens*, 864 F.3d at 808–09 ("[I]n most cases brought under the new
terrorism exception, the plaintiff need not rely upon state tort law."). Accordingly, discussion of the plaintiffs' tort-
based claims for relief is unnecessary, since those claims would give rise to no more damages than those available
under the FSIA's private right of action, *see* 28 U.S.C. § 1605A(c), and are therefore "subsumed in the FSIA
claims." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 508 (D.C. Cir. 2018).

matter jurisdiction and liability.").  Accordingly, for the reasons discussed in Part III.A, *supra*, the plaintiffs have established North Korea's liability to them under 28 U.S.C. § 1605A(c), leaving only the amount of damages allowable to the plaintiffs to resolve.

### D.      Damages

Otto's estate seeks to recover economic, pain and suffering, and punitive damages, and Fred and Cindy Warmbier seek solatium and punitive damages.  *See* Pls.' Mot at 2–3.  The damages to which each plaintiff is entitled are described below.

### 1.      Legal Standard for Damages Under Section 1605A(c)

Congress, in creating a private right of action in Section 1605A(c) for victims of state-sponsored terrorism, also provided, in the same subsection, that such foreign states are liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  "Upon obtaining a default judgment, successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'"  *Fraenkel*, 892 F.3d at 353 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003)); *see also Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015); *Roth*, 78 F. Supp. 3d at 402; *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005).  In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injury.  *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

For the reasons detailed *supra*, in Part III.A, the plaintiffs have satisfactorily shown that North Korea's torture, hostage taking and extrajudicial killing of Otto was likely, and reasonably certain, to result in injury and death to Otto and to devastate his family.

### 2. Economic Losses and Medical Expenses (Otto's Estate)

Otto's estate seeks to recover for Otto's "lost earning capacity, or the likely wages that he would have earned had his life not been cut short." Pl.'s Mot. at 40; *see also* Compl. at 21. "Unlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse [a plaintiff's] failure to support the claim for lost earnings with competent evidence." *Moradi*, 77 F. Supp. 3d at 71. A plaintiff, however, may prove lost earnings based on reasoned analysis of an expert economist, *see Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016), as the plaintiffs have done here.

In support of Otto's lost wages, the plaintiffs submitted evidence in the form of a report from Professor James V. Koch, a Board of Visitors Professor of Economics Emeritus and President Emeritus at Old Dominion University, with a Ph.D. from Northwestern University. Koch Report at 12. Mr. Koch accounted for Otto's life expectancy and work life expectancy, as well as Otto's "exceptional[] talent[]," "academic success at UVA," "his attendance at the London School of Economics," and his "signal selection" as a "highly compensated summer intern" at Millstein, a New York City investment firm. *Id.* at 2–3. Mr. Koch then ran three models. *Id.* at 3. The first assumed Otto would reject the "possibility of Wall Street" and instead earn the income of a "typical University of Virginia graduate," and the second assumed Otto would work at Millstein or a "comparable Wall Street firm and do[] good work, but . . . not [be] a star." *Id.* The third model assumed Otto would work at Millstein or a "comparable Wall Street firm," and "advance[] to [the] position of Director after twenty years." *Id.* Relying on his own

"education, training and experience, and accounting for the realities of the marketplace," Mr. Koch concluded, after reviewing Otto's case, that the third model provided the "most credible" estimate of "losses suffered by [Otto's] estate," at $6,038,308. *Id.* at 4. Despite the obvious assumptions underlying this model, Otto excelled at all that he set out to do in his young life, and his "driven" nature, H'rg Tr. (Rough) at 58 (C. W.), makes highly plausible that this success would have continued. Accordingly, Otto's estate is awarded $6,038,308 for his estimated economic losses as a result of North Korea's heinous treatment of him.

The plaintiffs also seek to recover Otto's medical expenses, Compl. at 21, and have submitted satisfactory evidence of those expenses, reflected in itemized medical bills totaling $96,375.80, *see* Hatch Medical Expenses Decl. ¶ 6; *see also id.*, Ex. A (UC Health Itemization of Otto's Hospital Services); *id.*, Ex. B (UC Health Itemization for Physician Providers); *id.*, Ex. C (UC Health Email Summary of Ex. B). *See Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1, 20 (D.D.C. 2007) ("[P]laintiffs, through their own testimony, have reasonably proven the costs incurred as a result of past medical expenses."); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 275 (D.D.C. 2003) ("[Plaintiff] has also requested damages for his past medical expenses and has 'reasonably proven' these expenses through the testimony of his mother.").

Although plaintiffs' counsel represented at the evidentiary hearing that insurance "covered part of" these expenses, H'rg Tr. (Rough) at 134, Otto's medical expenses are still recoverable in full. "[A] district court may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353. The Restatement (Second) of Torts provides that "[p]ayments made or benefits conferred by" collateral sources "do not have the effect of reducing the recovery against the defendant." RESTATEMENT (SECOND) OF TORTS §

920A cmt. b (1979).  Therefore, Otto's estate is awarded $96,375.80 for Otto's medical

expenses.

### 3.   Pain and Suffering (Otto's Estate)

"[W]hen assessing damages for surviving victims of terrorist hostilities," the "baseline

assumption" is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in

damages.'"  *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Davis v.

Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)).  This baseline may be moderated

either upward or downward.  An upward departure would be warranted "in the presence of

'severe instances of physical and psychological pain, such as where victims suffered relatively

more numerous and severe injuries, were rendered quadriplegic, including partially lost vision

and hearing, or were mistaken for dead,' or downward in the face of 'minor shrapnel injuries or

minor injury from small-arms fire.'"  *Id.* at 35–36 (quoting *Valore v. Islamic Republic of Iran*,

700 F. Supp. 2d 52, 84 (D.D.C. 2010)) (citation omitted and alteration adopted).

An award of "$9 to $10 million in compensatory damages" has been appropriate "in

cases where the victims were held as hostages and tortured for extensive periods of time," *Gill v.

Islamic Republic of Iran*, 249 F. Supp. 3d 88, 103 (D.D.C. 2017) (collecting cases), and $10

million has been awarded to an estate when a victim was "subjected to mental and physical

torture before being murdered by means involving the application of 'significant force' to his

jaw," *Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 157 (D.D.C. 2017).

Similar to these cases, North Korea detained Otto for approximately 17.5 months, and

North Korea is known to use extreme methods of torture to extract confessions from those it

detains, including "water-boarding, being forced to squat for several hours, . . . being placed in a

box too small to either stand or lie down in for long periods of time," Collins Expert Decl. ¶ 28,

"string[ing] prisoners up by their wrists from the bars in the cells just with their toes off the floor," forced kneeling or squatting with an "iron ore wooden bar" behind the legs, and beatings, H'rg Tr. (Rough) at 92–93 (Expert David Hawk).  North Korea also returned Otto to the United States with such severe brain injury that he was blind, deaf and completely unresponsive.  F. W. Decl. ¶ 25; H'rg Tr. (Rough) at 33, 36 (F. W.).  While the precise torture applied to Otto for this resulting injury is unknown, the blood flow to his brain was cut off for from five to twenty minutes, Kanter Decl. ¶ 15, which could have been caused by "[w]ater-boarding," "manipulating teeth with pliers," "application of electric shock," or suffocation.  Collins Expert Decl. ¶ 31. Furthermore, Otto's perfectly straight teeth had been rearranged to be misaligned, further indicative of the use of pliers or other tools to inflict that painful damage, plus the scar on his foot may have been caused by multiple applications of electrical shocks.  *Id.* ¶ 30.  Due to the duration of Otto's detention, the public humiliation to which he was subjected with a publicized coerced "confession" and trial, and the severity of the torture to which he was subjected over such a long period of time, Otto's estate is awarded $15 million in compensatory damages for pain and suffering.

### 4.   Solatium (Fred and Cindy Warmbier)

Fred and Cindy Warmbier, in their individual capacities, seek solatium damages to compensate for the emotional distress they experienced as family members of victims of the attack.  "District Court judges have discretion under 28 U.S.C. § 1608(e) to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning."  *Fraenkel*, 892 F.3d at 351. Citing Judge Lamberth's "seminal opinion explaining the origins and particulars of solatium damages" in *Flatow v. Islamic Republic of Iran*, the D.C. Circuit has explained that "'[s]olatium

is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society,'" and was an award that "began as a remedy for the loss of a spouse or a parent," but is now understood to include the loss of a child or a sibling, as well.  *Id.* at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)).

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium."  *Id.* at 356–57 (quoting *Flatow*, 999 F. Supp. at 30) (alteration adopted); *see also Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) ("A claim of solatium seeks compensation for the 'mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort.'" (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009))).  In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

Solatium damages, by their nature, are "unquantifiable," *Moradi*, 77 F. Supp. 3d at 72, and, therefore, this Court has developed a commonly accepted standardized framework, known as the *Heiser* damages framework, for solatium damages, *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *see also Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Though use of the *Heiser* framework is not mandatory, *Fraenkel*, 892 F.3d at 351 ("District Court judges invariably must exercise discretion in determining damages awards under the FSIA.

41

There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted." (emphasis in original)), this Court adopts this framework here in the interest of consistency.  As a baseline, under the *Heiser* framework, parents "received $5 million."  *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010). As noted, "families of victims who have died are typically awarded greater damages than families of victims who remain alive."  *Estate of Heiser*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)).

These numbers serve only as a baseline from which the Court may deviate to compensate for specific circumstances.  *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)).  Factors militating in favor of an award enhancement generally fall into one of three categories: "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing."  *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011).  "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ."  *Id.* at 26.

In Fred and Cindy's case, an upward enhancement is warranted.  "While it is difficult to quantify the grief that" Fred and Cindy "have experienced, and continue to experience, as a result of North Korea's violent actions, these plaintiffs are entitled to compensation for their loss,

pain, mental anguish, and suffering." *Kim*, 87 F. Supp. 3d at 290. There is no question, based on their moving live testimony, that Fred and Cindy were close with Otto and miss him greatly. The circumstances surrounding Otto's detention made North Korea's acts particularly agonizing for his parents. While North Korea detained Otto, this totalitarian state permitted almost no facts regarding his condition to be known, and Fred and Cindy constantly worried about their son, unsure of what was happening to him. *See Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 347 (D.D.C. 2016) (spouse received award of $12 million where "[t]he pain and suffering she has experienced were magnified by the initial lack of information surrounding [victim's] death" and where she had to spend years learning "exactly what happened").

Moreover, families of torture and hostage-taking victims "are typically awarded greater damages than are the families of victims of a single attack," because in the former cases, "the afflicted party not only had to cope with the grief that follows the loss of a loved one, but—at the time of the event—was also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member." *Oveissi*, 768 F. Supp. 2d at 27. Finally, North Korea returned Otto with such extensive brain damage that Otto's parents witnessed his discomfort, monstrous condition and, finally, his death shortly after his return.

Having examined closely the facts of this particular case, Fred and Cindy Warmbier are entitled to $15 million each, to account for their "first-hand observations and acute memories of [their] child's death," *Braun*, 228 F. Supp. 3d at 86, and their agonizing wait for him to return home, *see Kim*, 87 F. Supp. 3d at 290 (awarding $15 million each to brother and son of victim kidnapped and killed by North Korea).

### 5.    Punitive Damages (All Plaintiffs)

The plaintiffs also seek punitive damages, which are awarded not to compensate the

victims, but to "punish outrageous behavior and deter such outrageous conduct in the future."

*Kim*, 87 F. Supp. 3d at 290 (internal quotation marks omitted) (quoting *Bodoff v. Islamic*

*Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012)); *see also* RESTATEMENT (SECOND) OF

TORTS § 908(1) (1979).  Punitive damages are warranted where "defendants supported,

protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known

terrorist organization whose modus operandi included the targeting, brutalization, and murder of

American citizens and others."  *Baker*, 775 F. Supp. 2d at 85.  North Korea's conduct toward

Otto justifies the imposition of significant punitive damages here.  *See, e.g.*, *Hekmati*, 278 F.

Supp. 3d at 166 (punitive damages awarded where plaintiff was held in solitary confinement,

beaten, threatened, and psychologically battered for years in Iran).

In determining the appropriate amount of punitive damages, courts consider "(1) the

character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the

defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the

defendants."  *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 41 (D.D.C. 2012) (quoting

*Acosta*, 574 F. Supp. 2d at 30).  Taking these factors into account, several approaches have been

articulated for calculation of the appropriate amount of punitive damages in state-sponsored

terrorism cases.  One approach is to multiply the foreign state's "annual expenditures on

terrorism" by a factor between three and five.  *See Baker*, 775 F. Supp. 2d at 85 (citing *Valore*,

700 F. Supp. 2d at 88–90; *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 30–

31; *Acosta*, 574 F. Supp. 2d at 31); *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 26

(D.D.C. 2011).  This approach, which may result in awards in the billions of dollars, has been

used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen. *See Baker*, 775 F. Supp. 2d at 85. A second approach bases punitive damages on "the ratio of punitive to compensatory damages set forth in earlier cases," if similar conduct has been previously litigated. *See Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 31 (D.D.C. 2014); *Goldberg–Botvin v. Islamic Republic of Iran*, 938 F. Supp. 2d 1, 11–12 (D.D.C. 2013). A third approach awards a fixed amount of $150,000,000 per affected family. *See Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 233 (awarding $300,000,000 in total to two victims and their families); *Baker*, 775 F. Supp. 2d at 86 (awarding $150,000,000 each to families of three deceased victims); *Gates*, 580 F. Supp. 2d at 75 (awarding $150,000,000 each to the estates of two victims).

In this case, although egregious, Otto's detention in North Korea is not on the scale of an exceptionally deadly attack against many Americans, making the first method, which might result in an award in the billions of dollars, as the plaintiffs request, *see* Pls.' Mot. at 44, out-of-line with analogous circumstances. In addition, the first method requires knowing how much North Korea spends on terrorist activities, and that information is not available. *See Kim*, 87 F. Supp. 3d at 291 (explaining that "[n]o such information for North Korea is readily accessible, . . . if it is accessible at all"). The second method, likewise, is not appropriate since Otto's case is unique.

The third approach, thus, is the most appropriate, but recognizing that North Korea has committed acts that are "awful and worthy of the gravest condemnation," *id.* (quoting *Roth*, 78 F. Supp. 3d at 405), and that North Korea is "keenly aware" of the "political environment" in the United States, including judgments issued by United States courts, H'rg Tr. (Rough) at 131–32 (Expert Prof. Sung-Yoon Lee), a larger award is appropriate to punish and deter North Korea.

Accordingly, punitive damages are awarded to each of the three plaintiffs in the amount of $150 million, for a total of $450 million in punitive damages.  *See Kim*, 87 F. Supp. 3d at 291 (awarding $300 million in punitive damages in 2015, based on North Korea's "presumed torture" of a missionary in North Korea, which was insufficient to deter North Korea in 2016 in Otto's case).

## IV.    CONCLUSION

For the reasons outlined above, the plaintiffs' motion for default judgment is granted. North Korea is liable for the torture, hostage taking, and extrajudicial killing of Otto Warmbier, and the injuries to his mother and father, Fred and Cindy Warmbier.  The plaintiffs are awarded monetary damages in the following amounts: Otto Warmbier's estate is entitled to $6,038,308 in economic losses, $96,375.80 in medical expenses, $15,000,000 in pain and suffering, and $150,000,000 in punitive damages.  Fred and Cindy Warmbier are each entitled to $15,000,000 in solatium damages and a total of $300,000,000 in punitive damages.  Thus, the total damage award is $501,134,683.80.


Date: December 24, 2018


_____
BERYL A. HOWELL
Chief Judge