**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WARMBIER, *et al.*,
                        Plaintiffs,

            v.

DEMOCRATIC PEOPLE'S REPUBLIC OF
KOREA,
                        Defendant.

Civil Action No. 18-977 (BAH)
Judge Beryl A. Howell

**MEMORANDUM AND ORDER**

Plaintiffs, Frederick and Cynthia Warmbier, in their individual capacities and as representatives of the estate of their son, Otto Warmbier, seek turnover of $17,131,065.73 of blocked assets held in a JPMorgan account, plus interest between April 1, 2026, and the date of turnover (the "Blocked Assets"), in satisfaction of plaintiffs' $501,134,683.80 judgment against the Democratic People's Republic of Korea ("North Korea") for the torture, hostage-taking, and extrajudicial killing of Otto. *See* Pls.' Unopposed Mot. for Turnover Order and Final Judgment ("Pls.' Mot."), ECF Nos. 85 (sealed), 87 (redacted); *see also Warmbier v. Democratic People's Republic of Korea* ("*Warmbier I*"), 356 F. Supp. 3d 30 (D.D.C. 2018), ECF No. 25. For the reasons explained below, plaintiffs' motion is granted.

**I.     BACKGROUND**

In 2018, plaintiffs were awarded a $501,134,683.80 judgment against North Korea for the torture, hostage-taking, and extrajudicial killing of Otto Warmbier in 2016 and 2017. *See Warmbier I*, 356 F. Supp. 3d at 60. In April 2019, plaintiffs were granted permission to attach North Korean assets in satisfaction of judgment, as required for plaintiffs to make such attachments under 28 U.S.C. § 1610(c) ("No attachment or execution . . . shall be permitted until the court has

1

ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter."). *See* Order Pursuant to 28 U.S.C. § 1610, ECF No. 32.

In May 2025, plaintiffs moved to attach the Blocked Assets, alleging that the assets were the property of an entity called the A.Q. Khan Network, that the A.Q. Khan Network is an agency or instrumentality of North Korea, and that the assets are therefore subject to attachment in satisfaction of the Warmbiers' judgment pursuant to the Terrorism Risk Insurance Act's § 201. Pls.' Mot. for Issuance of Writ of Attachment, ECF No. 60; *see also* Terrorism Risk Insurance Act, Pub. L. 107-297 § 201, 116 Stat. 2322, 2337 (2002) (codified at 28 U.S.C. § 1610 Note).  After supplemental briefing on the question whether this Court had jurisdiction to attach the Blocked Assets, which are held in a JPMorgan account located in New York, *see* Minute Order (Sept. 19, 2026) (requesting supplemental briefing); Pls.' Suppl. Mem. in Support of Mot. for Writ of Attachment, ECF Nos. 62 (sealed), 84-5 (redacted), and finding that such jurisdiction existed, the writ of attachment was issued in November 2025, *see Warmbier v. Democratic People's Republic of Korea* ("*Warmbier II*"), No. 18-cv-977 (BAH), 2026 WL 1393272 (D.D.C. Nov. 26, 2025), ECF Nos. 65 (sealed), 84-6 (redacted); Writ of Attachment, ECF Nos. 66 (sealed), 84-7 (redacted). JPMorgan responded, expressing "deep sympathy" for the Warmbiers and stating that the bank "does not contest" either personal jurisdiction or the Court's *in rem* jurisdiction to order attachment of and execution on the Blocked Assets.  JPMorgan's Answer to Writ of Attachment ("JPMorgan Answer") ¶¶ 2, 9-10, ECF Nos. 75 (sealed), 84-17 (redacted).  In addition, JPMorgan did "not seek to impede any TRIA judgment creditor's efforts to execute on blocked funds," but, at the same time, the bank had an interest "in ensuring that any order or judgment directing it to turn over blocked assets . . . is immune from valid future challenge." *Id*. ¶ 2.  To this end, JPMorgan outlined

2

certain factual and legal findings necessary for turnover of the assets, *id.* ¶¶ 11-22, and advocated for notice to multiple entities with a potential interest in the Blocked Assets, *id.* ¶¶ 23-28.

Plaintiffs provided notice of attachment to numerous potentially interested parties: North Korea, JPMorgan, the A.Q. Khan Network, three banks through which the assets either flowed prior to landing in the JPMorgan account or where the assets were intended to flow thereafter, the purported originator and beneficiary of the assets, and the judgment-creditors from *Calderon-Cardona v. Democratic People's Republic of Korea*, No. 08-cv-1367 (D.P.R.), who also hold a judgment against North Korea. *See* Pls.' Aff. of Service of Writ of Attachment, ECF No. 68 (North Korea); Pls.' Proof of Notice, ECF No. 76, 84-18 (redacted) (others); Decl. of Michael Bass, ECF No. 81 (others). Thereafter, the Court directed plaintiffs to file, by May 1, 2026, any motion for turnover of the assets and judgment against JPMorgan, Minute Order (Mar. 19, 2026), and all documents related to the attachment were unsealed, in full or in part, Minute Order (Apr. 22, 2026); Minute Order (May 6, 2026).

Plaintiffs timely filed the instant motion for turnover and final judgment against JPMorgan as the garnishee holding assets owned by the A.Q. Khan Network, which this Court has already found reason to believe is an agency or instrumentality of North Korea, *Warmbier II*, 2026 WL 1393272, at *6-10, and whose assets are therefore subject to execution under § 201 of the Terrorism Risk Insurance Act, in satisfaction of judgment against North Korea, Pls.' Mot. at 6. The Court set a May 29, 2026, deadline on the public docket for any person to oppose plaintiffs' motion or object to an order directing JPMorgan to turn over the Blocked Assets to plaintiffs, Minute Order (May 6, 2026), and no such objection has been filed. For its part, JPMorgan "does not take a position on the motion or the relief requested" therein and has filed no opposition or response to the motion. Pls.' Mot. at 2.

## II.    APPLICABLE D.C. LAW

Under Federal Rule of Civil Procedure 69, once a money judgment is rendered, "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." FED. R. CIV. P. 69(a)(1). Thus, District of Columbia law governs the applicable procedure for attachment and execution here.

Under District of Columbia law, two steps are required to satisfy a judgment by seizing assets of the judgment debtor that are held by another person (the "garnishee"). First, in the "writ of attachment" step, "[a]n attachment shall be levied upon credits of the defendant, in the hands of a garnishee, by serving the garnishee with a copy of the writ of attachment . . . and a notice that property or credits of the defendant in his hands are seized by virtue of the attachment." D.C. Code § 16-546; *see id.* § 16-544. The judgment creditor seeking satisfaction of the judgment may, when attaching the property belonging to the judgment debtor, "submit interrogatories in writing" with the writ of attachment "to be served upon any garnishee, asking about any property of the defendant in his in his possession or charge, or indebtedness of his to the defendant at the time of the service of the attachment." *Id.* § 16-552(a). "Service of the writ on the garnishee creates a valid lien in favor of the judgment creditor on the debtor's property held by the garnishee." *Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1352 (D.C. 1994); *see Mercado v. Carmel Partners Constr.*, No. 22-cv-3083 (TSC), 2025 WL 1654514, at *1 (D.D.C. Apr. 30, 2025) (describing this process).

Second, at the "turnover" step, "within ten days after service" of the writ of attachment upon the garnishee, the "garnishee or [a] stranger to the action who may make claim to the property attached may file an answer defending against the attachment." D.C. Code §§ 16-551, 16-552(a).

The garnishee may defend against the action, for example, by challenging the jurisdiction of the court over the garnishee or denying the garnishee is in possession of the judgment debtor's property. *See, e.g.*, *Metro. Roofing & Sheet Metal Co. v. Franklin Inv. Co.*, 256 A.2d 913, 914-15 (D.C. 1969). Absent meritorious defenses, within four weeks of the due date for the interrogatories or within a later time authorized by the Court, the judgment-creditor may file an application for judgment before the court issuing the writ of attachment. D.C. Super. Ct. R. 69-I(e)(2). That court must then determine whether "the credits have been found" "in [the garnishee's] hands" and, if so, "judgment shall be entered against [the garnishee] for the amounts of the credits admitted or found, not exceeding the amount of the plaintiff's judgment, . . . and execution shall be had thereon." D.C. Code § 16-556.

In sum, at the request of a judgment-creditor, a court may issue a writ of attachment *ex parte* to be served on a garnishee holding assets of the judgment debtor. Upon service of the writ, a lien is created in favor of the judgment creditor. Then, the garnishee and any other interested parties may contest whether the property may be used to satisfy judgment. If the garnishee admits to having the property of the judgment debtor and the opportunity to contest the turnover lapses, the court must enter judgment against the garnishee and allow the judgment creditor to execute on the property by issuing a so-called turnover order directing the garnishee to give the property to the creditor.

In addition to consideration of the process requirements set out in local law, Rule 69 also requires consideration of any applicable federal statute "to the extent it applies." FED. R. CIV. P. 69(a)(1). The TRIA's § 201 allows execution of a judgment held "against a terrorist party on a claim based upon an act of terrorism" on "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)," to "the extent of any

5

compensatory damages for which such terrorist party has been adjudged." TRIA § 201(a). A "blocked asset" is "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)." TRIA § 201(d)(2).

## III.   DISCUSSION

To execute against the blocked assets, under the TRIA, plaintiffs, as the judgment creditor, must show that: (1) they hold a judgment against a terrorist party based on an act of terrorism; (2) the A.Q. Khan Network is an agency or instrumentality of the terrorist judgment-debtor party; (3) the Blocked Assets are owned by the A.Q. Khan Network; (4) the assets are blocked pursuant to one of the statutes listed in the TRIA, *see Stansell v. Revolutionary Armed Forces of Colombia*, No. 10-mc-471 (TJK), 2020 WL 3893017, at *2 (D.D.C. July 10, 2020); and (5) their judgment has yet to be satisfied and executing on the Blocked Assets will not exceed the "extent of any compensatory damages," TRIA § 201(a); *see also Stansell*, 2020 WL 3893017, at *1 (noting that "[p]laintiffs still have $298,030,624.78 outstanding from their judgment against the [the judgment-debtor], far more than the credits in [the accounts to be executed on]"). Additionally, under Federal Rule of Civil Procedure 69, they must show that compliance with the requirements of the D.C. post-judgment attachment statute, namely, that (6) they gave notice of the attachment to both the garnishee and the judgment-debtor, allowed sufficient time for the garnishee, judgment debtor, or any "stranger" to oppose the execution, and filed a timely motion for turnover. *Mercado*, 2025 WL 1654514, at *1 (issuing judgment against garnishee and turnover order upon compliance with these procedures).

At the outset, neither the D.C. post-judgment execution statute nor the TRIA specifies the standard of proof to establish these requisite elements for a turnover order against an agency or

instrumentality of a terrorist state, *i.e.*, in determining whether the assets targeted for attachment by the judgment creditor belong to an entity that is an agency or instrumentality of the judgment debtor.  Neither the D.C. Court of Appeals or other local courts, nor the D.C. Circuit has addressed this issue, though courts elsewhere have applied a "preponderance of the evidence" standard.  *See, e.g.*, *Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 472 (S.D.N.Y. 2017), v*acated and remanded on other grounds sub nom. In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147 (2d Cir. 2019), *and rev'd and remanded on other grounds sub nom. Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019) (applying a "preponderance of the credible evidence" standard to determine whether an entity was an agency or instrumentality of a terrorist state); *see also Kelley v. Stevanovich*, 40 F.4th 779, 788 (7th Cir. 2022) ("[U]nless the governing statute (or . . . rule) specifies a higher burden, or the Constitution demands a higher burden because of the nature of the individual interests at stake, proof by a preponderance of the evidence will suffice." (omission in original) (internal quotation marks omitted)).  When viewing the evidence, the D.C. Circuit has instructed that district courts must consider that "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism—including, at the time, the DPRK [North Korea]— to account for their repressive practices," and "to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins," by "refus[ing] to appear in court and subject [themselves] to discovery," and "intimidat[ing] defectors and potential witnesses" to "prevent[] evidence from leaving [their] borders."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1046, 1048 (D.C. Cir. 2014).  These considerations are equally applicable when evaluating the relationship between a terrorist state and its alleged instrumentality, which both entities have every reason to keep secret.  With these

7

limitations in mind, plaintiffs must show no more than a preponderance of the evidence that the requirements for execution are met.

Several of the prerequisites necessary for issuance of a turnover order are amply satisfied. First, the Warmbiers hold a judgment against a "terrorist party," namely, North Korea, for "an act of terrorism" when North Korea tortured and killed Otto Warmbier. *See Warmbier I*, 356 F. Supp. 3d at 54-55 (finding North Korea liable under the state sponsor of terrorism cause of action in the Foreign Sovereign Immunities Act). Second, the Blocked Assets to be turned over are frozen pursuant to the Trading With the Enemy Act ("TWEA"). *See* Pls.' Mem. in Support of Mot. for Writ of Attachment ("Pls.' Writ Mem.") ¶ 17, ECF Nos. 60-2 (redacted), 84-2 (citing TWEA's implementing regulation codified at 31 C.F.R. pt. 510); Pls.' Mot. for Writ of Attachment, Annex A, Decl. of Justin M. Sher, Pls.' Counsel ("Sher Decl.") ¶¶ 2-3, ECF No. 60-3 at 2 (same); Sher Decl., Ex. A, Letter from R. Richard Newcome, Dir., OFAC, to Chase Manhattan Bank ("OFAC Compliance Letter") (July 23, 1997), ECF No. 60-3 at 7 (directing JPMorgan's predecessor in interest to block the Blocked Assets upon their arrival at the bank pursuant to sanctions against North Korea). Third, the Warmbiers' judgment has yet to be satisfied. The Warmbiers were awarded $51,038,308.00 in compensatory damages and have collected only $2,465,806.57. *See Warmbier*, 356 F. Supp. 3d at 56-58; Writ of Attachment at 1. JPMorgan admits that the value of the Blocked Assets is approximately $17,131,065.73. *See* JPMorgan's Answer ¶ 1; Pls.' Mot. at 2 n.1 (providing updated figure). Thus, turnover of these assets will not exceed the extent to which compensatory damages were awarded to the Warmbiers. *See* TRIA § 201(a) (allowing attachment of blocked assets "to the extent of any compensatory damages for which such terrorist party has been adjudged"). Fourth, as described *supra* in Part I, plaintiffs have complied with and gone beyond the procedures designated under D.C. attachment law by giving notice not only to the

garnishee and judgment debtor, but also to potentially interested parties, giving them time to respond, and timely filing a motion for turnover.

The remaining two prerequisites for turnover of the Blocked Assets are whether the assets JPMorgan admittedly holds belong to the A.Q. Khan Network and, if so, whether the A.Q. Khan Network is an agency or instrumentality of North Korea.  This Court already found, when attaching the Blocked Assets, "reason to believe" that these two requirements were met, based on two detailed expert reports and other supporting OFAC materials provided by plaintiffs.  *Warmbier II*, 2026 WL 1393272, at *6-10.  The evidence underlying this finding is uncontested by any potentially interested party and is sufficient to establish by a preponderance of the evidence that these final requirements are met, for the reasons already explained in *Warmbier II*, 2026 WL 1393272, at *6-10.  Specifically, more likely than not, the A.Q. Khan Network is the originator of the Blocked Assets, and the A.Q. Khan Network is an agency or instrumentality of North Korea.  Under binding precedent, "terrorist victims may attach OFAC blocked electronic funds transfers if those funds can be traced to a terrorist owner," meaning that the funds originated with the terrorist owner, and "no intermediary or upstream bank asserts an interest as an innocent third party."  *Estate of Levin v. Wells Fargo Bank, N.A.*, 45 F.4th 416, 421, 423 (D.C. Cir. 2022).[1]  Those

---

[1]    Binding D.C. Circuit law treats frozen electronic funds transfers ("EFTs") as "the blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of [a] terrorist party)," TRIA § 201(a), if the terrorist party originated the transfer, even if the EFT passed through other banks prior to being frozen.  In its answer to the writ of attachment, JPMorgan raised the question "which Circuit's law governs the issue of who has a property interest in the Blocked Assets."  JPMorgan's Answer ¶ 20.  The D.C. Circuit has expressly considered this choice-of-law question and concluded that the D.C. Circuit's interpretation of the TRIA, which allows that "terrorist victims may attach OFAC blocked electronic funds transfers if those funds can be traced to a terrorist owner," governs rather than either the Uniform Commercial Code or the law of the state where the assets are located.  *Levin*, 45 F.4th at 421 n.11, 423 ("We acknowledge that the Second Circuit appears to have adopted U.C.C. Article 4A, or at least New York's version of it, as federal common law for all electronic funds transfers in cases such as this one within its non-diversity jurisdiction. . . .  We also acknowledge that our opinion aligns with the dissenting opinion in that case."); *id.* at 419 (noting that the funds at issue were located in "an account in South Dakota" but nonetheless applying the D.C. Circuit's interpretation of the TRIA).  In contrast to this precedent from the D.C. Circuit, under Second Circuit law, the only party with an interest in a mid-stream electronic funds transfer, such as the Blocked Assets, is the party who "transmitted the EFT directly to the bank where the EFT is held pursuant to the block."  *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1002 (2d Cir. 2014).  Here, the direct transferor to JPMorgan was Deutsche

conditions have been precisely met here because plaintiffs have shown that the A.Q. Khan Network, an agency or instrumentality of the terrorist judgment-debtor North Korea, was the true sender of the Blocked Assets. Indeed, none of the intermediary parties, all of whom received actual notice of this proceeding, have asserted any interest in the Blocked Assets.

Thus, plaintiffs have satisfied all elements required, under both the D.C. post-judgment attachment procedures and the TRIA, to direct turnover of the Blocked Assets in satisfaction of their judgment against North Korea.[2] JPMorgan is therefore directed to turn over the Blocked Assets to plaintiffs.[3]

---

Bank, through which the EFT pinged immediately prior to arriving at JPMorgan. Pls.' Writ Mem. ¶ 19. Even if the D.C. Circuit had not already made clear what law applies here, Deutsche Bank received notice of this action on February 13, 2026, *see* Pls.' Proof of Notice, Ex. 7, Deutsche Bank Notice, ECF No. 76-7, and did not challenge either the attachment of the assets or plaintiffs' application for a turnover order.

[2]     JPMorgan and plaintiffs agree that, once a final judgment and turnover order are entered pursuant to the TRIA, JPMorgan may turn the Blocked Assets over to plaintiffs without any additional license from OFAC. Pls.' Mot. at 13; JPMorgan's Answer ¶ 10 n.2; *see also Stansell*, 2020 WL 3893017, at *3 ("[W]hen a plaintiff executes assets under the TRIA, she need not obtain [an OFAC] license."); *Rubin v. Islamic Republic of Iran*, 709 F.3d 49, 54 (1st Cir. 2013) (noting that the TRIA "allows a person to circumvent the normal process for attaching assets that are blocked under a sanctions program, which entails obtaining a license from OFAC"); *Est. of Heiser v. Bank of Tokyo Mitsubishi UFJ*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013) ("[I]n the event a court determines that blocked assets are subject to TRIA, those funds may be distributed without a license from OFAC.").

[3]     Without explanation or citation to any statute or caselaw, plaintiffs offer a proposed order that includes broad releases of JPMorgan, including that, after turning over the Blocked Assets, "JPMorgan . . . shall be fully discharged, released, and held harmless from any and all liability or obligations to plaintiffs, North Korea, . . . and any other person or entity anywhere in the world based on, arising from, or otherwise relating to this payment"; and that "plaintiffs, North Korea, . . . and all other persons or entities with notice of this Order are hereby permanently restrained and enjoined from instituting or pursuing any other legal actions or proceedings, whether pending or future, against the JPMorgan . . . as to funds that are covered by this Order." *See* Pls.' Proposed Order at 5-6, ECF No. 85-1 (sealed); 87-1 (redacted). Although JPMorgan refers to these as "standard provisions" in its Answer, *see* JPMorgan's Answer ¶ 29, turnover orders in this District do not generally include this language, *see, e.g.*, Opinion and Order at 2-3, *Mercado*, No. 22-cv-3083 (TSC) (D.D.C. Apr. 30, 2025); Order, *Stansell*, No. 10-mc-471 (TJK) (D.D.C. July 10, 2020); *Est. of Heiser v. Islamic Republic of Iran*, No. 00-cv-2329 (RCL) (D.D.C. Aug. 10, 2011), unless they follow an interpleader action, *see, e.g.*, *Heiser*, No. 00-cv-2329 (RCL) (D.D.C. June 9, 2016) (including similar provisions after bank garnishees filed interpleader). That said, plaintiffs' thorough efforts to give notice to potentially interested parties, including all parties suggested by JPMorgan, *see* JPMorgan's Answer ¶¶ 23-28, and the finality of this Order directing turnover of the funds should provide JPMorgan with sufficient protection against any belated competing claim to the Blocked Assets. If plaintiffs or JPMorgan believe such releases are justified despite no interpleader having been filed, they may request entry of such an order separately.

## IV.    CONCLUSION AND ORDER

Upon consideration of plaintiffs' Motion for Turnover Order and Final Judgment, ECF No. 85, the legal memorandum in support, JPMorgan's Answer to the Writ of Attachment, ECF No. 75, and the entire record herein, it is hereby—

**ORDERED** that plaintiffs' Unopposed Motion for Entry of a Turnover Order and Final Judgment, ECF No. 85, is hereby **GRANTED**; it is further

**ORDERED** that judgment is entered in favor of plaintiffs with respect to the turnover of the Blocked Assets in the sum of $17,131,065.73, plus any additional interest accrued between April 1, 2026, and the date that the funds are remitted to plaintiffs' counsel; it is further

**ORDERED** that JPMorgan shall pay and turn over to plaintiffs' counsel the Blocked Assets in the account containing the Blocked Assets and ending in –1504[4] in the sum of $17,131,065.73 within ten business days after this Order has become final and non-appealable, whether by expiration of all applicable periods for appeal or, if an appeal is taken, upon final resolution of such appeal (including any Supreme Court review or expiration of the time to seek certiorari), via wire transfer pursuant to wire instructions provided by plaintiffs' counsel, in partial satisfaction of the Warmbiers' judgment against North Korea; it is further

**ORDERED** that within fifteen business days of the last day of the month in which the above payment is made, JPMorgan shall pay to plaintiffs' counsel, pursuant to the above-referenced wire instructions, any interest accrued on account ending in –1504 between April 1, 2026, and the date that the above funds were remitted to plaintiffs' counsel; and it is further

**ORDERED** that upon JPMorgan's delivery to plaintiffs of the Blocked Assets in accordance with this Order, the Writ of Attachment, ECF No. 66, and any and all other restraints,

---

[4]    The account is titled ██████████████████████.

11

attachments, or encumbrances imposed upon the Blocked Assets in connection with this proceeding are hereby vacated and dissolved, and JPMorgan shall have no further obligation to hold, block, or otherwise restrict the Blocked Assets on account of such Writ or restraint.

**SO ORDERED.**

*This is a final and appealable order.*

Date: June 11, 2026

_____
**BERYL A. HOWELL**
United States District Judge